**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BLAKE BAXTER, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>PDD HOLDINGS INC. F/K/A PINDUODUO INC., LEI CHEN, JING MA, JUN LIU, and JIAZHEN ZHAO,<br><br>Defendants | Case No. 24-cv-05653-PKC-CLP<br><br>CLASS ACTION<br><br>DEMAND FOR JURY TRIAL |

**CONSOLIDATED COMPLAINT FOR**
**VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION ..... 2

II. JURISDICTION AND VENUE ..... 6

III. PARTIES ..... 7

A. Lead Plaintiff ..... 7

B. Defendants ..... 7

IV. BACKGROUND FACTS ..... 9

A. Overview of PDD's Business ..... 9

B. PDD's Use of Forced Labor in Violation of the UFLPA ..... 10

C. PDD's Platform Illegally Acted as Spyware When Installed on User's Devices ..... 15

D. The Defendants' Materially False and Misleading Representations Made During the Class Period ..... 20

V. DEFENDANTS' VIOLATIONS OF THE EXCHANGE ACT` ..... 23

A. Defendants' Materially False and Misleading Statements and Omissions in Violation of Section 10(b) of the Exchange Act ..... 23

1. Misstatements Related to Forced Labor Allegations ..... 23

2. Misstatements Related to the Company's Platform Acting as Spyware ..... 30

3. PDD Reveals the Cost of Addressing These Critical Issues ..... 43

B. Defendants Acted with Scienter When They Made or Caused to be Made Material Misstatements and Omissions in Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder ..... 47

1. Indications of Knowledge and/or Reckless Disregard in Not Knowing All Undisclosed Adverse Facts ..... 50

VI. DEFENDANTS VIOLATIONS OF ITEM 303 OF REGULATION S-K ..... 53

VII. CONTROL PERSON ALLEGATIONS ..... 54

VIII. LOSS CAUSATION ........................................................................................ 57

IX. PRESUMPTION OF RELIANCE ........................................................................ 61

X. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ........................................................................ 63

XI. CLASS ACTION ALLEGATIONS ........................................................................ 64

COUNT I For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants ........................................................................ 65

COUNT II For Violation of Section 20(a) of the Exchange Act Against the Individual Defendants ........................................................................ 68

Court-appointed Lead Plaintiff Boston Retirement System ("BRS" or "Lead Plaintiff"), individually and on behalf of all other persons similarly situated, by its undersigned counsel, alleges the following against: (i) PDD Holdings Inc., f/k/a Pinduoduo Inc. ("PDD[1]" or the "Company"); and (ii) Lei Chen ("Chen"), Jing Ma ("Ma"), Jun Liu ("Liu"), and Jiazhen Zhao ("Zhao") (the "Individual Defendants" and, together with PDD, the "Defendants").

Lead Plaintiff's allegations are based upon personal knowledge as to itself and its own acts and upon information and belief as to all other matters, based on the investigation conducted by and through Lead Plaintiff's counsel, Labaton Keller Sucharow LLP ("Lead Counsel"), which includes, among other things a review of: (i) PDD's filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) research reports by securities and financial analysts; (iii) transcripts of PDD's conference calls with analysts and investors; (iv) PDD's presentations, press releases, and reports; (v) news and media reports concerning the Company and other facts related to this action; (vi) data reflecting the pricing of PDD stock; (vii) a June 22, 2023 congressional report titled "Fast Fashion and the Uyghur Genocide: Interim Findings" written by the United States Select Committee on the Chinese Communist Party (the "Congressional Report"); (viii) a complaint filed by the Arkansas Attorney General on June 25, 2024 in the Circuit Court of Cleburn County, Arkansas Civil Division captioned *State of Arkansas v. PDD Holdings Inc. and Whaleco Inc. d/b/a Temu*, Case No. 12-CV-24-149 (the "Arkansas Complaint"); and (ix) other material and data concerning the Defendants, as identified herein.[2]

Lead Counsel's investigation into the factual allegations continues, and many of the relevant facts are known only by Defendants or are exclusively within Defendants' custody or

---

[1] The definition of "PDD" herein also includes Temu.

[2] Unless otherwise noted, all emphasis is added and internal quotations and citations are omitted.

control. Lead Plaintiff believes that substantial additional evidentiary support is likely to exist for the allegations set forth herein after a reasonable opportunity for further investigation or discovery. Lead Plaintiff alleges as follows:

## I. INTRODUCTION

1. This securities class action is brought against PDD and the Individual Defendants for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder and alleges fraud by these Defendants. This class action is brought on behalf of all persons or entities who or which purchased or otherwise acquired the Company's publicly traded American Depository Shares ("ADS" or "ADSs") during the period from April 30, 2021 through August 23, 2024, inclusive (the "Class Period"), and were damaged thereby (the "Class").

2. Congress passed the Exchange Act during the Great Depression, to substitute a philosophy of full disclosure for the then-prevailing philosophy of *caveat emptor* and, thus, to achieve a high standard of business ethics in the securities industry that remains the default rule to this day. The Exchange Act gives rise to liability for false, misleading, and incomplete statements made in connection with the purchase or sale of securities to maintain confidence in our public securities markets. It is designed with flexibility in mind, "to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *SEC v. W. J. Howey Co.*, 328 U.S. 293, 299 (1946).

3. Throughout the Class Period, PDD and the Individual Defendants engaged in an undisclosed do-anything-necessary endeavor in its quest for profits and growth. However, PDD and the Individual Defendants fraudulently and affirmatively concealed from investors what exactly they had put at stake and what risks were taken to achieve profits and growth. Unfortunately, this quest was undertaken at the expense of the Company's investors, those

affected by forced labor abuses in China's Xinjiang Uyghur Autonomous Region, and users of the PDD and Temu platforms whose privacy was violated when the Company's platforms acted as spyware when downloaded by users on their personal devices. Ultimately, PDD's investors were kept in the dark as to the full scale of the risks taken by PDD and the Individual Defendants until the cost of the Defendants' Class Period acts was revealed on August 26, 2024.

4. Regarding forced labor abuses and PDD's compliance with the Uyghur Forced Labor Prevention Act ("UFLPA"), Defendants touted to investors in its Annual Report for the year ended December 31, 2023 on SEC Form 20F filed on April 25, 2024 (the "2023 Annual Report") that PDD "require[s] merchants on the Temu platform to comply with [PDD's] third-party code of conduct, which strictly prohibits the use of forced penal, or child labor." It further assured investors that the Company had "establish[ed] policies and procedures to ensure that no seller on the Temu platform is on the UFLPA Entity List, and use[d] technology to identify products that are at higher risk of non-compliance." In another instance in the same report, Defendants went so far as to inform investors that PDD "strive[s] to comply with all laws and regulations that are applicable to [its] operations around the world," which would include the UFLPA. As described below, these statements, among others made by Defendants regarding forced labor and PDD's compliance with the UFLPA, proved to be false.

5. Regarding PDD's platform acting as spyware, Defendants informed investors in PDD's Annual Report for the year ended December 31, 2020 on SEC Form 20F (the "2020 Annual Report") that PDD merely "collect[ed] anonymized, non-confidential user behavior and pattern data based on their interactions with [PDD's] platform through [the Company's] social network partners, which [was] pre-processed to exclude user identity or other sensitive information." The Company even further explained that "internet and data security" was critical

to PDD's "business and competitiveness." In another instance, Defendants boasted to investors that PDD had "adopted strict security policies and measures, including encryption technology, to protect our proprietary data and buyer information"[3] and that the Company "ha[s] always been strictly compliant with China's data security standards as regulators and . . . will also keep holding [itself] to a higher standard."[4] Importantly, Defendant Zhao expressly denied reports that PDD platform applications have hidden functions that allow for extensive data exfiltration.[5]

6. These statements, among many others made by Defendants, however, proved to be false, and shortly thereafter the issues of forced labor and use of spyware came to light. Defendants were forced to confront the consequences of their actions and had to make the difficult business decision to announce on August 26, 2024 that PDD had decided not to issue dividends or repurchase shares for the "foreseeable years ahead." The market was shocked and PDD's stock price collapsed by nearly 30%. As described below, PDD's reasons for this sharp decline were: (1) intensifying competition; (2) PDD taking on greater social responsibility as a result of the wrongful acts it committed relating to forced labor and spyware; and (3) improvements in compliance at PDD. In other words, PDD had to expend a tremendous amount of capital going forward to correct its previously undisclosed compliance and personal data security failures.

7. On a related earnings call, which took place before markets opened (7:30 a.m. ET) on August 26, 2024 ("Q2 2024 Earnings Conference Call"), Defendants attributed the

---

[3] PDD Holdings Inc., 2020 Annual Report, (SEC Form 6-K) (Apr. 30, 2021); PDD Holdings Inc., 2021 Annual Report (SEC Form 6-K) (Apr. 22, 2022); PDD Holdings Inc., 2022 Annual Report (SEC Form 6-K) (Apr. 26, 2023); PDD Holdings Inc., 2023 Annual Report (SEC Form 6-K) (Apr. 25, 2024).

[4] PDD Holdings Inc., Q2 2021 Earnings Call Transcript, (Aug. 29, 2022).

[5] PDD Holdings Inc., Q3 2023 Earnings Call Transcript, (Nov. 28, 2024).

Company's poor performance and future poor performance to intensifying competition and taking on greater social responsibilities as a result of the wrongful acts it committed relating to forced labor and spyware.

8. Although PDD attributed its poor past and future performance to "intensifying competition," it was PDD who became so enveloped in beating out its competition, that it relied on unsustainable business practices in an unethical attempt to stay ahead of the pack. PDD also attributed its poor past and future performance to its desire to take on greater "social responsibility," which it proved to have been doing the opposite of through its actions involving spyware and forced labor. Lastly, PDD expressed the desire to "improve" in the area of compliance. This forced change of action and mea culpa had devastating impacts on the Company and its investors, as explained in Section V(A)(3) herein.

9. Now, as detailed below, Lead Plaintiff's investigation, the investigations by the Arkansas Attorney General and United States Congress, as well as several of Defendants' own admissions, demonstrated the scope and nature of the fraud the Defendants engaged in through their undisclosed, highly risky activities.

10. As explained below, PDD knowingly and/or recklessly allowed the sale of goods from Xinjiang on its platforms, which, as the Congressional Report found, "guarantee[d] that shipments . . . containing products made with forced labor" entered the United States against the UFLPA. Further, PDD knowingly and/or recklessly created and implemented a platform which, as the Arkansas Complaint found, was "loaded with tools to execute virulent and dangerous malware and spyware activities on user devices that have downloaded and installed the TEMU app," and was "utilized to spy on users and competitors, allegedly to boost sales."

## II. JURISDICTION AND VENUE

11. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder by the SEC.

12. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

13. Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b) because the events and misstatements giving rise to the claims asserted herein occurred in substantial part in this District, including the dissemination of false and misleading statement in this District.

14. Defendants have submitted to personal jurisdiction in the City of New York. The Company's 2023 Annual Report stated that as per PDD's deposit agreements, federal or state courts in the City of New York have exclusive jurisdiction to determine claims arising under its deposit agreements. It stated the following:

> ***ADSs holders may not be titled to a jury trial with respect to claims arising under the deposit agreements, which could result in less favorable outcomes to the plaintiff(s) in any such action.***
>
> The deposit agreements governing the ADSs representing our ordinary shares provide that, subject to the depositary's right to require a claim to be submitted to arbitration, ***the federal or state courts in the City of New York have exclusive jurisdiction to hear and determine claims arising under the deposit agreements and in that regard, to the fullest extent permitted by law, ADS holders waive the right to a jury trial of any claim they may have against us or the depositary arising out of or relating to our shares, the ADSs or the deposit agreements, including any claim under the U.S. federal securities laws***.

15. In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III. PARTIES

### A. Lead Plaintiff

16. BRS was appointed to serve as Lead Plaintiff on November 19, 2024. BRS is a governmental defined benefit plan created by General Laws Chapter 32. Its Board serves members and retirees and qualified beneficiaries of all City of Boston departments, the Boston Housing Authority, the Boston Public Health Commission and the Boston Water and Sewer Commission. As set forth in the previously filed Certification to BRS's motion to be appointed a Lead Plaintiff (Dkt. No. 12-3), BRS purchased PDD's ADSs during the Class Period and suffered damages due to Defendants' violations of the federal securities laws alleged herein.

### B. Defendants

17. Defendant PDD was, at all relevant times, incorporated in the Cayman Islands with its principal place of business located at 25 St Stephen's Green, Dublin 2, D02 XF99, Ireland. Throughout the Class Period, PDD ADSs traded on the NASDAQ Stock Market ("NASDAQ") in New York, New York under the ticker symbol "PDD."

