

**Alfred L. Fatale III**
**Partner**
**Labaton Keller Sucharow LLP**
140 Broadway
New York, New York 10005
212.907.0884
AFatale@labaton.com

May 19, 2025

**VIA ECF**
The Honorable Pamela K. Chen
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

RE:     *Baxter v. PDD Holdings Inc. et al.*, 1:24-cv-05653-PKC-CLP (E.D.N.Y.)

Dear Judge Chen:

Court-appointed Lead Plaintiff Boston Retirement System respectfully writes in response to Defendant PDD's request for a pre-motion to dismiss conference.[1] Lead Plaintiff believes the arguments offered in support of PDD's proposed motion are unavailing.

**Falsity**. The Exchange Act imposes a duty to tell the full truth and makes actionable statements that are "inaccurate, incomplete, or misleading." *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 167 (2d Cir. 2021). The Complaint adequately alleges under Rule 9(b) and the PSLRA that Defendants failed this duty. Specifically, the Complaint explains "why and how" each statement was false and misleading, "evaluated not only by literal truth, but by context and manner of presentation." *IWA Forest Indus. Pension Plan v. Textron Inc.*, 14 F.4th 141, 145 (2d Cir. 2021).

UFLPA Compliance. PDD told investors that it "require[s] merchants on the Temu platform to comply with [PDD's] third-party code of conduct, which strictly prohibits the use of forced penal, or child labor[,]" and that it had "establish[ed] policies and procedures to ensure that no seller on the Temu platform is on the UFLPA Entity List, and use[d] technology to identify products that are at higher risk of non-compliance." ¶¶4, 62, 72–75. These statements are incomplete and misleading considering PDD's later admission that it lacked any internal controls to validate compliance with the UFLPA. *Id.*

PDD's claim that such (at best) half-truths should be shielded by unrelated "risk factors" should be rejected. At no point do these generalized cautions state that PDD lacked policies and procedures to detect instances of UFLPA non-compliance. ¶¶69–77. This fact would certainly influence a reasonable investor's calculations as to the likelihood and prevalence of non-compliance on the Company's platform. *See Hawaii Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*, 422 F. Supp. 3d 821, 840 (S.D.N.Y. 2019) ("[G]eneric warning

---

[1] Defined terms have the meaning ascribed in the operative Complaint (ECF No. 31). Citations to ¶ are to the Complaint. Internal quotation marks and citations are omitted throughout.



of a risk will not suffice when undisclosed facts ... would substantially affect a reasonable investor's calculations of probability.").[2]

Moreover, these risk factors are separately rendered inapplicable given that they warn of hypothetical non-compliance "when, in fact, that risk has already materialized." *Constr. Laborers Pension Tr. for S. Ca. v. CBS Corp.*, 433 F. Supp. 3d 515, 536 (S.D.N.Y. 2020); *see* ¶¶74–75. Under the UFLPA, it is presumed that "all goods manufactured in Xinjiang are made with forced labor." ¶32. In addition to its lack of internal controls, PDD refused to prohibit merchants on its platform from selling products from Xinjiang and even featured Xinjiang-made products on its marketplace. ¶¶32, 74–75, 115–18.

Data Privacy. The Complaint sufficiently alleges that the consumer data statements were incomplete and misleading. For example, PDD claimed it had "adopted strict data protection policy to ensure the security of our proprietary data" and only "collect[ed] anonymized, non-confidential user behavior and pattern data ... which [had] been pre-processed to exclude user identity or other sensitive information." ¶¶78–80. Yet, "Temu is purposefully designed to gain unrestricted access to a user's phone operating system, including, but not limited to, a user's camera, specific location, contacts, text messages, document, and other applications .... Temu monetizes this unauthorized collection of data by selling it to third parties." ¶56.

PDD chose to speak about its "strict data protection policy," and therefore, was under a self-imposed duty to disclose the full truth regarding its data protections, including the collection and monetization of private data. Boilerplate warnings that PDD "may not have fully complied [with all applicable laws and regulations] in the past and may not fully comply in the future" are characterized as potential and cannot sufficiently inform the reasonable investor as to present non-compliance. *See AMC*, 422 F. Supp. 3d at 840; ¶¶69–70, 83–86. Hypothetical warnings that "actual or perceived failures" relating to data privacy "could have a material and adverse effect" on the Company ring hollow when PDD's platform was intentionally designed to function as spyware.[3] ¶¶46, 55–58, 83, 92.