18. Defendant Chen is a founding member of PDD and has served as PDD's Chief Executive Officer ("CEO") from July 2020 through April 2023 and co-CEO since April 2023 until now. Defendant Chen is also the chairman of PDD's Board of Directors (the "Board"), which position he has held since March 2021.

19. Defendant Ma served as PDD's Vice President of Finance from the beginning of the Class Period until January 1, 2022. PDD has never had a Chief Financial Officer and the Vice President of Finance position is the closest equivalent.

20. Defendant Liu has served as PDD's Vice President of Finance from January 1, 2022 to the present. Prior to her position as the Vice President of Finance, Liu served as the Director of Finance from 2017 to 2021.

21. Defendant Zhao is a founding member of PDD, and both co-CEO and member of the Board since April 2023. Prior to then, Zhao served as Senior Vice President from 2018 to 2023.

22. Each of the Individual Defendants, because of each of their positions with the Company, possessed the power and authority to control the contents of PDD's reports to the SEC, press releases, and presentations to securities analysts, money portfolio managers and institutional investors, *i.e.*, the market. Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

23. The Company is liable for the acts of the Individual Defendants, and its employees under the doctrine of *respondeat superior* and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to PDD under *respondeat superior* and agency principles.

## IV. BACKGROUND FACTS

### A. Overview of PDD's Business

24. At all relevant times, PDD was and currently is a multinational commerce group that owns and operates a portfolio of businesses, including Chinese online retailer Pinduoduo and the U.S.-based ecommerce platform Temu, which allows Chinese vendors to sell and ship directly to customers across the globe without having to rely on intermediate distributors in the destination country.

25. PDD was founded in 2015 and initially focused on the agriculture industry. PDD's website touts that it currently serves approximately 900 million users and the Company "aims to bring more businesses and people into the digital economy so that local communities and small businesses can benefit from the increased productivity and new opportunities. PDD Holdings has built a network of sourcing, logistics, and fulfillment capabilities, that support its underlying businesses. One of them is . . . Consumer to Manufacturer [("C2M")] . . . process that helps sellers produce products according to consumers' preferences and drive cost down further." PDD describes this C2M process that the Company uses as "provid[ing] merchants with customer insights and preferences to help them tailor make products for their targeted customers and facilitate communication between merchants and users."

26. PDD's platform pioneered the "team purchase" model, in which buyers are encouraged to share product information on social networks, and invite their friends, family and social contacts to form shopping teams to enjoy the offered products at more attractive prices. PDD's customer base helps attract merchants to the platform, while the scale of the platform's sales volume encourages merchants to offer more competitive prices and customized products and services to customers.

27. The Temu platform, a business operated and owned by PDD, offers low prices on consumer goods, which are shipped mostly from China direct to consumers. Per Temu's LinkedIn page, Temu is an "e-commerce company that connects consumers with millions of merchandise partners, manufacturers and brands with the mission to empower them to live a better life." In its early stages of development, Temu aspired to become a global online platform that "empowers merchants" in partnership with a global network of logistics vendors and fulfillment partners.

28. PDD has touted on its website that the Company is "rooted in three principles – Benefit All, People First and being More Open." In fact, PDD's "core value" is "本分" (Ben Fen). PDD explained that 本分 means: "[b]e ***honest and trustworthy***; . . . ***[n]ever take advantage of others*** even when we are in a position to do so; [s]elf-reflect and ***take responsibilities*** when problems arise ***instead of blaming others*** . . . we always do things out of goodwill and ***do no evil***."

29. As explained herein, PDD's actions are shockingly contrary to its self-proclaimed values. Since its inception, Temu has been plagued by several legal disputes and drawn much criticism from the public regarding data privacy, forced labor, intellectual property and the general quality of Temu's goods, amongst other things. To date, the Better Business Bureau has received at least 3,715 complaints regarding Temu.

**B. PDD's Use of Forced Labor in Violation of the UFLPA**

30. During the Class Period, Defendants were allowing the merchants selling products on the Company's platform to directly or indirectly engage in the use of forced labor for the production of products sold.

31. The Xinjiang region of China is known for its production of cotton. According to a 2019 book by the Vice President of Citizen Power Initiatives for China, forced labor in Xinjiang

is so common that some say that it is simply part of the region's regular economy.[6] His study recommended banning certain imports from Xinjiang to the United States and concluded that any cotton product sourced from the Xinjiang region was likely a product of forced labor.[7]

32. On December 23, 2021, the UFPLA was signed into law and took effect on June 21, 2022. This law was enacted in "response to the Chinese government's systemic use of forced labor against Uyghurs and other ethnic minorities in the Xinjiang Uyghur Autonomous Region … in the People's Republic of China."[8] The goal of the UFLPA is to ensure that companies operating in the United States are not funding forced labor in the Xinjiang region. The UFLPA created a rebuttable presumption that ***all*** goods manufactured in Xinjiang are made with forced labor unless the United States Customs and Border Protection (the "CBP") certifies otherwise. This rebuttable presumption took effect on June 21, 2022.

33. To date, the CBP "has reviewed thousands of shipments from the electronics, apparel, footwear, pharmaceutical, agricultural, industrial, and automotive sectors. This has resulted in the denial of thousands of shipments including goods made with forced labor, totaling hundreds of millions in U.S. dollars. It also has resulted in companies conducting due diligence measures to ensure compliance with U.S. laws by tracing their supply chains for potential connections to forced labor."[9]

34. On June 22, 2023, the United States Select Committee on the Chinese Communist Party released the "Congressional Report detailing PDD and Temu's noncomplaince with the

---

[6] *See* Lianchao Han, *Cotton: The Fabric Full of Lies* (2019).

[7] *See id.*

[8] Uyghur Forced Labor Prevention Act, Pub. L. No. 117-78, 135 Stat. 1525 (2021). www.cbp.gov/trade/forced-labor/UFLPA.

[9] Uyghur Forced Labor Prevention Act Fact Sheet - United States Department of State (Jan 20, 2025), https://www.state.gov/office-to-monitor-and-combat-trafficking-in-persons/releases/2025/01/uyghur-forced-labor-prevention-act-uflpa-fact-sheet.

UFLPA." The Congressional Report shed light on Defendants' scienter, detailing their knowledge and/or reckless disregard of PDD's blatant use of forced labor in violation of the UFLPA.

35. The Congressional Report explained that the Company has no system to ensure compliance with the UFLPA, which "guarantee[d] that shipments from Temu containing products made with forced labor are entering the United States on a regular basis, in violation of the UFLPA." It detailed that the Company conducts no audits and enforces no compliance system which would ensure compliance with the UFLPA.

36. The Congressional Report further explained: "We asked Temu what measures it has in place to make sure that goods it sells are compliant with the UFLPA. Temu wrote, in part, 'Because Temu is not the importer of record with respect to goods shipped to the United States, [the UFLPA] and the prohibitions set out in [Section 307 of the Tariff Act of 1930] do not apply directly to Temu's activities as an online platform operator.' Temu denied all responsibility for ensuring that its China-based sellers comply with United States law and do not sell products produced by forced labor simply because the Company asserts that it is "not the importer of record with respect to goods shipped to the United States."

37. Also, per the Congressional Report, Temu admitted that it "does not expressly prohibit third-party sellers from selling products based on their origin in the Xinjiang Autonomous Region." Temu relies on a "reporting system" in which "consumers, sellers, [and] regulators," among others, can "file complaints for violations of Temu platform rules." Though, Temu denied having ever received any complaints regarding forced labor practices. This is not surprising because individuals in China are unlikely to self-report violations of United States law for political and other reasons.

38. An investigation detailed in the Congressional Report uncovered that Temu's marketplace shockingly featured a product on May 31, 2023, which was a keychain titled "New Handmade Knitted Cotton Pendant ***with Xinjiang Cotton*** Design Woven Pendant and Key Pendant." The Defendants cannot with a straight face say that they did not know or should not have known that the products sold on its platforms were likely violating the UFLPA.

39. On June 22, 2023 the New York Times published an article titled "Congress Spotlights 'Serious' Forced Labor Concerns With Chinese Shopping Sites,"[10] which discussed findings in the Congressional Report. This New York Times article noted that in 2022, "the U.S. imposed a ban on products from Xinjiang, citing the region's use of forced labor in factories and mines." It further stated that the Congressional Report said Temu failed "to maintain even the façade of a meaningful compliance program" and that the Company was likely shipping products made with forced labor into the United States on a "regular basis," thus, there is an "extremely high risk that Temu's supply chains are contaminated with forced labor."

40. Similarly concerned about PDD's lack of forced labor enforcement, just the next day, Business Insider published an article titled "Temu reportedly relies on customers and suppliers to report if goods from the site were produced by forced labor," which also discussed the Congressional Report in detail.

41. On February 12, 2024, Fox Business published an article titled "Temu's Super Bowl ads spark backlash over China-based firm's forced labor allegations."[11] This article stated

---

[10] Ana Swanson & Claire Fu, *Congress Spotlights 'Serious' Forced Labor Concerns With Chinese Shopping Sites*, N.Y. TIMES (June 22, 2023), https://www.nytimes.com/2023/06/22/business/economy/shein-temu-forced-labor-china.html (updated Nov. 3, 2023).

[11] Eric Revell, *Temu's Super Bowl Ads Spark Backlash Over China-Based Firm's Forced Labor Allegations*, FOX BUSINESS (Feb. 12, 2024), https://www.foxbusiness.com/markets/temu-super-bowl-ads-spark-backlash-over-china-based-firms-forced-labor-allegations.

that the Company "drew the eye of lawmakers in Congress over the China-based [C]ompany's links to products made with the use of forced labor in Xinjiang as well as its data-sharing policies. Members of Congress took to social media to call out Temu's data practices and links to forced labor in China as they sought to advise American consumers against downloading the app."

42. On February 26, 2024, an analyst report authored by Goldman Sachs[12] discussed the issue of PDD using forced labor. This analyst report stated: "On Feb 23, US Tech focused business media 'The Information' reported a number of US lawmakers have been asking agencies including the Department of Homeland Security (DHS) to consider adding Temu to the UFLPA list alongside an import ban, citing the platform has not taken enough actions to prevent its suppliers from using ***forced labor***."

43. On March 18, 2024, an analyst report authored by Morgan Stanley[13] discussed the same: "1) recently there has been more frequent negative newsflow (e.g., theinformation.com, Feb 23, 2024) reporting that US lawmakers were demanding a shipment ban on Temu, due to concerns over alleged use of forced labor among its suppliers."

44. Even after the Class Period, the world continued to discuss the forced labor issues at PDD. For example, on September 13, 2024, the Biden Administration issued an announcement titled: "FACT SHEET: Biden-Harris Administration Announces New Actions to Protect American Consumers, Workers, and Businesses by Cracking Down on De Minimis Shipments with Unsafe, Unfairly Traded Products."[14] The Announcement stated: "Today, the Biden-Harris

---

[12] Ronald Keung, et al., *China eCommerce - Tracking cross-border regulations; latest on five key areas & scenario analysis; PDD risk-reward remains favorable*, GOLDMAN SACHS (Feb. 26, 2024).

[13] Eddy Wang, et al., *PDD Holdings Inc. - Catalyst Driven Idea*, MORGAN STANLEY (Mar. 18, 2024).

[14] Fact Sheet: Biden-Harris Administration Announces New Actions to Protect American Consumers, Workers, and Businesses by Cracking Down on De Minimis Shipments with Unsafe,

Administration is taking new actions to enforce our laws . . . by addressing the significant increased abuse of the de minimis exemption, in particular China-founded e-commerce platforms, and strengthening efforts to target and block shipments that violate U.S. laws . . . Strengthened Textile and Apparel Enforcement: The Administration continues to prioritize enforcement efforts against illicit textile and apparel imports through . . . increased customs audits and foreign verifications, and the expansion of the Uyghur Forced Labor Prevention Act (UFLPA) Entity List."

45. On September 15, 2024, an analyst report authored by Goldman Sachs[15] stated that "PDD's slight negative share price reaction (-2%), in comparison with larger swings on past results/previous incremental newsflow, on this policy development has been due to: Sensitivity analysis on implications of various taxes/tariffs n on cross-border platform price advantage vs. other platforms: . . . We will continue to monitor the development of any risks related to targeted tariffs on China imports/app bans/expansion of the Uyghur Forced Labor Prevention Act (UFLPA) Entity List etc. that could pose a potential material impact to Temu's US operations."

**C. PDD's Platform Illegally Acted as Spyware When Installed on User's Devices**

46. Throughout the Class Period, the Company's platform acted as a form of spyware when consumers downloaded its platform on their personal devices, which had the ability to access a user's personal information. As per the Arkansas Complaint, the application would

---

Unfairly Traded Products, The White House (Sept. 13, 2024), https://bidenwhitehouse.archives.gov/briefing-room/statements-releases/2024/09/13/fact-sheet-biden-harris-administration-announces-new-actions-to-protect-american-consumers-workers-and-businesses-by-cracking-down-on-de-minimis-shipments-with-unsafe-unfairly-traded-products/.