**Scienter.** In analyzing scienter, the Court must conduct a "comparative assessment of plausible inferences" while "constantly assuming the plaintiff's allegations to be true," to determine whether "a reasonable person [would] deem the inference of scienter as least as strong as any opposing inference." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 326–27 (2007). It is black letter law that scienter can be established by "alleg[ing] facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness" which is "an extreme departure from the standards of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."

---

[2] It is not the case that Defendants were "uncertain[] as to the very possibility of maintaining adequate compliance mechanism[s.]" *Asay v. Pinduoduo Inc.*, 2021 WL 3871269, at *3 (2d Cir. Aug. 31, 2021). Rather, the Complaint alleges that Defendants knew, or were reckless in not knowing, whether PDD was compliant with the UFLPA because it did not have established mechanisms at all. ¶¶32, 74–75. It is inconsequential that PDD updated its disclosures because they were still inadequate.

[3] For these and similar reasons, PDD's misstatements and omissions are also actionable under Item 303 pursuant to Regulation S–K. *See Christine Asia Co. v. Ma*, 718 F. App'x 20, 23 (2d Cir. 2017).



*In re Arqit Quantum Inc. Sec. Litig.*, 2025 WL 977995, at *24 (E.D.N.Y. Mar. 28, 2025) (alteration and emphasis in original).

Here, the Complaint's allegations adequately show: "(1) specific contradictory information [that] was available to the defendants (2) at the same time they made their misleading statements." *Id.* The Complaint alleges particularized facts to show that Defendants were at least deliberately reckless in: (1) not knowing that the statements issued by PDD were materially false or misleading; (2) not knowing that such statements would be issued; and (3) substantially participating or acquiescing in the issuance of such statements in violation of federal securities laws. ¶¶106–12. Viewed holistically, investigations by Lead Plaintiff, the Arkansas Attorney General, Congress, as well as Defendants' own admissions, are sufficient to draw an inference of scienter as least as compelling as any alternative.[4]

**Loss Causation.** At the pleading stage, allegations of loss causation "is not a heavy burden," and must merely provide "some indication of the actual loss suffered and of a plausible causal link." *In re Dentsply Sirona, Inc. Sec. Litig.*, 665 F. Supp. 3d 255, 292 (E.D.N.Y. 2023). The Complaint easily satisfies this burden.

The Complaint alleges that PDD's stock price fell 4.55% on June 27, 2024, directly in response to the filing of the Arkansas Complaint. ¶136. The Complaint further explains the Arkansas Complaint revealed new information to the public regarding PDD's use of spyware, which is a "subject of the fraudulent statement[s] [and] omission[s]." *In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 252–53 (S.D.N.Y. 2007) (finding loss causation where stock price fell 4.5% in response to the announcement of an SEC investigation); *see* ¶¶46–59, 136.

The Complaint also pleads that immediately following the Company's Q2 2024 Earnings Release, PDD's stock price plummeted 29%. ¶¶137–38. Defendants claim this announcement "ha[d] nothing to do with [Lead] Plaintiff's claim" but the Complaint sets forth the exact connection between the misconduct and harm suffered. *See* ¶¶6–8, 99–100, 103, 137–41. Specifically, the Complaint avers that "it was PDD who became so enveloped in beating out its competition, that it relied on unsustainable business practices." ¶¶8, 103. In particular, the Complaint alleges that "the Company's applications, which functioned as spyware … were utilized to spy on users and competitors[.]" ¶103. These allegations suffice to create a causal link between the alleged misconduct and the economic harm suffered.

Respectfully submitted,

*Alfred L. Fatale III*
Alfred L. Fatale III

---

[4] PDD does not dispute that the Court may consider allegations concerning PDD's core operations as supplemental support for allegations of scienter. *See City of Warren Police & Fire Ret. Sys. v. Foot Locker, Inc.*, 412 F. Supp. 3d 206, 228 (E.D.N.Y. 2019).