[15] Ronald Keung, et al., *PDD Holdings (PDD) - New US policies targeting de-minimis exemptions; an evolving Temu business model*, GOLDMAN SACHS (Sept. 14, 2014).

"bypass users' cell phone security to monitor activities on other apps, check notifications, read private messages and change settings." The Arkansas Complaint reported that researchers concluded that the Temu platform was "the ***most dangerous app*** in wide circulation."

47. On March 20, 2023, an analyst report authored by Jefferies[16] stated that "[t]he amount of data generated and exchanged on e-commerce platforms is increasing rapidly and users are increasingly concerned with the security and privacy of the information they provide." For the reasons described herein, users were rightfully "concerned with the security and privacy" of their information upon installation of the Company's platform.

48. On March 21, 2023, Reuters published an article titled "Google suspends China's Pinduoduo app on security concerns."[17] It stated the following: "Google suspended the Play version of [PDD's] Pinduoduo app for security concerns, after malware issues were found on versions of the Chinese e-commerce app outside Google's app store . . . Off-Play versions of this app that have been found to contain malware have been enforced on via Google Play Protect . . . Google Play has informed us this morning that Pinduoduo App has been temporarily suspended as the current version is not compliant with Google's Policy."

49. On March 27, 2023, Bloomberg published an article titled "Pinduoduo App Malware detailed by Cybersecurity Researchers."[18] The article stated that "[s]ecurity researchers at Moscow-based Kaspersky Lab have identified and outlined potential malware in versions of [PDD's] Chinese shopping app Pinduoduo, days after Google suspended it from its Android app

---

[16] Thomas Chong, et al., *PDD - Building for the Long Term*, JEFFRIES (Mar. 20, 2023).

[17] *Google Suspends China's Pinduoduo App Due to Malware Issues*, REUTERS (Mar. 21, 2023), https://www.reuters.com/technology/google-suspends-chinas-pinduoduo-app-due-malware-issues-2023-03-21/.

[18] Sarah Zheng, *Pinduoduo App Malware Detailed by Cybersecurity Researchers*, BLOOMBERG (Mar. 27, 2023), https://www.bloomberg.com/news/articles/2023-03-27/pinduoduo-app-malware-detailed-by-cybersecurity-researchers.

store . . . [s]ome versions of the Pinduoduo app contained malicious code, which exploited known Android vulnerabilities to escalate privileges, download and execute additional malicious modules, some of which also gained access to users' notifications and files."

50. On March 31, 2023, Credit Suisse authored an analyst report[19] regarding the March 27, 2023 Bloomberg article and stated that the article "reported that security researchers at Kaspersky Lab identified and outlined potential malware in versions of PDD's app, days after Google suspended it from its Android app store. PDD has refuted claims of malicious code in its shopping app."

51. On April 2, 2023, CNN published an article titled "*I've never seen anything like this: One of China's most popular apps has the ability to spy on its users, say experts*."[20] The CNN article said that "according to cybersecurity researchers, it can also bypass users' cell phone security to monitor activities on other apps, check notifications, read private messages and change settings. And once installed, it's tough to remove. While many apps collect vast troves of user data, sometimes without explicit consent, experts say e-commerce giant Pinduoduo has taken violations of privacy and data security to the next level . . . Multiple experts identified the presence of malware on the Pinduoduo app that exploited vulnerabilities in Android operating systems. Company insiders said the exploits were utilized to spy on users and competitors, allegedly to boost sales."

---

[19] Kenneth Fong, et al., *Research Bulletin China Internet Weekly recap of regulatory development in 2023*, CREDIT SUISSE (Mar. 31, 2023).

[20] Nectar Gan, et al., *'I've never seen anything like this:' One of China's most popular apps has the ability to spy on its users, say experts*, CNN (Apr. 2, 2023), https://www.cnn.com/2023/04/02/tech/china-pinduoduo-malware-cybersecurity-analysis-intl-hnk/index.html (updated Apr. 3, 2023).

52. On April 28, 2023, an analyst report authored by Citibank[21] noted that Temu "'has rapidly expanded its US market presence in the past year' and that it was among a category of firms that the USCC felt might be 'posing risks and challenges to U.S. regulations, laws, and principles of market access.' The report came amidst events including: 1) Alphabet's Google business in March suspending the Play version of PDD's Pinduoduo app for security concerns related to malware issues . . ."

53. Shortly after, on May 17, 2023, the state of Montana banned the Temu application on government devices citing the dangers of the application and stating that the state was "[e]xpanding Tiktok prohibition to all social media applications that provide personal information or data to foreign adversaries."[22]

54. On September 6, 2023, the Grizzly Research report came out, which was titled: "We believe PDD is a Dying Fraudulent Company and its Shopping App TEMU is Cleverly Hidden Spyware that Poses an Urgent Security Threat to U.S. National Interests" (the "Grizzly Report").[23] This report dove deep into the issue of the Company's spyware and stated that researchers believed that "Temu is the ***most dangerous app*** in wide circulation." The Grizzly Report covered a slew of bad actions by PDD such as the following:

> The app has hidden functions that allow for extensive data exfiltration unbeknown to users, potentially giving bad actors full access to almost all data on customers' mobile devices.

---

[21] Alicia Yap, et al., *PDD Holdings Inc (PDD.O) - 2022 20-F Tidbits; 1Q23E Preview; Lower TP to US $100*, CITIBANK (Apr. 28, 2023).

[22] AGs letter to CBS re Temu (Feb. 10, 2024.

[23] Grizzly Research, *We Believe PDD is a Dying Fraudulent Company and its Shopping App TEMU is Cleverly Hidden Spyware that Poses an Urgent Security Threat to U.S. National Interests* (Sept. 6, 2023), https://grizzlyreports.com/we-believe-pdd-is-a-dying-fraudulent-company-and-its-shopping-app-temu-is-cleverly-hidden-spyware-that-poses-an-urgent-security-threat-to-u-s-national-interests/.

> It is evident that great efforts were taken to intentionally hide the malicious intent and intrusiveness of the software.
>
> We engaged numerous independent data security experts to decompile and analyze TEMU app's code, integrated with experts of our own staff, and analysts who have written independently in the public domain.
>
> Contributing to the danger of mass data exfiltration is the fast uptake rate of the TEMU app: over 100 million app downloads in the last 9 months, all in U.S. and Europe. TEMU is not offered in China.
>
> The TEMU app development team includes 100 engineers who built the Pinduoduo app, which earned a suspension from the Google Play Store.
>
> Pinduoduo app got reinstated by removing the "bad parts", some of which were identically utilized as components of the TEMU app, strongly indicating malicious intent.

55. On June 25, 2024, the Arkansas Attorney General filed the Arkansas Complaint, which illustrated in detail the shocking violations of privacy by PDD when users downloaded the Company's platform onto their personal devices.

56. The Arkansas Complaint alleged that "Temu is purposefully designed to gain unrestricted access to a user's phone operating system, including, but not limited to, a user's camera, specific location, contacts, text messages, documents, and other applications . . . Temu monetizes this unauthorized collection of data by selling it to third parties, profiting at the direct expense of Arkansans' privacy rights."

57. The Arkansas Complaint also alleged that "[o]n March 5, 2023, Pinduoduo issued a new update of its app, version 6.50.0, which removed the exploits . . . Two days after the update, Pinduoduo disbanded the team of engineers and product managers who had developed the exploits, according to a Pinduoduo source. Thereafter, most of the members on this team were transferred to work at Temu . . . It is evident that great efforts were taken to intentionally hide the malicious intent and intrusiveness of the software."

58. Further, the Arkansas Complaint pointed out that the Grizzly Report described that security researchers concluded the Temu app "is purposefully and intentionally loaded with tools to execute virulent and dangerous malware and spyware activities on user devices that have downloaded and installed the TEMU app."[24] These researchers found that the PDD platform was intentionally programmed to bypass mobile device security systems.[25] Other researchers reported that "[c]ompany insiders said the exploits were utilized to spy on users and competitors, allegedly to boost sales. [PDD] requested as many as 83 permissions, including access to biometrics, Bluetooth, and Wi-Fi network information."[26]

59. Lastly, it is important to note that the Arkansas Complaint explained in depth how particularly abusive the Company's spyware practices are "given that many of the users of Temu are minors, including minors under the age of 13. At all relevant times, Defendants have been aware that minors, including minors under the age of 13, are using the Temu platform . . . Defendants possess actual knowledge that children under the age of 13 are on the Temu app--and indeed, Defendants actively seek out this audience. Defendants also indiscriminately and surreptitiously mine those children's PII, without providing notice to parents of those children and without obtaining the parents' verifiable consent."

**D. The Defendants' Materially False and Misleading Representations Made During the Class Period**

60. Throughout the Class Period, Defendants repeatedly and falsely touted that PDD: (1) has established internal policies and procedures to ensure that Temu complies with the

---

[24] *Id.*

[25] *Id.*

[26] Nicholas Foisy, *Temu App Poses Potential Data Risk/or Consumers,* COMPASS IT COMPLIANCE (June 30, 2023), https://www.compassitc.com/blog/temu-app-poses-potential-data-risk-for-consumers.

UFLPA; (2) prioritizes the protection of its customers' data and data security generally; and (3) strives to comply with all applicable laws and regulations.

61. During the Class Period, Defendants made many materially false and misleading representations and omissions regarding forced labor and the Company's non-compliance with the UFLPA. For example, PDD in an SEC filing on April 25, 2022[27] (signed by Defendants Chen and Liu), stated that PDD misleadingly downplayed the passage of the UFLPA and the impact it would inevitably have on its business by merely noting the potentiality of "[c]hanges in U.S. and international trade policies, particularly with regard to China, ***may*** adversely impact our business and operating results," despite knowing or being reckless in not knowing of the Company's violations. On April 26, 2023, PDD again told investors of the mere potentiality that "[c]hanges in U.S. and international trade policies, particularly with regard to China, ***may*** adversely impact our business and operating results."[28]

62. On April 25, 2024, PDD even falsely assured its investors that PDD has "establish[ed] policies and procedures to ensure that no seller on the Temu platform is on the UFLPA Entity List, and use technology to identify products that are at higher risk of non-compliance."

63. During the Class Period, Defendants also made many materially false and misleading representations and omissions regarding the Company's platform acting as spyware when downloaded onto users' devices. For example, PDD told investors on April 30, 2021, that the Company has a whole team "dedicated to protecting the security of our data." PDD also touted that it "adopted strict data protection policy to ensure the security of our proprietary data," and

---

[27] Pinduoduo Inc., Annual Report (Form 20-F) (Apr. 25, 2022).

[28] *Id*. Pinduoduo Inc., Annual Report (Form 20-F) (Apr. 26, 2023).

that it "collect[s] anonymized, non-confidential user behavior and pattern data based on their interactions with our platform through our social network partners, which have been pre-processed to exclude user identity or other sensitive information." PDD further assured its investors that the Company "strictly control[s] and manage[s] the use of data within [its] various departments and do[es] not share data with external third parties, nor [does it] cooperate with third-party vendors in data analytics efforts."

64. In the same document, PDD even flaunted that "[m]aintaining complete security on [its] platform and systems for the storage and transmission of confidential or private information, such as buyers' personal information, payment-related information and transaction information, is essential to maintain consumer confidence in [PDD's] platform and systems. [PDD] adopted strict security policies and measures, including encryption technology, to protect [its] proprietary data and buyer information." On April 25, 2022, PDD again told the same to investors.[29]

65. On August 29, 2022, Defendant Chen during an earnings call explained to investors that PDD has "always been strictly compliant with China's data security standards as regulators and the industry as a whole continue to raise the bar on data security and data protection." He also proclaimed that PDD "will also keep holding [itself] to the higher standards. This is to help provide to [its] users and merchants a safe and efficient shopping environment."[30]

66. On April 26, 2023, PDD explained to investors that the Company "adopted strict security policies and measures, including encryption technology, to protect our proprietary data and buyer information." The Company further stated that "[m]aintaining complete security on its

---

[29] Pinduoduo Inc., Annual Report (Form 20-F) (Apr. 25, 2022).
[30] Pinduoduo Inc., Earnings Call Transcript (Aug. 29, 2022).

platforms and systems for the storage and transmission of confidential or private data, such as buyers' personal information, payment-related information and transaction information, is essential to maintain consumer confidence in [its] platforms and systems."[31]

67. On November 28, 2023, Defendant Zhao denied all reports and allegations of spyware on PDD's application. He told investors that the allegations "are totally baseless and … were published with the intent to create panic and to drive down stock prices …."

68. These statements and others discussed below, however, where materially false or misleading when made as revealed by the Arkansas Attorney General's investigation and Defendants' own admissions, among other things.

## V. DEFENDANTS' VIOLATIONS OF THE EXCHANGE ACT`

### A. Defendants' Materially False and Misleading Statements and Omissions in Violation of Section 10(b) of the Exchange Act

#### 1. Misstatements Related to Forced Labor Allegations

69. On April 26, 2023, PDD issued its Annual Report for the year ended December 31, 2022 on SEC Form 20-F (the "2022 Annual Report"),[32] which was signed by Defendants Chen and Liu. Defendants explained to investors that they "may not have fully complied . . . and may not fully comply in the future" with laws and regulations of another jurisdiction. Defendants at this time knew full well that they had not and would not comply with "laws and regulations of another jurisdiction," as expressed in the Congressional Report. In 2022 Annual Report, PDD stated that:

> ***Our business is subject to a large number of laws across many jurisdictions, many of which are evolving.*** [Emphasis in original.]

* * *

---

[31] PDD Holdings Inc., Annual Report (Form 20-F) (Apr. 26, 2023).

[32] PDD Holdings Inc., Annual Report (Form 20-F) (Apr. 26, 2023).

> ***We strive to comply with all applicable laws***, but they may conflict with each other, and by complying with the laws or regulations of one jurisdiction, we may find that we are violating the laws or regulations of another jurisdiction. ***Despite our efforts, we may not have fully complied in the past and may not fully comply in the future, particularly where the applicable regulatory regimes have not been broadly interpreted . . .***

70. The statements in Paragraph 69 were materially false and misleading when made for the following reasons:

(a) Defendants failed to take sufficient actions (if any) to ensure that goods sold on its platform were compliant with the UFLPA and not produced using forced labor;

(b) Defendants failed to implement any internal guidelines to ensure compliance with the UFLPA, which in turn, "guarantee[d] that shipments from Temu containing products made with forced labor . . . enter[ed] the United States on a regular basis, in violation of the UFLPA;"

(c) Defendants failed to expressly prohibit third-party sellers from selling products based on their origin in the Xinjiang Autonomous Region;

(d) Defendants failed to review the Company's platform for merchants selling goods expressly from the Xinjiang Autonomous Region;

(e) Defendants improperly relied only on customers and suppliers to report whether goods being sold on PDD's platforms were produced by forced labor;

(f) the above-mentioned risks would and did manifest during the Class Period, eventually forcing the Company to announce on August 26, 2024[33] that it had decided not to issue dividends or repurchase shares for the "foreseeable years ahead," and state that it attributed the Company's poor performance and future poor performance to (1) intensifying competition, (2)

[33] PDD Holdings Inc., Earnings Call Transcript (Aug. 26, 2024).

taking on greater social responsibilities as a result of the wrongful acts it committed relating to forced labor and spyware, and (3) improving in the area of compliance; and

(g) as a result, Defendants' statements during the Class Period were knowingly and/or recklessly false and misleading when made.

71. On April 25, 2024, PDD issued its 2023 Annual Report, which was signed by Defendant Chen. In the 2023 Annual Report, PDD told investors that the Company "require[s]" merchants on its platform to not use "forced, penal or child labor." Meanwhile, and as per the Congressional Report, PDD's actions at the time "guarantee[d] that shipments from Temu [to the United States] contain[ed] products made with forced labor . . . in violation of the UFLPA."[34]

72. In the 2023 Annual Report, the Company stated that:

> ***Additionally, if the third-party merchants that sell merchandise on our platforms or the third-party vendors that provide services to us violate applicable laws or regulations, those violations could also result in liabilities for us and harm our brands, reputation and business. For example, in June 2022, the Uyghur Forced Labor Prevention Act, or the UFLPA, became effective in the U.S., establishing a rebuttable presumption that goods mined, produced, or manufactured in a certain region in China or by an entity on the UFLPA Entity List are prohibited from importation into the U.S. We require merchants on the Temu platform to comply with our third-party code of conduct, which strictly prohibits the use of forced, penal or child labor. In addition, we establish policies and procedures to ensure that no seller on the Temu platform is on the UFLPA Entity List, and use technology to identify products that are at higher risk of non-compliance. Any third-party violations of applicable laws or our policies may subject us to negative publicity, investigations, fines, fees, settlements or other costs and liabilities as a result of the enforcement of laws, regulations, sanctions, embargoes, export controls programs or other restrictions.***[35]

73. PDD's statements in Paragraphs 72-73 were materially false and misleading when made for the following reasons:

---

[34] PDD Holdings Inc., Annual Report (Form 20-F) (Apr. 25, 2022).

[35] *Id.*

(a) Defendants failed to take sufficient actions (if any) to ensure that goods sold on its platform were compliant with the UFLPA and not produced using forced labor;

(b) Defendants failed to implement any internal guidelines to ensure compliance with the UFLPA, which in turn, "guarantee[d] that shipments from Temu containing products made with forced labor . . . enter[ed] the United States on a regular basis, in violation of the UFLPA;"

(c) Defendants failed to expressly prohibit third-party sellers from selling products based on their origin in the Xinjiang Autonomous Region;

(d) Defendants failed to review the Company's platform for merchants selling goods expressly from the Xinjiang Autonomous Region;

(e) Defendants improperly relied only on customers and suppliers to report whether goods being sold on PDD's platforms were produced by forced labor;

(f) the above-mentioned risks would and did manifest during the Class Period, eventually forcing the Company to announce on August 26, 2024 that it had decided not to issue dividends or repurchase shares for the "foreseeable years ahead," and state that it attributed the Company's poor performance and future poor performance to (1) intensifying competition, (2) taking on greater social responsibilities as a result of the wrongful acts it committed relating to forced labor and spyware, and (3) improving in the area of compliance; and

(g) as a result, Defendants' statements during the Class Period were knowingly and/or recklessly false and misleading when made.

74. Also in the 2023 Annual Report, PDD stated that:

> ***Our business is subject to a large number of laws across many jurisdictions, many of which are evolving.*** [Emphasis in original.]

* * *

> ***We strive to comply with all laws and regulations that are applicable to our operations around the world***. Despite our efforts, we may not have fully complied in the past, and may not be able to fully or timely comply in the future, with all applicable laws and regulations, particularly where the regulatory regimes have not been broadly applied to e commerce platforms
>
> * * *
>
> ***Additionally, if the third-party merchants that sell merchandise on our platforms or the third-party vendors that provide services to us violate applicable laws or regulations, those violations could also result in liabilities for us and harm our brands, reputation and business. For example, in June 2022, the Uyghur Forced Labor Prevention Act, or the UFLPA, became effective in the U.S., establishing a rebuttable presumption that goods mined, produced, or manufactured in a certain region in China or by an entity on the UFLPA Entity List are prohibited from importation into the U.S. We require merchants on the Temu platform to comply with our third-party code of conduct, which strictly prohibits the use of forced, penal or child labor. In addition, we establish policies and procedures to ensure that no seller on the Temu platform is on the UFLPA Entity List, and use technology to identify products that are at higher risk of non-compliance.***[36]

75. PDD's statements in Paragraph 74 were materially false and misleading when made for the following reasons:

(a) Defendants failed to take sufficient actions (if any) to ensure that goods sold on its platform were compliant with the UFLPA and not produced using forced labor;

(b) Defendants failed to implement any internal guidelines to ensure compliance with the UFLPA, which in turn, "guarantee[d] that shipments from Temu containing products made with forced labor . . . enter[ed] the United States on a regular basis, in violation of the UFLPA;"

(c) Defendants failed to expressly prohibit third-party sellers from selling products based on their origin in the Xinjiang Autonomous Region;

[36] *Id.*

(d) Defendants failed to review the Company's platform for merchants selling goods expressly from the Xinjiang Autonomous Region;

(e) Defendants improperly relied only on customers and suppliers to report whether goods being sold on PDD's platforms were produced by forced labor;

(f) the above-mentioned risks would and did manifest during the Class Period, eventually forcing the Company to announce on August 26, 2024 that it had decided not to issue dividends or repurchase shares for the "foreseeable years ahead," and state that it attributed the Company's poor performance and future poor performance to (1) intensifying competition, (2) taking on greater social responsibilities as a result of the wrongful acts it committed relating to forced labor and spyware, and (3) improving in the area of compliance; and

(g) as a result, Defendants' statements during the Class Period were knowingly and/or recklessly false and misleading when made.

76. On May 22, 2024, during an earnings call regarding PDD's Q1 2024 earnings ("Q1 2024 Earnings Conference Call"), Defendant Chen discussed PDD's future goals and the Company's intentions as they related to compliance. Though, per the Congressional Report and to the detriment of investors, the Company failed to disclose that "Temu had no system to ensure compliance with the UFLPA" and Temu even "admitted that it '[did] not expressly prohibit third-party sellers from selling products based on their origin in the Xinjiang Autonomous Region.'" Defendant Chen in the Q1 2024 Earnings Conference Call said:

> With the goal of building an ***industry-leading compliance program***, we will make . . . [firm] investment to create a safe and trustworthy shopping environment for our users. To uphold our compliance [standards], we will conduct forward-looking research into laws and regulations in the market we operate and transform our know-how into tools that can be easily assessed at our merchants.

* * *

> And regarding your second question on compliance, [a]s our business grows, consumers and regulatory bodies are holding us accountable for ever higher compliance requirements and also on the merchants doing business with us. And in order to create a trustworthy shopping environment for our users, ***compliance is an area where we're committed to improve and where we have invested significant resources over the past few quarters***. Major regulatory frameworks around the world are evolving and new laws and regulations are being introduced. And therefore we see compliance capability as an important aspect of our high-quality development strategy and also compliance capabilities as one of our core capabilities of our platform.[37]

77. PDD's statements in Paragraph 76 were materially false and misleading when made for the following reasons:

(a) Defendants failed to take sufficient actions (if any) to ensure that goods sold on its platform were compliant with the UFLPA and not produced using forced labor;

(b) Defendants failed to implement any internal guidelines to ensure compliance with the UFLPA, which in turn, "guarantee[d] that shipments from Temu containing products made with forced labor . . . enter[ed] the United States on a regular basis, in violation of the UFLPA;"

(c) Defendants failed to expressly prohibit third-party sellers from selling products based on their origin in the Xinjiang Autonomous Region;

(d) Defendants failed to review the Company's platform for merchants selling goods expressly from the Xinjiang Autonomous Region;

(e) Defendants improperly relied only on customers and suppliers to report whether goods being sold on PDD's platforms were produced by forced labor;

(f) the above-mentioned risks would and did manifest during the Class Period, eventually forcing the Company to announce on August 26, 2024 that it had decided not to issue

---

[37] PDD Holdings Inc., Earnings Call Transcript (May 22, 2024).

dividends or repurchase shares for the "foreseeable years ahead," and state that it attributed the Company's poor performance and future poor performance to (1) intensifying competition, (2) taking on greater social responsibilities as a result of the wrongful acts it committed relating to forced labor and spyware, and (3) improving in the area of compliance; and

(g) as a result, Defendants' statements during the Class Period were knowingly and/or recklessly false and misleading when made.

### 2. Misstatements Related to the Company's Platform Acting as Spyware

78. On April 30, 2021, PDD issued its 2020 Annual Report[38], which was signed by Defendants Chen and Ma. The misstatement described below tells investors that the data which PDD collects "exclude[s] user identity [and] other sensitive information." Per the Arkansas Attorney General, this is false. The Arkansas Complaint explains that "Temu acquires a significantly greater-and much more personal-array of data from a user's device, including but not limited to the user's (1) contacts, (2) calendars, (3) photo albums, (4) social media accounts, (5) chats, and (6) texts."

79. In the 2020 Annual Report, PDD stated that:

> We have a data security team of engineers and technicians dedicated to protecting the security of our data. ***We have also adopted strict data protection policy to ensure the security of our proprietary data. We collect anonymized, non-confidential user behavior and pattern data based on their interactions with our platform through our social network partners, which have been pre-processed to exclude user identity or other sensitive information.*** We encrypt confidential personal information we gather from our own platform. To ensure data security and avoid data leakage, we have established stringent internal protocols under which we grant classified access to confidential personal data only to limited employees with strictly defined and layered access authority. We strictly control and manage the use of data within our various departments and do not share data with external third parties, nor do we cooperate with third-party vendors in data analytics efforts.

[38] PDD Holdings Inc., Annual Form (Form 20-F) (Apr. 30, 2021).

80. The statements in Paragraph 79 were materially false and misleading when made for the following reasons:

(a) the Company's applications were "purposefully and intentionally loaded with tools to execute virulent and dangerous malware and spyware activities on user devices that have downloaded and installed the TEMU app;"

(b) the Company's applications could "bypass users' cell phone security to monitor activities on other apps, check notifications, read private messages and change settings;"

(c) the Company's applications were "purposefully designed to gain unrestricted access to a user's phone operating system, including, but not limited to, a user's camera, specific location, contacts, text messages, documents, and other applications;"

(d) the Company "monetize[d the] unauthorized collection of data by selling it to third parties, profiting at the direct expense . . . [of] privacy rights;"

(e) the above-mentioned risks would and did manifest during the Class Period, eventually forcing the Company to announce on August 26, 2024 that it decided not to issue dividends or repurchase shares for the "foreseeable years ahead," and state that it attributed the Company's poor performance and future poor performance to (1) intensifying competition, (2) taking on greater social responsibilities as a result of the wrongful acts it committed relating to forced labor and spyware, and (3) improving in the area of compliance; and

(f) as a result, Defendants' statements during the Class Period were knowingly and/or recklessly false and misleading when made.

81. On April 29, 2022, during a Q2 earnings call[39], Defendant Chen boasted to investors that PDD has "always been strictly compliant with China's data security standards as

[39] PDD Holdings Inc., Earnings Call Transcript (Apr. 29, 2022).

regulators and the industry as a whole continue to raise the bar on data security and data protection. We will also keep holding ourselves to the higher standards. This is to help provide to our users and merchants a safe and efficient shopping environment."

82. The statements that Defendant Chen made on behalf of PDD in the Q2 2021 earnings call and illustrated in Paragraph 81 were materially false and misleading when made for the following reasons:

(a) the Company's applications were "purposefully and intentionally loaded with tools to execute virulent and dangerous malware and spyware activities on user devices that have downloaded and installed the TEMU app;"

(b) the Company's applications could "bypass users' cell phone security to monitor activities on other apps, check notifications, read private messages, and change settings;"

(c) the Company's applications were "purposefully designed to gain unrestricted access to a user's phone operating system, including, but not limited to, a user's camera, specific location, contacts, text messages, documents, and other applications;"

(d) the Company "monetize[d the] unauthorized collection of data by selling it to third parties, profiting at the direct expense . . . [of] privacy rights";

(e) the above-mentioned risks would and did manifest during the Class Period, eventually forcing the Company to announce on August 26, 2024 that it decided not to issue dividends or repurchase shares for the "foreseeable years ahead," and state that it attributed the Company's poor performance and future poor performance to (1) intensifying competition, (2) taking on greater social responsibilities as a result of the wrongful acts it committed relating to forced labor and spyware, and (3) improving in the area of compliance; and

(f) as a result, Defendants' statements during the Class Period were knowingly and/or recklessly false and misleading when made.

83. On April 26, 2023, in the 2022 Annual Report[40], signed by Defendants Chen and Liu, Defendants explained to investors that they "may not have fully complied . . . and may not fully comply in the future" with laws and regulations of another jurisdiction. Defendants at this time knew full well that they had not and would not comply with "laws and regulations of another jurisdiction," as expressed in the Arkansas Complaint. PDD also stated that:

> ***Our business generates and processes a large amount of data, and we are required to comply with applicable laws relating to privacy and cybersecurity. The improper use or disclosure of data could have a material and adverse effect on our business and prospects.***
>
> Our business generates and processes a large amount of data. We face risks inherent in handling and protecting them. ***In particular, we face a number of challenges relating to data from transactions and other activities on our platforms, including:***
>
> > • ***protecting the data in and hosted on our system, including against attacks on our system by outside parties or fraudulent behavior or improper use by our employees, and securely transmitting such data over public networks;***
> >
> > • ***addressing concerns related to privacy and sharing, safety, security and other factors; and***
> >
> > • ***complying with applicable laws and regulations relating to the collection, use, storage, transfer, disclosure and security of personal data, including requests from regulatory and government authorities relating to these data.***
>
> * * *
>
> ***Any negative publicity on our platforms' data safety or privacy protection mechanisms and policies, and any claims asserted against us or fines imposed upon us as a result of actual or perceived failures, could have a material and adverse effect on our public image, reputation, financial condition and results of operations.*** Any compromise of our information security or the information

[40] PDD Holdings Inc., Annual Report (Form 20-F) (Apr. 26, 2023).

> security measures of our contracted third-party online payment service providers that results in data being improperly used or disclosed could have a material and adverse effect on our reputation, business, prospects, financial condition and results of operations. ***Significant capital, managerial and other resources, including costs incurred to deploy additional personnel and develop network protection technologies, train employees, and engage third-party experts and consultants, may be required to ensure and enhance information security or to address the issues caused by a potential security failure.***

84. The statements in Paragraph 83 were materially false and misleading when made for the following reasons:

(a) the Company's applications were "purposefully and intentionally loaded with tools to execute virulent and dangerous malware and spyware activities on user devices that have downloaded and installed the TEMU app;"

(b) the Company's applications could "bypass users' cell phone security to monitor activities on other apps, check notifications, read private messages and change settings;"

(c) the Company's applications were "purposefully designed to gain unrestricted access to a user's phone operating system, including, but not limited to, a user's camera, specific location, contacts, text messages, documents, and other applications;"

(d) the Company "monetize[d the] unauthorized collection of data by selling it to third parties, profiting at the direct expense . . . [of] privacy rights;"

(e) the above-mentioned risks would and did manifest during the Class Period, eventually forcing the Company to announce on August 26, 2024 that it decided not to issue dividends or repurchase shares for the "foreseeable years ahead," and state that it attributed the Company's poor performance and future poor performance to (1) intensifying competition, (2) taking on greater social responsibilities as a result of the wrongful acts it committed relating to forced labor and spyware, and (3) improving in the area of compliance; and

(f) as a result, Defendants' statements during the Class Period were knowingly and/or recklessly false and misleading when made.

85. In the same document, PDD stated that:

> ***Our business is subject to a large number of laws across many jurisdictions, many of which are evolving.*** [Emphasis in original.]
>
> * * *
>
> ***We strive to comply with all applicable laws***, but they may conflict with each other, and by complying with the laws or regulations of one jurisdiction, we may find that we are violating the laws or regulations of another jurisdiction. ***Despite our efforts, we may not have fully complied in the past and may not fully comply in the future, particularly where the applicable regulatory regimes have not been broadly interpreted . . .***

86. The statements in Paragraph 85 were materially false and misleading when made for the following reasons:

(a) the Company's applications were "purposefully and intentionally loaded with tools to execute virulent and dangerous malware and spyware activities on user devices that have downloaded and installed the TEMU app;"

(b) the Company's applications could "bypass users' cell phone security to monitor activities on other apps, check notifications, read private messages, and change settings;"

(c) the Company's applications were "purposefully designed to gain unrestricted access to a user's phone operating system, including, but not limited to, a user's camera, specific location, contacts, text messages, documents, and other applications;"

(d) the Company "monetize[d the] unauthorized collection of data by selling it to third parties, profiting at the direct expense . . . [of] privacy rights;"

(e) the above-mentioned risks would and did manifest during the Class Period, eventually forcing the Company to announce on August 26, 2024 that it decided not to issue

dividends or repurchase shares for the "foreseeable years ahead," and state that it attributed the Company's poor performance and future poor performance to (1) intensifying competition, (2) taking on greater social responsibilities as a result of the wrongful acts it committed relating to forced labor and spyware, and (3) improving in the area of compliance; and

(f) as a result, Defendants' statements during the Class Period were knowingly and/or recklessly false and misleading when made.

87. On November 28, 2023, during a Q3 2023 conference call, Defendant Zhao expressly denied reports that PDD platform applications have hidden functions that allow for extensive data exfiltration. This information entirely conflicted with the Arkansas Complaint, which stated that security researchers concluded that the Temu application "is purposefully and intentionally loaded with tools to execute virulent and dangerous malware and spyware activities on user devices that have downloaded and installed the TEMU app."[41]

88. Further, Defendant Zhao addressed the competition and stated that "we don't focus on what our competitors do, but what our customers need." This statement from Defendant Zhao is in direct contradiction to the investigation conducted by the Arkansas Attorney General, which Arkansas Complaint states: "[a]ccording to one report by an IT security firm, '[c]ompany insiders [related to the spyware allegations] said the exploits were utilized to spy on users and competitors, allegedly to boost sales.'"[42]

89. Defendant Zhao stated in full:

> ***Our approach to competition has always been clear, which is we don't focus on what our competitors do, but what our consumers need. We have been seeing a clear trend of consumption upgrade among our users. And against this backdrop, we formulated the high-quality development strategy to better adapt to this trend. The idea is very simple, but simple does not mean easy. There is both healthy and***

---

[41] PDD Holdings Inc., Earnings Call Transcript (Nov. 28, 2023).

[42] *Id.*

> ***malicious competition. Sometimes competition can easily evolve into unhealthy market practices. And those who do well will always attract attacks. And for example, we noted a short-tail report on our company was issued in early September. The allegations in the report are totally baseless and a short sale had a spotty track record. And on this page, the report was published with the intent to create panic and to drive down stock prices and enabling the firm to -- the short seller to profit from short position***.

90. The statements in Paragraph 90 were materially false and misleading when made for the following reasons:

(a) the Company's applications were "purposefully and intentionally loaded with tools to execute virulent and dangerous malware and spyware activities on user devices that have downloaded and installed the TEMU app;"

(b) the Company's applications could "bypass users' cell phone security to monitor activities on other apps, check notifications, read private messages, and change settings;"

(c) the Company's applications were "purposefully designed to gain unrestricted access to a user's phone operating system, including, but not limited to, a user's camera, specific location, contacts, text messages, documents, and other applications;"

(d) the Company "monetize[d the] unauthorized collection of data by selling it to third parties, profiting at the direct expense . . . [of] privacy rights;"

(e) the above-mentioned risks would and did manifest during the Class Period, eventually forcing the Company to announce on August 26, 2024 that it decided not to issue dividends or repurchase shares for the "foreseeable years ahead," and state that it attributed the Company's poor performance and future poor performance to (1) intensifying competition, (2) taking on greater social responsibilities as a result of the wrongful acts it committed relating to forced labor and spyware, and (3) improving in the area of compliance; and

(f) as a result, Defendants' statements during the Class Period were knowingly and/or recklessly false and misleading when made.

91. On April 25, 2024, PDD issued the 2023 Annual Report, which was signed by Defendants Chen and Liu.

92. In the 2023 Annual Report, PDD stated that:

> ***Our business generates and processes a large amount of data, and we are required to comply with laws relating to privacy and cybersecurity. The improper use or disclosure of data could have a material and adverse effect on our business and prospects.*** [Emphasis in original.]
>
> Our business generates and processes a large amount of data. We face a number of challenges relating to data from transactions and other activities on our platforms, including:
>
> • protecting the data in and hosted on our system, including against attacks on our system ***by outside parties or fraudulent behavior or improper use by our employees***, and securely transmitting such data over public networks;
>
> • addressing concerns related to privacy, sharing, safety, security and other factors; and
>
> • ***complying with applicable laws and regulations relating to the collection, use, storage, transfer, disclosure and security of personal data***, including any requests from regulatory and government authorities relating to these data.
>
> To address these challenges, we have adopted strict security policies and measures, including encryption technology, to protect our proprietary data and buyer information. ***Maintaining complete security on our platforms and systems for the storage and transmission of confidential or private data, such as buyers' personal information, payment-related information and transaction information, is essential to maintaining consumer confidence in our platforms and systems.***
>
> * * *
>
> ***Any negative publicity on our platforms' data safety or privacy protection mechanisms and policies, and any claims asserted or investigations against us or fines imposed upon us as a result of actual or perceived failures, could have a material and adverse effect on our public image, reputation, financial condition and results of operations.*** Any compromise of our information security or the information security measures of our contracted third-party payment service providers that results in data being improperly used or disclosed could also

> materially and adversely affect us. Significant capital, managerial and other resources, including costs incurred to deploy additional personnel, develop network protection technologies, train employees, and engage third-party experts and consultants, may be required to ensure and enhance information security or to address the issues caused by a potential security failure.[43]

93. The statements in Paragraph 92 were materially false and misleading when made for the following reasons:

(a) the Company's applications were "purposefully and intentionally loaded with tools to execute virulent and dangerous malware and spyware activities on user devices that have downloaded and installed the TEMU app;"

(b) the Company's app could "bypass users' cell phone security to monitor activities on other apps, check notifications, read private messages, and change settings;"

(c) the Company's applications were "purposefully designed to gain unrestricted access to a user's phone operating system, including, but not limited to, a user's camera, specific location, contacts, text messages, documents, and other applications;"

(d) the Company "monetize[d the] unauthorized collection of data by selling it to third parties, profiting at the direct expense . . . [of] privacy rights;"

(e) the above-mentioned risks would and did manifest during the Class Period, eventually forcing the Company to announce on August 26, 2024 that it decided not to issue dividends or repurchase shares for the "foreseeable years ahead," and state that it attributed the Company's poor performance and future poor performance to (1) intensifying competition, (2) taking on greater social responsibilities as a result of the wrongful acts it committed relating to forced labor and spyware, and (3) improving in the area of compliance; and

---

[43] *Id.*

(f) as a result, Defendants' statements during the Class Period were knowingly and/or recklessly false and misleading when made.

94. In the same document, PDD stated that:

> ***Our business is subject to complex and evolving laws and regulations regarding privacy and data protection in the countries and regions where we have operations. These laws and regulations can be complex and stringent, and many are subject to change and evolving interpretation, which may result in claims, changes to our data and other business practices, regulatory investigations, penalties, or otherwise affect our business.*** [Emphasis in original.]
>
> Regulatory authorities around the world have adopted laws and regulations or are considering legislative and regulatory proposals concerning privacy and data protection, including in the PRC, U.S. and the European Union. These laws and regulations regulate the way we collect, use, store, transfer, disclose and secure data and protect the privacy of our users. Global developments in these laws may also create additional compliance obligations for us in the jurisdictions in which we operate.
>
> * * *
>
> Aspects of certain newly enacted state privacy statutes remain unclear, resulting in further legal uncertainty and potentially requiring us to modify our data practices and policies and to incur substantial additional costs and expenses to comply. ***If more stringent privacy legislation arises in the United States, it could increase our potential liability and adversely affect our business, results of operations, and financial condition***.
>
> * * *
>
> ***Complying with these laws and contractual or other obligations relating to privacy, data protection, data transfers, data localization, or information security may require us to incur substantial operational costs or modify our data practices and policies.*** We have taken and will continue to take reasonable measures to comply with such laws and regulations, including those set forth under "Item 4. Information on the Company—B. Business Overview—Data Security and Protection" and "Item 16K. Cybersecurity." ***However, there are uncertainties with respect to how such laws and regulations will be implemented and interpreted in practice. Complying with applicable laws and regulations relating to data security and personal information protection may be costly and result in additional expenses to us, and any material failure to do so may subject us to potential liability, regulatory investigations, costly litigation or negative publicity, harm our reputation and business operations, significantly limit or completely hinder***

***our ability to continue to offer securities to investors, or cause the value of such securities to significantly decline.***[44]

95. The statements in Paragraph 94 were materially false and misleading when made for the following reasons:

(a) the Company's applications were "purposefully and intentionally loaded with tools to execute virulent and dangerous malware and spyware activities on user devices that have downloaded and installed the TEMU app;"

(b) the Company's applications could "bypass users' cell phone security to monitor activities on other apps, check notifications, read private messages, and change settings;"

(c) the Company's applications were "purposefully designed to gain unrestricted access to a user's phone operating system, including, but not limited to, a user's camera, specific location, contacts, text messages, documents, and other applications;"

(d) the Company "monetize[d the] unauthorized collection of data by selling it to third parties, profiting at the direct expense . . . [of] privacy rights;"

(e) the above-mentioned risks would and did manifest during the Class Period, eventually forcing the Company to announce on August 26, 2024 that it decided not to issue dividends or repurchase shares for the "foreseeable years ahead," and state that it attributed the Company's poor performance and future poor performance to (1) intensifying competition, (2) taking on greater social responsibilities as a result of the wrongful acts it committed relating to forced labor and spyware, and (3) improving in the area of compliance; and

(f) as a result, Defendants' statements during the Class Period were knowingly and/or recklessly false and misleading when made.

---

[44] *Id.*

96. As discussed above, on May 22, 2024 during the Q1 2024 Earnings Conference Call, Defendant Chen discussed PDD's future goals and the Company's intentions as they related to compliance stating that: "compliance is an area where [PDD is] committed to improve and where [PDD has] invested significant resources over the past few quarters."

97. The statements in Paragraph 96 were materially false and misleading when made for the following reasons:

(a) the Company's applications were "purposefully and intentionally loaded with tools to execute virulent and dangerous malware and spyware activities on user devices that have downloaded and installed the TEMU app;"

(b) the Company's applications could "bypass users' cell phone security to monitor activities on other apps, check notifications, read private messages, and change settings;"

(c) the Company's applications were "purposefully designed to gain unrestricted access to a user's phone operating system, including, but not limited to, a user's camera, specific location, contacts, text messages, documents, and other applications;"

(d) the Company "monetize[d the] unauthorized collection of data by selling it to third parties, profiting at the direct expense . . . [of] privacy rights;"

(e) the above-mentioned risks would and did manifest during the Class Period, eventually forcing the Company to announce on August 26, 2024 that it decided not to issue dividends or repurchase shares for the "foreseeable years ahead," and state that it attributed the Company's poor performance and future poor performance to (1) intensifying competition, (2) taking on greater social responsibilities as a result of the wrongful acts it committed relating to forced labor and spyware, and (3) improving in the area of compliance; and

(f) as a result, Defendants' statements during the Class Period were knowingly and/or recklessly false and misleading when made.

**3. PDD Reveals the Cost of Addressing These Critical Issues**

98. Before the market opened on August 26, 2024, PDD released its financial results for the second quarter 2024 (the "Q2 2024 Earnings Release").[45] From market close on Friday, August 23, 2024 to market close on Monday, August 26, 2024, PDD shares fell $39.87 or 29%. At the Q2 2024 Earnings Release, PDD disclosed its quarterly results for the second quarter of 2024, and announced on a related earnings call that it had decided not to issue dividends or repurchase shares for the "foreseeable years ahead," and stated that it expected that future profitability would be weighed down by a reduction in transaction fees for high quality merchants to drive the "high-quality development" of its merchant ecosystem. PDD reported fiscal second-quarter 2024 revenue growth of 86% year-over-year to $13.36 billion, missing the analyst consensus estimate of $13.97 billion.

99. On the Q2 2024 Earnings Conference Call, Defendants attributed the Company's poor performance and future poor performance to intensifying competition and taking on greater social responsibilities, thus confirming the wrongful acts PDD committed relating to forced labor and spyware. The Company also emphasized in its earlier Q1 2024 Earnings Conference Call that it needed to "improve" in the area of compliance and had "invested significant resources over the past few quarters" to do so.[46]

100. During the Q2 2024 Earnings Conference Call, Defendant Chen stated that "[a]s shown in this quarter's results, high revenue growth is not sustainable and a downward trend in

---

[45] PDD Holdings Inc., Earnings Call Transcript (Aug. 26, 2024).
[46] *Id.*

profitability is inevitable." He further explained that the Company would need to "improve [its] capabilities in supply chain, customer services and compliance to better meet the expectations of consumers around the world." Defendant Chen attributed the Company's past and future poor performance to "intensifying competition" and "taking on greater social responsibilities," thus confirming the wrongful acts PDD committed relating to forced labor and spyware. Defendant Chen also explained during an earlier Q1 2024 Earnings Conference all that "compliance is an area where [PDD is] committed to improve and where [PDD has] invested significant resources over the past few quarters."[47]

101. Following publication of the Q2 2024 Earnings Release and the Company's accompanying earnings call that same day, stock and research analysts that followed PDD were quick to voice their surprise. For example:

(a) A Morningstar Equity Analyst Report dated August 26, 2024 at 22:32 UTC described the Q2 2024 Earnings Release: "We assign PDD a Morningstar Uncertainty Rating of Very High. The business is cyclical, and a weak macroeconomic environment can reduce discretionary spending on PDD's platform. New regulations could benefit or hurt PDD. For instance . . . [a] more stringent data privacy requirements could hurt PDD."[48]

(b) One day later, another Morningstar Equity Analyst Report expressed anticipated declines in PDD shares due to the Q2 2024 Earnings Release. For example, this analyst report stated:

> Narrow-moat PDD Holding, or PDD, missed the LSEG revenue forecast by 3% but beat consensus operating profit by 14% in the second quarter. However, share price declined 29% after the results release as management gave pessimistic guidance on

---

[47] *Id.*

[48] Chelsey Tam, *PDD's Temu Is Expanding Faster And Burning Less Cash Than We Expected*, MORNINGSTAR (Aug. 26, 2024).

> future growth and margin and has no plans for dividends or share buybacks in the next few years.
>
> Management expects future revenue growth to slow down due to intensifying competition (increasing offerings of competitively priced products by peers) and external challenges (potential scrapping of the import tax exemption for low-value imports in the US and Europe) . . . More importantly, PDD thinks a long-term profitability decline is inevitable, while in the near term there will be fluctuation in margins.[49]

102. Following the publication of the Q2 2024 Earnings Release and the accompanying earnings call, which took place pre-market hours on August 26, 2024, PDD shares plummeted by 29% from the August 23, 2024 closing price of $139.87 per share on abnormally high volume of 103,174,600 shares traded on August 26, 2024, closing at $100.00 per share that same day.

103. Although PDD attributed its poor past and future performance to "intensifying competition," it was PDD who became so enveloped in beating out its competition, that it relied on unsustainable business practices in a poor-taste attempt to stay ahead of the pack. For example, as alleged by the Arkansas Attorney General and according to an IT security firm, "[c]ompany insiders" said the Company's applications, which functioned as spyware when downloaded onto users' devices, were "utilized to ***spy on*** users and ***competitors***, allegedly to boost sales."[50] Additionally, by having no company policy in place to prohibit the sale of goods from Xinjiang, PDD turned a blind eye to its merchants' use of these products in violation of the UFLPA. It is clear that PDD was willing to put anything or anyone at stake to beat out its competitors, including those affected by forced labor in the Xinjiang region, and also the privacy of its own users and customers.

---

[49] Chelsey Tam, *PDD Earnings: Fair Value Estimate Slashed by 26%, but Shares Still Cheap*, MORNINGSTAR (Aug. 27, 2024).

[50] Nicholas Foisy, *Temu App Poses Potential Data Risk/or Consumers,* Compass IT Compliance (June 30, 2023), https://www.compassitc.com/blog/temu-app-poses-potential-datarisk-for-consumers.

104. PDD also attributed its poor past and future performance to its desire to take on greater "social responsibility." Social responsibility is "an ethical focus for individuals and companies that want to take action and be accountable for practices that benefit society."[51] PDD had been doing just the opposite of that. For example, in response to an inquiry detailed in the congressional report regarding Temu discussed herein, "Temu acknowledged that it d[id] not have a policy in place to prohibit the sale of goods from Xinjiang—the location of the CCP's ongoing genocide against the Uyghurs—on its platform." Additionally, "Temu denie[d] responsibility for ensuring that its 80,000, mostly China-based sellers do not sell products produced with forced labor . . ." As another example and as alleged by the Arkansas Attorney General in the Arkansas Complaint, "Temu is purposefully designed to gain unrestricted access to a user's phone operating system, including, but not limited to, a user's camera, specific location, contacts, text messages, documents, and other applications . . . Temu monetize[d] this unauthorized collection of data by selling it to third parties, profiting at the direct expense of Arkansans' privacy rights."

105. Lastly, PDD in its Q1 2024 Earnings Conference Call[52] expressed the necessity for the Company to "improve" in the area of compliance and acknowledged that the Company had "invested significant resources over the past few quarters" to do so. This improvement in compliance would prove to be a herculean task to a company: (1) whose actions, per the Congressional Report, "guarantee[d] that shipments from Temu containing products made with forced labor are entering the United States on a regular basis, in violation of the UFLPA;" and (2) who, per the Arkansas Complaint, "is purposefully and intentionally loaded with tools to execute

---

[51] Akhilesh Ganti, *Social Responsibility in Business: Meaning, Types, Examples, and Criticism*, INVESTOPEDIA, (June 12, 2024) https://www.investopedia.com/terms/s/socialresponsibility.asp.

[52] PDD Holdings Inc., Earnings Call Transcript (May 22, 2024).

virulent and dangerous malware and spyware activities on user devices that have downloaded and installed the TEMU app." PDD conveniently failed to express to investors the devastating impact that this endeavor would and did have on its business.

### B. Defendants Acted with Scienter When They Made or Caused to be Made Material Misstatements and Omissions in Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder

106. As alleged herein, Defendants acted with scienter in that they: (i) knew, or were deliberately reckless in not knowing, that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; (ii) knew, or were deliberately reckless in not knowing, that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly (or with deliberate recklessness) and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

107. As set forth herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding PDD, their control over, receipt, and modification of PDD's allegedly materially misleading statements and their associations with the Company that made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

108. The Individual Defendants permitted PDD to release these false and misleading statements and failed to file the necessary corrective disclosures, which artificially inflated the value of the Company's ADSs. As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding PDD, their control over, receipt, and modification of the Company's allegedly materially misleading statements and omissions, and their positions with the Company that made them privy to confidential information concerning PDD, participated in the fraudulent scheme in violation of the Exchange Act as alleged herein.

109. The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on those who purchased PDD ADS by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme deceived the investing public regarding PDD's business, operations, and management and the intrinsic value of the Company's ADS and caused Lead Plaintiff and members of the Class to purchase PDD ADSs at artificially inflated prices.

110. Numerous additional facts, such as the ones listed below, give rise to the strong inference of scienter that, throughout the Class Period, Defendants Chen, Ma, Liu, and Zhao knew or were severely reckless in disregarding that:

(a) Defendants failed to take sufficient actions (if any) to ensure that goods sold on its platform were compliant with the UFLPA and not produced using forced labor;

(b) Defendants failed to implement any internal guidelines to ensure compliance with the UFLPA, which in turn, "guarantee[d] that shipments from Temu containing products made with forced labor . . . enter[ed] the United States on a regular basis, in violation of the UFLPA;"

(c) Defendants failed to expressly prohibit third-party sellers from selling products based on their origin in the Xinjiang Autonomous Region;

(d) Defendants failed to review the Company's platform for merchants selling goods expressly from the Xinjiang Autonomous Region;

(e) Defendants improperly relied only on customers and suppliers to report whether goods being sold on PDD's platforms were produced by forced labor;

(f) the Company's applications were "purposefully and intentionally loaded with tools to execute virulent and dangerous malware and spyware activities on user devices that have downloaded and installed the TEMU app;"

(g) the Company's applications could "bypass users' cell phone security to monitor activities on other apps, check notifications, read private messages, and change settings;"

(h) the Company's applications were "purposefully designed to gain unrestricted access to a user's phone operating system, including, but not limited to, a user's camera, specific location, contacts, text messages, documents, and other applications;"

(i) the Company "monetize[d the] unauthorized collection of data by selling it to third parties, profiting at the direct expense . . . [of] privacy rights;"

(j) the above-mentioned risks would and did manifest during the Class Period, eventually forcing the Company to announce on August 26, 2024 that it decided not to issue dividends or repurchase shares for the "foreseeable years ahead," and state that it attributed the Company's poor performance and future poor performance to (1) intensifying competition, (2) taking on greater social responsibilities as a result of the wrongful acts it committed relating to forced labor and spyware, and (3) improving in the area of compliance; and

(k) as a result, Defendants' statements during the Class Period were knowingly and/or recklessly false and misleading when made.

111. Additionally, Defendants have confirmed in a multitude of ways that they had knowledge or were reckless in not knowing during the Class Period of the fraud that would ultimately unravel on August 26, 2024. For example, and as shown above, the Defendants actually participated in the investigation in connection with the Congressional Report and answered questions regarding the facts set forth herein.

112. Lastly, the magnitude of Defendants' alleged fraud and the fact that it involved the core operations of the Company's business also support a strong inference of scienter. Defendants masked the startling bad acts of the company for profits, which did not come. The disclosures described above, in which PDD tried to deceive the public, sent PDD's stock price plummeting nearly 30%.

### 1. Indications of Knowledge and/or Reckless Disregard in Not Knowing All Undisclosed Adverse Facts

113. The public statements made by the Defendants indicate their knowledge of and/or reckless disregard in not knowing the undisclosed facts. Individual Defendants, along with other representatives of PDD, spoke to investors and analysts prior to and throughout the Class Period regarding forced labor and spyware allegations. Defendants' communications with the public regarding these allegations were detail-laden, reflecting that the Individual Defendants were hands-on managers with specific knowledge of (or direct access to) data and facts regarding forced labor and spyware allegations, whether disclosed to the investing public or not.

114. For instance, on June 22, 2023, the United States Select Committee on the Chinese Communist Party released a congressional report titled "Fast Fashion and the Uyghur Genocide: Interim Findings" detailing PDD and Temu's noncomplaince with the UFLPA. The Congressional Report shed light on scienter as to Defendants' knowledge and/or reckless disregard of PDD's blatant use of forced labor in violation of the UFLPA.

115. The Congressional Report explained that Temu has no system to ensure compliance with the UFLPA, which "guarantee[d] that shipments from Temu containing products made with forced labor are entering the United States on a regular basis, in violation of the UFLPA." Temu conducts no audits and enforces no compliance system which would ensure compliance with the UFLPA.

116. The Congressional Report stated that: "[w]e asked Temu what measures it has in place to make sure that goods it sells are compliant with the UFLPA. Temu wrote, in part, 'Because Temu is not the importer of record with respect to goods shipped to the United States, [the UFLPA] and the prohibitions set out in [Section 307 of the Tariff Act of 1930] do not apply directly to Temu's activities as an online platform operator.' Temu denied all responsibility for ensuring that its China-based sellers comply with United States law and do not sell products produced by forced labor simply because the Company asserts that it is "not the importer of record with respect to goods shipped to the United States."

117. Further, per the Congressional Report, Temu admitted that it "does not expressly prohibit third-party sellers from selling products based on their origin in the Xinjiang Autonomous Region." Temu relies on a "reporting system" in which "consumers, sellers, [and] regulators," among others, can "file complaints for violations of Temu platform rules." Though, Temu denied having ever received any complaints regarding forced labor practices. This is not surprising because individuals in China are unlikely to self-report violations of United States law for political and other reasons.

118. Upon investigations detailed in the Congressional Report, it was uncovered that Temu's marketplace shockingly featured the product listed in the below image, which was obtained on May 31, 2023. This product is a keychain with the following product description: "New Handmade Knitted Cotton Pendant ***with Xinjiang Cotton*** Design Woven Pendant and Key Pendant." Defendants cannot with a straight face say that they did not know or should not have known that the products sold on its platforms may have come from Xinjiang, and in turn, were likely violating the UFLPA.

119. Defendants also acted with scienter pertaining to the Company's platform effectively working as spyware when downloaded on users' devices. On June 25, 2024, the Arkansas Attorney General filed the Arkansas Complaint, which illustrated in shocking detail the violations of privacy that PDD undertook when users downloaded a PDD platform onto their personal devices.




120. The Arkansas Complaint alleged that "Temu is purposefully designed to gain unrestricted access to a user's phone operating system, including, but not limited to, a user's camera, specific location, contacts, text messages, documents, and other applications . . . Temu monetizes this unauthorized collection of data by selling it to third parties, profiting at the direct expense of Arkansans' privacy rights."

121. The Arkansas Complaint also alleged that "[o]n March 5, 2023, Pinduoduo issued a new update of its app, version 6.50.0, which removed the exploits . . . Two days after the update, Pinduoduo disbanded the team of engineers and product managers who had developed the exploits, according to a Pinduoduo source. Thereafter, most of the members on this team were

transferred to work at Temu . . . It is evident that great efforts were taken to intentionally hide the malicious intent and intrusiveness of the software."

122. Further, the Arkansas Complaint stated that the security researchers concluded that the Temu application was "purposefully and intentionally loaded with tools to execute virulent and dangerous malware and spyware activities on user devices that have downloaded and installed the TEMU app." These researchers found that the Company's applications were intentionally programmed to bypass mobile device security systems. Another report even alleged that "[c]ompany insiders said the exploits were utilized to spy on users and competitors, allegedly to boost sales. [PDD] requested as many as 83 permissions, including access to biometrics, Bluetooth, and Wi-Fi network information."[53]

123. Lastly, the Arkansas Complaint explained how particularly abusive the Company's spyware practices are "given that many of the users of Temu are minors, including minors under the age of 13. At all relevant times, Defendants have been aware that minors, including minors under the age of 13, are using the Temu platform. . . . Defendants possess actual knowledge that children under the age of 13 are on the Temu app—and indeed, Defendants actively seek out this audience. Defendants also indiscriminately and surreptitiously mine those children's PII, without providing notice to parents of those children and without obtaining the parents' verifiable consent."

## VI. DEFENDANTS VIOLATIONS OF ITEM 303 OF REGULATION S-K

124. Separately, Defendants were required to comply with Item 303 of Regulation S-K, 17 C.F.R. § 229.303 ("Item 303"). Item 303 required the Company to disclose "any known

[53] Nicholas Foisy, *Temu App Poses Potential Data Risk/or Consumers,* COMPASS IT COMPLIANCE (June 30, 2023), https://www.compassitc.com/blog/temu-app-poses-potential-datarisk-for-consumers.

trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." *Macquarie Infrastructure Corp. v. Moab Partners, L. P.* held that "[t]he failure to disclose information required by Item 303 can support a Rule 10b–5(b) claim only if the omission renders affirmative statements made misleading . . . private parties remain free to bring claims based on Item 303 violations that create misleading half-truths . . ." 601 U.S. 257, 258 (2024). For the reasons described above in Section V, Defendants did not comply with Item 303.

## VII. CONTROL PERSON ALLEGATIONS

125. The Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company and were directly involved in the day-to-day operations of the Company at the highest levels. The Individual Defendants participated in drafting, preparing, and/or approving the public statements and communications complained of herein and were aware of, or recklessly disregarded, the material misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.

126. Defendant Chen was, at all relevant times, a founding member of PDD and served as PDD's CEO from July 2020 through April 2023 and co-CEO since April 2023 until now. Defendant Chen is also the chairman of PDD's Board, which position he has held since March 2021.

127. Defendant Ma served as PDD's Vice President of Finance from the beginning of the Class Period until January 1, 2022. PDD has never had a CFO, and the Vice President of Finance position is the closest equivalent.

128. Defendant Liu has served as PDD's Vice President of Finance from January 1, 2022 to the present. Prior to her position as the Vice President of Finance, Liu served as the Director of Finance from 2017 to 2021.

129. Defendant Zhao is a founding member of PDD, and both co-CEO and member of the Board since April 2023. Prior to then, Zhao served as Senior Vice President from 2018 to 2023.

130. During the Class Period, Defendants' statements were materially false and misleading when made in that Defendants failed to disclose:

(a) Defendants failed to take sufficient actions (if any) to ensure that goods sold on its platform were compliant with the UFLPA and not produced using forced labor;

(b) Defendants failed to implement any internal guidelines to ensure compliance with the UFLPA, which in turn, "guarantee[d] that shipments from Temu containing products made with forced labor . . . enter[ed] the United States on a regular basis, in violation of the UFLPA;"

(c) Defendants failed to expressly prohibit third-party sellers from selling products based on their origin in the Xinjiang Autonomous Region;

(d) Defendants failed to review the Company's platform for merchants selling goods expressly from the Xinjiang Autonomous Region;

(e) Defendants improperly relied only on customers and suppliers to report whether goods being sold on PDD's platforms were produced by forced labor;

(f) the Company's applications were "purposefully and intentionally loaded with tools to execute virulent and dangerous malware and spyware activities on user devices that have downloaded and installed the TEMU app;"

(g) the Company's applications could "bypass users' cell phone security to monitor activities on other apps, check notifications, read private messages, and change settings;"

(h) the Company's applications were "purposefully designed to gain unrestricted access to a user's phone operating system, including, but not limited to, a user's camera, specific location, contacts, text messages, documents, and other applications;"

(i) the Company "monetize[d the] unauthorized collection of data by selling it to third parties, profiting at the direct expense . . . [of] privacy rights;"

(j) the above-mentioned risks would and did manifest during the Class Period, eventually forcing the Company to announce on August 26, 2024 that it decided not to issue dividends or repurchase shares for the "foreseeable years ahead," and state that it attributed the Company's poor performance and future poor performance to (1) intensifying competition, (2) taking on greater social responsibilities as a result of the wrongful acts it committed relating to forced labor and spyware, and (3) improving in the area of compliance; and

(k) as a result, Defendants' statements during the Class Period were knowingly and/or recklessly false and misleading when made.

131. The Individual Defendants, as senior executive officers of the Company, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period. The Individual Defendants were provided with copies of the documents and statements alleged herein to be materially false and misleading prior to or shortly after their issuance and/or had the ability and opportunity to prevent their issuance or cause them to be corrected. Accordingly, the Individual Defendants are responsible for the accuracy of the public reports, releases, and other statements detailed herein and are primarily liable for the misrepresentations and omissions contained therein.

132. The Individual Defendants, because of their positions of control and authority as senior executive officers and directors, had access to the adverse undisclosed information about PDD's business through their access to internal corporate documents and information, conversations and associations with other corporate officers and employees, attendance at regularly-held meetings, as well as other management and Board of Directors meetings and committees thereof, and reports and other information provided to them in connection therewith.

133. As senior officers and controlling persons of a publicly held company whose ADSs were, during the relevant time period, registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations and business, and to correct any previously issued statements that were or had become materially misleading or untrue, so that the market price of the Company's ADS would be based upon truthful and accurate information. The Individual Defendants' wrongdoing during the Class Period violated these specific requirements and obligations.

## VIII. LOSS CAUSATION

134. During the Class Period, as detailed herein, the Individual Defendants engaged in a course of conduct that artificially inflated the price of PDD. Their conduct operated as a fraud or deceit on Class Period purchasers of PDD's ADS and warrants by failing to disclose and misrepresenting the adverse facts relating to the Company's business and growth prospects that are detailed herein. By presenting a misleading picture of PDD's business and prospects, the Defendants' false and misleading statements had the intended effect of causing PDD ADS to trade at artificially inflated levels throughout the Class Period.

135. The price of PDD ADS fell precipitously when the prior artificial inflation in PDD shares evaporated when: (i) the Defendants' prior material misstatements and omissions were

revealed; (ii) omitted material adverse facts were disclosed and/or became apparent to the market; and/or (iii) the risks concealed by the Defendants' misconduct materialized.

136. The artificial inflation in the price of PDD ADS dissipated first on June 27, 2024 when Defendants' false and misleading statements and omissions became partially apparent to the market, and the price of PDD ADS sank 4.55% on shares which traded closing at $131.94 per share on Thursday, June 27, 2024, down from the closing price of $138.23 per share on Wednesday, June 26, 2024. This drop occurred after the Arkansas Attorney General filed the Arkansas Complaint, which provided the public with new reliable information regarding the Company's use of spyware.

137. As alleged herein, the artificial inflation in the price of PDD ADS dissipated again on August 26, 2024 as Defendants' false and misleading statements and omissions became apparent to the market, and the price of PDD ADS sank 29% on abnormally high volume of 103,174,600 shares traded closing at $100 per share on Monday, August 26, 2024, down from the closing price of $139.87 per share on Friday, August 23, 2024.

138. This drop occurred immediately after the Company disclosed its quarterly results for Q2 2024 and Defendant Chen stated that the Company had decided not to issue dividends or repurchase shares for the "foreseeable years ahead," and stated that it expected that future profitability would be weighed down by a reduction in transaction fees for high quality merchants to drive the "high-quality development" of its merchant ecosystem. On the Q2 2024 Earnings Conference Call, Defendants attributed the Company's poor performance and future poor performance to intensifying competition and taking on greater social responsibilities, thus confirming the wrongful acts PDD committed relating to forced labor and spyware. The Company

also suggested in its earlier Q1 2024 Earnings Conference Call that it needed to "improve" in the area of compliance but did not disclose at that time the enormous cost.[54]

139. The risk would soon materialize and these improvements would prove to be devastating to a company: (1) whose actions, per the Congressional Report, "guarantee[d] that shipments from Temu containing products made with forced labor are entering the United States on a regular basis, in violation of the UFLPA;" and (2) who, per the Arkansas Complaint, "is purposefully and intentionally loaded with tools to execute virulent and dangerous malware and spyware activities on user devices that have downloaded and installed the TEMU app." PDD conveniently failed to express to investors the devastating impact that this endeavor would and did have on its business. In turn, the stock plummeted.




140. The declines in the price of PDD stock pled herein were a direct and proximate result of the nature, extent and impact of Defendants' prior false and misleading statements and omissions being revealed to investors. The timing and magnitude of the price decline of PDD ADS negates any inference that the loss suffered by Lead Plaintiff and other Class members was

[54] *Id.*

caused by changed market conditions, macroeconomic or industry factors, or Company-specific factors unrelated to Defendants' wrongful conduct.

141. It was entirely foreseeable to Defendants that their materially false and misleading statements and omissions would artificially inflate and/or maintain the price of PDD ADS. It was also foreseeable to Defendants that the revelation of the truth alleged herein would cause the price of PDD ADS to fall as the artificial inflation caused by Defendants' misstatements and omissions was removed. Thus, the stock price declines described above were directly and proximately caused by Defendants' materially false and misleading statements and omissions.

142. Following publication of the Q2 2024 Earnings Release and the Company's accompanying earnings call that same day, stock and research analysts that followed PDD were quick to voice their surprise. For example:

(a) A Morningstar Equity Analyst Report dated August 26, 2024 at 22:32 UTC described the Q2 2024 Earnings Release stated: "[w]e assign PDD a Morningstar Uncertainty Rating of Very High. The business is cyclical, and a weak macroeconomic environment can reduce discretionary spending on PDD's platform. New regulations could benefit or hurt PDD. For instance, the end of an exclusivity agreement between Alibaba and its merchants favors PDD, while more stringent data privacy requirements could hurt PDD."[55]

(b) Just one day later, another Morningstar Equity Analyst Report expressed anticipated declines in PDD shares due to the Q2 2024 Earnings Release. For example, this analyst report stated:

> Narrow-moat PDD Holding, or PDD, missed the LSEG revenue forecast by 3% but beat consensus operating profit by 14% in the second quarter. However, share price declined 29% after the results release as management gave pessimistic guidance on

---

[55] Chelsey Tam, *PDD's Temu Is Expanding Faster And Burning Less Cash Than We Expected*, MORNINGSTAR (Aug. 26, 2024).

> future growth and margin and has no plans for dividends or share buybacks in the next few years.
>
> Management expects future revenue growth to slow down due to intensifying competition (increasing offerings of competitively priced products by peers) and external challenges (potential scrapping of the import tax exemption for low-value imports in the US and Europe) . . . More importantly, PDD thinks a long-term profitability decline is inevitable, while in the near term there will be fluctuation in margins.[56]

(c) On June 26, 2024, Yahoo Finance published an article titled "*Temu Faces Lawsuit for Privacy Violations in Arkansas, US*." This article details the Arkansas Complaint and is just another example of the world slowly realizing that, as the Arkansas Complaint states, "Temu is not an online marketplace like Amazon or Walmart. It is a data-theft business that sells goods online as a means to an end."

143. Following the publication of the Q2 2024 Earnings Release and the Company's second quarter 2024 earnings call, which took place pre-market hours on August 26, 2024, PDD shares plummeted by 29% from the August 23, 2024 closing price of $139.87 per share on abnormally high volume of 103,174,600 shares traded on August 26, 2024, closing at $100.00 per share that same day.

## IX. PRESUMPTION OF RELIANCE

144. Lead Plaintiff alleges that throughout the Class Period, Defendants omitted material information of which Defendants were aware or reckless in not knowing. Such statements artificially inflated or artificially maintained the price of PDD publicly traded ADS and operated as a fraud or deceit on all persons and entities who purchased or otherwise acquired

---

[56] Chelsey Tam, *PDD Earnings: Fair Value Estimate Slashed by 26%, but Shares Still Cheap*, MORNINGSTAR (Aug. 27, 2024).

that ADS during the Class Period. Because Defendants chose to speak on the issues described herein, it was important that Defendants not mislead investors or withhold material information.

145. Lead Plaintiff is titled to a presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) the omissions and misrepresentations were material;

(c) the Company's stock traded in an efficient market;

(d) the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's ADS; and

(e) Lead Plaintiff and other members of the Class purchased PDD ADSs between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

146. At all relevant times, the market for PDD stock was efficient for the following reasons, among others:

(a) PDD ADS met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) as a regulated issuer, PDD filed periodic public reports with the SEC;

(c) PDD regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(d) PDD was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms and that were publicly available and entered the public marketplace; and

(e) Unexpected material news about PDD was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

147. As a result of the foregoing, the market for PDD securities promptly digested current information regarding PDD from all publicly available sources and reflected such information in PDD's stock price. Under these circumstances, all purchasers of PDD ADS during the Class Period suffered similar injury through their purchase of PDD ADS at artificially inflated prices and the presumption of reliance applies.

148. In the alternative, to the extent that the Defendants concealed or improperly failed to disclose material facts with respect to PDD's business and financial prospects, including its large-scale development projects during the Class Period, Lead Plaintiff is titled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

## X. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

149. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could

cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of PDD who knew that the statement was false when made.

## XI. CLASS ACTION ALLEGATIONS

150. Plaintiff brings this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of all person or entities who purchased or otherwise acquired PDD's publicly traded ADS between April 30, 2021 through August 23, 2024, inclusive. Excluded from the Class are: (i) Defendants (as defined herein); (ii) present or former executive officers and directors of any Defendant, and members of their immediate families (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii)); (iii) any of the foregoing entities' and individuals' legal representatives, heirs, successors or assigns; and (iv) any entity in which Defendants have or had a controlling interest, or any affiliate of any Defendant. For avoidance of doubt, "affiliates" are persons or entities that directly, or indirectly through one or more intermediaries, control, are controlled by or are under common control with one of the Defendants, and include any employee benefit plan organized for the benefit of PDD employees.

151. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a) Whether the Exchange Act was violated by Defendants;

(b) Whether Defendants omitted and/or misrepresented material facts;

(c) Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(e) Whether the price of PDD stock was artificially inflated; and

(f) The extent of the damage sustained by Class members and the appropriate measure of damages.

152. Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

153. Lead Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in securities class action litigation. Lead Plaintiff has no interests that conflict with those of the Class.

154. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants

155. Lead Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

156. This Count is asserted pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, on behalf of Lead Plaintiff and the Class, against PDD and the Individual Defendants.

157. During the Class Period, Defendants disseminated or approved the materially false or misleading statements alleged herein, among others, which they knew or recklessly disregarded were misleading in that they misrepresented and/or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

158. Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices and a course of conduct that operated as a fraud and deceit upon purchasers of PDD ADS during the Class Period. The Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.

159. During the Class Period, Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiff and the Class; made materially false statements and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase or sale of PDD ADS, which were intended to, and did: (a) deceive the investing public, including Lead Plaintiff and the other Class members; (b) artificially inflate and maintain the market price of PDD ADS; and (c) caused Lead Plaintiff and other members of the Class to

purchase PDD ADS at artificially inflated prices and to suffer losses when the true facts became known.

160. Defendant PDD is liable for all materially false or misleading statements made during the Class Period, as alleged above.

161. The Individual Defendants are liable for the false or misleading statements they made and for which they were responsible, as alleged above.

162. As alleged above, the Defendants acted with scienter throughout the Class Period, in that they acted either with intent to deceive, manipulate, or defraud, or with reckless disregard for the truth. The material misrepresentations and omissions of material facts alleged herein, which presented a danger of misleading buyers and sellers of PDD ADS, were either known to the Defendant or were so obvious that the Defendants should have been aware of them.

163. The above allegations, as well as the allegations pertaining to the overall scope and breadth of the fraud at PDD, establish a strong inference that Defendants acted with scienter in making the materially false or misleading statements alleged above during the Class Period.

164. Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they purchased PDD ADS and were harmed when the truth about PDD negatively impacted the price of those securities. Lead Plaintiff and the Class would not have purchased PDD ADS at the prices they paid, or at all, had they been aware of the truth about PDD.

165. As a direct and proximate result of the Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered harm in connection with their respective purchases of the Company's ADS during the class period.

## COUNT II

**For Violation of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

166. Lead Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

167. This Count is asserted pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of Lead Plaintiff and the Class, against each of the Individual Defendants.

168. As set forth above, each of the Individual Defendants were each controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act. The Individual Defendants acted as controlling persons of PDD within the meaning of Section 20(a) of the Exchange Act by virtue of their executive positions and their culpable participation, as alleged above, the Individual Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements that Lead Plaintiff contends were false and misleading. The Individual Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by Lead Plaintiff to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

169. In particular, the Individual Defendants had direct involvement in and responsibility over the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and had the power and ability to control public statements about PDD and the actions of PDD and its employees. Moreover, the Individual Defendants were each directly involved in providing false information and certifying and/or approving the materially false or misleading statements disseminated by PDD during the Class Period. As a result of the

foregoing, the Individual Defendants each were controlling persons of PDD within the meaning of Section 20(a) of the Exchange Act.

170. As alleged above, PDD violated Section 10(b) of the Exchange Act by its material misrepresentations and omissions as alleged in this Complaint. By virtue of their positions as controlling persons of PDD and as a result of their own aforementioned conduct, the Individual Defendants are each liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act of Rule 10b-5 promulgated thereunder, to Lead Plaintiff and the other members of the Class who purchased or otherwise acquired PDD ADS. Moreover, as alleged above, during the respective times that the Individual Defendants served as officers and/or directors of PDD, each of the Individual Defendants culpably participated in the material misstatements and omissions made by PDD, as set forth above.

171. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases or acquisitions of the Company's ADS during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A. Determining that this action is a proper class action, designating Lead Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiff's counsel as Lead Counsel for the Class;

B. Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D. Awarding such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED: March 4, 2025

Respectfully submitted,

*/s/ Alfred L. Fatale III*
**LABATON KELLER SUCHAROW LLP**
Alfred L. Fatale III
Beth C. Khinchuk
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
afatale@labaton.com
bkhinchuk@labaton.com

*Counsel for Lead Plaintiff and Lead Counsel for the Proposed Class*

*/s/ Phillip Kim*

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
Jing Chen
101 Greenwood Ave., Ste. 440
Jenkintown, PA 19046
Telephone: (215) 600-2817
philkim@rosenlegal.com
jchen@rosenlegal.com

*Liaison Counsel for Lead Plaintiff and the Proposed Class*

**CERTIFICATE OF SERVICE**

I certify that this 4th day of March 2025, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Notice of Electronic Filing.

*/s/ Alfred L. Fatale III*
Alfred L. Fatale III