# Exhibit B

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**WASHINGTON, D.C. 20549**

# FORM 20-F

(Mark One)

☐ **REGISTRATION STATEMENT PURSUANT TO SECTION 12(b) OR (g) OF THE SECURITIES EXCHANGE ACT OF 1934**

OR

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2022**

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from              to**

OR

☐ **SHELL COMPANY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

Date of event requiring this shell company report

For the transition period from              to

Commission file number: 001-38591

# PDD Holdings Inc.

(Exact name of Registrant as specified in its charter)

**N/A**

(Translation of Registrant's name into English)

**Cayman Islands**

(Jurisdiction of incorporation or organization)

**First Floor, 25 St Stephen's Green**
**Dublin 2, D02 XF99**
**Ireland**

(Address of principal executive offices)

**Jianchong Zhu**
**Tel: +353-1-5397938**
**Email: investor@pddholdings.com**
**First Floor, 25 St Stephen's Green**
**Dublin 2, D02 XF99**
**Ireland**

(Name, Telephone, E-mail and/or Facsimile number and Address of Company Contact Person)

Securities registered or to be registered pursuant to Section 12(b) of the Act.

| Title of each class | Ticker Symbol | Name of each exchange on which registered |
|---|---|---|
| American Depositary Shares (one American depositary share representing four Class A ordinary shares, par value US$0.000005 per share) | PDD | The Nasdaq Stock Market LLC (The Nasdaq Global Select Market) |
| Class A ordinary shares, par value US$0.000005 per share* | | The Nasdaq Stock Market LLC (The Nasdaq) (The Nasdaq Global Select Market) |

\* Not for trading, but only in connection with the listing on The Nasdaq Global Select Market of American depositary shares.

Securities registered or to be registered pursuant to Section 12(g) of the Act.

**None**

(Title of Class)

Securities for which there is a reporting obligation pursuant to Section 15(d) of the Act.

**None**

(Title of Class)

Indicate the number of outstanding shares of each of the issuer's classes of capital or common stock as of the close of the period covered by the annual report: 5,278,348,396 Class A ordinary shares, par value US$0.000005 per share, and no Class B ordinary shares were outstanding as of December 31, 2022.

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.

☒ Yes ☐ No

If this report is an annual or transition report, indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934.

☐ Yes ☒ No

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

☒ Yes ☐ No

Indicate by check mark whether the registrant has submitted electronically, if any, every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).

☒ Yes ☐ No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☒          Accelerated filer ☐          Non-accelerated filer ☐          Emerging growth company ☐

If an emerging growth company that prepares its financial statements in accordance with U.S. GAAP, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards† provided pursuant to Section 13(a) of the Exchange Act.

☐ Yes ☐ No

† The term "new or revised financial accounting standard" refers to any update issued by the Financial Accounting Standards Board to its Accounting Standards Codification after April 5, 2012.

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b). ☐

Indicate by check mark which basis of accounting the registrant has used to prepare the financial statements included in this filing:

U.S. GAAP ☒          International Financial Reporting Standards as issued          ☐ Other
                      by the International Accounting Standards Board ☐

If "Other" has been checked in response to the previous question, indicate by check mark which financial statement item the registrant has elected to follow.

☐ Item 17 ☐ Item 18

If this is an annual report, indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).

☐ Yes ☒ No

(APPLICABLE ONLY TO ISSUERS INVOLVED IN BANKRUPTCY PROCEEDINGS DURING THE PAST FIVE YEARS)

Indicate by check mark whether the registrant has filed all documents and reports required to be filed by Sections 12, 13 or 15(d) of the Securities Exchange Act of 1934 subsequent to the distribution of securities under a plan confirmed by a court.

☐ Yes ☐ No

**TABLE OF CONTENTS**

| | | | |
|---|---|---|---|
| INTRODUCTION | | | 1 |
| FORWARD-LOOKING INFORMATION | | | 2 |
| PART I | | | 3 |
| | Item 1. | Identity of Directors, Senior Management and Advisers | 3 |
| | Item 2. | Offer Statistics and Expected Timetable | 3 |
| | Item 3. | Key Information | 3 |
| | Item 4. | Information on the Company | 62 |
| | Item 4A. | Unresolved Staff Comments | 85 |
| | Item 5. | Operating and Financial Review and Prospects | 85 |
| | Item 6. | Directors, Senior Management and Employees | 98 |
| | Item 7. | Major Shareholders and Related Party Transactions | 110 |
| | Item 8. | Financial Information | 112 |
| | Item 9. | The Offer and Listing | 113 |
| | Item 10. | Additional Information | 114 |
| | Item 11. | Quantitative and Qualitative Disclosures about Market Risk | 123 |
| | Item 12. | Description of Securities Other than Equity Securities | 124 |
| PART II | | | 125 |
| | Item 13. | Defaults, Dividend Arrearages and Delinquencies | 125 |
| | Item 14. | Material Modifications to the Rights of Security Holders and Use of Proceeds | 125 |
| | Item 15. | Controls and Procedures | 126 |
| | Item 16A. | Audit Committee Financial Expert | 126 |
| | Item 16B. | Code of Ethics | 126 |
| | Item 16C. | Principal Accountant Fees and Services | 127 |
| | Item 16D. | Exemptions from the Listing Standards for Audit Committees | 127 |
| | Item 16E. | Purchases of Equity Securities by the Issuer and Affiliated Purchasers | 127 |
| | Item 16F. | Change in Registrant's Certifying Accountant | 127 |
| | Item 16G. | Corporate Governance | 127 |
| | Item 16H. | Mine Safety Disclosure | 127 |
| | Item 16I. | Disclosure Regarding Foreign Jurisdictions That Prevent Inspections | 127 |
| | Item 16J. | Insider Trading Policies | 128 |
| PART III | | | 128 |
| | Item 17. | Financial Statements | 128 |
| | Item 18. | Financial Statements | 128 |
| | Item 19. | Exhibits | 128 |
| SIGNATURES | | | 131 |

**INTRODUCTION**

Unless otherwise indicated or the context otherwise requires, references in this annual report to:

- "active merchants" in a given period are to merchant accounts that had one or more orders shipped to a buyer on our platforms in that period, regardless of whether the buyer returns the merchandise or the merchant refunds the purchase price;

- "ADRs" are to the American depositary receipts that evidence our ADSs;

- "ADSs" are to our American depositary shares, each of which represents four Class A ordinary shares, par value US$0.000005 each;

- "China" or the "PRC" are to the People's Republic of China, excluding, for the purposes of this annual report only, Hong Kong, Macau and Taiwan;

- "our platforms" are to the Pinduoduo platform and the Temu platform;

- "PDD Holdings," "we," "us," "our company," "the Company," and "our" are to PDD Holdings Inc. (formerly known as Pinduoduo Inc.), our Cayman Islands holding company, its direct and indirect subsidiaries, and, in the context of describing our operations and consolidated financial information, the VIE (as defined below);

- "Pinduoduo" or "Pinduoduo platform" are to our Pinduoduo mobile app and a variety of related features, functionalities, tools and services that we provide to buyers and merchants via the Pinduoduo mobile app and through social networks and access points;

- "RMB" and "Renminbi" are to the legal currency of China;

- "SEC" are to the U.S. Securities and Exchange Commission;

- "shares" or "ordinary shares" are to our Class A and Class B ordinary shares, par value US$0.000005 per share;

- "Temu" or "Temu platform" are to our Temu mobile app and website and a variety of related features, functionalities, tools and services that we provide to buyers and merchants via the Temu mobile app and website;

- "US$," "U.S. dollars," "$," and "dollars" are to the legal currency of the United States; and

- "VIE" are to Hangzhou Aimi Network Technology Co., Ltd., or Hangzhou Aimi, a PRC entity in which we do not have equity interests but whose financial results are consolidated into our consolidated financial statements in accordance with U.S. GAAP.

Our reporting currency is Renminbi because substantially all of our revenues are denominated in Renminbi. This annual report contains translations of Renminbi amounts into U.S. dollars at specific rates solely for the convenience of the readers. Unless otherwise noted, all translations from Renminbi to U.S. dollars and from U.S. dollars to Renminbi in this annual report were made at a rate of RMB6.8972 to US$1.00, the exchange rate on December 30, 2022 as set forth in the H.10 statistical release of the Board of Governors of the Federal Reserve System. We make no representation that any Renminbi or U.S. dollar amounts could have been, or could be, converted into U.S. dollars or Renminbi, as the case may be, at any particular rate or at all.

1

**FORWARD-LOOKING INFORMATION**

This annual report contains forward-looking statements that reflect our current expectations and views of future events. The forward-looking statements are contained principally in the sections entitled "Item 3. Key Information—D. Risk Factors," "Item 4. Information on the Company—B. Business Overview" and "Item 5. Operating and Financial Review and Prospects." These forward-looking statements are made under the "safe-harbor" provisions of the U.S. Private Securities Litigation Reform Act of 1995. Known and unknown risks, uncertainties and other factors, including those listed under "Item 3. Key Information—D. Risk Factors," may cause our actual results, performance or achievements to be materially different from those expressed or implied by the forward-looking statements.

You can identify some of these forward-looking statements by words or phrases such as "may," "will," "expect," "anticipate," "aim," "estimate," "intend," "plan," "believe," "is/are likely to," "potential," "continue" or other similar expressions. We have based these forward-looking statements largely on our current expectations and projections about future events that we believe may affect our financial condition, results of operations, business strategy and financial needs. These forward-looking statements include statements relating to:

- our growth strategies;

- our future business development, financial conditions and results of operations;

- the trends in the e-commerce industry in the countries or regions where we have operations;

- our expectations regarding demand for and market acceptance of our products and services;

- our expectations regarding our relationships with buyers and merchants;

- competition in our industry; and

- relevant government policies and regulations relating to us, and their future development.

These forward-looking statements involve various risks and uncertainties. Although we believe that our expectations expressed in these forward-looking statements are reasonable, our expectations may later be found to be incorrect. Our actual results could be materially different from our expectations. Important risks and factors that could cause our actual results to be materially different from our expectations are generally set forth in "Item 3. Key Information—D. Risk Factors," "Item 4. Information on the Company—B. Business Overview," "Item 5. Operating and Financial Review and Prospects," and other sections in this annual report. You should read thoroughly this annual report and the documents that we refer to with the understanding that our actual future results may be materially different from and worse than what we expect. We qualify all of our forward-looking statements by these cautionary statements.

This annual report contains certain data and information that we obtained from various government and private publications. We have not independently verified the accuracy or completeness of the data contained in these industry publications and reports. Statistical data in these publications also include projections based on a number of assumptions. The e-commerce industry may not grow at the rate projected by market data, or at all. Failure of this market to grow at the projected rate may have a material and adverse effect on our business and the market price of our ADSs. In addition, the rapidly evolving nature of the e-commerce industry results in significant uncertainties for any projections or estimates relating to the growth prospects or future condition of our market. Furthermore, if any one or more of the assumptions underlying the market data are later found to be incorrect, actual results may differ from the projections based on these assumptions. You should not place undue reliance on these forward-looking statements.

The forward-looking statements made in this annual report relate only to events or information as of the date on which the statements are made in this annual report. Except as required by law, we undertake no obligation to update or revise publicly any forward-looking statements, whether as a result of new information, future events or otherwise, after the date on which the statements are made or to reflect the occurrence of unanticipated events. You should read this annual report and the documents that we refer to in this annual report and exhibits to this annual report completely and with the understanding that our actual future results may be materially different from what we expect.

## PART I

**Item 1.    Identity of Directors, Senior Management and Advisers**

Not applicable.

**Item 2.    Offer Statistics and Expected Timetable**

Not applicable.

**Item 3.    Key Information**

**Our Company**

PDD Holdings is a multinational commerce group that owns and operates a portfolio of businesses. We aim to bring more businesses and people into the digital economy so that local communities and small businesses can benefit from increased productivity and new opportunities.

Our Pinduoduo platform provides buyers with a comprehensive selection of value-for-money merchandise and fun and interactive shopping experiences. The platform pioneered an innovative "team purchase" model. Buyers are encouraged to share product information on social networks, and invite their friends, family and social contacts to form shopping teams to enjoy the more attractive prices available under the "team purchase" option. Pinduoduo's buyer base helps attract merchants to the platform, while the scale of the platform's sales volume encourages merchants to offer more competitive prices and customized products and services to buyers, thus forming a virtuous cycle.

We have always seen business opportunities in agriculture, and we seize these opportunities by leveraging the Pinduoduo platform to promote digital inclusion of smallholder farmers. The ability to aggregate demand and generate large volumes of orders helps create economies of scale for farmer merchants. Farmers can sell directly to consumers through the platform and become less dependent on wholesale distributors. Dedicated training programs are offered to enable farmers to become better business operators. We collaborate with reputable agricultural institutions to invest in technology and fund research with the objective of improving food production, quality control, food safety and sustainability, so that a greater volume of better, fresher and safer agricultural products can go directly from farm to table.

We launched a new initiative, Temu, in September 2022 in Boston, Massachusetts, the United States. Temu is a global online platform dedicated to providing affordable, quality products to consumers. Due to its short operating history and the early stage of development, Temu did not have a material impact on our financial results in 2022.

3

**Our Holding Company Structure and Contractual Arrangements with the VIE**

The following diagram illustrates our corporate structure, including our principal subsidiaries and the VIE and its principal subsidiary, as of the date of this annual report:



Note:

_____

(1)   Messrs. Lei Chen and Jianchong Zhu hold 86.6% and 13.4% equity interests in Hangzhou Aimi, respectively. They are employees of our company and have entered into a series of contractual arrangements with Hangzhou Weimi Network Technology Co., Ltd., or Hangzhou Weimi, pursuant to which the Company has control over and is the primary beneficiary of Hangzhou Aimi.

Holders of our ADSs hold equity interests in PDD Holdings Inc., a Cayman Islands holding company that does not conduct operations directly. Instead, we conduct our operations in China through (i) our PRC subsidiaries, (ii) the VIE, and (iii) the subsidiaries of the VIE. We do not have any equity ownership in the VIE or its subsidiaries. We only maintain contractual arrangements with the VIE which allows us to consolidate the financial results of the VIE and its subsidiaries into our consolidated financial statements in accordance with U.S. GAAP. Holders of our ADSs therefore do not have direct or indirect equity interests in the VIE and its subsidiaries.

The VIE structure allows foreign investors to have exposure to China-based operating companies that are subject to restrictions on direct foreign investment under Chinese law. In particular, PRC laws and regulations restrict and impose conditions on foreign investment in value-added telecommunications services business, such as internet content-related services and online data processing and transaction processing services. Accordingly, we operate these businesses in China through the VIE and its subsidiaries, and rely on contractual arrangements among Hangzhou Weimi (one of our PRC subsidiaries), the VIE and its shareholders to direct the business operations of the VIE and its subsidiaries. The VIE was established in April 2015 and holds the value-added telecommunication business operation license, or the VATS License, covering online data processing and transaction processing business (operating e-commerce) and internet content-related services. Shanghai Xunmeng was established in January 2014 and holds the VATS License covering (i) online data processing and transaction processing business (operating e-commerce), (ii) internet content-related services, (iii) domestic call center business, and (iv) information services.

4

The VIE structure consists of a series of contractual arrangements, including a shareholders' voting rights proxy agreement, equity pledge agreement, spousal consent letter, exclusive consulting and services agreement and exclusive option agreement, that have been entered into by and among Hangzhou Weimi, the VIE, the VIE's shareholders and, as applicable, their spouses. As a result of the contractual arrangements, we are able to direct the activities of and derive economic benefits from the VIE. We are considered the primary beneficiary of the VIE and its subsidiaries for accounting purposes, and we have consolidated their financial results in our consolidated financial statements. Revenues contributed by the VIE and its subsidiaries accounted for 65.1%, 59.3% and 56.2% of our total revenues for 2020, 2021 and 2022, respectively. For more details of these contractual arrangements, see "Item 4. Information on the Company—C. Organizational Structure—Contractual Arrangements with the VIE and Its Shareholders."

However, the use of these contractual arrangements involves unique risks to investors. The contractual arrangements do not, and may never, provide holders of our ADSs with direct or indirect equity ownership in the VIE and its subsidiaries. Although the contractual arrangements enable us to direct the activities of and derive economic benefits from the VIE, any control that we have over, as well as any economic benefits that we may derive from, the VIE depends on the enforceability of the contractual arrangements that we have entered into with the VIE and its shareholders. Although King & Wood Mallesons, our PRC legal counsel, has advised us that these contractual arrangements are legal, valid, binding and enforceable in accordance with their terms and applicable PRC laws and regulations, they have also advised us that there are uncertainties under PRC laws and regulations regarding the enforceability of the whole or any part of our contractual arrangements with the VIE. As of the date of this annual report, the legality and enforceability of these contractual arrangements, as a whole, have not been tested in any PRC court. There is no guarantee that these contractual arrangements, as a whole, would be enforceable if they were tested in a PRC court, and we may incur substantial costs to enforce the terms of the arrangements. See "Item 3. Key Information—D. Risk Factors—Risks Related to Our Corporate Structure—We rely on contractual arrangements with the VIE and its shareholders for a large portion of our business operations, which may not be as effective as direct ownership in providing operational control" and "Item 3. Key Information—D. Risk Factors—Risks Related to Our Corporate Structure—The shareholders of the VIE may have potential conflicts of interest with us, which may materially and adversely affect our business and financial condition."

In addition to the uncertainties under PRC laws and regulations regarding the enforceability of the whole or any part of our contractual arrangements with the VIE, the PRC authorities may also disallow the use of VIE structures. If the whole or any part of our contractual arrangements with the VIE is found to be unenforceable, or if the PRC authorities disallow the use of VIE structures, we may not be able to consolidate, derive economic interests from, or direct the activities of the VIE and its subsidiaries, which could result in a material adverse change in the financial performance of our company and cause our ADSs to decline in value or become worthless. See "Item 3. Key Information—D. Risk Factors—Risks Related to Our Corporate Structure—If the PRC government determines that the contractual arrangements that establish part of the VIE structure do not comply with PRC regulations relating to the relevant industries, or if these regulations or the interpretation of existing regulations change in the future, we could be subject to severe penalties or be forced to relinquish our interests in those operations, and our ADSs may decline in value or become worthless."

**Our Operations in China are subject to PRC Laws and Regulations**

The operations of the businesses that we own and operate in China, and particularly those of the Pinduoduo platform, are subject to PRC laws and regulations. The laws and regulations governing the internet industry in China are relatively new and quickly evolving, hence bringing uncertainties to their interpretation and enforcement. For example, our operations in China are subject to regulatory approvals and permit requirements, oversight on cybersecurity and data privacy, and anti-monopoly and anti-unfair competition laws, with respect to which the applicable laws and regulations have evolved substantially in recent years. For more information see "Item 4. Information on the Company—B. Business Overview—Regulation" in this annual report.

As of the date of this annual report, our PRC subsidiaries, the VIE and its subsidiaries have obtained the requisite licenses and permits from the PRC government authorities that are material for our business operations in China, including, among others, VATS Licenses. New laws and regulations may be adopted from time to time, which may require us to obtain additional licenses and permits for our operations and services. If, in the future, we offer new functions and services in China, we may be required to obtain additional licenses, permits, filings or approvals for such functions or services. If we fail to obtain such additional licenses, permits, filings or approvals, our business and results of operations, as well as the value of our ADSs, may be materially and adversely affected. For more detailed information, see "Item 3. Key Information—D. Risk Factors—Risks Related to Our Business and Industry—Any lack of additional requisite approvals, licenses or permits or failure to comply with any requirements of the applicable laws, regulations and policies may materially and adversely affect our daily operations and hinder our growth."

The PRC governmental authorities have recently promulgated PRC laws and regulations relating to cybersecurity review and overseas listings. Pursuant to the M&A Rules effective as of the date of this annual report, an offshore special purpose vehicle that (i) was formed for listing purposes through the acquisition of PRC domestic companies and (ii) is controlled by PRC persons or entities must obtain the approval of the China Securities Regulatory Commission, or the CSRC, before it can list its securities on an overseas stock exchange. Based on the advice of King & Wood Mallesons, our PRC legal counsel, we are of the view that none of us, our PRC subsidiaries, the VIE or its subsidiaries is required under the M&A Rules to obtain any permission from the CSRC for our previous offshore offerings because (a) our PRC subsidiaries were incorporated as wholly foreign-owned enterprises through direct investment, rather than by the acquisition, through merger or otherwise, of the equity interests or assets of a PRC domestic company owned by PRC entities or individuals that are the Company's beneficial owners, and (b) the Company does not constitute a "special purpose vehicle," to whom the relevant provisions of the M&A Rules would apply.

The Data Security Law, the Regulations on the Protection of Critical Information Infrastructure, and the Cybersecurity Review Measures promulgated by PRC authorities (collectively, the "Cybersecurity Laws") impose cybersecurity review obligations on critical information infrastructure operators and network platform operators. Critical information infrastructure operators, as determined and notified by the applicable governing authorities, are required to undergo cybersecurity reviews if they procure network products and services which could affect the security of their information infrastructure, network or data. As of the date of this annual report, we have not received any notice that we are a critical information infrastructure operator from any government authority. Nor have we received any request from the Cyberspace Administration of China, or the CAC, to undergo a cybersecurity review pursuant to the Cybersecurity Laws. Moreover, none of us, our PRC subsidiaries, the VIE or its subsidiaries has received any notice from any PRC authority requiring us to obtain any permissions, in each case in connection with our previous issuance of securities to foreign investors.

However, in connection with any future overseas capital markets activities, we may need to obtain permission from the CSRC, undergo a cybersecurity review conducted by the CAC or meet other regulatory requirements that may be adopted in the future by PRC authorities. To the extent such requirements are or become applicable, we cannot assure you that we would be able to comply with them. Any failure to obtain or delay in obtaining such permission, clearing such review process or meeting such requirements would subject us to restrictions and penalties imposed by the CSRC, the CAC or other PRC regulatory authorities, which could include fines and penalties on our operations in China, delays of or restrictions on the repatriation of the proceeds from our offshore offerings into China, restrictions on our ability to remain listed on a U.S. exchange, or other actions that could materially and adversely affect our business, financial condition, results of operations, and prospects, as well as significantly limit or completely hinder or to offer or continue to offer our securities to investors and cause the value of such securities to significantly decline or be worthless. For more detailed information, see "Item 3. Key Information—D. Risk Factors—Risks Related to Our Business and Industry—Our business generates and processes a large amount of data, and we are required to comply with PRC and other applicable laws relating to privacy and cybersecurity. The improper use or disclosure of data could have a material and adverse effect on our business and prospects" and "Item 3. Key Information —D. Risk Factors—Risks Related to Our Business and Industry—The approval of or filing with the CSRC or other PRC government authorities may be required in connection with our future offshore offerings under PRC laws, and, if required, we cannot predict whether or for how long we will be able to obtain such approval or complete such filing."

In February 2021, the Anti-monopoly Committee of the State Council of the PRC published the Anti-monopoly Guidelines for the Platform Economy Sector, aiming at enhancing anti-monopoly administration of businesses that operate under the platform model and the overall platform economy in China. According to these guidelines, business practices such as deploying big data analytics to set discriminatory terms for merchandise price or other transaction terms, coercive exclusivity arrangements with transaction counterparties, blocking of competitor interface through technological means and unlawful collection of user data without consent, are prohibited. The heightened regulatory scrutiny of business operators under the Anti-monopoly Law may increase our compliance costs and subject us to heightened risks and challenges that may materially and adversely affect our business, results of operations and financial results. For more detailed information, see "Item 3. Key Information—D. Risk Factors—Risks Related to Our Business and Industry—We may be subject to claims under consumer protection laws, including health and safety claims and product liability claims, if property or people are harmed by the products and services sold on our platforms. Meanwhile, we are subject to existing and new laws and regulations imposing various requirements on our business operations."

**The Holding Foreign Companies Accountable Act**

Pursuant to the Holding Foreign Companies Accountable Act, or the HFCA Act, if the SEC determines that we have filed audit reports issued by a registered public accounting firm that has not been subject to inspections by the Public Company Accounting Oversight Board, or the PCAOB, for two consecutive years, the SEC will prohibit our shares or the ADSs from being traded on a national securities exchange or in the over-the-counter trading market in the United States. On December 16, 2021, the PCAOB issued a report to notify the SEC of its determination that the PCAOB was unable to inspect or investigate completely registered public accounting firms headquartered in mainland China and Hong Kong, including our auditor.

In May 2022, the SEC conclusively listed us as a Commission-Identified Issuer under the HFCA Act following the filing of our annual report on Form 20-F for the fiscal year ended December 31, 2021. On December 15, 2022, the PCAOB issued a report that vacated its December 16, 2021 determination and removed mainland China and Hong Kong from the list of jurisdictions where it is unable to inspect or investigate completely registered public accounting firms. For this reason, we do not expect to be identified as a Commission-Identified Issuer under the HFCA Act after we file this annual report on Form 20-F. Each year, the PCAOB will determine whether it can inspect and investigate completely audit firms in mainland China and Hong Kong, among other jurisdictions. If the PCAOB determines in the future that it no longer has full access to inspect and investigate completely accounting firms in mainland China and Hong Kong and we continue to use an accounting firm headquartered in one of those jurisdictions to issue an audit report on our financial statements filed with the SEC, we would be identified as a Commission-Identified Issuer following the filing of the annual report on Form 20-F for the relevant fiscal year. There can be no assurance that we would not be identified as a Commission-Identified Issuer for any future fiscal year, and if we were so identified for two consecutive years, we would become subject to the prohibition on trading under the HFCA Act. See "Item 3. Key Information—D. Risk Factors—Risks Related to Our Multi-jurisdictional Operations—The PCAOB had historically been unable to inspect our auditor in relation to their audit work performed for our financial statements and the inability of the PCAOB to conduct inspections of our auditor in the past has deprived our investors of the benefits of such inspections" and "—Our ADSs may be prohibited from trading in the United States under the HFCA Act in the future if the PCAOB is unable to inspect or investigate completely auditors located in China. The delisting of the ADSs, or the threat of their being delisted, may materially and adversely affect the value of your investment."

**Summary of Risk Factors**

Investing in our ADSs involves significant risks. You should carefully consider all of the information in this annual report before making an investment in our ADSs. Below please find a summary of the principal risks we face, organized under relevant headings. In the event that PRC regulations become applicable to companies in Hong Kong, the legal and operational risks associated with operating in China, as discussed in "Item 3. Key Information—D. Risk Factors—Risks Relating to Our Business and Industry," may also apply to our operations in Hong Kong. These risks are discussed more fully in the section titled "Item 3. Key Information—D. Risk Factors."

*Risks Related to Our Business and Industry*

Risks and uncertainties related to our business and industry include, but are not limited to, the following:

- Our limited operating history makes it difficult to evaluate our business and prospects. We cannot guarantee that we will be able to maintain the growth rate that we have experienced to date.

- If we fail to anticipate buyer needs and provide products and services to attract and retain buyers, or fail to adapt our services or business model to changing buyer needs or emerging industry standards, our business may be materially and adversely affected.

- Any harm to our brands or reputation may materially and adversely affect our business and results of operations.

- Merchants on our platforms deliver their products to buyers through a variety of third-party logistics service providers, third-party warehouse operators, third-party pick-up point operators and/or e-waybill systems. Service interruptions, failures, or constraints of these third parties or any disruptions or malfunctions of the e-waybill systems could severely harm our business and prospects.

- We face intense competition, and if we fail to compete effectively, we may lose market share, buyers and merchants.

- If we fail to maintain and expand our relationships with merchants, our revenues and results of operations will be harmed.

- We have incurred net losses in the past, and we may not be able to maintain profitability in the future.

- We may incur liability for counterfeit, unauthorized, illegal, or infringing products sold or misleading information available on our platforms.

7

- We may be subject to claims under consumer protection laws, including health and safety claims and product liability claims, if property or people are harmed by the products and services sold on our platforms. Meanwhile, we are subject to existing and new laws and regulations imposing various requirements on our business operations.

### *Risks Related to Our Corporate Structure*

Risks and uncertainties related to our corporate structure include, but are not limited to, the following:

- Holders of our ADSs hold equity interests in PDD Holdings Inc., a Cayman Islands holding company that does not conduct operations directly. Instead, we conduct our operations in China through (i) our PRC subsidiaries, (ii) the VIE, and (iii) the subsidiaries of the VIE. We do not have any equity ownership in the VIE or its subsidiaries. We only maintain contractual arrangements with the VIE which allows us to consolidate the financial results of the VIE and its subsidiaries into our consolidated financial statements in accordance with U.S. GAAP. Holders of our ADSs therefore do not have direct or indirect equity interests in the VIE and its subsidiaries. In addition to the uncertainties under PRC laws and regulations regarding the enforceability of the whole or any part of these contractual arrangements, the PRC authorities may also disallow the use of VIE structures. If the whole or any part of our contractual arrangements with the VIE and its shareholders is found to be unenforceable, or if the PRC authorities disallow the use of VIE structures, we may not be able to consolidate, derive economic interests from, or direct the activities of the VIE and its subsidiaries, which could result in a material adverse change in the financial performance of our company and cause our ADSs to decline in value or become worthless.

- The rights and functions of the PDD Partnership, once effective, may impact your ability to appoint executive directors and nominate the chief executive officer of our company, and the interests of the PDD Partnership may conflict with your interests.

- Any failure by the VIE or its shareholders to perform their obligations under our contractual arrangements with them would have a material and adverse effect on our business.

- The shareholders of the VIE may have potential conflicts of interest with us, which may materially and adversely affect our business and financial condition.

### *Risks Related to our Multi-jurisdictional Operations*

We are also subject to risks and uncertainties associated with having a business presence in multiple jurisdictions, including the PRC and the United States. These risks and uncertainties include, but are not limited to, the following:

- Our business is subject to a large number of laws across many jurisdictions, many of which are evolving.

- Changes in U.S. and international trade policies, particularly with regard to China, may adversely impact our business and operating results.

- Changes in China's economic, political or social conditions or government policies could have a material adverse effect on our business and operations.

- The laws and regulations governing the internet industry in China are relatively new and quickly evolving, hence bringing risks and uncertainties to their interpretation and enforcement. If we fail to meet or comply with requirements under the applicable laws and regulations, it could result in a material change in our operations and the value of our ADSs. For more details, see "Item 3. Key Information—D. Risk Factors—Risks Related to Our Multi-jurisdictional Operations— Uncertainties with respect to the PRC legal system and changes in laws and regulations in China could adversely affect us" and "Item 3. Key Information—D. Risk Factors—Risks Related to Our Multi-jurisdictional Operations—We may be adversely affected by the complexity, uncertainties and changes in PRC regulation of internet-related businesses and companies, and any lack of requisite approvals, licenses or permits applicable to our business may have a material adverse effect on our business and results of operations."

- The PRC government's authority in regulating our operations, our overseas offerings of securities and foreign investment in us could limit our ability or prevent us from conducting future offerings of securities to investors, which may cause the value of our ADSs to significantly decline. For more details, see "Item 3. Key Information—D. Risk Factors—Risks Related to Our Multi-jurisdictional Operations—The PRC government's significant oversight and discretion over our business operations could result in a material change in our operations and the value of our ADSs."

- Cash transfers from our PRC subsidiaries to entities outside of China are subject to PRC government controls on currency conversion. To the extent cash in our business is in the PRC or a PRC entity, such cash may not be available to fund operations or for other use outside of the PRC due to restrictions and limitations imposed by the governmental authorities on currency conversion, cross-border transactions and cross-border capital flows. Shortages in the availability of foreign currency may temporarily delay the ability of our PRC subsidiaries, the VIE and its subsidiaries to remit sufficient foreign currency to pay dividends or other payments to us, or otherwise satisfy their foreign currency denominated obligations. For more details, see "Item 3. Key Information—D. Risk Factors—Risks Related to Our Multi-jurisdictional Operations—We may rely on dividends and other distributions on equity paid by our PRC subsidiaries to fund any cash and financing requirements we may have, and any limitation on the ability of our PRC subsidiaries to make payments to us could have a material and adverse effect on our ability to conduct our business" and "Item 3. Key Information—D. Risk Factors—Risks Related to Our Multi-jurisdictional Operations—Governmental control of currency conversion may limit our ability to utilize our revenues effectively and affect the value of your investment."

- Our ADSs may be prohibited from trading in the United States under the HFCA Act in the future if the PCAOB is unable to inspect or fully investigate auditors located in China. The PCAOB had historically been unable to inspect our auditor in relation to their audit work performed for our financial statements and the inability of the PCAOB to conduct inspections of our auditor in the past has deprived our investors of the benefits of such inspections. The delisting of our ADSs, or the threat of their being delisted, may materially and adversely affect the value of your investment. For more details, see "Item 3. Key Information—D. Risk Factors—Risks Related to Our Multi-jurisdictional Operations—The PCAOB had historically been unable to inspect our auditor in relation to their audit work performed for our financial statements and the inability of the PCAOB to conduct inspections of our auditor in the past has deprived our investors of the benefits of such inspections" and "Item 3. Key Information—D. Risk Factors—Risks Related to Our Multi-jurisdictional Operations—Our ADSs may be prohibited from trading in the United States under the HFCA Act in the future if the PCAOB is unable to inspect or investigate completely auditors located in China. The delisting of the ADSs, or the threat of their being delisted, may materially and adversely affect the value of your investment."

### *Risks Related to Our ADSs*

In addition to the risks described above, we are subject to general risks relating to our ADSs, including, but not limited to, the following:

- The trading price of our ADSs may be volatile, which could result in substantial losses to investors.

- The sale or availability for sale of substantial amounts of our ADSs could adversely affect their market price.

### Cash and Asset Flows through Our Organization

PDD Holdings Inc. is a holding company with no operations of its own. We conduct our operations in China primarily through our subsidiaries, the VIE and its subsidiaries. As a result, although other means are available for us to obtain financing at the holding company level, PDD Holdings Inc.'s ability to pay dividends to the shareholders and to service any debt it may incur may depend upon dividends paid by our PRC subsidiaries and license and service fees paid by the VIE. If any of our subsidiaries incurs debt on its own behalf in the future, the instruments governing such debt may restrict its ability to pay dividends to our offshore holding company. In addition, our PRC subsidiaries are permitted to pay dividends to our offshore holding company only out of their retained earnings, if any, as determined in accordance with PRC accounting standards and regulations. Further, our PRC subsidiaries, the VIE and its subsidiaries are required to make appropriations to certain statutory reserve funds or may make appropriations to certain discretionary funds, which are not distributable as cash dividends except in the event of a solvent liquidation of the companies. For more details, see "Item 5. Operating and Financial Review and Prospects—B. Liquidity and Capital Resources—Holding Company Structure."

Under PRC laws and regulations, our PRC subsidiaries, the VIE and its subsidiaries are subject to certain restrictions with respect to paying dividends or otherwise transferring any of their net assets to us. Remittance of dividends by a wholly foreign-owned enterprise out of China is also subject to examination by the banks designated by the State Administration of Foreign Exchange, or SAFE. The amounts restricted include the paid-up capital and the statutory reserve funds of our PRC subsidiaries and the net assets of the VIE in which we have no legal ownership, totaling RMB10,789.1 million, RMB23,306.4 million and RMB57,000.1 million (US$8,264.2 million) as of December 31, 2020, 2021 and 2022, respectively. Furthermore, cash transfers from our PRC subsidiaries, the VIE and its subsidiaries to entities outside of China are subject to PRC government controls on currency conversion. To the extent cash in our business is in the PRC or a PRC entity, such cash may not be available to fund operations or for other use outside of the PRC due to restrictions and limitations imposed by the governmental authorities on currency conversion, cross-border transactions and cross-border capital flows. Shortages in the availability of foreign currency may temporarily delay the ability of our PRC subsidiaries, the VIE and its subsidiaries to remit sufficient foreign currency to pay dividends or other payments to us, or otherwise satisfy their foreign currency denominated obligations. In view of the foregoing, to the extent cash in our business is held in China or by a PRC entity, such cash may not be available to fund operations or for other use outside of the PRC. For risks relating to the fund flows of our operations in China, see "Item 3. Key Information—D. Risk Factors—Risks Related to Our Multi-jurisdictional Operations—We may rely on dividends and other distributions on equity paid by our PRC subsidiaries to fund any cash and financing requirements we may have, and any limitation on the ability of our PRC subsidiaries to make payments to us could have a material and adverse effect on our ability to conduct our business" and "Item 3. Key Information—D. Risk Factors—Risks Related to Our Multi-jurisdictional Operations—Governmental control of currency conversion may limit our ability to utilize our revenues effectively and affect the value of your investment."

Under PRC law, PDD Holdings Inc. may provide funding to our PRC subsidiaries only through capital contributions or loans, and to the VIE only through loans, subject to satisfaction of applicable government registration and approval requirements. For the years ended December 31, 2020, 2021 and 2022, (i) PDD Holdings Inc. provided loans to our subsidiaries in an aggregate principal amount of RMB54,469.7 million, RMB15,520.1 million and RMB21,991.6 million (US$3,188.5 million), respectively, (ii) our subsidiaries repaid loans to PDD Holdings Inc. in an aggregate principal amount of RMB2,418.2 million, RMB9,664.8 million and RMB22,057.3 million (US$3,198.0 million), respectively, (iii) the VIE and its subsidiaries provided loans to our subsidiaries in an aggregate principal amount of RMB21,545.3 million, RMB47,711.8 million and RMB5,443.7 million (US$789.3 million), respectively, (iv) our subsidiaries repaid loans to the VIE and its subsidiaries in an aggregate principal amount of RMB14,760.6 million, RMB29,999.3 and RMB16.0 million (US$2.3 million), respectively, (v) our subsidiaries provided loans to the VIE and its subsidiaries in an aggregate principal amount of RMB12,204.2 million, RMB7,729.5 million and RMB62,753.7 million (US$9,098.4 million), respectively, and (vi) the VIE and its subsidiaries repaid loans to our subsidiaries in an aggregate principal amount of RMB5,291.6 million, RMB7,300.0 million and RMB46,043.4 million (US$6,675.6 million), respectively.

As of the date of this annual report, we do not have any cash management policies that dictate how funds are transferred among PDD Holdings Inc., our subsidiaries, the VIE and its subsidiaries and investors.

PDD Holdings Inc. has not declared or paid any cash dividends, nor does it have any present plan to pay any cash dividends on our ordinary shares in the foreseeable future. We currently intend to retain most, if not all, of our available funds and any future earnings to operate and expand our business. See "Item 8. Financial Information—A. Consolidated Statements and Other Financial Information—Dividend Policy." For PRC and United States federal income tax considerations of an investment in our ADSs, see "Item 10. Additional Information—E. Taxation."

**Financial Information Related to the VIE**

The following table presents the condensed consolidating schedule of financial position and results for (i) PDD Holdings Inc., (ii) Hangzhou Weimi, a PRC subsidiary of the Company that has entered into contractual arrangements with the VIE, the VIE's shareholders and, as applicable, their spouses, (iii) the VIE and its subsidiaries, and (iv) the Company's subsidiaries other than Hangzhou Weimi as of the dates or for the periods presented.

10

*Selected Condensed Consolidated Statements of Income Information*

| | PDD Holdings Inc. (Primary beneficiary of the VIE) | Hangzhou Weimi* | VIE and Its Subsidiaries | Other Subsidiaries of PDD Holdings Inc.** | Eliminations | Consolidated Total |
|---|---|---|---|---|---|---|
| | **For the Year Ended December 31, 2022** | | | | | |
| | (RMB in thousands) | | | | | |
| Revenues | — | 837,973 | 103,631,702 | 66,770,734 | (40,682,820) | 130,557,589 |
| Total costs and operating expenses | (660,216) | (803,066) | (68,152,664) | (71,222,542) | 40,682,820 | (100,155,668) |
| Share of profit from subsidiaries, the VIE and subsidiaries of the VIE | 32,238,254 | — | — | — | (32,238,254) | — |
| Net income/(loss) | 31,538,062 | 47,567 | 33,595,051 | (1,404,364) | (32,238,254) | 31,538,062 |

| | PDD Holdings Inc. (Primary beneficiary of the VIE) | Hangzhou Weimi* | VIE and Its Subsidiaries | Other Subsidiaries of PDD Holdings Inc.** | Eliminations | Consolidated Total |
|---|---|---|---|---|---|---|
| | **For the Year Ended December 31, 2021** | | | | | |
| | (RMB in thousands) | | | | | |
| Revenues | — | 2,288,608 | 77,877,339 | 50,467,506 | (36,683,514) | 93,949,939 |
| Total costs and operating expenses | (649,171) | (2,273,922) | (62,977,072) | (57,836,526) | 36,683,514 | (87,053,177) |
| Share of profit from subsidiaries, the VIE and subsidiaries of the VIE | 9,579,738 | — | — | — | (9,579,738) | — |
| Net income/(loss) | 7,768,670 | 43,461 | 15,169,180 | (5,632,903) | (9,579,738) | 7,768,670 |

| | PDD Holdings Inc. (Primary beneficiary of the VIE) | Hangzhou Weimi* | VIE and Its Subsidiaries | Other Subsidiaries of PDD Holdings Inc.** | Eliminations | Consolidated Total |
|---|---|---|---|---|---|---|
| | **For the Year Ended December 31, 2020** | | | | | |
| | (RMB in thousands) | | | | | |
| Revenues | — | 1,101,213 | 51,351,861 | 21,614,790 | (14,575,999) | 59,491,865 |
| Total costs and operating expenses | (667,210) | (1,332,403) | (50,118,546) | (31,330,030) | 14,575,999 | (68,872,190) |
| Share of profit from subsidiaries, the VIE and subsidiaries of the VIE | (5,996,484) | — | — | — | 5,996,484 | — |
| Net (loss)/income | (7,179,742) | (229,006) | 2,552,665 | (8,320,143) | 5,996,484 | (7,179,742) |

11

Table of Contents

*Selected Condensed Consolidated Balance Sheets Information*

| | As of December 31, 2022 | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | PDD Holdings Inc. (Primary beneficiary of the VIE) | Hangzhou Weimi* | VIE and Its Subsidiaries | Other Subsidiaries of PDD Holdings Inc.** | Eliminations | Consolidated Total |
| | (RMB in thousands) | | | | | |
| **Current assets:** | | | | | | |
| Cash and cash equivalents | 61,553 | 73 | 2,725,249 | 31,539,317 | — | 34,326,192 |
| Restricted cash | — | — | 57,955,328 | 18,897 | — | 57,974,225 |
| Short-term investments | — | — | 45,273,907 | 69,838,647 | — | 115,112,554 |
| Amounts due from Group companies[1] | — | 1,097,624 | 34,810,132 | 24,602,577 | (60,510,333) | — |
| Others | 443 | 3,450 | 7,812,912 | 1,388,100 | — | 9,204,905 |
| **Total current assets** | **61,996** | **1,101,147** | **148,577,528** | **127,387,538** | **(60,510,333)** | **216,617,876** |
| **Non-current assets:** | | | | | | |
| Other non-current assets | — | 5,005 | 10,444,964 | 6,412,148 | — | 16,862,117 |
| Investments in subsidiaries, the VIE and its subsidiaries[2] | 133,085,591 | 2,000 | — | 1,725,183 | (134,812,774) | — |
| Others | 109,847 | 76,235 | 1,415,413 | 2,038,465 | — | 3,639,960 |
| **Total non-current assets** | **133,195,438** | **83,240** | **11,860,377** | **10,175,796** | **(134,812,774)** | **20,502,077** |
| **Total assets** | **133,257,434** | **1,184,387** | **160,437,905** | **137,563,334** | **(195,323,107)** | **237,119,953** |
| **Current liabilities:** | | | | | | |
| Payable to merchants | — | — | 62,006,946 | 1,309,749 | — | 63,316,695 |
| Merchant deposits | — | — | 14,681,913 | 376,316 | — | 15,058,229 |
| Amounts due to Group companies[1] | — | 1,124,895 | 22,452,033 | 125,803,100 | (149,380,028) | — |
| Convertible bonds, current portion | 13,885,751 | — | — | — | — | 13,885,751 |
| Others | 25,017 | 194,971 | 15,014,803 | 9,394,014 | — | 24,628,805 |
| **Total current liabilities** | **13,910,768** | **1,319,866** | **114,155,695** | **136,883,179** | **(149,380,028)** | **116,889,480** |
| **Non-current liabilities** | | | | | | |
| Convertible bonds | 1,575,755 | — | — | — | — | 1,575,755 |
| Others | — | 62,630 | 290,412 | 530,765 | — | 883,807 |
| **Total non-current liabilities** | **1,575,755** | **62,630** | **290,412** | **530,765** | **—** | **2,459,562** |
| **Total liabilities** | **15,486,523** | **1,382,496** | **114,446,107** | **137,413,944** | **(149,380,028)** | **119,349,042** |

12

| | As of December 31, 2021 | | | | | |
|---|---|---|---|---|---|---|
| | PDD Holdings Inc. (Primary beneficiary of the VIE) | Hangzhou Weimi* | VIE and Its Subsidiaries | Other Subsidiaries of PDD Holdings Inc.** | Eliminations | Consolidated Total |
| | (RMB in thousands) | | | | | |
| **Current assets:** | | | | | | |
| Cash and cash equivalents | 2,269 | 1,033 | 2,430,440 | 3,992,973 | — | 6,426,715 |
| Restricted cash | — | — | 59,402,079 | 215,177 | — | 59,617,256 |
| Short-term investments | — | — | 12,306,340 | 74,210,278 | — | 86,516,618 |
| Amounts due from Group companies[1] | — | 1,239,992 | 40,425,872 | 29,829,301 | (71,495,165) | — |
| Others | 390 | 9,393 | 6,198,116 | 2,140,680 | — | 8,348,579 |
| **Total current assets** | **2,659** | **1,250,418** | **120,762,847** | **110,388,409** | **(71,495,165)** | **160,909,168** |
| **Non-current assets:** | | | | | | |
| Other non-current assets | — | — | 5,300,938 | 11,125,028 | — | 16,425,966 |
| Investments in subsidiaries, the VIE and its subsidiaries[2] | 86,252,341 | 2,000 | — | 1,579,309 | (87,833,650) | — |
| Others | 674,057 | 9,690 | 2,581,092 | 609,745 | — | 3,874,584 |
| **Total non-current assets** | **86,926,398** | **11,690** | **7,882,030** | **13,314,082** | **(87,833,650)** | **20,300,550** |
| **Total assets** | **86,929,057** | **1,262,108** | **128,644,877** | **123,702,491** | **(159,328,815)** | **181,209,718** |
| **Current liabilities:** | | | | | | |
| Payable to merchants | — | — | 61,947,517 | 562,197 | — | 62,509,714 |
| Merchant deposits | — | — | 13,360,409 | 217,143 | — | 13,577,552 |
| Amounts due to Group companies[1] | — | 1,315,756 | 27,978,153 | 123,501,613 | (152,795,522) | — |
| Others | 24,607 | 191,953 | 12,619,600 | 4,806,288 | — | 17,642,448 |
| **Total current liabilities** | **24,607** | **1,507,709** | **115,905,679** | **129,087,241** | **(152,795,522)** | **93,729,714** |
| **Non-current liabilities** | | | | | | |
| Convertible bonds | 11,788,907 | — | — | — | — | 11,788,907 |
| Others | 996 | 75 | 324,285 | 251,194 | — | 576,550 |
| **Total non-current liabilities** | **11,789,903** | **75** | **324,285** | **251,194** | **—** | **12,365,457** |
| **Total liabilities** | **11,814,510** | **1,507,784** | **116,229,964** | **129,338,435** | **(152,795,522)** | **106,095,171** |

13

| | As of December 31, 2020 | | | | | |
|---|---|---|---|---|---|---|
| | PDD Holdings Inc. (Primary beneficiary of the VIE) | Hangzhou Weimi* | VIE and Its Subsidiaries | Other Subsidiaries of PDD Holdings Inc.** | Eliminations | Consolidated Total |
| | | | (RMB in thousands) | | | |
| **Current assets:** | | | | | | |
| Cash and cash equivalents | 6,566 | 9,168 | 3,593,192 | 18,812,263 | — | 22,421,189 |
| Restricted cash | — | 45,000 | 52,148,852 | 228,595 | — | 52,422,447 |
| Short-term investments | 5,840,247 | — | 7,026,442 | 51,684,405 | — | 64,551,094 |
| Amounts due from Group companies[1] | — | 999,964 | 9,932,418 | 14,699,309 | (25,631,691) | — |
| Others | 359 | 38,340 | 8,788,524 | 1,301,925 | — | 10,129,148 |
| **Total current assets** | **5,847,172** | **1,092,472** | **81,489,428** | **86,726,497** | **(25,631,691)** | **149,523,878** |
| **Non-current assets:** | | | | | | |
| Other non-current assets | — | 5,005 | 4,380,476 | 2,889,824 | — | 7,275,305 |
| Investments in subsidiaries, the VIE and its subsidiaries[2] | 67,814,679 | 2,000 | — | 1,616,265 | (69,432,944) | |
| Others | 1,276,751 | 23,967 | 654,790 | 153,923 | — | 2,109,431 |
| **Total non-current assets** | **69,091,430** | **30,972** | **5,035,266** | **4,660,012** | **(69,432,944)** | **9,384,736** |
| **Total assets** | **74,938,602** | **1,123,444** | **86,524,694** | **91,386,509** | **(95,064,635)** | **158,908,614** |
| **Current liabilities:** | | | | | | |
| Payable to merchants | — | — | 53,417,259 | 416,722 | — | 53,833,981 |
| Merchant deposits | — | — | 10,926,319 | — | — | 10,926,319 |
| Amounts due to Group companies[1] | — | 1,068,463 | 9,759,506 | 92,224,226 | (103,052,195) | — |
| Others | 327,004 | 334,083 | 14,809,044 | 3,651,646 | — | 19,121,777 |
| **Total current liabilities** | **327,004** | **1,402,546** | **88,912,128** | **96,292,594** | **(103,052,195)** | **83,882,077** |
| **Non-current liabilities** | | | | | | |
| Convertible bonds | 14,432,792 | — | — | — | — | 14,432,792 |
| Others | 2,918 | 10,034 | 366,834 | 38,071 | — | 417,857 |
| **Total non-current liabilities** | **14,435,710** | **10,034** | **366,834** | **38,071** | **—** | **14,850,649** |
| **Total liabilities** | **14,762,714** | **1,412,580** | **89,278,962** | **96,330,665** | **(103,052,195)** | **98,732,726** |

14

*Selected Condensed Consolidated Cash Flows Information*

| | For the Year Ended December 31, 2022 | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | PDD Holdings Inc. (Primary beneficiary of the VIE) | Hangzhou Weimi* | VIE and Its Subsidiaries | Other Subsidiaries of PDD Holdings Inc.** | Eliminations | Consolidated Total |
| | ( RMB in thousands) | | | | | |
| Net cash (used in)/generated from operating activities(3) | (24,202) | 25,830 | 25,650,939 | 22,855,293 | — | 48,507,860 |
| Net cash generated from/(used in) investing activities | 65,707 | (93,576) | (43,513,150) | (1,053,261) | 22,232,610 | (22,361,670) |
| Net cash generated from financing activities | 10,079 | 66,786 | 16,710,269 | 5,455,555 | (22,232,610) | 10,079 |

| | For the Year Ended December 31, 2021 | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | PDD Holdings Inc. (Primary beneficiary of the VIE) | Hangzhou Weimi* | VIE and Its Subsidiaries | Other Subsidiaries of PDD Holdings Inc.** | Eliminations | Consolidated Total |
| | (RMB in thousands) | | | | | |
| Net cash generated from/(used in) operating activities(3) | 82,074 | (150,891) | 34,365,025 | (5,513,197) | — | 28,783,011 |
| Net cash used in investing activities | (91,170) | (270,312) | (26,828,581) | (33,008,291) | 24,635,989 | (35,562,365) |
| Net cash generated from/(used in) financing activities | 318 | 368,069 | (1,445,969) | 23,838,417 | (24,635,989) | (1,875,154) |

| | For the Year Ended December 31, 2020 | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | PDD Holdings Inc. (Primary beneficiary of the VIE) | Hangzhou Weimi* | VIE and Its Subsidiaries | Other Subsidiaries of PDD Holdings Inc.** | Eliminations | Consolidated Total |
| | (RMB in thousands) | | | | | |
| Net cash generated from/(used in) operating activities(3) | 735,231 | (452,435) | 29,379,799 | (1,465,968) | — | 28,196,627 |
| Net cash used in investing activities | (52,266,859) | (224,486) | (11,802,074) | (40,595,102) | 66,530,620 | (38,357,901) |
| Net cash generated from financing activities | 50,892,970 | 678,729 | 7,818,632 | 58,939,285 | (66,530,620) | 51,798,996 |

Notes:

\* Represents Hangzhou Weimi, a PRC subsidiary of the Company that has entered into contractual arrangements with the VIE, the VIE's shareholders and, as applicable, their spouses. These contractual arrangements enable us to direct the activities of and derive economic benefits from the VIE and its subsidiaries. For more information, see "Item 4. Information on the Company—C. Organizational Structure —Contractual Arrangements with the VIE and Its Shareholders."

\*\* Represents all of the Company's subsidiaries other than Hangzhou Weimi.

(1)   Represents the elimination of the intercompany balances among PDD Holdings Inc., Hangzhou Weimi, the Company's subsidiaries other than Hangzhou Weimi, and the VIE and its subsidiaries.

(2)   Represents the elimination of the investments in Hangzhou Weimi, the Company's subsidiaries other than Hangzhou Weimi, and the VIE and its subsidiaries.

(3)   For the years ended December 31, 2020, 2021 and 2022, cash paid by the VIE and its subsidiaries to Hangzhou Weimi, primarily for service fees, was RMB935.1 million, RMB2,714.2 million and RMB963.9 million (US$139.8 million), respectively.

**A.**      **[Reserved]**

**B.**      **Capitalization and Indebtedness**

Not applicable.

**C.**      **Reasons for the Offer and Use of Proceeds**

Not applicable.

15

D.        **Risk Factors**

Investing in our ADSs involves significant risks. You should carefully consider all of the information in this annual report before making an investment in our ADSs. Below please find the principal risks we face, organized under relevant headings. In the event that PRC regulations become applicable to companies in Hong Kong, the legal and operational risks associated with operating in China, as discussed in "Item 3. Key Information—D. Risk Factors—Risks Relating to Our Business and Industry," may also apply to our operations in Hong Kong.

**Risks Related to Our Business and Industry**

***Our limited operating history makes it difficult to evaluate our business and prospects. We cannot guarantee that we will be able to maintain the growth rate that we have experienced to date.***

The businesses that we own and operate have a limited operating history. The Pinduoduo platform commenced its commercial operations in 2015. The Temu platform commenced its commercial operations in 2022. Our revenues grew from RMB93,949.9 million in 2021 to RMB130,557.6 million (US$18,929.1 million) in 2022. However, our historical performance may not be indicative of our future growth or financial results. We cannot assure you that we will be able to grow at the same rate as we did in the past, or avoid any decline in the future. Our growth may slow down or become negative, and revenues may decline for a number of possible reasons, some of which are beyond our control, including decreasing consumer spending, increasing competition, declining growth of our overall market or industry, the emergence of alternative business models, changes in rules, regulations, government policies or general economic conditions. In addition, our online marketing services, from which we have generated most of our revenues since 2017, may not grow as quickly as we have anticipated. It is difficult to evaluate our prospects, as we may not have sufficient experience in addressing the risks to which companies operating in rapidly evolving markets may be exposed. If our growth rate declines, investors' perceptions of our business, operating results and prospects may be materially and adversely affected and the market price of our ADSs could decline. You should consider our prospects in light of the risks and uncertainties that companies with a limited operating history may encounter.

***If we fail to anticipate buyer needs and provide products and services to attract and retain buyers, or fail to adapt our services or business model to changing buyer needs or emerging industry standards, our business may be materially and adversely affected.***

The e-commerce market in which we operate as well as buyer needs and preferences are constantly evolving. As a result, we must continuously respond to changes in the market and buyer demand and preferences to remain competitive, grow our business and maintain our market position. We intend to further diversify our product and service offerings to add to our revenue sources in the future. New products and services, new types of buyers or new business models may involve risks and challenges we do not currently face. Any new initiatives may require us to devote significant financial and management resources and may not perform as well as expected. For example, Duo Duo Grocery, a next-day grocery pick-up service that we started in August 2020 as an extension of the Pinduoduo platform, and the Temu platform, a global e-commerce marketplace that we launched in September 2022, may each require financial, personnel and other resources commitment over time and may not attract or retain enough users or otherwise perform in accordance with our expectations.

Furthermore, we may have difficulty in anticipating buyer demand and preferences, and the products offered on our platforms may not be accepted by the market or be rendered obsolete or uneconomical. Therefore, any inability to adapt to these changes may result in a failure to capture new buyers or retain existing buyers, the occurrence of which would materially and adversely affect our business, financial condition and results of operations.

In addition, to remain competitive, we must continue to enhance and improve the responsiveness, functionality and features of our platforms. The internet and e-commerce markets are characterized by rapid technological evolution, changes in buyer requirements and preferences, frequent introductions of new products, features and services embodying new technologies and the emergence of new industry standards and practices, any of which could render our existing technologies and systems obsolete. Our success will depend, in part, on our ability to identify, develop and adapt to new technologies useful in our business, and respond to technological advances and emerging industry standards and practices, in particular with respect to mobile internet, in a cost-effective and timely way. We cannot assure you that we will be successful in these efforts.

16

Table of Contents

***Any harm to our brands or reputation may materially and adversely affect our business and results of operations.***

We believe that the recognition and reputation of our brands, including Pinduoduo and Temu, among our buyers, merchants and third-party service providers have contributed significantly to the growth and success of our business. Maintaining and enhancing the recognition and reputation of our brands are critical to our business and competitiveness.

Many factors, some of which are beyond our control, are important to maintaining and enhancing our brands. These factors include our ability to:

- provide a superior shopping experience to buyers;

- maintain the popularity, attractiveness, diversity, quality and authenticity of our product offerings;

- maintain the efficiency, reliability and quality of the fulfillment and delivery services to our buyers;

- maintain or improve buyers' satisfaction with our after-sale services;

- increase brand awareness through marketing and brand promotion activities; and

- preserve our reputation and goodwill in the event of any negative publicity on our consumer experience or merchant service, internet and data security, product quality, price or authenticity, performance measures, or other issues affecting us or other e-commerce businesses in the countries or regions where we have operations.

Public perception that counterfeit, unauthorized, illegal, or infringing products are sold on our platforms or that we or merchants on our platforms do not provide satisfactory consumer services, even if factually incorrect or based on isolated incidents, could damage our reputation, diminish the value of our brands, undermine the trust and credibility we have established and have a negative impact on our ability to attract new buyers or retain our current buyers. In particular, we have been and may continue to be subject to negative publicity based on claims and allegations related to intellectual property. For example, the Office of the U.S. Trade Representative, or USTR, has identified the Pinduoduo platform as a "notorious market" in its Special 301 Reports since 2019. The USTR may continue to identify the Pinduoduo platform as a notorious market in the future. The negative public perception resulted therefrom could damage our reputation, harm our business, diminish the value of our brand name and negatively affect trading price of our ADSs.

If we are unable to maintain our reputation, enhance our brand recognition or increase positive awareness of our platforms, products and services, it may be difficult to maintain and grow our buyer base, and our business and growth prospects may be materially and adversely affected.

17

Table of Contents

***Merchants on our platforms deliver their products to buyers through a variety of third-party logistics service providers, third-party warehouse operators, third-party pick-up point operators and/or e-waybill systems. Service interruptions, failures, or constraints of these third parties or any disruptions or malfunctions of the e-waybill systems could severely harm our business and prospects.***

Merchants on our platforms fulfil and deliver their orders through third-party logistics service providers, warehouse operators and/or pick-up point operators. Interruptions to or failures in services provided by these third parties could affect timely and successful delivery of the ordered products to our buyers. As we do not directly control or manage the operations of these third parties, we may not be able to guarantee their performance. Any failure to provide satisfactory services to our buyers, such as delays in delivery, product damage or product loss during transit, shutdown or termination of pick-up points may damage our reputation and cause us to lose buyers, and may ultimately adversely affect our results of operations. In addition, certain of these third parties may be influenced by our competitors when providing services to us. For example, if third-party logistics service providers raise the shipping rates for delivering products of merchants on our platforms, our merchants may not be willing to bear the increased costs or be able to offer competitive prices for products on our platforms. As a result, our business and prospects, as well as our financial condition and results of operations could be materially and adversely affected.

If these third parties fail to deliver products to our buyers on time or in good condition, our buyers may refuse to accept merchandise purchased on our platforms and have less confidence in our platforms. In such event, we cannot assure you that our merchants or we will be able to find alternative cost-efficient service providers or operators to offer satisfactory services or pick-up points in a timely manner, or at all, which could cause our business and reputation to suffer or cause merchants and buyers to move to other platforms and have negative impact on our financial conditions.

Most merchants on our platforms use e-waybill systems to arrange and track shipments. While we launched our e-waybill system during the first quarter of 2019, merchants on our platforms are allowed to choose different e-waybill systems developed and operated by third-party service providers. Any disruptions or malfunctions of e-waybill systems used by our merchants could prevent the timely or proper delivery of products to consumers, which would damage our reputation, harm our business, diminish the value of our brand name.

***We face intense competition, and if we fail to compete effectively, we may lose market share, buyers and merchants.***

The e-commerce industry is intensely competitive. We compete to attract, engage and retain buyers, merchants, and other participants on our platforms. Our current or potential competitors include (i) major e-commerce operators, (ii) major traditional and brick-and-mortar retailers, (iii) retail companies focused on specific product categories and (iv) major internet companies that do not operate e-commerce businesses now but may enter the e-commerce business area or are in the process of initiating their e-commerce businesses. These current or future competitors may have longer operating histories, greater brand recognition, better supplier or merchant relationships, stronger infrastructure, larger buyer bases or greater financial, technical or marketing resources than we do. Competitors may leverage their brand recognition, experience and resources to compete with us in a variety of ways, including making investments and acquisitions for the expansion of their product and service offerings. Some of our competitors may be able to secure more favorable terms from merchants, devote greater resources to marketing and promotional campaigns, adopt more aggressive pricing or inventory policies and devote substantially more resources to develop their IT systems and technology. Some of these competitors may also offer "team purchase" on their platforms or offer innovative purchase models that may turn out to be highly popular among buyers, and buyers may prefer them over our business model. In addition, new and enhanced technologies may increase the competition in the market we operate in. Increased competition may reduce our profitability, market share, user base and brand recognition. There can be no assurance that we will be able to compete successfully against current or future competitors, and such competitive pressures may have a material and adverse effect on our business, financial condition and results of operations.

18

***If we fail to maintain and expand our relationships with merchants, our revenues and results of operations will be harmed.***

We rely on our merchants to offer merchandise that appeal to our existing and potential buyers at attractive prices. Our ability to provide popular products on our platforms at attractive prices depends on our ability to develop mutually beneficial relationships with our merchants. For example, we rely on our merchants to make available sufficient inventory and fulfill large volumes of orders in an efficient and timely manner to ensure our user experience. However, we may experience merchant attrition in the ordinary course of business resulting from several factors, such as losses to competitors, perception that marketing on our platforms is ineffective, reduction in merchants' marketing budgets, and closures or bankruptcies of merchants. In addition, we may have disputes with merchants with respect to their compliance with our quality control policies and measures and the penalties imposed by us for violation of these policies or measures from time to time, which may cause them to be dissatisfied with our platforms. Their complaints may in turn result in negative impact on our public image and reputation. If we experience significant merchant attrition, or if we are unable to attract new merchants, our revenues and results of operations may be materially and adversely affected. In addition, our agreements with merchants also typically do not restrict them from establishing or maintaining business relationships with our competitors. We cannot assure you that merchants will continue to offer merchandise on our platforms if they are pressured to use only one platform to market their products.

***Any change, disruption, discontinuity in the features and functions of major social networks could severely limit our ability to continue growing our buyer base, and our business may be materially and adversely affected.***

Our success depends on our ability to attract and retain new buyers and expand our buyer base. Acquiring and retaining buyers on our platforms is important to the growth and profitability of our business. We leverage social networks as a tool for buyer acquisition and engagement. Although buyers can access our platforms and make purchases directly through our platforms, we leverage social networks to enable buyers to share product information and their purchase experiences with their friends, family and other social contacts to generate effective and organic traffic and active interactions among buyers. A portion of our buyer traffic comes from these recommendations or product introductions that buyers share through social networks. Due to the nature of our business model, which resembles a dynamic and interactive shopping experience, it is impracticable for us to accurately bifurcate and quantify the buyer traffic generated directly through our platforms and through social networks. Therefore, during our daily operations, we focus more on the gross merchandise value on our platforms as a whole and the seamless user experience across different access points, and believe that the final purchase destination cannot be used to reflect the significance of social networks and our platforms to our business operations.

To the extent that we fail to effectively leverage such social networks, our ability to attract or retain buyers may be severely harmed. If any of these social networks makes changes to its functions or support, such as charging fees for functions or support that are currently provided for free, or stops offering its functions or support to us, we may not be able to locate alternative platforms of similar scale to provide similar functions or support on commercially reasonable terms in a timely manner, or at all. Furthermore, we may fail to establish or maintain relationships with additional social network operators to support the growth of our business on economically viable terms, or at all. Any interruption to or discontinuation of our relationships with major social network operators may severely and negatively impact our ability to continue growing our buyer base, and any occurrence of the circumstances mentioned above may have a material adverse effect on our business, financial condition and results of operations.

***We are dependent on app stores to disseminate our mobile apps.***

Consumers primarily access our services through the Pinduoduo and Temu mobile apps. Our mobile apps are offered via app stores operated by third parties, such as Apple's App Store, which could suspend or terminate users' access to our mobile apps, increase access costs or change the terms of access in a way that makes our apps less desirable or harder to access. As a result, our ability to expand our user base may be hindered if potential users experience difficulties in or are barred from accessing our mobile apps. In the past, our mobile apps were taken down from certain third-party app stores for a short period of time. We cannot assure you that we will not experience such incident of similar nature in the future. The occurrence of the similar incident may adversely affect our brands and reputation, business, financial condition and results of operations.

***Any disruption to our IT systems could materially affect our ability to maintain the satisfactory performance of our IT systems and deliver consistent services to our buyers and merchants.***

The proper functioning of our IT systems is essential to our businesses. The satisfactory performance, reliability and availability of our IT systems are critical to our success, our ability to attract and retain buyers and our ability to maintain and deliver consistent services to our buyers and merchants. However, our technology infrastructure may fail to keep pace with the growth of our business, particularly with respect to our new product and service offerings. Our buyers may experience delays as we seek to source additional capacity. If our buyers are dissatisfied with their experience on our platforms as a result of such delays, our results of operations as well as our reputation could be adversely affected.

19

Table of Contents

Additionally, we must continue to upgrade and improve our technology infrastructure to support the growth of our business. However, we cannot assure you that we will be successful in executing these system upgrades, and the failure to do so may impede our growth. We currently rely on cloud services and servers operated by external cloud service providers to store our data, to allow us to analyze a large amount of data simultaneously and to update our buyer database and buyer profiles quickly. Any interruption or delay in the functionality of these external cloud service and server providers may materially and adversely affect the operations of our business.

We may be unable to monitor and ensure high-quality maintenance and upgrade of our IT systems and infrastructure on a real-time basis, and buyers may experience service outages and delays in accessing and using our platforms to place orders. In addition, we may experience surges in online traffic and orders associated with promotional activities and generally as we scale, which can put additional demand on our platforms at specific times. Our technology or infrastructure may not function properly at all times. Any system interruptions caused by telecommunications failures, computer viruses, hacking or other attempts to harm our systems that result in the unavailability or slowdown of our platforms or reduced order fulfillment performance could reduce the volume of products sold and the attractiveness of product offerings on our platforms. Our servers may also be vulnerable to computer viruses, physical or electronic break-ins and similar disruptions, which could lead to system interruptions, mobile app slowdown or unavailability, delays or errors in transaction processing, loss of data or the inability to accept and fulfill buyer orders. Any such occurrence could cause disruption to our daily operations. As a result, our reputation may be materially and adversely affected, our market share could decline and we could be subject to liability claims.

***We have incurred net losses in the past, and we may not be able to maintain profitability in the future.***

We incurred net losses from our inception until 2020, before recording a net income of RMB7,768.7 million in 2021 and a net income of RMB31,538.1 million (US$4,572.6 million) in 2022. We cannot assure you that we will be able to maintain profitability in the future. In particular, we expect our operating costs and expenses to increase in absolute amounts in the future due to: (i) the continued expansion of our business operations, buyer base and merchant network, (ii) the continued investment in technology infrastructure and network, (iii) our promotion and marketing efforts as we continue to enhance our brand recognition, retain and grow our buyer base, and increase our buyer activities, (iv) the launch of new services, and (v) the investment in new initiatives, which may incur upfront costs, change our existing revenue and cost structures, and affect our ability to maintain profitability.

In addition to managing the foregoing costs and expenses, our ability to maintain profitability depends on our ability to, among other things, attract and retain buyers and increase buyer activities, establish and maintain relationships with merchants, provide valuable online marketplace services and broaden service offerings, and optimize our cost structure. We may not be able to achieve any of the above. In particular, our sales and marketing expenses increased by 21.3% from RMB44,801.7 million in 2021 to RMB54,343.7 million (US$7,879.1 million) in 2022, as we invested in cultivating greater user recognition and engagement through online and offline advertising campaigns and promotions. Similarly, our research and development expenses increased by 15.5% from RMB8,992.6 million in 2021 to RMB10,384.7 million (US$1,505.6 million) in 2022, as we hired additional experienced research and development personnel. If we incur substantial sales and marketing expenses without being able to achieve the anticipated growth in the number of buyers and merchants on our platforms or their spending, our operating results may be materially and adversely affected. Moreover, if our investment in our research and development does not result in improvements to the quality or efficiency of our services or otherwise fails to generate returns as expected, our operating results may also be materially and adversely affected. As a result, we may experience decreasing operating margin, and may incur net losses in the future. In addition, our ability to use our net losses, to the extent we record such net losses in future periods, to offset future taxable income may be subject to certain limitations, including limitations resulting from the reorganization of our corporate structure and change of our primary operating entities. As such, we may not be able to fully utilize our net losses or at all.

***We rely on certain key operating metrics to evaluate the performance of our business, and perceived inaccuracies in such metrics may harm our reputation and negatively affect our business.***

We rely on certain key operating metrics to evaluate the performance of our business. Our operating metrics may differ from estimates published by third parties or from similarly titled metrics used by other companies due to differences in methodology and assumptions. If these metrics are perceived to be inaccurate by investors or investors make investment decisions based on operating metrics we disclosed but with their own methodology and assumptions or those published or used by third parties or other companies, our reputation may be harmed, which could negatively affect our business, and we may also face potential lawsuits or disputes.

20

***We face risks related to natural disasters, health epidemics and other outbreaks, most notably those related to the outbreak of COVID-19, which could significantly disrupt our operations.***

We and our merchants are vulnerable to natural disasters, health epidemics, and other calamities. Any such occurrence could cause disruption to our and our merchants' daily operations or the closure of facilities and logistics delivery networks, which may disrupt our business operations and adversely affect our results of operations. In recent years, there have been outbreaks of epidemics in the countries or regions where we have operations. For example, from early 2020 to the end of 2022, to contain the spread of COVID-19, the Chinese government took a number of actions, including quarantine and social distancing measures, among other things. COVID-19 also resulted in the temporary closure of corporate offices, retail stores, manufacturing facilities and factories across China, and put significant strain on merchandise shipping and delivery. At the end of 2022, China began to modify its zero-COVID policy, and most of the travel restrictions and quarantine requirements were lifted in December 2022. From late December 2022 to early 2023, certain parts of China experienced a heightened number of COVID-19 cases, which resulted in temporary disruptions to business and other activities. The extent to which the pandemic impacts our results of operations going forward will depend on future developments which are highly uncertain and unpredictable, including the frequency, duration and extent of outbreaks of COVID-19, the appearance of new variants with different characteristics, the effectiveness of efforts to contain or treat cases, and future actions that may be taken in response to these developments. Consequently, the COVID-19 pandemic may continue to materially and adversely affect our business, financial condition and results of operations in the current and future years. In addition, our results of operations could be adversely affected to the extent that any epidemics or other catastrophic events harm the local or global economy in general.

***Our success depends on the continuing efforts of our key employees. If we fail to hire, retain and motivate our key employees, our business may suffer.***

Our future success is significantly dependent upon the continued service of our key executives and other key employees. If we lose the services of any member of our management or key personnel, we may not be able to locate suitable or qualified replacements, and may incur additional expenses to recruit and train new staff, which could severely disrupt our business and growth. Our management and key personnel are critical to our vision, strategic direction, culture and overall business success. If there is any internal organizational structure change or change in responsibilities for our management or key personnel, the operation of our business and our business prospects may be adversely affected. Our employees, including members of our management, may choose to pursue other opportunities. If we are unable to motivate or retain key employees, our business may be severely disrupted and our prospects could suffer.

The increasing scale of our business also requires us to hire and retain a wide range of capable and experienced personnel and technology talents who can adapt to a dynamic, competitive and challenging business environment. For example, we may need to hire additional personnel with special sets of skills and experience for our new initiatives and businesses, such as Duo Duo Grocery and the Temu platform. Competition for talent is intense, and the availability of suitable and qualified candidates is limited. Competition for talent could cause us to offer higher compensation and other benefits to attract and retain suitable individuals. Even if we were to offer higher compensation and other benefits, these individuals may choose not to join or continue to work for us. Any failure to attract or retain management and key personnel could severely disrupt our business and growth.

***If we are unable to manage our growth or execute our strategies effectively, our business and prospects may be materially and adversely affected.***

We anticipate that further expansion of our businesses will be required. Expansion in general increases the complexity of our operations and places significant strains on our management, operational and financial resources, and may cause additional risks and costs in relation to compliance, such as dealing with regulatory enforcement or labor disputes. We may continue to hire, train and effectively manage new employees and contractors. If our new hires perform poorly or if we are unsuccessful in hiring, training, managing and integrating new employees and contractors, our business, financial condition and results of operations may be materially harmed.

In addition, we plan to further establish relationships with more merchants to increase the product offerings on our platforms. Such expansion may require us to introduce new products and work with a variety of additional merchants to address the evolving needs of our buyers. We may have limited or no experience for certain new product offerings, and our expansion into these new product offerings may not achieve broad buyer acceptance. These offerings may present new and difficult technological or operational challenges, and we may be subject to claims if buyers are not satisfied with the quality of the products or do not have satisfactory experiences in general.

To effectively execute our business strategies and manage the expected growth of our operations and personnel, we will need to continue to improve our transaction processing, technological, operational and financial systems, policies, procedures and controls. All of the relevant endeavors involve risks and will require significant management, financial and human resources. We cannot assure you that we will be able to effectively manage our growth or to implement our strategies successfully. If we are not able to manage our growth or implement our strategies effectively, or at all, our business and prospects may be materially and adversely affected.

We have launched a number of new initiatives in recent years. For example, we have developed an open, asset-light logistics technology platform. As the first pillar to such logistics technology platform, we launched our e-waybill system during the first quarter of 2019. Building on top of our e-waybill system, our aim is to build a platform that would provide technology solutions to our sizable and growing merchant base, and fundamentally improve their efficiencies and services to users as we deepen our relationships with them. As a result of the development of this platform, we may incur additional costs and expenses, devote more management's attention to its operations and compliance and allocate additional resources in dealing with potential disputes relating to its operations and intellectual property rights. In August 2020, as an extension to the Pinduoduo platform, we started Duo Duo Grocery, a next-day grocery pick-up service that allows users to order groceries and related products online and collect their orders the next day at nearby designated pickup points. In September 2022, we launched the Temu platform, a global online marketplace that connects consumers with global sellers, manufacturers and brands around the world. We cannot assure you that we will be able to manage or operate these new business initiatives successfully or effectively, including by providing the requisite services to the merchants, attracting and retaining capable employees and partners, or leasing suitable facilities on commercially acceptable terms. Failure to manage and operate Duo Duo Grocery or the Temu platform could materially and adversely affect our business, financial condition and results of operations.

***We may incur liability for counterfeit, unauthorized, illegal, or infringing products sold or misleading information available on our platforms.***

Under the marketplace model currently in place on our platforms, substantially all of products offered on our platforms are supplied by merchants, who are separately responsible for sourcing and coordinating delivery of the products. We have been and may continue to be subject to allegations and lawsuits claiming that products listed or sold through our platforms by us or third-party merchants are counterfeit, unauthorized, illegal, or otherwise infringe third-party copyrights, trademarks, patents or other intellectual property rights, or that content posted on our user interface contains misleading information on description of products and comparable prices. Although we have adopted strict measures to protect us against these potential liabilities, including but not limited to, proactively verifying the authenticity and authorization of products sold on our platforms through working with brands and conducting offline investigations, blocking prior to product launch or immediately taking down any counterfeit or illegal products or misleading information found on our platforms, closing higher-risk online stores, and freezing the accounts of merchants in violation of the platform policies, these measures may not always be successful or timely. For example, in January 2018, we were required by the relevant government authorities to strengthen supervision on the qualifications of the distributors of publications on our platforms and to respond effectively to claims of copyright infringement. We have taken a number of measures in accordance with such requirements including the implementation of a comprehensive system in reviewing and tracking the qualification status of the relevant merchants. In August 2018, we met with the officials from the relevant governmental authorities to discuss the alleged sale of counterfeit and infringing products on our platforms upon their request. Shortly after the meetings, we adopted a number of remediation measures including more rigorous policies of closure of stores and removal of listings with infringing products from our platforms. We may implement further measures in an effort to eliminate infringing products on our platforms, including taking legal actions against merchants of counterfeit or infringing products, which may cause us to spend substantial additional resources or result in reduced revenues. In addition, these measures may not appeal to consumers, merchants or other participants on our platforms. A merchant whose account is suspended or terminated by us, regardless of our compliance with the applicable laws and regulations, may have disputes with us and commence action against us for damages, make public complaints or engage in publicity campaigns against us. We may incur significant costs to defend against these activities, which could harm our business.

In the event that counterfeit, illegal, unauthorized or infringing products are sold on our platforms or infringing or misleading content is posted on our user interface, we could face claims or be imposed penalties. Counterfeit products sold on our platforms may damage our reputation and cause buyers to refrain from making future purchases from us, which would materially and adversely affect our business operations and financial results. We have in the past received claims alleging the sales of defective, counterfeit or unauthorized items on our platforms. Irrespective of the validity of such claims, we could incur significant costs and efforts in either defending against or settling such claims. If there is a successful claim against us in the United States, we might be required to pay substantial damages or be enjoined from permitting further sale of the relevant products or activities by certain merchants. Potential liabilities under PRC law for negligence in participating or assisting in infringement activities associated with counterfeit goods include injunctions to cease infringing activities, rectification, compensation, administrative penalties and even criminal liability.

22

Moreover, the alleged sales of counterfeit products and third-party claims or administrative penalties related to them could result in significant negative publicity and our reputation could be severely damaged. The negative public perception resulted therefrom could damage our reputation, harm our business, diminish the value of our brand name and negatively affect trading price of our ADSs.

Some of our merchants interact and exchange information with our users through our livestreaming feature. As such communication is conducted in real time, we are unable to verify the information exchanged. Therefore, it is possible that users may engage in conversations or activities with illegal, obscene or infringing content that may be deemed unlawful under the applicable laws and regulations on our platforms. In addition, certain merchants may post and sell on our platforms products that may not be sold via e-commerce platform under the applicable regulations. Failure to identify and remove such products and content from our platforms may subject us to liability and administrative penalties. Any of these events could have a material and adverse effect on our business, results of operations or financial condition.

Under our standard form agreements, we require our merchants to indemnify us for any losses we suffer or any costs that we incur due to any products sold by these merchants. However, we may not be able to successfully enforce our contractual rights and may need to initiate costly and lengthy legal proceedings in China to protect our rights.

In addition to fraudulent transactions with legitimate buyers, merchants on our platforms may engage in fictitious transactions with themselves or collaborate with third parties in order to artificially inflate their sales records and search results rankings. Such activity may frustrate other merchants by enabling the perpetrating merchants to be favored over legitimate merchants, and may harm buyers by misleading them to believe that a merchant is more reliable or trustworthy than the merchant actually is. We are also aware that certain merchants and users engage in fictitious transactions on e-commerce platforms to facilitate illegal activities such as online gambling. Fictitious transactions may result our key metrics being inflated. Although we have implemented strict measures to detect and penalize merchants who engaged in fictitious transactions on our platforms, there can be no assurance that such measures will be effective in preventing all fraudulent transactions or deter illegal activities.

Moreover, illegal, fraudulent or collusive activities by our employees could also subject us to liability or negative publicity. There were occasions where we found our employees accepting payments from merchants in exchange for preferential treatment on our platforms, and we reported such behavior to the relevant government authorities.

Although we implement a zero-tolerance policy towards these activities and have not been charged with any wrongdoing, there can be no assurance that our controls and policies will prevent all fictitious, fraudulent or illegal activities by merchants, users or our employees or that similar incidents will not occur in the future. Any inquiries, investigations and other governmental actions associated with and negative publicity and user sentiment resulting from similar incidents could divert significant management time and attention, severely diminish consumer confidence in us and the value of our brands, and would materially and adversely affect our business, financial condition and results of operations.

***We may be subject to claims under consumer protection laws, including health and safety claims and product liability claims, if property or people are harmed by the products and services sold on our platforms. Meanwhile, we are subject to existing and new laws and regulations imposing various requirements on our business operations.***

The products sold on our platforms may be defectively designed or manufactured, and offerings of defective products on our platforms may expose us to liabilities associated with consumer protection laws. Third parties who purchased defective products sold by us and sustained personal injury or property damage may bring claims or legal proceedings against us as the retailer of the product. Although we would have legal recourse against the manufacturer of such products under the applicable law, attempting to enforce our rights against the manufacturer may be expensive, time-consuming and ultimately futile. Also, operators of e-commerce platforms may be subject to certain provisions of consumer protection laws even where the operator is not the manufacturer, provider or retailer of the products or services purchased by the consumer. In addition, if we do not take appropriate remedial actions against merchants on our platforms for their actions that we know, or should have known, would infringe upon the rights and interests of consumers, we may be held jointly liable for infringement alongside the merchants. For example, in China, if  the operator of the Pinduoduo platform fails to provide a consumer with the real name, address and contact details of the merchant that sold the defective product on the Pinduoduo platform, the operator of the Pinduoduo platform may be liable to compensate such consumer damages suffered by him or her. Moreover, applicable consumer protection laws in China provide that a platform will be held liable for failing to meet any undertaking that it made to consumers with regard to products listed on it, and the Pinduoduo platform is required to report violations of applicable consumer protection laws, regulations or administrative rules by merchants on the platform to the State Administration for Market Regulation of the PRC, or the SAMR, or its local branches, and take appropriate remedial measures, including ceasing to provide services to the relevant merchants, as a platform. The operator of the Pinduoduo platform may also be held jointly liable with merchants on the platform who do not possess the proper licenses or authorizations to sell goods or sell goods that do not meet product standards.

23

We do not maintain product liability insurance for products transacted on our platforms, and our rights of indemnity from the merchants or suppliers on our platforms may not adequately cover us for any liability we may incur. Claims against us, even if they are eventually unsuccessful, could result in significant expenditure of funds and diversion of management time and resources, which could materially and adversely affect our business, financial condition and prospects. In addition, governments and regulatory authorities of the jurisdictions where we operate may continue to promulgate new laws and regulations governing the e-commerce industry, tighten enforcement of existing laws and regulations, and impose additional requirements and other obligations on our business including the operation of our platforms and our market promotion activities. Compliance with these laws and regulations may be costly, and any incompliance or associated inquiries, investigations and other governmental actions may divert significant management time and attention and our financial resources, bring negative publicity, or subject us to liabilities or administrative penalties. For example, in the case of the Pinduoduo platform:

- In August 2018, the Standing Committee of the National People's Congress of the PRC, or the NPC, promulgated the E-Commerce Law, pursuant to which we may be held responsible if fresh produce or other products sold through Duo Duo Grocery caused harm to the interests and health of consumers. Please see "Item 4. Information on the Company—B. Business Overview—Regulation—Regulations Relating to E-Commerce—The E-Commerce Law" for details.

- The E-Commerce Law requires certain e-commerce operators, including but not limited to e-commerce platform operators and merchants on these platforms, to register with the relevant local branches of the SAMR, and e-commerce platform operators should provide the identity information of the merchants on their platforms to local branches of the SAMR and procure the merchants who fail to make such registrations to comply with the registration requirements. The Measures for the Supervision and Administration of Online Transactions, promulgated by the SAMR in 2021, also require e-commerce platforms to remind individual merchants to timely register with the applicable local branches of the SAMR if those merchants have an aggregate annual online business turnover of RMB100,000 or more. Please see "Item 4. Information on the Company—B. Business Overview—Regulation—Regulations Relating to E-Commerce—The E-Commerce Law" and "—Regulations on Online Transactions" for details. The policy of the Pinduoduo platform expressly requires all merchants on the platform to complete these registrations. The Pinduoduo platform may lose existing or potential merchants who do not or are unwilling to comply with the registration and related requirements, and the Pinduoduo platform may be found liable under the E-Commerce Law and related regulations if it is deemed to have failed to implement the required procedures.

- In October 2020, the SAMR issued the Interim Provisions for Regulating Promotional Activities that require platform operators to design rules and procedures to foster fair and transparent merchandise promotional activities, and assist the authorities in their investigation of violations by platform merchants. In addition, according to the PRC Anti-unfair Competition Law and relevant laws and regulations, business operators are prohibited from inducing consumers into transactions via misleading pricing terms or engaging in other anti-competitive conducts associated with product price. Violators of these laws and regulations may be subject to fines and other administrative penalties. For example, in March 2021, the SAMR fined five platform operators a sum of RMB6.5 million, including RMB1.5 million against the operator of the Pinduoduo platform, for unfair pricing conduct with respect to their online grocery businesses.

- In February 2021, the Anti-monopoly Committee of the State Council of the PRC published the Anti-monopoly Guidelines for the Platform Economy Sector, which prohibit business practices such as deploying big data analytics to set discriminatory terms for merchandise price or other transaction terms, coercive exclusivity arrangements with transaction counterparties, blocking of competitor interface through technological means and unlawful collection of user data without consent. If the Pinduoduo platform is found to have any non-compliance issues by relevant authorities, it may be subject to fines and other penalties.

- In April 2021, the SAMR, together with the CAC and the State Administration of Taxation of the PRC, or SAT, held a meeting with more than 30 major platform operators, including  the operator of the Pinduoduo platform. All platform operators that participated in the meeting were required to conduct a self-inspection within one month to identify and correct possible violations of anti-monopoly, anti-unfair competition, tax and other related laws and regulations and submit their compliance commitments for public supervision. It is still uncertain how the requirement will be implemented and whether further legislation and administration activities will be entailed. As a result, we may incur additional costs and expenses, devote more management's attention and allocate additional resources in the compliance with relevant laws and regulations. If the operator of the Pinduoduo platform is required to take any rectifying or remedial measures or are subject to any penalty, the reputation and business operations of the Pinduoduo platform may be materially and adversely affected.

24

- In August 2022, certain amendments to the Anti-monopoly Law became effective, which generally impose stricter requirements for completing acquisitive transactions. Please see "Item 4. Information on the Company—B. Business Overview—Regulation—Regulations Relating to Anti-unfair Competition and Anti-monopoly" for details. Any failure or perceived failure by the Pinduoduo platform to comply with the anti-monopoly laws and regulations may result in governmental investigations or enforcement actions, lawsuits or claims against the Pinduoduo platform or its operator, and could have an adverse effect on our business, financial condition and results of operations.

Due to the uncertainties associated with the evolving legislative activities and varied local implementation practices of consumer protection, anti-monopoly and competition laws and regulations in the countries or regions where we have operations, compliance with these laws, regulations, rules, guidelines and implementations may be costly, and any incompliance or associated inquiries, investigations and other governmental actions may divert significant management time and attention and our financial resources, bring negative publicity, subject us to liabilities or administrative penalties, and may materially and adversely affect our financial conditions, operations and business prospects.

***We may face challenges in expanding our product offerings.***

The merchants on our platforms carry a wide range of products, including agricultural produce, apparel, shoes, bags, mother and childcare products, food and beverage, electronic appliances, furniture and household goods, cosmetics and other personal care items, sports and fitness items and auto accessories. Expansion of product offerings both in categories and items involve new risks and challenges. Our lack of familiarity with these products and lack of relevant buyer data relating to these products may make it more difficult for us to anticipate buyer demand and preferences and to inspect and control quality and ensure proper handling, storage and delivery by our merchants. Our merchants may experience higher return rates on new products, receive more buyer complaints about such products and face costly product liability claims as a result of selling such products, which would harm our brands and reputation as well as our financial performance. We may also be involved in disputes with the merchants in connection with these claims and complaints.

As we broaden our product offerings, we will need to work with a large number of new merchants efficiently and establish and maintain mutually beneficial relationships with our existing and new merchants. To support our growth and our expansion, we will need to devote management, operating, financial and human resources which may divert our attention from existing businesses, incur upfront costs, and implement a variety of new and upgraded management, operating and financial systems, procedures and controls. There is no assurance that we will be able to implement all of these systems, procedures and control measures successfully or address the various challenges in expanding our future businesses and operations effectively. In addition, our newly launched initiatives, such as livestreaming, Duo Duo Grocery and Temu, may face risks and uncertainties and may not grow successfully.

***Tencent provides services to us in connection with various aspects of our operations. If such services become limited, restricted, curtailed or less effective or more expensive in any way or become unavailable to us for any reason, our business may be materially and adversely affected.***

We collaborate with Tencent, one of our principal shareholders and the owner of Weixin and QQ, with respect to various aspects of our business, including our Pinduoduo mini-programs within Weixin and the entry point to our Pinduoduo mini-program in Weixin Pay, which serves as one of the access points to the Pinduoduo platform, as well as services such as payment processing, advertising and cloud technology.

If the services provided by Tencent to us become limited, compromised, restricted, curtailed or less effective or become more expensive or unavailable to us for any reason, including the availability of our mini-programs within Weixin and the entry point to our Pinduoduo mini-program in Weixin Pay, our business may be materially and adversely affected. Failure to maintain our relationship with Tencent could materially and adversely affect our business and results of operations. See "Item 7. Major Shareholders and Related Party Transactions—B. Related Party Transactions."

25

***We rely on the proper operation and maintenance of our platforms and internet infrastructure and telecommunications networks in the countries or regions where we have operations. Any malfunction, capacity constraint or operation interruption may have an adverse impact on our business.***

Currently, all of our sales of products are generated online through our platforms. Therefore, the satisfactory performance, reliability and availability of our platforms are critical to our success and our ability to attract and retain buyers. Our business depends on the performance and reliability of the internet infrastructure in the countries or regions where we have operations. The reliability and availability of our platforms depends on telecommunications carriers and other third-party providers for communications and storage capacity, including bandwidth and server storage, among other things. If we are unable to enter into and renew agreements with these providers on acceptable terms, or if any of our existing agreements with such providers are terminated as a result of our breach or otherwise, our ability to provide our services to our buyers could be adversely affected. In the case of the Pinduoduo platform, access to the internet in China is maintained through state-owned telecommunications carriers under administrative control. The Pinduoduo platform obtains access to end-user networks operated by such telecommunications carriers and internet service providers. The failure of telecommunications network operators to provide us with the requisite bandwidth could also interfere with the speed and availability of our platforms. Service interruptions prevent buyers from accessing our platforms and placing orders, and frequent interruptions could frustrate buyers and discourage them from attempting to place orders, which could cause us to lose buyers and harm our operating results. In addition, we have no control over the costs of the services provided by the telecommunications operators. If the prices that we pay for telecommunications and internet services rise significantly, our financial results could be adversely affected.

***We may engage in acquisitions, investments or strategic alliances, which could require significant management attention and materially and adversely affect our business and results of operations.***

We may from time to time identify strategic partners to form strategic alliances, invest in or acquire additional assets, technologies or businesses that are complementary to our existing business. These transactions may involve minority investments in other companies, acquisitions of controlling stakes in other companies or acquisitions of selected assets.

Any strategic alliances, investments or acquisitions and the subsequent integration of the new assets and businesses obtained or developed from such transactions into our own may divert management from their primary responsibilities and subject us to additional liabilities. In addition, the costs of identifying and consummating investments and acquisitions may be significant. We may also incur costs and experience uncertainties in completing necessary registrations and obtaining necessary approvals from relevant government authorities. The costs and duration of integrating newly acquired assets and businesses could also materially exceed our expectations. Any such negative developments could have a material adverse effect on our business, financial condition, results of operations and cash flow.

Our financial results could be adversely affected by our investments or acquisitions. The investments and acquired assets or businesses may not generate anticipated synergies with our business or achieve anticipated financial growth as we would expect. They could result in significant investments and goodwill impairment charges and amortization expenses for other intangible assets, which would adversely affect our financial condition and operating results.

***Undetected programming errors or flaws or failure to maintain effective customer service could damage our reputation or even cause direct loss to us which would materially and adversely affect our results of operations.***

Our platforms and internal systems rely on software that is highly technical and complex. In addition, our platforms and internal systems depend on the ability of such software to store, retrieve, process and manage an immense amount of data and the ability of their operators to operate these complex systems properly. The software on which we rely may contain undetected programming errors or design defects, some of which may only be discovered after the code has been released. Improper operations or other human errors may also occur from time to time as a result of operating such software and complex systems. Programming errors or design defects within the software or human errors in connection with the operation of the software may result in negative experience to buyers using our platforms, disruptions to the operations of our merchants, delay in introductions of new features or enhancements, unintended disclosure of confidential information of buyers, merchants and our platforms or compromise in our ability to provide effective customer service and enjoyable user engagement or exploitation of loopholes by dishonest buyers or merchants. They could cause damage to our reputation, loss of buyers or merchants, or direct economic loss to us.

***Our business generates and processes a large amount of data, and we are required to comply with applicable laws relating to privacy and cybersecurity. The improper use or disclosure of data could have a material and adverse effect on our business and prospects.***

Our business generates and processes a large amount of data. We face risks inherent in handling and protecting them. In particular, we face a number of challenges relating to data from transactions and other activities on our platforms, including:

- protecting the data in and hosted on our system, including against attacks on our system by outside parties or fraudulent behavior or improper use by our employees, and securely transmitting such data over public networks;

- addressing concerns related to privacy and sharing, safety, security and other factors; and

- complying with applicable laws and regulations relating to the collection, use, storage, transfer, disclosure and security of personal data, including any requests from regulatory and government authorities relating to these data.

To address these challenges, we have adopted strict security policies and measures, including encryption technology, to protect our proprietary data and buyer information. Maintaining complete security on our platforms and systems for the storage and transmission of confidential or private data, such as buyers' personal information, payment-related information and transaction information, is essential to maintain consumer confidence in our platforms and systems.

However, advances in technology, the expertise of hackers, new discoveries in the field of cryptography or other events or developments could result in a compromise or breach of the technology that we use to protect our data. We may not be able to prevent third parties, especially hackers or other individuals or entities engaging in similar activities through viruses, Trojan horses, malicious software, break-ins, phishing attacks, third-party manipulation or security breaches, from illegally obtaining the confidential or private data we hold on our platforms. Individuals or entities that illegally obtain confidential or private data may further engage in various other illegal activities using such data. The methods used by hackers and others engaging in illegal online activities are increasingly more sophisticated and constantly evolving. In addition, all online payments for products sold on our platforms are settled through third-party online payment services. We have limited control or influence over the security policies or measures adopted by third-party providers of online payment services through which some of our buyers may choose to make payment for purchases.

Any negative publicity on our platforms' data safety or privacy protection mechanisms and policies, and any claims asserted against us or fines imposed upon us as a result of actual or perceived failures, could have a material and adverse effect on our public image, reputation, financial condition and results of operations. Any compromise of our information security or the information security measures of our contracted third-party online payment service providers that results in data being improperly used or disclosed could have a material and adverse effect on our reputation, business, prospects, financial condition and results of operations. Significant capital, managerial and other resources, including costs incurred to deploy additional personnel and develop network protection technologies, train employees, and engage third-party experts and consultants, may be required to ensure and enhance information security or to address the issues caused by a potential security failure.

***Our business is subject to complex and evolving laws and regulations regarding privacy and data protection in countries and regions where we have operations. These laws and regulations can be complex and stringent, and many are subject to change and uncertain interpretation, which could result in claims, changes to our data and other business practices, regulatory investigations, penalties, or otherwise affect our business.***

Regulatory authorities around the world have adopted laws and regulations or are considering legislative and regulatory proposals concerning privacy and data protection, including in the PRC, U.S. and the European Union. These laws and regulations regulate the way we collect, use, store, transfer, disclose and secure data and protect the privacy of our users. Global developments in these laws may also create additional compliance obligations for us in the jurisdictions in which we operate.

In the PRC, the regulatory and enforcement regime relating to data security and data protection is evolving and may be subject to different interpretations or substantive changes. Moreover, different PRC regulatory bodies, including the Standing Committee of the NPC, the Ministry of Industry and Information Technology of the PRC, or the MIIT, the CAC, the Ministry of Public Security of the PRC, or the MPS, and the SAMR, have enforced data privacy and protections laws and regulations with varying standards and applications. See "Item 4. Information on the Company—B. Business Overview—Regulation—Regulations Relating to Internet Information Security and Privacy Protection." The following are examples of certain recent PRC regulatory activities in this area:

27

Table of Contents

*Cybersecurity and Data Security*

● PRC authorities have promulgated a number of laws and regulations relating to cybersecurity and data security in the past few years. In June 2021, the Standing Committee of the NPC promulgated the Data Security Law, effective September 1, 2021. In July 2021, the state council of the PRC promulgated the Regulations on the Protection of Critical Information Infrastructure, effective September 1, 2021. In December 2021, the CAC, together with other authorities, jointly promulgated the Cybersecurity Review Measures, effective February 15, 2021. These laws and regulations impose cybersecurity review obligations on critical information infrastructure operators and network platform operators. Under the Regulations on the Protection of Critical Information Infrastructure, "critical information infrastructure" is defined as those network facilities or information systems that may endanger national security, people's livelihoods and the public interest if such facilities or systems were to experience data breaches, damage, or system malfunctions. Critical information infrastructure operators, as determined and notified by the applicable governing authorities, are required to undergo cybersecurity reviews if they procure network products and services which could affect the security of their information infrastructure, network or data. As of the date of this annual report, we have not received any notice that we are a critical information infrastructure operator from any government authority. Under the Cybersecurity Review Measures, any network platform operator that holds personal data of more than one million users must apply for a cybersecurity review before it makes any public offering on a foreign stock exchange. As these laws and regulations are relatively new, certain concepts thereunder, including the exact scope of the term "critical information infrastructure operators" and "network platform operators," remain subject to further clarification. Therefore, it is uncertain whether we would be deemed to be a critical information infrastructure operator or a network platform operator under PRC law and become subject to the relevant PRC cybersecurity laws and regulations, such as cybersecurity review obligations discussed above.

● In addition to the currently effective laws and regulations described above, PRC authorities may adopt additional laws and regulations in the future that further heighten the regulation of data security. For example, in November 2021, the CAC released a consultation draft of the Regulations on Network Data Security Management, or the Draft Network Data Security Regulations, for public comment. These regulations create cybersecurity review obligations for data processors, which are broadly defined as individuals or organizations that have discretion in deciding the objectives and means of their data processing activities, such as data collection, storage, utilization, transmission, publication and deletion. In particular, pursuant to the Draft Network Data Security Regulations, a data processor must apply for cybersecurity review if, among others, it seeks a public offering on a foreign stock exchange and processes the data of more than one million users. In addition to the foregoing cybersecurity review obligations, the Draft Network Data Security Regulations also proposed to create a system of annual data security self-assessments, whereby data processors that (i) process "important data" or (ii) are listed overseas must conduct an annual data security assessment and submit the annual assessment report to the applicable municipal cybersecurity department by the end of January in the following year. As of the date of this annual report, the Draft Network Data Security Regulations have only been released for public comment, and their respective provisions and anticipated adoption or effective date remain subject to change with substantial uncertainty. However, if such regulations were to be adopted in their current form, we would be subject to additional regulatory obligations with respect to data security, and may face challenges in addressing their requirements and amending our internal data processing policies and practices to ensure compliance therewith.

*Personal Data and Privacy*

● The Anti-monopoly Guidelines for the Platform Economy Sector published by the Anti-monopoly Committee of the State Council, effective February 7, 2021, prohibit collection of user information through coercive means by online platforms operators.

28

Table of Contents

- In August 2021, the Standing Committee of the NPC promulgated the Personal Information Protection Law, which unified a number of hitherto separate rules with respect to personal information rights and privacy protection, effective November 1, 2021. The Personal Information Protection Law strengthened the protection of personal information. As a general principle, the processing of personal data must be directly related to a specific and reasonable purpose and the related collection of personal information must be tailored to what is necessary to meet that purpose. The Personal Information Protection Law also created a number of specific requirements for the processing of personal data. For example, the law prohibits any person that processes personal data from engaging in price discrimination or otherwise applying unreasonable differential treatment to individuals based on automated analysis of collected personal information. To meet the latest regulatory requirements of the PRC authorities, we update our privacy policies from time to time and adopt technical measures to protect data and ensure that we systematically protect personal information rights. However, many of the specific requirements of the Personal Information Protection Law remain to be clarified by the CAC, other regulatory authorities, and courts in practice. We may be required to make further adjustments to our business practices to comply with personal information protection laws and regulations.

We believe, to the best of our knowledge, that our business operations are compliant with the currently effective PRC laws relating to cybersecurity, data security, and personal data and privacy laws in all material respects. These PRC laws and regulations are relatively new and certain concepts thereunder remain subject to interpretation by the PRC regulators. The Pinduoduo platform is subject to heightened scrutiny and required to adopt stricter measures to protect and manage certain categories of data. However, some of the provisions under the Cybersecurity Review Measures and the Draft Network Data Security Regulations remain unclear on whether they are, or will be, applicable to companies that are already listed in the United States, such as us. If the Cybersecurity Review Measures and the enacted version of the Draft Network Data Security Regulations mandate that issuers like us must clear cybersecurity review or obtain other regulatory approvals for their previous issuances of securities in the United States or future offerings, it is unclear whether we would be able to complete such regulatory procedures in a timely fashion, or at all. Failure to do so may subject us to government actions, investigations, fines, penalties, suspension of our operations or removal of our apps from the relevant application stores, which could have a material and adverse effect on our business and results of operations.

In the United States, rules and regulations governing data privacy and security include those promulgated under the authority of the Federal Trade Commission Act, the Electronic Communications Privacy Act, the Computer Fraud and Abuse Act, California's California Consumer Privacy Act of 2018 ("CCPA") and California Privacy Rights Act of 2020 ("CPRA"), and other state and federal laws relating to privacy, consumer protection, and data security. The CCPA and CPRA introduce new requirements regarding the handling of personal information of California consumers and households, including compliance and record keeping obligations, the right to request access to and deletion of their personal information, and the right to opt out of the sale and other uses of their personal information, and provides a private right of action and statutory damages for data breaches. Other jurisdictions in the United States are beginning to expand existing regulations, or propose laws similar to the CCPA, which will continue to shape the data privacy environment nationally. Aspects of certain newly enacted state privacy statutes remain unclear, resulting in further legal uncertainty and potentially requiring us to modify our data practices and policies and to incur substantial additional costs and expenses in an effort to comply. If more stringent privacy legislation arises in the United States, it could increase our potential liability and adversely affect our business, results of operations, and financial condition.

In the European Union, the European Union General Data Protection Regulation ("GDPR"), which came into effect on May 25, 2018, includes operational requirements for companies that receive or process personal data of residents of the European Economic Area. The GDPR establishes new requirements applicable to the processing of personal data, affords new data protection rights to individuals and imposes penalties for serious data breaches. Individuals also have a right to compensation under the GDPR for financial or non-financial losses. Complying with these laws and contractual or other obligations relating to privacy, data protection, data transfers, data localization, or information security may require us to incur substantial operational costs or modify our data practices and policies. Any actual or perceived failure by us to comply with these laws, regulations, or other obligations may lead to significant fines, penalties, regulatory investigations, lawsuits, significant costs for remediation, damage to our reputation, or other liabilities.

We have taken and will continue to take reasonable measures to comply with such laws and regulations, including those set forth under "Item 4. Information on the Company—B. Business Overview—Data Security and Protection." However, there are uncertainties with respect to how such laws and regulations will be implemented and interpreted in practice. Complying with applicable laws and regulations relating to data security and personal information protection may be costly and result in additional expenses to us, and any material failure to do so may subject us to negative publicity, harm our reputation and business operations, significantly limit or completely hinder our ability to continue to offer securities to investors, or cause the value of such securities to significantly decline.

***We currently rely on commercial banks and third-party online payment service providers for payment processing and escrow services. If these payment services are restricted or curtailed in any way, are offered to us on less favorable terms, or become unavailable to us or our buyers for any reason, our business may be materially and adversely affected.***

All online payments for products sold on our platforms are settled through third-party online payment service providers. Our business depends on the billing, payment and escrow systems of these payment service providers to maintain accurate records of payments of sales proceeds by buyers and collect such payments. If the quality, utility, convenience or attractiveness of these payment processing and escrow services declines, or we have to change the pattern of using these payment services for any reason, the attractiveness of our platforms could be materially and adversely affected.

Business involving online payment services is subject to a number of risks that could materially and adversely affect third-party online payment service providers' ability to provide payment processing and escrow services to us, including:

- dissatisfaction with these online payment services or decreased use of their services by buyers and merchants;

- increasing competition, including from other established Chinese internet companies, payment service providers and companies engaged in other financial technology services;

- changes to rules or practices applicable to payment systems that link to third-party online payment service providers;

- breach of buyers' personal information and concerns over the use and security of information collected from buyers;

- service outages, system failures or failures to effectively scale the system to handle large and growing transaction volumes;

- increasing costs to third-party online payment service providers, including fees charged by banks to process transactions through online payment channels, which would also increase our costs of revenues; and

- failure to manage funds accurately or loss of funds, whether due to employee fraud, security breaches, technical errors or otherwise.

Certain commercial banks in China impose limits on the amounts that may be transferred by automated payment from buyers' bank accounts to their linked accounts with third-party online payment services. We cannot predict whether these and any additional restrictions that could be put in place would have a material adverse effect on the Pinduoduo platform.

The commercial banks and third-party online payment service providers in China that work with the Pinduoduo platform are subject to the supervision of the People's Bank of China, or the PBOC. The PBOC may publish rules, guidelines and interpretations from time to time regulating the operation of financial institutions and payment service providers that may in turn affect the pattern of services provided by such entities to the Pinduoduo platform. For example, in November 2017, the PBOC published a notice, or the PBOC Notice, on the investigation and administration of illegal offering of settlement services by financial institutions and third-party payment service providers to unlicensed entities. The PBOC Notice intended to prevent unlicensed entities from using licensed payment service providers as a conduit for conducting the unlicensed payment settlement services, so as to safeguard the fund security and information security. We believe that the pattern of the Pinduoduo platform receiving settlement services from third-party online payment service providers is not in violation of the PBOC Notice because (i) the relevant commercial bank opens an internal special account to receive payment from the buyers, (ii) the Pinduoduo platform submits to the bank materials verifying the truthfulness of the relevant transactions and (iii) the bank also verifies other information if it deems necessary before it distributes the payment to merchants on the Pinduoduo platform and the Pinduoduo platform, as applicable. However, we cannot assure you that the PBOC or other governmental authorities will take the same view as ours. If required by the PBOC or new legislation, the payment service providers that work with the Pinduoduo platform will have to suspend their services or explore new models to offer their services to the Pinduoduo platform, the Pinduoduo platform may not be able to claim its ownership and exclusive control of the payments from the buyers in the bank accounts opened with the relevant commercial banks, and the Pinduoduo platform may incur additional expenses or invest considerable resources in complying with the requirements. If the PBOC or other governmental authorities deem the Pinduoduo platform's cooperation with payment service providers to be violative of law, the Pinduoduo platform may also have to suspend or terminate its cooperation with these payment service providers or explore new models for using their services, and the income derived from the accrued interests in the relevant bank accounts may be confiscated, and the Pinduoduo platform may be subject to a fine of one to five times of such income.

30

We cannot assure you that we will be successful in entering and maintaining amicable relationships with commercial banks and online payment service providers that work with us. Identifying, negotiating and maintaining relationships with these providers require significant time and resources. Our current agreements with these service providers also do not prohibit them from working with our competitors. They could choose to terminate their relationships with us or propose terms that we cannot accept. Moreover, we cannot guarantee that the terms we negotiated with these payment service providers, including the payment processing fee rates, will remain as favorable. If the terms with these payment service providers become less favorable to us, such as the increase of payment processing fee rate, we may have to raise the transaction services fees for certain of our merchants, which may cause us to lose merchants, or absorb the additional costs by ourselves, both of which may materially and adversely affect our business, financial condition and results of operations. Furthermore, these service providers may not perform as expected under our agreements with them, and we may have disagreements or disputes with such payment service providers, any of which could adversely affect our brands and reputation as well as our business operations.

***We do not control Shanghai Fufeitong and the majority of its equity interests is indirectly controlled by our executive officers. If any conflict arises between us and Shanghai Fufeitong and cannot be resolved in our favor, our business, financial condition, results of operations and prospects may be materially and adversely affected.***

In April 2020, Shanghai Xunmeng, a subsidiary of the VIE, entered into a business cooperation agreement with Shanghai Fufeitong Information Service Co., Ltd., or Shanghai Fufeitong, pursuant to which both parties agreed to conduct comprehensive business cooperation in payment services, technical resources and other related professional areas. As Shanghai Fufeitong is a company which Messrs. Lei Chen and Zhenwei Zheng, our executive officers, indirectly hold 50.01% of the equity interests in, the transaction constitutes our related party transaction. See "Item 7. Major Shareholders and Related Party Transactions—B. Related Party Transactions—Loan to Ningbo Hexin and Business Cooperation Agreement with Shanghai Fufeitong" for more details of the transactions.

As Shanghai Fufeitong, which we do not have control over, also provides payment services to other parties from time to time, we cannot assure you that Shanghai Fufeitong's transactions with other parties or its pursuit of opportunities and development would not conflict with our interests. There can be no assurance that Messrs. Lei Chen and Zhenwei Zheng, in light of their control over Shanghai Fufeitong, would act in favor of our interests if any conflict arises between us and Shanghai Fufeitong. If the conflict cannot be resolved in our favor, our business, financial condition, results of operations and prospects may be materially and adversely affected.

Moreover, due to our cooperation with Shanghai Fufeitong, any event that negatively affects Shanghai Fufeitong may also negatively affect the perception of our customers, merchants, regulators and other third parties on us and may further adversely and materially affect our reputation, business, results of operations and prospects.

***Any lack of additional requisite approvals, licenses or permits or failure to comply with any requirements of the applicable laws, regulations and policies may materially and adversely affect our daily operations and hinder our growth.***

Our business is subject to governmental supervision and regulation by the relevant governmental authorities. In the case of the Pinduoduo platform, these authorities include the Ministry of Commerce of the PRC, or MOFCOM, the MIIT, the National Radio and Television Administration of the PRC, or the NRTA, and other governmental authorities in charge of the relevant categories of products sold on the Pinduoduo platform. Together, these government authorities promulgate and enforce regulations that cover many aspects of the operation of online retailing and related business, including entry into this industry, the scope of permissible business activities, licenses and permits for various business activities, and foreign investment. For instance, the Pinduoduo platform is required to hold a number of licenses and permits in connection with its business operations, including the ICP license and approvals for the establishment of foreign-invested enterprises engaging in the sale of goods over the internet. We have in the past held and currently hold all material licenses and permits described above and may apply for certain additional licenses with the government authorities in the future to maintain compliance especially when we take on new business activities. See "Item 4. Information on the Company—B. Business Overview—Regulation—Regulations Relating to Foreign Investment" and "Item 4. Information on the Company—B. Business Overview—Regulation—Licenses, Permits and Filings."

31

As of the date of this annual report, we have not been subject to material penalties or other material disciplinary action from the relevant governmental authorities regarding conducting our business without proper approvals, licenses and permits. However, we cannot assure you that we will not receive such notice of warning or be subject to penalties or other disciplinary actions in the future. New laws and regulations may be adopted from time to time to require additional licenses and permits other than those we currently have, and to address new issues that arise from time to time. As a result, substantial uncertainties exist regarding the interpretation and implementation of current and any future laws and regulations applicable to online retail and related businesses. If any governmental authority considers us operating without proper approvals, licenses, filings, registrations or permits or promulgates new laws and regulations that require additional approvals, filings, registrations or licenses or impose additional restrictions on the operation of any part of our business, it has the power, among other things, to levy fines, confiscate our income, revoke our business licenses, and require us to discontinue our relevant business or impose restrictions on the affected portion of our business. Any of these and other regulatory actions by the governmental authorities, including issuance of official notices, change of policies, promulgation of regulations and imposition of sanctions, may adversely affect our business and have a material and adverse effect on our results of operations. In addition, if we were to use new or additional domain names to conduct our business, we would have to apply for the same set of government authorizations or amend the current ones. There is no assurance that we will be able to complete such procedures timely.

Applicable laws and regulations may also require e-commerce platform operators to take measures to protect consumer rights. Failure to do so may subject the e-commerce platform operators to rectification requirements and penalties. Although we endeavor to comply with the relevant laws and regulations, there is no assurance that we can timely react to the evolving requirements. If the competent governmental authorities deem that we fail to meet such requirements, we may receive warnings, be ordered to make rectifications, or subject to other administrative sanctions and/or penalties that may have a material adverse effect on our reputation, business, financial condition and results of operations.

For instance, on November 12, 2020, the NRTA issued the Circular on Strengthening the Administration of Livestreaming, or Notice 78. Pursuant to Notice 78, platforms that provide livestreaming must register their information and business operations. On April 23, 2021, seven PRC regulatory authorities jointly promulgated the Administrative Measures on Online Livestreaming Marketing (Trial), effective May 25, 2021, which requires livestreaming platforms to adopt measures to (i) intervene in risky or illegal transactions by limiting traffic, suspending livestreaming or other methods, and (ii) prominently warn users of the risks involved in transactions conducted outside of the livestreaming platforms. Regulatory authorities may promulgate new laws and regulations from time to time to address new issues and regulate emerging activities. There also remains uncertainties in the interpretation and implementation of existing laws and regulations applicable to business activities in livestreaming and e-commerce. We cannot assure you that we will not be found in violation of any of the laws and regulations currently in effect due to the evolving interpretation and implementation of these laws and regulations.

Our entities in China are required by PRC laws and regulations to comply with PRC labor laws and regulations, pursuant to which they must pay overtime compensation and various government statutory employee benefit plans, including medical insurance, maternity insurance, workplace injury insurance, unemployment insurance and pension benefits through a PRC government-mandated multi-employer defined contribution plan. The relevant government agencies may examine whether an employer has made adequate payments of the requisite statutory employee benefits, and those employers who fail to make adequate payments may be subject to late payment fees, fines and/or other penalties. If the relevant PRC authorities determine that the relevant PRC entities need to make supplemental contributions, that these entities are not in compliance with labor laws and regulations, or that these entities are subject to fines or other legal sanctions, such as order of timely rectification, our business, financial condition and results of operations may be adversely affected.

Pursuant to the Individual Income Tax Law of the PRC, as amended on August 31, 2018, which became effective on January 1, 2019, an individual's taxable income shall be an amount equal to such individual's total annual income less a general deductible of RMB60,000 and various special deductibles permitted under relevant laws. Determination and calculation of such special deductibles in accordance with relevant laws may result in an increase of the operating costs and expenses of the Pinduoduo platform. However, as these laws and implementing rules were only recently promulgated and their interpretations have not been entirely settled yet, our determination and calculation of the special deductibles based on our understanding may be different from how the tax authorities or our employees in the PRC would do. These differences may result in inquiries or reassessment by the tax authorities, as well as disputes with our employees in the PRC.

***We may increasingly become a target for public scrutiny and anti-competitive conducts of competitors or third parties with ill intent, including complaints to regulatory agencies, negative media coverage, and public dissemination of malicious reports or accusations about our business, all of which could severely damage our reputation and materially and adversely affect our business and prospects.***

We process an extremely large number of transactions on a daily basis on our platforms, and the high volume of transactions taking place on our platforms as well as publicity about our business create the possibility of heightened attention from the public, competitors, regulators and the media. Heightened regulatory and public concerns over consumer protection and consumer safety issues may subject us to additional legal and social responsibilities and increased scrutiny and negative publicity over these issues, due to the large number of transactions that take place on our platform and the increasing scope of our overall business operations. In addition, changes in our services or policies have resulted and could result in objections by the public, our competitors, operators of traditional or new media and social networks, merchants on our platform or others. From time to time, these objections or allegations, regardless of their veracity, may result in consumer dissatisfaction, public protests or negative publicity, which could result in government inquiry or substantial harm to our brand, reputation and operations.

In particular, as the competition in the e-commerce industry further intensifies, we are increasingly susceptible to aggressive, anti-competitive and potentially malicious behaviors, conducts and campaigns by our competitors or third parties with ill intent. For example, untrue and unsubstantiated allegations targeting our platforms or merchants on our platforms may be posted on internet forums, social media platforms or websites by anyone on an anonymous basis. The availability of information on the Internet is virtually immediate, as is its impact. These information platforms may not necessarily filter or check the accuracy of information before allowing them to be published. We are often afforded little or no time to respond. For instance, in March 2023, a number of media channels reported cybersecurity concerns about our Pinduoduo mobile app alleged by an anonymous source. Competitors or third parties with ulterior motives could launch aggressive marketing and publicity strategies against us and place the media coverage about this incident among other innocuous or unrelated matters. We are working with stakeholders to refute the allegations while using this opportunity to review our practices. As a result of these anti-competitive conducts, or activities in the similar nature, our brand name and reputation may be materially and adversely affected, and our business operations and strategies may be disrupted or harmed. We may even be subject to governmental or regulatory scrutiny or third-party claims as a result. Meanwhile, we may be required to spend significant amount of time and incur substantial costs to react to or address these consequences. There is no assurance that we will be able to effectively fend ourselves off these anti-competitive conducts within a reasonable period of time, or at all.

Moreover, as our business expands and grows, both organically and through acquisitions of and investments in other businesses, domestically and internationally, we may be exposed to heightened public scrutiny in jurisdictions where we already operate as well as in new jurisdictions where we may operate. There is no assurance that we would not become a target for regulatory or public scrutiny in the future or that scrutiny and public exposure would not severely damage our reputation as well as our business and prospects.

***The online marketing services provided by the Pinduoduo platform in China constitute internet advertisement under PRC law, which in turn subjects the Pinduoduo platform to PRC laws and regulations applicable to advertising.***

The Pinduoduo platform generates a significant amount of our revenues from online marketing services and other related services. In July 2016, the State Administration of Industry and Commerce of the PRC, or the SAIC, which has now been merged into the SAMR, promulgated the Interim Administrative Measures on Internet Advertising, or the Internet Advertising Measures, effective September 2016, pursuant to which internet advertisements are defined as any commercial advertising that directly or indirectly promotes goods or services through internet media in any form including paid-for search results. See "Item 4. Information on the Company—B. Business Overview—Regulation—Regulations Relating to Internet Advertising Business." Under the Internet Advertising Measures, our online marketing services and other related services constitute internet advertisement.

PRC advertising laws and regulations require advertisers, advertising operators and advertising distributors to ensure that the content of the advertisements they prepare or distribute is fair and accurate and is in full compliance with applicable law. The Pinduoduo platform currently generate revenues primarily from online marketing services. Violation of these laws, rules or regulations may result in penalties, including fines, confiscation of advertising fees and orders to cease dissemination of the advertisements. In circumstances involving serious violations, the PRC government may suspend or revoke a violator's business license or license for operating advertising business. In addition, the Internet Advertising Measures require paid-for search results to be distinguished from natural search results so that consumers will not be misled as to the nature of these search results. As such, the Pinduoduo platform must distinguish between merchants who purchase online marketing and related services (or the relevant listings posted by these merchants), and other merchants. Complying with these requirements and any penalties or fines for any failure to comply may significantly reduce the attractiveness of the Pinduoduo platform and increase our costs and could have a material adverse effect on our business, financial condition and results of operations.

33

In addition, for advertising content related to specific types of products and services, advertisers, advertising operators and advertising distributors must confirm that the advertisers have obtained requisite government approvals, including the advertiser's operating qualifications, proof of quality inspection of the advertised products, and, with respect to certain industries, government approval of the content of the advertisement and filing with the local authorities. Pursuant to the Internet Advertising Measures, the Pinduoduo platform is required to take steps to monitor the content of advertisements displayed on the platform. Complying with PRC requirements on online advertising requires considerable resources and time, and could significantly affect the operation of the business of the Pinduoduo platform, while at the same time also exposing the Pinduoduo platform to increased liability under the relevant laws and regulations. The costs associated with complying with these laws and regulations, including any penalties or fines for our failure to so comply if required, could have a material adverse effect on the Pinduoduo platform's business, financial condition and results of operations. Any further change in the classification of the Pinduoduo platform's online marketing and other related services by the PRC government may also significantly disrupt the Pinduoduo platform's operations, and materially and adversely affect its business and prospects.

In addition, the Chinese government may, from time to time, promulgate new advertising laws and regulations in the future to impose further requirements on online advertising services. For example, on November 26, 2021, the SAMR promulgated a draft of the Measures for the Administration of Internet Advertisements for public comment, which stipulates that the promotion of commodities or services in the form of paid listings on the Internet must be prominently identified as advertisements, among other heightened obligations. To the extent these measures are enacted into law, our costs of complying with and our potential liability under the relevant laws and regulations would increase, which may have a material adverse effect on our business, financial condition and results of operations.

***We may be subject to intellectual property infringement claims, which may be expensive to defend and may disrupt our business and operations.***

We cannot be certain that our operations or any aspects of our business do not or will not infringe upon or otherwise violate patents, copyrights or other intellectual property rights held by third parties. We have been, and from time to time in the future may be, subject to legal proceedings and claims relating to the intellectual property rights of others. In addition, there may be other third-party intellectual property that is infringed by products offered by our merchants and our services or other aspects of our business. There could also be existing patents of which we are not aware that our products may inadvertently infringe. We cannot assure you that holders of patents purportedly relating to some aspect of our technology platforms or business, if any such holders exist, would not seek to enforce such patents against us in any jurisdiction. Further, the application and interpretation of patent laws and the procedures and standards for granting patents in certain countries or regions where we operate may be evolving and are uncertain, and we cannot assure you that their courts or regulatory authorities would agree with our analysis. If we are found to have violated the intellectual property rights of others, we may be subject to liability for our infringement activities or may be prohibited from using such intellectual property, and we may incur licensing fees or be forced to develop alternatives of our own. In addition, we may incur significant expenses, and may be forced to divert management's time and other resources from our business and operations to defend against these infringement claims, regardless of their merits. Successful infringement or licensing claims made against us may result in significant monetary liabilities and may materially disrupt our business and operations by restricting or prohibiting our use of the intellectual property in question. Finally, we use open-source software in connection with our products and services. Companies that incorporate open-source software into their products and services have, from time to time, faced claims challenging the ownership of open-source software and compliance with open-source license terms. As a result, we could be subject to suits by parties claiming ownership of what we believe to be open-source software or noncompliance with open-source licensing terms. Some open-source software licenses require users who distribute open-source software as part of their software to publicly disclose all or part of the source code to such software and make available any derivative works of the open-source code on unfavorable terms or at no cost. Any requirement to disclose our source code or pay damages for breach of contract could be harmful to our business, results of operations and financial condition.

34

***We may not be able to prevent others from unauthorized use of our intellectual property, which could harm our business and competitive position.***

We regard our trademarks, copyrights, patents, domain names, know-how, proprietary technologies, and similar intellectual property as critical to our success, and we rely on a combination of intellectual property laws and contractual arrangements, including confidentiality, invention assignment and non-compete agreements with our employees and others, to protect our proprietary rights. We are aware of certain copycat websites that attempt to cause confusion or diversion of traffic from us at the moment, against which we are considering initiating lawsuits, and we may continue to become an attractive target to such attacks in the future because of our brand recognition in the online retail industry. Despite these measures, any of our intellectual property rights could be challenged, invalidated, circumvented or misappropriated, or such intellectual property may not be sufficient to provide us with competitive advantages. In addition, there can be no assurance that (i) our application for registration of trademarks, patents, and other intellectual property rights will be approved, (ii) any intellectual property rights will be adequately protected, or (iii) such intellectual property rights will not be challenged by third parties or found by a judicial authority to be invalid or unenforceable. Further, because of the rapid pace of technological change in our industry, parts of our business rely on technologies developed or licensed by third parties, and we may not be able to obtain or continue to obtain licenses and technologies from these third parties at all or on reasonable terms.

Confidentiality, invention assignment and non-compete agreements may be breached by counterparties, and there may not be adequate remedies available to us for any such breach. Accordingly, we may not be able to effectively protect our intellectual property rights or to enforce our contractual rights. Policing any unauthorized use of our intellectual property is difficult and costly and the steps we take may be inadequate to prevent the infringement or misappropriation of our intellectual property. In the event that we resort to litigation to enforce our intellectual property rights, such litigation could result in substantial costs and a diversion of our management and financial resources, and could put our intellectual property at risk of being invalidated or narrowed in scope. We can provide no assurance that we will prevail in such litigation, and even if we do prevail, we may not obtain a meaningful recovery. In addition, our trade secrets may be leaked or otherwise become available to, or be independently discovered by, our competitors. Any failure in maintaining, protecting or enforcing our intellectual property rights could have a material adverse effect on our business, financial condition and results of operations.

***Tightening of tax compliance efforts that affect merchants on the Pinduoduo platform could materially and adversely affect our business, financial condition and results of operations.***

The e-commerce industry in China is still developing, and the PRC government may require e-commerce platform operators, such as the operator of the Pinduoduo platform, to assist in the collection of taxes with respect to income generated by merchants from transactions conducted on the Pinduoduo platform. Merchants operating businesses on the Pinduoduo platform may be deficient in their tax registration. PRC tax authorities may enforce registration requirements that target these merchants and may request assistance from the Pinduoduo platform in these efforts. As a result, these merchants may be subject to more stringent tax compliance requirements and liabilities and their business on the Pinduoduo platform could suffer or they could decide to terminate their relationship with the Pinduoduo platform, which could in turn negatively affect us. According to the E-Commerce Law, the e-commerce platform operators shall submit the identity information and the information related to tax payment of the merchants on the platforms to the tax authorities. The Pinduoduo platform may also be requested by tax authorities to assist in the enforcement of tax regulations, such as disclosure of transaction records and bank account information of the merchants, and withholding against merchants on the Pinduoduo platform. If that occurs, the Pinduoduo platform may lose existing merchants and potential merchants might not be willing to operate their business on the Pinduoduo platform. The Pinduoduo platform may be subject to liabilities if it fails to cooperate with the relevant PRC tax authorities to assist in the enforcement as requested. Stricter tax enforcement by the PRC tax authorities may also reduce the activities by merchants on the Pinduoduo platform. Any of these results could have a material adverse effect on our business, financial condition and results of operations.

***Our business may be subject to seasonal sales fluctuations which could result in volatility or have an adverse effect on the market price of our ADSs.***

We experience seasonality in our business, reflecting a combination of seasonal fluctuations in internet usage and traditional retail seasonality patterns. For example, we generally experience less buyer traffic and purchase orders in the first quarter of each year. Furthermore, sales are generally higher in the fourth quarter of each calendar year than in the preceding three quarters. Due to the foregoing factors, our financial condition and results of operations for future quarters may continue to fluctuate and our historical quarterly results may not be comparable to future quarters. Moreover, due to our limited operating history, the seasonal trends that we have experienced in the past may not apply to, or be indicative of, our future operating results. As a result, the trading price of our ADSs may fluctuate from time to time due to seasonality.

***We have granted and may continue to grant options and other types of awards under our share incentive plans, which may result in increased share-based compensation expenses.***

We adopted a global share incentive plan in 2015 (the "2015 Plan") and a share incentive plan in 2018 (the "2018 Plan") for the purpose of granting share-based compensation awards to employees, directors and consultants to incentivize their performance and align their interests with ours. Under each of the share incentive plans, we are authorized to grant options and other types of awards. The maximum aggregate number of ordinary shares which may be issued pursuant to all awards under the 2015 Plan is 581,972,860 Class A ordinary shares, subject to adjustment and amendment, and the maximum aggregate number of shares which may be issued pursuant to all awards under the 2018 Plan was initially 363,130,400 Class A ordinary shares, plus an annual increase on the first day of each fiscal year of our company during the term of the 2018 Plan commencing with the fiscal year beginning January 1, 2019, by an amount equal to the lessor of (i) 1.0% of the total number of shares issued and outstanding on the last day of the immediately preceding fiscal year, and (ii) such number of shares as may be determined by our board of directors. In March 2021, our board of directors approved an amendment to the 2018 Plan to increase the annual increase percentage from 1.0% to 3.0% effective from the fiscal year beginning January 1, 2022. See "Item 6. Directors, Senior Management and Employees—B. Compensation" for further details. We recognized substantial share-based compensation expenses in our consolidated financial statements in connection with these grants, and may continue to incur such expenses in the future.

We believe the granting of share-based compensation is of significant importance to our ability to attract and retain key personnel and employees, and we will continue to grant share-based compensation to employees in the future. As a result, our expenses associated with share-based compensation may increase, which may have an adverse effect on our results of operations. We may re-evaluate the vesting schedules, lock-up period, exercise price or other key terms applicable to the grants under our currently effective share incentive plans from time to time. If we choose to do so, our expenses associated with share-based compensation may increase, which may have an adverse effect on our results of operations.

***If we fail to implement and maintain an effective system of internal control over financial reporting, our ability to accurately and timely report our financial results or prevent fraud may be adversely affected, and investor confidence and the market price of our ADSs may be adversely impacted.***

We are subject to the reporting requirements of the Exchange Act of 1934, or the Exchange Act, the Sarbanes-Oxley Act of 2002, or the Sarbanes-Oxley Act, and the rules and regulations of the Nasdaq Global Select Market. The Sarbanes-Oxley Act requires, among other things, that we maintain effective disclosure controls and procedures and internal control over financial reporting. We must perform system and process evaluation and testing of our internal control over financial reporting to allow management to report on the effectiveness of our internal control over financial reporting in our Form 20-F filing for that year, as required by Section 404 of the Sarbanes-Oxley Act. In addition, our independent registered public accounting firm must attest to and report on the effectiveness of our internal control over financial reporting. Our management has concluded that our internal control over financial reporting was effective as of December 31, 2022. See "Item 15. Controls and Procedures." If we fail to implement and maintain an effective system of internal control, we will not be able to conclude and our independent registered public accounting firm will not be able to report that we have effective internal control over financial reporting in accordance with the Sarbanes-Oxley Act in our future annual report on Form 20-F covering the fiscal year in which this failure occurs. Effective internal control over financial reporting is necessary for us to produce reliable financial reports. Any failure to maintain effective internal control over financial reporting could prevent us from identifying fraud and result in the loss of investor confidence in the reliability of our financial statements, which in turn could have a material and adverse effect on the trading price of our ADSs. Furthermore, we may need to incur additional costs and use additional management and other resources as our business and operations further expand or in an effort to remediate any significant control deficiencies that may be identified in the future.

***If we cannot obtain sufficient cash when we need it, we may not be able to meet our payment obligations under our convertible notes.***

In September 2019, we issued US$1 billion in aggregate principal amount of convertible senior notes due 2024 (the "2024 Notes"). The 2024 Notes do not bear regular interest, and will mature on October 1, 2024.

In November 2020, we issued US$2 billion in aggregate principal amount of convertible senior notes due 2025 (the "2025 Notes"). The 2025 Notes do not bear regular interest, and will mature on December 1, 2025.

We may not have sufficient funds to fulfill our payment obligations under the 2024 Notes and the 2025 Notes, including to repay the 2024 Notes and/or the 2025 Notes upon maturity, to settle conversions of the 2024 Notes and/or the 2025 Notes in cash, to repurchase the 2024 Notes and/or the 2025 Notes upon a tax redemption or an optional redemption thereof or, at the holders' election, upon a fundamental change (as defined in the terms of the 2024 Notes and the 2025 Notes, respectively) or on the specified dates set forth in the terms of the 2024 Notes and/or the 2025 Notes. In September 2022, we offered to repurchase the 2024 Notes at the election of the holders thereof pursuant to such holders' right to repurchase their notes on the specified date set forth in the terms of the 2024 Notes (the "Repurchase Right Offer"), and we completed the Repurchase Right Offer relating to the 2024 Notes in October 2022. US$1,000 aggregate principal amount of the 2024 Notes were validly surrendered and repurchased.

We derive most of our revenues from, and hold most of our assets through, our subsidiaries. As a result, we may rely in part upon distributions and advances from our subsidiaries in order to help us meet our payment obligations under the 2024 Notes, the 2025 Notes and our other obligations. Our subsidiaries are distinct legal entities and do not have any obligation, legal or otherwise, to provide us with distributions or advances. We may face tax or other adverse consequences, or legal limitations, on our ability to obtain funds from these entities. In addition, our ability to obtain external financing in the future is subject to a variety of uncertainties, including:

- our financial condition, results of operations and cash flows;

- general market conditions for financing activities by internet companies; and

- economic, political and other conditions in the PRC and elsewhere.

If we are unable to obtain funding in a timely manner or on commercially acceptable terms, we may not be able to meet our payment obligations under the 2024 Notes and/or the 2025 Notes, which in turn may constitute a default under the existing and/or future agreements governing our indebtedness.

***We do not have any business insurance coverage in China.***

The insurance industry in China is still at an early stage of development, and insurance companies in China currently offer limited business-related insurance products. We do not have any business liability or disruption insurance to cover our operations in China. We have determined that the costs of insuring for these risks and the difficulties associated with acquiring such insurance on commercially reasonable terms make it impractical for us to have such insurance. Any uninsured risks may result in substantial costs and the diversion of resources, which could adversely affect our results of operations and financial condition.

***A severe or prolonged downturn in the global economy could materially and adversely affect our business and financial condition.***

The COVID-19 pandemic has had a widespread impact on the global economy since 2020. The pandemic remains ongoing and continues to evolve, and its long-term impact on economic growth is unknown. Even before the outbreak of COVID-19, the global macroeconomic environment was facing numerous challenges. There was considerable uncertainty over the long-term effects of the expansionary monetary and fiscal policies which had been adopted by the central banks and financial authorities of some of the world's leading economies, including the United States and China. The conflict in Ukraine and the imposition of broad economic sanctions on Russia could raise energy prices and disrupt global markets. Unrest, terrorist threats and the potential for war in the Middle East and elsewhere may increase market volatility across the globe. There have also been concerns about the relationship between China and other countries, including the surrounding Asian countries, which may potentially have economic effects. In particular, there is significant uncertainty about the future relationship between the United States and China with respect to trade policies, treaties, government regulations and tariffs. Any severe or prolonged slowdown in the global economy may materially and adversely affect our business, results of operations and financial condition.

***We and certain of our directors and officers have been named as defendants in several lawsuits, which could have a material adverse impact on our business, financial condition, results of operation, cash flows and reputation.***

Between August and December 2018, several putative shareholder class action lawsuits were filed against us and certain of our directors and officers. See "Item 8. Financial Information—A. Consolidated Statements and Other Financial Information—Legal Proceedings" for more details. We may continue to be a target for lawsuits in the future, including putative class action lawsuits brought by shareholders and lawsuits arising from contractual disputes in the ordinary course of our business. There can be no assurance that we will be able to prevail in our defense or reverse any unfavorable judgment on appeal, and we may decide to settle lawsuits on unfavorable terms. Any adverse outcome of these cases, including any plaintiffs' appeal of the judgment in these cases, could result in payments of substantial monetary damages or fines, or changes to our business practices, and thus have a material adverse effect on our business, financial condition, results of operation, cash flows and reputation. In addition, all or part of the defense costs, or any liabilities that may arise from these matters may not be covered by any insurance. The litigation process may utilize a significant portion of our cash resources and divert management's attention from the day-to-day operations of our company, all of which could harm our business. We may also be subject to claims for indemnification related to these matters, and we cannot predict the impact that indemnification claims may have on our business or financial results.

### Risks Related to Our Corporate Structure

***If the PRC government determines that the contractual arrangements that establish part of the VIE structure do not comply with PRC regulations relating to the relevant industries, or if these regulations or the interpretation of existing regulations change in the future, we could be subject to severe penalties or be forced to relinquish our interests in our operations in China, and our ADSs may decline in value or become worthless.***

Foreign ownership of certain parts of our businesses including value-added telecommunications services ("VATS") is subject to restrictions under current PRC laws and regulations. For example, foreign investors are not allowed to own more than 50% of the equity interests in a value-added telecommunications service provider (except for e-commerce, domestic multi-party communications, storage and forwarding classes, and call centers).

PDD Holdings Inc. is a Cayman Islands holding company and our PRC subsidiaries, namely our WFOEs, are considered foreign-invested enterprises. Accordingly, our WFOEs are not eligible to provide value-added telecommunications services. As a result, we conduct our operations in China through (i) our PRC subsidiaries, (ii) the VIE, in which PDD Holdings Inc. does not have any equity interest but with which we maintain contractual arrangements, and (iii) the subsidiaries of the VIE. In particular, we currently conduct the business activities of the Pinduoduo platform through Shanghai Xunmeng, a subsidiary of the VIE, which holds the VATS License for (i) online data processing and transaction processing business (operating e-commerce), (ii) internet content-related services, (iii) domestic call center business, and (iv) information services. Shanghai Xunmeng is wholly owned by the VIE, namely Hangzhou Aimi, which has obtained a VATS License covering online data processing and transaction processing business (operating e-commerce) and internet content-related services. We, through Hangzhou Weimi, entered into a series of contractual arrangements, including a shareholders' voting rights proxy agreement, equity pledge agreement, spousal consent letter, exclusive consulting and services agreement and exclusive option agreement, with Hangzhou Aimi, its shareholders and, as applicable, their spouses, which enable us to (i) direct the activities of the VIE, (ii) receive substantially all of the economic benefits of the VIE and its subsidiaries, and (iii) have an exclusive option to purchase all or part of the equity interests and assets in the VIE when and to the extent permitted by PRC law. As a result of these contractual arrangements, we have control over and are the primary beneficiary of the VIE and its subsidiaries for accounting purposes and hence consolidate their financial results into our consolidated financial statements under U.S. GAAP. Our PRC subsidiaries contributed 43.3% of our revenues in 2022. The VIE and its subsidiaries contributed 56.2% of our revenues in 2022. See "Item 4. Information on the Company—C. Organizational Structure" for further details.

In the opinion of King & Wood Mallesons, our PRC legal counsel, (i) the structures of the VIE and Hangzhou Weimi are not in violation of applicable PRC laws and regulations currently in effect; and (ii) the contractual arrangements between Hangzhou Weimi, the VIE and its shareholders governed by PRC law are legal, valid, binding and enforceable in accordance with its terms and applicable PRC laws. However, as of the date of this annual report, the legality and enforceability of our contractual arrangements, as a whole, have not been tested in any PRC court, and we cannot guarantee you that the contractual arrangements, as a whole, would ultimately be legal or enforceable if they were to be tested in a PRC court.

King & Wood Mallesons, our PRC legal counsel, has also advised us that there are substantial uncertainties regarding the interpretation and application of current and future PRC laws and regulations. Accordingly, the PRC regulatory authorities may take a view that is contrary to the opinion of our PRC legal counsel. It is uncertain whether any new PRC laws or regulations relating to variable interest entity structures will be adopted or if adopted, what they would provide. The PRC government has broad discretion in determining rectifiable or punitive measures for non-compliance with or violations of PRC laws and regulations. If we, the VIE or its subsidiaries are found to be in violation of any existing or future PRC laws or regulations, or fail to obtain or maintain any of the required permits or approvals, the relevant PRC regulatory authorities would have broad discretion to take action in dealing with such violations or failures, including, but not limited to:

- revoking the business license and/or operating license of such entities;

- discontinuing or placing restrictions or onerous conditions on our operations, including by blocking the VIE's websites or apps;

- imposing fines, confiscating the income from Hangzhou Weimi, the VIE or its subsidiaries, or imposing other requirements with which we, the VIE or its subsidiaries may not be able to comply;

- requiring us to restructure our ownership structure or operations, including terminating the contractual arrangements with the VIE and deregistering the equity pledges of the VIE, which in turn would affect our ability to consolidate, derive economic interests from, or direct the activities of the VIE and its subsidiaries; or

- restricting or prohibiting our use of the proceeds of offshore financing to finance our business and operations in China.

The imposition of any of the penalties listed above would result in a material and adverse effect on our ability to conduct our business in the PRC. We may not be able to repay the notes and other indebtedness.

In addition, if the PRC government authorities determine that the contractual arrangements constituting part of the VIE structure to be in violation of PRC laws and regulations, or if these PRC laws and regulations change or are interpreted differently in the future, our ADSs may decline in value or become worthless if the determinations, changes, or interpretations result in our inability to assert contractual control over the assets of the VIE that conducts our operations in China. In particular, if the imposition of any of these government actions causes us to lose our right to direct the activities of the VIE and its subsidiaries or our right to receive substantially all the economic benefits and residual returns from the VIE and its subsidiaries and we are not able to restructure our ownership structure and operations in a satisfactory manner, we would no longer be able to consolidate the financial results of the VIE and its subsidiaries in our consolidated financial statements. This would have a material adverse effect on our financial condition and results of operations and the value of our ADSs.

***We face uncertainties with respect to the implementation of the Foreign Investment Law and how it may impact the viability of our current corporate structure, corporate governance and business operations.***

On March 15, 2019, the NPC approved the Foreign Investment Law, which took effect on January 1, 2020 and replaced most of the laws and regulations previously governing foreign investment in the PRC. The Foreign Investment Law is the foundation for regulating foreign investments in China. Subsequently, on December 26, 2019, the State Council promulgated the Implementation Regulations on the Foreign Investment Law, which came into effect on January 1, 2020.

39

Under the Foreign Investment Law, "foreign investment" refers to the investment activities directly or indirectly conducted by foreign individuals, enterprises or other foreign entities in China. The Foreign Investment Law stipulates three forms of foreign investment, but is silent as to whether contractual arrangements are a form of foreign investment. The Implementation Regulations on the Foreign Investment Law are also silent as to whether contractual arrangements should be deemed to be a form of foreign investment. However, the definition of "foreign investment" under the Foreign Investment Law is broad and covers all activities whereby foreign investors invest in China, including investments made through "any other methods" under laws, administrative regulations, or provisions prescribed by the State Council. Before clarification or confirmation by future laws, administrative regulations or provisions promulgated by the State Council on the nature of contractual arrangements, there is no assurance that contractual arrangements would not be considered to be foreign investment under the Foreign Investment Law. The State Council may in the future enact laws or issue administrative regulations or provisions to classify contractual arrangements as a form of foreign investment, at which time it would be uncertain as to how contractual arrangements would be regulated and whether such contractual arrangements would be deemed to be in violation of the foreign investment restrictions. There is no guarantee that our contractual arrangements and our business will not be materially and adversely affected in the future due to changes in PRC laws and regulations. If future laws, administrative regulations or provisions prescribed by the State Council mandate further actions to be completed by companies with existing contractual arrangements, we may face substantial uncertainties as to the timely completion of such actions. Failure to take timely and appropriate measures to cope with any of these or similar regulatory compliance challenges could materially and adversely affect our current corporate structure and business operations.

***The rights and functions of the PDD Partnership, once effective, may impact your ability to appoint executive directors and nominate the chief executive officer of our company, and the interests of the PDD Partnership may conflict with your interests.***

Under our currently effective articles of association, the PDD Partnership, upon and for so long as certain conditions are satisfied, will be entitled to nominate two executive directors (if there are no more than five directors on the board of directors) or three executive directors (if there are more than five but no more than nine directors on the board of directors) and nominate the chief executive officer candidate of our company. Such executive director candidate duly nominated by the PDD Partnership shall be approved and appointed by our board of directors and serve as an executive director of our company until expiry of his or her terms (if any), removal by the PDD Partnership, the shareholders by an ordinary resolution or vacation of office if such executive director, among other things, resigns his office by notice in writing to us or dies or is found to be or becomes of unsound mind. The chief executive officer candidate nominated by the PDD Partnership shall stand for appointment by the nominating and corporate governance committee of the board of directors. If the candidate is not appointed by the nominating and corporate governance committee in accordance with the then effective articles of association of the company, the PDD Partnership may nominate a replacement nominee until the nominating and corporate governance committee appoints such nominee as chief executive officer, or if the nominating and corporate governance committee fails to appoint more than three candidates nominated by the PDD Partnership consecutively, the board of directors may then nominate and appoint any person to serve as our chief executive officer in accordance with the then effective articles of association of the company. See "Item 6. Directors, Senior Management and Employees—A. Directors and Senior Management—PDD Partnership." This governance structure and contractual arrangements will limit your ability to influence corporate matters, including the matters determined at the board level.

In addition, the interests of the PDD Partnership may not coincide with your interests, including certain managerial decisions such as partner compensation. For example, each year, once an aggregate bonus pool is approved by the board of directors, the partnership committee of the PDD Partnership will make further determinations as to, among other things, the allocation of the current bonus pool among all partners and these allocations may not be entirely aligned with the interest of shareholders who are not partners. Because the partners may be largely comprised of members of our management team, the PDD Partnership and its executive director nominees may focus on the operational and financial results that may differ from the expectations and desires of shareholders. To the extent that the interests of the PDD Partnership differ from your interests on certain matters, you may be disadvantaged.

***We rely on contractual arrangements with the VIE and its shareholders for a large portion of our business operations, which may not be as effective as direct ownership in providing operational control.***

The VIE and its subsidiaries contributed 65.1%, 59.3% and 56.2% of our consolidated total revenues in 2020, 2021 and 2022, respectively. We have relied and expect to continue to rely on contractual arrangements with the VIE and its shareholders to conduct our business in the PRC. For a description of these contractual arrangements, see "Item 4. Information on the Company—C. Organizational Structure." These contractual arrangements may not be as effective as direct ownership in providing us with control over the VIE and its subsidiaries. For example, the VIE and its shareholders could breach their contractual arrangements with us by, among other things, failing to conduct their operations in an acceptable manner or taking other actions that are detrimental to our interests.

40

If we had direct ownership of the VIE, we would be able to exercise our rights as a shareholder to effect changes in the board of directors of the VIE, which in turn could implement changes, subject to any applicable fiduciary obligations, at the management and operational level. However, under the current contractual arrangements, we rely on the performance by the VIE and its shareholders of their obligations under the contracts to exercise control over the VIE and its subsidiaries. The shareholders of our consolidated VIE may not act in the best interests of our company or may not perform their obligations under these contracts. Such risks exist throughout the period in which we intend to operate certain portions of our business through the contractual arrangements with the VIE. If any dispute relating to these contracts remains unresolved, we will have to enforce our rights under these contracts through the operations of PRC law and arbitration, litigation and other legal proceedings and therefore will be subject to uncertainties in the PRC legal system. See "Item 3. Key Information—D. Risk Factors—Risks Related to Our Corporate Structure—Any failure by the VIE or its shareholders to perform their obligations under our contractual arrangements with them would have a material and adverse effect on our business." Therefore, our contractual arrangements with the VIE may not be as effective in ensuring our control over the relevant portion of our business operations as direct ownership would be.

***Any failure by the VIE or its shareholders to perform their obligations under our contractual arrangements with them would have a material and adverse effect on our business.***

Although the shareholders of the VIE hold equity interests on record in the VIE, each such shareholder has irrevocably authorized Hangzhou Weimi to exercise his rights as a shareholder of the VIE pursuant to the terms of the relevant shareholders' voting rights proxy agreement. However, if the VIE or its shareholders fail to perform their respective obligations under the contractual arrangements, we may have to incur substantial costs and expend additional resources to enforce such arrangements. We may also have to rely on legal remedies under PRC law, including seeking specific performance or injunctive relief, and claiming damages, which may not be effective under PRC law. For example, if the shareholders of the VIE refuse to transfer their equity interest in the VIE to us or our designee if we exercise the purchase option pursuant to these contractual arrangements, or if they otherwise act in bad faith toward us, then we may have to take legal actions to compel them to perform their contractual obligations.

All of the arrangements under our contractual arrangements are governed by PRC law and provide for the resolution of disputes through arbitration in China. Accordingly, these contracts would be interpreted in accordance with PRC law and any disputes would be resolved in accordance with PRC legal procedures. The legal system in the PRC differs to that of other jurisdictions, such as the United States. Uncertainties in the PRC legal system could limit our ability to enforce these contractual arrangements. See "Item 3. Key Information—D. Risk Factors—Risks Related to Our Multi-jurisdictional Operations—Uncertainties with respect to the PRC legal system and changes in laws and regulations in China could adversely affect us." Meanwhile, there are very few precedents and little formal guidance as to how contractual arrangements in the context of a VIE should be interpreted or enforced under PRC law. There remain significant uncertainties regarding the ultimate outcome of such arbitration should legal action become necessary. In addition, under PRC law, rulings by arbitrators are final, parties cannot appeal the arbitration results in courts, and if the losing parties fail to carry out the arbitration awards within a prescribed time limit, the prevailing parties may only enforce the arbitration awards in PRC courts through arbitration award recognition proceedings, which would require additional expenses and delay. In the event we are unable to enforce these contractual arrangements, or if we suffer significant delays or other obstacles in the process of enforcing these contractual arrangements, we may not be able to direct the activities of the VIE and its subsidiaries, and our ability to conduct our business may be negatively affected.

***The shareholders of the VIE may have potential conflicts of interest with us, which may materially and adversely affect our business and financial condition.***

Messrs. Lei Chen and Jianchong Zhu hold 86.6% and 13.4% equity interests in the VIE, respectively. They are employees of our company and have entered into a series of contractual arrangements with Hangzhou Weimi, pursuant to which we have control over and are considered the primary beneficiary of the VIE and its subsidiaries. These shareholders of the VIE may have potential conflicts of interest with us. See "Item 4. Information on the Company—C. Organizational Structure." These shareholders may breach, or cause the VIE to breach, or refuse to renew, the existing contractual arrangements we have with them and the VIE, which would have a material and adverse effect on our ability to direct the activities of the VIE and its subsidiaries and receive economic benefits from it. For example, the shareholders may be able to cause our arrangements with the VIE to be performed in a manner adverse to us by, among other things, failing to remit payments due under the contractual arrangements to us on a timely basis. We cannot assure you that when conflicts of interest arise any or all of these shareholders will act in the best interests of our company or such conflicts will be resolved in our favor.

41

Currently, we do not have any arrangements to address potential conflicts of interest between these shareholders and our company, except that we could exercise our purchase option under the exclusive option arrangements with these shareholders to request them to transfer all of their equity interests in the VIE to a PRC entity or individual designated by us, to the extent permitted by PRC law. We also rely on these shareholders to abide by the laws of the Cayman Islands, which provide that directors and officers owe a fiduciary duty to the company that requires them to act in good faith and in what they believe to be the best interests of the company and not to use their position for personal gains. The shareholders of the VIE have executed shareholders' voting rights proxy agreement to appoint Hangzhou Weimi or a person designated by Hangzhou Weimi to vote on their behalf and exercise voting rights as shareholders of the VIE. If we cannot resolve any conflict of interest or dispute between us and the shareholders of the VIE, we would have to rely on legal proceedings, which could result in disruption of our business and subject us to substantial uncertainty as to the outcome of any such legal proceedings.

The shareholders of the VIE may be involved in personal disputes with third parties or other incidents that may have an adverse effect on their respective equity interests in the VIE and the validity or enforceability of our contractual arrangements with the relevant entity and its shareholders. For example, in the event that any of the shareholders of the VIE divorces his spouse, the spouse may claim that the equity interest of the VIE held by such shareholder is part of their community property and should be divided between such shareholder and his spouse. If such claim is supported by the court, the relevant equity interest may be obtained by the shareholder's spouse or another third party who is not subject to obligations under our contractual arrangements, which could result in a loss of our ability to direct the activities of the VIE and its subsidiaries by us. Similarly, if any of the equity interests of the VIE is inherited by a third party with whom the current contractual arrangements are not binding, we could lose our control over the VIE and its subsidiaries or have to maintain such control by incurring unpredictable costs, which could cause significant disruption to our business and operations and harm our financial condition and results of operations.

Although under our current contractual arrangements, (i) to the extent applicable, the spouse of each of the shareholders of the VIE has executed a spousal consent letter, under which the spouse agrees not to raise any claim against the equity interest, and to take every action to ensure the performance of the contractual arrangements, and (ii) it is expressly provided that the rights and obligations under the contractual arrangements shall be equally effective and binding on the heirs and successors of the parties thereto, or that the VIE shall not assign or delegate its rights and obligations under the contractual arrangements to third parties without our prior consent, we cannot assure you that these undertakings and arrangements will be complied with or effectively enforced. In the case any of them is breached or becomes unenforceable and leads to legal proceedings, it could disrupt our business, distract our management's attention and subject us to substantial uncertainties as to the outcome of any such legal proceedings.

***Contractual arrangements in relation to the VIE may be subject to scrutiny by the PRC tax authorities and they may determine that we, the VIE or its subsidiaries owes additional taxes, which could negatively affect our financial condition and the value of your investment.***

Under applicable PRC laws and regulations, arrangements and transactions among related parties may be subject to audit or challenge by the PRC tax authorities. We could face material and adverse tax consequences if the PRC tax authorities determine that the VIE contractual arrangements were not entered into on an arm's length basis in such a way as to result in an impermissible reduction in taxes under applicable PRC laws and regulations, and adjust the income of the VIE in the form of a transfer pricing adjustment. A transfer pricing adjustment could, among other things, result in a reduction of expense deductions recorded by the VIE for PRC tax purposes, which could in turn increase its tax liabilities without reducing Hangzhou Weimi's tax expenses. In addition, the PRC tax authorities may impose late payment fees and other penalties on the VIE for the adjusted but unpaid taxes according to the applicable regulations. Our financial position could be materially and adversely affected if the VIE's tax liabilities increase or if it is required to pay late payment fees and other penalties.

***We may lose the ability to use and enjoy assets held by the VIE that are material to the operation of certain portion of our business if the VIE goes bankrupt or become subject to a dissolution or liquidation proceeding.***

As part of our contractual arrangements with the VIE, the VIE and its subsidiaries hold certain assets that are material to the operation of certain portion of our business, including intellectual property and premise and VATS licenses. If the VIE goes bankrupt and all or part of its assets become subject to liens or rights of third-party creditors, we may be unable to continue some or all of our business activities, which could materially and adversely affect our business, financial condition and results of operations. Under the contractual arrangements, the VIE may not, in any manner, sell, transfer, mortgage or dispose of their assets or legal or beneficial interests in the business without our prior consent. If the VIE undergoes a voluntary or involuntary liquidation proceeding, independent third-party creditors may claim rights to some or all of these assets, thereby hindering our ability to operate our business, which could materially and adversely affect our business, financial condition and results of operations.

42

*If the chops of our PRC subsidiaries and the VIE are not kept safely, are stolen or are used by unauthorized persons or for unauthorized purposes, the corporate governance of these entities could be severely and adversely compromised.*

In China, a company chop or seal serves as the legal representation of the company towards third parties even when unaccompanied by a signature. Each legally registered company in China is required to maintain a company chop, which must be registered with the local Public Security Bureau. In addition to this mandatory company chop, companies may have several other chops which can be used for specific purposes. The chops of our PRC subsidiaries and the VIE are generally held securely by personnel designated or approved by us in accordance with our internal control procedures. To the extent those chops are not kept safely, are stolen or are used by unauthorized persons or for unauthorized purposes, the corporate governance of these entities could be severely and adversely compromised and those corporate entities may be bound to abide by the terms of any documents so chopped, even if they were chopped by an individual who lacked the requisite power and authority to do so. In addition, if the chops are misused by unauthorized persons, we could experience disruption to our normal business operations. We may have to take corporate or legal action, which could involve significant time and resources to resolve while distracting management from our operations.

**Risks Related to Our Multi-jurisdictional Operations**

*Our global operations expose us to a number of risks.*

We began our business operations in multiple jurisdictions through the launch of the Temu platform in September 2022. As we continue to expand our global operations, we will face risks associated with expanding into markets where we have limited or no experience and where we may be less well-known or have fewer local resources. We will also be subject to a variety of risks inherent in doing business on the global scale, including:

- international geopolitical tensions and events;

- political, social and economic instability of each jurisdiction where we operate;

- compliance challenges due to different laws and regulatory environments, including but not limited to those related to privacy, data use, data protection, data security, data localization, network security, consumer protection, payments, advertising, and restrictions on pricing or discounts;

- compliance challenges under different tax regimes and policies in jurisdictions where we operate;

- risks related to the overall global legal and regulatory environment, including difficulties in understanding and ensuring compliance with multiple, conflicting and changing laws, rules and regulations by our employees, other personnel and business partners, over whom we exert limited or no control, as well as unexpected changes in laws, regulatory requirements and enforcement;

- potential damage to our brands and reputation due to compliance with local laws, including requirements to censor content and/or requirements to provide user information to local authorities;

- local and/or regional competition;

- fluctuations in currency exchange rates;

- difficulties in staffing and managing global operations and the increased travel, infrastructure and compliance costs associated with multiple locations across the world;

- differing levels of technology development in different countries and regions, including infrastructure and third-party payment platforms; and

- higher costs of doing business globally, including increased accounting, travel, infrastructure and legal compliance costs.

As we expand further into new and existing countries, regions and markets, these risks could intensify, and efforts we make to expand our business and operations globally may not be successful. Failure to successfully expand globally and manage the complexity of our global operations could materially and adversely affect our business, financial condition and results of operations.

43

Despite our global footprint, we are still in the early stages of operating the Temu platform. There can be no assurance we will be able to generate revenue from the Temu platform. We have devoted, and will need to continue to devote, substantial managerial, financial and human resources to devise and implement monetization strategies and product and service offerings that are suitable for diverse global markets with different user needs, competitive landscapes and operational requirements. If we fail to generate revenue globally in an effective and efficient manner, our business, financial condition and results of operations may be materially and adversely affected.

***Changes in U.S. and international trade policies, particularly with regard to China, may adversely impact our business and operating results.***

The U.S. government has proposed, among other actions, imposing new or higher tariffs on specified products imported from China to penalize China for what it characterizes as unfair trade practices and China has responded by proposing new or higher tariffs on specified products imported from the United States. For example, in 2018, the United States announced three finalized tariffs that applied exclusively to products imported from China, totaling approximately US$250 billion, and in May 2019 the United States increased from 10% to 25% the rate of certain tariffs previously levied on Chinese products. Trade tension between China and the United States may intensify, and the United States may adopt even more drastic measures in the future. Any unfavorable government policies on international trade, such as capital controls or tariffs, may affect the demand for our products and services, impact the competitive position of our products or prevent us from being able to sell products in certain countries. If any new tariffs, legislation and/or regulations are implemented, or if existing trade agreements are renegotiated such changes could have an adverse effect on our business, financial condition, results of operations. In addition, future actions or escalations by either the United States or China that affect trade relations may cause global economic turmoil and potentially have a negative impact on our business.

In particular, economic tension between the United States and China, or between other countries, may intensify and the United States, China, or other countries may adopt drastic measures in the future that impact our global expansion and our business. Recent economic and trade sanctions threatened and/or imposed by the U.S. government on a number of technology companies with significant China operations have raised concerns as to whether, in the future, there may be additional regulatory challenges or enhanced restrictions involving other technology companies with significant China operations. Similar or more expansive restrictions that may be imposed by the U.S. or other jurisdictions in the future, may materially and adversely affect our ability to acquire technologies, systems or devices that may be important to our technology infrastructure, service offerings and business operations. The adoption or expansion of restrictions, including restrictions on access to apps and other platforms, cross-border data transfers, tariffs, or other governmental action related to economic policies, has the potential to adversely impact our business, operational results and financial position.

***Our business is subject to a large number of laws across many jurisdictions, many of which are evolving.***

We are subject to a variety of laws and regulation around the world, including those relating to traditional businesses, such as employment laws, accessibility requirements, and taxation, and laws and regulations focused on e-commerce and online marketplaces, such as online payments, privacy, anti-spam, data security and protection, online platform liability, marketplace seller regulation, intellectual property, product liability, marketing, and consumer protection.

These laws and regulations are continuously evolving, and compliance is costly and can require changes to our business practices and significant management time and effort. Additionally, it is not always clear how existing laws apply to online marketplaces as many of these laws do not address the unique issues raised by online marketplaces or e-commerce. In some jurisdictions, these laws and regulations subject us to attempts to apply domestic rules worldwide against us, and occasionally may subject us to inconsistent obligations across jurisdictions.

We strive to comply with all applicable laws, but they may conflict with each other, and by complying with the laws or regulations of one jurisdiction, we may find that we are violating the laws or regulations of another jurisdiction. Despite our efforts, we may not have fully complied in the past and may not fully comply in the future, particularly where the applicable regulatory regimes have not been broadly interpreted. If we become liable under laws or regulations applicable to us, we could be required to pay significant fines and penalties, our reputation may be harmed, and we may be forced to change the way we operate. That could require us to incur significant expenses or to discontinue certain services, which could negatively affect our business. In addition, if we are restricted from operating in one or more countries, our ability to attract and retain sellers and buyers may be adversely affected and we may not be able to grow our business as we anticipate.

Additionally, if third parties with whom we work violate applicable laws or our policies, those violations could also result in liabilities for us and could harm our business. Our ability to rely on insurance, contracts, indemnification and other remedies to limit these liabilities, may be insufficient or unavailable in some cases. Furthermore, the circumstances in which we may be held liable for the acts, omissions, or responsibilities of our merchants is uncertain, complex, and evolving.

***Changes in China's economic, political or social conditions or government policies could have a material adverse effect on our business and operations.***

A significant portion of our assets and operations is located in China. Accordingly, our business, financial condition, results of operations and prospects may be influenced to a significant degree by political, economic and social conditions in China generally. The Chinese economy differs from the economies of most developed countries in many respects, including the level of government involvement, level of development, growth rate, control of foreign exchange and allocation of resources. Although the Chinese government has implemented measures emphasizing the utilization of market forces for economic reform, the reduction of state ownership of productive assets, and the establishment of improved corporate governance in business enterprises, a substantial portion of productive assets in China is still owned by the government. In addition, the Chinese government continues to play a significant role in regulating industry development by imposing industrial policies.

The Chinese government also exercises significant control over China's economic growth through allocating resources, controlling payment of foreign currency-denominated obligations, setting monetary policy, and providing preferential treatment to particular industries or companies.

While the Chinese economy has experienced significant growth over the past decades, growth has been uneven, both geographically and among various sectors of the economy, and the rate of growth has been slowing since 2012, and the impact of COVID-19 on the Chinese economy in 2020 was severe. According to the National Bureau of Statistics of China, China's real GDP growth rate was 2.3%, 8.1% and 3.0% in 2020, 2021 and 2022, respectively. There have also been concerns about geopolitical conditions in certain regions or around the world, which may result in or intensify potential conflicts in relation to territorial, regional security and trade disputes. Any adverse changes in economic conditions in China, in the policies of the Chinese government or in the laws and regulations in China could have a material adverse effect on the overall economic growth of China. Such developments could adversely affect our business and operating results, lead to reduction in demand for our services and adversely affect our competitive position. Any disruptions or continuing or worsening slowdown could significantly reduce domestic commerce activities in China, which could lead to significant reduction in merchants' demand for and spending on the various services we offer. An economic downturn, whether actual or perceived, a further decrease in economic growth rates or an otherwise uncertain economic outlook in China could have a material adverse effect on business and consumer spending and, as a result, adversely affect our business, financial condition and results of operations. The Chinese government has implemented various measures to encourage economic growth and guide the allocation of resources. Some of these measures may benefit the overall Chinese economy, but may have a negative effect on us. For example, our financial condition and results of operations may be adversely affected by government control over capital investments or changes in tax regulations.

In addition, because we hold a significant amount of cash and cash equivalents and short-term investments, if financial institutions and issuers of financial instruments that we hold become insolvent or if the market for these financial instruments become illiquid as a result of a severe economic downturn, our business and financial condition could be materially and adversely affected.

***Uncertainties with respect to the PRC legal system and changes in laws and regulations in China could adversely affect us.***

We conduct our business in China primarily through our PRC subsidiaries, the VIE and its subsidiaries. Our operations in China are governed by PRC laws and regulations. Our PRC subsidiaries are subject to laws and regulations applicable to foreign investment in China. The PRC legal system is a civil law system based on written statutes. Unlike the common law system, prior court decisions under the civil law system may be cited for reference but have limited precedential value. In addition, any new or changes in PRC laws and regulations related to foreign investment in China could affect the business environment and our ability to operate our business in China.

From time to time, we may have to resort to administrative and court proceedings to enforce our legal rights. Any administrative and court proceedings in China may be protracted, resulting in substantial costs and diversion of resources and management's attention. Since PRC administrative and court authorities have significant discretion in interpreting and implementing statutory provisions and contractual terms, it may be more difficult to evaluate the outcome of administrative and court proceedings and the level of legal protection we enjoy than in more developed legal systems. These uncertainties may impede our ability to enforce the contracts we have entered into and could materially and adversely affect our business and results of operations.

Furthermore, the PRC legal system is based in part on government policies and internal rules, some of which are not published on a timely basis or at all and may have retroactive effect. As a result, we may not be aware of our violation of any of these policies and rules until sometime after the violation. Such unpredictability towards our contractual, property and procedural rights could adversely affect our business and impede our ability to continue our operations.

***We may be adversely affected by the complexity, uncertainties and changes in PRC regulation of internet-related businesses and companies, and any lack of requisite approvals, licenses or permits applicable to our business may have a material adverse effect on our business and results of operations.***

The PRC government extensively regulates the internet industry, including foreign ownership of, and the licensing and permit requirements pertaining to, companies in the internet industry. These internet-related laws and regulations are relatively new and evolving. As a result, in certain circumstances it may be difficult to determine what actions or omissions may be deemed to be in violation of applicable laws and regulations.

We only have contractual control over the Pinduoduo platform. We do not directly own the Pinduoduo platform due to the restrictions on foreign investment in businesses providing value-added telecommunications services in China, including e-commerce services and internet content-related services. This may significantly disrupt our business, subject us to sanctions, compromise enforceability of related contractual arrangements, or have other harmful effects on us.

The evolving PRC regulatory system for the internet industry may lead to the establishment of new regulatory agencies. For example, in May 2011, the State Council announced the establishment of the State Internet Information Office (with the involvement of the State Council Information Office, the MIIT and the MPS). The primary role of the State Internet Information Office is to facilitate the policy-making and legislative development in this field, to direct and coordinate with the relevant departments in connection with online content administration and to deal with cross-ministry regulatory matters in relation to the internet industry.

The Circular on Strengthening the Administration of Foreign Investment in and Operation of Value-added Telecommunications Business, issued by the MIIT in July 2006, prohibits domestic telecommunications service providers from leasing, transferring or selling VATS Licenses to any foreign investor in any form, or providing any resources, sites or facilities to any foreign investor for their illegal operation of a telecommunications business in China. According to this circular, either the holder of a value-added telecommunications services operation permit or its shareholders must directly own the domain names and trademarks used by such license holders in their provision of value-added telecommunications services. The circular also requires each license holder to have the necessary facilities, including servers, for its approved business operations and to maintain such facilities in the regions covered by its license. Shanghai Xunmeng owns the relevant domain names and trademarks in connection with the Pinduoduo platform and has the necessary personnel to operate the Pinduoduo platform.

The interpretation and application of existing PRC laws, regulations and policies and possible new laws, regulations or policies relating to the internet industry have created substantial uncertainties regarding the legality of existing and future foreign investments in, and the businesses and activities of, internet businesses in China, including the Pinduoduo platform. We cannot assure you that the Pinduoduo platform has obtained all the permits or licenses required for conducting its business or will be able to maintain its existing licenses or obtain new ones. If the PRC government determines that the Pinduoduo platform was operating without the proper approvals, licenses or permits or promulgates new laws and regulations that require additional approvals or licenses or imposes additional restrictions on any part of the operations of the Pinduoduo platform, the PRC government has the power to, among other things, levy fines, confiscate income, revoke business licenses, and require the Pinduoduo platform to discontinue its relevant business or impose restrictions on the affected portion of the Pinduoduo platform. Any of these actions by the PRC government may have a material adverse effect on our business and results of operations.

***The PRC government's significant oversight and discretion over our business operations could result in a material change in our operations and the value of our ADSs.***

Our operations in China are governed by PRC laws and regulations. The PRC government has significant oversight and discretion over the conduct of our business. The PRC government has released regulations and policies that have significantly impacted various industries in general and specific operators within such industries, and may in the future release new regulations or policies that could intervene in or influence our operations or the industry sectors in which we operate. The PRC government may also require us to obtain new permits or approvals to continue our operations. If we fail to comply with these regulations, policies or requirements, it could result in a material change in our operations or significantly limit or completely hinder our ability to offer or continue to offer our ADSs to investors and cause the value of our ADSs to significantly decline or become worthless. Therefore, investors of our company and our business face uncertainty from potential actions taken by regulators that may affect our business and the value of our ADSs.

46

***Discontinuation of any preferential tax treatments or imposition of any additional taxes could adversely affect our financial condition and results of operations.***

Each of Shanghai Xunmeng and Walnut Street (Shanghai) Information Technology Co., Ltd. (formerly known as Shanghai Pinduoduo Network Technology Co., Ltd.), or Walnut Shanghai, one of our PRC subsidiaries, was recognized as a "high and new technology enterprise" and is eligible for a preferential corporate income tax rate of 15% until 2023. Shenzhen Qianhai Xinzhijiang Information Technology Co., Ltd., or Xinzhijiang, one of our PRC subsidiaries in Qianhai District, Shenzhen, Guangdong Province, is also eligible for a preferential corporate income tax rate of 15% until 2025. These preferential corporate income tax treatments are subject to the discretion of the relevant governmental authorities. The discontinuation of any preferential tax treatments or the imposition of any additional taxes could adversely affect our financial condition and results of operations.

***You may experience difficulties in effecting service of legal process, enforcing foreign judgments or bringing actions in China against us or our management named in the annual report based on foreign laws.***

We are an exempted company incorporated under the laws of the Cayman Islands. We conduct a significant portion of our operations in China and a significant portion of our assets are located in China. It may be difficult for you to effect service of process upon us or our directors and officers inside mainland China. It may also be difficult for you to enforce in U.S. courts judgments obtained in U.S. courts based on the civil liability provisions of the U.S. federal securities laws against us and our officers and directors as most of our current directors and officers are nationals and residents of countries other than the United States and a significant portion of the assets of these persons may be located outside the United States. In addition, there is uncertainty as to whether the courts of the Cayman Islands or the PRC would recognize or enforce judgments of U.S. courts against us or such persons predicated upon the civil liability provisions of the securities laws of the United States or any state.

The recognition and enforcement of foreign judgments are provided for under the PRC Civil Procedures Law. PRC courts may recognize and enforce foreign judgments in accordance with the requirements of the PRC Civil Procedures Law based either on treaties between China and the country where the judgment is made or on principles of reciprocity between jurisdictions. China does not have any treaties or other forms of written arrangement with the United States that provide for the reciprocal recognition and enforcement of foreign judgments. In addition, according to the PRC Civil Procedures Law, the PRC courts will not enforce a foreign judgment against us or our directors and officers if they decide that the judgment violates the basic principles of PRC laws or national sovereignty, security or public interest. As a result, it is uncertain whether and on what basis a PRC court would enforce a judgment rendered by a court in the United States.

***We may rely on dividends and other distributions on equity paid by our PRC subsidiaries to fund any cash and financing requirements we may have, and any limitation on the ability of our PRC subsidiaries to make payments to us could have a material and adverse effect on our ability to conduct our business.***

We are a Cayman Islands holding company and we rely to a significant extent on dividends and other distributions on equity from our PRC subsidiaries, as well as service fees paid by the VIE and its subsidiaries pursuant to our contractual arrangements with them, to meet our cash requirements, including the funds necessary to pay dividends and other cash distributions to our shareholders. If any of our PRC subsidiaries incur debt on its own behalf, the instruments governing the debt may restrict its ability to pay dividends or make other distributions to us. Under PRC laws and regulations, our PRC subsidiaries, each of which is a wholly foreign-owned enterprise may pay dividends only out of its respective accumulated profits as determined in accordance with PRC accounting standards and regulations. In addition, a wholly foreign-owned enterprise is required to set aside at least 10% of its after-tax profits each year, if any, to fund a certain statutory reserve fund, until the aggregate amount of such fund reaches 50% of its registered capital. At its discretion, a wholly foreign-owned enterprise may allocate a portion of its after-tax profits based on PRC accounting standards to a staff welfare and bonus fund. These reserve fund and staff welfare and bonus fund cannot be distributed to us as dividends.

Our PRC subsidiaries generate primarily all of their revenue in Renminbi, which is not freely convertible into other currencies. As result, any restriction on currency exchange may limit the ability of our PRC subsidiaries to use their Renminbi revenues to pay dividends to us.

The PRC government may continue to strengthen its capital controls, and more restrictions and substantial vetting process may be put forward by SAFE for cross-border transactions falling under both the current account and the capital account. Any limitation on the ability of our PRC subsidiaries to pay dividends or make other kinds of payments to us, or on the ability of the VIE and its subsidiaries to pay service fees to us, could materially and adversely limit our ability to grow, make investments or acquisitions that could be beneficial to our business, pay dividends, or otherwise fund and conduct our business.

In addition, the Enterprise Income Tax Law and its implementation rules provide that a withholding tax rate of up to 10% will be applicable to dividends payable by Chinese companies to non-PRC-resident enterprises unless otherwise exempted or reduced according to treaties or arrangements between the PRC central government and governments of other countries or regions where the non-PRC-resident enterprises are incorporated.

***PRC regulation of loans to and direct investment in PRC entities by offshore holding companies and governmental control of currency conversion may delay or prevent us from using the proceeds of our offshore financing to make loans or additional capital contributions to our PRC subsidiaries, which could materially and adversely affect our liquidity and our ability to fund and expand our business.***

We are an offshore holding company, and a significant portion of our holdings conduct operations in China. We may make loans to our PRC subsidiaries, the VIE and its subsidiaries subject to the approval, registration, and filing with governmental authorities and limitation of amount, or we may make additional capital contributions to our wholly foreign-owned subsidiaries in China. Any loans to our wholly foreign-owned subsidiaries in China, which are treated as foreign-invested enterprises under PRC law, are subject to foreign exchange loan registrations. In addition, a foreign invested enterprise shall use its capital pursuant to the principle of authenticity and self-use within its business scope. The capital of a foreign invested enterprise shall not be used for the following purposes: (i) directly or indirectly used for payment beyond the business scope of the enterprises or the payment prohibited by relevant laws and regulations; (ii) directly or indirectly used for investment in securities or investments other than banks' principal-secured products unless otherwise provided by relevant laws and regulations; (iii) the granting of loans to non-affiliated enterprises, except where it is expressly permitted in the business license; and (iv) paying the expenses related to the purchase of real estate that is not for self-use (except for the foreign-invested real estate enterprises).

In light of the various requirements imposed by PRC regulations on loans to and direct investment in PRC entities by offshore holding companies, we cannot assure you that we will be able to complete the necessary government registrations or obtain the necessary government approvals or filings on a timely basis, if at all, with respect to future loans by us to our PRC subsidiaries or the VIE or with respect to future capital contributions by us to our PRC subsidiaries. If we fail to complete such registrations or obtain such approvals, our ability to use the proceeds from our offshore financing and to capitalize or otherwise fund our PRC operations may be negatively affected, which could materially and adversely affect our liquidity and our ability to fund and expand our business.

***Fluctuations in exchange rates could have a material and adverse effect on our results of operations and the value of your investment.***

The conversion of Renminbi into foreign currencies, including U.S. dollars, is based on rates set by the PBOC. The Renminbi has fluctuated against the U.S. dollar, at times significantly and unpredictably. The value of Renminbi against the U.S. dollar is affected by changes in the political and economic conditions of the PRC and the U.S., and by the foreign exchange policies of the PRC and the U.S., among other things. We cannot assure you that Renminbi will not appreciate or depreciate significantly in value against the U.S. dollar in the future. It is difficult to predict how market forces or PRC or U.S. government policy may impact the exchange rate between Renminbi and the U.S. dollar in the future.

Any significant appreciation or depreciation of Renminbi may materially and adversely affect our revenues, earnings and financial position, and the value of, and any dividends payable on, our ADSs in U.S. dollars. For example, to the extent that we need to convert U.S. dollars we receive from our initial public offering, follow-on offerings or convertible senior notes offerings into Renminbi for our operations in the PRC, appreciation of the Renminbi against the U.S. dollar would have an adverse effect on the Renminbi amount we would receive from the conversion. Conversely, if we decide to convert our Renminbi into U.S. dollars for the purpose of making payments for dividends on our ordinary shares or ADSs, payments when due on the 2024 Notes or the 2025 Notes, or for other business purposes, appreciation of the U.S. dollar against the Renminbi would have a negative effect on the U.S. dollar amount available to us.

Very limited hedging options are available in China to reduce our exposure to exchange rate fluctuations. As of December 31, 2022, we had not entered into any hedging transactions in an effort to reduce our exposure to foreign currency exchange risk. While we may decide to enter into hedging transactions in the future, the availability and effectiveness of these hedges may be limited and we may not be able to adequately hedge our exposure or at all. In addition, our currency exchange losses may be magnified by PRC exchange control regulations that restrict our ability to convert Renminbi into foreign currency. As a result, fluctuations in exchange rates may have a material adverse effect on your investment.

***Governmental control of currency conversion may limit our ability to utilize our revenues effectively and affect the value of your investment.***

The PRC government imposes controls on the convertibility of the Renminbi into foreign currencies and, in certain cases, the remittance of currency out of China. To the extent cash in our business is in the PRC or a PRC entity, such cash may not be available to fund operations or for other use outside of the PRC due to restrictions and limitations imposed by the governmental authorities on currency conversion, cross-border transactions and cross-border capital flows.

We receive a significant portion of our revenues in Renminbi. Under our current corporate structure, our Cayman Islands holding company relies to a significant extent on dividend payments from our PRC subsidiaries, as well as service fees from the VIE and its subsidiaries, to fund any cash and financing requirements we may have. Under existing PRC foreign exchange regulations, payments of current account items, including profit distributions, interest payments and trade and service-related foreign exchange transactions, can be made in foreign currencies without prior approval of SAFE by complying with certain procedural requirements. Specifically, under the existing exchange restrictions, without prior approval of SAFE, cash generated from the operations of our PRC subsidiaries in China may be used to pay dividends to our company. However, approval from or registration with appropriate government authorities is required where Renminbi is to be converted into foreign currency and remitted out of China to pay capital expenses such as the repayment of loans denominated in foreign currencies. As a result, we need to obtain SAFE approval to use cash generated from the operations of our PRC subsidiaries, the VIE and its subsidiaries to pay off any non-Renminbi debt that our PRC subsidiaries, the VIE or its subsidiaries may owe to entities outside of China, or to make other capital expenditure payments outside China in a currency other than Renminbi.

The PRC government may from time to time impose more restrictive foreign exchange policies and step up scrutiny of major outbound capital movement. More restrictions and substantial vetting process may be required by SAFE or other government authorities to regulate cross-border transactions falling under the capital account. The PRC government may at its discretion restrict access to foreign currencies for current account transactions in the future. If the foreign exchange control system prevents us from obtaining sufficient foreign currencies to satisfy our foreign currency demands, we may not be able to utilize cash held in China or generated by a PRC entity to fund any cash or financing requirements we may have outside of China or pay dividends in foreign currencies to our shareholders, including holders of our ADSs.

***Any factors that reduce cross-border e-commerce or make such trade activities more difficult could harm our business.***

Shipping and handling of goods across national borders is often expensive and complicated in the context of cross-border e-commerce. Customs and duty procedures and reviews, including duty-free thresholds in various key markets, the interaction of national postal systems, and security related governmental processes at international borders, may increase costs, discourage cross-border purchases, delay transit, and create shipping uncertainties. Any factors that increase the costs of cross-border e-commerce or restrict, delay, or make cross-border e-commerce more difficult or impractical would lower our revenue and profits and could harm our business.

***Certain PRC regulations may make it more difficult for us to pursue growth through acquisitions.***

Among other things, the Regulations on Mergers and Acquisitions of Domestic Enterprises by Foreign Investors, or the M&A Rules, adopted by six PRC regulatory agencies in 2006 and amended in 2009, established additional procedures and requirements that could make merger and acquisition activities by foreign investors more time-consuming and complex. The M&A Rules require, among other things, that MOFCOM be notified in advance of any change-of-control transaction in which a foreign investor acquires control of a PRC domestic enterprise and involves any of the following circumstances: (i) an important industry is concerned, (ii) the transaction involves factors that impact or may impact national economic security, or (iii) the transaction will lead to a change in control of a domestic enterprise which holds a famous trademark or PRC time-honored brand. The M&A Rules also require that, in accordance with the Anti-monopoly Law promulgated by the Standing Committee of the NPC, which was most recently amended in 2022, any merger and acquisitions of domestic enterprises by foreign investors which are deemed concentrations and involve parties with specified turnover thresholds must be cleared by MOFCOM before they can be completed. In addition, PRC national security review rules that became effective in September 2011 require acquisitions by foreign investors of PRC companies engaged in military related or certain other industries that are crucial to national security be subject to security review before consummation of any such acquisition. We may pursue potential strategic acquisitions that are complementary to our business and operations. Complying with the requirements of these regulations to complete such transactions could be time-consuming, and any required approval processes, including obtaining approval or clearance from MOFCOM, may delay or inhibit our ability to complete such transactions, which could affect our ability to expand our business or maintain our market share.

We are subject to anti-monopoly laws and regulations with respect to investments in or by us. For example, our operations in the PRC are subject to the PRC Anti-monopoly Law, pursuant to which companies conducting certain investments and acquisitions relating to businesses in China as described under the Anti-monopoly Law must file a notification with the PRC regulator in advance. Furthermore, in February 2021, the Anti-monopoly Committee of the State Council published the Anti-monopoly Guidelines for the Platform Economy Sector and included concentrations involving companies with VIE structure within the ambit of the SAMR's merger control review, if certain reporting thresholds are met. Any failure or perceived failure to comply with the relevant anti-monopoly laws and guidelines relating to investments in or by us may result in governmental investigations or enforcement actions, litigations or claims against us and could have an adverse effect on our business, financial condition and results of operations.

***PRC regulations relating to offshore investment activities by PRC residents may limit our PRC subsidiaries' ability to change their registered capital or distribute profits to us or otherwise expose us or our PRC resident beneficial owners to liability and penalties under PRC laws.***

In July 2014, SAFE promulgated the Circular on Relevant Issues Concerning Foreign Exchange Control on Domestic Residents' Offshore Investment and Financing and Roundtrip Investment Through Special Purpose Vehicles, or SAFE Circular 37. SAFE Circular 37 requires PRC residents (including PRC individuals and PRC corporate entities as well as foreign individuals that are deemed as PRC residents for foreign exchange administration purpose) to register with SAFE or its local branches in connection with their direct or indirect offshore investment activities. SAFE Circular 37 further requires amendment to the SAFE registrations in the event of any changes with respect to the basic information of the offshore special purpose vehicle, such as change of a PRC individual shareholder, name and operation term, or any significant changes with respect to the offshore special purpose vehicle, such as increase or decrease of capital contribution, share transfer or exchange, or mergers or divisions. SAFE Circular 37 is applicable to our shareholders who are PRC residents and may be applicable to any offshore acquisitions that we make in the future.

If our shareholders who are PRC residents fail to make the required registration or to update the previously filed registration, our PRC subsidiaries may be prohibited from distributing their profits or the proceeds from any capital reduction, share transfer or liquidation to us, and we may also be prohibited from making additional capital contributions into our PRC subsidiaries. In February 2015, SAFE promulgated a Notice on Further Simplifying and Improving Foreign Exchange Administration Policy on Direct Investment, or SAFE Notice 13, effective June 2015. Under SAFE Notice 13, applications for foreign exchange registration of inbound foreign direct investments and outbound overseas direct investments, including those required under SAFE Circular 37, will be filed with qualified banks instead of SAFE. The qualified banks will directly examine the applications and accept registrations under the supervision of SAFE.

All of our shareholders who we are aware of being subject to the SAFE regulations have completed the initial registrations with the local SAFE branch or qualified banks as required by SAFE Circular 37. However, we may not be informed of the identities of all the PRC residents holding direct or indirect interest in our company, and we cannot provide any assurance that these PRC residents will comply with our request to make or obtain any applicable registrations or continuously comply with all requirements under SAFE Circular No. 37 or other related rules. The failure or inability of the relevant shareholders to comply with the registration procedures set forth in these regulations may subject us to fines and legal sanctions, such as restrictions on our cross-border investment activities, on the ability of our wholly foreign-owned subsidiaries in China to distribute dividends and the proceeds from any reduction in capital, share transfer or liquidation to us. Moreover, failure to comply with the various foreign exchange registration requirements described above could result in liability under PRC law for circumventing applicable foreign exchange restrictions. As a result, our business operations and our ability to distribute profits to you could be materially and adversely affected.

50

***Any failure to comply with PRC regulations regarding the registration requirements for employee stock incentive plans may subject the PRC plan participants or us to fines and other legal or administrative sanctions.***

In February 2012, SAFE promulgated the Notices on Issues Concerning the Foreign Exchange Administration for Domestic Individuals Participating in Stock Incentive Plan of Overseas Publicly Listed Company, replacing earlier rules promulgated in 2007. Pursuant to these rules, PRC citizens and non-PRC citizens who reside in China for a continuous period of not less than one year who participate in any stock incentive plan of an overseas publicly listed company, subject to a few exceptions, are required to register with SAFE through a domestic qualified agent, which could be the PRC subsidiaries of such overseas-listed company, and complete certain other procedures. In addition, an overseas-entrusted institution must be retained to handle matters in connection with the exercise or sale of stock options and the purchase or sale of shares and interests. We and our executive officers and other employees who are PRC citizens or who reside in the PRC for a continuous period of not less than one year and who have been granted options are subject to these regulations as our company is an overseas-listed company. Failure to complete SAFE registrations may subject them to fines of up to RMB300,000 for entities and up to RMB50,000 for individuals, and legal sanctions and may also limit our ability to contribute additional capital into our PRC subsidiaries and limit our PRC subsidiaries' ability to distribute dividends to us. We also face regulatory uncertainties that could restrict our ability to adopt additional incentive plans for our directors, executive officers and employees under PRC law. See "Item 4. Information on the Company—B. Business Overview—Regulation—Regulations Relating to Foreign Exchange—Regulations on Stock Incentive Plans."

In addition, the SAT has issued certain circulars concerning employee share options and restricted shares. Under these circulars, our employees working in China who exercise share options or are granted restricted shares will be subject to PRC individual income tax. Our PRC subsidiaries have obligations to file documents related to employee share options or restricted shares with relevant tax authorities and to withhold individual income taxes of those employees who exercise their share options. If our employees fail to pay or we fail to withhold their income taxes according to relevant laws and regulations, we may face sanctions imposed by the tax authorities or other PRC government authorities. See "Item 4. Information on the Company—B. Business Overview—Regulation—Regulations Relating to Foreign Exchange—Regulations on Stock Incentive Plans."

***Our use of some leased properties could be challenged by third parties or government authorities, which may cause interruptions to our business operations.***

Certain of our leasehold interests in leased properties in China have not been registered with the relevant PRC government authorities as required by PRC law, which may expose us to potential fines if we fail to remediate after receiving notice from the relevant PRC government authorities. In case of failure to register or file a lease in China, the parties to the unregistered lease may be ordered to make rectifications (which would involve registering such lease with the relevant PRC authority) before being subject to penalties. The penalty ranges from RMB1,000 to RMB10,000 for each unregistered lease, at the discretion of the relevant PRC authority. The law is not clear as to which of the parties, the lessor or the lessee, is liable for the failure to register the lease. Although we have proactively requested that the applicable lessors complete or cooperate with us to complete the registration in a timely manner, we are unable to control whether and when such lessors will do so. In the event that a fine or a portion thereof is imposed on the lessee, and if we are unable to recover from the lessor any fine paid by us, such fine will be borne by us. Moreover, certain lessors have not provided us with valid ownership certificates or authorization of sublease for our leased properties in China. As a result, there is a risk that these lessors may not have the right to lease such properties to us, in which case the relevant lease agreements may be deemed invalid or we may face challenges from the property owners or other third parties regarding our right to occupy the premises. We are not aware of any actions, claims or investigations being initiated by third parties or competent governmental authorities with respect to the defects in our leased real properties. However, if we are unable to continue our operations on the current premises and cannot find a suitable replacement in a timely manner, our business, results of operations and financial condition could be materially and adversely affected.

51

***If we are classified as a PRC resident enterprise for PRC income tax purposes, such classification could result in unfavorable tax consequences to us and our non-PRC shareholders or ADS holders.***

Under the PRC Enterprise Income Tax Law and its implementation rules, an enterprise established outside of the PRC with "de facto management body" within the PRC is considered a "resident enterprise" and will be subject to the enterprise income tax on its global income at the rate of 25%. The implementation rules define the term "de facto management body" as the body that exercises full and substantial control and overall management over the business, productions, personnel, accounts and properties of an enterprise. In 2009, the SAT issued a circular, known as SAT Circular 82, which provides certain specific criteria for determining whether the "de facto management body" of a PRC-controlled enterprise that is incorporated offshore is located in China. Although this circular only applies to offshore enterprises controlled by PRC enterprises or PRC enterprise groups, not those controlled by PRC individuals or foreigners, the criteria set forth in the circular may reflect SAT's general position on how the "de facto management body" text should be applied in determining the tax resident status of all offshore enterprises. According to SAT Circular 82, an offshore incorporated enterprise controlled by a PRC enterprise or a PRC enterprise group will be regarded as a PRC tax resident by virtue of having its "de facto management body" in China and will be subject to PRC enterprise income tax on its global income only if all of the following conditions are met: (i) the primary location of the day-to-day operational management is in the PRC; (ii) decisions relating to the enterprise's financial and human resource matters are made or are subject to approval by organizations or personnel in the PRC; (iii) the enterprise's primary assets, accounting books and records, company seals, and board and shareholder resolutions, are located or maintained in the PRC; and (iv) at least 50% of voting board members or senior executives habitually reside in the PRC.

We believe that we are not a PRC resident enterprise for PRC tax purposes. However, the tax resident status of an enterprise is subject to determination by the PRC tax authorities and uncertainties remain with respect to the interpretation of the term "de facto management body." If the PRC tax authorities determine that we are a PRC resident enterprise for enterprise income tax purposes, we could be subject to PRC tax at a rate of 25% on our worldwide income, which could materially reduce our net income, and we may be required to withhold a 10% withholding tax from dividends we pay to our shareholders that are non-resident enterprises, including the holders of our ADSs. In addition, non-resident enterprise shareholders (including our ADS holders) may be subject to PRC tax on gains realized on the sale or other disposition of ADSs or ordinary shares, if such income is treated as sourced from within the PRC. Furthermore, if we are deemed a PRC resident enterprise, dividends payable to our non-PRC individual shareholders (including our ADS holders) and any gain realized on the transfer of ADSs or ordinary shares by such shareholders may be subject to PRC tax at a rate of 10% in the case of non-PRC enterprises or a rate of 20% in the case of non-PRC individuals unless a reduced rate is available under an applicable tax treaty. It is unclear whether non-PRC shareholders of our company would be able to claim the benefits of any tax treaties between their country of tax residence and the PRC in the event that we are treated as a PRC resident enterprise. Any such tax may reduce the returns on your investment in the ADSs or ordinary shares.

***We face uncertainty with respect to indirect transfers of equity interests in PRC resident enterprises by their non-PRC holding companies.***

Pursuant to the Notice on Strengthening Administration of Enterprise Income Tax for Share Transfers by Non-PRC Resident Enterprises, or SAT Circular 698, issued by SAT in 2009 with retroactive effect from January 1, 2008, where a non-resident enterprise transfers the equity interests of a PRC resident enterprise indirectly by disposition of the equity interests of an overseas holding company, or an Indirect Transfer, and such overseas holding company is located in a tax jurisdiction that: (i) has an effective tax rate less than 12.5% or (ii) does not tax foreign income of its residents, the non-resident enterprise, being the transferor, shall report to the competent tax authority of the PRC resident enterprise this Indirect Transfer.

In February 2015, SAT issued a Public Notice Regarding Certain Corporate Income Tax Matters on Indirect Transfer of Properties by Non-Tax Resident Enterprises, or SAT Circular 7. SAT Circular 7 supersedes the rules with respect to the Indirect Transfer under SAT Circular 698, but does not touch upon the other provisions of SAT Circular 698, which remain in force. SAT Circular 7 has introduced a new tax regime that is significantly different from the previous one under SAT Circular 698. SAT Circular 7 extends its tax jurisdiction to not only Indirect Transfers set forth under SAT Circular 698 but also transactions involving transfer of other taxable assets through offshore transfer of a foreign intermediate holding company. In addition, SAT Circular 7 provides clearer criteria than SAT Circular 698 for assessment of reasonable commercial purposes and has introduced safe harbors for internal group restructurings and the purchase and sale of equity through a public securities market. SAT Circular 7 also brings challenges to both foreign transferor and transferee (or other person who is obligated to pay for the transfer) of taxable assets. Where a non-resident enterprise transfers taxable assets indirectly by disposing of the equity interests of an overseas holding company, which is an Indirect Transfer, the non-resident enterprise as either transferor or transferee, or the PRC entity that directly owns the taxable assets, may report such Indirect Transfer to the relevant tax authority. Using a "substance over form" principle, the PRC tax authority may disregard the existence of the overseas holding company if it lacks a reasonable commercial purpose and was established for the purpose of reducing, avoiding or deferring PRC tax. As a result, gains derived from such Indirect Transfer may be subject to PRC enterprise income tax, and the transferee or other person who is obligated to pay for the transfer is obligated to withhold the applicable taxes, currently at a rate of 10% for the transfer of equity interests in a PRC resident enterprise. Both the transferor and the transferee may be subject to penalties under PRC tax laws if the transferee fails to withhold the taxes and the transferor fails to pay the taxes.

In October 2017, SAT issued an Announcement on Issues Relating to Withholding at Source of Income Tax of Non-resident Enterprises, or SAT Circular 37. Effective December 2017, SAT Circular 37, among others, repealed the Circular 698 and amended certain provisions in SAT Circular 7. According to SAT Circular 37, where the non-resident enterprise fails to declare the tax payable pursuant to Article 39 of the Enterprise Income Tax, the tax authority may order it to pay the tax due within required time limits, and the non-resident enterprise shall declare and pay the tax payable within such time limits specified by the tax authority. However, if the non-resident enterprise voluntarily declares and pays the tax payable before the tax authority orders it to do so within required time limits, it shall be deemed that such enterprise has paid the tax in time.

We face uncertainties as to the reporting and other implications of certain past and future transactions where PRC taxable assets are involved, such as offshore restructuring, sale of the shares in our offshore subsidiaries and investments. Our company may be subject to filing obligations or taxed if our company is transferor in such transactions, and may be subject to withholding obligations if our company is transferee in such transactions, under SAT Circular 7 and SAT Circular 37. For transfer of shares in our company by investors who are non-PRC resident enterprises, our PRC subsidiaries may be requested to assist in the filing under the SAT circulars. As a result, we may be required to expend valuable resources to comply with the SAT circulars or to request the relevant transferors from whom we purchase taxable assets to comply with these circulars, or to establish that our company should not be taxed under these circulars, which may have a material adverse effect on our financial condition and results of operations.

***The approval of or filing with the CSRC or other PRC government authorities may be required in connection with our previous or future offshore offerings under PRC laws, and, if required, we cannot predict whether or for how long we will be able to obtain such approval or complete such filing.***

Pursuant to the M&A Rules, an offshore special purpose vehicle that (i) was formed for listing purposes through the acquisition of PRC domestic companies and (ii) is controlled by PRC persons or entities must obtain the approval of the CSRC before it can list its securities on an overseas stock exchange. Based on the advice of King & Wood Mallesons, our PRC legal counsel, we are of the view that we did not need, and will not need, to obtain the CSRC's approval under the M&A Rules for our previous offshore offerings. However, the interpretation and application of the regulations could change so that we may need to obtain the CSRC's approval with respect to our previous or future offshore offerings. To the extent such CSRC approvals are required, we cannot assure you that we would be able to obtain them in a timely manner. Any failure to obtain or delay in obtaining the requisite CSRC approvals for any of our previous or future offshore offerings would subject us to sanctions imposed by the CSRC or other PRC regulatory authorities, which could include fines and penalties on our operations in China, restrictions or limitations on our ability to pay dividends outside of China.

The PRC government authorities have recently indicated an intent to exert more oversight and control over securities offerings and other capital markets activities that are conducted overseas. In July 2021, the General Office of the Central Committee of the Communist Party of China and the General Office of the State Council issued the Opinions on Strictly Scrutinizing Illegal Securities Activities in Accordance with the Law. These opinions emphasized the need to, among other things, strengthen the supervision of overseas listings conducted by companies with significant operations in China. These opinions also proposed the development of a regulatory system to oversee companies with significant operations in China that conduct listings markets other than the PRC.

In December 2021, the National Development and Reform Commission of the PRC, or the NDRC, and MOFCOM jointly issued the Special Administrative Measures (Negative List) for Foreign Investment Access (2021 Version), or the 2021 Negative List, which became effective on January 1, 2022. Pursuant to the 2021 Negative List, if a PRC company that is engaged in a prohibited businesses under the 2021 Negative List seeks an overseas offering and listing of securities, it must obtain approval from the competent governmental authorities. In addition, the foreign investors of such PRC company may not be involved in the company's operations and management, and their shareholding percentage is subject to the relevant regulations on domestic securities investments by foreign investors, which regulations are set out in more detail under "Item 4. Information on the Company—B. Business Overview—Regulation —Regulations Relating to Foreign Investment."

On February 17, 2023, the CSRC released a set of regulations, including the Trial Administrative Measures of Overseas Securities Offering and Listing by Domestic Companies and five supporting guidelines, or, collectively, the Filing Measures, which took effect on March 31, 2023. The Filing Measures establish a new filing-based regime for regulating direct or indirect overseas offerings and listings by PRC domestic companies. The Filing Measures require, among others, that the issuers of PRC domestic companies or their main operating entities in PRC, in case of indirect overseas offering and listings, to file with the CSRC for its offshore offering or listing within three working days after submitting the application documents for overseas offerings and listings. Companies that have already completed overseas listings or offerings before March 31, 2023 are not required to complete the filling procedures immediately but are required to file with the CSRC for their follow-on offerings. For details about the Filing Measures, see "Item 4. Information on the Company—B. Business Overview—Regulation—Regulations Relating to Overseas Listings and M&A."

If it is determined in the future that approval and filing from the CSRC or other regulatory authorities or other procedures, including the cybersecurity review under the Cybersecurity Review Measures, are required for our offerings, it is uncertain whether we can or how long it will take us to obtain such approval or complete such filing procedures. Any failure to obtain (including possible rescission of any approvals that had been obtained) or delay in obtaining such approval or completing such filing procedures for our offerings could subject us to penalties and sanctions such as fines and penalties on our operations in China, orders limiting our ability to pay dividends outside of China, reduction of our operating privileges in China, or delay or restrictions on repatriation of the proceeds from our offshore offerings into China. These penalties and sanctions could materially and adversely affect our business, financial condition, results of operations, and prospects, as well as the trading price of our securities. Similarly, the CSRC or other PRC regulatory authorities could also require us to halt our offshore offerings before settlement and delivery of the shares offered. Consequently, if investors engage in trading or hedging activities in anticipation of and prior to settlement and delivery, they do so at the risk that settlement and delivery may not occur. In addition, if the CSRC or other regulatory authorities subsequently promulgate new rules or explanations requiring that we obtain their approvals or accomplish the required filing or other regulatory procedures for our prior offshore offerings, we may be unable to obtain a waiver of such approval requirements, if and when procedures are established to obtain such a waiver. Any uncertainties or negative publicity regarding such approval requirement could materially and adversely affect our business, prospects, financial condition, reputation, and the trading price of our listed securities.

***The PCAOB had historically been unable to inspect our auditor in relation to their audit work performed for our financial statements and the inability of the PCAOB to conduct inspections of our auditor in the past has deprived our investors of the benefits of such inspections.***

Our auditor, the independent registered public accounting firm that issues the audit report included elsewhere in this annual report, as an auditor of companies that are traded publicly in the United States and a firm registered with the PCAOB, is subject to laws in the United States pursuant to which the PCAOB conducts regular inspections to assess its compliance with the applicable professional standards. The auditor is located in mainland China, a jurisdiction where the PCAOB was historically unable to conduct inspections and investigations completely before 2022. As a result, we and investors in the ADSs were deprived of the benefits of such PCAOB inspections. The inability of the PCAOB to conduct inspections of auditors in China in the past has made it more difficult to evaluate the effectiveness of our independent registered public accounting firm's audit procedures or quality control procedures as compared to auditors outside of China that are subject to the PCAOB inspections. On December 15, 2022, the PCAOB issued a report that vacated its December 16, 2021 determination and removed mainland China and Hong Kong from the list of jurisdictions where it is unable to inspect or investigate completely registered public accounting firms. However, if the PCAOB determines in the future that it no longer has full access to inspect and investigate completely accounting firms in mainland China and Hong Kong, and we use an accounting firm headquartered in one of these jurisdictions to issue an audit report on our financial statements filed with the SEC, we and investors in the ADSs would be deprived of the benefits of such PCAOB inspections again, which could cause investors and potential investors in our ADSs to lose confidence in our audit procedures and reported financial information and the quality of our financial statements.

54

Table of Contents

***Our ADSs may be prohibited from trading in the United States under the HFCA Act in the future if the PCAOB is unable to inspect or investigate completely auditors located in China. The delisting of the ADSs, or the threat of their being delisted, may materially and adversely affect the value of your investment.***

Pursuant to the HFCA Act, if the SEC determines that we have filed audit reports issued by a registered public accounting firm that has not been subject to inspections by the PCAOB for two consecutive years, the SEC will prohibit our shares or ADSs from being traded on a national securities exchange or in the over-the-counter trading market in the United States. On December 16, 2021, the PCAOB issued a report to notify the SEC of its determination that the PCAOB was unable to inspect or investigate completely registered public accounting firms headquartered in mainland China and Hong Kong and our auditor was subject to that determination. In May 2022, the SEC conclusively listed us as a Commission-Identified Issuer under the HFCA Act following the filing of our annual report on Form 20-F for the fiscal year ended December 31, 2021. On December 15, 2022, the PCAOB removed mainland China and Hong Kong from the list of jurisdictions where it is unable to inspect or investigate completely registered public accounting firms. For this reason, we do not expect to be identified as a Commission-Identified Issuer under the HFCA Act after we file this annual report on Form 20-F for the fiscal year ended December 31, 2022.

Each year, the PCAOB will determine whether it can inspect and investigate completely audit firms in mainland China and Hong Kong, among other jurisdictions. If the PCAOB determines in the future that it no longer has full access to inspect and investigate completely accounting firms in mainland China and Hong Kong and we use an accounting firm headquartered in one of these jurisdictions to issue an audit report on our financial statements filed with the SEC, we would be identified as a Commission-Identified Issuer following the filing of the annual report on Form 20-F for the relevant fiscal year. In accordance with the HFCA Act, our securities would be prohibited from being traded on a national securities exchange or in the over-the-counter trading market in the United States if we are identified as a Commission-Identified Issuer for two consecutive years in the future. If our shares and ADSs are prohibited from trading in the United States, there is no certainty that we will be able to list on a non-U.S. exchange or that a market for our shares will develop outside of the United States. A prohibition of being able to trade in the United States would substantially impair your ability to sell or purchase our ADSs when you wish to do so, and the risk and uncertainty associated with delisting would have a negative impact on the price of our ADSs. Also, such a prohibition would significantly affect our ability to raise capital on terms acceptable to us, or at all, which would have a material adverse impact on our business, financial condition, and prospects.

***It may be difficult for overseas regulators to conduct investigations or collect evidence within China.***

Shareholder claims or regulatory investigation that are common in the United States generally are difficult to pursue as a matter of law or practicality in China. For example, in China, there are significant legal and other obstacles to providing information needed for regulatory investigations or litigation initiated outside China. Although the authorities in China may establish a regulatory cooperation mechanism with the securities regulatory authorities of another country or region to implement cross-border supervision and administration, such cooperation with the securities regulatory authorities in the Unities States may not be efficient in the absence of mutual and practical cooperation mechanism. Furthermore, according to Article 177 of the PRC Securities Law, or Article 177, which became effective in March 2020, no overseas securities regulator is allowed to directly conduct investigations or evidence collection activities within the territory of the PRC. While detailed interpretation of or implementation rules under Article 177 have yet to be promulgated, the inability for an overseas securities regulator to directly conduct investigations or evidence collection activities within China may further increase difficulties faced by you in protecting your interests.

55

**Risks Related to Our ADSs**

***The trading price of our ADSs may be volatile, which could result in substantial losses to investors.***

Since our ADSs became listed on the Nasdaq Global Select Market on July 26, 2018, the trading price of our ADSs has fluctuated significantly. The trading price of our ADSs may be volatile and could fluctuate widely due to factors beyond our control. This may happen because of broad market and industry factors, including the performance and fluctuation of the market prices of other companies with business operations located in China that have listed their securities in the United States. The trading performances of these other companies' securities, including internet and e-commerce companies, may affect the attitudes of investors toward similar companies listed in the United States, which consequently may impact the trading performance of our ADSs, regardless of our actual operating performance. In addition, any negative news or perceptions about inadequate corporate governance practices or fraudulent accounting, corporate structure or matters of these other companies may also negatively affect the attitudes of investors towards companies with business operations in China in general, including us, regardless of our conduct. In addition, securities markets may from time to time experience significant price and volume fluctuations that are not related to our operating performance, such as the large decline in share prices in the United States, which may have a material and adverse effect on the trading price of our ADSs. In addition to market and industry factors, the price and trading volume for our ADSs may be highly volatile for factors specific to our own operations, including the following:

- variations in our revenues, earnings and cash flow;

- announcements of new investments, acquisitions, strategic partnerships or joint ventures by us or our competitors;

- announcements of new offerings, solutions and expansions by us or our competitors;

- changes in financial estimates by securities analysts;

- detrimental adverse publicity about us, our brands, our services or our industry;

- additions or departures of key personnel;

- release of lock-up or other transfer restrictions on our outstanding equity securities or sales of additional equity securities;

- convertible arbitrage strategy employed by certain investors in the convertible notes offered in the 2024 Notes and/or the 2025 Notes, including related short selling of our ADS; and

- potential litigation or regulatory investigations.

Any of these factors may result in large and sudden changes in the volume and price at which our ADSs will trade.

In the past, shareholders of public companies have often brought securities class action suits against those companies following periods of instability in the market price of their securities, such as the putative class action lawsuits we disclosed in the "Item 8. Financial Information—A. Consolidated Statements and Other Financial Information—Legal Proceedings." These putative class action suits could divert a significant amount of our management's attention and other resources from our business and operations and require us to incur significant expenses to defend the suits, which could harm our results of operations. Moreover, these class action suits, whether or not successful, could harm our reputation and restrict our ability to raise capital in the future. In addition, if a claim is successfully made against us, we may be required to pay significant damages or indemnification claims, which could have a material adverse effect on our financial condition and results of operations.

***Conversion of the 2024 Notes or the 2025 Notes may dilute the ownership interest of the existing shareholders, including holders who had previously converted their 2024 Notes or 2025 Notes.***

The conversion of some or all of the 2024 Notes and/or the 2025 Notes, will dilute the ownership interests of existing shareholders and existing holders of our ADSs. Any sales in the public market of the ADSs, if any, issuable upon such conversion may increase the opportunities to create short positions with respect to the ADSs, which could adversely affect prevailing market prices of our ADSs. In addition, the existence of the 2024 Notes and/or the 2025 Notes may encourage short selling by market participants because the conversion of the 2024 Notes and/or the 2025 Notes could depress the price of our ADSs. The price of our ADSs could be affected by possible sales of our ADSs by investors who view the 2024 Notes and/or the 2025 Notes as a more attractive means of equity participation in us and by hedging or arbitrage trading activity, which we expect to occur involving our ADSs.

***If securities or industry analysts do not publish research or reports about our business, or if they adversely change their recommendations regarding our ADSs, the market price for our ADSs and trading volume could decline.***

The trading market for our ADSs will be influenced by research or reports that industry or securities analysts publish about our business. If one or more analysts who cover us downgrade our ADSs, the market price for our ADSs would likely decline. If one or more of these analysts cease to cover us or fail to regularly publish reports on us, we could lose visibility in the financial markets, which in turn could cause the market price or trading volume for our ADSs to decline.

***Techniques employed by short sellers may drive down the market price of the ADSs.***

Short selling is the practice of selling securities that a seller does not own but rather has borrowed from a third party with the intention of buying identical securities back at a later date to return to the lender. Short sellers hope to profit from a decline in the value of the securities between the sale of the borrowed securities and the purchase of the replacement shares, as short sellers expect to pay less in that purchase than they received in the sale. As it is in short sellers' interest for the price of the security to decline, many short sellers publish, or arrange for the publication of, negative opinions and allegations regarding the relevant issuer and its business prospects in order to create negative market momentum and generate profits for themselves after selling a security short. These short attacks have, in the past, led to selling of shares in the market.

We have been the subject of short selling, and it is not clear what long-term effect such negative publicity could have on us. We may also be subject to short seller attacks from time to time in the future. If we were to become the subject of any unfavorable allegations, whether such allegations are proven to be true or untrue, we may have to expend a significant amount of resources to investigate such allegations and/or defend ourselves. While we would strongly defend against any such short seller attacks, we may be constrained in the manner in which we can proceed against the relevant short sellers by principles of freedom of speech, applicable state law or issues of commercial confidentiality. Such a situation could be costly and time-consuming, and could divert management's attention from the day-to-day operations of our company. Even if such allegations are ultimately proven to be groundless, allegations against us could severely impact the market price of our ADSs and our business operations.

***The sale or availability for sale of substantial amounts of our ADSs could adversely affect their market price.***

Sales of substantial amounts of our ADSs in the public market or the perception that these sales could occur, could adversely affect the market price of our ADSs and could materially impair our ability to raise capital through equity offerings in the future. We cannot predict what effect, if any, market sales of securities held by our significant shareholders or any other shareholder or the availability of these securities for future sale will have on the market price of our ADSs.

***Because we do not expect to pay dividends in the foreseeable future, you must rely on a price appreciation of our ADSs for return on your investment.***

We currently intend to retain most, if not all, of our available funds and any future earnings to fund the development and growth of our business. As a result, we do not expect to pay any cash dividends in the foreseeable future. Therefore, you should not rely on an investment in our ADSs as a source for any future dividend income.

Our board of directors has complete discretion as to whether to distribute dividends, subject to certain requirements of Cayman Islands law. In addition, our shareholders may by ordinary resolution declare a dividend, but no dividend may exceed the amount recommended by our directors. Under Cayman Islands law, a Cayman Islands company may pay a dividend out of either profit or share premium account, provided that in no circumstances may a dividend be paid if this would result in the company being unable to pay its debts as they fall due in the ordinary course of business. Even if our board of directors decides to declare and pay dividends, the timing, amount and form of future dividends, if any, will depend on our future results of operations and cash flow, our capital requirements and surplus, the amount of distributions, if any, received by us from our subsidiaries, our financial condition, contractual restrictions and other factors deemed relevant by our board of directors. Accordingly, the return on your investment in our ADSs will likely depend entirely upon any future price appreciation of our ADSs. There is no guarantee that our ADSs will appreciate in value or even maintain the price at which you purchased the ADSs. You may not realize a return on your investment in our ADSs and you may even lose your entire investment in our ADSs.

57

***Our memorandum and articles of association contain anti-takeover provisions that could have a material adverse effect on the rights of holders of our ordinary shares and ADSs.***

Our currently effective memorandum and articles of association contain provisions to limit the ability of others to acquire control of our company or cause us to engage in change-of-control transactions. These provisions could have the effect of depriving our shareholders of an opportunity to sell their shares at a premium over prevailing market prices by discouraging third parties from seeking to obtain control of our company in a tender offer or similar transaction. Our board of directors has the authority, without further action by our shareholders, to issue preferred shares in one or more series and to fix their designations, powers, preferences, privileges, and relative participating, optional or special rights and the qualifications, limitations or restrictions, including dividend rights, conversion rights, voting rights, terms of redemption and liquidation preferences, any or all of which may be greater than the rights associated with our ordinary shares, in the form of ADS or otherwise. Preferred shares could be issued quickly with terms calculated to delay or prevent a change in control of our company or make removal of management more difficult. If our board of directors decides to issue preferred shares, the price of our ADSs may fall and the voting and other rights of the holders of our ordinary shares and ADSs may be materially and adversely affected.

***You may face difficulties in protecting your interests, and your ability to protect your rights through U.S. courts may be limited, because we are incorporated under Cayman Islands law.***

We are an exempted company incorporated under the laws of the Cayman Islands. Our corporate affairs are governed by our memorandum and articles of association, the Companies Act (As Revised) of the Cayman Islands and the common law of the Cayman Islands. The rights of shareholders to take action against our directors, actions by our minority shareholders and the fiduciary duties of our directors to us under Cayman Islands law are to a large extent governed by the common law of the Cayman Islands. The common law of the Cayman Islands is derived in part from comparatively limited judicial precedent in the Cayman Islands as well as from the common law of England, the decisions of whose courts are of persuasive authority, but are not binding, on a court in the Cayman Islands. The rights of our shareholders and the fiduciary duties of our directors under Cayman Islands law are not as clearly established as they would be under statutes or judicial precedent in some jurisdictions in the United States. In particular, the Cayman Islands has a less developed body of securities laws than the United States. Some U.S. states, such as Delaware, have more fully developed and judicially interpreted bodies of corporate law than the Cayman Islands. In addition, Cayman Islands companies may not have standing to initiate a shareholder derivative action in a federal court of the United States.

Shareholders of Cayman Islands exempted companies like us have no general rights under Cayman Islands law to inspect corporate records (except the memorandum and articles of association and register of mortgages and charges) or to obtain copies of lists of shareholders of these companies. Our directors have discretion under our currently effective articles of association to determine whether or not, and under what conditions, our corporate records may be inspected by our shareholders, but are not obliged to make them available to our shareholders. This may make it more difficult for you to obtain the information needed to establish any facts necessary for a shareholder motion or to solicit proxies from other shareholders in connection with a proxy contest.

As a result of all of the above, our public shareholders may have more difficulty in protecting their interests in the face of actions taken by management, members of the board of directors or controlling shareholders than they would as public shareholders of a company incorporated in the United States.

***ADSs holders may not be entitled to a jury trial with respect to claims arising under the deposit agreements, which could result in less favorable outcomes to the plaintiff(s) in any such action.***

The deposit agreements governing the ADSs representing our ordinary shares provide that, subject to the depositary's right to require a claim to be submitted to arbitration, the federal or state courts in the City of New York have exclusive jurisdiction to hear and determine claims arising under the deposit agreements and in that regard, to the fullest extent permitted by law, ADS holders waive the right to a jury trial of any claim they may have against us or the depositary arising out of or relating to our shares, the ADSs or the deposit agreements, including any claim under the U.S. federal securities laws.

58

If we or the depositary opposed a jury trial demand based on the waiver, the court would determine whether the waiver was enforceable based on the facts and circumstances of that case in accordance with the applicable U.S. state and federal law. To our knowledge, the enforceability of a contractual pre-dispute jury trial waiver in connection with claims arising under the U.S. federal securities laws has not been finally adjudicated by the United States Supreme Court. However, based on past court decisions, we believe that a contractual pre-dispute jury trial waiver provision is generally enforceable, including under the laws of the State of New York, which govern the deposit agreements. In determining whether to enforce a contractual pre-dispute jury trial waiver provision, courts will generally consider whether a party knowingly, intelligently and voluntarily waived the right to a jury trial. We believe that this is the case with respect to the deposit agreements and the ADSs. It is advisable that you consult legal counsel regarding the jury waiver provision under the deposit agreements before investing in the ADSs.

If you or any other holders or beneficial owners of ADSs bring a claim against us or the depositary in connection with matters arising under the deposit agreements or the ADSs, including claims under U.S. federal securities laws, you or such other holder or beneficial owner may not be entitled to a jury trial with respect to such claims, which may have the effect of limiting and discouraging lawsuits against us and/or the depositary. If a lawsuit is brought against us and/or the depositary under the deposit agreements, it may be heard only by a judge or justice of the applicable trial court, which would be conducted according to different civil procedures and may result in different outcomes than a trial by jury would have had, including results that could be less favorable to the plaintiff(s) in any such action.

Nevertheless, if this jury trial waiver provision is not enforced, to the extent a court action proceeds, it would proceed under the terms of the deposit agreements with a jury trial. No condition, stipulation or provision of the deposit agreements or ADSs serves as a waiver by any holder or beneficial owner of ADSs or by us or the depositary of compliance with the U.S. federal securities laws and the rules and regulations promulgated thereunder.

***Certain judgments obtained against us by our shareholders may not be enforceable.***

We are a Cayman Islands exempted company and a significant portion of our assets are located outside of the United States. A significant portion of our business is conducted outside the United States. In addition, most of our current directors and officers are nationals and residents of countries other than the United States. A significant portion of the assets of these persons may be located outside the United States. As a result, it may be difficult or impossible for you to bring an action against us or against these individuals in the United States in the event that you believe that your rights have been infringed under the U.S. federal securities laws or otherwise. Even if you are successful in bringing an action of this kind, the laws of the Cayman Islands and of China may render you unable to enforce a judgment against our assets or the assets of our directors and officers.

***The voting rights of holders of ADSs are limited by the terms of the deposit agreements, and you may not be able to exercise your right to vote your Class A ordinary shares.***

Holders of ADSs do not have the same rights as our registered shareholders. As a holder of our ADSs, you will not have any direct right to attend general meetings of our shareholders or to cast any votes at such meetings. As an ADS holder, you will only be able to exercise the voting rights carried by the underlying Class A ordinary shares represented by your ADSs indirectly by giving voting instructions to the depositary in accordance with the provisions of the relevant deposit agreement. Under the deposit agreements, you may vote only by giving voting instructions to the depositary. Upon receipt of your voting instructions, the depositary will try, as far as is practicable, to vote the underlying Class A ordinary shares represented by your ADSs in accordance with your instructions. If we ask for your instructions, then upon receipt of your voting instructions, the depositary will try to vote the underlying Class A ordinary shares represented by your ADSs in accordance with these instructions. If we do not instruct the depositary to ask for your instructions, the depositary may still vote in accordance with instructions you give, but it is not required to do so. You will not be able to directly exercise your right to vote with respect to the underlying Class A ordinary shares represented by your ADSs unless you withdraw such shares, and become the registered holder of such shares prior to the record date for the general meeting. When a general meeting is convened, you may not receive sufficient advance notice of the meeting to withdraw the underlying Class A ordinary shares represented by your ADSs and become the registered holder of such shares to allow you to attend the general meeting and to vote directly with respect to any specific matter or resolution to be considered and voted upon at the general meeting. In addition, under our currently effective memorandum and articles of association, for the purposes of determining those shareholders who are entitled to attend and vote at any general meeting, our directors may close our register of members and/or fix in advance a record date for such meeting, and such closure of our register of members or the setting of such a record date may prevent you from withdrawing the underlying Class A ordinary shares represented by your ADSs and becoming the registered holder of such shares prior to the record date, so that you would not be able to attend the general meeting or to vote directly. If we ask for your instructions, the depositary will notify you of the upcoming vote and will arrange to deliver our voting materials to you. We have agreed to give the depositary notice of shareholder meetings sufficiently in advance of such meetings. Nevertheless, we cannot assure you that you will receive the voting materials in time to ensure that you can instruct the depositary to vote the underlying Class A ordinary shares represented by your ADSs. In addition, the depositary and its agents are not responsible for failing to carry out voting instructions or for their manner of carrying out your voting instructions. The deposit agreements provide that if the depositary does not timely receive voting instructions from the ADS holders and if voting is by poll, then such holder shall be deemed, and the depositary shall deem such holder, to have instructed the depositary to give a discretionary proxy to a person designated by us to vote the underlying Class A ordinary shares represented by the relevant ADSs, with certain limited exceptions. This means that you may not be able to exercise your right to direct how the underlying Class A ordinary shares represented by your ADSs are voted and you may have no legal remedy if the underlying Class A ordinary shares represented your ADSs are not voted as you requested.

***You may experience dilution of your holdings due to the inability to participate in future rights offerings.***

We may, from time to time, distribute rights to our shareholders, including rights to acquire securities. Under the deposit agreements, the depositary will not distribute rights to holders of ADSs unless the distribution and sale of rights and the securities to which these rights relate are either exempt from registration under the Securities Act with respect to all holders of ADSs, or are registered under the provisions of the Securities Act. The depositary may, but is not required to, attempt to sell these undistributed rights to third parties, and may allow the rights to lapse. We may be unable to establish an exemption from registration under the Securities Act, and we are under no obligation to file a registration statement with respect to these rights or underlying securities or to endeavor to have a registration statement declared effective. Accordingly, holders of ADSs may be unable to participate in our rights offerings and may experience dilution of their holdings as a result.

***You may be subject to limitations on the transfer of your ADSs.***

Your ADSs are transferable on the books of the depositary. However, the depositary may close its books at any time or from time to time when it deems it expedient in connection with the performance of its duties. The depositary may close its books from time to time for a number of reasons, including in connection with corporate events such as a rights offering, during which time the depositary needs to maintain an exact number of ADS holders on its books for a specified period. The depositary may also close its books in emergencies, and on weekends and public holidays. The depositary may refuse to deliver, transfer or register transfers of our ADSs generally when our share register or the books of the depositary are closed, or at any time if we or the depositary thinks it is advisable to do so because of any requirement of law or of any government or governmental body, or under any provision of the deposit agreement, or for any other reason.

***We may incur increased costs as a result of being a public company.***

As a public company, we incur significant accounting, legal and other expenses. The Sarbanes-Oxley Act, as well as rules subsequently implemented by the SEC and Nasdaq, have detailed requirements concerning corporate governance practices of public companies, including Section 404 of the Sarbanes-Oxley Act relating to internal controls over financial reporting. We expect to incur significant expenses and devote substantial management effort toward ensuring compliance with the requirements of Section 404 of the Sarbanes-Oxley Act and the other rules and regulations of the SEC, for example, adoption of policies regarding internal controls and disclosure controls and procedures. In addition, we incur additional costs associated with our public company reporting requirements. We cannot predict or estimate with certainty the amount of compliance costs we may incur or the timing of such costs.

***As an exempted company incorporated in the Cayman Islands, we are permitted to adopt certain home country practices in relation to corporate governance matters that differ significantly from the Nasdaq corporate governance listing standards; these practices may afford less protection to shareholders than they would enjoy if we complied fully with the Nasdaq corporate governance listing standards.***

As a Cayman Islands exempted company listed on the Nasdaq Global Select Market, we are subject to the Nasdaq Stock Market corporate governance listing standards. However, Nasdaq Stock Market rules permit a foreign private issuer like us to follow the corporate governance practices of its home country. Certain corporate governance practices in the Cayman Islands, which is our home country, may differ significantly from the Nasdaq Stock Market corporate governance listing standards. For example, under Cayman Islands law, we are not required to (i) have a majority of independent directors in our board of directors, or (ii) obtain shareholders' approval for material amendment to any share incentive plan. We may also opt to rely on additional home country practice exemptions in the future. As a result, our shareholders may be afforded less protection than they would otherwise enjoy under the Nasdaq Stock Market corporate governance listing standards applicable to U.S. domestic issuers.

***There can be no assurance that we will not be classified as a passive foreign investment company, or PFIC, for U.S. federal income tax purposes for any taxable year, which could subject U.S. investors in our ADSs or Class A ordinary shares to significant adverse U.S. income tax consequences.***

We will be a "passive foreign investment company," or "PFIC," if, in any particular taxable year, either (a) 75% or more of our gross income for such year consists of certain types of "passive" income or (b) 50% or more of the value of our assets (generally determined on the basis of a quarterly average) during such year produce or are held for the production of passive income. Although the law in this regard is unclear, we intend to treat the VIE (including its subsidiaries) as being owned by us for U.S. federal income tax purposes, not only because we are able to direct the activities of such entity but also because we are entitled to substantially all of its economic benefits, and, as a result, we consolidate its results of operations in our consolidated financial statements. Assuming that we are the owner of the VIE (including its subsidiaries) for U.S. federal income tax purposes, we do not believe that we were a PFIC for the taxable year ended December 31, 2022 and based upon our current and expected income and assets, including goodwill, and the current and projected value of our ADSs, we do not expect to be a PFIC in the current taxable year or for the foreseeable future.

While we do not anticipate becoming a PFIC, changes in the nature of our income or assets, or fluctuations in the market price of our Class A ordinary shares and/or ADSs, may cause us to become a PFIC for future taxable years because the value of our assets for the purpose of the asset test may be determined by reference to the market price of our ADSs from time to time (which may be volatile). The market price of our ADSs may continue to fluctuate considerably and, consequently, we cannot assure you of our PFIC status for any taxable year. Because PFIC status is a factual determination made annually after the close of each taxable year, there can be no assurance that we will not be a PFIC for the current taxable year or any future taxable year.

If we are a PFIC in any taxable year, a U.S. holder (as defined in "Item 10. Additional Information—E. Taxation—U.S. Federal Income Tax Considerations") may incur significantly increased U.S. income tax on gain recognized on the sale or other disposition of the ADSs or Class A ordinary shares and on the receipt of distributions on the ADSs or Class A ordinary shares to the extent such gain or distribution is treated as an "excess distribution" under the U.S. federal income tax rules and such holder may be subject to burdensome reporting requirements. Further, if we are a PFIC for any year during which a U.S. holder holds our ADSs or Class A ordinary shares, we generally will continue to be treated as a PFIC for all succeeding years during which such U.S. holder holds our ADSs or Class A ordinary shares. For more information see "Item 10. Additional Information—E. Taxation—U.S. Federal Income Tax Considerations—Passive Foreign Investment Company Considerations" in this annual report.

**Item 4.    Information on the Company**

**A.    History and Development of the Company**

We commenced our commercial operations in 2015 through Hangzhou Aimi and Shanghai Xunmeng in parallel. In June 2016, to streamline the operations of these two companies, Hangzhou Aimi acquired 100% equity interest in Shanghai Xunmeng, and Shanghai Xunmeng became a wholly-owned subsidiary of Hangzhou Aimi.

We incorporated Walnut Street Group Holding Limited under the laws of the Cayman Islands as our offshore holding company in April 2015 to facilitate offshore financing. In the same month, we established HongKong Walnut Street Limited, or Walnut HK, our wholly-owned Hong Kong subsidiary, and Walnut HK established a wholly-owned PRC subsidiary, Hangzhou Weimi. Walnut HK subsequently established two additional wholly-owned PRC subsidiaries, Walnut Shanghai and Xinzhijiang, in January 2018 and April 2018, respectively. In July 2018, we renamed our company "Pinduoduo Inc." We established an additional wholly-owned PRC subsidiary, Shanghai Yucan Information Technology Co., Ltd., in September 2020 through offshore holding entities, which, together with Hangzhou Weimi, Walnut Shanghai and Xinzhijiang, are collectively referred to as our WFOEs in this annual report.

Due to restrictions imposed by PRC laws and regulations on foreign ownership of companies that engage in internet and other related business, Hangzhou Weimi entered into a series of contractual arrangements with Hangzhou Aimi, which we refer to as the VIE in this annual report, and its shareholders. We depend on these contractual arrangements with the VIE, in which we have no ownership interests, and its shareholders to conduct most aspects of our operation. We have relied and expect to continue to rely on these contractual arrangements to conduct our business in China. The shareholders of the VIE may have potential conflicts of interest with us. See "Item 3. Key Information— D. Risk Factors—Risks Related to Our Corporate Structure—The shareholders of the VIE may have potential conflicts of interest with us, which may materially and adversely affect our business and financial condition."

Under PRC laws and regulations, our PRC subsidiaries may pay cash dividends to us out of their respective accumulated profits. However, the ability of our PRC subsidiaries to make such distribution to us is subject to various PRC laws and regulations, including the requirement to fund certain statutory funds, as well as potential restriction on currency exchange and capital controls imposed by the PRC government. For more details, see "Item 3. Key Information—D. Risk Factors—Risks Related to Our Multi-jurisdictional Operations—We may rely on dividends and other distributions on equity paid by our PRC subsidiaries to fund any cash and financing requirements we may have, and any limitation on the ability of our PRC subsidiaries to make payments to us could have a material and adverse effect on our ability to conduct our business" and "Item 4. Information on the Company—B. Business Overview—Regulation—Regulations Relating to Dividend Distributions."

As a result of our direct ownership in our WFOEs and the VIE contractual arrangements, we are regarded as the primary beneficiary of the VIE and its subsidiaries. We treat it and its subsidiaries as our consolidated affiliated entities under U.S. GAAP, and have consolidated the financial results of these entities in our consolidated financial statements in accordance with U.S. GAAP.

On July 26, 2018, our ADSs commenced trading on the Nasdaq Global Select Market under the symbol "PDD." We raised approximately US$1.7 billion in net proceeds from the issuance of new shares from the initial public offering after deducting underwriting commissions and the offering expenses payable by us. In February 2019, we completed a follow-on public offering, and raised approximately US$1.2 billion in net proceeds after deducting underwriting discounts and offering expenses payable by us. In September 2019, we completed an offering of US$1.0 billion in aggregate principal amount of convertible senior notes due 2024, or the 2024 Notes. In April 2020, we raised US$1.1 billion in net proceeds from the private placement of our Class A ordinary shares to certain long-term investors. In November 2020, we completed (i) an offering of US$2.0 billion in aggregate principal amount of convertible senior notes due 2025, and (ii) a concurrent follow-on public offering, which raised approximately US$4.1 billion in net proceeds after deducting underwriting discounts and offering expenses payable by us. In December 2020, we raised US$500 million in net proceeds from the private placement of our Class A ordinary shares to a global institutional investor.

In September 2022, we offered to repurchase the 2024 Notes at the election of the holders thereof pursuant to such holders' right to repurchase their notes on the specified date set forth in the terms of the 2024 Notes (the "Repurchase Right Offer"), and we completed the Repurchase Right Offer relating to the 2024 Notes in October 2022. US$1,000 aggregate principal amount of the 2024 Notes were validly surrendered and repurchased.

In February 2023, we renamed our company "PDD Holdings Inc."

Our principal executive offices are located at First Floor, 25 St Stephen's Green, Dublin 2, D02 XF99, Ireland. Our telephone number at this address is +353-1-5397938. Our registered office in the Cayman Islands is located at the offices of Vistra (Cayman) Limited, P.O. Box 31119 Grand Pavilion, Hibiscus Way, 802 West Bay Road, Grand Cayman, KY1-1205, Cayman Islands. Our agent for service of process in the United States is Puglisi & Associates, located at 850 Library Avenue, Suite 204, Newark, Delaware 19711.

SEC maintains an internet site that contains reports, proxy and information statements, and other information regarding issuers that file electronically with the SEC on *www.sec.gov*. You can also find information on our website *http://investor.pddholdings.com*. The information contained on our website is not a part of this annual report.

**B.    Business Overview**

PDD Holdings is a multinational commerce group that owns and operates a portfolio of businesses. We aim to bring more businesses and people into the digital economy so that local communities and small businesses can benefit from increased productivity and new opportunities.

We generate most of our revenues from online marketing services. Our revenues grew from RMB59,491.9 million in 2020 to RMB93,949.9 million in 2021 and further to RMB130,557.6 million (US$18,929.1 million) in 2022. We incurred net loss of RMB7,179.7 million in 2020, and generated a net income of RMB7,768.7 million in 2021 and a net income of RMB31,538.1 million (US$4,572.6 million) in 2022.

**The Pinduoduo Platform**

*Overview*

Founded in 2015, the Pinduoduo platform provides buyers with a comprehensive selection of value-for-money merchandise and fun and interactive shopping experiences. The platform provides a comprehensive suite of product categories, including agricultural produce, apparel, shoes, bags, mother and childcare products, food and beverage, electronic appliances, furniture and household goods, cosmetics and other personal care items, sports and fitness items and auto accessories.

Pinduoduo pioneered an innovative "team purchase" model. Buyers are encouraged to share product information on social networks, and invite their friends, family and social contacts to form shopping teams to enjoy the more attractive prices available under the "team purchase" option. The act of sharing is then rewarded by the more attractive purchase price offered through the team purchase option. The embedded social element helps foster a highly engaged user base.

*Buyers and merchants*

Pinduoduo's key ecosystem partners are the buyers and merchants who transact on the platform. These ecosystem partners add value for each other in a virtuous cycle. The buyer base attracts more merchants to the Pinduoduo platform. As the number of merchants increases, the platform is able to offer even more competitive prices and customized products and services for buyers, attracting more buyers, thus creating a virtuous cycle.

Buyers come to the Pinduoduo platform to browse, explore and purchase attractive value-for-money merchandise from third-party merchants. Direct buyer traffic to the Pinduoduo platform is primarily generated from word-of-mouth referrals by existing buyers, as well as the effect of marketing campaigns. To enable buyers to make payments for their purchases easily and efficiently, Pinduoduo cooperates with leading third-party online payment service providers in China. Pinduoduo does not depend on any particular provider for such services.

Merchants are drawn to Pinduoduo by the scale of sales volume on the platform. This scale encourages merchants join Pinduoduo platform and to offer more competitive prices and customized products and services to buyers. Many merchants set aside exclusive product supplies and offer competitive prices for buyers on Pinduoduo.

The Pinduoduo platform offers merchants multiple features and value-added services to enhance their transaction efficiency to help merchants promote their merchandise and handle transactions more effectively, including online marketing services and transaction services. The Pinduoduo platform also offers merchants additional training resources and merchant support, which are easily accessible through the main merchant dashboard and are frequently updated to guide merchants through the various tools available to them on the Pinduoduo platform.

Once an order is placed on the platform and confirmed with the applicable merchant, the merchant will handle fulfilment, select the most suitable third-party logistics service provider and arrange for the delivery of the products to the buyers. The Pinduoduo proprietary e-waybill system efficiently integrates its merchants with third-party logistics service providers, and provides buyers real-time visibility on the delivery status of their purchase orders.

### Digital inclusion in agriculture

Pinduoduo actively leverages its platform resources to promote digital inclusion of smallholder farmers, utilizing its ability to aggregate demand and create economies of scale for farmer merchants. Farmers can sell directly to consumers through the platform and become less dependent on wholesale distributors. Overall supply chain efficiency is improved through this broadening of direct market access for producers and growers. Consumers therefore get fresher and safer products for lower prices while farmers earn more, which can be reinvested in their farming practices and technology to further improve production efficiency and quality. Pinduoduo offers dedicated training programs to enable farmers to become better business operators.

### Duo Duo Grocery

As a natural extension of the Pinduoduo platform, Duo Duo Grocery, the next-day grocery pick-up service, was launched in 2020. The service caters to the rising consumer demand for more timely turnaround and better value-for-money goods without home delivery requirements. Duo Duo Grocery connects local farmers and distributors directly to local consumers on a daily basis and provide supporting services on the delivery of such goods to consumers. Each day, consumers place their orders with merchants through the Duo Duo Grocery channel. The merchants supply the ordered items overnight to regional warehouses. The sorted goods are then delivered from regional warehouses to designated pickup points the next day, where consumers can pick up their purchases.

### Data security and protection

Pinduoduo utilizes a comprehensive security system, supported by a network situational awareness and risk management system designed to protect individual end users across the entire network. These systems are designed to ensure the security of the data and services of the Pinduoduo platform. The back-end security system of Pinduoduo is capable of withstanding a large number of cybersecurity attacks at any given time, enabling Pinduoduo to safeguard the security of the Pinduoduo platform and protect the privacy of its buyers and merchants.

### Merchant Onboarding

The Pinduoduo platform implements strict policies and control measures aimed at ensuring the accuracy of product descriptions. In general, merchant registration on the Pinduoduo platform starts with an identity verification process.

Pinduoduo screens and verifies the product listings posted by merchants. After merchants post product information on the platform, Pinduoduo leverages an artificial intelligence-based screening system to identify potential issues and submit questionable merchandise for further review and verification. After product information is posted, the system continues to monitor and conduct semantic analysis on buyer reviews, the results of which are used as inputs for evaluation of the associated merchant's compliance with the platform's policies. If a merchant is found to have violated the policies, such merchant is required to compensate the buyers in accordance with the service agreement with the merchant. In addition to responding to buyer complaints, the platform's dedicated merchandise control team also conducts sample test purchases to verify whether product descriptions match the products delivered. A merchant's record of compliance, together with other factors such as its sales volume and buyer feedback and reviews, is taken into account when compiling such merchant's ranking, which may affect the level of exposure it receives on the Pinduoduo platform and in turn may affect its sales volume. Pinduoduo invests in technical capabilities relating to keyword identification, filtering images, text and video recognition and the development of a blacklisting mechanism. It also rewards merchants who sell high-quality products and provide superb services with preferential transaction services fee rates, as part of the continued efforts to improve user experience, thereby creating a virtuous cycle that attracts high-quality merchants and weeds out counterfeit and infringing goods.

Additionally, the Pinduoduo platform requires merchants to strictly abide by the return policy for products sold by them on the Pinduoduo platform. In accordance with the policy, buyers can return the products within the period so long as the products are in their original condition and any usage of such products does not affect the merchants' ability to resell. Once a buyer submits a return request, the relevant merchant will first review and process the request. In the event that the request cannot be resolved within a certain amount of time or a dispute escalates, the platform will be involved to resolve the request or dispute.

**Corporate Social Responsibility and Our Impact on Agriculture**

Corporate social responsibility has been central to how we do business, starting with operating with integrity in all we do and extending to serving the community at large. We are committed to leveraging our platforms to better the lives of millions and to promote sustainable development. In particular, agriculture is one important area where we carry out our corporate social responsibility.

We connect millions of farmers to the digital economy. We coach farmers on setting up stores online, provide them with access to end demand, and help them to increase their household income. We support young men and women from rural areas to become e-commerce savvy "new farmers." Many of them have become better business operators through continuous training and learning by doing.

In August 2021, we launched the "10 Billion Agriculture Initiative" to address some of the critical needs in the agricultural sector and rural areas in China. This initiative is not driven by profit or commercial goals, but instead strives to facilitate the advancement of agritech, promote digital inclusion, and provide agritech talents and workers with greater motivation and a sense of achievement. We have been funding this initiative from our profits. We seek to generate sustainable value to our consumers, our farmer merchants, our ecosystem partners and our communities.

Through the dedicated "Help the Farmers" channel and events on the Pinduoduo platform, we endeavor to facilitate the direct sale of seasonal produce to a greater number of consumers. By doing this, we harness our supply chain expertise and resources to promote quality produce to more consumers and help farmers at the same time.

We also collaborate with reputable agricultural institutions to invest in technology and fund research with the objective of improving food production, quality control, food safety and sustainability, so that a greater volume of better, fresher and safer agricultural products can go directly from farm to table.

**Marketing**

We have built up our brand awareness and our large base of loyal buyers by leveraging word-of-mouth referrals on social networks, as well as online and offline marketing and brand promotion activities, such as online advertisements and television commercials. From time to time, we also offer coupons to consumers on our platforms.

**Technology**

Our operations and growth are supported by our proprietary technology. Our technology team has created opportunities for continuous improvements in our technology capabilities, which in turn draws new talents to join us. As of December 31, 2022, we had a technology team of more than 6,400 engineers. Many of our engineers have post-graduate degrees and had prior working experience in leading technology companies.

**Competition**

The e-commerce industry in which we compete is intensely competitive, and our platforms compete on a global scale with industry players such as (i) major e-commerce operators, (ii) major traditional and brick-and-mortar retailers, (iii) retail companies focused on specific product categories and (iv) major companies that do not operate an e-commerce business now but may enter the e-commerce industry or are in the process of initiating their e-commerce businesses.

Our platforms compete primarily on the basis of:

- our ability to attract, engage and retain buyers and merchants on our platforms;

- the fun and interactive shopping experiences on our platforms;

- the ability of our platforms to seamlessly connect e-commerce with social networks;

- pricing of products sold on our platforms;

- product quality and selection;

- brand recognition and reputation; and

65

- the experience and expertise of our management team.

**Seasonality**

We experience seasonality in our business, reflecting a combination of seasonal fluctuations in internet usage and traditional retail seasonality patterns. For example, we generally experience less buyer traffic and purchase orders in the first quarter of each year. Furthermore, sales are generally higher in the fourth quarter of each calendar year than in the preceding three quarters, as e-commerce companies typically hold special promotional campaigns in the fourth quarter that boost sales. Due to our limited operating history, the seasonal trends that we have experienced in the past may not apply to, or be indicative of, our future operating results.

**Intellectual Property**

As of December 31, 2022, we had 92 registered computer software copyrights relating to various aspects of our operations. As of the same date, we had approximately 1,607 trademark registrations and 1,419 trademark applications in China, the U.S. and other jurisdictions. Our registered domain names include www.pddholdings.com, www.pinduoduo.com and www.temu.com, among others.

**New Initiative – Temu**

We launched a new initiative, Temu, in September 2022 in Boston, Massachusetts, the United States. Temu is a global online platform dedicated to providing affordable, quality products to consumers. Leveraging a global ecosystem of suppliers, logistic vendors, and fulfillment partners, Temu offers products from global sellers, manufacturers and brands to buyers at attractive prices. Due to its short operating history and the early stage of development, Temu did not have a material impact on our financial results in 2022.

**Regulations in the PRC**

This section sets forth a summary of the most significant rules and regulations that affect our business and operations in the PRC or the rights of our shareholders to receive dividends and other distributions from us.

***Regulations Relating to Foreign Investment***

*The Foreign Investment Law*

On March 15, 2019, the NPC approved the Foreign Investment Law, which took effect on January 1, 2020 and replaced most of the laws and regulations previously governing foreign investment in the PRC. The Foreign Investment Law is the foundation for regulating foreign investments in China. Subsequently, on December 26, 2019, the State Council promulgated the Implementation Regulations on the Foreign Investment Law, which came into effect on January 1, 2020.

Under the Foreign Investment Law, "foreign investment" refers to the investment activities directly or indirectly conducted by foreign individuals, enterprises or other foreign entities in China. As a general principle, under the Foreign Investment Law, foreign investment is accorded pre-entry national treatment, which means that the treatment given to foreign investors and their investments must not be less favorable than those given to domestic investors and their investments, except if a foreign investment falls under a negative list, such as the 2021 Negative List.

The Foreign Investment Law stipulates three forms of foreign investment, but is silent as to whether contractual arrangements are a form of foreign investment. The Implementation Regulations on the Foreign Investment Law are also silent as to whether contractual arrangements should be deemed to be a form of foreign investment. However, the definition of "foreign investment" under the Foreign Investment Law is broad and covers all activities whereby foreign investors invest in China, including investments made through "any other methods" under laws, administrative regulations, or provisions prescribed by the State Council. Before clarification or confirmation by future laws, administrative regulations or provisions promulgated by the State Council on the nature of contractual arrangements, there is no assurance that contractual arrangements would not be considered to be foreign investment under the Foreign Investment Law. The State Council may in the future enact laws or issue administrative regulations or provisions to classify contractual arrangements as a form of foreign investment, at which time it would be uncertain as to how contractual arrangements would be regulated and whether such contractual arrangements would be deemed to be in violation of the foreign investment restrictions. There is no guarantee that our contractual arrangements and our business will not be materially and adversely affected in the future due to changes in PRC laws and regulations. See "Item 3. Key Information—D. Risk Factors—Risks Related to Our Corporate Structure—We face uncertainties with respect to the implementation of the Foreign Investment Law and how it may impact the viability of our current corporate structure, corporate governance and business operations."

66

*The 2021 Negative List and the 2022 Encouraged Industries Catalog*

The industries in which foreign investors and foreign-invested enterprises may make investments in the PRC are regulated by the Catalog of Industries in which Foreign Investment is Encouraged (2022 edition), or the 2022 Encouraged Industries Catalog, and the Special Administrative Measures for Foreign Investment Access (Negative List 2021), or the 2021 Negative List. These lists were promulgated, and are amended from time to time, by MOFCOM and the NDRC.

The 2021 Negative List limits the industries in which foreign investors may invest. It sets out a list of "restricted" and "prohibited" industries. Foreign investors may only invest in restricted industries if they satisfy certain conditions, including government approval. Foreign investors may not invest in prohibited industries. By contrast, the 2022 Encouraged Industries Catalog includes a list of "encouraged" industries in which foreign investors are incentivized to invest. Foreign investment in industries that are not listed in the 2021 Negative List or the 2022 Encouraged Industries Catalog is generally permitted, unless specifically restricted by other PRC laws.

*Regulations on Foreign Investment in Value-Added Telecommunications Services*

Foreign investment in value-added telecommunications services (excluding e-commerce, domestic multiparty communications, storage and forwarding classes, and call centers) is subject to equity ownership limitations. In particular, pursuant to the Provisions on Administration of Foreign-Invested Telecommunications Enterprises promulgated by the State Council in December 2001, as amended, or the FITE Regulations, the level of ultimate foreign equity ownership in a value-added telecommunications services provider may not exceed 50%. An exception to this limitation was introduced in June 2015, when the MIIT issued the Circular on Removing the Restrictions on Equity Ratio Held by Foreign Investors in Online Data Processing and Transaction Processing (Operating E-Commerce) Business, which amended the relevant provisions in the FITE Regulations to allow foreign investors to own more than 50% of the equity interest in an operator that conducts an e-commerce business. Foreign investors nonetheless remain prohibited from holding more than 50% of the equity interest in a provider of other subcategories of value-added telecommunications services.

There are also limitations on foreign ownership of VATS Licenses, which are required for the provision of value-added telecommunication services. Pursuant to publicly available information, the PRC government has issued VATS Licenses to only a limited number of foreign-invested enterprises, most of which are Sino-foreign joint ventures engaging in the value-added telecommunication business. In addition, pursuant to the Circular on Strengthening the Administration of Foreign Investment in and Operation of Value-added Telecommunications Business, which was issued by the MIIT in July 2006, a PRC company that holds a VATS License is prohibited from leasing, transferring or selling such license to foreign investors in any form, and from providing any assistance, including providing resources, sites or facilities, to foreign investors that conduct value-added telecommunications business illegally in China.

To comply with PRC laws and regulations, we rely on contractual arrangements with the VIE to operate our e-commerce business in China. See "Item 3. Key Information—D. Risk Factors—Risks Related to Our Corporate Structure—We rely on contractual arrangements with the VIE and its shareholders for a large portion of our business operations, which may not be as effective as direct ownership in providing operational control."

*Information Reporting Requirements Applicable to Foreign Investment*

In December 2019, MOFCOM and the SAMR promulgated the Measures on Reporting of Foreign Investment Information, which became effective on January 1, 2020. Pursuant to these measures, foreign investors and foreign-invested enterprises must submit investment information through the Enterprise Registration System and the National Enterprise Credit Information Publicity System operated by the SAMR for their direct or indirect foreign investments in the PRC.

*The Foreign Investment Security Review Measures*

On December 19, 2020, the NDRC and MOFCOM promulgated the Foreign Investment Security Review Measures, which took effect on January 18, 2021. Under these measures, foreign investments in military, national defense-related areas or in locations close to military facilities, or foreign investments that would result in a foreign entity acquiring the actual control of assets in certain key sectors, including, among others, internet products and services, are required to obtain approval from the competent governmental authorities in advance.

67

***Licenses, Permits and Filings***

The PRC government extensively regulates the telecommunications industry, particularly the internet services sector. The State Council, the MIIT, MOFCOM, the SAIC (which has now been merged into the SAMR), the former State Administration of Press, Publication, Radio, Film and Television (which has been replaced by the State Administration of Radio and Television), and other relevant government authorities have promulgated an extensive regulatory scheme governing telecommunications, online sales and e-commerce. New laws and regulations may be adopted from time to time that will require us to obtain additional licenses and permits in addition to those that we currently have, and will require us to address new issues that arise from time to time. In addition, uncertainties exist regarding the interpretation and implementation of current and any future PRC laws and regulations applicable to the telecommunications, online sales and e-commerce. See "Item 3. Key Information—D. Risk Factors—Risks Related to Our Business and Industry—Any lack of additional requisite approvals, licenses or permits or failure to comply with any requirements of the applicable laws, regulations and policies may materially and adversely affect our daily operations and hinder our growth."

We are required to hold certain licenses and permits and to make certain filings with the relevant PRC governmental authorities in connection with various aspects of our business, including the following:

*Value-Added Telecommunication Business Operation Licenses*

In September 2000, the Telecommunications Regulations of the People's Republic of China, or the Telecom Regulations, were issued by the State Council as the primary governing law on telecommunication services. The Telecom Regulations set out the general framework for the provision of telecommunication services by PRC companies.

The Telecom Regulations draw a distinction between "basic telecommunications services" and "value-added telecommunications services." In December 2015, the MIIT released the Catalog of Telecommunication Business (2015 Revision), which clarified the scope of "value-added telecommunications services." In particular, under this catalog, both the online data processing and transaction processing business (i.e., the e-commerce business) and information service business, were categorized as value-added telecommunications services. This catalog also specifies that the scope of information service business includes information release and delivery services, information search and query services, information community platform services, information real-time interactive services, and information protection and processing services.

Under the Telecom Regulations, telecommunications service providers are required to obtain operating licenses before they commence operations. In March 2009, the MIIT issued the Administrative Measures for Telecommunications Business Operating Permit, which confirm the two types of telecom operating licenses for operators in China, namely, licenses for basic telecommunications services and licenses for value-added telecommunications services. The operation scope of the license will detail the permitted activities of the enterprise to which it is granted. An approved telecommunication services operator must conduct its business in accordance with the specifications recorded on its VATS License(s). In addition, a VATS License holder is required to obtain approval from the original permit-issuing authority before any change to its shareholders or business scope may be made. In January 2014, the State Council has issued the Decisions on Cancelling and Adjusting a Batch of Administrative Approval Items, which, among others, replaced the pre-registration approval requirement for telecommunications business with a post-registration approval requirement.

In September 2000, the State Council promulgated the Administrative Measures on Internet Information Services, pursuant to which commercial internet content-related services operators must obtain a VATS License for internet content-related business from the relevant government authorities before engaging in any commercial internet content-related services operations within China.

Our consolidated affiliated entity, Shanghai Xunmeng, the main operating entity which provides platform service to third-party merchants for their sales of products, has obtained the VATS Licenses covering (i) online data processing and transaction processing business (operating e-commerce), (ii) internet content-related services, (iii) domestic call center business, and (iv) information services from Shanghai Communications Administration. Certain of Shanghai Xunmeng's VATS Licenses will expire in 2025, while the remaining licenses will expire in 2027. Another consolidated affiliated entity, Hangzhou Aimi, has obtained a VATS License for online data processing and transaction processing business (operating e-commerce) and internet content-related services. Hangzhou Aimi's VATS License will expire in 2025.

68

*Internet Drug Information Service Qualification Certificate*

The State Food and Drug Administration, or the SFDA (which has now been merged into the SAMR), promulgated the Administrative Measures on Internet Drug Information Service in July 2004, most recently amended in November 2017, and certain implementing rules and notices thereafter. These measures set out regulations governing the classification, application, approval, content, qualifications and requirements for internet drug information services. An internet information service operator that provides information regarding drugs or medical equipment must obtain an Internet Drug Information Service Qualification Certificate from the province-level counterpart of the SFDA. Shanghai Xunmeng holds an Internet Drug Information Service Qualification Certificate issued by the Shanghai Municipal Food and Drug Administration for the provision of internet medical information services, and this license will expire in 2024.

*Filing by Online Trading Platforms Providing Services for the Distribution of Publications*

We are subject to regulations relating to online trading platform services provided for distribution of publications including books and audio-video products. Pursuant to the Regulation on the Protection of the Right to Network Dissemination of Information promulgated by the State Council, a network service provider of information storage, searching and linking services must remove the link to a work, performance or audio-video product if the work is suspected of infringing upon the right of another person. The removal should take place promptly by the service provider upon receipt of a notice alleging such infringement issued by the owner of such work or audio-video products. According to the Provisions on the Administration of the Publication Market, an online trading platform that provides services for the distribution of publications must complete filing procedures with the competent publication administrative authority. An online trading platform is required to examine the identity of the dealers distributing publications through the platform, verify their business license and Publications Operation Permit, establish a mechanism to prevent and control the trading risks and take effective measures to rectify illicit actions conducted by the dealers distributing publications on the platform. If any entity subject to such requirements fails to complete the filing or fails to fulfill the relevant duties of examination and supervision in accordance with this regulation, it may be subject to an order to cease illegal acts and a warning by the competent publication administrative authority, as well as a penalty not exceeding RMB30,000. Shanghai Xunmeng has completed the requisite procedures with the relevant publication authority.

*Filing by Third-Party Platforms Providers for Medical Device Online Trading Services*

The SFDA promulgated the Measures for the Supervision and Administration of Online Sale of Medical Devices in December 2017, which became effective in March 2018. Pursuant to such measures, a third-party platform providing online trading services for medical devices must complete filing procedures with the competent provincial food and drug administrative department. According to the measures, a third-party platform that fails to complete the filing in accordance with the measures may be ordered by the competent provincial food and drug administrative department to make rectification within a prescribed time limit, and failure to make such rectification may subject the platform to public exposure of incompliance and a penalty of not exceeding RMB30,000. Shanghai Xunmeng has completed the requisite procedures with the relevant administrative authority.

*Filing by Third-Party Platform Providers for Online Food Trading*

In July 2016, the SFDA promulgated the Measures for Investigation and Handling of Illegal Acts Involving Online Food Safety, which became effective on October 1, 2016 and was amended on April 2, 2021, pursuant to which a third-party platform providing online food trading in the PRC must file a record with the food and drug administration at the provincial level and obtain a filing number. If the platform fails to complete such filing, it may be ordered to make rectifications and given a warning by the competent food and drug administration, and the failure to make such rectification may subject the third-party platform to fines ranging from RMB5,000 to RMB30,000. Shanghai Xunmeng has completed the requisite procedures with the competent food and drug administration.

***Regulations Relating to E-Commerce***

*The E-Commerce Law*

In August 2018, the Standing Committee of the NPC promulgated the E-Commerce Law, which took effect in January 2019. The E-Commerce Law imposes a number of requirements on e-commerce operators, including individuals and entities carrying out business online, e-commerce platform operators and merchants on the platform. For example, the E-Commerce Law requires e-commerce platform operators to respect and indiscriminately protect consumers' legitimate rights and provide options to consumers, and also requires e-commerce operators to clearly identify bundle sales in which additional services or products are added by merchants to consumers' orders, and not to assume that consumers will consent to such bundle sales by default. E-commerce platform operators are required under the E-Commerce Law to establish a credit evaluation system and publicize the credit evaluation rules, and provide consumers with ways to evaluate products sold or services provided on the platform. The E-Commerce Law also requires any e-commerce platform operator to develop, and continuously publish or make publicly available by a prominent link on its home page, its platform service agreement and transaction rules, specifying the rights and obligations of relevant parties with respect to registration and de-registration on the platform, quality assurance and protection of consumer rights and personal information, and to ensure convenient and full access to reading and downloading such service agreement and transaction rules by merchants and consumers. Moreover, according to the E-Commerce Law, e-commerce platform operators, who fail to take necessary actions when they know or should have known any intellectual property infringement, product defects or other infringement of consumer rights by any merchant on the platform, will be imposed a joint liability with the merchants; with respect to the products or services affecting consumers' life and health, the e-commerce platform operators will bear relevant responsibilities if they fail to review the qualifications of merchants or fail to safeguard the interests of the consumers. In addition, the E-Commerce Law requires e-commerce operators (including individuals and entities carrying out business online, e-commerce platform operators and merchants on these platforms) to display prominently on their home page the information contained in their business licenses or administrative permits relating to their operating businesses and, in the case of e-commerce platforms, to take necessary actions if merchants on their platforms fail to do so. Failure to take necessary actions against merchants on the e-commerce platforms that are not in compliance with such requirements may subject the e-commerce platform operators to rectification within a specified period and a fine between RMB20,000 and RMB100,000.

*Regulations on the Registration of E-Commerce Operators*

In December 2018, the SAMR issued the Opinions on Doing Well in E-Commerce Operator Registration, which requires e-commerce operators, including individuals and entities carrying out business online and e-commerce platform operators and merchants on these platforms, to register with the local branches of the SAMR. Individuals selling agricultural products or goods of de minimis value and volume are not subject to these registration requirements. Pursuant to these opinions, the e-commerce platform operators must provide the identity information of merchants on their platform to the local branches of the SAMR and prompt the merchants failing to make such registrations to comply with the relevant registration requirements.

*Regulations on Cross-Border E-Commerce*

In March 2016, the SAT, the Ministry of Finance, or the MOF, and the General Administration of Customs jointly issued the Circular on Tax Policy for Cross-Border E-commerce Retail Imports, which took effect in April 2016. Pursuant to this circular, goods imported through cross-border e-commerce channels are subject to tariff, import value-added tax, or VAT, and consumption tax based on the types of goods. Individuals purchasing any goods imported through cross-border e-commerce channels are taxpayers, and e-commerce companies, companies operating e-commerce transaction platforms or logistic companies are required to withhold the taxes.

*Regulations on Livestreaming*

On November 12, 2020, the NRTA issued the Circular on Strengthening the Administration of Livestreaming, or the Notice 78, which requires, among other things, platforms that provide livestreaming to register their information and business operations. Pursuant to the circular, internet platforms that operate livestreaming business are subject to a series of compliance requirements covering the areas of, among other things, maintenance of sufficient content review staff, training and registration of the content review staff and dynamic adjustment of the content review protocols. Online e-commerce livestreaming platforms are required to design mechanisms for qualification verification and real-name authentication of e-commerce business owners and individuals who conduct livestreaming marketing on their platforms and keep complete records. Subsequently, on April 23, 2021, seven PRC regulatory authorities jointly promulgated the Administrative Measures on Online Livestreaming Marketing (Trial), effective May 25, 2021, which requires livestreaming platforms to (i) intervene in risky or illegal transactions by limiting traffic, suspending livestreaming or other methods, and (ii) prominently warn users of the risks involved in transactions conducted outside of the livestreaming platforms.

*Regulations on Online Transactions*

In March 2021, the SAMR issued the Measures for the Supervision and Administration of Online Transactions, or the Online Transactions Supervision Measures, which became effective on May 1, 2021. The Online Transactions Supervision Measures provide a number of specific rules relating to the registration of entities that transact online, the supervision of e-commerce and other business models, and the protection of consumers' rights and personal information. In particular, pursuant to the Online Transactions Supervision Measures, individual merchants with an aggregate annual online business turnover of RMB100,000 or more must register with the applicable local branches of the SAMR, and e-commerce platforms must remind the individual merchants on their platforms to make such registrations in a timely manner.

### Regulations Relating to Internet Information Security and Privacy Protection

The PRC has extensive laws and regulations relating to internet information security and privacy protection, including with respect to the following key areas:

*National Security*

Internet information in China is regulated from a national security standpoint. China's National Security Law covers technology security and information security. The Standing Committee of the NPC has also enacted the Decisions on Preserving Internet Security, which subject violators to potential criminal punishment in China for any attempt to: (i) gain improper entry into a computer or system of strategic importance; (ii) disseminate politically disruptive information; (iii) leak state secrets; (iv) spread false commercial information; or (v) infringe intellectual property rights. The MPS has promulgated measures that prohibit use of the internet in ways which, among other things, result in the leakage of state secrets or the spread of socially destabilizing content. If an internet information service provider violates these measures, the MPS and its local branches may revoke its operating license and shut down its websites.

*Personal Information and Data Privacy*

On August 20, 2021, the Standing Committee of the NPC promulgated the Personal Information Protection Law, which unified a number of hitherto separate rules with respect to personal information rights and privacy protection, and took effect on November 1, 2021. The Personal Information Protection Law strengthened the protection of personal information. As a general principle, the processing of personal data must be directly related to a specific and reasonable purpose and the related collection of personal information must be tailored to what is necessary to meet that purpose. The Personal Information Protection Law also created a number of specific requirements for the processing of personal data. For example, personal data processors must adopt measures necessary for safeguarding the security of the personal data that they handle. Moreover, the law prohibits personal data processors from engaging in price discrimination or otherwise applying unreasonable differential treatment to individuals based on automated analysis of collected personal information. Entities that violate the Personal Information Protection law may be subjected to a number of penalties, including (i) orders to rectify their violations, (ii) the suspension or termination of the provision of their services, (iii) confiscation of income that was illegally earned, or (iv) fines.

In addition to the Personal Information Protection Law, PRC authorities have enacted a number of other laws and regulations on internet use to protect personal information and data privacy. On March 12, 2021, the CAC, the MIIT, the MPS and the SAMR jointly released the Provisions on the Scope of Necessary Personal Information for Common Types of Mobile Internet Applications, effective May 1, 2021. These rules introduce a number of other obligations for persons that process certain types of personal information. For example, mobile internet application operators may not prevent users from using the basic functions and services of their mobile apps solely because such users do not agree to provide their non-essential personal information.

Under China's Criminal Law, certain activities that infringe upon personal information privacy are criminal offenses. The laws relating to personal information-related crimes was most recently revised in the Ninth Amendment to the Criminal Law, which became effective in November 2015 and was subsequently clarified in relevant part by the Interpretations of the Supreme People's Court and the Supreme People's Procuratorate of the PRC on Several Issues Concerning the Application of Law in Handling Criminal Cases of Infringing Personal Information, which was issued in May 2017. China's Criminal Law imposes criminal culpability for the unlawful collection, transaction, and provision of personal information. Moreover, pursuant to China's Criminal Law, ICP providers that fail to fulfill their obligations relating to internet information security under applicable laws and refuse to rectify such failures may be subject to criminal liability.

71

*Cybersecurity*

The Standing Committee of the NPC promulgated the Cybersecurity Law, effective June 1, 2017, to protect the security and order of cyberspace. Pursuant to the Cybersecurity Law, any individual or organization using the network must comply with the constitution and the applicable laws, follow public order and respect social moralities. The Cybersecurity Law prohibits endangering cybersecurity, leveraging the network to engage in activities that endanger national security, or infringe upon the fame, privacy, intellectual property or other legitimate rights and interests of others. The Cybersecurity Law provides for various security protection obligations for network operators, which are defined as "owners and administrators of networks and network service providers." In particular, network operators must, among other obligations, comply with requirements regarding the use of tiered cyber protection systems, verify users' real identity, store personal data and important data gathered and produced by key information infrastructure operators within the PRC, and assist government authorities to the extent necessary for protecting national security and investigating crimes.

Critical information infrastructure operators are subject to specific cybersecurity regulations under PRC laws and regulations. Under the Regulations on the Protection of Critical Information Infrastructure, "critical information infrastructure" is defined as those network facilities or information systems that may endanger national security, people's livelihoods and the public interest if such facilities or systems were to experience data breaches, damage, or system malfunctions. In particular, the network facilities or information systems used in certain critical industries or sectors (such as telecommunications, energy, transportation, finance, public services and national defense) are considered critical information infrastructure. The administration department of each critical industry or sector is responsible for identifying the critical information infrastructure operators in their industry or sector. In terms of legal rights and duties, the Regulations on the Protection of Critical Information Infrastructure provide, among other things, that (i) no individual or organization may intrude into, interfere with, sabotage or endanger the security of critical information infrastructure; and (ii) critical information infrastructure operators must establish a cybersecurity protection system and accountability system, and the main responsible person of a critical information infrastructure operator must take full responsibility for protecting that operator's critical information infrastructure.

PRC laws and regulations impose cybersecurity review obligations on critical information infrastructure operators and network platform operators. These obligations are imposed by the Cybersecurity Review Measures and the Regulations on the Protection of Critical Information Infrastructure. Critical information infrastructure operators, as determined and notified by the applicable governing authorities, are required to undergo cybersecurity reviews if they procure network products and services which could affect the security of their information infrastructure, network or data and such procurement will or may affect national security. As of the date of this annual report, we have not received any notice that we are a critical information infrastructure operator by any government authority. Under the Cybersecurity Review Measures, any network platform operator that holds personal data of more than one million users must apply for a cybersecurity review before it makes any public offering on a foreign stock exchange.

In addition to the foregoing circumstances, the Cybersecurity Review Measures also impose cybersecurity review obligations on national security grounds. In particular, if a member organization of the Cybersecurity Review Working Mechanism (consisting of the CAC, MIIT, CSRC and the other governmental authorities that jointly promulgated the Cybersecurity Review Measures) finds that an operator is engaged in offering network products and services or data processing activities affect or may affect national security, the Cybersecurity Review Office must report to the CAC for approval and may initiate a cybersecurity review, even if the operators would not otherwise have an obligation to report for a cybersecurity review in their capacity as a critical information infrastructure operator or a network platform operator. The Cybersecurity Review Measures lists a number of factors for assessing national security risks, including, among others: (i) the risk of any core data, important data or a large amount of personal data being stolen, leaked, destroyed, illegally used or illegally transferred abroad; and (ii) the risk of critical information infrastructure, core data, important data or a large amount of personal data being affected, controlled or maliciously used by foreign governments after a foreign listing.

As the Cybersecurity Review Measures and the Regulations on the Protection of Critical Information Infrastructure are relatively new, certain concepts thereunder, including the exact scope of the term "critical information infrastructure operators" and "network platform operators," remain subject to further clarification. Therefore, it is uncertain whether we would be deemed to be a critical information infrastructure operator or a network platform operator under PRC law and become subject to the relevant PRC cybersecurity laws and regulations. In addition, some of the provisions under the Cybersecurity Review Measures remain unclear on whether they are applicable to companies that are already listed in the United States, such as us.

72

Besides the Cybersecurity Law and the Cybersecurity Review Measures, a number of other rules and regulations also regulate cybersecurity. In July 2013, the MIIT promulgated the Rules on the Protection of Personal Information of Telecommunications and Internet Users promulgated, which became effective in September 2013 and contain detailed requirements on the use and collection of personal information, as well as the security measures that must be taken by telecommunications business operators and internet information service providers. On November 28, 2019, the Secretary Bureau of the CAC, the General Office of the MIIT, the General Office of the Ministry of Public Security and the General Office of the State Administration for Market Regulation promulgated the Identification Method of Illegal Collection and Use of Personal Information Through Apps, which provides guidance for regulatory authorities to identify the illegal collection and use of personal information through mobile apps and for mobile app operators to conduct self-examination and self-correction. The Civil Code, promulgated in 2020, also provides specific provisions regarding the protection of personal information.

*Data Security*

On June 10, 2021, the Standing Committee of the NPC published the Data Security Law of the People's Republic of China, which took effect on September 1, 2021. The Data Security Law broadly requires data processing, which includes the collection, storage, use, processing, transmission, provision, publication of data, to be conducted in a legitimate and proper manner. To that end, the Data Security Law imposes a number of data security and privacy obligations on entities and individuals that process data, requiring them to engage in in risk monitoring, take remedial measures against data security vulnerabilities and data security incidents, and timely notify users and regulators about any data security incidents.

The Data Security Law introduces a data classification and multilevel protection system, pursuant to which data is classified based on such data's importance to China's economic and social development, as well as the degree of harm that may be caused to national security, the public interest, and the legitimate rights and interest of individuals or organizations if such data were to be tampered with, destroyed, leaked, illegally acquired or illegal used. Data that is classified as more important will be subject to stricter management and protection requirements. For example, the Data Security Law introduces the concept of national core data, which is defined as data that relates to national security, the lifeline of the national economy, people's livelihoods and major public interests. National core data is subject to more stringent regulatory control by central and local governments. Similarly, for data classified as important data, the Data Security Law requires the processors of such important data to regularly conduct risk assessments and submit the resultant risk assessment reports to regulators.

The Data Security Law imposes limitations on the cross-border transfer of data. For example, the Data Security Law prohibits organizations and individuals in the PRC from providing any data stored in China to foreign judicial bodies or foreign law enforcement authorities without the approval of the competent PRC governmental authorities.

Following the passage of the Data Security Law, the PRC government has issued additional draft regulations relating to data security. In particular, on November 14, 2021, the CAC released the Draft Network Data Security Regulations for public comment. These draft regulations proposed to create cybersecurity review obligations for data processors, which are broadly defined as individuals or organizations that have discretion in deciding the objectives and means of their data processing activities, such as data collection, storage, utilization, transmission, publication and deletion. In particular, pursuant to these draft regulations, a data processor must apply for cybersecurity review if, among others, it (i) seeks a public offering on a foreign stock exchange and processes the data of more than one million users, (ii) seeks a Hong Kong listing that affects or may affect national security, or (iii) otherwise conducts data processing activities that affect or may affect national security. However, as of the date of this annual report, there have been no clarifications from the relevant authorities as to the standards for determining whether an activity is one that "affects or may affect national security." In addition to the foregoing cybersecurity review obligations, the Draft Network Data Security Regulations also proposed to create a system of annual data security self-assessments, whereby data processors that (i) process "important data" or (ii) are listed overseas must conduct an annual data security assessment, and submit the annual assessment report to the applicable municipal cybersecurity department by the end of January in the following year. As of the date of this annual report, the Draft Network Data Security Regulations have only been released for public comment, and their respective provisions and anticipated adoption or effective date remain subject to change with substantial uncertainty.

73

On July 7, 2022, the CAC issued the Measures for the Security Assessment of Data Cross-border Transfer, effective September 1, 2022. These measures require data processors to apply to the CAC for security assessment through the provincial-level cyberspace administration authority for any outbound data transfer that falls within any of the following circumstances: (i) outbound transfers of important data; (ii) outbound transfers of personal information by a critical information infrastructure operator or a data processor that has processed the personal information of more than 1,000,000 individuals; (iii) outbound transfers by a data processor if that data processor has cumulatively made outbound transfers of the personal information of 100,000 or more individuals, or if that data processor has cumulatively made outbound transfers of the sensitive information of 10,000 or more individuals since January 1 of the previous year; or (iv) other circumstances where applications for security assessment are required by the CAC. There are still uncertainties as to the interpretation and implementation of these new measures. It is unclear whether and to what extent we will be subject to these new requirements.

*Network Products*

On July 12, 2021, the MIIT and two other authorities jointly issued the Provisions on the Administration of Security Vulnerabilities of Network Products. These provisions state that organizations and individuals are prohibited from (i) abusing the security vulnerabilities of network products to engage in activities that endanger network security and (ii) illegally collecting, selling, or publishing information about such security vulnerabilities. It is also prohibited to provide technical support, advertising, payment settlement and other assistance to a person who is known to be in violation of the provisions. Additionally, network product providers, network operators, and platforms collecting network product security vulnerabilities must establish channels for receiving information about network product security vulnerabilities and keep such channels open, as well as retain logs about network product security vulnerability information for at least six months. These provisions also ban the provision of undisclosed vulnerabilities to overseas organizations or individuals other than to the providers of the products to which the vulnerabilities relate.

### Regulations Relating to Product Quality and Consumer Rights Protection

The PRC Consumer Rights and Interests Protection Law, as amended in and effective March 2014, and the Online Transactions Supervision Measures, have provided stringent requirements and obligations on business operators, including internet business operators and platform service providers. For example, consumers are entitled to return goods purchased online, subject to certain exceptions, within seven days upon receipt of such goods for no reason. To ensure that sellers and service providers comply with these laws and regulations, the platform operators are required to implement rules governing transactions on the platform, monitor the information posted by sellers and service providers, and report any violations by such sellers or service providers to the relevant authorities. In addition, online marketplace platform providers may, pursuant to the relevant PRC consumer protection laws, be exposed to liabilities if the lawful rights and interests of consumers are infringed upon in connection with consumers' purchase of goods or acceptance of services on online marketplace platforms and the online marketplace platform providers fail to provide consumers with the contact information of the seller or manufacturer. In addition, online marketplace platform providers may be jointly and severally liable with sellers and manufacturers if they are aware or should be aware that any seller or manufacturer is using the online platform to infringe upon the lawful rights and interests of consumers and fail to take measures necessary to prevent or stop such activity.

The Civil Code of the PRC, effective January 1, 2021, also provides that if an online service provider is aware that an online user is committing infringing activities, such as selling counterfeit products, through its internet services and fails to take necessary measures, it shall be jointly liable with the said online user for such infringement. If the online service provider receives any notice from the infringed party on any infringing activities, the online service provider shall take necessary measures, including deleting, blocking and unlinking the infringing content, in a timely manner. Otherwise, it will be held jointly liable with the relevant online user for the extended damages.

We are subject to the Civil Code of the PRC, the PRC Consumer Rights and Interests Protection Law, and the Online Transactions Supervision Measures as an e-commerce platform service provider and believe that we are currently in compliance with these regulations in all material aspects.

### Regulations Relating to Anti-unfair Competition and Anti-monopoly

On April 23, 2019, the Standing Committee of the NPC amended the PRC Anti-unfair Competition Law, pursuant to which business operators may not engage in anti-competitive activities including but not limited to, unduly influencing transactions, confusing or defrauding consumers, commercial bribery, trade secret infringement and commercial libel. Failure to comply with the Anti-unfair Competition Law and related regulations could result in various administrative penalties, including fines, confiscation of illegal gains and cessation of business activities.

After its promulgation, the relevant PRC anti-monopoly authorities further strengthened enforcement under the Anti-monopoly Law. In February 2021, the Anti-monopoly Committee of the State Council published the Antimonopoly Guidelines for the Platform Economy Sector, aiming at enhancing anti-monopoly administration of businesses that operate under the platform model and the overall platform economy. According to these guidelines, business practices such as deploying big data analytics to set discriminatory terms for merchandise price or other transaction terms, coercive exclusivity arrangements with transaction counterparties, blocking of competitor interface through technological means and unlawful collection of user data without consent, are prohibited. In addition, the guidelines included concentrations involving companies with VIE structure within the ambit of the SAMR's merger control review, if certain reporting thresholds are met.

In addition to the currently enacted laws and regulations, PRC authorities have proposed certain draft regulations that would further strengthen unfair competition and anti-monopoly laws if enacted into law. In particular, on August 17, 2021, the SAMR issued the Draft Provisions on the Prohibition of Unfair Competition on the Internet for public comment. These draft provisions prohibit business operators from using data, algorithms and other technical methods to hijack traffic or influence users' choices, or use technical means to illegally capture or use other business operators' data. Subsequently, certain amendments to the Anti-monopoly Law became effective in August 2022. The amended Anti-monopoly Law increased the maximum amount of fines that may be imposed on a business operator for violations of certain market concentration requirements to 10% of the business operator's sales revenue from the preceding year and also proposes that the relevant authority should investigate a transaction if the concentration resulting from the transaction has or may have the effect of eliminating or restricting competition, even if such concentration does not reach the filing threshold.

***Regulations Relating to Internet Advertising Business***

In July 2016, the SAIC issued the Interim Measures for the Administration of Internet Advertising to regulate internet advertising activities. It defines internet advertising as any commercial advertising that directly or indirectly promotes goods or services through websites, webpages, internet applications and other internet media in the forms of words, picture, audio, video or others, including promotion through emails, texts, images, video with embedded links and paid-for search results. According to these measures, no advertisement of any medical treatments, medicines, food for special medical purposes, medical apparatuses, pesticides, veterinary medicines, dietary supplement or other special commodities or services subject to examination by an advertising examination authority may be published only after passing the examination. In addition, no entity or individual may publish any advertisement of over-the-counter medicines or tobacco on the internet. An internet advertisement must be identifiable and clearly identified as an "advertisement" to the consumers. Paid search advertisements are required to be clearly distinguished from natural search results. In addition, the following internet advertising activities are prohibited: providing or using any applications or hardware to intercept, filter, cover, fast forward or otherwise restrict any authorized advertisement of other persons; using network pathways, network equipment or applications to disrupt the normal data transmission of advertisements, alter or block authorized advertisements of other persons or load advertisements without authorization; or using fraudulent statistical data, transmission effect or matrices relating to online marketing performance to induce incorrect quotations, seek undue interests or harm the interests of others. Internet advertisement publishers are required to verify relevant supporting documents and check the content of the advertisement and are prohibited from publishing any advertisement with unverified content or without all the necessary qualifications. Internet information service providers that are not involved in internet advertising business activities but simply provide information services are required to block any attempt to publish an illegal advisement that they are aware of or should reasonably be aware of through their information services.

In addition, the Chinese government may, from time to time, promulgate new advertising laws and regulations in the future to impose additional requirements on online advertising services. For example, on November 26, 2021, the SAMR promulgated a draft of the Measures for the Administration of Internet Advertisements for public comment. These draft measures stipulate that the promotion of commodities or services in the form of paid listings on the Internet must be prominently identified as advertisements, among other obligations. To the extent these measures are enacted into law, internet information service providers would be subject to additional requirements under PRC online advertising laws.

***Regulations Relating to Payment Services***

In April 2020, the PBOC amended the Administrative Measures for the Payment Services of Non-Financial Institutions, or the Payment Services Measures. Under this rule, a non-financial institution must obtain a payment business license, or the Payment License, to provide payment services and qualifies as a paying institution. With the Payment License, a non-financial institution may serve as an intermediary between payees and payers and provide some or all of the following services: online payment, issuance and acceptance of prepaid card, bank card acceptance, and other payment services as specified by PBOC. Without PBOC's approval, no non-financial institution or individual may engage in payment business whether explicitly or in a disguised form.

In November 2017, PBOC published a notice, or the PBOC Notice, on the investigation and administration of illegal offering of settlement services by financial institutions and third-party payment service providers to unlicensed entities. The PBOC Notice intended to prevent unlicensed entities from using licensed payment service providers as a conduit for conducting the unlicensed payment settlement services, so as to safeguard the security of funds and information. We believe that our pattern of receiving settlement services from commercial banks and third-party online payment service providers are not in violation of the PBOC Notice. See "Item 3. Key Information—D. Risk Factors— Risks Related to Our Business and Industry—We currently rely on commercial banks and third-party online payment service providers for payment processing and escrow services. If these payment services are restricted or curtailed in any way, are offered to us on less favorable terms, or become unavailable to us or our buyers for any reason, our business may be materially and adversely affected."

### *Regulations Relating to Intellectual Property in the PRC*

#### *Copyright*

Pursuant to the Copyright Law of the PRC, copyrights include personal rights such as the right of publication and that of attribution as well as property rights such as the right of production and that of distribution. Reproducing, distributing, performing, projecting, broadcasting or compiling a work or communicating the same to the public via an information network without permission from the owner of the copyright therein, unless otherwise provided in the Copyright Law of the PRC, shall constitute infringements of copyrights. The infringer shall, according to the circumstances of the case, undertake to cease the infringement, take remedial action, and offer an apology, pay damages, etc.

#### *Trademark*

Pursuant to the Trademark Law of the PRC, the right to exclusive use of a registered trademark shall be limited to trademarks which have been approved for registration and to goods for which the use of such trademark has been approved. The period of validity of a registered trademark shall be ten years, counted from the day the registration is approved. According to this law, using a trademark that is identical to or similar to a registered trademark in connection with the same or similar goods without the authorization of the owner of the registered trademark constitutes an infringement of the exclusive right to use a registered trademark. The infringer shall, in accordance with the regulations, undertake to cease the infringement, take remedial action, and pay damages, etc.

#### *Patent*

Pursuant to the Patent Law of the PRC, after the grant of the patent right for an invention or utility model, except where otherwise provided for in the Patent Law, no entity or individual may, without the authorization of the patent owner, exploit the patent, that is, make, use, offer to sell, sell or import the patented product, or use the patented process, or use, offer to sell, sell or import any product which is a direct result of the use of the patented process, for production or business purposes. After a patent right is granted for a design, no entity or individual shall, without the permission of the patent owner, exploit the patent, that is, for production or business purposes, manufacture, offer to sell, sell, or import any product containing the patented design. Once the infringement of patent is confirmed, the infringer shall, in accordance with the regulations, undertake to cease the infringement, take remedial action, and pay damages, etc.

#### *Domain Name*

Pursuant to the Measures for the Administration of Internet Domain Names of China, "domain name" shall refer to the character mark of hierarchical structure, which identifies and locates a computer on the internet and corresponds to the internet protocol (IP) address of that computer. The principle of "first come, first serve" is followed for the domain name registration service. After completing the domain name registration, the applicant becomes the holder of the domain name registered by it. Any organization or individual may file an application for settlement with the domain names dispute resolution institution or file a lawsuit in the people's court in accordance with the law, if such organization or individual consider its/his legal rights and interests to be infringed by domain names registered or used by others.

76

***Regulations Relating to Labor Protection in the PRC***

According to the Labor Law of the PRC, an employer must develop and improve its rules and regulations to safeguard the rights of its workers. An employer must develop and improve its labor safety and health system, stringently implement national protocols and standards on labor safety and health, conduct labor safety and health education for workers, guard against labor accidents and reduce occupational hazards.

The Labor Contract Law of the PRC and the Implementation Regulations on Labor Contract Law, regulate both parties to a labor contract, namely the employer and the employee, and contain specific provisions involving the terms of the labor contract. It is stipulated by the Labor Contract Law and the Implementation Regulations on Labor Contract Law that a labor contract must be made in writing. An employer and an employee may enter into a fixed-term labor contract, an un-fixed term labor contract, or a labor contract that concludes upon the completion of certain work assignments, after reaching agreement upon due negotiations. An employer may legally terminate a labor contract and dismiss its employees after reaching agreement upon due negotiations with the employee or by fulfilling the statutory conditions. Labor contracts concluded prior to the enactment of the Labor Contract Law and subsisting within the validity period thereof shall continue to be honored. With respect to a circumstance where a labor relationship has already been established but no formal contract has been made, a written labor contract shall be entered into within one month from the effective date of the Labor Contract Law.

According to the Interim Regulations on the Collection and Payment of Social Insurance Premiums, the Regulations on Workplace Injury Insurance, the Regulations on Unemployment Insurance and the Trial Measures on Employee Maternity Insurance of Enterprises, enterprises in the PRC must provide benefit plans for their employees, which include basic pension insurance, unemployment insurance, maternity insurance, workplace injury insurance and basic medical insurance. An enterprise must provide social insurance by processing social insurance registration with local social insurance agencies, and shall pay or withhold relevant social insurance premiums for or on behalf of employees. The Law on Social Insurance of the PRC has consolidated pertinent provisions for basic pension insurance, unemployment insurance, maternity insurance, workplace injury insurance and basic medical insurance, and has elaborated in detail the legal obligations and liabilities of employers who do not comply with relevant laws and regulations on social insurance.

According to the Interim Measures for Participation in the Social Insurance System by Foreigners Working within the Territory of China, employers who employ foreigners must participate in the basic pension insurance, unemployment insurance, basic medical insurance, occupational injury insurance, and maternity leave insurance in accordance with the relevant law, with the social insurance premiums to be contributed respectively by the employers and foreigner employees as required. In accordance with such Interim Measures, the social insurance administrative agencies shall exercise their right to supervise and examine the legal compliance of foreign employees and employers, and the employers who do not pay social insurance premiums in conformity with the laws shall be subject to the administrative provisions provided in the Social Insurance Law and other relevant regulations and rules.

According to the Regulations on the Administration of Housing Provident Fund, housing provident fund contributions by an individual employee and housing provident fund contributions by his or her employer shall belong to the individual employee.

The employer must timely pay up and deposit housing provident fund contributions in full amount and late or insufficient payments shall be prohibited. The employer must process housing provident fund payment and deposit registrations with the housing provident fund administration center. With respect to companies who violate the above regulations and fail to process housing provident fund payment and deposit registrations or open housing provident fund accounts for their employees, such companies shall be ordered by the housing provident fund administration center to complete such procedures within a designated period. Those who fail to process their registrations within the designated period shall be subject to a fine ranging from RMB10,000 to RMB50,000. When companies violate these regulations and fail to pay up housing provident fund contributions in full amount as due, the housing provident fund administration center shall order such companies to pay up within a designated period, and may further apply to the People's Court for mandatory enforcement against those who still fail to comply after the expiry of such period.

See "Item 3. Key Information—D. Risk Factors—Risks Related to Our Business and Industry—Any lack of additional requisite approvals, licenses or permits or failure to comply with any requirements of the applicable laws, regulations and policies may materially and adversely affect our daily operations and hinder our growth."

***Regulations Relating to Tax in the PRC***

*Income Tax*

The PRC Enterprise Income Tax Law was recently amended in December 2018. The PRC Enterprise Income Tax Law applies a uniform 25% enterprise income tax rate to both foreign-invested enterprises and domestic enterprises, except where tax incentives are granted to special industries and projects. Under the PRC Enterprise Income Tax Law, an enterprise established outside China with "de facto management bodies" within China is considered a "resident enterprise" for PRC enterprise income tax purposes and is generally subject to a uniform 25% enterprise income tax rate on its worldwide income. Under the implementation regulations to the PRC Enterprise Income Tax Law, a "de facto management body" is defined as the body that exercises full and substantial control and overall management over the business, productions, personnel, accounts and properties of an enterprise.

In January 2009, the SAT promulgated the Provisional Measures for the Administration of Withholding of Enterprise Income Tax for Non-resident Enterprises, or the Non-resident Enterprises Measures, pursuant to which entities that have direct obligation to make certain payments to a nonresident enterprise shall be the relevant tax withholders for such non-resident enterprise. Further, the Non-resident Enterprises Measures provide that, in case of an equity transfer between two non-resident enterprises occurring outside China, which is indirectly related to the transfer of equity interests of a PRC resident enterprise, the non-resident enterprise which receives the equity transfer payment shall, by itself or engage an agent to, file tax declaration with the PRC tax authority located at the place of the PRC company whose equity has been transferred, and the PRC company whose equity has been transferred shall assist the tax authorities to collect taxes from the relevant non-resident enterprise. In April 2009, MOF and the SAT jointly issued the Notice on Issues Concerning Process of Enterprise Income Tax in Enterprise Restructuring Business. In December 2009, SAT issued the Notice on Strengthening Administration of Enterprise Income Tax for Share Transfers by Non-PRC Resident Enterprises, or Circular 698. Both the Notice on Issues Concerning Process of Enterprise Income Tax in Enterprise Restructuring Business and Circular 698 became effective retroactively as of January 2008. In February 2011, SAT issued the Notice on Several Issues Regarding the Income Tax of Non-PRC Resident Enterprises, or SAT Circular 24. By promulgating and implementing these circulars, the PRC tax authorities have enhanced their scrutiny over the direct or indirect transfer of equity interests in a PRC resident enterprise by a non-resident enterprise.

In February 2015, the SAT issued the Notice on Certain Corporate Income Tax Matters on Indirect Transfer of Properties by Non-PRC Resident Enterprises, or SAT Circular 7, to supersede existing provisions in relation to the indirect transfer as set forth in Circular 698, while the other provisions of Circular 698 remain in force. SAT Circular 7 introduces a new tax regime that is significantly different from that under Circular 698. SAT Circular 7 extends its tax jurisdiction to capture not only indirect transfers as set forth under Circular 698 but also transactions involving transfer of immovable property in China and assets held under the establishment, and placement in China, of a foreign company through the offshore transfer of a foreign intermediate holding company. SAT Circular 7 also addresses transfer of the equity interest in a foreign intermediate holding company broadly. In addition, SAT Circular 7 provides clearer criteria than Circular 698 on how to assess reasonable commercial purposes and introduces safe harbor scenarios applicable to internal group restructurings. However, it also brings challenges to both the foreign transferor and transferee of the indirect transfer as they have to determine whether the transaction should be subject to PRC tax and to file or withhold the PRC tax accordingly. In October 2017, SAT issued the Announcement on Issues Relating to Withholding at Source of Income Tax of Non-resident Enterprises, or SAT Circular 37. SAT Circular 37, effective December 2017, superseded the Non-resident Enterprises Measures and SAT Circular 698 as a whole and partially amended some provisions in SAT Circular 24 and SAT Circular 7. SAT Circular 37 purports to clarify certain issues in the implementation of the above regime, by providing, among others, the definition of equity transfer income and tax basis, the foreign exchange rate to be used in the calculation of withholding amount, and the date of occurrence of the withholding obligation. Specifically, SAT Circular 37 provides that where the transfer income subject to withholding at source is derived by a non-PRC resident enterprise in instalments, the instalments may first be treated as recovery of costs of previous investments. Upon recovery of all costs, the tax amount to be withheld must then be computed and withheld.

*Value-Added Tax*

According to the Temporary Regulations on Value-added Tax and the Detailed Implementing Rules of the Temporary Regulations on Value-added Tax, all taxpayers selling goods, providing processing, repair or replacement services or importing goods within the PRC shall pay value-added tax. The tax rate of 17% shall be levied on general taxpayers selling or importing various goods; the tax rate of 17% shall be levied on the taxpayers providing processing, repairing or replacement service; the applicable rate for the export of goods by taxpayers shall be nil, unless otherwise stipulated.

78

Furthermore, according to the Trial Scheme for the Conversion of Business Tax to Value-added Tax, promulgated by MOF and the SAT in November 2011, the State Council began to launch taxation reforms in a gradual manner in January 2012, whereby the collection of value-added tax in lieu of business tax items was implemented on a trial basis in regions showing significant radiating effects in economic development and providing outstanding reform examples, beginning with production service industries such as transportation and certain modern service industries.

In accordance with a SAT circular that took effect in May 2016, upon approval of the State Council, the pilot program of the collection of value-added tax in lieu of business tax shall be promoted nationwide in a comprehensive manner starting from May 2016, and all taxpayers of business tax engaged in the construction industry, the real estate industry, the financial industry and the life science industry shall be included in the scope of the pilot program with regard to payment of value-added tax instead of business tax.

In April 2018, MOF and the SAT jointly promulgated the Circular of the Ministry of Finance and the State Administration of Taxation on Adjustment of Value-Added Tax Rates, or Circular 32, according to which (i) for VAT taxable sales acts or importation of goods originally subject to value-added tax rates of 17% and 11% respectively, such tax rates shall be adjusted to 16% and 10%, respectively; (ii) for purchase of agricultural products originally subject to deduction rate of 11%, such deduction rate shall be adjusted to 10%; (iii) for purchase of agricultural products for the purpose of production and sales or consigned processing of goods subject to tax rate of 16%, such tax shall be calculated at the deduction rate of 12%; (iv) for exported goods originally subject to tax rate of 17% and export tax refund rate of 17%, the export tax refund rate shall be adjusted to 16%; and (v) for exported goods and cross-border taxable acts originally subject to tax rate of 11% and export tax refund rate of 11%, the export tax refund rate shall be adjusted to 10%. Circular 32 became effective on May 1, 2018 and shall supersede existing provisions which are inconsistent with Circular 32.

In March 2019, MOF, the SAT and the General Administration of Customs jointly issued the Notice on Measures to Implement the Reform on Value-Added Tax, which came into effect on April 1, 2019. According to the above-mentioned notice, starting from April 1, 2019, taxable sales acts or importation of goods originally subject to value-added tax rates of 16% and 10%, respectively, become subject to lower value-added tax rates of 13% and 9%, respectively. No change of value-added tax rates has been made with respect to our services.

### *Regulations Relating to Dividend Distributions*

The principal regulations governing the distribution of dividends paid by wholly foreign-owned enterprises include the PRC Company Law and the Foreign Investment Law. Under these regulations, foreign-invested enterprises in China may pay dividends only out of their accumulated profits, if any, as determined in accordance with PRC accounting standards and regulations. In addition, a PRC company is required to set aside at least 10% of its after-tax profit based on PRC accounting standards each year to its general reserves until its cumulative total reserve funds reaches 50% of its registered capital. These reserve funds, however, may not be distributed as cash dividends.

### *Regulations Relating to Foreign Exchange*

#### *Regulations on Foreign Exchange Registration of Overseas Investment by PRC Residents*

The Circular on Relevant Issues Concerning Foreign Exchange Control on Domestic Residents' Offshore Investment and Financing and Roundtrip Investment Through Special Purpose Vehicles, or Circular 37, issued by SAFE in and effective July 2014, regulates foreign exchange matters in relation to the use of special purpose vehicles, or SPVs, by PRC residents or entities to seek offshore investment and financing and conduct round trip investment in China. Under Circular 37, a SPV refers to an offshore entity established or controlled, directly or indirectly, by PRC residents or entities for the purpose of seeking offshore financing or making offshore investment, using legitimate domestic or offshore assets or interests, while "round trip investment" refers to the direct investment in China by PRC residents or entities through SPVs, namely, establishing foreign-invested enterprises to obtain the ownership, control rights and management rights. Circular 37 requires that, before making contribution into an SPV, PRC residents or entities are required to complete foreign exchange registration with SAFE or its local branch. Circular 37 further provides that option or share-based incentive holders of a non-listed SPV can exercise the options or share incentive grants to become a shareholder of such non-listed SPV, subject to registration with SAFE or its local branch.

PRC residents or entities who have contributed domestic or offshore interests or assets to SPVs but have yet to obtain SAFE registration before the implementation of the Circular 37 shall register their ownership interests or control in such SPVs with SAFE or its local branch. An amendment to the registration is required if there is a material change in the registered SPV, such as any change of basic information (including change of such PRC resident's name and operation term), increases or decreases in investment amounts, transfers or exchanges of shares, or mergers or divisions. Failure to comply with the registration procedures set forth in Circular 37, or making misrepresentation or failure to disclose controllers of foreign-invested enterprise that is established through round-trip investment, may result in restrictions on the foreign exchange activities of the relevant foreign-invested enterprises, including payment of dividends and other distributions, to its offshore parent or affiliate, and the capital inflow from the offshore parent, and may also subject relevant PRC residents or entities to penalties under PRC foreign exchange administration regulations. In February 2015, SAFE further promulgated the Circular on Further Simplifying and Improving the Administration of the Foreign Exchange Concerning Direct Investment, or SAFE Circular 13. This SAFE Circular 13 has amended SAFE Circular 37 by requiring PRC residents or entities to register with qualified banks rather than SAFE or its local branch in connection with their establishment or control of an offshore entity established for the purpose of overseas investment or financing. Circular 37 is applicable to our shareholders who are PRC residents and may be applicable to any offshore acquisitions that we make in the future. All of our shareholders who, to our knowledge, are subject to the above SAFE regulations have completed the necessary registrations with the local SAFE branch or qualified banks as required by SAFE Circular 37.

In March 2015, SAFE promulgated the Circular on Reforming the Management Approach regarding the Settlement of Foreign Exchange Capital of Foreign-invested Enterprises, or Circular 19. According to Circular 19, the foreign exchange capital of foreign-invested enterprises shall be subject to the Discretional Foreign Exchange Settlement. The Discretional Foreign Exchange Settlement refers to the foreign exchange capital in the capital account of a foreign-invested enterprise for which the rights and interests of monetary contribution has been confirmed by the local foreign exchange bureau (or the book-entry registration of monetary contribution by the banks), and this foreign exchange capital can be settled at the banks based on the actual operational needs of the foreign-invested enterprise. The proportion of Discretional Foreign Exchange Settlement of the foreign exchange capital of a foreign-invested enterprise is temporarily determined to be 100%.

SAFE issued the Circular on Reforming and Regulating Policies on the Control over Foreign Exchange Settlement of Capital Accounts, or Circular 16. Pursuant to Circular 16, enterprises registered in the PRC may also convert their foreign debts from foreign currency to Renminbi on a discretionary basis. Circular 16 provides an integrated standard for conversion of foreign exchange under capital account items (including but not limited to foreign currency capital and foreign debts) on a discretionary basis which applies to all enterprises registered in the PRC. Circular 16 reiterates the principle that Renminbi converted from foreign currency-denominated capital of a company may not be directly or indirectly used for purposes beyond its business scope or prohibited by PRC laws or regulations, and such converted Renminbi shall not be provided as loans to its non-affiliated entities. As Circular 16 is newly issued, and SAFE has not provided detailed guidelines with respect to its interpretation or implementations, it is uncertain how these rules will be interpreted and implemented.

In January 2017, SAFE promulgated the Circular on Further Improving Reform of Foreign Exchange Administration and Optimizing Genuineness and Compliance Verification, or Circular 3. Circular 3 sets out various measures to tighten genuineness and compliance verification of cross-border transactions and cross-border capital flow, which include requiring banks to verify board resolutions, tax filing form, and audited financial statements before wiring foreign invested enterprises' foreign exchange distribution above US$50,000, and strengthening genuineness and compliance verification of foreign direct investments.

On October 23, 2019, SAFE promulgated the Notice of the Administration of Foreign Exchange on Further Promoting the Convenience of Cross-Border Trade and Investment, which, among other things, non-investment foreign-invested entities may use foreign exchange capital or Renminbi funds converted from the foreign exchange capital to make domestic equity investments, provided that such investments should comply with relevant PRC laws and regulations.

Our PRC subsidiaries' distributions to their offshore parents are required to comply with the requirements as described above.

*Regulations on Stock Incentive Plans*

Pursuant to the Notice on Issues Concerning the Foreign Exchange Administration for Domestic Individuals Participating in Stock Incentive Plan of Overseas Publicly Listed Company, or Circular 7, issued by SAFE in February 2012, employees, directors, supervisors and other senior management participating in any stock incentive plan of an overseas publicly listed company who are PRC citizens or who are non-PRC citizens residing in China for a continuous period of not less than one year are generally required to register with SAFE through a domestic qualified agent. We and our directors, executive officers and other employees who are PRC citizens or who reside in the PRC for a continuous period of not less than one year and who have been granted options are subject to these regulations as our company is an overseas-listed company. See "Item 3. Key Information—D. Risk Factors—Risks Related to Our Multi-Jurisdictional Operations —Any failure to comply with PRC regulations regarding the registration requirements for employee stock incentive plans may subject the PRC plan participants or us to fines and other legal or administrative sanctions."

In addition, SAT has issued certain circulars concerning employee share options or restricted shares. Under these circulars, the employees working in the PRC who exercise share options or are granted restricted shares will be subject to PRC individual income tax. The PRC subsidiaries of such overseas listed company have obligations to file documents related to employee share options or restricted shares with relevant tax authorities and to withhold individual income taxes of those employees who exercise their share options. If the employees fail to pay or the PRC subsidiaries fail to withhold their income taxes according to relevant laws and regulations, the PRC subsidiaries may face sanctions imposed by the tax authorities or other PRC government authorities.

### Regulations Relating to Overseas Listings and M&A

*The M&A Rules*

On August 8, 2006, six PRC governmental and regulatory agencies, including MOFCOM and the CSRC, jointly promulgated the M&A Rules, which became effective on September 8, 2006 and was subsequently amended on June 22, 2009. The M&A Rules govern merger and acquisition transactions involving foreign investors. In particular, the M&A Rules apply to foreign investors that (i) purchase equity interests in, or subscribe for the increased capital of, a domestic company such that the domestic company becomes a foreign-invested enterprise, (ii) establish a foreign-invested enterprise in the PRC for the purpose of purchasing and operating the assets of a domestic company; or (iii) purchase the assets of a domestic company and transfer such assets to a foreign-invested enterprise for the purpose of operating those assets. The M&A Rules require, among other things, that MOFCOM be notified in advance of any change-of-control transaction in which a foreign investor acquires control of a PRC domestic enterprise and which involves any of the following circumstances: (i) an important industry is concerned, (ii) the transaction involves factors that impact or may impact national economic security, or (iii) the transaction will lead to a change in control of a domestic enterprise which holds a famous trademark or PRC time-honored brand. The M&A Rules also require that, in accordance with the Anti-monopoly Law promulgated by the Standing Committee of the NPC, which became effective in 2008, any merger and acquisitions of domestic enterprises by foreign investors which are deemed concentrations and involve parties with specified turnover thresholds must be cleared by MOFCOM before they can be completed.

The M&A Rules also regulate overseas listings. Pursuant to the M&A Rules, an offshore special purpose vehicle that (i) was formed for listing purposes through the acquisition of PRC domestic companies and (ii) is controlled by PRC persons or entities must obtain the approval of the CSRC before it can list its securities on an overseas stock exchange. Based on the advice of King & Wood Mallesons, our PRC legal counsel, we are of the view that we did not need, and will not need, to obtain the CSRC's approval under the M&A Rules for our previous offshore offerings. However, the interpretation and application of the regulations could change so that we may need to obtain the CSRC's approval with respect to our previous or future offshore offerings.

*The 2021 Negative List*

On December 27, 2021, the NDRC and MOFCOM jointly issued the 2021 Negative List, which became effective on January 1, 2022. Pursuant to the 2021 Negative List, if a PRC company that is engaged in a prohibited business under the 2021 Negative List seeks an overseas offering and listing of securities, it must obtain approval from the competent governmental authorities. In addition, the foreign investors of such PRC company may not be involved in the company's operations and management, and their shareholding percentage is subject to the relevant regulations on domestic securities investments by foreign investors. As the 2021 Negative List is relatively new, there are substantial uncertainties as to the interpretation and implementation of these new requirements, and it is unclear as to whether and to what extent listed companies like us will be subject to these new requirements.

*Regulations on Overseas Listings and Offerings*

The PRC government authorities have recently indicated an intent to exert more oversight and control over securities offerings and other capital markets activities that are or have been conducted overseas and foreign investment in China-based companies. On July 6, 2021, the General Office of the Central Committee of the Communist Party of China and the General Office of the State Council issued the Opinions on Strictly Scrutinizing Illegal Securities Activities in Accordance with the Law. These opinions emphasized the need to, among other things, strengthen the supervision of overseas listings by China-based companies.

On February 17, 2023, the CSRC released a set of regulations, including the Trial Administrative Measures of Overseas Securities Offering and Listing by Domestic Companies and five supporting guidelines, or, collectively, the Filing Measures, which took effect on March 31, 2023. On February 17, 2023, the CSRC released the Filing Measures. The Filing Measures established a filing-based regulatory system for the "indirect overseas offerings and listings" of domestic Chinese companies, which refer to securities offerings and listings made in an overseas market by an offshore entity based on the underlying equity, assets, earnings, or similar rights of a domestic company operating mainly in China. According to the Filing Measures, an offering or listing by an issuer that meets both of the following standards shall be considered an "indirect overseas offering and listing by a domestic Chinese company": (i) 50% or more of the issuer's operating revenue, total profit, total assets or net assets as documented in its audited consolidated financial statements for the most recent accounting year is accounted for by domestic PRC companies; and, and (ii) the issuer conducts its principal business activities in China, or its principal places of business are located in China, or the majority of its senior management in charge of its business operations are PRC citizens or residents. To conduct an indirect overseas initial offering or listing, an issuer must make filings with the CSRC within three working days after the relevant overseas offering application is submitted to the relevant overseas regulator or listing venue. However, listed companies are not required to apply for filing immediately until they are involved in matters that require filings, such as follow-on financings. Additionally, to approve the overseas offering and listing of issuers who have set up variable interest entities (or other contractual arrangements), the CSRC will conduct direct communications with, and consolidate the views of, regulators of the relevant industries in which the variable interest entities operate. Failure to complete the relevant filing procedures in a timely manner could result in sanctions by the CSRC or other regulatory agencies in China, including fines and penalties on operations, restrictions on or the prohibition of dividend payments or remittances by PRC subsidiaries, or delays or restrictions on the repatriation of proceeds from the offering into China. The CSRC or other PRC regulatory authorities may also require the relevant issuer to halt its offerings before the securities being offered thereunder are delivered and settled.

## Regulations in the Other Jurisdictions

Due to our global operations, we are also subject to the rules and regulations of the other jurisdictions in which we operate. For example, the Temu platform operates primarily in the United States, where federal and state laws govern the processing of payments, consumer protection and the privacy of consumer information; other laws define and regulate unfair and deceptive trade practices and marketing activities. The growing focus on data privacy and regulation of ecommerce worldwide could impose additional compliance burdens and costs on us or on merchants, and could subject us to significant liability for any failure to comply. Below are certain areas of U.S. regulations that may materially affect our operations in the United States:

*U.S. State Privacy Legislation*

All states have enacted legislation that addresses certain aspects of data privacy. Much of such legislation focuses on notification to data subjects and regulators in the event of a data breach, but as privacy becomes more of a focus for both regulators and the general public, many states have amended their original data-breach legislation to address a broader scope of personal information and to impose additional requirements on companies in the event of a data breach. This patchwork of legislation and regulations regarding security, privacy and data protection may give rise to conflicts or differing views of personal privacy rights. For example, certain state laws may be more stringent or broader in scope, or offer greater individual rights with respect to personal data than federal or other state laws, and such laws may differ from each other, all of which may complicate compliance efforts.

*Fair Trade Practices*

The FTC monitors and identifies practices that may be unfair or deceptive, including those that compromise privacy and consumer welfare, by examining, among other things, whether consumers are notified regarding the type of consumer data being collected and how such data will be used and stored. The FTC creates policies and brings enforcement actions to halt practices that it deems unfair or deceptive. The FTC has expressed particular interest in the mobile environment and companies that collect sensitive data. Although much of the FTC's focus is on consumer protection, the FTC has conducted numerous discussions on mobile and internet advertising privacy practices and may pursue more rigorous privacy regulation, possibly including regulation of non-identifiable data which could, in combination with other information, become personal data. Such increased regulation may impact our business.

See "Item 3. Key Information— D. Risk Factors—Risks Related to Our Multi-Jurisdictional Operations" for further discussion of risks related to government regulations and other legal obligations related to privacy, data protection, information security, and consumer protection.

**C.  Organizational Structure**

The following diagram illustrates our corporate structure, including our principal subsidiaries and the VIE and its principal subsidiary, as of the date of this annual report:



Note:
_____

(1)   Messrs. Lei Chen and Jianchong Zhu hold 86.6% and 13.4% equity interests in Hangzhou Aimi, respectively. They are employees of our company and have entered into a series of contractual arrangements with Hangzhou Weimi, pursuant to which the Company has control over and is the primary beneficiary of Hangzhou Aimi.

**Contractual Arrangements with the VIE and Its Shareholders**

The following is a summary of the currently effective contractual arrangements by and among our wholly-owned subsidiary, Hangzhou Weimi, the VIE and its shareholders. These contractual arrangements enable us to (i) direct the activities of the VIE and its subsidiaries; (ii) receive substantially all of the economic benefits of the VIE and its subsidiaries; and (iii) have an exclusive option to purchase all or part of the equity interests in and assets of the VIE when and to the extent permitted by PRC law.

83

*Arrangements that enable us to direct the activities of the VIE and its subsidiaries*

*Shareholders' Voting Rights Proxy Agreement*. Pursuant to the amended and restated shareholders' voting rights proxy agreement dated July 15, 2020, by and among Hangzhou Weimi, Hangzhou Aimi and the shareholders of Hangzhou Aimi, each shareholder of Hangzhou Aimi irrevocably authorized Hangzhou Weimi or any person(s) designated by Hangzhou Weimi to exercise such shareholder's rights in Hangzhou Aimi, including without limitation, the power to participate in and vote at shareholder's meetings, the power to nominate and appoint the directors, senior management, the power to sell or transfer such shareholder's equity interest in Hangzhou Aimi, the power to propose to convene an extraordinary shareholders meeting, and other shareholders' voting rights permitted by the Articles of Association of Hangzhou Aimi. The shareholders' voting rights proxy agreement remains irrevocable and continuously valid from the date of execution so long as each shareholder remains as a shareholder of Hangzhou Aimi.

*Equity Pledge Agreement*. Pursuant to the amended and restated equity pledge agreement dated July 15, 2020, by and among Hangzhou Weimi, Hangzhou Aimi and the shareholders of Hangzhou Aimi, the shareholders of Hangzhou Aimi pledged all of their equity interests in Hangzhou Aimi to Hangzhou Weimi to guarantee their and Hangzhou Aimi's obligations under the contractual arrangements including the exclusive consulting and services agreement, the exclusive option agreement and the shareholders' voting rights proxy agreement and this equity pledge agreement, as well as any loss incurred due to events of default defined therein and all expenses incurred by Hangzhou Weimi in enforcing such obligations of Hangzhou Aimi or its shareholders. In the event of default defined therein, upon written notice to the shareholders of Hangzhou Aimi, Hangzhou Weimi, as pledgee, will have the right to dispose of the pledged equity interests in Hangzhou Aimi and priority in receiving the proceeds from such disposition. The shareholders of Hangzhou Aimi agree that, without Hangzhou Weimi's prior written approval, during the term of the equity pledge agreement, they will not dispose of the pledged equity interests or create or allow any other encumbrance on the pledged equity interests. We have completed the registration of the equity pledges with the relevant office of the SAIC in accordance with the PRC Property Rights Law.

*Spousal Consent Letter*. Pursuant to each spousal consent letter, the spouse of the signing shareholder of the VIE unconditionally and irrevocably agreed that the equity interest in Hangzhou Aimi held by such shareholder and registered in his name will be disposed of pursuant to the equity interest pledge agreement, the exclusive option agreement and the shareholders' voting rights proxy agreement. The spouse of the signing shareholder of the VIE agreed not to assert any rights over the equity interest in Hangzhou Aimi held by the signing shareholder. In addition, in the event that the spouse of the signing shareholder of the VIE obtains any equity interest in Hangzhou Aimi held by the signing shareholder for any reason, the spouse agreed to be bound by the contractual arrangements.

*Agreements that allow us to receive economic benefits from the VIE*

*Exclusive Consulting and Services Agreement*. Under the exclusive consulting and services agreement between Hangzhou Weimi and Hangzhou Aimi, dated June 5, 2015, Hangzhou Weimi has the exclusive right to provide to Hangzhou Aimi consulting and services related to, among other things, design and development, operation maintenance, product consulting, and management and marketing consulting. Hangzhou Weimi has the exclusive ownership of intellectual property rights created as a result of the performance of this agreement. Hangzhou Aimi agrees to pay Hangzhou Weimi service fee at an amount as determined by Hangzhou Weimi. This agreement will remain effective for a ten-year term and then be automatically renewed, unless Hangzhou Weimi gives Hangzhou Aimi a termination notice 90 days before the term ends.

*Agreements that provide us with the option to purchase the equity interests in the VIE*

*Exclusive Option Agreement*. Pursuant to the amended and restated exclusive option agreement dated July 15, 2020, by and among Hangzhou Weimi, Hangzhou Aimi and each of the shareholders of Hangzhou Aimi, each of the shareholders of Hangzhou Aimi irrevocably granted Hangzhou Weimi an exclusive call option to purchase, or have its designated person(s) to purchase, at its discretion, all or part of their equity interests in Hangzhou Aimi, and the purchase price shall be the lowest price permitted by applicable PRC law. In addition, Hangzhou Aimi has granted Hangzhou Weimi an exclusive call option to purchase, or have its designated person(s) to purchase, at its discretion, to the extent permitted under PRC law, all or part of Hangzhou Aimi's assets at the book value of such assets, or at the lowest price permitted by applicable PRC law, whichever is higher. Each of the shareholders of Hangzhou Aimi undertakes that, without the prior written consent of Hangzhou Weimi or us, they may not increase or decrease the registered capital, dispose of its assets, incur any debts or guarantee liabilities, enter into any material purchase agreements, enter into any merger, acquisition or investments, amend its articles of association or provide any loans to third parties. Unless terminated by Hangzhou Weimi at its sole discretion, the exclusive option agreement will remain effective until all equity interests in Hangzhou Aimi held by the shareholders of Hangzhou Aimi and all assets of Hangzhou Aimi are transferred or assigned to Hangzhou Weimi or its designated representatives.

84

In the opinion of King & Wood Mallesons, our PRC legal counsel, (i) the structures of Hangzhou Weimi and Hangzhou Aimi are not in any violation of PRC laws or regulations currently in effect; and (ii) the contractual arrangements among Hangzhou Weimi and Hangzhou Aimi and its shareholders governed by PRC law are legal, valid, binding and enforceable in accordance with its terms and applicable PRC laws, and do not and will not result in any violation of PRC laws or regulations currently in effect. However, as of the date of this annual report, the legality and enforceability of our contractual arrangements, as a whole, have not been tested in any PRC court, and we cannot guarantee you that the contractual arrangements, as a whole, would ultimately be legal or enforceable if they were to be tested in a PRC court.

However, we have been further advised by King & Wood Mallesons, our PRC legal counsel, that there are substantial uncertainties regarding the interpretation and application of current and future PRC laws and regulations. If the PRC government finds that the arrangements that establish the structure for operating our e-commerce business do not comply with PRC government restrictions on foreign investment in our businesses, we could be subject to severe penalties including being prohibited from continuing operations. See "Item 3. Key Information—D. Risk Factors—Risks Related to Our Corporate Structure—If the PRC government finds that the arrangements that establish the structure for operating some of our operations in China do not comply with PRC regulations relating to the relevant industries, or if these regulations or the interpretation of existing regulations change in the future, we could be subject to severe penalties or be forced to relinquish our interests in those operations."

## D.  Property, Plant and Equipment

Our principal executive offices are located in Dublin, Ireland. We also maintain offices in North America, Asia and Europe. As of December 31, 2022, our main office facilities worldwide had an aggregate gross floor area of approximately 80,654 square meters. We lease all of the office premises that we currently occupy, and we plan to renew our leases from time to time as needed.

Our servers are hosted in internet data centers in different geographic regions and countries around the world, including Europe, the U.S. and China. We typically enter into leasing and hosting service agreements with internet data center providers that are renewed periodically. We believe that our existing facilities are sufficient for our current needs, and we will obtain additional facilities, principally through leasing, to accommodate our future expansion plans.

## Item 4A.  Unresolved Staff Comments

None.

## Item 5.  Operating and Financial Review and Prospects

You should read the following discussion and analysis of our financial condition and results of operations in conjunction with our audited consolidated financial statements and the related notes included elsewhere in this annual report. This discussion may contain forward-looking statements based upon current expectations that involve risks and uncertainties. Our actual results may differ materially from those anticipated in these forward-looking statements as a result of various factors, including those set forth under "Item 3. Key Information—D. Risk Factors" or in other parts of this annual report on Form 20-F.

## A.  Operating Results

**Key Factors Affecting Our Results of Operations**

Our results of operations and financial condition are affected by the general factors affecting the retail industry in the markets in which we operate, including the level of overall economic growth, increase in per capita disposable income and growth in consumer spending in those markets. In addition, they are also affected by factors driving online retail in the markets in which we operate, such as the growing popularity of online shopping, improvements in logistics infrastructure and the increasing adoption of online payment methods. Unfavorable changes in any of these general factors could materially and adversely affect our results of operations.

While our business is influenced by general factors affecting our industry, our results of operations are more directly affected by certain company specific factors, including:

***Our ability to further enhance buyer and merchant engagement on our platforms***

Our key ecosystem partners are the buyers and merchants who transact on our platforms. Our ability to further improve the activities of buyers and merchants on our platforms is a key driver of our growth.

85

We benefit from a virtuous cycle as we seek to enhance our buyer and merchant engagement. Increasing the engagement of buyers makes our platforms more attractive to merchants, who are drawn to our platforms' large buyer base and diverse sales opportunities. At the same time, expanding our merchant base enables our platforms to offer more competitive prices and a wider range of product categories, which in turn helps us attract and retain buyers, generating a virtuous cycle.

Our ability to improve buyer activities depends on our ability to continue to provide a wide selection of merchandise at attractive prices, as well as fun and interactive shopping experiences on our platforms. We also plan to further leverage social networks and word-of-mouth viral marketing, and conduct online and offline marketing and brand promotion activities to attract new buyers and increase buyer activities. In addition, we plan to continue to encourage buyers to place more orders with us through a variety of means, including granting coupons and holding special promotional events.

Merchants are attracted to our platforms by our buyer base, plentiful sales opportunities, and the value-added services that we provide, such as targeted online marketing. Our ability to provide popular products on our platforms at attractive prices also depends on our ability to maintain mutually beneficial relationships with our merchants. For example, we rely on our merchants to make available sufficient inventory and fulfill large volumes of orders in an efficient and timely manner to ensure a good user experience.

***Our ability to provide valuable online marketplace services and broaden service offerings***

We currently generate revenues primarily from online marketplace services that we provide to merchants through our platforms. We believe that increasing the value and variety of our online marketplace services and the consequent return on investment to merchants from utilizing these services will increase demand for our services. We aim to enhance the value of our online marketplace services through such means as broadening our service offerings, increasing the size and engagement of our buyer base, improving recommendation features, developing innovative marketing services, and improving the measurement tools available to merchants. For example, in August 2020, as a natural extension of the Pinduoduo platform, we started Duo Duo Grocery, a next-day grocery pick-up service that allows users to order groceries and related products online and collect goods the next day at nearby designated pickup points.

***Our ability to manage our costs and expenses by leveraging our scale of business***

Our results of operations depend on our ability to manage our costs and expenses. We expect our costs and expenses to continue to increase as we grow our business and attract and retain buyers and merchants for our businesses. Our costs of revenues consist primarily of payment processing fees paid to third party online payment platforms, costs associated with the operation of our platforms and others, such as costs and expenses attributable to merchandise sales, fulfillment fees, merchant support services, bandwidth and server costs, amortizations, depreciation and maintenance costs, payroll, employee benefits and share-based compensation expenses, call center, surcharges and other expenses directly attributable to the online marketplace services. In addition, we have invested significantly in marketing activities to promote our brand and our products and services. Our sales and marketing expenses increased from RMB41,194.6 million in 2020 to RMB44,801.7 million in 2021 and further to RMB54,343.7 million (US$7,879.1 million) in 2022, while sales and marketing expenses as a percentage of our revenues decreased from 69.2% in 2020 to 47.7% in 2021, and further decreased to 41.6% in 2022.

We believe our marketplace model has significant operating leverage and enables us to realize structural cost savings. We achieve economies of scale in our operation as a wider selection of merchandise attracts and retains a larger number of buyers, which in turn drives an increase in our scale and attracts more merchants to our platforms. In addition, our scale creates value for our merchants by providing an effective channel for selling large volumes of products. We believe this value proposition will make our platforms more attractive to merchants and further increase their sales and spending on our platforms. This business model also enables us to avoid the costs, risks and capital requirements associated with sourcing merchandise or holding inventory.

**Impact of COVID-19 on Our Operations and Financial Performance**

The Pinduoduo platform is based primarily in China. From early 2020 to the end of 2022, in response to the intensifying efforts to contain the spread of COVID-19, the Chinese government took a number of actions, including quarantine and social distancing measures, among other things. COVID-19 also resulted in the temporary closure of corporate offices, retail stores, manufacturing facilities and factories across China, and put significant strain on merchandise shipping and delivery. At the end of 2022, China began to modify its zero-COVID policy, and most of the travel restrictions and quarantine requirements were lifted in December 2022. From late December 2022 to early 2023, certain parts of China experienced a heightened number of COVID-19 cases, which resulted in temporary disruptions to business and other activities. The extent to which the pandemic impacts our results of operations going forward will depend on future developments which are highly uncertain and unpredictable, and therefore cannot reasonably be estimated at this time.

As of December 31, 2022, we had RMB34,326.2 million (US$4,976.8 million) in cash and cash equivalents and RMB115,112.6 million (US$16,689.8 million) in short-term investments. Our short-term investments mainly include time deposits and wealth management products in financial institutions, which are highly liquid. We believe this level of liquidity is sufficient to successfully navigate an extended period of uncertainty. See also "Item 3. Key Information—D. Risk Factors—Risks Related to Our Business and Industry—We face risks related to natural disasters, health epidemics and other outbreaks, most notably those related to the outbreak of COVID-19, which could significantly disrupt our operations."

**Key Line Items and Specific Factors Affecting Our Results of Operations**

*Revenues*

Under our current business model, we generate revenues primarily from online marketing services. We also generate revenues from transaction services and merchandise sales. The following table sets forth the components of our revenues by amounts and percentages of our total revenues for the periods presented:

| | For the Year Ended December 31, | | | | | | |
| | 2020 | | 2021 | | 2022 | | |
| | RMB | % | RMB | % | RMB | US$ | % |
| | (in thousands, except for percentages) | | | | | | |
| **Revenues**: | | | | | | | |
| Online marketing services and others | 47,953,779 | 80.6 | 72,563,402 | 77.2 | 102,721,924 | 14,893,279 | 78.7 |
| Transaction services | 5,787,415 | 9.7 | 14,140,449 | 15.1 | 27,626,494 | 4,005,465 | 21.2 |
| Merchandise sales | 5,750,671 | 9.7 | 7,246,088 | 7.7 | 209,171 | 30,327 | 0.1 |
| **Total revenues** | **59,491,865** | **100.0** | **93,949,939** | **100.0** | **130,557,589** | **18,929,071** | **100.0** |

*Online marketing services and others*. We provide merchants with performance-based marketing services that match product listings appearing in search or browser results on our online marketplace. The placement and the price for such placement are determined through an online bidding system. Revenues from online marketing services and others depend on spontaneous decisions made by the millions of merchants on our platforms based on different marketing opportunities.

*Transaction services*. We charge merchants fees for transaction-related services that we provide to merchants on our platform. To better serve our merchants, we are focused on introducing them to more of our value-added services based on their transaction needs. In addition, as part of our continued efforts to improve user experience, we reward merchants who sell high-quality products and provide superb services with preferential fee rates. Fee rates are not necessarily fixed and may vary based on a number of factors, including the category of the goods sold, the sellers' transaction performance, and the attribution of the consumption scenarios, among others.

*Merchandise sales.* We generated a small portion of revenues from direct sales, whereby we acquired products from suppliers and sold them directly to the customers. We have scaled down this aspect of our business.

*Costs of revenues*

The following table sets forth the components of our costs of revenues by amounts and percentages of costs of revenues for the periods presented:

| | For the Year Ended December 31, | | | | | | |
| | 2020 | | 2021 | | 2022 | | |
| | RMB | % | RMB | % | RMB | US$ | % |
| | (in thousands, except for percentages) | | | | | | |
| **Costs of revenues:** | | | | | | | |
| Payment processing fees | (1,545,564) | 8.0 | (3,108,086) | 9.8 | (3,450,929) | (500,338) | 11.0 |
| Costs associated with the operation of our platform and others | (17,733,077) | 92.0 | (28,610,007) | 90.2 | (28,011,369) | (4,061,266) | 89.0 |
| **Total costs of revenues** | **(19,278,641)** | **100.0** | **(31,718,093)** | **100.0** | **(31,462,298)** | **(4,561,604)** | **100.0** |

87

Costs of revenues consist primarily of payment processing fees paid to third party online payment platforms, costs associated with the operation of our platforms and others, such as costs and expenses attributable to merchandise sales, fulfillment fees, merchant support services, bandwidth and server costs, amortization, depreciation and maintenance costs, payroll, employee benefits and share-based compensation expenses, call center, surcharges and other expenses directly attributable to the online marketplace services.

*Operating expenses*

| | For the Year Ended December 31, | | | | | | |
|---|---|---|---|---|---|---|---|
| | 2020 | | 2021 | | 2022 | | |
| | RMB | % | RMB | % | RMB | US$ | % |
| | (in thousands, except for percentages) | | | | | | |
| **Operating expenses:** | | | | | | | |
| Sales and marketing expenses | (41,194,599) | 83.1 | (44,801,720) | 80.9 | (54,343,719) | (7,879,099) | 79.1 |
| General and administrative expenses | (1,507,297) | 3.0 | (1,540,774) | 2.8 | (3,964,935) | (574,862) | 5.8 |
| Research and development expenses | (6,891,653) | 13.9 | (8,992,590) | 16.3 | (10,384,716) | (1,505,642) | 15.1 |
| **Total operating expenses** | **(49,593,549)** | **100.0** | **(55,335,084)** | **100.0** | **(68,693,370)** | **(9,959,603)** | **100.0** |

*Sales and marketing expenses*. Sales and marketing expenses consist primarily of online and offline advertising, promotion and coupon expenses, as well as payroll, employee benefits, share-based compensation expenses and other related expenses associated with sales and marketing. We expect to continue our sales and marketing spending in the foreseeable future as we seek to increase our brand awareness, enhance user engagement and build scale.

*General and administrative expenses*. General and administrative expenses consist primarily of payroll, employee benefits, share-based compensation expenses and other related expenses. We expect to continue our general and administrative spending in the foreseeable future due to the anticipated growth of our business as well as accounting, insurance, investor relations and other public company costs.

*Research and development expenses*. Research and development expenses consist primarily of payroll, employee benefits, share-based compensation expenses, R&D-related cloud services and other related expenses associated with research and platform development. We expect our research and development expenses to increase as we expand our research and development team to enhance our artificial intelligence technology and big data analytics capabilities and develop new features and functionalities on our platforms.

**Taxation**

*Cayman Islands*

The Cayman Islands currently levies no taxes on individuals or corporations based upon profits, income, gains or appreciation and there is no taxation in the nature of inheritance tax or estate duty.

There are no other taxes likely to be material to us levied by the government of the Cayman Islands except for stamp duties which may be applicable on instruments executed in, or brought within the jurisdiction of the Cayman Islands. There are no exchange control regulations or currency restrictions in the Cayman Islands.

Payments of dividends and capital in respect of the shares will not be subject to taxation in the Cayman Islands and no withholding will be required on the payment of a dividend or capital to any holder of the shares, nor will gains derived from the disposal of the shares be subject to Cayman Islands income or corporation tax.

*Hong Kong*

Walnut HK is incorporated in Hong Kong and is subject to Hong Kong profits tax of 16.5% on its activities conducted in Hong Kong and may be exempted from income tax on its foreign-derived income. There are no withholding taxes in Hong Kong for distribution of dividends by a company incorporated in Hong Kong.

*PRC*

Generally, our PRC subsidiaries, the VIE and subsidiaries of the VIE are subject to enterprise income tax on their taxable income in China at a statutory rate of 25%. The enterprise income tax is calculated based on the entity's global income as determined under PRC tax laws and accounting standards. Each of Shanghai Xunmeng and Walnut Shanghai was recognized as a "high and new technology enterprise" and is eligible for a preferential corporate income tax rate of 15% until 2023. Xinzhijiang is also eligible for a preferential corporate income tax rate of 15% until 2025.

We are subject to value-added tax at a rate of (i) 16% (before April 1, 2019) or 13% (on or after April 1, 2019) on the sale of goods and (ii) 6% on the sale of services (including value-added telecommunication services), in each case less any deductible value-added tax we have already paid or borne in connection with such sale of goods or services. We are also subject to surcharges on value-added tax payments in accordance with PRC law.

Dividends paid by our wholly foreign-owned subsidiaries in China to our intermediary holding company in Hong Kong will be subject to a withholding tax rate of 10%, unless the relevant Hong Kong entity satisfies all the requirements under the Arrangement between China and the Hong Kong Special Administrative Region on the Avoidance of Double Taxation and Prevention of Fiscal Evasion with respect to Taxes on Income and Capital, in which case the tax rate would become 5%. See "Item 3. Key Information—D. Risk Factors—Risks Related to Our Multi-jurisdictional Operations—We may rely on dividends and other distributions on equity paid by our PRC subsidiaries to fund any cash and financing requirements we may have, and any limitation on the ability of our PRC subsidiaries to make payments to us could have a material and adverse effect on our ability to conduct our business."

If our holding company in the Cayman Islands or any of our subsidiaries outside of China were deemed to be a "resident enterprise" under the PRC Enterprise Income Tax Law, it would be subject to enterprise income tax on its worldwide income at a rate of 25%. See "Item 3. Key Information—D. Risk Factors—Risks Related to Our Multi-jurisdictional Operations—If we are classified as a PRC resident enterprise for PRC income tax purposes, such classification could result in unfavorable tax consequences to us and our non-PRC shareholders or ADS holders."

**Results of Operations**

The following table sets forth a summary of our consolidated results of operations for the periods presented, both in absolute amount and as a percentage of our revenues for the periods presented. This information should be read together with our audited consolidated financial statements and related notes included elsewhere in this annual report. The results of operations in any period are not necessarily indicative of our future trends.

We adopted Accounting Standards Update ("ASU") No. 2016-13, *Financial Instruments-Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments* ("ASU 2016-13") on January 1, 2020, which requires the measurement and recognition of expected credit losses for financial assets held at amortized cost. ASU 2016-13 replaces the incurred loss methodology with a forward-looking current expected credit losses. We adopted ASU No. 2020-06, *Accounting for Convertible Instruments and Contracts in an Entity's Own Equity* ("ASU 2020-06") on January 1, 2022, which simplified the accounting for convertible instruments by removing the separation models for convertible debt with cash conversion features and convertible instruments with a beneficial conversion feature.

| | For the Year Ended December 31, | | | | | | |
|---|---|---|---|---|---|---|---|
| | 2020 | | 2021 | | 2022 | | |
| | RMB | % | RMB | % | RMB | US$ | % |
| | | | (in thousands, except for percentages) | | | | |
| **Revenues** | | | | | | | |
| Online marketing services and others | 47,953,779 | 80.6 | 72,563,402 | 77.2 | 102,721,924 | 14,893,279 | 78.7 |
| Transaction services | 5,787,415 | 9.7 | 14,140,449 | 15.1 | 27,626,494 | 4,005,465 | 21.2 |
| Merchandise sales | 5,750,671 | 9.7 | 7,246,088 | 7.7 | 209,171 | 30,327 | 0.1 |
| **Total revenues** | **59,491,865** | **100.0** | **93,949,939** | **100.0** | **130,557,589** | **18,929,071** | **100.0** |
| Costs of revenues[(1)] | (19,278,641) | (32.4) | (31,718,093) | (33.8) | (31,462,298) | (4,561,604) | (24.1) |
| **Gross profit** | **40,213,224** | **67.6** | **62,231,846** | **66.2** | **99,095,291** | **14,367,467** | **75.9** |
| **Operating expenses** | | | | | | | |
| Sales and marketing expenses[(1)] | (41,194,599) | (69.2) | (44,801,720) | (47.7) | (54,343,719) | (7,879,099) | (41.6) |
| General and administrative expenses[(1)] | (1,507,297) | (2.5) | (1,540,774) | (1.6) | (3,964,935) | (574,862) | (3.0) |
| Research and development expenses[(1)] | (6,891,653) | (11.6) | (8,992,590) | (9.6) | (10,384,716) | (1,505,642) | (8.0) |
| **Total operating expenses** | **(49,593,549)** | **(83.4)** | **(55,335,084)** | **(58.9)** | **(68,693,370)** | **(9,959,603)** | **(52.6)** |
| **Operating (loss)/profit** | **(9,380,325)** | **(15.8)** | **6,896,762** | **7.3** | **30,401,921** | **4,407,864** | **23.3** |
| **Other income** | | | | | | | |
| Interest and investment gain, net | 2,455,366 | 4.1 | 3,061,662 | 3.3 | 3,997,100 | 579,525 | 3.1 |
| Interest expenses | (757,336) | (1.3) | (1,231,002) | (1.3) | (51,655) | (7,489) | (0.0) |
| Foreign exchange gain/(loss) | 225,197 | 0.4 | 71,750 | 0.1 | (149,710) | (21,706) | (0.1) |
| Other income, net | 193,702 | 0.3 | 656,255 | 0.7 | 2,221,358 | 322,066 | 1.7 |
| **(Loss)/profit before income tax and share of results of equity investees** | **(7,263,396)** | **(12.2)** | **9,455,427** | **10.1** | **36,419,014** | **5,280,260** | **27.9** |
| Income tax expenses | — | — | (1,933,585) | (2.1) | (4,725,667) | (685,157) | (3.6) |
| Share of results of equity investees | 83,654 | 0.1 | 246,828 | 0.3 | (155,285) | (22,514) | (0.1) |
| **Net (loss)/income** | **(7,179,742)** | **(12.1)** | **7,768,670** | **8.3** | **31,538,062** | **4,572,589** | **24.2** |

Note:
(1)  Share-based compensation expenses were allocated as follows:

| | For the Year Ended December 31, | | | |
|---|---|---|---|---|
| | 2020 | 2021 | 2022 | |
| | RMB | RMB | RMB | US$ |
| | | (in thousands) | | |
| Costs of revenues | 32,291 | 26,624 | 33,788 | 4,899 |
| Sales and marketing expenses | 1,093,547 | 1,612,219 | 2,158,676 | 312,979 |
| General and administrative expenses | 966,985 | 792,421 | 3,004,327 | 435,586 |
| Research and development expenses | 1,520,220 | 2,343,466 | 2,521,574 | 365,594 |
| **Total** | **3,613,043** | **4,774,730** | **7,718,365** | **1,119,058** |

**Year ended December 31, 2022 compared to year ended December 31, 2021**

*Revenues*

Our revenues, which consist of revenues from online marketing services and others, transaction services and merchandise sales, increased by 39.0% from RMB93,949.9 million in 2021 to RMB130,557.6 million (US$18,929.1 million) in 2022.

Revenues from online marketing services and others increased from RMB72,563.4 million in 2021 to RMB102,721.9 million (US$14,893.3 million) in 2022, primarily attributable to interrelated factors, including our stronger brand and market position as a result of our branding campaigns, more active merchants offering a greater breadth of products and our continued focus on offering a wide selection of merchandise at attractive prices, as well as fun and interactive shopping experiences for consumers, which contributed to an increase in user engagement and activities.

Revenues from transaction services increased from RMB14,140.4 million in 2021 to RMB27,626.5 million (US$4,005.5 million), primarily due to the increase in the number of active merchants on our platforms and the increase in average transaction services revenues per active merchant. The number of our active merchants increased from 11.5 million in 2021 to 13.0 million in 2022. Average transaction services revenues per active merchant increased from RMB1,230 in 2021 to RMB2,125 in 2022, as a result of the growth of our merchants' businesses and the increase in merchant demand for more value-added services driven by the increased diversity of transactions under different consumption scenarios and product categories on our platforms.

Revenues from merchandise sales decreased from RMB7,246.1 million in 2021 to RMB209.2 million (US$30.3 million), as we scaled down this aspect of our business.

*Costs of revenues*

Our costs of revenues amounted to RMB31,462.3 million (US$4,561.6 million) in 2022, which remained relatively stable compared to our costs of revenues of RMB31,718.1 million in 2021.

*Gross profit*

As a result of the foregoing, our gross profit increased to RMB99,095.3 million (US$14,367.5 million) in 2022 from RMB62,231.8 million in 2021. The improvement was primarily attributable to the continued growth in revenues.

*Operating expenses*

Our total operating expenses increased by 24.1% from RMB55,335.1 million in 2021 to RMB68,693.4 million (US$9,959.6 million) primarily due to the increases in sales and marketing expenses and general and administrative expenses.

*Sales and marketing expenses*. Our sales and marketing expenses increased from RMB44,801.7 million in 2021 to RMB54,343.7 million (US$7,879.1 million), primarily attributable to the increase of RMB8,514.6 million in advertising expenses and promotion and coupon expenses, which was focused on building our brand awareness and driving user growth and engagement on our platforms.

*General and administrative expenses*. Our general and administrative expenses increased from RMB1,540.8 million in 2021 to RMB3,964.9 million (US$574.9 million) in 2022. The increase was primarily attributable to the increase in staff related costs.

*Research and development expenses*. Our research and development expenses increased from RMB8,992.6 million in 2021 to RMB10,384.7 million (US$1,505.6 million) in 2022, primarily due to the increase of RMB1,064.4 million in staff related costs. The increase in staff costs was primarily attributable to the increase in headcount for our research and development personnel, as we hired additional experienced research and development personnel.

*Operating profit*

As a result of the foregoing, we recorded operating profit of RMB30,401.9 million (US$4,407.9 million) in 2022, compared to operating profit of RMB6,896.8 million in 2021.

*Other income/(expenses)*

*Interest and investment income, net*. Net interest and investment income mainly represents interest earned on demand deposits, time deposits and wealth management products in financial institutions. We had net interest and investment income of RMB3,061.7 million and RMB3,997.1 million (US$579.5 million) in 2021 and 2022, respectively. The increase was primarily attributable to the increase of our time deposits and wealth management products.

*Interest expense*. We had interest expense of RMB51.7 million (US$7.5 million) in 2022, compared to interest expense of RMB1,231.0 million in 2021, primarily due to the decrease of RMB1,170.2 million in interest expenses related to the convertible bonds' amortization to face value.

*Other income, net*. We had other net income of RMB2,221.4 million (US$322.1 million) in 2022, compared to other net income of RMB656.3 million in 2021, primarily due to the increase in the amount of subsidies received, such as tax refunds and other non-operating income items.

*Income tax expense*

We had income tax expense of RMB4,725.7 million (US$685.2 million) in 2022, compared to RMB1,933.6 million in 2021, primarily due to the increased profit before income tax expense.

*Share of results of equity investees*

We had share of losses of equity investees of RMB155.3 million (US$22.5 million) in 2022, compared to share of profits of RMB246.8 million in 2021.

*Net income*

As a result of the foregoing, we had net income of RMB31,538.1 million (US$4,572.6 million) in 2022, compared to RMB7,768.7 million in 2021.

**Year ended December 31, 2021 compared to year ended December 31, 2020**

*Revenues*

Our revenues, which consist of revenues from online marketing services and others, transaction services and merchandise sales, increased by 57.9% from RMB59,491.9 million in 2020 to RMB93,949.9 million in 2021. Revenues from online marketing services and others increased from RMB47,953.8 million in 2020 to RMB72,563.4 million in 2021, primarily attributable to our stronger brand and market position as a result of our branding campaigns, more active merchants offering greater breadth of products and the increase in the number of our buyers and annual spending per buyer. Revenues from transaction services increased from RMB5,787.4 million in 2020 to RMB14,140.4 million in 2021, primarily due to the increase in gross merchandise value. Revenues from merchandise sales increased from RMB5,750.7 million in 2020 to RMB7,246.1 million in 2021.

*Costs of revenues*

Our costs of revenues increased by 64.5% from RMB19,278.6 million in 2020 to RMB31,718.1 million in 2021, primarily due to the increase in payment processing fees and costs directly attributable to the operation of the Pinduoduo platform and others. The increase in payment processing fees from RMB1,545.6 million in 2020 to RMB3,108.1 million in 2021 was primarily due to the growth of our gross merchandise value. The increase in costs directly attributable to the operation of the Pinduoduo platform and others from RMB17,733.1 million in 2020 to RMB28,610.0 million in 2021 was primarily due to the increase of RMB8,920.3 million in fulfillment fees and merchant support services and the increase of RMB761.6 million in cost and expenses attributable to merchandise sales.

*Gross profit*

As a result of the foregoing, our gross profit increased to RMB62,231.8 million in 2021, from RMB40,213.2 million in 2020. The improvement was primarily attributable to the continued growth in revenues.

*Operating expenses*

Our total operating expenses increased by 11.6% from RMB49,593.5 million in 2020 to RMB55,335.1 million in 2021 primarily due to the increase in sales and marketing expenses and research and development expenses.

*Sales and marketing expenses*. Our sales and marketing expenses increased from RMB41,194.6 million in 2020 to RMB44,801.7 million in 2021, primarily attributable to the increase of RMB2,158.9 million in advertising expenses and promotion and coupon expenses and the increase of RMB1,376.9 million in staff related costs. The increase in advertising expenses and promotion and coupon expenses was focused on building our brand awareness and driving user growth and engagement.

*General and administrative expenses*. Our general and administrative expenses increased slightly from RMB1,507.3 million in 2020 to RMB1,540.8 million in 2021.

*Research and development expenses*. Our research and development expenses increased substantially from RMB6,891.7 million in 2020 to RMB8,992.6 million in 2021, primarily due to the increase of RMB2,556.9 million in staff related costs. The increase in staff costs was primarily attributable to the increase in headcount for our research and development personnel, as we hired additional experienced research and development personnel.

Table of Contents

*Operating profit/(loss)*

As a result of the foregoing, we recorded operating profit of RMB6,896.8 million in 2021, compared to operating loss of RMB9,380.3 million in 2020.

*Other income/(expenses)*

Interest and investment income, net. Net interest and investment income mainly represents interest earned on demand deposits, time deposits and wealth management products in financial institutions. We had net interest and investment income of RMB2,455.4 million and RMB3,061.7 million in 2020 and 2021, respectively. The increase was primarily attributable to the increase of our time deposits and wealth management products.

Interest expense. We had interest expense of RMB1,231.0 million in 2021, compared to interest expense of RMB757.3 million in 2020, primarily due to the increase of RMB526.0 million in interest expenses related to the convertible bonds' amortization to face value.

Other income, net. We had other net income of RMB656.3 million in 2021, compared to other net income of RMB193.7 million in 2020, primarily due to the increase in the amount of subsidies received, such as tax refunds, disposal gains and other non-operating income items.

*Income tax expense*

We had income tax expense of RMB1,933.6 million and nil in 2021 and 2020, respectively.

*Share of results of equity investees*

We had share of results of equity investees of RMB246.8 million in 2021, compared to RMB83.7 million in 2020.

*Net income/(loss)*

As a result of the foregoing, we had net income of RMB7,768.7 million in 2021, compared to net loss of RMB7,179.7 million in 2020.

**Critical Accounting Policies**

An accounting policy is considered critical if it requires an accounting estimate to be made based on assumptions about matters that are highly uncertain at the time such estimate is made, and if different accounting estimates that reasonably could have been used, or changes in the accounting estimates that are reasonably likely to occur periodically, could materially impact the consolidated financial statements.

We prepare our financial statements in conformity with U.S. GAAP, which requires us to make judgments, estimates and assumptions. We continually evaluate these estimates and assumptions based on the most recently available information, our own historical experiences and various other assumptions that we believe to be reasonable under the circumstances. Since the use of estimates is an integral component of the financial reporting process, actual results could differ from our expectations as a result of changes in our estimates. Some of our accounting policies require a higher degree of judgment than others in their application and require us to make significant accounting estimates.

The following descriptions of critical accounting policies, judgments and estimates should be read in conjunction with our consolidated financial statements and accompanying notes and other disclosures included in this annual report. When reviewing our financial statements, you should consider (i) our selection of critical accounting policies, (ii) the judgments and other uncertainties affecting the application of such policies, and (iii) the sensitivity of reported results to changes in conditions and assumptions.

*Revenue recognition*

Revenues are principally comprised of those generated from online marketplace services and merchandise sales. Revenues from online marketplace services primarily consist of online marketing services revenues and transaction services fees. Revenues represent the amount of consideration that we are entitled to in exchange for the transfer of promised goods or services in the ordinary course of our activities and are recorded net of value-added tax ("VAT"). Consistent with the criteria of ASC Topic 606 ("ASC 606"), Revenue from Contracts with Customers, we recognize revenue when the performance obligation in a contract is satisfied by transferring the control of a promised good or service to a customer. We also evaluate whether it is appropriate to record the gross amounts of goods and services sold and the related costs, or the net amounts earned as commissions. Payments for services or goods are generally received before deliveries.

Online marketing services

We entered into contractual agreements with certain merchants to provide online marketing services on our online marketplace for which we receive service fees from merchants. We provide merchants with performance-based marketing services that match product listings appearing in search or browser results on our online marketplace. Merchants prepay for online marketing services that are primarily charged on a cost-per-click basis. Under ASC 606, the related revenues are recognized at a point of time when consumers click the merchants' product listings and the online marketing services are completed by us for the merchants. The positioning of such listings and the price for such positioning are determined through an online auction system, which facilitates price discovery through a market-based mechanism.

We also provide display marketing services that allow the merchants to place advertisements on the platform primarily at fixed prices. In general, the merchants need to prepay for display marketing which is accounted for as customer advances and deferred revenues and revenues are primarily recognized over the period during which the advertising services are provided.

Transaction services

We charge fees expected to receive from transaction services to merchants for sales transactions completed on our platforms, where we do not take control of the products provided by merchants at any point in time during the transactions and do not have latitude over pricing of the merchandise. Revenues related to transaction services are recognized in consolidated statements of comprehensive income/(loss) at a point in time when our service obligations to the merchants are determined to have been completed under each sales transaction upon the confirmation of the receipts of goods by the consumers.

Merchandise sales

In certain cases, we acquire merchandise from suppliers and sell directly to the customers. We act as a principal as we obtain control of the merchandise, are primarily obligated for the merchandise sold to the customers, bear inventory risks and have latitude in establishing prices. Revenues from merchandise sales are recorded on a gross basis, net of discounts and return allowances when the product is delivered and title is passed to customers in this type of transaction. Proceeds received in advance of customer acceptance are recorded as current liabilities in customer advances and deferred revenues.

Incentives provided to the consumers

In order to promote our online marketplace and attract more registered consumers, we at our own discretion provide various forms of incentives, for example, coupons, credits and other subsidies that are not specific to any merchant, to the consumers who are not our customers. Despite the absence of any explicit contractual obligations to incentivize the consumers on behalf of the merchants, we further evaluated the varying features of different incentive programs to determine that whether the incentives represent implicit obligations to the consumers on behalf of merchants and if so, should be recorded as reduction of revenues. Based on that evaluation, we determined that incentives provided to the consumers are not considered as payments to the merchant-customers.

We, at our discretion, issue to the consumers coupons and credits upon completion of certain actions to promote our platforms. The coupons can be used for future purchases of eligible merchandise offered on our online marketplace to reduce purchase price and the credits can be used to redeem cash from us. We recognize the amounts of coupons and credits as marketing expenses when future purchases are completed or when the credits are issued. Other subsidies unconditionally provided to the consumers are recognized as marketing expenses when the related transaction services revenues from merchants are recognized. Certain subsidies are provided to consumers upon their completion of certain actions to promote our platforms, and we record the related costs in marketing expenses upon the completion of such promotion tasks.

94

*Income taxes*

We follow the liability method of accounting for income taxes in accordance with ASC 740 ("ASC 740"), *Income Taxes*. Under this method, deferred tax assets and liabilities are determined based on the difference between the financial reporting and tax bases of assets and liabilities using enacted tax rates that will be in effect in the period in which the differences are expected to reverse. We record a valuation allowance to offset deferred tax assets if based on the weight of available evidence, it is more-likely-than-not that some portion, or all, of the deferred tax assets will not be realized. The effect on deferred taxes of a change in tax rate is recognized in tax expense in the period that includes the enactment date of the change in tax rate.

We accounted for uncertainties in income taxes in accordance with ASC 740. Interest and penalties related to unrecognized tax benefit recognized in accordance with ASC 740 are classified in the consolidated statements of comprehensive income/(loss) as income tax expenses.

## Recent Accounting Pronouncements

See Item 17 of Part III, "Financial Statements—Note 2—Summary of significant accounting policies—Recent accounting pronouncements."

## B.      Liquidity and Capital Resources

The following table sets forth a summary of our cash flows for the periods presented:

| | 2020 | 2021 | 2022 | |
| --- | --- | --- | --- | --- |
| | RMB | RMB | RMB | US$ |
| **Summary Consolidated Cash Flow Data:** | | | | |
| Net cash generated from operating activities | 28,196,627 | 28,783,011 | 48,507,860 | 7,032,979 |
| Net cash used in investing activities | (38,357,901) | (35,562,365) | (22,361,670) | (3,242,137) |
| Net cash generated from/(used in) financing activities | 51,798,996 | (1,875,154) | 10,079 | 1,461 |
| Exchange rate effect on cash, cash equivalents and restricted cash | (139,943) | (145,157) | 100,177 | 14,524 |
| Net increase/(decrease) in cash, cash equivalents and restricted cash | 41,497,779 | (8,799,665) | 26,256,446 | 3,806,827 |
| Cash, cash equivalents and restricted cash at beginning of the year | 33,345,857 | 74,843,636 | 66,043,971 | 9,575,476 |
| Cash, cash equivalents and restricted cash at end of the year | 74,843,636 | 66,043,971 | 92,300,417 | 13,382,303 |

To date, we have financed our operating and investing activities through cash generated by historical equity financing activities. We also raised proceeds from the initial public offering of our ADSs in July 2018, a follow-on offering of our ADSs in February 2019, a convertible senior notes offering in September 2019, a private placement in April 2020, a convertible senior notes offering and a concurrent follow-on offering of our ADSs in November 2020, and a private placement in December 2020. As of December 31, 2022, our cash and cash equivalents were RMB34,326.2 million (US$4,976.8 million). Our cash and cash equivalents primarily consist of cash at banks and other highly liquid investments. As of the same date, we had restricted cash of RMB57,974.2 million (US$8,405.5 million), mainly representing cash received from buyers and reserved in a bank supervised account for payments to merchants.

We believe that our current cash and cash equivalents and our anticipated cash flows from operations will be sufficient to meet our anticipated working capital requirements and capital expenditures for at least the next 12 months. We may decide to enhance our liquidity position or increase our cash reserve for future investments through additional equity and debt financing. The issuance and sale of additional equity would result in further dilution to our shareholders. The incurrence of indebtedness would result in an increase in fixed obligations and could result in operating covenants that would restrict our operations. We cannot assure you that financing will be available in amounts or on terms acceptable to us, if at all.

As of December 31, 2022, 27.7% of our cash and cash equivalents were held in China, and 7.9% were held by the VIE and its subsidiaries and denominated in Renminbi. Although we consolidate the results of the VIE and its subsidiaries, we only have access to the assets or earnings of the VIE and its subsidiaries through our contractual arrangements with the VIE and its shareholders. See "Item 4. Information on the Company—C. Organizational Structure." For restrictions and limitations on liquidity and capital resources as a result of our corporate structure, see "Item 5. Operating and Financial Review and Prospects—B. Liquidity and Capital Resources—Holding Company Structure."

Table of Contents

In utilizing the proceeds we received from our initial public offerings, follow-on offerings, convertible senior notes offerings and private placements, we may make additional capital contributions to our PRC subsidiaries, establish new PRC subsidiaries and make capital contributions to these new PRC subsidiaries, make loans to our PRC subsidiaries, or acquire offshore entities with operations in China in offshore transactions. However, most of these uses are subject to PRC regulations. See "Item 3. Key Information—D. Risk Factors—Risks Related to Our Multi-jurisdictional Operations—PRC regulation of loans to and direct investment in PRC entities by offshore holding companies and governmental control of currency conversion may delay or prevent us from using the proceeds of our offshore financing to make loans or additional capital contributions to our PRC subsidiaries, which could materially and adversely affect our liquidity and our ability to fund and expand our business."

A majority of our future revenues are likely to continue to be in the form of Renminbi. Under existing PRC foreign exchange regulations, Renminbi may be converted into foreign exchange for current account items, including profit distributions, interest payments and trade- and service-related foreign exchange transactions, without prior SAFE approval as long as certain routine procedural requirements are fulfilled. Therefore, our PRC subsidiaries are allowed to pay dividends in foreign currencies to us without prior SAFE approval by following certain routine procedural requirements. However, approval from or registration with competent government authorities is required where the Renminbi is to be converted into foreign currency and remitted out of China to pay capital expenses such as the repayment of loans denominated in foreign currencies. The PRC government may at its discretion restrict access to foreign currencies for current account transactions in the future.

### Operating activities

Net cash generated from operating activities in 2022 was RMB48,507.9 million (US$7,033.0 million), as compared to net income of RMB31,538.1 million (US$4,572.6 million) in the same period. The difference was primarily due to the increase of RMB1,480.7 million (US$214.7 million) in merchant deposits, and an increase of RMB7,004.0 million (US$1,015.5 million) in accrued expenses and other liabilities, partially offset by an increase of RMB2,068.7 million (US$299.9 million) in amounts due from related parties. The increase in merchant deposits and accrued expenses and other liabilities was primarily attributable to our business expansion and the increase of number of merchants on our platforms. The principal non-cash items affecting the difference between our net income and our net cash generated from operating activities in 2022 were RMB7,718.4 million (US$1,119.1 million) in share-based compensation expenses and RMB2,224.2 million (US$322.5 million) in depreciation and amortization.

Net cash generated from operating activities in 2021 was RMB28,783.0 million, as compared to net income of RMB7,768.7 million in the same period. The difference was primarily due to the increase of RMB8,686.5 million in payables to merchants, an increase of RMB2,651.2 million in merchant deposits, an increase of RMB3,492.0 million in accrued expenses and other liabilities, and a decrease of RMB1,744.6 million in prepayments and other current assets, partially offset by a decrease of RMB1,422.9 million in amounts due to related parties and a decrease of RMB1,256.4 million in customer advances and deferred revenues. The increase in payables to merchants, merchant deposits and accrued expenses and other liabilities was primarily attributable to our business expansion and the increase of number of merchants on the Pinduoduo platform. The principal non-cash items affecting the difference between our net income and our net cash generated from operating activities in 2021 were RMB4,774.7 million in share-based compensation expenses and RMB1,495.4 million in depreciation and amortization.

Net cash generated from operating activities in 2020 was RMB28,196.6 million, as compared to net loss of RMB7,179.7 million in the same period. The difference was primarily due to the increase of RMB23,934.2 million in payables to merchants, an increase of RMB3,085.4 million in merchant deposits, an increase of RMB5,849.1 million in accrued expenses and other liabilities, an increase of RMB1,883.0 million in amounts due to related parties, and an increase of RMB1,817.2 million in customer advances and deferred revenues, partially offset by an increase of RMB4,048.5 million in prepayments and other current assets and an increase of RMB1,636.5 million in amounts due from related parties. The increase in payables to merchants, merchant deposits, accrued expenses and other liabilities and customer advances and deferred revenues was primarily attributable to our business expansion and the increase of number of merchants on the Pinduoduo platform. The principal non-cash item affecting the difference between our net loss and our net cash generated from operating activities in 2020 was RMB3,613.0 million in share-based compensation expenses.

### Investing activities

Net cash used in investing activities in 2022 was RMB22,361.7 million (US$ 3,242.1 million), primarily due to purchase of short-term time deposits, held to maturities and other investments of RMB160,414.5 million (US$23,257.9 million), purchase of long-term time deposits, held to maturities and other investments of RMB6,795.8 million (US$985.3 million) and purchases of available-for-sale investments of RMB3,581.9 million (US$519.3 million), partially offset by proceeds from sales of short-term time deposits, held to maturities and other investments of RMB141,928.4 million (US$20,577.7 million) and proceeds from sales of long-term time deposits, held to maturities and other investments of RMB7,137.8 million (US$1,034.9 million).

96

Table of Contents

Net cash used in investing activities in 2021 was RMB35,562.4 million, primarily due to purchase of short-term time deposits, held to maturities and other investments of RMB116,639.6 million, purchase of long-term time deposits, held to maturities and other investments of RMB13,628.1 million, and purchase of property, equipment, software and intangible assets of RMB3,287.2 million, partially offset by proceeds from sales of short-term time deposits, held to maturities and other investments of RMB97,547.0 million.

Net cash used in investing activities in 2020 was RMB38,357.9 million, primarily due to purchase of short-term time deposits, held to maturities and other investments of RMB86,438.1 million and purchase of long-term time deposits, held to maturities and other investments of RMB6,722.2 million, partially offset by proceeds from sales of short-term time deposits, held to maturities and other investments of RMB55,083.4 million.

*Financing activities*

Net cash generated from financing activities in 2022 was RMB10.1 million (US$1.5 million).

Net cash used in financing activities in 2021 was RMB1,875.2 million, primarily attributable to the repayment of short-term borrowings.

Net cash generated from financing activities in 2020 was RMB51,799.0 million, primarily attributable to the net proceeds from the follow-on offering, net proceeds from issuance of convertible bonds, and proceeds from the private placements.

*Material cash requirements*

Our material cash requirements as of December 31, 2022 and any subsequent interim period primarily include our capital expenditures, convertible bonds obligations, operating lease commitments and investment commitments.

Our capital expenditures are primarily incurred for purchases of computer equipment relating to the operation of our platforms, furniture, office equipment and leasehold improvement for our office facilities and software. Our capital expenditures were RMB43.0 million in 2020, RMB3,287.2 million in 2021 and RMB635.7 million (US$92.2 million) in 2022.

Our convertible bonds obligations represent our principal payments. Please see "convertible bonds" under Note 11 to our audited consolidated financial statements. Payment due by December 31, 2022 for our convertible bonds obligations amounted to RMB15,505.0 million (US$2,248.0 million).

Our operating lease commitments mainly represent our obligations for leasing offices and warehouses, which include all future cash outflows under ASC Topic 842, Leases. Please see "Leases" under Note 8 to our audited consolidated financial statements. Payment due by December 31, 2022 for our operating lease commitments amounted to RMB1,565.2 million (US$226.9 million).

Our investment commitments primarily relate to capital contributions obligation under certain arrangement which does not have contractual maturity date. Payment due by December 31, 2022 for our investment commitments amounted to RMB80.0 million (US$11.6 million).

We intend to fund our future capital expenditures with anticipated cash flows from operations, our existing cash balance and short-term investments. We will continue to make cash commitments, including capital expenditures, to meet the expected growth of our business.

We have not entered into any financial guarantees or other commitments to guarantee the payment obligations of any third parties. We do not have retained or contingent interests in assets transferred. We have not entered into contractual arrangements that support the credit, liquidity or market risk for transferred assets. We do not have obligations that arise or could arise from variable interests held in an unconsolidated entity, or obligations related to derivative instruments that are both indexed to and classified in our own equity, or not reflected in the statement of financial position.

97

**Holding Company Structure**

PDD Holdings Inc. is a holding company with no material operations of its own. We conduct our operations primarily through our subsidiaries, the VIE and its subsidiaries. As a result, PDD Holdings Inc.'s ability to pay dividends depends upon dividends paid by our subsidiaries. If our existing subsidiaries or any newly formed ones incur debt on their own behalf in the future, the instruments governing their debt may restrict their ability to pay dividends to us. In addition, our wholly foreign-owned subsidiaries in China are permitted to pay dividends to us only out of its retained earnings, if any, as determined in accordance with PRC accounting standards and regulations. Under PRC law, each of our subsidiaries, the VIE and its subsidiaries in China is required to set aside at least 10% of its after-tax profits each year, if any, to fund certain statutory reserve funds until such reserve funds reach 50% of their registered capital. In addition, our wholly foreign-owned subsidiaries in China may allocate a portion of their after-tax profits based on PRC accounting standards to a staff welfare and bonus fund at their discretion. The statutory reserve funds and the discretionary funds are not distributable as cash dividends. Remittance of dividends by a wholly foreign-owned company out of China is subject to examination by the banks designated by SAFE. Our PRC subsidiaries have not paid dividends and will not be able to pay dividends until they generate accumulated profits and meet the requirements for statutory reserve funds.

**C.      Research and Development**

See "Item 4. Information on the Company—B. Business Overview—Technology" and "Item 4. Information on the Company—B. Business Overview—Intellectual Property."

**D.      Trend Information**

Other than as disclosed elsewhere in this annual report, we are not aware of any trends, uncertainties, demands, commitments or events for the year ended December 31, 2022 that are reasonably likely to have a material and adverse effect on our net revenues, income, profitability, liquidity or capital resources, or that would cause the disclosed financial information to be not necessarily indicative of future results of operations or financial conditions.

**E.      Critical Accounting Estimates**

For our critical accounting estimates, see "Item 5. Operating and Financial Review and Prospects—A. Operating Results—Critical Accounting Policies."

**Item 6.      Directors, Senior Management and Employees**

**A.      Directors and Senior Management**

**PDD Partnership**

To ensure the sustainability and governance of our company and better align them with the interests of our shareholders, our management has established an executive partnership, the PDD Partnership, to help us better manage our business and to carry out our vision, mission and value continuously. The structure of the PDD Partnership is designed to promote people with diverse skillsets but sharing the same core values and beliefs that we hold dear.

The PDD Partnership will be operated under principles, policies and procedures that evolve with our business and encompass the following major aspects:

*Nomination and Election of Partners*

Partners will be elected annually through a nomination process, whereby any existing partner may propose candidates to the partnership committee (the "Partnership Committee"), which reviews the nomination and propose candidates to the entire partnership for election. Election of new partners requires the affirmative vote of at least 75% of all the partners. In order to be elected a partner, the partner candidate must meet certain quality standards including, among other things, a high standard of personal character and integrity, continued service as a director, officer or employee with our company for no less than five years (or a shorter period before our company reaches a five-year operating history), a consistent commitment to our company's mission, vision and values as well as a track record of contribution to our business.

Table of Contents

In order to align the interests of partners with the interests of shareholders, the Partnership Committee may require a partner to maintain a meaningful level of equity interests in our company during his or her tenure as a partner. The specific level of equity interests to be maintained shall be determined by the Partnership Committee from time to time.

The PDD Partnership's major rights and functions, such as its right to appoint the executive director to our board and CEO nomination right, will not become effective until the PDD Partnership consists of no less than five limited partners (the "Partnership Condition"). Currently, such rights and functions have yet to come into effect.

### Partnership Committee

The Partnership Committee will be the primary management body of the PDD Partnership. The Partnership Committee must consist of no more than five partners, and all decisions of the Partnership Committee will be made by majority vote of the members.

Partnership Committee members serve for a term of three years and may serve multiple terms, unless terminated upon his or her death, resignation, removal or termination of his or her membership in the partnership. Prior to each election that takes place once every three years, the Partnership Committee will nominate a number of partners equal to the number of Partnership Committee members plus three additional nominees. After voting, all except the three nominees who receive the least votes from the partners are elected to the Partnership Committee.

### Executive Director Appointment and CEO Nomination Right

The PDD Partnership will be entitled to appoint executive directors and nominate and recommend the chief executive officer of our company.

An executive director refers to the director of the company that is (i) neither a director who satisfies the "independence" requirements of Rule 5605(a)(2) of the Nasdaq Stock Market Rules or Section 303A of the Corporate Governance Rules of the New York Stock Exchange nor a director who is affiliated with or was appointed to our board by a holder or a group of affiliated holders of preferred shares and/or Class A ordinary shares converted from preferred shares of our company prior to our initial public offering, and (ii) maintains an employment relationship with our company. Pursuant to our currently effective articles of association, our board of directors shall consist of not less than three but not more than nine directors, and shall include (i) two executive directors, if there are no more than five directors, and (ii) three executive directors, if there are more than five but no more than nine directors. The executive directors shall be nominated by the PDD Partnership for so long as certain conditions are satisfied. Our board of directors is obligated to cause the executive director candidate duly nominated by the PDD Partnership to be appointed by the board upon the delivery by the PDD Partnership of a written notice (duly executed by the general partner of the PDD Partnership) to us, and such executive director shall serve until expiry of his or her terms, unless removed by the shareholders by ordinary resolutions in accordance with our articles of association, removed by the PDD Partnership or the office is vacated upon, among other things, his or her death or resignation. Our board of directors may, by a majority of the remaining directors present and voting at a board meeting, appoint any person as a director to fill vacancy on the board upon resignation of a non-executive director member of the board. If at any time the total number of executive directors on the board nominated by the PDD Partnership is less than two or three, as applicable based on the then board composition, for any reason, the PDD Partnership shall be entitled to appoint such number of executive directors to the board as may be necessary to ensure that the board includes the number of executive directors as required pursuant to our articles of association. Such appointment of the executive directors to the board shall become effective immediately upon the delivery by the PDD Partnership of a written notice to us, without the requirement for any further resolution, vote or approval by the shareholders or the board. Mr. Lei Chen is an executive director of our company.

The chief executive officer candidate nominated by the PDD Partnership shall stand for appointment by the nominating and corporate governance committee of the board of directors. If the candidate is not appointed by the nominating and corporate governance committee in accordance with our articles of association, the PDD Partnership may nominate a replacement nominee until the nominating and corporate governance committee appoints such nominee as chief executive officer, or if the nominating and corporate governance committee fails to appoint more than three candidates nominated by the PDD Partnership consecutively, the board of directors may then nominate and appoint any person to serve as the chief executive officer of our company in accordance with our articles of association.

Any partner may propose to the Partnership Committee any qualified individual to stand for nomination for executive director or chief executive officer. The Partnership Committee shall select from the proposed individuals one or more candidates for partnership approval. Nomination by the PDD Partnership of such candidate as the executive director or chief executive officer, as applicable, shall require the affirmative votes of a majority of the partners.

Table of Contents

*Partner Termination, Retirement and Removal*

Partners may elect to retire or withdraw from the PDD Partnership at any time. All partners are required to retire upon reaching the age of sixty or upon termination of their employment. Any partner may be removed upon affirmative vote of a majority of all partners, in the event that the Partnership Committee determines that such partner fails to meet any of the qualifying standards and so recommend to the partnership.

Retired partners upon meeting certain requirements may be designated as honorary partners by the Partnership Committee. Honorary partners may not act as partner, but may be entitled to allocations from the deferred portion of the bonus pool.

*Amendment of Partnership Agreement*

Pursuant to the partnership agreement, amendment of the partnership agreement requires the approval of 75% of the partners.

**Directors and Executive Officers**

The following table sets forth information regarding our directors and executive officers as of the date of this annual report.

| Directors and Executive Officers | Age | Position/Title |
|---|---|---|
| Lei Chen | 43 | Chairman of the Board of Directors and Co-Chief Executive Officer |
| Jiazhen Zhao | 39 | Director and Co-Chief Executive Officer |
| Anthony Kam Ping Leung | 62 | Independent Director |
| Haifeng Lin | 46 | Director |
| Qi Lu | 61 | Independent Director |
| George Yong-Boon Yeo | 68 | Independent Director |
| Jun Liu | 40 | Vice President of Finance |
| Junyun Xiao | 43 | Senior Vice President of Operation |
| Zhenwei Zheng | 39 | Senior Vice President of Product Development |
| Jianchong Zhu | 44 | General Counsel |

*Lei Chen* is a founding member of our company and has served as our chairman of the board of directors since March 2021 and co-chief executive officer since April 2023. Mr. Chen has also served as our director since July 2020. Mr. Chen served as our chief executive officer from July 2020 to April 2023, as our chief technology officer from 2016 to 2020 and as our director from February 2017 to July 2018. Prior to joining our company, Mr. Chen served as chief technology officer of Xinyoudi Studio since 2011. Mr. Chen's prior working experience includes internships with Google (Nasdaq: GOOG), Yahoo Inc. and IBM (NYSE: IBM) in the United States. Mr. Chen was trained as a data scientist and is a prolific publisher on the subject of data mining, and has presented his works in large international conferences, such as the ACM SIGMOD Conference, Very Large Data Bases (VLDB) Conferences and International Conference on Machine Learning. Mr. Chen received his bachelor's degree in computer science from Tsinghua University and his doctoral degree in computer science from University of Wisconsin-Madison.

*Jiazhen Zhao* is a founding member of our company and has served as our director and co-chief executive officer since April 2023. Mr. Jiazhen Zhao served as a senior vice president from 2018 to 2023. Mr. Zhao has held several leadership roles across our company. He started our Duo Duo Grocery business and led the operations of a few key product categories in the Pinduoduo platform, including agriculture. He also led our supply chain efforts. Mr. Zhao received his bachelor's degree in e-commerce management from South China University of Technology.

*Anthony Kam Ping Leung* has served as our independent director and chairman of the audit committee since August 2019. Mr. Kam has more than 30 years of experience in the financial services industry in Asia. He is a Chartered Financial Analyst and a chartered accountant in Singapore. He also serves as an independent director of OCBC Wing Hang Bank (China) Ltd since September 2021. Mr. Kam served as the deputy chief executive officer and the executive director of HSBC Bank (China) Company Limited ("HSBC China") from February 2016 to April 2018 and served as the chief financial officer of HSBC China from May 2013 to February 2016. Prior to that, Mr. Kam served as the chief financial officer of HSBC Bank (Singapore) Limited ("HSBC Singapore") from September 2005 to May 2013. In addition to financial accounting and control, management accounting and tax responsibilities, Mr. Kam had direct oversight on specific risk management functions such as treasury product control and asset & liabilities management. Mr. Kam was also a member of the asset and liabilities management meeting and a member of the risk management meeting under the executive committee of HSBC Singapore and HSBC China. Mr. Kam received bachelor of science from University of Hong Kong and his master degree in applied finance from Macquarie University.

100

*Haifeng Lin* has served as our director since June 2017. Mr. Lin is currently the head of Tencent Financial Technology and a corporate vice president of Tencent Holdings Limited (HKEx: 00700). Prior to that, he served as general manager of the merger and acquisitions department of Tencent Technology (Shenzhen) Company Limited, an affiliate of Tencent Holdings Limited. From July 2003 to November 2010, Mr. Lin served in different roles in finance, strategy and business operation at Microsoft. Prior to that, Mr. Lin worked at Nokia China from 1999 to 2001. Mr. Lin also serves as a non-executive director of Linklogis Inc. (HKEx: 09959) since October 2019. Mr. Lin received his bachelor's degree in engineering from Zhejiang University in June 1997 and his master's degree in business administration from the Wharton School of the University of Pennsylvania in May 2003.

*Qi Lu* has served as our independent director and chairman of our compensation committee since July 2018. Currently, he is the founding CEO of Miracle Plus and also serves as a director of SAP and a director of Pine Field. He was president and COO of Baidu and the China founding CEO and head of research of Y Combinator China, and prior to that served as Microsoft's global executive vice president and led Applications and Services Group. Dr. Lu joined Microsoft in 2009 as president of its Online Services Division. Earlier in his career, Dr. Lu joined Yahoo! in 1998, later becoming senior vice president in charge of search and advertising technologies, and subsequently executive vice president in 2007. Dr. Lu holds both bachelor and master degrees in computer science from Fudan University in Shanghai and a Ph.D. in computer science from Carnegie Mellon University. He holds over 40 US patents and has authored many papers in his field.

*George Yong-Boon Yeo* has served as our independent director and chairman of our nominating and corporate governance committee since July 2018. He currently serves as a Visiting Scholar at the Lee Kuan Yew School of Public Policy of the National University of Singapore and is an independent non-executive director of AIA Group Limited (HKEx: 01299) and an independent non-executive director of Creative Technology Ltd. (SGX: C76). Prior to that, Mr. Yeo served 23 years in the government of Singapore, and was Minister for Information and the Arts, Health, Trade & Industry, and Foreign Affairs of Singapore. Mr. Yeo is also a member of the Board of Trustees of Berggruen Institute on Governance and International Advisory Panel of Peking University, among others. Mr. Yeo studied Engineering at Cambridge University on a President's Scholarship, graduating with a Double First in 1976, and became a Signals Officer in the Singapore Armed Forces. After graduating from the Singapore Command and Staff College in 1979, he was posted to the Republic of Singapore Air Force. Mr. Yeo graduated with an MBA (Baker Scholar) from the Harvard Business School in 1985. He was appointed Chief-of-Staff of the Air Staff from 1985 to 1986 and Director of Joint Operations and Planning in the Defence Ministry from 1985 to 1988, attaining the rank of Brigadier-General.

*Jun Liu* has served as our vice president of finance since January 2022. Ms. Liu served as our director of finance from 2017 to 2021. Prior to joining our company, Ms. Liu served as the director of finance at xiaohongshu.com and an associate director of finance at Light-In-The-Box Limited. From 2005 to 2013, she was an associate and then manager at PricewaterhouseCoopers Consultants (Shenzhen) Limited. Ms. Liu received her bachelor's degree in economics from Zhongnan University of Economics and Law.

*Junyun Xiao* is a founding member of our company and has served as our senior vice president of operation since 2016 and our director from April 2018 to July 2018. Prior to joining our company, Mr. Xiao served as operation director of Xinyoudi Studio since 2011. Prior to that, he was a member of the founding team of Ouku.com and served as operation manager from 2007 to 2010.

*Zhenwei Zheng* is a founding member of our company and has served as our senior vice president of product development since 2016, and our director from April 2018 to July 2018. Prior to joining our company, Mr. Zheng served as chief executive officer of Xinyoudi Studio since 2011. Prior to that, he held various positions at Baidu (Nasdaq: BIDU) from 2008 to 2010. Mr. Zheng received his bachelor's degree and master's degree in computer science from Zhejiang University.

*Jianchong Zhu* has served as our general counsel since July 2020. Mr. Zhu had served as senior vice president of our company since 2018. Prior to joining our company, Mr. Zhu was a partner in the Beijing office of White & Case LLP. From 2010 to 2017, he was an associate and then counsel in Skadden, Arps, Slate, Meagher & Flom LLP. Mr. Zhu received his bachelor's degree in English language and literature from Tsinghua University, and his juris doctor's degree from University of California Hastings College of the Law.

## B.    Compensation

In the year ended December 31, 2022, we paid an aggregate of US$2.8 million in cash to our directors and executive officers as a group. We have not set aside or accrued any amount to provide pension, retirement or other similar benefits to our executive officers and directors. Our PRC subsidiaries, the VIE and its subsidiaries are required by law to make contributions equal to certain percentages of each employee's salary for his or her medical insurance, maternity insurance, workplace injury insurance, unemployment insurance, pension benefits through a PRC government-mandated multi-employer defined contribution plan and other statutory benefits.

Table of Contents

**Employment Agreements and Indemnification Agreements**

We have entered into employment agreements with each of our executive officers. Under these agreements, each of our executive officers is employed for a specified time period. We may terminate employment for cause, at any time, without advance notice or remuneration, for certain acts of the executive officer, such as conviction or plea of guilty to a felony or any crime involving moral turpitude, negligent or dishonest acts to our detriment, or misconduct or a failure to perform agreed duties. We may also terminate an executive officer's employment without cause upon three-month advance written notice. In such case of termination by us, we will provide severance payments to the executive officer as expressly required by applicable law of the jurisdiction where the executive officer is based. The executive officer may resign at any time with a three-month advance written notice.

Each executive officer has agreed to hold, both during and after the termination or expiry of his or her employment agreement, in strict confidence and not to use, except as required in the performance of his or her duties in connection with the employment or pursuant to applicable law, any of our confidential information or trade secrets, any confidential information or trade secrets of our clients or prospective clients, or the confidential or proprietary information of any third party received by us and for which we have confidential obligations. The executive officers have also agreed to disclose in confidence to us all inventions, designs and trade secrets which they conceive, develop or reduce to practice during the executive officer's employment with us and to assign all right, title and interest in them to us, and assist us in obtaining and enforcing patents, copyrights and other legal rights for these inventions, designs and trade secrets.

In addition, each executive officer has agreed to be bound by non-competition and non-solicitation restrictions during the term of his or her employment and typically for one year following the last date of employment. Specifically, each executive officer has agreed not to (i) approach our suppliers, clients, customers or contacts or other persons or entities introduced to the executive officer in his or her capacity as a representative of us for the purpose of doing business with such persons or entities that will harm our business relationships with these persons or entities; (ii) assume employment with or provide services to any of our competitors, or engage, whether as principal, partner, licensor or otherwise, any of our competitors, without our express consent; or (iii) seek directly or indirectly, to solicit the services of any of our employees who is employed by us on or after the date of the executive officer's termination, or in the year preceding such termination, without our express consent.

We have also entered into indemnification agreements with each of our directors and executive officers. Under these agreements, we agree to indemnify our directors and executive officers against certain liabilities and expenses incurred by such persons in connection with claims made by reason of their being a director or officer of our company.

**Amended and Restated 2015 Global Share Plan**

In September 2015, our board of directors approved a 2015 global share plan, which was most recently amended in November 2022, to attract and retain the best available personnel, provide additional incentives to employees, directors and consultants and promote the success of our business. The amended 2015 global share plan is referred to as the 2015 Plan in this annual report. The maximum aggregate number of ordinary shares which may be issued pursuant to all awards under the 2015 Plan is 581,972,860 Class A ordinary shares, subject to adjustment and amendment. As of December 31, 2022, options to purchase 336,255,324 Class A ordinary shares under the 2015 Plan had been granted and were outstanding under the 2015 plan.

The following paragraphs describe the principal terms of the 2015 Plan.

*Types of awards*. The 2015 Plan permits the awards of options or restricted shares.

*Plan administration*. Our board of directors or a committee of one or more members appointed by our board of directors will administer the 2015 Plan. Subject to the terms of the 2015 Plan and in the case of the committee, the specific duties delegated by our board of directors to the committee, the plan administrator has the authority to determine the participants to receive awards, the type and number of awards to be granted to each participant, and the terms and conditions of each award, among others.

*Award agreement*. Awards granted under the 2015 Plan are evidenced by an award agreement that sets forth terms, conditions and limitations for each award, which may include the term of the award, the provisions applicable in the event that the grantee's employment or service terminates, and our authority to unilaterally or bilaterally amend, modify, suspend, cancel or rescind the award.

102

Table of Contents

*Eligibility*. We may grant awards to our employees, directors and consultants of our company.

*Vesting schedule*. In general, the plan administrator determines the vesting schedule, which is specified in the relevant award agreement.

*Exercise of options*. The plan administrator determines the exercise price for each award, which is stated in the award agreement. The vested portion of option will expire if not exercised prior to the time as the plan administrator determines at the time of its grant. However, the maximum exercisable term is twenty years from the date of a grant.

*Transfer restrictions*. Awards may not be transferred in any manner by the participant other than in accordance with the exceptions provided in the 2015 Plan, such as transfers by will or the laws of descent and distribution, or as provided in the relevant award agreement or otherwise determined by the plan administrator.

*Termination and amendment of the 2015 Plan*. Unless terminated earlier, the 2015 Plan has a term of ten years. Our board of directors has the authority to terminate, amend or modify the plan. No termination, amendment or modification may adversely affect in any material way an outstanding award granted pursuant to the 2015 Plan unless mutually agreed between the participant and the plan administrator.

## Amended and Restated 2018 Share Incentive Plan

In July 2018, we adopted the 2018 Share Incentive Plan, which was most recently amended in November 2022, to attract and retain the best available personnel, provide additional incentives to employees, directors and consultants and promote the success of our business. The amended 2018 Share Incentive Plan is referred to as the 2018 Plan in this annual report. The maximum aggregate number of shares which may be issued pursuant to all awards under the 2018 Plan was initially 363,130,400, plus an annual increase on the first day of each fiscal year of our company during the term of the 2018 Plan commencing with the fiscal year beginning January 1, 2019, by an amount equal to the lessor of (i) 1.0% of the total number of shares issued and outstanding on the last day of the immediately preceding fiscal year, and (ii) such number of shares as may be determined by our board of directors. In March 2021, our board of directors approved an amendment to the 2018 Plan to increase the annual increase percentage from 1.0% to 3.0% effective from the fiscal year beginning January 1, 2022. As of December 31, 2022, options to purchase 175,376,564 Class A ordinary shares and restricted share units representing 81,984,488 Class A ordinary shares had been granted and were outstanding under the 2018 Plan.

The following paragraphs describe the principal terms of the 2018 Plan.

*Types of Awards*. The 2018 Plan permits the awards of options, restricted shares, restricted share units or any other type of awards approved by the administration committee.

*Plan Administration*. Our board of directors or the administration committee will administer the 2018 Plan. The administration committee or the full board of directors, as applicable, will determine the participants to receive awards, the type and number of awards to be granted to each participant, and the terms and conditions of each award.

*Award Agreement*. Awards granted under the 2018 Plan are evidenced by an award agreement that sets forth terms, conditions and limitations for each award, which may include the term of the award, the provisions applicable in the event that the grantee's employment or service terminates, and our authority to unilaterally or bilaterally amend, modify, suspend, cancel or rescind the award.

*Eligibility*. We may grant awards to our employees, directors and consultants of our company. However, we may grant options that are intended to qualify as incentive share options only to our employees and employees of our parent companies and subsidiaries.

*Vesting Schedule*. In general, the administration committee determines the vesting schedule, which is specified in the relevant award agreement.

*Exercise of Options*. The administration committee determines the exercise price for each award, which is stated in the award agreement. The vested portion of option will expire if not exercised prior to the time as the administration committee determines at the time of its grant. However, the maximum exercisable term is twenty years from the date of a grant.

*Transfer Restrictions*. Awards may not be transferred in any manner by the recipient other than in accordance with the exceptions provided in the 2018 Plan, such as transfers by will or the laws of descent and distribution.

103

*Termination and Amendment of the 2018 Plan*. Unless terminated earlier, the 2018 Plan has a term of ten years. Our board of directors has the authority to amend or terminate the plan. However, no such action may adversely affect in any material way any awards previously granted unless agreed by the recipient.

The following table summarizes, as of December 31, 2022, the number of Class A ordinary shares under outstanding options, restricted share units and other equity awards that we granted to our directors and executive officers, excluding awards that were forfeited or cancelled after the relevant grant dates.

| Name | Class A Ordinary Shares Underlying Equity Awards Granted | Exercise Price (US$/Share) | Date of Grant | Date of Expiration |
|---|---|---|---|---|
| Lei Chen | * | Nominal | September 1, 2016 and September 1, 2020 | August 31, 2036 and August 31, 2040 |
| Jiazhen Zhao | * | Nominal | Various dates between February 1, 2016 and October 1, 2022 | Various dates between January 31, 2036 and September 30, 2042 |
| Qi Lu | * | Nominal | Various dates between February 1, 2019 and August 1, 2022 | Not applicable |
| George Yong-Boon Yeo | * | Nominal | Various dates between February 1, 2019 and August 1, 2022 | Not applicable |
| Anthony Kam Ping Leung | * | Nominal | Various dates between March 1, 2020 and September 1, 2022 | Not applicable |
| Junyun Xiao | * | Nominal | November 1, 2015 and September 1, 2016 | October 31, 2035 and August 31, 2036 |
| Zhenwei Zheng | * | Nominal | Various dates from November 1, 2015 to March 1, 2022 | Various dates from October 31, 2035 to February 28, 2039 |
| Jun Liu | * | Nominal | Various dates from September 1, 2018 to April 1, 2022 | Various dates from August 31, 2038 to Mar 31, 2042 |
| Jianchong Zhu | * | Nominal | June 1, 2019 | May 31, 2039 |
| All directors and executive officers as a group | 68,663,864 | Nominal | Various dates between November 1, 2015 and October 1, 2022 | Various dates between October 31, 2035 and September 30, 2042 |

\* Less than 1% of our total ordinary shares outstanding.

As of December 31, 2022, our employees other than members of our senior management as a group held options to purchase 448,020,512 Class A ordinary shares, with nominal exercise prices, and restricted share units representing 76,932,000 Class A ordinary shares.

For discussions of our accounting policies and estimates for awards granted pursuant to the 2015 Plan and 2018 Plan, see "Item 5. Operating and Financial Review and Prospects—A. Operating Results—Critical Accounting Policies—Share-based compensation."

## C.    Board Practices

### Board of Directors

Our board of directors consists of six directors. A director is not required to hold any shares in our company by way of qualification. A director may vote with respect to any contract or transaction or proposed contract or transaction notwithstanding that he may be interested therein provided (a) such director has declared the nature of his interest at the earliest meeting of the board at which it is practicable for him to do so, either specifically or by way of a general notice and (b) if such contract or arrangement is a transaction with a related party, such transaction has been approved by the audit committee. The directors may from time to time at their discretion exercise all the powers of the company to raise or borrow money, mortgage or charge its undertaking, property and assets (present and future) and uncalled capital or any part thereof, to issue debentures, debenture stock, bonds and other securities, whether outright or as collateral security for any debt, liability or obligation of the company or of any third party. None of our non-executive directors has a service contract with us that provides for benefits upon termination of service.

### Committees of the Board of Directors

As a Cayman Islands exempted company listed on the Nasdaq Stock Market, we are subject to the Nasdaq corporate governance listing standards. However, Nasdaq rules permit a foreign private issuer like us to follow the corporate governance practices of its home country. Certain corporate governance practices in the Cayman Islands, which is our home country, may differ significantly from the Nasdaq corporate governance listing standards. For example, neither the Companies Act of the Cayman Islands nor our memorandum and articles of association requires a majority of our directors to be independent, we could include non-independent directors as members of our compensation committee and nominating committee, and our independent directors would not necessarily hold regularly scheduled meetings at which only independent directors are present. However, we currently intend to comply with the rules of the Nasdaq in lieu of following home country practice.

We have established three committees under the board of directors: an audit committee, a compensation committee and a nominating and corporate governance committee. Each committee's members and functions are described below.

Table of Contents

*Audit Committee*. Our audit committee consists of Mr. Anthony Kam Ping Leung, Dr. Qi Lu and Mr. George Yong-Boon Yeo. Mr. Anthony Kam Ping Leung is the chairman of our audit committee. We have determined that Mr. Anthony Kam Ping Leung, Dr. Qi Lu and Mr. George Yong-Boon Yeo each satisfies the "independence" requirements of Rule 5605(c)(2) of the Nasdaq Stock Market Rules and meet the independence standards under Rule 10A-3 under the Exchange Act, as amended. We have determined that Mr. Anthony Kam Ping Leung qualifies as an "audit committee financial expert." The audit committee oversees our accounting and financial reporting processes and the audits of the financial statements of our company. The audit committee is responsible for, among other things:

- appointing the independent auditors and pre-approving all auditing and non-auditing services permitted to be performed by the independent auditors;

- reviewing with the independent auditors any audit problems or difficulties and management's response;

- discussing the annual audited financial statements with management and the independent auditors;

- reviewing the adequacy and effectiveness of our accounting and internal control policies and procedures and any steps taken to monitor and control major financial risk exposures;

- reviewing and approving all proposed related party transactions;

- meeting separately and periodically with management and the independent auditors; and

- monitoring compliance with our code of business conduct and ethics, including reviewing the adequacy and effectiveness of our procedures to ensure proper compliance.

*Compensation Committee*. Our compensation committee consists of Dr. Qi Lu and Mr. Anthony Kam Ping Leung. Dr. Qi Lu is the chairman of our compensation committee. We have determined that Dr. Qi Lu and Mr. Anthony Kam Ping Leung each satisfies the "independence" requirements of Rule 5605(a)(2) of the Nasdaq Stock Market Rules. The compensation committee assists the board in reviewing and approving the compensation structure, including all forms of compensation, relating to our directors and executive officers. Our co-chief executive officers may not be present at any committee meeting during which his compensation is deliberated. The compensation committee is responsible for, among other things:

- reviewing and approving, or recommending to the board for its approval, the compensation for our co-chief executive officers and other executive officers;

- reviewing and recommending to the board for determination with respect to the compensation of our non-employee directors;

- reviewing periodically and approving any incentive compensation or equity plans, programs or similar arrangements; and

- selecting compensation consultant, legal counsel or other adviser only after taking into consideration all factors relevant to that person's independence from management.

*Nominating and Corporate Governance Committee*. Our nominating and corporate governance committee consists of Mr. George Yong-Boon Yeo and Dr. Qi Lu. Mr. George Yong-Boon Yeo is the chairman of our nominating and corporate governance committee. Dr. Qi Lu and Mr. George Yong-Boon Yeo each satisfies the "independence" requirements of Rule 5605(a)(2) of the Nasdaq Stock Market Rules. The nominating and corporate governance committee assists the board of directors in selecting individuals qualified to become our directors and in determining the composition of the board and its committees. The nominating and corporate governance committee is responsible for, among other things:

- selecting and recommending to the board nominees for election by the shareholders or appointment by the board;

- reviewing annually with the board the current composition of the board with regards to characteristics such as independence, knowledge, skills, experience and diversity;

105

Table of Contents

- making recommendations on the frequency and structure of board meetings and monitoring the functioning of the committees of the board; and

- advising the board periodically with regards to significant developments in the law and practice of corporate governance as well as our compliance with applicable laws and regulations, and making recommendations to the board on all matters of corporate governance and on any remedial action to be taken.

**Duties of Directors**

Under Cayman Islands law, our directors owe fiduciary duties to our company, including a duty to act honestly, and a duty to act in what they consider in good faith to be in our best interests. Our directors must also exercise their powers only for a proper purpose. A director must exercise the skill and care of a reasonably diligent person having both – (i) the general knowledge, skill and experience that may reasonably be expected of a person in the same position (an objective test), and (ii) if greater, the general knowledge, skill and experience that that director actually possesses (a subjective test). In fulfilling their duty of care to our company, our directors must ensure compliance with our memorandum and articles of association, as amended and restated from time to time, and the rights vested thereunder in the holders of the shares. Our directors owe their fiduciary duties to our company and not to our company's individual shareholders, and it is our company which has the right to seek damages if a duty owed by our directors is breached. In limited exceptional circumstances, a shareholder may have the right to seek damages in our name if a duty owed by our directors is breached.

Our board of directors has all the powers necessary for managing, and for directing and supervising, our business affairs. The functions and powers of our board of directors include, among others:

- convening shareholders' annual general meetings and reporting its work to shareholders at such meetings;

- declaring dividends and distributions;

- appointing officers and determining the term of office of the officers;

- exercising the borrowing powers of our company and mortgaging the property of our company; and

- approving the transfer of shares in our company, including the registration of such shares in our share register.

106

Table of Contents

**Terms of Directors and Officers**

Our officers are elected by and serve at the discretion of the board of directors. Our directors shall serve and hold office until expiry of his or her terms or until such time as they are removed from office by ordinary resolutions of the shareholders. Pursuant to our currently effective articles of association, our board of directors shall consist of not less than three but not more than nine directors, and shall include (i) two executive directors, if there are no more than five directors, and (ii) three executive directors, if there are more than five but no more than nine directors. The executive directors shall be nominated by the PDD Partnership. Our board of directors is obligated to cause the executive director candidate duly nominated by the PDD Partnership to be appointed by the board upon the delivery by the PDD Partnership of a written notice (duly executed by the general partner of the PDD Partnership) to us. The PDD Partnership is entitled to nominate the chief executive officer of our company, subject to appointment by the nominating and corporate governance committee of our board of directors. For additional information, see "Item 6. Directors, Senior Management and Employees —A. Directors and Senior Management—PDD Partnership." The office of a director will be vacated if the director (i) becomes bankrupt or makes any arrangement or composition with his creditors; (ii) dies or is found to be or becomes of unsound mind; (iii) resigns his or her office by notice in writing to us; (iv) without special leave of absence from the board of directors, is absent from meetings of the board of directors for four consecutive meetings and the board of directors resolves that his office be vacated; or (v) is removed from office pursuant to the provisions of our memorandum and articles of association.

**Board Diversity**

| Board Diversity Matrix (As of February 28, 2023) | | | | |
|---|---|---|---|---|
| Country of Principal Executive Offices: | Ireland | | | |
| Foreign Private Issuer | Yes | | | |
| Disclosure Prohibited Under Home Country Law | No | | | |
| Total Number of Directors | 6 | | | |
| | **Female** | **Male** | **Non-Binary** | **Did Not Disclose Gender** |
| **Part I: Gender Identity** | | | | |
| Directors | 0 | 6 | 0 | 0 |
| **Part II: Demographic Background** | | | | |
| Underrepresented Individual in Home Country Jurisdiction | 0 | | | |
| LGBTQ+ | 0 | | | |
| Did Not Disclose Demographic Background | 0 | | | |

Under Rule 5606(f)(2) and Rule 5606(f)(6) of the Nasdaq Listing Rules, we are required to have, or disclose why we do not have, at least one "diverse" (as such term is defined in Rule 5606(f)(2)(B) of the Nasdaq Listing Rules) director by December 31, 2023. As of February 28, 2023, we did not have at least one diverse director because we have not yet identified a suitable candidate. We will continue our search for a suitable candidate in order to increase the diversity of our board.

Table of Contents

**D.    Employees**

**Employees**

As of December 31, 2022, we had a total of 12,992 employees. We had a total of 7,986 and 9,762 employees as of December 31, 2020 and 2021, respectively.

The following table gives breakdowns of our employees as of December 31, 2022 by function:

| | As of December 31, 2022 |
|---|---|
| Function: | |
| Sales and marketing | 4,590 |
| Product development | 6,444 |
| Platform operation | 809 |
| Management and administration | 1,149 |
| **Total** | **12,992** |

We are dedicated to providing employees with social benefits, diversified work environment and a wide range of career development opportunities. We have invested significant resources in employee career development and training opportunities. For example, we have established training programs that cover topics such as our corporate culture, employee rights and responsibilities, team-building, professional conduct and job performance. We are committed to making continued efforts to provide better working environment and benefits to our employees.

As required by regulations in China, we participate in various government statutory employee benefit plans, including medical insurance, maternity insurance, workplace injury insurance, unemployment insurance and pension benefits through a PRC government-mandated multi-employer defined contribution plan. We are required under PRC law to contribute to employee benefit plans at specified percentages of the salaries, bonuses and certain allowances of our employees up to a maximum amount specified by the local government from time to time.

We enter into standard labor contracts with our employees. We also enter into standard confidentiality and non-compete agreements with all of our senior management and employees. The non-compete restricted period typically expires two years after the termination of employment, and we may have to compensate the employee with a certain percentage of his or her pre-departure salary during the restricted period.

We believe that we maintain a good working relationship with our employees, and we have not experienced any major labor disputes.

**E.    Share Ownership**

Except as specifically noted, the following table sets forth information with respect to the beneficial ownership of our Class A ordinary shares as of February 28, 2023 by:

- each of our directors and executive officers; and

- each person known to us to beneficially own more than 5% of our total outstanding ordinary shares.

The calculations in the table below are based on 5,314,348,396 Class A ordinary shares and no Class B ordinary Shares outstanding as of February 28, 2023.

108

Beneficial ownership is determined in accordance with the rules and regulations of the SEC. In computing the number of shares beneficially owned by a person and the percentage ownership of that person, we have included shares that the person has the right to acquire within 60 days, including through the exercise of any option, warrant or other right or the conversion of any other security. These shares, however, are not included in the computation of the percentage ownership of any other person.

| | Class A Ordinary Shares Beneficially Owned** | |
| | Number | % |
| --- | --- | --- |
| **Directors and Executive Officers**\*\*: | | |
| Lei Chen | * | * |
| Jiazhen Zhao | * | * |
| Anthony Kam Ping Leung | * | * |
| Haifeng Lin | * | * |
| Qi Lu | * | * |
| George Yong-Boon Yeo | * | * |
| Jun Liu | * | * |
| Junyun Xiao | * | * |
| Zhenwei Zheng | * | * |
| Jianchong Zhu | * | * |
| All Directors and Executive Officers as a Group | 61,396,894 | 1.2 |
| **Principal Shareholders:** | | |
| Entities affiliated with Zheng Huang[1] | 1,409,744,080 | 26.5 |
| Entities affiliated with Tencent[2] | 783,468,116 | 14.7 |
| Entities affiliated with PDD Partnership[3] | 370,772,220 | 7.0 |

Notes:

\*    Less than 1% of our total outstanding shares.

\*\*    Beneficial ownership information disclosed herein represents direct and indirect holdings of entities owned, controlled or otherwise affiliated with the applicable holder as determined in accordance with the rules and regulations of the SEC.

(1)    Represents (i) 1,134,932,140 Class A ordinary shares directly held by Walnut Street Investment, Ltd., a business company limited by shares incorporated in the British Virgin Islands, and (ii) 274,811,940 Class A ordinary shares directly held by Walnut Street Management, Ltd., a business company limited by shares incorporated in the British Virgin Islands. Each of Walnut Street Investment, Ltd. and Walnut Street Management, Ltd. is controlled by Steam Water Limited, a business company limited by shares incorporated in the British Virgin Islands, which is beneficially owned by Mr. Zheng Huang through a trust established under the laws of the British Virgin Islands. Mr. Huang is the settlor of the trust, and Mr. Huang and his family members are the trust's beneficiaries. Walnut Street Investment, Ltd., Walnut Street Management, Ltd. and Steam Water Limited are collectively referred to as entities affiliated with Mr. Huang. The registered address of each of Walnut Street Investment, Ltd. and Walnut Street Management, Ltd. is Trinity Chambers, P.O. Box 4301, Road Town, Tortola, British Virgin Islands. The registered address of Steam Water Limited is Ritter House, Wickhams Cay II, Road Town, Tortola, British Virgin Islands.

(2)    Represents (i) 754,359,876 Class A ordinary shares held by Tencent Mobility Limited, a limited liability company incorporated in Hong Kong, (ii) 473,956 Class A ordinary shares held by TPP Follow-on I Holding G Limited, a limited liability company incorporated in the Cayman Islands, (iii) 27,781,280 Class A ordinary shares held by Chinese Rose Investment Limited, a limited liability company incorporated in the British Virgin Islands, and (iv) 853,004 Class A ordinary shares held by Distribution Pool Limited, a limited liability company incorporated in British Virgin Islands, as reported in a Schedule 13D/A jointly filed by Tencent Holdings Limited and Tencent Mobility Limited on March 24, 2021. Tencent Mobility Limited, TPP Follow-on I Holding G Limited, Chinese Rose Investment Limited and Distribution Pool Limited are investing entities either directly or beneficially owned by Tencent Holdings Limited, and are collectively referred to as entities affiliated with Tencent. Tencent Holdings Limited is a limited liability company incorporated in the Cayman Islands and is listed on the Hong Kong Stock Exchange. The registered address of Tencent Mobility Limited is 29/F, Three Pacific Place, No. 1 Queen's Road East, Wanchai, Hong Kong. The registered address of TPP Follow-on I Holding G Limited is P.O. Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. The registered address of Chinese Rose Investment Limited is P.O. Box 957, Offshore Incorporations Centre, Road Town, Tortola, British Virgin Islands. The registered address of Distribution Pool Limited is Vistra Corporate Services Centre, Wickhams Cay II, Road Town, Tortola, VG1110, British Virgin Islands.

(3)    Represents 370,772,220 Class A ordinary shares directly held by Quantum Dot Limited, a business company limited by shares incorporated in the British Virgin Islands. Quantum Dot Limited is a wholly-owned subsidiary of Qubit Partners L.P., an exempted limited partnership formed under the laws of the Cayman Islands. Qubit GP Limited, an exempted company with limited liability incorporated under the law of the Cayman Islands, is the general partner of Qubit Partners L.P. Mr. Zheng Huang is the sole director of Qubit GP Limited and the sole director of Quantum Dot Limited. Quantum Dot Limited, Qubit GP Limited and Qubit Partners L.P. are collectively referred to as entities affiliated with PDD Partnership. The registered address of Quantum Dot Limited is Kingston Chambers, PO Box 173, Road Town, Tortola, British Virgin Islands. The registered address of each of Qubit Partners L.P. and Qubit GP Limited is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands.

To our knowledge, as of February 28, 2023, a total of 2,418,018,928 Class A ordinary shares were held by three record holders in the United States, representing approximately 45.5% of our total outstanding shares. These record holders included Deutsche Bank Trust Company Americas, the depositary of our ADS program. The number of beneficial owners of our ADSs in the United States is likely to be much larger than the number of record holders of our ordinary shares in the United States.

We are not aware of any arrangement that may, at a subsequent date, result in a change of control of our company.

**F.      Disclosure of a Registrant's Action to Recover Erroneously Awarded Compensation**

Not applicable.

**Item 7.      Major Shareholders and Related Party Transactions**

**A.      Major Shareholders**

Please refer to "Item 6. Directors, Senior Management and Employees—E. Share Ownership."

**B.      Related Party Transactions**

**Contractual Arrangements with the VIE and Its Shareholders**

For a description of these contractual arrangements, see "Item 4. Information on the Company—C. Organizational Structure."

**Shareholders Agreement**

We entered into our seventh amended and restated shareholders agreement on March 5, 2018 with our then shareholders. Pursuant to this shareholders agreement, we have granted certain registration rights to our shareholders. Set forth below is a description of the registration rights granted under the agreement.

*Demand Registration Rights*. Holders holding at least 30% or more of the issued and outstanding registrable securities (on an as converted basis) held by the preferred shareholders, the Class B ordinary shareholders and Class A ordinary shareholders have the right to demand in writing that we file a registration statement covering the registration of at least 25% of their registrable securities. We have the right to defer filing of a registration statement for a period of not more than 90 days if we determine in good faith that filing of a registration statement in the near future will be materially detrimental to us or our shareholders, but we cannot exercise the deferral right for more than once during any twelve-month period and cannot register any other securities during such 90-day period. We are not obligated to effect more than two demand registrations. Further, if the registrable securities are offered by means of an underwritten offering, and the underwriters advise us that marketing factors require a limitation of the number of securities to be underwritten, the number of registrable securities that may be included in the underwriting shall be reduced as required by the underwriters and allocated among the holders of registrable securities on a pro rata basis according to the number of registrable securities requested by each holder, provided that all other equity securities are first excluded and 25% of shares of registrable securities requested by the holders are included.

*Registration on Form F-3*. Any holder may request us to file a registration statement on Form F-3 if we qualify for registration on Form F-3. The holders are entitled to an unlimited number of registrations on Form F-3 so long as such registration offerings are in excess of US$500,000. We, however, are not obligated to consummate a registration if we have consummated two registrations within any twelve-month period. We have the right to defer filing of a registration statement for a period of not more than 60 days if we determine in good faith that filing of a registration statement in the near future will be materially detrimental to us or our shareholders, but we cannot exercise the deferral right for more than once during any twelve-month period and cannot register any other securities during such 60-day period.

110

*Piggyback Registration Rights*. If we propose to register for a public offering or our securities other than relating to any share incentive plan or a corporate reorganization, we must notify all holders of registrable securities and offer them an opportunity to be included in such registration. If the managing underwriter determines in good faith that market factors require a limitation of the number of registrable securities to be underwritten, the managing underwriter may decide to exclude shares from the registration and the underwriting, and the number of shares that may be included in the registration and the underwriting will be allocated, first, to us, second, to each of the holders requesting inclusion of their registrable securities on a pro rata basis based on the total amount of registrable securities requested by each such holder, and third, to holders of other securities of our company, provided that all other equity securities are first excluded and 25% of shares of registrable securities requested by the holders are included.

*Expenses of Registration*. We will bear all registration expenses, other than the underwriting discounts and commissions, fees for special counsel for the holders participating in such registration and certain excepted expenses as described in the shareholders agreement, incurred in connection with registrations, filings or qualification pursuant to the shareholders agreement.

*Termination of Obligations*. We have no obligation to effect any demand, piggyback or Form F-3 registration upon (i) the fifth anniversary from the date of closing of a Qualified Initial Public Offering (as defined in the shareholders agreement), (ii) upon the termination, liquidation or dissolution of our company or a Liquidation Event (as defined in the shareholders agreement), or (iii) all registrable securities proposed to be sold by a holder may then be sold without registration in any 90-day period under Rule 144 of the Securities Act.

## Employment Agreements and Indemnification Agreements

See "Item 6. Directors, Senior Management and Employees—B. Compensation."

## Share Incentive Plans

See "Item 6. Directors, Senior Management and Employees—B. Compensation."

## Agreement and Business Cooperation with Tencent

*Strategic Cooperation Framework Agreement*. In February 2018, we entered into a Strategic Cooperation Framework Agreement with Tencent, a provider of internet value-added services serving the largest online community in China. Pursuant to the Strategic Cooperation Framework Agreement, Tencent agreed to offer us access points on the interface of Weixin Pay enabling us to utilize traffic from Tencent's Weixin Pay. In addition, we and Tencent have agreed to cooperate in a number of areas including payment solutions, cloud services and user engagement, and to explore and pursue additional opportunities for potential cooperation. Tencent agreed to provide us with Weixin payment services and charge the payment processing fee corresponding to each transaction payment through Weixin Wallet on the Pinduoduo platform at a rate no higher than the normal rate of its payment solutions charged to third parties. Tencent also agreed to share technical and administrative resources with us and make reasonable efforts to provide support in a variety of professional areas, such as talent recruiting, training and technical resources. The Strategic Cooperation Framework Agreement has a term of five years.

*Business Cooperation with Tencent*. Tencent has been a principal shareholder of us since February 2017. In 2020, 2021 and 2022, we purchased from Tencent certain services, including payment processing, advertising and cloud services, in the total amount of RMB10,541.5 million, RMB8,416.6 million and RMB7,061.1 million (US$1,023.8 million), respectively. As of December 31, 2020, 2021 and 2022, we had a receivable balance from Tencent in the amount of RMB3,177.5 million, RMB2,803.3 million and RMB2,763.9 million (US$400.7 million), respectively, and a payable balance to Tencent in the amount of RMB3,370.9 million, RMB1,916.5 million and RMB1,539.7 million (US$223.2 million), respectively. In 2021, we purchased certain computer equipment from Tencent for a total amount of RMB1,833.5 million.

## Passive Investments in Related-Party Funds

The Company had set up funds as a limited partner with related parties to invest in privately-held companies. However, these related parties ceased to be affiliated with the Company after the fourth quarter of 2022. As of December 31, 2020, 2021 and 2022, the carrying amount for the investments was RMB252.4 million, RMB332.6 million and RMB355.7 million (US$51.6 million).

**Loan to Ningbo Hexin and Business Cooperation Agreement with Shanghai Fufeitong**

We currently rely on commercial banks and third-party online payment service providers for payment processing and escrow services. See "Item 3. Key Information—D. Risk Factors—Risks Related to Our Business—We currently rely on commercial banks and third-party online payment service providers for payment processing and escrow services. If these payment services are restricted or curtailed in any way, are offered to us on less favorable terms, or become unavailable to us or our buyers for any reason, our business may be materially and adversely affected." To mitigate risk and impact on our business operations in the event of disruption or discontinuance of our relationship with commercial banks and third-party online payment service providers, we facilitated Messrs. Lei Chen and Zhenwei Zheng, our executive officers, to acquire the controlling equity interests in Shanghai Fufeitong, a licensed payment service company, by providing interest-free loans in the aggregate amount of RMB697.6 million (US$101.1 million) to Ningbo Hexin Equity Investment Partnership, or Ningbo Hexin, a limited partnership controlled by Messrs. Lei Chen and Zhenwei Zheng.

As of December 31, 2022, Ningbo Hexin beneficially owned 50.01% equity interests in Shanghai Fufeitong. Subject to compliance with applicable laws and regulations and approval by relevant regulatory authorities, Hangzhou Aimi may require Ningbo Hexin to repay the loans at any time and use the proceeds to pay for the limited partnership interests in Ningbo Hexin. As of December 31, 2022, the loans were still outstanding.

In April 2020, Shanghai Xunmeng entered into a business cooperation agreement with Shanghai Fufeitong, pursuant to which both parties agreed to conduct comprehensive business cooperation in payment services, technical resources and other related professional areas. As of December 31, 2022, we had a receivable balance from Shanghai Fufeitong and its affiliates of RMB2,856.9 million (US$414.2 million), and a payable balance to Shanghai Fufeitong and its affiliates of RMB136.7 million (US$19.8 million).

**C.      Interests of Experts and Counsel**

Not applicable.

**Item 8.      Financial Information**

**A.      Consolidated Statements and Other Financial Information**

We have appended consolidated financial statements filed as part of this annual report.

**Legal Proceedings**

From time to time, we may be involved in disputes and legal or administrative proceedings in the ordinary course of our business, including actions with respect to product quality complaints, breach of contract, labor and employment claims, copyright, trademark and patent infringement, and other matters. For example, in July 2018, a complaint was filed against us in the U.S. federal court alleging contributory trademark infringement and unfair competition based on certain allegedly counterfeit and unauthorized merchandise sold by merchants to U.S. consumers on the Pinduoduo platform. In August 2019, the court dismissed all claims against us. In February 2020, the District Court awarded the Company a fee award and entered final judgment. The time period for plaintiff to appeal the dismissal of the amended complaint and the fee award expired, but plaintiff would not confirm that it would pay the fee award, and plaintiff's U.S. counsel in the litigation stated that it no longer represents plaintiff in this matter. Accordingly, starting in April 2020, the Company commenced efforts to enforce the judgment. Those efforts were successful, and in November 2020, the plaintiff paid the Company the full amount of the judgment plus additional interest for the delay. The Company filed a Satisfaction of Judgment with the District Court, and the matter is now closed.

112

Between August and December 2018, several putative shareholder class action lawsuits were filed against us and certain of our officers and directors in the U.S. District Court for the Southern District of New York ("SDNY") and the Superior Court of the State of California. The plaintiffs in these cases alleged, in sum and substance, that certain disclosure and statements made by our company in connection with our initial public offering contained material misstatements and omissions in violation of the federal securities laws. In March 2020, the court granted our motion to dismiss the claims in the consolidated action in the SDNY. In August 2021, the United States Court of Appeals for the Second Circuit affirmed the district court's dismissal of the federal action, and the matter is now closed. The consolidated action in the Superior Court of the State of California was stayed in June 2019 at our request while the abovementioned SDNY action was pending. In October 2020, the stay was lifted. In February 2021, the Superior Court of the State of California dismissed all claims against us for lack of personal jurisdiction, and the time period for plaintiffs to appeal the dismissal has expired. For risks and uncertainties relating to lawsuits against us, please see "Item 3. Key Information—D. Risk Factors—Risks Related to Our Business—We and certain of our directors and officers have been named as defendants in several lawsuits, which could have a material adverse impact on our business, financial condition, results of operation, cash flows and reputation" and "Item 3. Key Information—D. Risk Factors—Risks Related to Our Business—We may incur liability for counterfeit, unauthorized, illegal, or infringing products sold or misleading information available on our platforms."

**Dividend Policy**

Our board of directors has complete discretion on whether to distribute dividends, subject to our memorandum and articles of association and certain requirements of Cayman Islands law. In addition, our shareholders may by ordinary resolution declare a dividend, but no dividend may exceed the amount recommended by our board of directors. Even if our board of directors decides to pay dividends, the form, frequency and amount will depend upon our future operations and earnings, capital requirements and surplus, general financial condition, contractual restrictions and other factors that the board of directors may deem relevant.

We do not have any present plan to pay any cash dividends on our ordinary shares in the foreseeable future. We currently intend to retain most, if not all, of our available funds and any future earnings to operate and expand our business.

We are a holding company incorporated in the Cayman Islands. We may rely on dividends from our subsidiaries in China for our cash requirements, including any payment of dividends to our shareholders. PRC regulations may restrict the ability of our PRC subsidiaries to pay dividends to us. See "Item 4. Information on the Company—B. Business Overview—Regulation—Regulations Relating to Dividend Distributions."

If we pay any dividends on our ordinary shares, we will pay those dividends which are payable in respect of the Class A ordinary shares underlying our ADSs to the depositary, as the registered holder of such Class A ordinary shares, and the depositary then will pay such amounts to our ADS holders in proportion to Class A ordinary shares underlying the ADSs held by such ADS holders, subject to the terms of the deposit agreement, including the fees and expenses payable thereunder. Cash dividends on our ordinary shares, if any, will be paid in U.S. dollars.

**B.      Significant Changes**

Except as disclosed elsewhere in this annual report, we have not experienced any significant changes since the date of our audited consolidated financial statements included in this annual report.

**Item 9.      The Offer and Listing**

**A.      Offering and Listing Details**

Our ADSs, each representing four Class A ordinary shares, have been listed on Nasdaq Stock Market since July 26, 2018. Our ADSs trade under the symbol "PDD."

**B.      Plan of Distribution**

Not applicable.

**C.      Markets**

Our ADSs, each representing four Class A ordinary shares of ours, have been listed on Nasdaq Stock Market since July 26, 2018 under the symbol "PDD."

Table of Contents

**D.**      <u>**Selling Shareholders**</u>

   Not applicable.

**E.**      <u>**Dilution**</u>

   Not applicable.

**F.**      <u>**Expenses of the Issue**</u>

   Not applicable.

**Item 10.**    **Additional Information**

**A.**      <u>**Share Capital**</u>

   Not applicable.

**B.**      <u>**Memorandum and Articles of Association**</u>

   The following are summaries of material provisions of our currently effective memorandum and articles of association and of the Companies Act, insofar as they relate to the material terms of our ordinary shares.

   *Objects of Our Company.* Under our memorandum and articles of association, the objects of our company are unrestricted and we have the full power and authority to carry out any object not prohibited by the law of the Cayman Islands.

   *Ordinary Shares*. Our ordinary shares are divided into Class A ordinary shares and Class B ordinary shares. Holders of our Class A ordinary shares and Class B ordinary shares will have the same rights except for voting and conversion rights. Each Class A ordinary share shall entitle the holder thereof to one (1) vote on all matters subject to vote at our general meetings, and each Class B ordinary share shall entitle the holder thereof to ten (10) votes on all matters subject to vote at our general meetings. Our ordinary shares are issued in registered form and are issued when registered in our register of members.

   *Conversion*. Each Class B ordinary share is convertible into one Class A ordinary share at any time by the holder thereof. Class A ordinary shares are not convertible into Class B ordinary shares under any circumstances. Upon any sale, transfer, assignment or disposition of any Class B ordinary shares by a holder thereof to any person other than Mr. Zheng Huang or any entity which is not ultimately controlled by Mr. Zheng Huang, such Class B ordinary shares shall be automatically and immediately converted into the same number of Class A ordinary shares.

   *Dividends*. The holders of our ordinary shares are entitled to such dividends as may be declared by our board of directors. Under the laws of the Cayman Islands, our company may declare and pay a dividend out of either profit or share premium account, provided that in no circumstances may a dividend be paid if this would result in our company being unable to pay its debts as they fall due in the ordinary course of business.

   *Voting Rights*. Our Class A ordinary shares and Class B ordinary shares vote together as a single class on all matters submitted to a vote of our shareholders, except as may otherwise be required by law or provided for in our memorandum and articles of association. In respect of matters requiring shareholders' vote, each Class A ordinary share is entitled to one vote, and each Class B ordinary share is entitled to ten votes. At any general meeting a resolution put to the vote of the meeting shall be decided on a show of hands, unless a poll is (before or on the declaration of the result of the show of hands) demanded by the chairman or any shareholder present in person or by proxy.

   A quorum required for a meeting of shareholders consists of one or more shareholders holding not less than a majority of all votes attaching to all of our shares in issue and entitled to vote present in person or by proxy or, if a corporation or other non-natural person, by its duly authorized representative. Advance notice of at least ten calendar days is required for the convening of our annual general meeting and other shareholders meetings.

Table of Contents

An ordinary resolution to be passed at a meeting by the shareholders requires the affirmative vote of a simple majority of the votes attaching to the ordinary shares cast at a meeting. A special resolution requires the affirmative vote of no less than two-thirds of the votes cast attaching to the outstanding shares at a meeting. Our articles of association provide that a special resolution shall be required, and that for the purposes of any such special resolution, the affirmative vote of no less than 95% of votes cast by the shareholders entitled to vote who are present in person or by proxy at a general meeting shall be required to approve any amendments to any provisions of our articles of association that relate to or have an impact upon: (i) the right of the PDD Partnership to appoint executive directors and nominate the chief executive officer candidate of our company as described under "Item 6. Directors, Senior Management and Employees—A. Directors and Senior Management—PDD Partnership—Executive Director Appointment and CEO Nomination Right," and (ii) the procedures regarding the election, appointment and removal of directors or size of the board. Both ordinary resolutions and special resolutions may also be passed by a unanimous written resolution signed by all the shareholders of our company, as permitted by the Companies Act and our memorandum and articles of association. A special resolution will be required for important matters such as a change of name or making changes to our articles of association.

*General Meetings of Shareholders*. As a Cayman Islands exempted company, we are not obliged by the Companies Act to call shareholders' annual general meetings. Our articles of association provide that we may (but are not obliged to) in each year hold a general meeting as our annual general meeting in which case we shall specify the meeting as such in the notices calling it, and the annual general meeting shall be held at such time and place as may be determined by our directors.

Shareholders' general meetings may be convened by the chairman or a majority of our board of directors. Advance notice of at least ten (10) calendar days is required for the convening of our annual general shareholders' meeting (if any) and any other general meeting of our shareholders. A quorum required for any general meeting of shareholders consists of one or more shareholders present or by proxy, representing not less than a majority of all votes attaching to all of our shares in issue and entitled to vote.

The Companies Act does not provide shareholders with any right to put any proposal before a general meeting. However, these rights may be provided in a company's articles of association. Our memorandum and articles of association provide that upon the requisition of shareholders representing in aggregate not less than one-third of all votes attaching to all issued and outstanding shares of our company that as at the date of the deposit carry the right to vote at general meetings of our company, our board of directors will convene an extraordinary general meeting and put the resolutions so requisitioned to a vote at such meeting. However, our memorandum and articles of association do not provide our shareholders with any right to put any proposals before annual general meetings or extraordinary general meetings not called by such shareholders.

*Transfer of Ordinary Shares*. Subject to the restrictions set out below, any of our shareholders may transfer all or any of his or her ordinary shares by an instrument of transfer in writing, and shall be executed by or on behalf of the transferor, and if in respect of a nil or partly paid up share, or the directors so require, shall also be executed by the transferee.

Our board of directors may, in its absolute discretion, decline to register any transfer of any ordinary share which is not fully paid up or on which we have a lien. Our board of directors may also decline to register any transfer of any ordinary share unless:

- the instrument of transfer is lodged with us, accompanied by the certificate for the ordinary shares to which it relates and such other evidence as our board of directors may reasonably require to show the right of the transferor to make the transfer;

- the instrument of transfer is in respect of only one class of ordinary shares;

- the instrument of transfer is properly stamped, if required;

- in the case of a transfer to joint holders, the number of joint holders to whom the ordinary share is to be transferred does not exceed four; and

- a fee of such maximum sum as the Nasdaq Global Select Market may determine to be payable or such lesser sum as our directors may from time to time require is paid to us in respect thereof.

If our directors refuse to register a transfer they shall, within three calendar months after the date on which the instrument of transfer was lodged, send to each of the transferor and the transferee notice of such refusal.

115

Table of Contents

The registration of transfers may, after compliance with any notice required of the Nasdaq Stock Market, be suspended and the register closed at such times and for such periods as our board of directors may from time to time determine, provided, however, that the registration of transfers shall not be suspended nor the register closed for more than 30 calendar days in any calendar year as our board may determine.

*Liquidation*. On the winding up of our company, if the assets available for distribution amongst our shareholders shall be more than sufficient to repay the whole of the share capital at the commencement of the winding up, the surplus shall be distributed amongst our shareholders in proportion to the par value of the shares held by them at the commencement of the winding up, subject to a deduction from those shares in respect of which there are monies due, of all monies payable to our company for unpaid calls or otherwise. If our assets available for distribution are insufficient to repay all of the paid-up capital, the assets will be distributed so that the losses are borne by our shareholders in proportion to the par value of the shares held by them.

*Calls on Shares and Forfeiture of Shares*. Our board of directors may from time to time make calls upon shareholders for any amounts unpaid on their shares in a notice served to such shareholders at least 14 calendar days prior to the specified time of payment. The shares that have been called upon and remain unpaid are subject to forfeiture.

*Redemption, Repurchase and Surrender of Shares*. We may issue shares on terms that such shares are subject to redemption, at our option or at the option of the holders of these shares, on such terms and in such manner as may be determined by our board of directors, or by the shareholders by special resolutions. Our company may also repurchase any of our shares on such terms and in such manner as have been approved by our board of directors or by an ordinary resolution of our shareholders. Under the Companies Act, the redemption or repurchase of any share may be paid out of our company's profits, out of the share premium account, or out of the proceeds of a new issue of shares made for the purpose of such redemption or repurchase, or out of capital if our company can, immediately following such payment, pay its debts as they fall due in the ordinary course of business. In addition, under the Companies Act no such share may be redeemed or repurchased (a) unless it is fully paid up, (b) if such redemption or repurchase would result in there being no shares outstanding or (c) if our company has commenced liquidation. In addition, our company may accept the surrender of any fully paid share for no consideration.

*Variations of Rights of Shares*. If at any time, our share capital is divided into different classes of shares, the rights attached to any class of shares (unless otherwise provided by the terms of issue of the shares of that class), whether or not our company is being wound-up, may be varied with the consent in writing of the holders of two-thirds of the issued shares of that class or with the sanction of a resolution passed at a separate meeting of the holders of the shares of the class by the holders of two-thirds of the issued shares of that class. The rights conferred upon the holders of the shares of any class issued shall not, unless otherwise expressly provided by the terms of issue of the shares of that class, be deemed to be varied by the creation or issue of further shares ranking pari passu with such existing class of shares.

*Issuance of Additional Shares*. Our memorandum and articles of association authorizes our board of directors to issue additional ordinary shares from time to time as our board of directors shall determine, to the extent of available authorized but unissued shares.

Our memorandum of association also authorizes our board of directors to establish from time to time one or more series of preference shares and to determine, with respect to any series of preference shares, the terms and rights of that series, including:

- the designation of the series;

- the number of shares of the series;

- the dividend rights, dividend rates, conversion rights, voting rights; and

- the rights and terms of redemption and liquidation preferences.

Our board of directors may issue preference shares without action by our shareholders to the extent authorized but unissued. Issuance of these shares may dilute the voting power of holders of ordinary shares.

*Inspection of Books and Records*. Holders of our ordinary shares will have no general right under Cayman Islands law to inspect or obtain copies of our list of shareholders or our corporate records. However, we will provide our shareholders with annual audited financial statements.

116

*Anti-Takeover Provisions*. Some provisions of our memorandum and articles of association may discourage, delay or prevent a change of control of our company or management that shareholders may consider favorable, including provisions that:

- authorize our board of directors to issue preference shares in one or more series and to designate the price, rights, preferences, privileges and restrictions of such preference shares without any further vote or action by our shareholders; and

- regulate the ability of shareholders to requisition and convene general meetings of shareholders.

However, under Cayman Islands law, our directors may only exercise the rights and powers granted to them under our memorandum and articles of association for a proper purpose and for what they believe in good faith to be in the best interests of our company.

*Exempted Company*. We are an exempted company with limited liability under the Companies Act. The Companies Act distinguishes between ordinary resident companies and exempted companies. Any company that is registered in the Cayman Islands but conducts business mainly outside of the Cayman Islands may apply to be registered as an exempted company. The requirements for an exempted company are essentially the same as for an ordinary company except that an exempted company:

- does not have to file an annual return of its shareholders with the Registrar of Companies;

- is not required to open its register of members for inspection;

- does not have to hold an annual general meeting;

- may issue shares with no par value;

- may obtain an undertaking against the imposition of any future taxation (such undertakings are usually given for 20 years in the first instance);

- may register by way of continuation in another jurisdiction and be deregistered in the Cayman Islands;

- may register as an exempted limited duration company;

- may register as a segregated portfolio company; and

- may apply to be registered as a special economic zone company.

"Limited liability" means that the liability of each shareholder is limited to the amount unpaid by the shareholder on the shares of the company.

## C.      **Material Contracts**

We have not entered into any material contracts other than in the ordinary course of business and other than those described in "Item 4. Information on the Company" and "Item 7. Major Shareholders and Related Party Transactions—B. Related Party Transactions" or elsewhere in this annual report on Form 20-F.

## D.      **Exchange Controls**

See "Item 4. Information on the Company—B. Business Overview—Regulation—Regulations Relating to Foreign Exchange."

Table of Contents

**E.**     <u>**Taxation**</u>

The following summary of the material Cayman Islands, PRC and U.S. federal income tax consequences of an investment in our ADSs or ordinary shares is based upon laws and relevant interpretations thereof in effect as of the date of this annual report, all of which are subject to change. This summary does not deal with all possible tax consequences relating to an investment in our ADSs or ordinary shares, such as the tax consequences under U.S. state and local tax laws or under the tax laws of jurisdictions other than the Cayman Islands, China and the United States.

**Cayman Islands Taxation**

The Cayman Islands currently levies no taxes on individuals or corporations based upon profits, income, gains or appreciation and there is no taxation in the nature of inheritance tax or estate duty. There are no other taxes likely to be material to us levied by the government of the Cayman Islands except for stamp duties which may be applicable on instruments executed in, or brought within the jurisdiction of the Cayman Islands. The Cayman Islands is not party to any double tax treaties that are applicable to any payments made to or by our company. There are no exchange control regulations or currency restrictions in the Cayman Islands.

Payments of dividends and capital in respect of our ordinary shares and ADSs will not be subject to taxation in the Cayman Islands, and no withholding will be required on the payment of a dividend or capital to any holder of our ordinary shares or ADSs, nor will gains derived from the disposal of our ordinary shares or ADSs be subject to Cayman Islands income or corporation tax.

No stamp duty is payable in respect of the issue of the shares or on an instrument of transfer in respect of shares in Cayman Islands exempted companies, except for those companies which hold interests in land in the Cayman Islands or if the relevant instrument is brought into the Cayman Islands.

**PRC Taxation**

Under the PRC Enterprise Income Tax Law and its implementation rules, an enterprise established outside the PRC with "de facto management body" within the PRC is considered a resident enterprise. The implementation rules define the term "de facto management body" as the body that exercises full and substantial control and overall management over the business, productions, personnel, accounts and properties of an enterprise. In April 2009, the SAT issued a circular, known as Circular 82, which provides certain specific criteria for determining whether the "de facto management body" of a PRC-controlled enterprise that is incorporated offshore is located in China. Although this circular only applies to offshore enterprises controlled by PRC enterprises or PRC enterprise groups, not those controlled by PRC individuals or foreigners, the criteria set forth in the circular may reflect the SAT's general position on how the "de facto management body" text should be applied in determining the tax resident status of all offshore enterprises. According to Circular 82, an offshore incorporated enterprise controlled by a PRC enterprise or a PRC enterprise group will be regarded as a PRC tax resident by virtue of having its "de facto management body" in China only if all of the following conditions are met: (i) the primary location of the day-to-day operational management is in the PRC; (ii) decisions relating to the enterprise's financial and human resource matters are made or are subject to approval by organizations or personnel in the PRC; (iii) the enterprise's primary assets, accounting books and records, company seals, and board and shareholder resolutions, are located or maintained in the PRC; and (iv) at least 50% of voting board members or senior executives habitually reside in the PRC.

We believe that PDD Holdings Inc. is not a PRC resident enterprise for PRC tax purposes. PDD Holdings Inc. is not controlled by a PRC enterprise or PRC enterprise group and we do not believe that PDD Holdings Inc. meets all of the conditions above. PDD Holdings Inc. is a company incorporated outside China. As a holding company, its key assets are its ownership interests in its subsidiaries, and its records (including the resolutions of its board of directors and the resolutions of its shareholders) are maintained, outside China. In addition, we are not aware of any offshore holding companies with a similar corporate structure as ours ever having been deemed a PRC "resident enterprise" by the PRC tax authorities. However, the tax resident status of an enterprise is subject to determination by the PRC tax authorities and uncertainties remain with respect to the interpretation of the term "de facto management body."

If the PRC tax authorities determine that PDD Holdings Inc. is a PRC resident enterprise for enterprise income tax purposes, we may be required to withhold a 10% withholding tax from dividends we pay to our shareholders that are non-resident enterprises, including the holders of our ADSs. In addition, non-resident enterprise shareholders (including our ADS holders) may be subject to a 10% PRC tax on gains realized on the sale or other disposition of ADSs or ordinary shares, if such income is treated as sourced from within China. It is unclear whether our non-PRC individual shareholders (including our ADS holders) would be subject to any PRC tax on dividends or gains obtained by such non-PRC individual shareholders in the event we are determined to be a PRC resident enterprise. If any PRC tax were to apply to such dividends or gains, it would generally apply at a rate of 20% unless a reduced rate is available under an applicable tax treaty. However, it is also unclear whether non-PRC shareholders of PDD Holdings Inc. would be able to claim the benefits of any tax treaties between their country of tax residence and China in the event that PDD Holdings Inc. is treated as a PRC resident enterprise. See "Item 3. Key Information—D. Risk Factors—Risks Related to Our Multi-jurisdictional Operations—If we are classified as a PRC resident enterprise for PRC income tax purposes, such classification could result in unfavorable tax consequences to us and our non-PRC shareholders or ADS holders."

## U.S. Federal Income Tax Considerations

The following discussion is a summary of U.S. federal income tax considerations generally applicable to the ownership and disposition of our ADSs or Class A ordinary shares by a U.S. holder (as defined below) that holds our ADSs or Class A ordinary shares as "capital assets" (generally, property held for investment) under the U.S. Internal Revenue Code of 1986, as amended (the "Code"). This discussion is based upon existing U.S. federal income tax law, which is subject to differing interpretations and may be changed, possibly with retroactive effect. There can be no assurance that the Internal Revenue Service (the "IRS") or a court will not take a contrary position. This discussion does not address all aspects of U.S. federal income taxation that may be important to particular investors in light of their individual circumstances, including investors subject to special tax rules (for example, banks and certain financial institutions, insurance companies, pension plans, cooperatives, broker-dealers, traders in securities that have elected the mark-to-market method of accounting for their securities, partnerships and their partners, regulated investment companies, real estate investment trusts, certain former U.S. citizens or long-term residents, persons liable for alternative minimum tax, and tax-exempt organizations (including private foundations)), investors who are not U.S. holders, investors who own (directly, indirectly, or constructively) 10% or more of our stock (by vote or value), investors that will hold their ADSs or Class A ordinary shares as part of a straddle, hedge, conversion, constructive sale, or other integrated transaction for U.S. federal income tax purposes, or investors that have a functional currency other than the U.S. dollar, all of whom may be subject to tax rules that differ significantly from those summarized below. In addition, this discussion does not discuss any non-U.S., alternative minimum tax, state, or local tax or any non-income tax (such as the U.S. federal gift or estate tax) considerations, or the Medicare tax on net investment income. Each U.S. holder is urged to consult its tax advisor regarding the U.S. federal, state, local, and non-U.S. income and other tax considerations of an investment in our ADSs or Class A ordinary shares.

### *General*

For purposes of this discussion, a "U.S. holder" is a beneficial owner of our ADSs or Class A ordinary shares that is, for U.S. federal income tax purposes, (i) an individual who is a citizen or resident of the United States, (ii) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created in, or organized under the laws of, the United States or any state thereof or the District of Columbia, (iii) an estate the income of which is subject to U.S. federal income taxation regardless of its source, or (iv) a trust (A) the administration of which is subject to the primary supervision of a U.S. court and which has one or more U.S. persons who have the authority to control all substantial decisions of the trust or (B) that has otherwise elected to be treated as a U.S. person under applicable U.S. Treasury regulations.

If a partnership (or other entity or arrangement treated as a partnership for U.S. federal income tax purposes) is a beneficial owner of our ADSs or Class A ordinary shares, the tax treatment of a partner in the partnership will generally depend upon the status of the partner and the activities of the partnership. Partnerships holding our ADSs or Class A ordinary shares and partners in such partnerships are urged to consult their tax advisors as to the particular U.S. federal income tax consequences of an investment in our ADSs or Class A ordinary shares.

For U.S. federal income tax purposes, a U.S. holder of ADSs will generally be treated as the beneficial owner of the underlying shares represented by the ADSs. The remainder of this discussion assumes that a U.S. holder of our ADSs will be treated as the beneficial owner of the underlying shares represented by the ADSs. Accordingly, deposits or withdrawals of Class A ordinary shares for ADSs will generally not be subject to U.S. federal income tax.

119

***Passive Foreign Investment Company Considerations***

A non-U.S. corporation, such as our company, will be a "passive foreign investment company," or "PFIC," for U.S. federal income tax purposes, if, in any particular taxable year, either (i) 75% or more of its gross income for such year consists of certain types of "passive" income or (ii) 50% or more of the value of its assets (generally determined on the basis of a quarterly average) during such year produce or are held for the production of passive income. Cash is categorized as a passive asset and the company's unbooked intangibles associated with active business activities may generally be classified as active assets. Passive income generally includes, among other things, dividends, interest, rents, royalties, and gains from the disposition of passive assets.

We will be treated as owning a proportionate share of the assets and earning a proportionate share of the income of any other corporation in which we own, directly or indirectly, 25% or more (by value) of the stock. Although the law in this regard is unclear, we intend to treat the VIE (including its subsidiaries) as being owned by us for U.S. federal income tax purposes, and we treat it that way, not only because we are able to direct the activities of such entity but also because we are entitled to substantially all of its economic benefits, and, as a result, we consolidate its results of operations in our consolidated financial statements. Assuming that we are the owner of the VIE (including its subsidiaries) for U.S. federal income tax purposes, and based upon our current income and assets and the value of our ADSs, we do not believe that we were a PFIC for the taxable year ended December 31, 2022 and we do not expect to be classified as a PFIC in the current taxable year or for the foreseeable future.

While we do not expect to be or become a PFIC in the current or the foreseeable future, the determination of whether we are or will become a PFIC will depend in part upon the value of our goodwill and other unbooked intangibles (which will depend upon the market price of our ADSs from time-to-time, which may be volatile). The market price of our ADSs may continue to fluctuate considerably and, consequently, we cannot assure you of our PFIC status for any taxable year. In estimating the value of our goodwill and other unbooked intangibles, we have taken into account our market capitalization. Among other matters, if our market capitalization is less than anticipated or subsequently declines, we may be or become a PFIC for the current or future taxable years.

The determination of whether we will be or become a PFIC will also depend, in part, on the composition of our income and assets, which may be affected by how, and how quickly, we use our liquid assets. If we determine not to deploy significant amounts of cash for active purposes or if we were treated as not owning the VIE for U.S. federal income tax purposes, our risk of being classified as a PFIC may substantially increase. Because our PFIC status for any taxable year is a factual determination that can be made only after the close of a taxable year, there can be no assurance that we will not be a PFIC for the current taxable year or any future taxable year. If we are a PFIC for any year during which a U.S. holder holds our ADSs or Class A ordinary shares, we generally will continue to be treated as a PFIC for all succeeding years during which such U.S. holder holds our ADSs or Class A ordinary shares.

The discussion below under "Dividends" and "Sale or Other Disposition of ADSs or Class A Ordinary Shares" is written on the basis that we will not be or become a PFIC for U.S. federal income tax purposes. The U.S. federal income tax rules that apply if we are a PFIC for the current taxable year or any subsequent taxable year are generally discussed below under "Passive Foreign Investment Company Rules."

***Dividends***

Subject to the PFIC rules discussed below, any cash distributions paid on our ADSs or Class A ordinary shares (including the amount of any tax withheld) out of our current or accumulated earnings and profits, as determined under U.S. federal income tax principles, will generally be includible in the gross income of a U.S. holder as dividend income on the day actually or constructively received by the U.S. holder, in the case of Class A ordinary shares, or by the depositary, in the case of ADSs. Because we do not intend to determine our earnings and profits on the basis of U.S. federal income tax principles, we will generally report any distribution paid as a dividend for U.S. federal income tax purposes. Dividends received on the ADSs or Class A ordinary shares will not be eligible for the dividends received deduction allowed to corporations.

Table of Contents

Individuals and other non-corporate U.S. holders will generally be subject to tax at the lower capital gain tax rate applicable to "qualified dividend income," provided that certain conditions are satisfied, including that (1) our ADSs are readily tradable on an established securities market in the United States, or, in the event that we are deemed to be a PRC resident enterprise under the PRC tax law, we are eligible for the benefit of the United States-PRC income tax treaty (the "Treaty"), (2) we are neither a PFIC nor treated as such with respect to a U.S. holder (as discussed below) for the taxable year in which the dividend was paid and the preceding taxable year, and (3) certain holding period requirements are met. Our ADSs (but not our Class A ordinary shares) are listed on the Nasdaq Global Select Market and is considered readily tradeable on an established securities market in the United States. There can be no assurance that our ADSs will continue to be considered readily tradable on an established securities market in later years. Since we do not expect that our Class A ordinary shares will be listed on established securities markets, we do not believe that dividends that we pay on our Class A ordinary shares that are not backed by ADSs currently meet the conditions required for the reduced tax rate. However, in the event we are deemed to be a resident enterprise under the PRC Enterprise Income Tax Law, we may be eligible for the benefits of the Treaty (which the U.S. Treasury Department has determined is satisfactory for this purpose) and in that case, we would be treated as a qualified foreign corporation with respect to dividends paid on our Class A ordinary shares as well as our ADSs. Each non-corporate U.S. holder is advised to consult its tax advisors regarding the availability of the reduced tax rate applicable to qualified dividend income for any dividends we pay with respect to our ADSs or Class A ordinary shares.

Dividends generally will be treated as income from foreign sources for U.S. foreign tax credit purposes and generally will constitute passive category income. In the event that we are deemed to be a PRC "resident enterprise" under the Enterprise Income Tax Law, a U.S. holder may be subject to PRC withholding taxes on dividends paid on our ADSs or Class A ordinary shares. See "Item 10. Additional Information—E. Taxation—PRC Taxation." In that case, a U.S. holder may be eligible, subject to a number of complex limitations, to claim a foreign tax credit in respect of any foreign withholding taxes imposed on dividends received on ADSs or Class A ordinary shares. A U.S. holder who does not elect to claim a foreign tax credit for foreign tax withheld may instead claim a deduction, for U.S. federal income tax purposes, in respect of such withholdings, but only for a year in which such U.S. holder elects to do so for all creditable foreign income taxes. The rules governing the foreign tax credit are complex. U.S. holders are advised to consult their tax advisors regarding the availability of the foreign tax credit under their particular circumstances.

### Sale or Other Disposition of ADSs or Class A Ordinary Shares

Subject to the PFIC rules discussed below, a U.S. holder generally will recognize capital gain or loss upon the sale or other disposition of ADSs or Class A ordinary shares in an amount equal to the difference between the amount realized upon the disposition and the U.S. holder's adjusted tax basis in such ADSs or Class A ordinary shares. Any capital gain or loss will be long-term if the ADSs or Class A ordinary shares have been held for more than one year and generally will be U.S. source gain or loss for U.S. foreign tax credit purposes. Long-term capital gains of individuals and other non-corporate U.S. holders generally are eligible for a reduced rate of taxation. The deductibility of a capital loss may be subject to limitations.

In the event that we are treated as a PRC "resident enterprise" under the Enterprise Income Tax Law and gain from the disposition of the ADSs or Class A ordinary shares is subject to tax in the PRC, a U.S. holder that is eligible for the benefits of the Treaty may elect to treat the gain as PRC source income. Pursuant to recently issued U.S. Treasury Regulations, however, if a U.S. holder is not eligible for the benefits of the Treaty or does not elect to apply the Treaty, then such holder may not be able to claim a foreign tax credit arising from any PRC tax imposed on the disposition of ADSs or Class A ordinary shares. The rules regarding foreign tax credits and deduction of foreign taxes are complex. U.S. holders should consult their tax advisors regarding the availability of a foreign tax credit or deduction in light of their particular circumstances, including their eligibility for benefits under the Treaty and the potential impact of the recently issued U.S. Treasury Regulations.

### Passive Foreign Investment Company Rules

If we are a PFIC for any taxable year during which a U.S. holder holds our ADSs or Class A ordinary shares, and unless the U.S. holder makes a mark-to-market election (as described below), the U.S. holder will generally be subject to special tax rules that have a penalizing effect, regardless of whether we remain a PFIC, for subsequent taxable years, on (i) any excess distribution that we make to the U.S. holder (which generally means any distribution paid during a taxable year to a U.S. holder that is greater than 125% of the average annual distributions paid in the three preceding taxable years or, if shorter, the U.S. holder's holding period for the ADSs or Class A ordinary shares), and (ii) any gain realized on the sale or other disposition, including, under certain circumstances, a pledge, of ADSs or Class A ordinary shares. Under the PFIC rules:

- such excess distribution and/or gain will be allocated ratably over the U.S. holder's holding period for the ADSs or Class A ordinary shares;

121

Table of Contents

- such amount allocated to the current taxable year and any taxable years in the U.S. holder's holding period prior to the first taxable year in which we are a PFIC, or pre-PFIC year, will be taxable as ordinary income;

- such amount allocated to each prior taxable year, other than a pre-PFIC year, will be subject to tax at the highest tax rate in effect for that year; and

- an interest charge generally applicable to underpayments of tax will be imposed on the tax attributable to each prior taxable year, other than a pre-PFIC year.

If we are a PFIC for any taxable year during which a U.S. holder holds our ADSs or Class A ordinary shares and any of our non-U.S. subsidiaries is also a PFIC, such U.S. holder would be treated as owning a proportionate amount (by value) of the shares of the lower-tier PFIC for purposes of the application of these rules. U.S. holders are advised to consult their tax advisors regarding the application of the PFIC rules to any of our subsidiaries.

As an alternative to the foregoing rules, a U.S. holder of "marketable stock" in a PFIC may make a mark-to-market election with respect to such stock, provided that such stock is regularly traded on a qualified exchange or other market, as defined in the applicable United States Treasury Regulations. For those purposes, our ADSs, but not our Class A ordinary shares, are listed on the Nasdaq Global Market, which is a qualified exchange. We anticipate that our ADSs should qualify as being regularly traded, but no assurances may be given in this regard. Because a mark-to-market election technically cannot be made for any lower-tier PFICs that a PFIC may own, a U.S. holder who makes a mark-to-market election with respect to our ADSs will generally continue to be subject to the PFIC rules with respect to such U.S. holder's indirect interest in any investments held by us that are treated as an equity interest in a PFIC for U.S. federal income tax purposes.

If a U.S. holder makes a mark-to-market election with respect to our ADSs, the U.S. holder generally will (i) include as ordinary income for each taxable year that we are a PFIC the excess, if any, of the fair market value of ADSs held at the end of the taxable year over the adjusted tax basis of such ADSs and (ii) deduct as an ordinary loss the excess, if any, of the adjusted tax basis of the ADSs over the fair market value of such ADSs held at the end of the taxable year, but only to the extent of the net amount previously included in income as a result of the mark-to-market election. The U.S. holder's adjusted tax basis in the ADSs would be adjusted to reflect any income or loss resulting from the mark-to-market election. Further, in each year that we are a PFIC any gain recognized upon the sale or other disposition of the ADSs will be treated as ordinary income and loss will be treated as ordinary loss, but only to the extent of the net amount previously included in income as a result of the mark-to-market election. If a U.S. holder makes a mark-to-market election it will be effective for the taxable year for which the election is made and all subsequent taxable years unless the ADSs are no longer regularly traded on a qualified exchange or the IRS consents to the revocation of the election. It should also be noted that it is intended that only the ADSs and not the Class A ordinary shares will be listed on the Nasdaq Global Select Market. Consequently, if a U.S. holder holds Class A ordinary shares that are not represented by ADSs, such holder generally will not be eligible to make a mark-to-market election if we are or were to become a PFIC.

If a U.S. holder makes a mark-to-market election in respect of a PFIC and such corporation ceases to be a PFIC, the U.S. holder will not be required to take into account the mark-to-market gain or loss described above during any period that such corporation is not a PFIC.

We do not intend to provide information necessary for U.S. holders to make qualified electing fund elections, which, if available, would result in tax treatment different from (and generally less adverse than) the general tax treatment for PFICs described above.

If a U.S. holder owns our ADSs or Class A ordinary shares during any taxable year that we are a PFIC, such holder would generally be required to file an annual IRS Form 8621. Each U.S. holder is advised to consult its tax advisors regarding the potential tax consequences to such holder if we are or become a PFIC, including the possibility of making a mark-to-market election.

**F.    Dividends and Paying Agents**

Not applicable.

**G.    Statement by Experts**

Not applicable.

**H.**        **Documents on Display**

We are subject to periodic reporting and other informational requirements of the Exchange Act as applicable to foreign private issuers, and are required to file reports and other information with the SEC. Specifically, we are required to file annually an annual report on Form 20-F within four months after the end of each fiscal year, which is December 31. All information filed with the SEC can be obtained over the internet at the SEC's website at www.sec.gov. As a foreign private issuer, we are exempt from the rules under the Exchange Act prescribing the furnishing and content of quarterly reports and proxy statements, and officers, directors and principal shareholders are exempt from the reporting and short-swing profit recovery provisions contained in Section 16 of the Exchange Act.

We will furnish Deutsche Bank Trust Company Americas, the depositary of our ADSs, with our annual reports, which will include a review of operations and annual audited consolidated financial statements prepared in conformity with U.S. GAAP, and all notices of shareholders' meetings and other reports and communications that are made generally available to our shareholders. The depositary will make such notices, reports and communications available to holders of ADSs and, upon our request, will mail to all record holders of ADSs the information contained in any notice of a shareholders' meeting received by the depositary from us.

In accordance with Nasdaq Stock Market Rule 5250(d), we will post this annual report on Form 20-F on our website at http://investor.pddholdings.com. In addition, we will provide hardcopies of our annual report free of charge to shareholders and ADS holders upon request.

**I.**        **Subsidiary Information**

Not applicable.

**J.**        **Annual Report to Security Holders**

Not applicable.

**Item 11.**        **Quantitative and Qualitative Disclosures about Market Risk**

**Foreign exchange risk**

A significant portion of our revenues and expenses are denominated in RMB. We do not believe that we currently have any significant direct foreign exchange risk and have not used any derivative financial instruments to hedge exposure to such risk. Although our exposure to foreign exchange risks should be limited in general, the value of your investment in our ADSs will be affected by the exchange rate between U.S. dollar and Renminbi because the value of our business is effectively denominated in RMB, while our ADSs will be traded in U.S. dollars.

The conversion of Renminbi into foreign currencies, including U.S. dollars, is based on rates set by the People's Bank of China. The Renminbi has fluctuated against the U.S. dollar, at times significantly and unpredictably. It is difficult to predict how market forces or the PRC or U.S. government policy may impact the exchange rate between Renminbi and the U.S. dollar in the future.

To the extent that we need to convert U.S. dollars into Renminbi for our operations, appreciation of the Renminbi against the U.S. dollar would have an adverse effect on the RMB amount we receive from the conversion. Conversely, if we decide to convert Renminbi into U.S. dollars for the purpose of making payments for dividends on our ordinary shares or ADSs or for other business purposes, appreciation of the U.S. dollar against the Renminbi would have a negative effect on the U.S. dollar amounts available to us.

**Interest rate risk**

Our exposure to interest rate risk primarily relates to the interest income generated by excess cash, which is mostly held in interest-bearing bank deposits, restricted cash and short-term investments. Interest-earning instruments carry a degree of interest rate risk. We have not been exposed to material risks due to changes in interest rates, and we have not used any derivative financial instruments to manage our interest risk exposure.

**Inflation**

To date, inflation in China has not materially impacted our results of operations. According to the National Bureau of Statistics of China, the year-over-year percent changes in the consumer price index for December 2020, 2021 and 2022 were increases of 0.2%, 1.5% and 1.8%, respectively. Although we have not been materially affected by inflation in the past, we can provide no assurance that we will not be affected by higher rates of inflation in China in the future.

**Item 12.     Description of Securities Other than Equity Securities**

**A.     Debt Securities**

Not applicable.

**B.     Warrants and Rights**

Not applicable.

**C.     Other Securities**

Not applicable.

**D.     American Depositary Shares**

**Fees and Expenses Our ADS Holders May Have to Pay**

As an ADS holder, you will be required to pay the following service fees to the depositary bank and certain taxes and governmental charges (in addition to any applicable fees, expenses, taxes and other governmental charges payable on the deposited securities represented by any of your ADSs):

| Service | Fees |
| --- | --- |
| · To any person to which ADSs are issued or to any person to which a distribution is made in respect of ADS distributions pursuant to stock dividends or other free distributions of stock, bonus distributions, stock splits or other distributions (except where converted to cash) | Up to US$0.05 per ADS issued |
| · Distribution of cash dividends | Up to US$0.05 per ADS cancelled |
| · Distribution of cash entitlements (other than cash dividends) | Up to US$0.05 per ADS held |
| · and/or cash proceeds from the sale of rights, securities and other entitlements | Up to US$0.05 per ADS held |
| · Distribution of ADSs pursuant to exercise of rights. | Up to US$0.05 per ADS held |
| · Distribution of securities other than ADSs or rights to purchase additional ADSs | Up to US$0.05 per ADS held |
| Depositary services | Up to US$0.05 per ADS held on the applicable record date(s) established by the depositary bank |

As an ADS holder, you will also be responsible to pay certain fees and expenses incurred by the depositary bank and certain taxes and governmental charges (in addition to any applicable fees, expenses, taxes and other governmental charges payable on the deposited securities represented by any of your ADSs) such as:

- Fees for the transfer and registration of Class A ordinary shares charged by the registrar and transfer agent for the Class A ordinary shares in the Cayman Islands (i.e., upon deposit and withdrawal of Class A ordinary shares).

- Expenses incurred for converting foreign currency into U.S. dollars.

- Expenses for cable, telex and fax transmissions and for delivery of securities.

- Taxes and duties upon the transfer of securities, including any applicable stamp duties, any stock transfer charges or withholding taxes (i.e., when Class A ordinary shares are deposited or withdrawn from deposit).

- Fees and expenses incurred in connection with the delivery or servicing of Class A ordinary shares on deposit.

- Fees and expenses incurred in connection with complying with exchange control regulations and other regulatory requirements applicable to Class A ordinary shares, deposited securities, ADSs and ADRs.

- Any applicable fees and penalties thereon.

The depositary fees payable upon the issuance and cancellation of ADSs are typically paid to the depositary bank by the brokers (on behalf of their clients) receiving the newly issued ADSs from the depositary bank and by the brokers (on behalf of their clients) delivering the ADSs to the depositary bank for cancellation. The brokers in turn charge these fees to their clients. Depositary fees payable in connection with distributions of cash or securities to ADS holders and the depositary services fee are charged by the depositary bank to the holders of record of ADSs as of the applicable ADS record date.

The depositary fees payable for cash distributions are generally deducted from the cash being distributed or by selling a portion of distributable property to pay the fees. In the case of distributions other than cash (i.e., share dividends, rights), the depositary bank charges the applicable fee to the ADS record date holders concurrent with the distribution. In the case of ADSs registered in the name of the investor (whether certificated or uncertificated in direct registration), the depositary bank sends invoices to the applicable record date ADS holders. In the case of ADSs held in brokerage and custodian accounts (via DTC), the depositary bank generally collects its fees through the systems provided by DTC (whose nominee is the registered holder of the ADSs held in DTC) from the brokers and custodians holding ADSs in their DTC accounts. The brokers and custodians who hold their clients' ADSs in DTC accounts in turn charge their clients' accounts the amount of the fees paid to the depositary banks.

In the event of refusal to pay the depositary fees, the depositary bank may, under the terms of the deposit agreement, refuse the requested service until payment is received or may set off the amount of the depositary fees from any distribution to be made to the ADS holder.

**Fees and Other Payments Made by the Depositary to Us**

The depositary has agreed to make payments to us and reimburse us for certain costs and expenses upon such rates and terms as agreed between the depository and us. We did not receive any reimbursement from the depositary for the year ended December 31, 2022, but we received from the depository the net payment of US$5.8 million in January 2023.

**PART II**

**Item 13.      Defaults, Dividend Arrearages and Delinquencies**

None.

**Item 14.      Material Modifications to the Rights of Security Holders and Use of Proceeds**

None.

125

**Item 15.       Controls and Procedures**

**Evaluation of Disclosure Controls and Procedures**

Our management, under the supervision and with the participation of our co-chief executive officer and vice president of finance, carried out an evaluation of the effectiveness of our disclosure controls and procedures, which is defined in Rules 13a-15(e) of the Exchange Act, as of December 31, 2022. Based upon that evaluation, our management, with the participation of our co-chief executive officer and vice president of finance, has concluded that, as of the end of the period covered by this annual report, our disclosure controls and procedures were effective in ensuring that the information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms, and that the information required to be disclosed by us in the reports that we file or submit under the Exchange Act is accumulated and communicated to our management, including our co-chief executive officer and vice president of finance, as appropriate, to allow timely decisions regarding required disclosure.

**Management's Annual Report on Internal Control over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as defined in Rules 13a-15 (f) under the Exchange Act. Our management, with the participation of our co-chief executive officer, evaluated the effectiveness of our internal control over financial reporting based on criteria established in the framework in Internal Control-Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this evaluation, our management has concluded that our internal control over financial reporting was effective as of December 31, 2022.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies and procedures may deteriorate.

Our independent registered public accounting firm, Ernst & Young Hua Ming LLP, has audited the effectiveness of our internal control over financial reporting as of December 31, 2022, as stated in its report, which appears on page F-4 of this annual report.

**Changes in Internal Control over Financial Reporting**

Other than as described above, there were no changes in our internal controls over financial reporting that occurred during the period covered by this annual report on Form 20-F that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**Item 16.**

**Item 16A.   Audit Committee Financial Expert**

Our board of directors has determined that Mr. Anthony Kam Ping Leung, an independent director (under the standards set forth in Nasdaq Stock Market Rule 5605(a)(2) and Rule 10A-3 under the Exchange Act) and member of our audit committee, is an audit committee financial expert.

**Item 16B.   Code of Ethics**

Our board of directors adopted a code of business conduct and ethics that applies to our directors, officers and employees in June 2018. We have posted a copy of our code of business conduct and ethics on our website at *http://investor.pddholdings.com*.

126

**Item 16C.  Principal Accountant Fees and Services**

The following table sets forth the aggregate fees by categories specified below in connection with certain professional services rendered by Ernst & Young Hua Ming LLP, our principal external auditors, for the periods indicated.

| | 2021 US$ | 2022 US$ |
|---|---|---|
| | (in thousands) | |
| Audit fees[1] | 3,099 | 3,042 |
| All other fees[2] | 71 | 74 |

(1)  "Audit fees" represents the aggregate fees billed for each of the fiscal years listed for professional services rendered by our principal auditors for the audit of our annual financial statements, issue of comfort letters in connection with our initial public offering, follow-on offering, and issuance of unsecured senior notes, assistance with and review of documents filed with the SEC.

(2)  "All other fees" represents the aggregate fees billed in each of the fiscal years listed for services rendered by our principal auditors other than services reported under "Audit Fees."

The policy of our audit committee is to pre-approve all audit and non-audit services provided by Ernst & Young Hua Ming LLP, including audit services, audit-related services, tax services and other services as described above, other than those for de minimis services which are approved by the audit committee prior to the completion of the audit.

**Item 16D.  Exemptions from the Listing Standards for Audit Committees**

Not applicable.

**Item 16E.  Purchases of Equity Securities by the Issuer and Affiliated Purchasers**

Not applicable.

**Item 16F.  Change in Registrant's Certifying Accountant**

Not applicable.

**Item 16G.  Corporate Governance**

As a Cayman Islands exempted company listed on Nasdaq Stock Market, we are subject to the Nasdaq corporate governance listing standards. However, Nasdaq rules permit a foreign private issuer like us to follow the corporate governance practices of its home country. Certain corporate governance practices in the Cayman Islands, which is our home country, may differ significantly from the Nasdaq corporate governance listing standards. For example, under Cayman Islands law, we are not required to (i) have a majority of independent directors in our board of directors, or (ii) obtain shareholders' approval for material amendment to any share incentive plan. We may also opt to rely on additional home country practice exemptions in the future. As a result, our shareholders may be afforded less protection than they would otherwise enjoy under the Nasdaq Stock Market corporate governance listing standards applicable to U.S. domestic issuers. See "Item 3. Key Information—D. Risk Factors—Risks Related to Our ADSs—As an exempted company incorporated in the Cayman Islands, we are permitted to adopt certain home country practices in relation to corporate governance matters that differ significantly from the Nasdaq corporate governance listing standards; these practices may afford less protection to shareholders than they would enjoy if we complied fully with the Nasdaq corporate governance listing standards."

**Item 16H.  Mine Safety Disclosure**

Not applicable.

**Item 16I.    Disclosure Regarding Foreign Jurisdictions That Prevent Inspections**

On December 16, 2021, the PCAOB issued a report to notify the SEC of its determination that the PCAOB was unable to inspect or investigate completely registered public accounting firms headquartered in mainland China and Hong Kong, and our auditor was subject to that determination.

In May 2022, PDD Holdings Inc. was conclusively listed by the SEC as a Commission-Identified Issuer under the HFCA Act following the filing of our annual report on Form 20-F for the fiscal year ended December 31, 2021.

On December 15, 2022, the PCAOB removed mainland China and Hong Kong from the list of jurisdictions where it is unable to inspect or investigate completely registered public accounting firms. For this reason, we do not expect to be identified as a Commission-Identified Issuer under the HFCA Act after we file this annual report.

To our knowledge, no Cayman Islands governmental entities own any shares of PDD Holdings Inc. as of the date of this annual report.

To our knowledge, no PRC governmental entities own any shares of PDD Holdings Inc. or the VIE as of the date of this annual report. Therefore, PRC governmental entities do not have a controlling financial interest in PDD Holdings Inc. or the VIE as of the date of this annual report.

To our knowledge, no member of the board of directors of PDD Holdings Inc., our operating entities or the VIE is an official of the Chinese Communist Party as of the date of this annual report.

None of the currently effective memorandum and articles of association (or equivalent organizing document) of PDD Holdings Inc. or the VIE contains any charter of the Chinese Communist Party.

**Item 16J.Insider Trading Policies**

Not applicable.

**PART III**

**Item 17.    Financial Statements**

We have elected to provide financial statements pursuant to Item 18.

**Item 18.    Financial Statements**

The consolidated financial statements of PDD Holdings Inc., its subsidiaries and its consolidated variable interest entity are included at the end of this annual report.

**Item 19.    Exhibits**

| Exhibit Number | Description of Document |
|---|---|
| 1.1 | Tenth Amended and Restated Memorandum and Articles of Association of the Registrant (incorporated herein by reference to Exhibit 99.1 to the current report on Form 6-K furnished with the Securities and Exchange Commission on February 9, 2023 (File No. 001-38591)) |
| 2.1 | Registrant's Specimen American Depositary Receipt (incorporated herein by reference to the Rule 424(b)(3) registration statement on Form F-6 filed with the Securities and Exchange Commission on February 10, 2023 (File No. 333-226185)) |
| 2.2* | Registrant's Specimen Certificate for Class A Ordinary Shares |
| 2.3 | Deposit Agreement by and among the Registrant, the depositary and the holders and beneficial owners of the American Depositary Receipts issued thereunder dated July 25, 2018 (incorporated herein by reference to Exhibit 4.3 to the registration statement on Form F-1 filed with the Securities and Exchange Commission on February 5, 2019 (File No. 333-229523)) |
| 2.4 | Seventh Amended and Restated Shareholders Agreement between the Registrant and other parties thereto dated March 5, 2018 (incorporated herein by reference to Exhibit 4.4 to the Form F-1 filed on June 29, 2018 (File No. 333-226014)) |

128

| Exhibit Number | Description of Document |
|---|---|
| 2.5 | Indenture dated as of September 27, 2019 between PDD Holdings Inc. (formerly known as Pinduoduo Inc.) and Deutsche Bank Trust Company Americas, as trustee (incorporated herein by reference to Exhibit 2.5 to the annual report on Form 20-F filed on April 24, 2020 (File No. 001-38591)) |
| 2.6 | Indenture dated as of November 20, 2020 between PDD Holdings Inc. (formerly known as Pinduoduo Inc.) and Deutsche Bank Trust Company Americas, as trustee (incorporated herein by reference to Exhibit 2.6 to the annual report on Form 20-F filed on April 30, 2021 (File No. 001-38591)) |
| 2.7 | First Supplemental Indenture dated as of November 20, 2020 between PDD Holdings Inc. (formerly known as Pinduoduo Inc.) and Deutsche Bank Trust Company Americas, as trustee, supplementing the Indenture dated as of November 20, 2020 between PDD Holdings Inc. (formerly known as Pinduoduo Inc.) and Deutsche Bank Trust Company Americas (incorporated herein by reference to Exhibit 2.7 to the annual report on Form 20-F filed on April 30, 2021 (File No. 001-38591)) |
| 2.8* | Description of Securities |
| 2.9 | Description of the Registrant's US$2,000,000,000 0.00% Convertible Senior Notes Due 2025 (incorporated herein by reference to (i) the section titled "Description of Debt Securities" in the Registrants' registration statement on Form F-3 (File No. 333-250117) filed with the Securities and Exchange Commission on November 16, 2020 and (ii) the section titled "Description of the Notes" in the prospectus supplement, in the form filed by the Registrant with the Securities and Exchange Commission on November 19, 2020 pursuant to Rule 424(b) under the Securities Act of 1933, as amended) |
| 4.1* | Amended and Restated 2015 Global Share Plan |
| 4.2* | Amended and Restated 2018 Share Incentive Plan |
| 4.3 | Form of Indemnification Agreement between the Registrant and its directors and executive officers (incorporated herein by reference to Exhibit 10.2 to the registration statement on Form F-1 filed with the Securities and Exchange Commission on June 29, 2018 (File No. 333-226014)) |
| 4.4 | Form of Employment Agreement between the Registrant and its executive officers (incorporated herein by reference to Exhibit 10.3 to the registration statement on Form F-1 filed with the Securities and Exchange Commission on June 29, 2018 (File No. 333-226014)) |
| 4.5 | English translation of the Shareholders' Voting Rights Proxy Agreement among Hangzhou Weimi, Hangzhou Aimi and the shareholders of Hangzhou Aimi dated July 15, 2020 (incorporated herein by reference to Exhibit 4.5 to the annual report on Form 20-F filed on April 30, 2021 (File No. 001-38591)) |
| 4.6 | English translation of the Equity Pledge Agreement among Hangzhou Weimi, Hangzhou Aimi and the shareholders of Hangzhou Aimi dated July 15, 2020 (incorporated herein by reference to Exhibit 4.6 to the annual report on Form 20-F filed on April 30, 2021 (File No. 001-38591)) |
| 4.7 | English translation of the Exclusive Consulting and Services Agreement between Hangzhou Weimi and Hangzhou Aimi dated June 5, 2015 (incorporated herein by reference to Exhibit 10.6 to the registration statement on Form F-1 filed with the Securities and Exchange Commission on June 29, 2018 (File No. 333-226014)) |
| 4.8 | English translation of the Exclusive Option Agreement among Hangzhou Weimi, Hangzhou Aimi and the shareholders of Hangzhou Aimi dated July 15, 2020 (incorporated herein by reference to Exhibit 4.8 to the annual report on Form 20-F filed on April 30, 2021 (File No. 001-38591)) |
| 4.9 | English translation of the Spousal Consent Letter (incorporated herein by reference to Exhibit 4.9 to the annual report on Form 20-F filed on April 30, 2021 (File No. 001-38591)) |
| 8.1* | List of Subsidiaries and Consolidated Variable Interest Entity of the Registrant |

129

| Exhibit Number | Description of Document |
|---|---|
| 11.1 | Code of Business Conduct and Ethics of the Registrant (incorporated herein by reference to Exhibit 99.1 to the registration statement on Form F-1 filed with the Securities and Exchange Commission on June 29, 2018 (File No. 333-226014)) |
| 12.1* | CEO Certification Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 12.2* | CFO Certification Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 13.1** | CEO Certification Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 13.2** | CFO Certification Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 15.1* | Consent of King & Wood Mallesons |
| 15.2* | Consent of Ernst & Young Hua Ming LLP, Independent Registered Public Accounting Firm |
| 15.3* | Submission under Item 16I(a) of Form 20-F in relation to the Holding Foreign Companies Accountable Act |
| 101.INS* | Inline XBRL Instance Document |
| 101.SCH* | Inline XBRL Taxonomy Extension Scheme Document |
| 101.CAL* | Inline XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.DEF* | Inline XBRL Taxonomy Extension Definition Linkbase Document |
| 101.LAB* | Inline XBRL Taxonomy Extension Label Linkbase Document |
| 101.PRE* | Inline XBRL Taxonomy Extension Presentation Linkbase Document |
| 104 | Cover Page Interactive Data File (embedded within the Inline XBRL document) |

*   Filed with this Annual Report on Form 20-F.
** Furnished with this Annual Report on Form 20-F.

**SIGNATURES**

The registrant hereby certifies that it meets all of the requirements for filing on Form 20-F and that it has duly caused and authorized the undersigned to sign this annual report on its behalf.

**PDD Holdings Inc.**

By: /s/ Lei Chen
_____
Name:  Lei Chen
Title:    Chairman of the Board of Directors
and Co-Chief Executive Officer

Date: April 26, 2023

131

Table of Contents

**PDD HOLDINGS INC.**

**Index to Consolidated Financial Statements**

| Contents | Page(s) |
|---|---|
| Reports of Independent Registered Public Accounting Firm (PCAOB ID: 1408) | F-2 – F-4 |
| Consolidated Balance Sheets as of December 31, 2021 and 2022 | F-5 – F-6 |
| Consolidated Statements of Comprehensive Income/(Loss) for the Years Ended December 31, 2020, 2021 and 2022 | F-7 |
| Consolidated Statements of Shareholders' Equity for the Years Ended December 31, 2020, 2021 and 2022 | F-8 – F-10 |
| Consolidated Statements of Cash Flows for the Years Ended December 31, 2020, 2021 and 2022 | F-11 |
| Notes to Consolidated Financial Statements | F-12 – F-49 |

F-1

Table of Contents

REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Shareholders and the Board of Directors of PDD Holdings Inc.

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of PDD Holdings Inc. (the Company) as of December 31, 2022 and 2021, the related consolidated statements of comprehensive income/(loss), shareholders' equity and cash flows for each of the three years in the period ended December 31, 2022, and the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company at December 31, 2022 and 2021, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2022, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Company's internal control over financial reporting as of December 31, 2022, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework), and our report dated April 26, 2023 expressed an unqualified opinion thereon.

**Adoption of New Accounting Standard**

As described in Note 11 to the consolidated financial statements, the Company changed its method for accounting for the convertible bonds in the year ended December 31, 2022.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

F-2

**Critical Audit Matter**

The critical audit matter communicated below is a matter arising from the current period audit of the financial statements that was communicated or required to be communicated to the audit committee and that: (1) relates to accounts or disclosures that are material to the financial statements and (2) involved our especially challenging, subjective or complex judgments. The communication of critical audit matter does not alter in any way our opinion on the consolidated financial statements, taken as a whole, and we are not, by communicating the critical audit matter below, providing a separate opinion on the critical audit matter or on the accounts or disclosures to which it relates.

### *Classification of Incentives Provided to the Consumers*

| | |
|---|---|
| *Description of the Matter* | As described in Note 2 to the consolidated financial statements, the Company at its own discretion provides various forms of incentives, to consumers who are not customers of the Company to promote its online marketplace and attract more registered consumers. These incentives, including coupons, credits and other subsidies that are not specific to any merchants, can be used by the consumers to purchase merchandises provided on the Company's online marketplace at reduced prices or to redeem cash from the Company. Despite the absence of any explicit contractual obligations to incentivize the consumers on behalf of the merchants, the Company further evaluated the varying features of different incentive programs to determine whether the incentives represent implicit obligations to consumers on behalf of merchants. Based on that evaluation, the Company determined that incentives provided to the consumers are not considered as payments to the merchant-customers. |
| | Auditing the classification of the Company's incentives provided to consumers was complex due to judgement involved in analyzing the varying features in the different incentive programs. This included evaluating the Company's determination of whether the incentives provided represent implicit obligations to the consumers on behalf of the merchants and if so, the incentives should be considered as payments to customers. Such determination is used in the process of evaluating the classification of the costs associated with the incentives as sales and marketing expenses or net of revenues. |
| *How we addressed the matter in our audit* | We obtained an understanding, evaluated the design and tested the operating effectiveness of controls over the Company's classification of the incentives. For example, we tested the controls over the management's review of the analysis of the varying features in the incentive programs for the appropriate classification of the incentives. |
| | To audit the classification of incentives provided to the consumers, we assessed and compared the incentive classification in the consolidated financial statements for consistency with the Company's accounting policies and underlying documentation.  We also evaluated management's judgement applied in determining whether the terms and conditions underlying the incentive programs create any implicit obligations of the Company to incentivize the consumers on behalf of the merchants. In addition, we assessed the adequacy of the Company's disclosures included in Note 2 to the consolidated financial statements regarding the classification of incentives provided to the consumers. |

/s/ Ernst & Young Hua Ming LLP

We have served as the Company's auditor since 2018.
Shanghai, the People's Republic of China
April 26, 2023

F-3

REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Shareholders and the Board of Directors of PDD Holdings Inc.

**Opinion on Internal Control Over Financial Reporting**

We have audited PDD Holdings Inc.'s internal control over financial reporting as of December 31, 2022 based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) (the COSO criteria). In our opinion, PDD Holdings Inc. (the Company) maintained, in all material respects, effective internal control over financial reporting as of December 31, 2022, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated balance sheets of the Company as of December 31, 2022 and 2021, and the related consolidated statements of comprehensive income/(loss), shareholders' equity and cash flows for each of the three years in the period ended December 31, 2022, and the related notes (collectively referred to as the "consolidated financial statements") and our report dated April 26, 2023 expressed an unqualified opinion thereon.

**Basis for Opinion**

The Company's management is responsible for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Annual Report on Internal Control Over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects.

Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

**Definition and Limitations of Internal Control Over Financial Reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ Ernst & Young Hua Ming LLP

Shanghai, the People's Republic of China
April 26, 2023

F-4

Table of Contents

PDD HOLDINGS INC.
CONSOLIDATED BALANCE SHEETS
(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),
except for number of shares and per share data)

| | Notes | As of December 31, | | |
| --- | --- | --- | --- | --- |
| | | 2021 | 2022 | |
| | | RMB | RMB | US$ |
| **ASSETS** | | | | |
| **Current assets** | | | | |
| Cash and cash equivalents | | 6,426,715 | 34,326,192 | 4,976,830 |
| Restricted cash | | 59,617,256 | 57,974,225 | 8,405,473 |
| Receivables from online payment platforms | | 673,737 | 587,696 | 85,208 |
| Short-term investments | 4 | 86,516,618 | 115,112,554 | 16,689,751 |
| Amounts due from related parties | 18 | 4,250,155 | 6,318,830 | 916,144 |
| Prepayments and other current assets | 5 | 3,424,687 | 2,298,379 | 333,235 |
| **Total current assets** | | **160,909,168** | **216,617,876** | **31,406,641** |
| **Non-current assets** | | | | |
| Property, equipment and software, net | 6 | 2,203,323 | 1,044,847 | 151,489 |
| Intangible assets | 7 | 701,220 | 134,002 | 19,428 |
| Right-of-use assets | 8 | 938,537 | 1,416,081 | 205,312 |
| Deferred tax assets | 17 | 31,504 | 1,045,030 | 151,515 |
| Other non-current assets | 9 | 16,425,966 | 16,862,117 | 2,444,777 |
| **Total non-current assets** | | **20,300,550** | **20,502,077** | **2,972,521** |
| **Total Assets** | | **181,209,718** | **237,119,953** | **34,379,162** |
| | | | | |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | | | |
| **Current liabilities** | | | | |
| Amounts due to related parties (including amounts due to related parties of the consolidated VIE and its subsidiaries without recourse to the primary beneficiary of RMB1,962,029 and RMB1,671,246 (US$242,308) as of December 31, 2021 and 2022, respectively) | 18 | 1,963,007 | 1,676,391 | 243,054 |
| Customer advances and deferred revenues (including customer advances and deferred revenues of the consolidated VIE and its subsidiaries without recourse to the primary beneficiary of RMB1,158,738 and RMB1,369,573 (US$198,569) as of December 31, 2021 and 2022, respectively) | 15 | 1,166,764 | 1,389,655 | 201,481 |
| Payable to merchants (including payable to merchants of the consolidated VIE and its subsidiaries without recourse to the primary beneficiary of RMB61,947,517 and RMB62,006,946 (US$8,990,162) as of December 31, 2021 and 2022, respectively) | | 62,509,714 | 63,316,695 | 9,180,058 |
| Accrued expenses and other liabilities (including accrued expenses and other liabilities of the consolidated VIE and its subsidiaries without recourse to the primary beneficiary of RMB9,360,166 and RMB11,817,208 (US$1,713,334) as of December 31, 2021 and 2022, respectively) | 10 | 14,085,513 | 20,960,723 | 3,039,019 |
| Merchant deposits (including merchant deposits of the consolidated VIE and its subsidiaries without recourse to the primary beneficiary of RMB13,360,409 and RMB14,681,913 (US$2,128,677) as of December 31, 2021 and 2022, respectively) | | 13,577,552 | 15,058,229 | 2,183,238 |
| Convertible bonds, current portion | 11 | — | 13,885,751 | 2,013,245 |
| Lease liabilities (including lease liabilities of the consolidated VIE and its subsidiaries without recourse to the primary beneficiary of RMB138,667 and RMB156,776 (US$22,730) as of December 31, 2021 and 2022, respectively) | 8 | 427,164 | 602,036 | 87,287 |
| **Total current liabilities** | | **93,729,714** | **116,889,480** | **16,947,382** |
| **Non-current liabilities** | | | | |
| Convertible bonds | 11 | 11,788,907 | 1,575,755 | 228,463 |
| Lease liabilities (including lease liabilities of the consolidated VIE and its subsidiaries without recourse to the primary beneficiary of RMB305,068 and RMB290,412 (US$42,106) as of December 31, 2021 and 2022, respectively) | 8 | 544,263 | 870,782 | 126,252 |
| Deferred tax liabilities (including deferred tax liabilities of the consolidated VIE and its subsidiaries without recourse to the primary beneficiary of RMB19,217 and nil as of December 31, 2021 and 2022, respectively) | 17 | 31,291 | 13,025 | 1,888 |
| Other non-current liabilities | | 996 | — | — |
| **Total non-current liabilities** | | **12,365,457** | **2,459,562** | **356,603** |
| **Total liabilities** | | **106,095,171** | **119,349,042** | **17,303,985** |
| **Commitments and contingencies** | 22 | | | |

The accompanying notes are an integral part of the consolidated financial statements.

F-5

Table of Contents

PDD HOLDINGS INC.
CONSOLIDATED BALANCE SHEETS (CONTINUED)
(Amounts in thousands of RMB and US$, except for number of shares and per share data)

| | Notes | As of December 31, | | |
| | | 2021 | 2022 | |
| | | RMB | RMB | US$ |
|---|---|---|---|---|
| **Shareholders' equity** | | | | |
| Class A ordinary shares (US$0.000005 par value; 77,300,000,000 shares authorized, 5,057,542,676 and 5,278,348,396 shares issued and outstanding as of December 31, 2021 and 2022, respectively) | 13 | 161 | 170 | 25 |
| Additional paid-in capital | | 95,340,819 | 99,250,468 | 14,389,965 |
| Statutory reserves | | — | 5,000 | 725 |
| Accumulated other comprehensive (loss)/income | 14 | (2,519,900) | 3,322,238 | 481,679 |
| (Accumulated deficits)/retained earnings | | (17,706,533) | 15,193,035 | 2,202,783 |
| **Total shareholders' equity** | | **75,114,547** | **117,770,911** | **17,075,177** |
| **Total liabilities and shareholders' equity** | | **181,209,718** | **237,119,953** | **34,379,162** |

The accompanying notes are an integral part of the consolidated financial statements.

F-6

Table of Contents

PDD HOLDINGS INC.
CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME/(LOSS)
(Amounts in thousands of RMB and US$, except for number of shares and per share data)

| | Notes | For the years ended December 31, | | | |
| --- | --- | --- | --- | --- | --- |
| | | 2020 | 2021 | 2022 | |
| | | RMB | RMB | RMB | US$ |
| Revenues (including services provided to a related party of nil, nil and RMB10,765 (US$1,561) for the years ended December 31, 2020, 2021 and 2022, respectively) | 15 | 59,491,865 | 93,949,939 | 130,557,589 | 18,929,071 |
| Costs of revenues (including services received from related parties of RMB4,570,292, RMB5,166,381 and RMB5,353,661 (US$776,208) for the years ended December 31, 2020, 2021 and 2022, respectively) | | (19,278,641) | (31,718,093) | (31,462,298) | (4,561,604) |
| **Gross profit** | | **40,213,224** | **62,231,846** | **99,095,291** | **14,367,467** |
| | | | | | |
| Sales and marketing expenses (including services received from a related party of RMB4,166,230, RMB2,857,063 and RMB2,004,654 (US$290,648) for the years ended December 31, 2020, 2021 and 2022, respectively) | | (41,194,599) | (44,801,720) | (54,343,719) | (7,879,099) |
| General and administrative expenses | | (1,507,297) | (1,540,774) | (3,964,935) | (574,862) |
| Research and development expenses (including services received from related parties of RMB1,850,321, RMB604,605 and RMB356,789 (US$51,730) for the years ended December 31, 2020, 2021 and 2022, respectively) | | (6,891,653) | (8,992,590) | (10,384,716) | (1,505,642) |
| **Total operating expenses** | | **(49,593,549)** | **(55,335,084)** | **(68,693,370)** | **(9,959,603)** |
| | | | | | |
| **Operating (loss)/profit** | | **(9,380,325)** | **6,896,762** | **30,401,921** | **4,407,864** |
| | | | | | |
| Interest and investment income, net | | 2,455,366 | 3,061,662 | 3,997,100 | 579,525 |
| Interest expenses | | (757,336) | (1,231,002) | (51,655) | (7,489) |
| Foreign exchange gain/(loss) | | 225,197 | 71,750 | (149,710) | (21,706) |
| Other income, net | | 193,702 | 656,255 | 2,221,358 | 322,066 |
| | | | | | |
| **(Loss)/profit before income tax and share of results of equity investees** | | **(7,263,396)** | **9,455,427** | **36,419,014** | **5,280,260** |
| Income tax expenses | 17 | — | (1,933,585) | (4,725,667) | (685,157) |
| Share of results of equity investees | 9 | 83,654 | 246,828 | (155,285) | (22,514) |
| **Net (loss)/income** | | **(7,179,742)** | **7,768,670** | **31,538,062** | **4,572,589** |
| | | | | | |
| **Net (loss)/income attributable to ordinary shareholders** | | **(7,179,742)** | **7,768,670** | **31,538,062** | **4,572,589** |
| | | | | | |
| **(Loss)/earnings per share:** | 19 | | | | |
| Basic | | (1.51) | 1.55 | 6.24 | 0.90 |
| Diluted | | (1.51) | 1.36 | 5.48 | 0.79 |
| Shares used in (loss)/earnings per share computation: | | | | | |
| Basic | | 4,768,343,300 | 5,012,651,334 | 5,057,540,124 | 5,057,540,124 |
| Diluted | | 4,768,343,300 | 5,713,764,297 | 5,761,291,439 | 5,761,291,439 |
| Other comprehensive (loss)/income | | | | | |
| Foreign currency translation difference, net of tax of nil | | (2,495,958) | (1,472,172) | 5,860,304 | 849,664 |
| Unrealized losses on available-for-sale investments, net of tax | | — | — | (18,166) | (2,634) |
| **Total other comprehensive (loss)/income** | | **(2,495,958)** | **(1,472,172)** | **5,842,138** | **847,030** |
| | | | | | |
| **Comprehensive (loss)/income** | | **(9,675,700)** | **6,296,498** | **37,380,200** | **5,419,619** |

The accompanying notes are an integral part of the consolidated financial statements.

F-7

PDD HOLDINGS INC.
CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY
(Amounts in thousands of RMB and US$, except for number of shares and per share data)

| | Notes | Number of ordinary shares | Ordinary shares | Additional paid-in capital | Accumulated other comprehensive income/(loss) | Accumulated deficits | Total shareholders' equity |
|---|---|---|---|---|---|---|---|
| | | | RMB | RMB | RMB | RMB | RMB |
| **Balance as of January 1, 2020** | | **4,650,028,688** | **148** | **41,493,949** | **1,448,230** | **(18,295,461)** | **24,646,866** |
| Net loss | | — | — | — | — | (7,179,742) | (7,179,742) |
| Foreign currency translation difference | | — | — | — | (2,495,958) | — | (2,495,958) |
| Issuance of ordinary shares for private placements | 13 | 150,810,912 | 5 | 11,063,334 | — | — | 11,063,339 |
| Follow-on offering | 13 | 132,020,000 | 5 | 26,805,433 | — | — | 26,805,438 |
| Conversion of the convertible bonds into ordinary shares | 11 | 9,900,368 | 1 | 317,541 | — | — | 317,542 |
| Equity component of convertible bonds | 11 | — | — | 3,405,360 | — | — | 3,405,360 |
| Shares issued to depository bank | 19 | 12,050,000 | — | — | — | — | — |
| Exercise of share-based awards | | 4,950,492 | — | — | — | — | — |
| Settlement of share-based compensation with shares held by depository bank | | (4,950,492) | — | — | — | — | — |
| Share-based compensation | 16 | — | — | 3,613,043 | — | — | 3,613,043 |
| **Balance as of December 31, 2020** | | **4,954,809,968** | **159** | **86,698,660** | **(1,047,728)** | **(25,475,203)** | **60,175,888** |

The accompanying notes are an integral part of the consolidated financial statements.

F-8

Table of Contents

PDD HOLDINGS INC.
CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY (CONTINUED)
(Amounts in thousands of RMB and US$, except for number of shares and per share data)

| | Notes | Number of ordinary shares | Ordinary shares | Additional paid-in capital | Accumulated other comprehensive income/(loss) | Accumulated deficits | Total shareholders' equity |
|---|---|---|---|---|---|---|---|
| | | RMB | RMB | RMB | RMB | RMB | RMB |
| Balance as of January 1, 2021 | | 4,954,809,968 | 159 | 86,698,660 | (1,047,728) | (25,475,203) | 60,175,888 |
| Net income | | — | — | — | — | 7,768,670 | 7,768,670 |
| Foreign currency translation difference | | — | — | — | (1,472,172) | — | (1,472,172) |
| Conversion of the convertible bonds into ordinary shares | 11 | 62,732,708 | 2 | 3,867,054 | — | — | 3,867,056 |
| Shares issued to depository bank | 19 | 40,000,000 | — | — | — | — | — |
| Exercise of share-based awards | | 24,395,952 | — | 375 | — | — | 375 |
| Settlement of share-based compensation with shares held by depository bank | | (24,395,952) | — | — | — | — | — |
| Share-based compensation | 16 | — | — | 4,774,730 | — | — | 4,774,730 |
| Balance as of December 31, 2021 | | 5,057,542,676 | 161 | 95,340,819 | (2,519,900) | (17,706,533) | 75,114,547 |

The accompanying notes are an integral part of the consolidated financial statements.

F-9

PDD HOLDINGS INC.
CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY (CONTINUED)
(Amounts in thousands of RMB and US$, except for number of shares and per share data)

| | Notes | Number of ordinary shares | Ordinary shares | Additional paid-in capital | Statutory reserves | Accumulated other comprehensive (loss)/income | (Accumulated deficits)/retained earnings | Total shareholders' equity |
|---|---|---|---|---|---|---|---|---|
| | | | RMB | RMB | RMB | RMB | RMB | RMB |
| Balance as of December 31, 2021 | | 5,057,542,676 | 161 | 95,340,819 | — | (2,519,900) | (17,706,533) | 75,114,547 |
| Cumulative effect of change in accounting principle | 11 | — | — | (3,818,926) | — | 136,096 | 1,366,506 | (2,316,324) |
| Balance as of January 1, 2022 | | 5,057,542,676 | 161 | 91,521,893 | — | (2,383,804) | (16,340,027) | 72,798,223 |
| Net income | | — | — | — | — | — | 31,538,062 | 31,538,062 |
| Foreign currency translation difference | | — | — | — | — | 5,724,208 | — | 5,724,208 |
| Net change in unrealized losses on available-for-sale debt securities | | — | — | — | — | (18,166) | — | (18,166) |
| Shares issued to depository bank | 19 | 220,805,720 | — | — | — | — | — | — |
| Exercise of share-based awards | | 241,135,744 | 9 | 10,210 | — | — | — | 10,219 |
| Settlement of share-based compensation with shares held by depository bank | | (241,135,744) | — | — | — | — | — | — |
| Share-based compensation | 16 | — | — | 7,718,365 | — | — | — | 7,718,365 |
| Appropriation to statutory reserves | | — | — | — | 5,000 | — | (5,000) | — |
| Balance as of December 31, 2022 | | 5,278,348,396 | 170 | 99,250,468 | 5,000 | 3,322,238 | 15,193,035 | 117,770,911 |
| Balance as of December 31, 2022 (US$) | | | 25 | 14,389,965 | 725 | 481,679 | 2,202,783 | 17,075,177 |

The accompanying notes are an integral part of the consolidated financial statements.

F-10

PDD HOLDINGS INC.
CONSOLIDATED STATEMENTS OF CASH FLOWS
(Amounts in thousands of RMB and US$, except for number of shares and per share data))

| | For the years ended December 31, | | | |
| | 2020 | 2021 | 2022 | |
| | RMB | RMB | RMB | US$ |
|---|---|---|---|---|
| **CASH FLOW FROM OPERATING ACTIVITIES** | | | | |
| Net (loss)/income | (7,179,742) | 7,768,670 | 31,538,062 | 4,572,589 |
| Adjustments to reconcile net (loss)/income to net cash provided by operating activities: | | | | |
| Interest expense | 757,336 | 1,231,002 | 51,655 | 7,489 |
| Allowance for credit losses | 43,434 | 49,300 | 118,384 | 17,164 |
| Depreciation and amortization | 651,523 | 1,495,380 | 2,224,169 | 322,474 |
| Deferred income tax, net | — | (213) | (1,028,586) | (149,131) |
| Amortization of right-of-use assets | 148,945 | 348,863 | 510,915 | 74,076 |
| Interest and investment gain, net | (469,486) | (146,972) | (606,447) | (87,927) |
| Loss/(gain) on disposal of property and equipment | 24 | (258) | 10,697 | 1,551 |
| Share-based compensation | 3,613,043 | 4,774,730 | 7,718,365 | 1,119,058 |
| Foreign exchange (gain)/loss | (225,197) | (71,750) | 149,710 | 21,706 |
| Share of results of equity investees | (83,654) | (246,828) | 155,285 | 22,514 |
| Fair value change of investments | (104,068) | 22,170 | 242,236 | 35,121 |
| Gain on extinguishment of convertible bonds | (5,188) | (2,788) | — | — |
| | | | | |
| **Changes in operating assets and liabilities:** | | | | |
| Receivables from online payment platforms | 321,426 | 55,811 | 86,041 | 12,475 |
| Amounts due from related parties | (1,636,541) | (10,086) | (2,068,675) | (299,930) |
| Prepayments and other current assets | (4,048,536) | 1,744,645 | 758,282 | 109,941 |
| Customer advances and deferred revenues | 1,817,220 | (1,256,426) | 222,891 | 32,316 |
| Amounts due to related parties | 1,882,971 | (1,422,856) | (286,616) | (41,555) |
| Payable to merchants | 23,934,151 | 8,686,493 | 749,373 | 108,649 |
| Accrued expenses and other liabilities | 5,849,148 | 3,492,038 | 7,003,998 | 1,015,484 |
| Merchant deposits | 3,085,407 | 2,651,233 | 1,480,677 | 214,678 |
| Lease liabilities | (137,936) | (354,123) | (487,068) | (70,618) |
| Other non-current assets | (13,182) | (23,102) | (34,492) | (5,001) |
| Other non-current liabilities | (4,471) | (1,922) | (996) | (144) |
| **Net cash generated from operating activities** | **28,196,627** | **28,783,011** | **48,507,860** | **7,032,979** |
| **CASH FLOW FROM INVESTING ACTIVITIES** | | | | |
| Purchase of short-term time deposits, held to maturities and other investments | (86,438,068) | (116,639,550) | (160,414,453) | (23,257,909) |
| Proceeds from sales of short-term time deposits, held to maturities and other investments | 55,083,390 | 97,547,038 | 141,928,351 | 20,577,677 |
| Purchases of available-for-sale investments | — | — | (3,581,868) | (519,322) |
| Purchase of long-term time deposits, held to maturities and other investments | (6,722,228) | (13,628,052) | (6,795,838) | (985,305) |
| Proceeds from sales of long-term time deposits, held to maturities and other investments | — | — | 7,137,814 | 1,034,886 |
| Purchase of property, equipment and software and intangible assets | (43,046) | (3,287,232) | (635,716) | (92,170) |
| Proceeds from disposal of property and equipment | 51 | 394 | 40 | 6 |
| Loans to a related party | (238,000) | — | — | — |
| Others | — | 445,037 | — | — |
| **Net cash used in investing activities** | **(38,357,901)** | **(35,562,365)** | **(22,361,670)** | **(3,242,137)** |
| **CASH FLOW FROM FINANCING ACTIVITIES** | | | | |
| Net proceeds from the follow-on offerings | 26,805,438 | — | — | — |
| Proceeds from the private placements | 11,063,339 | — | — | — |
| Net proceeds from the issuance of convertible bonds | 13,024,199 | — | — | — |
| Proceeds from short-term borrowings | 1,828,923 | — | — | — |
| Repayment of short-term borrowings | (922,897) | (1,875,472) | — | — |
| Others | (6) | 318 | 10,079 | 1,461 |
| **Net cash generated from/(used in) financing activities** | **51,798,996** | **(1,875,154)** | **10,079** | **1,461** |
| **Effect of exchange rate changes on cash, cash equivalents and restricted cash** | **(139,943)** | **(145,157)** | **100,177** | **14,524** |
| Increase/(decrease) in cash, cash equivalents and restricted cash | 41,497,779 | (8,799,665) | 26,256,446 | 3,806,827 |
| Cash, cash equivalents and restricted cash at beginning of the year | 33,345,857 | 74,843,636 | 66,043,971 | 9,575,476 |
| **Cash, cash equivalents and restricted cash at end of the year** | **74,843,636** | **66,043,971** | **92,300,417** | **13,382,303** |
| **Supplement disclosure of cash flow information：** | | | | |
| Interest received | 1,881,812 | 2,936,860 | 3,567,738 | 517,273 |
| Income taxes paid | — | — | 4,881,252 | 707,715 |
| | | | | |
| **Supplement disclosure of non-cash operating activities：** | | | | |
| Recognition of right-of-use assets and lease liabilities | 265,821 | 704,142 | 1,068,063 | 154,855 |
| | | | | |
| **Supplement disclosure of non-cash investing activities：** | | | | |
| Purchase of property, equipment and software included in accrued expenses and other liabilities | 162,641 | 194,385 | 136,411 | 19,778 |
| **Reconciliation of cash, cash equivalents and restricted cash:** | | | | |
| Cash and cash equivalents | 22,421,189 | 6,426,715 | 34,326,192 | 4,976,830 |
| Restricted cash | 52,422,447 | 59,617,256 | 57,974,225 | 8,405,473 |
| **Total cash, cash equivalents and restricted cash in the statements of cash flows** | **74,843,636** | **66,043,971** | **92,300,417** | **13,382,303** |

The accompanying notes are an integral part of the consolidated financial statements.

F-11

PDD HOLDINGS INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
(Amounts in thousands of RMB and US$, except for number of shares and per share data)

**1.  Organization**

PDD Holdings Inc. (the ''Company''), formerly known as Pinduoduo Inc., was incorporated in the Cayman Islands on April 20, 2015 under the Cayman Islands Companies Law as an exempted company with limited liability. The Company through its consolidated subsidiaries, variable interest entity (the ''VIE'') and the subsidiaries of the VIE (collectively, the ''Group'') are principally engaged in the merchandise sales and the provision of online marketplace to help merchants leverage the power of the internet to engage with their customers in the People's Republic of China (the ''PRC'' or ''China''). Due to the PRC legal restrictions on foreign ownership and investment in such business, the Company conducts its primary business operations through its VIE and subsidiaries of the VIE.

As of December 31, 2022, the details of the Company's major subsidiaries, consolidated VIE and the subsidiaries of the VIE are as follows:

| Entity | Date of incorporation | Place of incorporation | Percentage of ownership by the Company | | Principal activities |
|---|---|---|---|---|---|
| | | | Direct | Indirect | |
| **Subsidiaries:** | | | | | |
| HongKong Walnut Street Limited (''Walnut HK'') | April 28, 2015 | Hong Kong | 100 % | — | Holding company |
| Hangzhou Weimi Network Technology Co., Ltd. (''Hangzhou Weimi'' or the ''WFOE'') | May 28, 2015 | PRC | 100 % | — | Technology research and development |
| Walnut Street (Shanghai) Information Technology Co., Ltd. (''Walnut Shanghai'') | January 25,2018 | PRC | 100 % | — | Technology research and development |
| Shenzhen Qianhai Xinzhijiang Information Technology Co., Ltd. (''Xinzhijiang'') | April 25, 2018 | PRC | 100 % | — | E-commerce platform |
| Shanghai Yucan Information Technology Co., Ltd. | September 14, 2020 | PRC | 100 % | — | E-commerce platform |
| | | | | | |
| **VIE:** | | | | | |
| Hangzhou Aimi Network Technology Co., Ltd. (''VIE'') | April 14, 2015 | PRC | — | 100 % | E-commerce platform |
| | | | | | |
| **VIE's subsidiary:** | | | | | |
| Shanghai Xunmeng Information Technology Co., Ltd. (''Shanghai Xunmeng'') | January 9, 2014 | PRC | — | 100 % | E-commerce platform |

F-12

Table of Contents

PDD HOLDINGS INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)
(Amounts in thousands of RMB and US$, except for number of shares and per share data)

**1. Organization (Continued)**

**The VIE agreements**

The PRC laws and regulations currently place certain restrictions on foreign ownership of companies that engage in internet content and other restricted businesses. To comply with PRC laws and regulations, the Group conducts the majority of its business in China through the VIE and subsidiaries of the VIE. Despite the lack of technical majority ownership, the Company directs the activities of the VIE through a series of contractual arrangements (the "Contractual Agreements"). The equity interests of the VIE are legally held by PRC individuals (the "Nominee Shareholders"). Through the Contractual Agreements, the Nominee Shareholders of the VIE effectively assigned all of their voting rights underlying their equity interests in the VIE to the Company, via the WFOE, and therefore, the Company has the power to direct the activities of the VIE that most significantly impact its economic performance. The Company also has the right to receive economic benefits and obligations to absorb losses from the VIE, via the WFOE, that potentially could be significant to the VIE. Based on the above, the Company consolidates the VIE in accordance with SEC Regulation SX-3A-02 and ASC810-10, *Consolidation: Overall.*

The following is a summary of the Contractual Agreements:

***Exclusive Option Agreements*** Pursuant to the Exclusive Option Agreements entered into among the Nominee Shareholders, the VIE and the WFOE, Nominee Shareholders irrevocably granted WFOE an exclusive call option to purchase, or have its designated person(s) to purchase their equity interests in the VIE. The WFOE has the sole discretion as to when to exercise the options, whether in part or full. The exercise price of the options to purchase all or part of the equity interests in the VIE will be all or part of the VIE's assets at the book value of such assets, or the minimum amount of consideration permitted by the applicable PRC laws, whichever is higher. Any proceeds received by the Nominee Shareholders from the exercise of the options shall be remitted to the WFOE or its designated party, to the extent permitted under PRC laws. The Exclusive Option Agreements will remain in effect until all the equity interests in VIE held by Nominee Shareholders are transferred to the WFOE or its designated party. The WFOE may terminate the Exclusive Option Agreements at its sole discretion, whereas under no circumstances may the VIE or the Nominee Shareholders terminate the agreements.

***Equity Pledge Agreement*** Pursuant to the Equity Pledge Agreement entered into among the WFOE (the "Pledge Agreement"), the Nominee Shareholders and the VIE, the Nominee Shareholders pledged all of their equity interests in the VIE to the WFOE as collateral to secure their obligations under the Contractual Agreements. The Nominee Shareholders further undertake that they will remit any distributions in connection with such shareholders' equity interests in the VIE to the WFOE, to the extent permitted by PRC laws. If the VIE or any of their Nominee Shareholders breach any of their respective contractual obligations under the above agreements, the WFOE, as the pledgee, will be entitled to certain rights, including the right to sell, transfer or dispose of the pledged equity interest. The Nominee Shareholders of the VIE agree not to create any encumbrance on or otherwise transfer or dispose of their respective equity interest in the VIE, without the prior consent of the WFOE. The Equity Pledge Agreement will be valid until the VIE and the shareholders fulfill all the contractual obligations under the Contractual Agreements in full and the pledged equity interests have been transferred to the WFOE and/or its designee.

F-13

Table of Contents

PDD HOLDINGS INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)
(Amounts in thousands of RMB and US$, except for number of shares and per share data)

1.  **Organization (Continued)**

    **The VIE agreements (Continued)**

    *Shareholders' Voting Rights Proxy Agreement*  Pursuant to the Shareholders' Voting Rights Proxy Agreement entered into among the Nominee Shareholders, the VIE and the WFOE (the ''Proxy Agreement''), the Nominee Shareholders authorized the WFOE or its designated party to (1) act on behalf of the Nominee Shareholders as exclusive agent and attorney with all respect to all matters concerning the shareholding including but not limited to attend shareholders' meetings of the VIE; (2) exercise all the shareholders' rights, including voting rights; and (3) designate and appoint on behalf of each shareholder and the senior management members of the VIE. The proxy remains irrevocable and continuously valid from the date of execution so long as each Nominee Shareholder remains as a shareholder of the VIE.

    *Exclusive Consulting and Services Agreement*  Pursuant to the Exclusive Consulting and Services Agreement (the ''Consulting and Services Agreement''), WFOE retains exclusive right to provide to the VIE the technical support and consulting services, including but not limited to, technology development and maintenance service, marketing consulting service and administrative consulting service. WFOE owns the intellectual property rights developed in the performance of the agreement. In exchange for these services, WFOE is entitled to charge the VIE annual service fees which typically amount to what would be substantially all of the VIE's pre-tax profits, resulting in a transfer of substantially all of the profits from the VIE to the WFOE. The term of the agreement is 10 years, expiring on June 5, 2025, which will be automatically renewed every ten-year thereafter if the WFOE does not provide notice of termination to the Nominee Shareholders three months prior to expiration.

    In the opinion of the Company's management and PRC counsel, (i) the ownership structure of the Group, including its subsidiaries, the VIE and the subsidiaries of the VIE, is not in violation with any applicable PRC laws and (ii) each of the VIE agreements is legal, valid, binding and enforceable to each party of such agreements in accordance with its terms and applicable PRC Laws.

    The Proxy Agreement was assigned by the WFOE to the Company. The Company and the VIE entered into a financial support undertaking letter pursuant to which, the Company is obligated and hereby undertakes to provide unlimited financial support to the VIE, to the extent permissible under the applicable PRC laws and regulations, whether or not any such operational loss is actually incurred.

    Uncertainties in the PRC legal system could cause the relevant regulatory authorities to find the current Contractual Agreements and businesses to be in violation of any existing or future PRC laws or regulations. If the Company, the WFOE or any of its current or future VIE are found in violation of any existing or future laws or regulations, or fail to obtain or maintain any of the required permits or approvals, the relevant PRC regulatory authorities would have broad discretion in dealing with such violations, which may include, but not limited to, revocation of business and operating licenses, being required to discontinue or restrict its business operations, restriction of the Group's right to collect revenues, being required to restructure its operations, imposition of additional conditions or requirements with which the Group may not be able to comply, or other regulatory or enforcement actions against the Group that could be harmful to its business. The imposition of any of these or other penalties may result in a material and adverse effect on the Group's ability to conduct its business. In addition, if the imposition of any of these penalties causes the Company to lose the rights to direct the activities of the VIE or the right to receive their economic benefits, the Company would no longer be able to consolidate the VIE.

F-14

Table of Contents

PDD HOLDINGS INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)
(Amounts in thousands of RMB and US$, except for number of shares and per share data)

**1. Organization (Continued)**

**The VIE agreements (Continued)**

In addition, if the VIE or the Nominee Shareholders fail to perform their obligations under the Contractual Agreements, the Group may have to incur substantial costs and expend resources to enforce the primary beneficiary' rights under the contracts. The Group may have to rely on legal remedies under PRC laws, including seeking specific performance or injunctive relief and claiming damages, which may not be effective. All of the Contractual Agreements are governed by PRC laws and provide for the resolution of disputes through arbitration in the PRC. Accordingly, these contracts would be interpreted in accordance with PRC laws and any disputes would be resolved in accordance with PRC legal procedures. Uncertainties in the PRC legal system could limit the Group's ability to enforce these contractual arrangements. Under PRC laws, rulings by arbitrators are final, parties cannot appeal the arbitration results in courts, and prevailing parties may only enforce the arbitration awards in PRC courts through arbitration award recognition proceedings, which would incur additional expenses and delay. In the event the Group is unable to enforce the Contractual Agreements, the primary beneficiary may not be able to direct the activities of its VIE, and the Group's ability to conduct its business may be negatively affected.

The VIE and its subsidiaries contributed to 65.1%, 59.3% and 56.2% of the Group's consolidated revenues for the years ended December 31, 2020, 2021 and 2022, respectively. As of December 31, 2021 and 2022, the VIE and its subsidiaries accounted for an aggregate of 48.7% and 53.0%, respectively of the consolidated total assets, and 83.2% and 77.1%, respectively of the consolidated total liabilities.

Other revenue-producing assets held by the VIE and its subsidiaries mainly include licenses, such as the internet content provision license and internally-developed intangible assets including trademarks, patents, copyrights and domain names.

F-15

PDD HOLDINGS INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)
(Amounts in thousands of RMB and US$, except for number of shares and per share data)

**1.  Organization (Continued)**

**The VIE agreements (Continued)**

The following tables represent the financial information for the VIE and its subsidiaries as of December 31, 2021 and 2022 and for the years ended December 31, 2020, 2021 and 2022 before eliminating the inter-company balances and transactions between the VIE, the subsidiaries of the VIE and other entities within the Group:

| | As of December 31, | | |
| --- | --- | --- | --- |
| | 2021 | 2022 | |
| | RMB | RMB | US$ |
| **ASSETS** | | | |
| **Current assets** | | | |
| Cash and cash equivalents | 2,430,440 | 2,725,249 | 395,124 |
| Restricted cash | 59,402,079 | 57,955,328 | 8,402,733 |
| Receivables from online payment platforms | 668,953 | 426,193 | 61,792 |
| Short-term investments | 12,306,340 | 45,273,907 | 6,564,099 |
| Amounts due from related parties [(i)] | 4,198,391 | 6,106,160 | 885,310 |
| Amounts due from Group companies | 40,425,872 | 34,810,132 | 5,046,995 |
| Prepayments and other current assets | 1,330,772 | 1,280,559 | 185,664 |
| **Total current assets** | **120,762,847** | **148,577,528** | **21,541,717** |
| **Non-current assets** | | | |
| Property, equipment and software, net | 2,116,566 | 950,273 | 137,777 |
| Intangible asset | 27,163 | 24,155 | 3,502 |
| Right-of-use assets | 417,455 | 426,429 | 61,826 |
| Deferred tax assets | 19,908 | 14,556 | 2,110 |
| Other non-current assets | 5,300,938 | 10,444,964 | 1,514,377 |
| **Total non-current assets** | **7,882,030** | **11,860,377** | **1,719,592** |
| **Total assets** | **128,644,877** | **160,437,905** | **23,261,309** |

| | As of December 31, | | |
| --- | --- | --- | --- |
| | 2021 | 2022 | |
| | RMB | RMB | US$ |
| **LIABILITIES** | | | |
| **Current liabilities** | | | |
| Amounts due to related parties [(i)] | 1,962,029 | 1,671,246 | 242,308 |
| Amounts due to Group companies | 27,978,153 | 22,452,033 | 3,255,239 |
| Customer advances and deferred revenues | 1,158,738 | 1,369,573 | 198,569 |
| Payable to merchants | 61,947,517 | 62,006,946 | 8,990,162 |
| Accrued expenses and other liabilities | 9,360,166 | 11,817,208 | 1,713,334 |
| Merchant deposits | 13,360,409 | 14,681,913 | 2,128,677 |
| Lease liabilities | 138,667 | 156,776 | 22,730 |
| **Total current liabilities** | **115,905,679** | **114,155,695** | **16,551,019** |
| Lease liabilities | 305,068 | 290,412 | 42,106 |
| Deferred tax liabilities | 19,217 | — | — |
| **Total non-current liabilities** | **324,285** | **290,412** | **42,106** |
| **Total liabilities** | **116,229,964** | **114,446,107** | **16,593,125** |

F-16

PDD HOLDINGS INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)
(Amounts in thousands of RMB and US$, except for number of shares and per share data)

**1.  Organization (Continued)**

**The VIE agreements (Continued)**

| | For the years ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2020 | 2021 | 2022 | |
| | RMB | RMB | RMB | US$ |
| **Net revenues from** | | | | |
| Group companies | 12,602,673 | 22,136,726 | 30,199,788 | 4,378,558 |
| External | 38,749,188 | 55,740,613 | 73,431,914 | 10,646,626 |
| **Net revenues** | **51,351,861** | **77,877,339** | **103,631,702** | **15,025,184** |
| **Net income** | **2,552,665** | **15,169,180** | **33,595,051** | **4,870,825** |

(i)     Information with respect to related parties is discussed in Note 18.

| | For the years ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2020 | 2021 | 2022 | |
| | RMB | RMB | RMB | US$ |
| Net cash generated from operating activities | 29,379,799 | 34,365,025 | 25,650,939 | 3,719,037 |
| Net cash used in investing activities | (11,802,074) | (26,828,581) | (43,513,150) | (6,308,814) |
| Net cash generated from/(used in) financing activities | 7,818,632 | (1,445,969) | 16,710,269 | 2,422,761 |
| Net increase/(decrease) in cash, cash equivalents and restricted cash | 25,396,357 | 6,090,475 | (1,151,942) | (167,016) |

As of December 31, 2022, there are no consolidated VIE's assets that are pledged or collateralized for the VIE's obligations and which can only be used to settle the VIE's obligations, except for registered capital and the PRC statutory reserves, which were RMB121,000 and RMB5,889, respectively, as of December 31, 2022. Relevant PRC laws and regulations restrict the VIE from transferring a portion of its net assets, equivalent to the balance of their statutory reserves and its share capital, to the Company in the form of loans and advances or cash dividends. Please refer to Note 20 for disclosure of the restricted net assets. As the VIE is incorporated as a limited liability company under the PRC Company Law, creditors of the VIE do not have recourse to the general credit of the Company for any of the liabilities of the VIE. There were no other pledges or collateralization of the VIE's assets.

**2.Summary of Significant Accounting Policies**

*(a)Basis of presentation*

The accompanying consolidated financial statements have been prepared in accordance with the accounting principles generally accepted in the United States of America ("US GAAP").

*(b)Principles of consolidation*

The consolidated financial statements include the financial statements of the Company, its subsidiaries, the VIE and the subsidiaries of the VIE. All significant inter-company transactions and balances between the Company, its subsidiaries, the VIE and subsidiaries of the VIE have been eliminated upon consolidation.

F-17

Table of Contents

PDD HOLDINGS INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)
(Amounts in thousands of RMB and US$, except for number of shares and per share data)

**2. Summary of Significant Accounting Policies (Continued)**

*(c) Use of estimates*

The preparation of financial statements in conformity with US GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities at the balance sheet dates and revenues and expenses during the reporting periods. Significant accounting estimates reflected in the Group's consolidated financial statements include, but are not limited to allowance for doubtful accounts arising from expected credit losses, economic lives and impairment of long-lived assets, valuation of short-term and long-term investments, valuation allowance for deferred tax assets, uncertain tax position, valuation for share-based compensation, liability component of convertible bonds and incremental borrowing rates for operating lease liabilities. Changes in facts and circumstances may result in revised estimates. Actual results could differ from those estimates, and as such, differences may be material to the consolidated financial statements.

*(d) Foreign currency*

The functional currency of the Company and its major overseas subsidiaries is the US$. The Company's PRC subsidiaries, the VIE and subsidiaries of the VIE determined their functional currencies to be RMB based on the criteria of ASC 830, *Foreign Currency Matters*. The Group uses the RMB as its reporting currency.

Transactions denominated in foreign currencies are re-measured into the functional currency at the exchange rates prevailing on the transaction dates. Monetary assets and liabilities denominated in foreign currencies are re-measured at the exchange rates prevailing at the balance sheet date. Non-monetary items that are measured in terms of historical cost in foreign currency are re-measured using the exchange rates at the dates of the initial transactions. Exchange gains and losses are included in the consolidated statements of comprehensive income/(loss).

The Company uses the average exchange rate for the year and the exchange rate at the balance sheet date to translate the operating results and financial position, respectively. Translation differences are recorded in accumulated other comprehensive income/(loss), a component of shareholders' equity.

*(e) Convenience translation*

Amounts in US$ are presented for the convenience of the reader and are translated at the noon buying rate of US$1.00 to RMB6.8972 on December 30, 2022, the last business day in December 2022, as published on the website of the United States Federal Reserve Board. No representation is made that the RMB amounts could have been, or could be, converted into US$ at such rate.

*(f) Cash and cash equivalents*

Cash and cash equivalents consist of cash on hand and highly liquid investments which are unrestricted as to withdrawal or use and have original maturities of three months or less when purchased.

*(g) Restricted cash*

Restricted cash mainly represents cash received from consumers and reserved in a bank supervised account for payments to merchants.

F-18

Table of Contents

PDD HOLDINGS INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)
(Amounts in thousands of RMB and US$, except for number of shares and per share data)

**2.Summary of Significant Accounting Policies (Continued)**

*(h)Investments*

The Group's short-term investments and long-term investments included in other non-current assets primarily consist of time deposits, held-to-maturity debt securities, investment in convertible bonds, available-for-sale debt securities and equity-method investments. The classification of an investment is determined based on the Group's ability and intent to hold the investment, the nature of the investment, and the degree to which the Group may exercise influence over the investee. All highly liquid investments with original maturities of greater than three months but less than twelve months, are classified as short-term investments. Investments that are expected to be realized in cash during the next twelve months are also included in short-term investments. Long-term debt securities with maturities of greater than twelve months, that the Group has positive intent and ability to hold to maturity, which are stated at amortized cost, are classified as other non-current assets.

Investments in debt securities that the Group has positive intent and ability to hold to maturity are categorized as "held to maturity". Wealth management products with the intention to sell in the near term are classified as trading securities and measured at fair value. Any realized gains or losses on the sale of the held-to-maturity debt securities and trading securities are determined on a specific identification method and are reflected in earnings during the period in which gains or losses are realized. Realized and unrealized gains and losses and interest income from the investments are recorded in "Interest and investment income, net" in the consolidated statements of comprehensive income/(loss).

The Group has elected the fair value option for investment in convertible bonds in accordance with ASC Subtopic 825-10 ("ASC 825-10"), *Recognition and Measurement of Financial Assets and Financial Liabilities*. The financial instruments guidance in ASC 825-10 permits reporting entities to apply the fair value option on an instrument-by-instrument basis. Therefore, a reporting entity can elect the fair value option for certain instruments but not others within a group of similar instruments. The fair value option permits the irrevocable election on an instrument-by-instrument basis at initial recognition of an asset or liability or upon an event that gives rise to a new basis of accounting for that instrument. The investments accounted for under the fair value option are carried at fair value with realized and unrealized gains or losses recorded in "Interest and investment income, net" on the consolidated statements of comprehensive income/(loss).

The Group accounts for available-for-sale debt securities in accordance with ASC Topic 320, *Investments-Debt Securities*. Available-for-sale debt securities are stated at fair value, with the unrealized gains and losses, net of tax, reported in other comprehensive income/(loss). The net carrying value of debt securities classified as available-for-sale is adjusted for amortization of premiums and accretion of discounts to maturity. Such amortization is computed using the effective interest method and included in interest income.

The Group's investments in common stock or in-substance common stock in entities in which it can exercise significant influence but does not own a majority equity interest or control are accounted for using the equity method of accounting and classified as "equity method investments" in accordance with ASC Subtopics 323-10 ("ASC 323-10"), *Investments-Equity Method and Joint Ventures: Overall*. The Group applies the equity method of accounting that is consistent with ASC 323-10 in limited partnerships which the Group has significant influence. After the date of investment, the Group subsequently adjusts the carrying amount of the investment to recognize the Group's proportionate share of each equity investees' profits or loss into earnings. The Group evaluates the equity method investments for impairment under ASC 323-10. An impairment loss on the equity method investments is recognized in earnings when the decline in value is determined to be other-than-temporary.

F-19

Table of Contents

PDD HOLDINGS INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)
(Amounts in thousands of RMB and US$, except for number of shares and per share data)

**2.Summary of Significant Accounting Policies (Continued)**

**(i)Property, equipment and software, net**

Property, equipment and software are stated at cost and are depreciated and amortized using the straight-line method over the estimated useful lives of the assets, as follows:

| Category | Estimated useful life |
|---|---|
| Computer equipment | 1-3 years |
| Office equipment | 3 years |
| Purchased software | 3-5 years |
| Leasehold improvements | Over the shorter of lease terms or the estimated useful lives of the assets |

Repair and maintenance costs are charged to expense as incurred, whereas the costs of renewals and betterments that extend the useful lives of property, equipment and software are capitalized as additions to the related assets. Retirements, sales and disposals of assets are recorded by removing the cost and accumulated depreciation from the asset and accumulated depreciation accounts with any resulting gain or loss reflected in the consolidated statements of comprehensive income/(loss).

**(j)Impairment of long-lived assets other than goodwill**

The Group evaluates its long-lived assets, including fixed assets and intangible assets with finite lives, for impairment whenever events or changes in circumstances, such as a significant adverse change to market conditions that will impact the future use of the assets, indicate that the carrying amount of an asset may not be fully recoverable. When these events occur, the Group evaluates the recoverability of long-lived assets by comparing the carrying amounts of the assets to the future undiscounted cash flows expected to result from the use of the assets and their eventual disposition. If the sum of the expected undiscounted cash flows is less than the carrying amounts of the assets, the Group recognizes an impairment loss based on the excess of the carrying amounts of the assets over their fair value. Fair value is generally determined by discounting the cash flows expected to be generated by the assets, when the market prices are not readily available.

For all periods presented, there were no impairment of any of the Group's long-lived assets.

F-20

PDD HOLDINGS INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)
(Amounts in thousands of RMB and US$, except for number of shares and per share data)

**2. Summary of Significant Accounting Policies (Continued)**

*(k) Fair value of financial instruments*

The Group's financial instruments include cash and cash equivalents, restricted cash, receivables from online payment platforms, amounts due from/to related parties, merchant deposits, payables to merchants, short-term investments, long-term time deposits and debt securities and convertible bonds. For the aforementioned financial instruments included in current assets and liabilities, except for ones measured at fair value, their carrying amount approximate to their respective fair values because of the general short maturities. The carrying amounts of time deposits and long-term held-to-maturity debt securities approximate to fair values as the related interest rates currently offered by financial institutions for similar debt instruments of comparable maturities. The fair value of convertible bonds that are not reported at fair value are disclosed in Note 12.

The Group applies ASC 820, *Fair Value Measurements and Disclosures* ("ASC 820"). ASC 820 defines fair value, establishes a framework for measuring fair value and expands disclosures about fair value measurements. ASC 820 requires disclosures to be provided on fair value measurement.

ASC 820 establishes a three-tier fair value hierarchy, which prioritizes the inputs used in measuring fair value as follows:

Level 1 — Observable inputs that reflect quoted prices (unadjusted) for identical assets or liabilities in active markets.

Level 2 — Other inputs that are directly or indirectly observable in the marketplace.

Level 3 — Unobservable inputs which are supported by little or no market activity.

ASC 820 describes three main approaches to measuring the fair value of assets and liabilities: (1) market approach; (2) income approach; and (3) cost approach. The market approach uses prices and other relevant information generated from market transactions involving identical or comparable assets or liabilities. The income approach uses valuation techniques to convert future amounts to a single present value amount. The measurement is based on the value indicated by current market expectations about those future amounts. The cost approach is based on the amount that would currently be required to replace an asset.

*(l) Revenue recognition*

Revenues are principally comprised of those generated from online marketplace services and merchandise sales. Revenues from online marketplace services primarily consist of online marketing services revenues and transaction services fees. Revenues represent the amount of consideration that the Company is entitled to in exchange for the transfer of promised goods or services in the ordinary course of the Company's activities and is recorded net of value-added tax ("VAT"). Consistent with the criteria of ASC Topic 606 ("ASC 606"), *Revenue from Contracts with Customers*, the Group recognizes revenue when the performance obligation in a contract is satisfied by transferring the control of a promised good or service to a customer. The Group also evaluates whether it is appropriate to record the gross amounts of goods and services sold and the related costs, or the net amounts earned as commissions. Payments for services or goods are generally received before deliveries.

Table of Contents

PDD HOLDINGS INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)
(Amounts in thousands of RMB and US$, except for number of shares and per share data)

**2. Summary of Significant Accounting Policies (Continued)**

*(l) Revenue recognition (Continued)*

Online marketing services

The Group entered into contractual agreements with certain merchants to provide online marketing services on the Group's online marketplace for which the Group receives service fees from merchants. The Group provides merchants with performance-based marketing services that match product listings appearing in search or browser results on the Group's online marketplace. Merchants prepay for online marketing services that are primarily charged on a cost-per-click basis. Under ASC 606, the related revenues are recognized at a point of time when consumers click the merchants' product listings and the online marketing services are completed by the Group for the merchants. The positioning of such listings and the price for such positioning are determined through an online auction system, which facilitates price discovery through a market-based mechanism.

The Group also provides display marketing services that allow the merchants to place advertisements on the platform primarily at fixed prices. In general, the merchants need to prepay for display marketing which is accounted for as customer advances and deferred revenues and revenues are primarily recognized over the period during which the advertising services are provided.

Transaction services

The Group charges fees expected to receive from transaction services to merchants for sales transactions completed on our platforms, where the Group does not take control of the products provided by merchants at any point in time during the transactions and do not have latitude over pricing of the merchandise. Revenues related to transaction services are recognized in consolidated statements of comprehensive income/(loss) at a point in time when the Group's service obligations to the merchants are determined to have been completed under each sales transaction upon the confirmation of the receipts of goods by the consumers.

Merchandise sales

The Group in certain cases acquires the merchandises from suppliers and sells directly to the customers. The Group acts as a principal as it obtains control of the merchandises, is primarily obligated for the merchandise sold to the customers, bears inventory risks and has the latitude in establishing prices. Revenues from merchandise sales are recorded on a gross basis, net of discounts and return allowances when the product is delivered and title is passed to customers in this type of transaction. Proceeds received in advance of customer acceptance are recorded as current liabilities in customer advances and deferred revenues.

F-22

Table of Contents

PDD HOLDINGS INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)
(Amounts in thousands of RMB and US$, except for number of shares and per share data)

**2. Summary of Significant Accounting Policies (Continued)**

**(l) Revenue recognition (Continued)**

Incentives provided to the consumers

In order to promote its online marketplace and attract more registered consumers, the Group at its own discretion provides various forms of incentives, for example, coupons, credits and other subsidies that are not specific to any merchant, to the consumers who are not customers of the Group. Despite the absence of any explicit contractual obligations to incentivize the consumers on behalf of the merchants, the Group further evaluated the varying features of different incentive programs to determine that whether the incentives represent implicit obligations to the consumers on behalf of merchants and if so, should be recorded as reduction of revenues. Based on that evaluation, the Group determined that incentives provided to the consumers are not considered as payments to the merchant-customers.

The Group at its discretion issues to the consumers coupons and credits upon completion of certain actions to promote the Group's platform. The coupons can be used for future purchases of eligible merchandise offered on the Group's online marketplace to reduce purchase price and the credits can be used to redeem cash from the Group. The Group recognizes the amounts of coupons and credits as marketing expenses when future purchases are completed or when the credits are issued. Other subsidies unconditionally provided to the consumers are recognized as marketing expenses when the related transaction services revenues from merchants are recognized. Certain subsidies are provided to consumers upon their completion of certain actions to promote the platform, and the Group records the related costs in marketing expenses upon the completion of such promotion tasks.

**(o) Costs of revenues**

Costs of revenues consist primarily of payment processing fees paid to third party online payment platforms, costs associated with the operation of the platform and others, such as costs and expenses attributable to merchandise sales, fulfillment fees, merchant support services, bandwidth and server costs, amortization, depreciation and maintenance costs, payroll, employee benefits and share-based compensation expenses, call center, surcharges and other expenses directly attributable to the online marketplace services.

**(p) Advertising expenditures**

Advertising expenditures are expensed when incurred and are included in sales and marketing expenses. Total amount of advertising expenditures and incentive programs recognized in sales and marketing expenses were RMB39,297,890, RMB41,456,838 and RMB49,971,418 (US$7,245,175) for the years ended December 31, 2020, 2021 and 2022, respectively.

**(q) Research and development expenses**

Research and development expenses include payroll, employee benefits, and other operating expenses associated with research and platform development. Research and development expenses also include rent, depreciation and other related expenses. To date, expenditures incurred between when the application has reached the development stage and when it is substantially complete and ready for its intended use have been inconsequential and, as a result, the Group did not capitalize any software development costs in the accompanying consolidated financial statements.

F-23

Table of Contents

PDD HOLDINGS INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)
(Amounts in thousands of RMB and US$, except for number of shares and per share data)

**2. Summary of Significant Accounting Policies (Continued)**

*(r) Government subsidies*

Government subsidies primarily consist of financial subsidies received from local governments for operating a business in their jurisdictions and compliance with specific policies promoted by the local governments. Such amounts are recognized as "Other income, net" upon receipt and when all conditions attached to the grants are fulfilled.

*(s) Credit loss*

The Group adopted Accounting Standards Update No. 2016-13, *Financial Instruments-Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments* on January 1, 2020, using the modified retrospective transition method. The Group's allowance for credit losses as of December 31, 2021 and 2022 reflects the best estimation of the expected future losses for its financial instruments measured at amortized cost, based on the current economic conditions; however, as a result of the uncertainty caused by the coronavirus (COVID-19) pandemic and other factors, these estimates may change and future actual losses may differ from the estimates. The Group will continue to monitor economic conditions and will revise the estimates of the expected future losses for financial instruments measured at amortized cost as necessary.

*(t) Leases*

The Group as the lessee determines if an arrangement is a lease at inception. Leases are classified as operating or finance leases in accordance with the recognition criteria in ASC 842-20-25. The Group's lease portfolio consisted entirely of operating leases as of December 31, 2020, 2021 and 2022. The Group's leases do not contain any residual value guarantees or material restrictive covenants. The Group also elected the practical expedient of the short-term lease exemption for contracts with lease terms of 12 months or less.

At the commencement date of an operating lease, the Group records a right-of-use ("ROU") asset and lease liability based on the present value of the lease payments over the lease term. Variable lease payments not dependent on an index or rate are excluded from the ROU asset and lease liability calculations and are recognized in expense in the period which the obligation for those payments is incurred. As the rate implicit in the Group's lease is not typically readily available, the Group uses an incremental borrowing rate based on the information available at the lease commencement date in determining the present value of lease payments. This incremental borrowing rate reflects the fixed rate at which the Group could borrow on a collateralized basis the amount of the lease payments in the same currency, for a similar term, in a similar economic environment. ROU assets include any lease prepayments and are reduced by lease incentives. Operating lease expense for lease payments is recognized on a straight-line basis over the lease term. Lease terms are based on the non-cancelable term of the lease and may contain options to extend the lease when it is reasonably certain that the Group will exercise that option. The Group accounts for lease and non-lease components separately.

F-24

Table of Contents

PDD HOLDINGS INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)
(Amounts in thousands of RMB and US$, except for number of shares and per share data)

**2. Summary of Significant Accounting Policies (Continued)**

*(u) Income taxes*

The Group follows the liability method of accounting for income taxes in accordance with ASC 740("ASC 740"), *Income Taxes*. Under this method, deferred tax assets and liabilities are determined based on the difference between the financial reporting and tax bases of assets and liabilities using enacted tax rates that will be in effect in the period in which the differences are expected to reverse. The Group records a valuation allowance to offset deferred tax assets if based on the weight of available evidence, it is more-likely-than-not that some portion, or all, of the deferred tax assets will not be realized. The effect on deferred taxes of a change in tax rate is recognized in tax expense in the period that includes the enactment date of the change in tax rate.

The Group accounted for uncertainties in income taxes in accordance with ASC 740. Interest and penalties related to unrecognized tax benefit recognized in accordance with ASC 740 are classified in the consolidated statements of comprehensive income/(loss) as income tax expenses.

*(v) Share-based compensation*

The Group applies ASC 718 ("ASC 718"), *Compensation—Stock Compensation*, to account for its employee share-based payments. In accordance with ASC 718, the Group determines whether an award should be classified and accounted for as a liability award or an equity award. All of the Group's share-based awards to employees were classified as equity awards. The Group measures the employee share-based compensation based on the fair value of the award at the grant date. Expense is recognized using accelerated method over the requisite service period. The fair value of share options at the time of grant is determined using the binomial-lattice option pricing model. In accordance with ASU No. 2016-09, *Compensation-Stock Compensation* (Topic 718): *Improvement to Employee Share-based Payment Accounting*, the Group elected to account for forfeitures as they occurred.

*(w) Employee benefit expenses*

As stipulated by the regulations of the PRC, full-time employees of the Group are entitled to various government statutory employee benefit plans, including medical insurance, maternity insurance, workplace injury insurance, unemployment insurance and pension benefits through a PRC government-mandated multi-employer defined contribution plan. The Group is required to make contributions to the plan and accrues for these benefits based on certain percentages of the qualified employees' salaries.

*(x) Comprehensive income/(loss)*

Comprehensive income/(loss) is defined as the changes in equity of the Group during a period from transactions and other events and circumstances excluding transactions resulting from investments by owners and distributions to owners. Among other disclosures, ASC 220, *Comprehensive Income*, requires that all items that are required to be recognized under current accounting standards as components of comprehensive income be reported in a financial statement that is displayed with the same prominence as other financial statements. For each of the periods presented, the Group's comprehensive income/(loss) includes net income/(loss), foreign currency translation difference and unrealized holding losses associated with the available-for-sale debt securities and is presented in the consolidated statements of comprehensive income/(loss).

F-25

Table of Contents

PDD HOLDINGS INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)
(Amounts in thousands of RMB and US$, except for number of shares and per share data)

**2. Summary of Significant Accounting Policies (Continued)**

*(y) Earnings/(Loss) per share*

Basic earnings/(loss) per share is computed by dividing net income/(loss) attributable to ordinary shareholders by the weighted average number of ordinary shares outstanding during the period using the two-class method. Under the two-class method, net income/(loss) is allocated between ordinary shares and other participating securities based on their participating rights. Diluted earnings/(loss) per share is calculated by dividing net income/(loss) attributable to ordinary shareholders by the weighted average number of ordinary and dilutive ordinary equivalent shares outstanding during the period. Ordinary equivalent shares consist of unvested restricted share unites ("RSUs") and shares issuable upon the exercise of share options using the treasury stock method, and conversion of convertible bonds using the if-converted method. Ordinary equivalent shares are not included in the denominator of the diluted earnings/(loss) per share calculation when inclusion of such shares would be anti-dilutive.

Basic and diluted earnings/(loss) per share are not reported separately for Class A ordinary shares or Class B ordinary shares (the "Ordinary Shares") as each class of shares has the same rights to undistributed and distributed earnings.

*(z) Segment reporting*

The Group follows ASC 280, *Segment Reporting*. The Group's Chief Executive Officer as the chief operating decision-maker reviews the consolidated financial results when making decisions about allocating resources and assessing the performance of the Group as a whole and hence, the Group has only one reportable segment. The Group operates and manages its business as a single segment. As the Group's long-lived assets are substantially all located in the PRC and substantially all the Group revenues are derived from within the PRC, no geographical segments are presented.

*(aa) Recent accounting pronouncements*

The Group does not expect the adoption of any recently issued accounting pronouncements to have a material impact on the financial statements.

F-26

Table of Contents

PDD HOLDINGS INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)
(Amounts in thousands of RMB and US$, except for number of shares and per share data)

**3. Concentration of Risks**

*(a) Concentration of credit risk*

Financial instruments that may potentially subject the Group to significant concentration of credit risk consist primarily of cash and cash equivalents, restricted cash, receivables from online payment platforms, amounts due from related parties, short-term investments, and long-term debt investments. As of December 31, 2021 and 2022, a majority of the Group's cash and cash equivalents, restricted cash, short-term investments and long-term debt investments were held at reputable financial institutions with high-credit ratings. In the event of bankruptcy of one of these financial institutions, the Group may not be able to claim its cash and demand deposits back in full. The Group continues to monitor the financial strength of the financial institutions. There has been no recent history of default in relation to these financial institutions. Receivables from online payment platforms and amounts due from related parties (Note 18), unsecured and denominated in RMB and US$, derived from transactions on the Group's online marketplace to consumers, are exposed to credit risk. The risk is mitigated by credit evaluations the Group performs on the selected online payment platforms that are highly reputable and market leaders. There has been no default of payments from these online payment platforms.

*(b) Business, customer, political, social and economic risks*

The Group participates in a dynamic and competitive high technology industry and believes that changes in any of the following areas could have a material adverse effect on the Group's future financial position, results of operations or cash flows: changes in the overall demand for services; changes in competitive landscape including potential new entrants; advances and new trends in new technology; strategic relationships or customer relationships; regulatory considerations; and risks associated with the Group's ability to attract and retain employees necessary to support its growth.

(i) Business supplier risk - the purchases from Tencent Group accounted for over 10% of the total purchases of the Group for the years ended December 31, 2020, 2021 and 2022. Please refer to Note 18 for disclosure of the related party transactions.

(ii) Customer risk - there were no customers whose revenues individually represent greater than 10% of the total revenues of the Group for the years ended December 31, 2020, 2021 and 2022.

(iii) Economic risk - the Group's operations could be adversely affected by significant political, economic and social changes.

F-27

Table of Contents

PDD HOLDINGS INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)
(Amounts in thousands of RMB and US$, except for number of shares and per share data)

**3. Concentration of Risks (Continued)**

*(c) Foreign currency exchange rate risk*

The Group is exposed to foreign currency exchange rate risk, which mainly affects the monetary assets denominated in the currencies other than the functional currencies of the respective entities. From July 21, 2005, the RMB is permitted to fluctuate within a narrow and managed band against a basket of certain foreign currencies. The (depreciation)/appreciation of the US$ against RMB was approximately (6.5)%, (2.3)% and 9.2% for the years ended December 31, 2020, 2021 and 2022, respectively. The functional currency and the reporting currency of the Company are the US$ and the RMB, respectively. Most of the Group's revenues and costs are denominated in RMB, while a portion of cash and cash equivalents, short-term investments and long-term debt investments, are denominated in US$. It is difficult to predict how market forces or PRC or U.S. government policy may impact the exchange rate between the RMB and the US$ in the future.

*(d) Currency convertibility risk*

The Group transacts most of its business in RMB, which is not freely convertible into foreign currencies. All foreign exchange transactions continue to take place either through the PBOC or other banks authorized to buy and sell foreign currencies at the exchange rates quoted by the PBOC. Approval of foreign currency payments by the PBOC or other institutions requires submitting a payment application form together with suppliers' invoices, shipping documents and signed contracts.

**4. Short-term Investments**

Short-term investments classification as of December 31, 2021 and 2022 were shown as below:

| | As of December 31, | | |
| --- | --- | --- | --- |
| | 2021 | 2022 | 2022 |
| | RMB | RMB | US$ |
| Time deposits and held-to-maturity debt securities | 86,203,296 | 113,872,353 | 16,509,939 |
| Trading securities | 313,322 | 6,917 | 1,003 |
| Investments in convertible bonds | — | 1,233,284 | 178,809 |
| | 86,516,618 | 115,112,554 | 16,689,751 |

The gross unrecognized holding gains or loss on the held-to-maturity debt securities was nil as of December 31, 2021 and 2022.

The cost of trading securities was RMB300,000 and RMB6,828 (US$990), with net unrealized gain of RMB13,322 and RMB89 (US$13) as of December 31, 2021 and 2022, respectively.

For the years ended December 31, 2020, 2021 and 2022, interest income related to time deposits and held-to-maturity debt securities was RMB1,175,842, RMB1,093,654 and RMB2,442,413 (US$354,117), respectively.

The Group invested in convertible bonds issued by a third party in 2020, which is accounted for under the fair value option and reclassified from other non-current assets (Note 9) to short-term investments during the year ended December 31,2022. As of December 31, 2021 and 2022, the fair value was RMB1,290,901 and RMB1,233,284 (US$178,809), respectively. Unrealized gains recorded on these convertible bonds in the consolidated statements of comprehensive income/(loss) was RMB88,928 for the year ended December 31, 2020, while unrealized loss of RMB67,065 and RMB221,640 (US$32,135) were recorded for the year ended December 31, 2021 and 2022, respectively.

PDD HOLDINGS INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)
(Amounts in thousands of RMB and US$, except for number of shares and per share data)

### 5. Prepayments and Other Current Assets

The components of prepayments and other current assets are as follows:

|  | As of December 31, | | |
|  | 2021 | 2022 | 2022 |
|  | RMB | RMB | US$ |
|---|---|---|---|
| Prepayments | 1,392,929 | 966,439 | 140,120 |
| VAT recoverable | 670,541 | 326,427 | 47,328 |
| Interest receivables | 364,594 | 119,564 | 17,335 |
| Rental and other deposits | 111,139 | 86,915 | 12,602 |
| Others | 885,484 | 799,034 | 115,850 |
|  | 3,424,687 | 2,298,379 | 333,235 |

The prepayments mainly consist of advertising fees paid in advance.

### 6. Property, Equipment and Software, Net

|  | As of December 31, | | |
|  | 2021 | 2022 | 2022 |
|  | RMB | RMB | US$ |
|---|---|---|---|
| At cost: |  |  |  |
| Computer equipment, office equipment and purchased software | 3,135,385 | 3,591,861 | 520,771 |
| Leasehold improvement | 28,773 | 30,249 | 4,386 |
|  | 3,164,158 | 3,622,110 | 525,157 |
| Less: accumulated depreciation | (960,835) | (2,577,263) | (373,668) |
|  | 2,203,323 | 1,044,847 | 151,489 |

For the years ended December 31, 2020, 2021 and 2022, the Group recorded depreciation expenses amounted RMB27,999, RMB911,964 and RMB1,615,551 (US$234,233), respectively.

### 7. Intangible Assets

Intangible assets consisted of the following:

|  | As of December 31, | | |
|  | 2021 | 2022 | 2022 |
|  | RMB | RMB | US$ |
|---|---|---|---|
| Balance as of January 1 | 1,276,751 | 701,220 | 101,667 |
| Addition | 30,073 | — | — |
| Amortization | (583,416) | (608,618) | (88,241) |
| Foreign currency translation difference | (22,188) | 41,400 | 6,002 |
| Balance as of December 31 | 701,220 | 134,002 | 19,428 |

In February 2018, the Company entered into a strategic cooperation framework agreement (the "Agreement") with an affiliate of Tencent Group. The Company and Tencent Group agreed to cooperate in a number of areas primarily for Tencent Group to provide the Company with Weixin access point and other services and to pursue additional opportunities for future potential cooperation. The Agreement is valid for five years, from March 1, 2018 to February 28, 2023. The Company recognized the Agreement as an intangible asset at the fair value of consideration paid in the form of convertible preferred shares of RMB2,852 million. The Group recognizes the related amortization expense in costs of revenues, over the period of five years using the straight-line method. Amortization expense for intangible assets were RMB623,524, RMB583,416 and RMB608,618 (US$88,241) for the years ended December 31, 2020, 2021 and 2022, respectively. No impairment charge was recognized on the intangible assets for any of the three years in the period ended December 31, 2022.

PDD HOLDINGS INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)
(Amounts in thousands of RMB and US$, except for number of shares and per share data)

**7. Intangible Assets (Continued)**

The estimated annual amortization expense for each of the remaining fiscal years is as follows:

| | Amortization | |
| --- | --- | --- |
| | RMB | US$ |
| 2023 | 112,854 | 16,362 |
| 2024 | 3,007 | 436 |
| 2025 | 3,007 | 436 |
| 2026 | 3,007 | 436 |
| 2027 and after | 12,127 | 1,758 |

**8. Leases**

The Group has operating leases mainly for offices and warehouses in China. For the years ended December 31, 2020, 2021 and 2022, operating lease costs were RMB177,976, RMB385,377 and RMB557,477 (US$80,827), respectively; and short-term lease costs were RMB31,394, RMB141,507 and RMB174,402 (US$25,286), respectively. There were no leasing costs other than the operating lease costs and short-term lease costs for the years ended December 31, 2020, 2021 and 2022.

A maturity analysis of the Company's operating lease liabilities and reconciliation of the undiscounted cash flows to the operating lease liabilities recognized on the consolidated balance sheet was as below:

| | As of December 31, 2022 | |
| --- | --- | --- |
| | RMB | US$ |
| 2023 | 650,617 | 94,331 |
| 2024 | 497,166 | 72,082 |
| 2025 | 274,728 | 39,832 |
| 2026 | 67,483 | 9,784 |
| 2027 and after | 75,197 | 10,903 |
| Total undiscounted cash flows | 1,565,191 | 226,932 |
| Less: imputed interest | (92,373) | (13,393) |
| Present value of lease liabilities | 1,472,818 | 213,539 |

As of December 31, 2022, the Company had no operating leases that had not yet commenced.

As of December 31, 2020, 2021 and 2022, the weighted average remaining lease term was 3.39 years, 2.74 years and 2.87 years, respectively, and the weighted average discount rate was 4.90%, 4.38% and 4.05% for the Company's operating leases, respectively.

Other supplemental information related to leases is summarized below:

| | For the years ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2020 | 2021 | 2022 | 2022 |
| | RMB | RMB | RMB | US$ |
| Cash payments for operating leases | 166,967 | 388,144 | 534,784 | 77,536 |
| ROU assets obtained in exchange for new operating lease liabilities | 265,821 | 704,142 | 1,068,063 | 154,855 |

F-30

Table of Contents

PDD HOLDINGS INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)
(Amounts in thousands of RMB and US$, except for number of shares and per share data)

**9.Other Non-current Assets**

Other non-current assets mainly include time deposits, held-to-maturity debt securities, available-for-sale debt securities, investment in convertible bonds, and equity method investments.

Time deposits and held-to-maturity debt securities represent the time deposits made in financial institutions and other held-to-maturity debt securities that the Group has positive intent and ability to hold to maturity. As of December 31, 2021 and 2022, the carrying amount for the investments, net of allowance for credit losses, was RMB13,008,899 and RMB11,040,283 (US$1,600,691), respectively. As of December 31, 2021 and 2022, the allowance for credit losses was RMB14,378 and RMB12,873 (US$1,866), respectively. The gross unrecognized holding gains or loss on the investments was nil as of December 31, 2021 and 2022. Interest income recorded on these time deposits in the consolidated statements of comprehensive income/(loss) were RMB66,602, RMB83,728 and RMB151,299 (US$21,936) for the years ended December 31, 2020, 2021 and 2022, respectively.

The following table summarizes the net carrying amount of long-term time deposits and held-to-maturity debt securities with stated contractual dates, classified by the contractual maturity date of the investments:

| | As of December 31, | | |
| --- | --- | --- | --- |
| | 2021 | 2022 | 2022 |
| | RMB | RMB | US$ |
| Due in 1 year through 2 years | 8,936,424 | 5,536,768 | 802,756 |
| Due in 2 years through 3 years | 4,072,475 | 5,503,515 | 797,935 |
| | 13,008,899 | 11,040,283 | 1,600,691 |

As of December 31, 2022, available-for-sale debt securities include government bonds purchased from financial institutions, with maturities of greater than twelve months. The following table summarizes the details of available-for-sale debt securities with stated contractual dates, classified by the contractual maturity date of the investments:

| | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Fair Value (Net Carrying Amount) | Fair Value (Net Carrying Amount) |
| --- | --- | --- | --- | --- | --- |
| | RMB | RMB | RMB | RMB | US$ |
| Due in 5 years through 10 years | 3,596,846 | 4,626 | (25,998) | 3,575,474 | 518,395 |

The Group does not consider the investments in available-for-sale debt securities to be other-than-temporarily impaired at December 31, 2022. Hence, no allowance for credit loss was recorded as of December 31, 2022.

As of December 31, 2021, investment in convertible bonds measured at fair value amounted to RMB1,290,901, which is reclassified to short-term investments for the year ended December 31, 2022 (Note 4).

Equity method investments consist of the Group's investments as a limited partner in certain limited partnership funds, including funds set up by the Company's related parties, to make strategic investments. As of December 31, 2021 and 2022, the carrying amount for the investments was RMB1,968,156 and RMB2,049,616 (US$297,166), respectively. No equity method investments were considered, individually or in aggregate, material as of December 31, 2021 and 2022. There was no impairment on these investments during the years ended December 31, 2020, 2021 and 2022.

F-31

Table of Contents

PDD HOLDINGS INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)
(Amounts in thousands of RMB and US$, except for number of shares and per share data)

**10. Accrued Expenses and Other Liabilities**

The components of accrued expenses and other liabilities are as follows:

| | As of December 31, | | |
| | 2021 | 2022 | 2022 |
| | RMB | RMB | US$ |
|---|---|---|---|
| Accrued advertising and marketing expenses | 3,652,648 | 5,850,125 | 848,188 |
| VAT and other tax payable | 5,734,281 | 6,970,790 | 1,010,670 |
| Payroll payable | 1,949,173 | 2,364,723 | 342,853 |
| Accounts payable | 1,951,681 | 3,978,818 | 576,874 |
| Others | 797,730 | 1,796,267 | 260,434 |
| | 14,085,513 | 20,960,723 | 3,039,019 |

**11. Convertible Bonds**

*(a) 2024 Convertible Bonds*

In September 2019, the Company issued US$1,000,000 principal amount 0.00% convertible senior notes including US$125,000 sold upon the exercise of the over-allotment option (the "2024 Notes"). The 2024 Notes will mature on October 1, 2024 unless redeemed, repurchased or converted prior to such date.

Holders may convert their 2024 Notes at their option prior to the close of business on the business day immediately preceding April 1, 2024 only under the following circumstances: (1) during any calendar quarter commencing after the calendar quarter ending on December 31, 2019 (and only during such calendar quarter), if the last reported sale price of the Company's American Depositary Shares (the "ADSs"), each representing four Class A ordinary shares of the Company, par value US$0.000005 per share, for at least 20 trading days (whether or not consecutive) during a period of 30 consecutive trading days ending on, and including, the last trading day of the immediately preceding calendar quarter is greater than or equal to 130% of the conversion price on each applicable trading day (the "2024 Price Condition"); (2) during the five-business-day-period after any ten-consecutive-trading-day-period (the "measurement period") in which the trading price per US$1,000 principal amount of the 2024 Notes for each trading day of the measurement period was less than 98% of the product of the last reported sale price of the ADSs and the conversion rate on each such trading day; (3) if the Company calls the 2024 Notes for a tax redemption; (4) if the Company calls the 2024 Notes for redemption at its option or (5) upon the occurrence of specified corporate events. On or after April 1, 2024 until the close of business on the second scheduled trading day immediately preceding the maturity date, holders may convert their 2024 Notes at any time. Upon conversion, the Company will pay or deliver, as the case may be, cash, ADSs, or a combination of cash and ADSs, at its election.

The initial conversion rate of the 2024 Notes is 23.4680 of the Company's ADS per US$1,000 principal amount of the 2024 Notes (which is equivalent to an initial conversion price of approximately US$42.61 per ADS). The conversion rate will be subject to adjustment in some events. In addition, following certain corporate events that occur prior to the maturity date, if a make-whole fundamental change occurs prior to the maturity date of the 2024 Notes, or under certain circumstances upon a tax redemption or the Company's optional redemption, the Company will, in certain circumstances, increase the conversion rate for a holder who elects to convert its 2024 Notes in connection with such corporate event, such make-whole fundamental change or such notice of tax redemption or notice of optional redemption, as the case may be.

The Company may not redeem the 2024 Notes prior to October 1, 2022 unless certain tax-related events occur. On or after October 1, 2022, the Company may redeem for cash all or part of the 2024 Notes, at its option, if the last reported sale price of the Company's American Depositary Shares has been at least 130% of the conversion price then in effect on (i) each of at least 20 trading days (whether or not consecutive) during any 30 consecutive trading day period ending on, and including, the trading day immediately prior to the date the Company provides notice of redemption; and (ii) the trading day immediately preceding the date the Company sends such notice. Holders of the 2024 Notes may require the Company to repurchase all or part of their 2024 Notes in cash on October 1, 2022 (the "Repurchase Date") or in the event of certain fundamental changes. No sinking fund is provided for the 2024 Notes.

F-32

Table of Contents

PDD HOLDINGS INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)
(Amounts in thousands of RMB and US$, except for number of shares and per share data)

**11. Convertible Bonds (Continued)**

*(b) 2025 Convertible Bonds*

In November 2020, the Company issued US$2,000,000 principal amount 0.00% convertible senior notes including US$250,000 sold upon the exercise of the over-allotment option (the "2025 Notes"). The Notes will mature on December 1, 2025 unless redeemed, repurchased or converted prior to such date.

Holders may convert their 2025 Notes at their option prior to the close of business on the business day immediately preceding June 1, 2025 only under the following circumstances: (1) during any calendar quarter commencing after the calendar quarter ending on March 31, 2021 (and only during such calendar quarter), if the last reported sale price of the Company's ADS, par value US$0.000005 per share, for at least 20 trading days (whether or not consecutive) during a period of 30 consecutive trading days ending on, and including, the last trading day of the immediately preceding calendar quarter is greater than or equal to 130% of the conversion price on each applicable trading day; (2) during the five-business-day period after any ten-consecutive-trading-day period (the ''measurement period'') in which the ''trading price'' (as defined below) per US$1,000 principal amount of 2025 Notes for each trading day of the measurement period was less than 98% of the product of the last reported sale price of the ADSs and the conversion rate on each such trading day; (3) if the Company calls the 2025 Notes for a tax redemption; (4) if the Company calls the 2024 Notes for redemption at its option or (5) upon the occurrence of specified corporate events. On or after June 1, 2025 until the close of business on the second scheduled trading day immediately preceding the maturity date, holders may convert their 2025 Notes at any time, regardless of the foregoing circumstances. Upon conversion, the Company will pay or deliver, as the case may be, cash, ADSs, or a combination of cash and ADSs, at its election.

The conversion rate will initially be 5.2459 ADSs per US$1,000 principal amount of 2025 Notes (equivalent to an initial conversion price of approximately US$190.63 per ADS). The conversion rate will be subject to adjustment in some events but will not be adjusted for any accrued and unpaid special interest, if any. In addition, following certain corporate events that occur prior to the maturity date or following the Company's delivery of a notice of a tax or optional redemption, the Company will, in certain circumstances, increase the conversion rate for a holder who elects to convert its 2025 Notes in connection with such a corporate event or such notice of tax or optional redemption, as the case may be.

The Company may not redeem the 2025 Notes prior to December 6, 2023 unless certain tax-related events occur. On or after December 6, 2023, the Company may redeem for cash all or part of the 2025 Notes, at its option, if the last reported sale price of its ADSs has been at least 130% of the conversion price then in effect on (i) each of at least 20 trading days (whether or not consecutive) during any 30 consecutive trading day period ending on, and including, the trading day immediately prior to the date the Company provide notice of redemption and (ii) the trading day immediately preceding the date the Company send such notice. Holders of the 2025 Notes may require the Company to repurchase all or part of their 2025 Notes in cash on December 1, 2023 (the "Repurchase Date") or in the event of certain fundamental changes. No sinking fund is provided for the 2025 Notes.

*(c) Accounting for Convertible Bonds*

The Group adopted ASU No. 2020-06, *Accounting for Convertible Instruments and Contracts in an Entity's Own Equity* ("ASU 2020-06"), effective from January 1, 2022, using the modified retrospective method. Under the modified retrospective approach, the Group apply the standard to all convertible bonds that are outstanding on the effective date, with the cumulative effect recognized as an adjustment to the opening balance of retained earnings, and do not restate comparable periods.

F-33

Table of Contents

PDD HOLDINGS INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)
(Amounts in thousands of RMB and US$, except for number of shares and per share data)

**11. Convertible Bonds (Continued)**

*(c) Accounting for Convertible Bonds (Continued)*

The cumulative effects of changes made to the Group's consolidated balance sheet on January 1, 2022 for the adoption of ASU 2020-06 were as follows:

| | Balance at December 31, 2021 RMB | Adjustment RMB | Balance at January 1, 2022 RMB |
|---|---|---|---|
| **Liabilities** | | | |
| Convertible bonds | 11,788,907 | 2,316,324 | 14,105,231 |
| **Equity** | | | |
| Additional paid-in capital | 95,340,819 | (3,818,926) | 91,521,893 |
| Accumulated other comprehensive loss | (2,519,900) | 136,096 | (2,383,804) |
| Accumulated deficits | (17,706,533) | 1,366,506 | (16,340,027) |

The adoption of ASU 2020-06 reduced interest expense by RMB1,268,792 (US$183,958) in 2022, and increased the basic and diluted earnings per share by RMB0.25 (US$0.04) and RMB0.17 (US$0.02), respectively. Those convertible bonds were anti-dilutive before adoption of ASU 2020-06.

Prior to the adoption of ASU 2020-06, as the conversion option may be settled in cash, ADSs, or a combination of cash and ADSs at the Company's option, the Company separated the 2024 Notes and the 2025 Notes (collectively as the "Notes") into liability and equity components in accordance with ASC 470-20, *Debt with Conversion and Other Options*. The carrying amount of the liability component was initially calculated by measuring the fair value of a similar liability that does not have an associated conversion feature. The carrying amount of the equity component representing the conversion option was determined by deducting the fair value of the liability component from the initial proceeds and recorded as additional paid-in capital. Debt issuance costs were allocated to the liability and equity components proportionately. The resulting discount, together with the allocated issuance costs, are accreted at the effective interest rate over the period from the issuance date to the Repurchase Date.

After the adoption of ASU 2020-06, the Group recombine convertible bonds that were previously separated into liability and equity components in accordance with ASC 470-20. The revised amortized cost of the outstanding convertible bonds at transition is recomputed as if the conversion option was not separated. The Group determined the amortized cost at issuance date and then recalculate the amortization of the discount using the recalculated effective interest rate. The resulting discount, together with the issuance costs as mentioned below, are accreted at an effective interest rate over the period from the issuance date to the Repurchase Date. The recalculated effective rate of the 2024 Notes and 2025 Notes are 0.53% and 0.34%, respectively. The adjustment to retained earnings is the difference between the sum of the carrying amount of the liability and equity component immediately before transition and the revised amortized cost.

The gross proceeds from the issuance of the 2024 Notes and 2025 Notes were US$1,000,000 and US$2,000,000, respectively, and debt issuance costs including under writing commissions and offering expenses were approximately US$15,680 and US$20,607, respectively.

As of December 31, 2021 and 2022, the principal amount of the Notes were US$2,226,253 and US$2,226,252, unamortized debt discount were US$377,216 and US$6,239, and net carrying amount of the Notes were RMB11,788,907 and RMB15,461,506, respectively.

F-34

Table of Contents

PDD HOLDINGS INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)
(Amounts in thousands of RMB and US$, except for number of shares and per share data)

**11. Convertible Bonds (Continued)**

*(c) Accounting for Convertible Bonds (Continued)*

For the year ended December 31, 2021 and 2022, the amount of interest cost recognized relating to the amortization of the discount on the Notes were RMB1,221,846 and RMB51,655 (US$7,489), respectively. As of December 31, 2022, the net carry amount of 2025 Notes will be accreted up to the principal amount over a remaining period of 0.92 year. The amount repayable within the next twelve months are classified as "Convertible notes, current portion" on the consolidated balance sheets.

For the year ended December 31, 2021, holders of US$656,771 in aggregate principal amount of the 2024 Notes exercised their right to convert their notes into shares under the 2024 Price Condition at its initial conversion price. As a result, the Company issued 62,732,708 ordinary shares. As of December 31, 2022, the if-converted values of remaining 2024 Notes were US$431,757, which exceed their principal amount of US$226,252.

**12. Fair Value Measurement**

In accordance with ASC 820, the Company measures investment in convertible bonds and certain wealth management products classified as trading securities on a recurring basis. The following tables set forth the financial instruments measured at fair value on a recurring basis by level within the fair value hierarchy:

| | Fair Value Measurements | | |
| --- | --- | --- | --- |
| | Quoted Price in Active Market for Identical Assets (Level 1) RMB | Significant Other Observable Inputs (Level 2) RMB | Unobservable Inputs (Level 3) RMB |
| *Recurring* | | | |
| **As of December 31, 2021:** | | | |
| Short-term investments: | | | |
| Trading securities | — | 313,322 | — |
| Other non-current assets: | | | |
| Investments in convertible bonds | — | — | 1,290,901 |
| | — | 313,322 | 1,290,901 |

| | Fair Value Measurements | | |
| --- | --- | --- | --- |
| | Quoted Price in Active Market for Identical Assets (Level 1) RMB | Significant Other Observable Inputs (Level 2) RMB | Unobservable Inputs (Level 3) RMB |
| *Recurring* | | | |
| **As of December 31, 2022:** | | | |
| Cash equivalents | | | |
| Money market funds | 7,791,628 | — | — |
| Short-term investments: | | | |
| Trading securities | 6,917 | — | — |
| Investments in convertible bonds | — | — | 1,233,284 |
| Other non-current assets: | | | |
| Available-for-sale debt securities | — | 3,575,474 | — |
| | 7,798,545 | 3,575,474 | 1,233,284 |

F-35

PDD HOLDINGS INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)
(Amounts in thousands of RMB and US$, except for number of shares and per share data)

**12.Fair Value Measurement (Continued)**

Investment in convertible notes is classified under level 3 in the fair value hierarchy, with the fair value estimated based on the third-party appraisal report using the discounted cashflow model and the binomial model. Key inputs and parameters include volatility which is an expected rate based on the historical stock price of the bond issuer, risk free rate which is based on the yield of US government bond and discount rate which is based on yield of comparable bonds with similar credit rating applicable for the bond issuer.

Certain trading securities and available-for-sale debt securities are classified under level 2 in the fair value hierarchy, with the fair value determined based on quoted prices of similar assets.

The Group values its money market funds and certain trading securities using quoted prices for the underlying securities in active markets, and accordingly, the Group classifies the valuation techniques that use these inputs as Level 1.

Reconciliations of assets categorized within Level 3 under the fair value hierarchy are as follow:

|  | Amounts RMB |
| --- | ---: |
| Balance at December 31, 2020 | 1,388,916 |
| Net unrealized fair value | (67,065) |
| Foreign currency translation adjustments | (30,950) |
| Balance at December 31, 2021 | 1,290,901 |
| Net unrealized fair value | (221,640) |
| Foreign currency translation adjustments | 164,023 |
| Balance at December 31, 2022 | 1,233,284 |

As of December 31, 2021 and 2022, the Group did not have any assets or liabilities that were measured at fair value on a non-recurring basis and no impairment charge was recorded.

The followings are financial instruments not measured at fair value in the consolidated balance sheets, but for which the fair value is estimated for disclosure purposes. The fair values of time deposits and held-to-maturity debt investments are estimated using prevailing interest rates. The fair values of the convertible bonds are based on broker quotes:

|  | Fair Value disclosure | | |
| --- | ---: | ---: | ---: |
|  | Quoted Price in Active Market for Identical Assets (Level 1) RMB | Significant Other Observable Inputs (Level 2) RMB | Unobservable Inputs (Level 3) RMB |
| **As of December 31, 2021:** | | | |
| Short-term investments: | | | |
| Time deposits and held-to-maturity debt securities | — | 86,203,296 | — |
| Other non-current assets: | | | |
| Time deposits and held-to-maturity debt securities | — | 13,008,899 | — |
| Convertible bonds | — | 13,690,953 | — |
| **As of December 31, 2022:** | | | |
| Short-term investments: | | | |
| Time deposits and held-to-maturity debt securities | — | 113,872,353 | — |
| Convertible bonds, current portion | — | 13,093,448 | — |
| Other non-current assets: | | | |
| Time deposits and held-to-maturity debt securities | — | 11,040,283 | — |
| Convertible bonds | — | 3,056,964 | — |

Table of Contents

PDD HOLDINGS INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)
(Amounts in thousands of RMB and US$, except for number of shares and per share data)

**13. Ordinary Shares**

Holders of Class A ordinary shares and Class B ordinary shares are entitled to the same rights except for voting rights. In respect of matters requiring a shareholder's vote, each Class A ordinary share is entitled to one vote and each Class B ordinary share is entitled to ten votes. There were no outstanding Class B ordinary shares as of December 31, 2021 and 2022.

In the third quarter of 2018, the Company completed its Initial Public Offering ("IPO") on the National Association of Securities Deal Automated Quotations under the symbol of "PDD".

In February 2019, the Company completed a follow-on public offering and issued 48,435,000 ADSs, representing 193,740,000 Class A ordinary shares for total proceeds net of issuance costs of US$1,181,209.

In April 2020, the Company completed a private placement and issued 135,426,300 Class A Ordinary Shares for total proceeds of US$1,100,000.

In June 2020, 664,703,620 Class B ordinary shares were converted into Class A ordinary shares by the holder on a one-for-one basis.

In November 2020, the Company completed a follow-on public offering and issued 33,005,000 ADSs, representing 132,020,000 Class A ordinary shares for total proceeds net of issuance costs of US$4,074,642.

In December 2020, the Company completed a private placement and issued 15,384,612 Class A Ordinary Shares for total proceeds of US$500,000.

In March 2021, 1,409,744,080 Class B ordinary shares were converted into Class A ordinary shares by the holder on a one-for-one basis.

**14. Accumulated other comprehensive (loss)/income**

| | Foreign currency translation difference | Net change in unrealized losses on available-for-sale debt securities | Total |
|---|---|---|---|
| | RMB | RMB | RMB |
| Balances as of January 1, 2020 | 1,448,230 | — | 1,448,230 |
| Other comprehensive loss | (2,495,958) | — | (2,495,958) |
| Balances as of December 31, 2020 | (1,047,728) | — | (1,047,728) |
| Other comprehensive loss | (1,472,172) | — | (1,472,172) |
| Balances as of December 31, 2021 | (2,519,900) | — | (2,519,900) |
| Cumulative effect of accounting change | 136,096 | — | 136,096 |
| Balances as of January 1, 2022 | (2,383,804) | — | (2,383,804) |
| Other comprehensive income/(loss) | 5,724,208 | (18,166) | 5,842,138 |
| Balances as of December 31, 2022 | 3,340,404 | (18,166) | 3,322,238 |
| Balances as of December 31, 2022 (US$) | 484,313 | (2,634) | 481,679 |

The income tax effects related to the accumulated other comprehensive (loss)/income were insignificant for all periods presented.

F-37

Table of Contents

PDD HOLDINGS INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)
(Amounts in thousands of RMB and US$, except for number of shares and per share data)

**15.Revenues**

| | For the years ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2020 | 2021 | 2022 | 2022 |
| | RMB | RMB | RMB | US$ |
| Online marketing services and others | 47,953,779 | 72,563,402 | 102,721,924 | 14,893,279 |
| Transaction services | 5,787,415 | 14,140,449 | 27,626,494 | 4,005,465 |
| Merchandise sales | 5,750,671 | 7,246,088 | 209,171 | 30,327 |
| | **59,491,865** | **93,949,939** | **130,557,589** | **18,929,071** |

**Contract balances**

The Group's contract liabilities comprised of customer advances and deferred revenues and portions of payable to merchants:

| | As of | | |
| --- | --- | --- | --- |
| | December 31, 2021 | December 31, 2022 | December 31, 2022 |
| | RMB | RMB | US$ |
| Customer advances and deferred revenues | 1,166,764 | 1,389,655 | 201,481 |
| Payable to merchants | 319,329 | 637,240 | 92,391 |

Customer advances and deferred revenues and payable to merchants relate to considerations received in advance for online marketplace services and merchandise sales, for which control of the services occur at a later point in time. During the year ended December 31, 2022, revenues of RMB1,356,566 (US$196,684) were recognized from the carrying value of contract liabilities as of December 31, 2021. During the year ended December 31, 2021, revenues of RMB2,487,806 were recognized from the carrying value of contract liabilities as of December 31, 2020.

**16.Share-Based Compensation**

In order to provide additional incentives to employees and to promote the success of the Group's business, the Group adopted a share incentive plan in 2015 (the ''2015 Plan''). The 2015 Plan allows the Group to grant options to employees, directors or consultants. Under the 2015 Plan, the maximum aggregate number of shares that may be issued shall not exceed 581,972,860. The terms of the options shall not exceed twenty years from the date of grant.

In July 2018, the Group adopted the 2018 Share Incentive Plan (the "2018 Plan"). The 2018 Plan allows the Group to grant options and RSUs to employees, directors or consultants. Under the 2018 Plan, the maximum aggregate number of shares that may be issued pursuant to all awards is initially 363,130,400, plus an annual increase on the first day of each fiscal year of the company during the term of the 2018 Plan commencing with the fiscal year beginning January 1, 2019, by an amount equal to the lessor of (i) 1.0% of the total number of shares issued and outstanding on the last day of the immediately preceding fiscal year, and (ii) such number of shares as may be determined by our board of directors. In March 2021, our board of directors approved an amendment to the 2018 Plan to increase the annual increase percentage from 1.0% to 3.0% effective from the fiscal year beginning January 1, 2022.

For the share options granted under the 2015 Plan and the 2018 Plan, in addition to the explicit service periods of four years, with 25% of the options vesting annually, Class A ordinary shares acquired from the exercise of vested options cannot be sold or transferred by the employees without the prior written consents of the Company within the first three years of vested (''Restricted Shares''). In the event that employment relationship is terminated with the Company, voluntarily or involuntarily, within the three-year lock-up periods, the Company may, at its sole discretion, repurchase the Restricted Shares at the employee's exercise price. The Group determined the substance of the lock up periods to be additional implicit service periods of three years, thereby extending the vesting terms of the options to be seven years in total.

The RSUs granted under the 2018 Plan vest over a period of four years with 25% vesting on each anniversary from the date of grant, or with 50% of the RSUs vesting on the second anniversary and 25% on each of the third and fourth anniversary from the date of grant.

F-38

Table of Contents

PDD HOLDINGS INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)
(Amounts in thousands of RMB and US$, except for number of shares and per share data)

**16. Share-Based Compensation (Continued)**

*(a) Share options:*

The following table summarize the Group's option activities under the 2015 Plan and the 2018 Plan:

| | Number of share options | Weighted average exercise price | Weighted average grant date fair value | Aggregate intrinsic value | Weighted average remaining contractual term |
|---|---|---|---|---|---|
| | | US$ | US$ | US$ | Years |
| Outstanding as of December 31, 2021 | 720,003,536 | 0.0065 | 4.0216 | 10,489,372 | 6.07 |
| Granted | 23,652,900 | 0.0065 | 13.4311 | | |
| Forfeited | (6,342,000) | 0.0065 | 8.7834 | | |
| Exercised | (225,682,548) | 0.0065 | 2.1461 | | |
| Outstanding as of December 31, 2022 | 511,631,888 | 0.0065 | 5.2248 | 10,427,570 | 15.44 |
| Vested and expected to vest as of December 31, 2022 | 511,631,888 | 0.0065 | 5.2248 | 10,427,570 | 15.44 |
| Exercisable as of December 31, 2022 | 442,371,733 | 0.0065 | 3.5480 | 9,015,978 | 15.03 |

The aggregate intrinsic value in the table above is calculated as the difference between the exercise price of the awards and the fair value of the underlying Ordinary Shares at each reporting date, for those awards that had exercise price below the estimated fair value of the relevant Ordinary Shares.

Total intrinsic value of options exercised for the years ended December 31, 2020, 2021 and 2022 was nil, RMB1,252,115 and RMB32,530,282 (US$4,716,448), respectively. The total fair value of vested options for the years ended December 31, 2020, 2021 and 2022 was RMB3,237,924, RMB3,949,471, and RMB4,770,523 (US$691,661), respectively. The weighted average grant date fair value of options granted during the years ended December 31, 2020, 2021 and 2022 was US$14.5801, US$32.0457 and US$13.4311, respectively.

As of December 31, 2022, total unrecognized share-based compensation expense relating to unvested awards was RMB8,579,593 (US$1,243,924) which is expected to be recognized over a weighted-average period of 2.44 years.

The Group calculated the estimated fair value of the options on the respective grant dates using the binomial-lattice option valuation model with the following assumptions for each applicable period which took into account variables such as volatility, dividend yield, and risk-free interest rates:

| | For the years ended December 31, | | |
|---|---|---|---|
| | 2020 | 2021 | 2022 |
| Risk-free interest rates | 0.62%-1.13% | 1.31%-1.69% | 1.52%-4.08% |
| Expected volatility | 43.89%-46.68% | 46.28%-46.87% | 46.29%-50.26% |
| Expected dividend yield | 0% | 0% | 0% |
| Exercise multiple | 2.80 | 2.80 | 2.80 |
| Post-vesting forfeit rate | 0% | 0% | 0% |
| Fair value of underlying ordinary shares | $8.9450-$34.1350 | $22.0375-$46.5375 | $10.6625-$17.8550 |
| Fair value of share option | $8.9385-$34.1285 | $22.0310-$46.5310 | $10.6560-$17.8485 |

F-39

Table of Contents

PDD HOLDINGS INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)
(Amounts in thousands of RMB and US$, except for number of shares and per share data)

**16. Share-Based Compensation (Continued)**

*(b)* **RSUs:**

The following table summarize the Group's RSU activities under the 2018 Plan:

|  | Number of RSUs | Weighted average grant date fair value |
|---|---|---|
|  |  | US$ |
| Outstanding as of December 31, 2021 | 41,518,464 | 19.0563 |
| Granted | 59,628,020 | 13.0177 |
| Vested | (15,453,196) | 14.7922 |
| Forfeited | (3,708,800) | 18.1311 |
| Outstanding as of December 31, 2022 | 81,984,488 | 15.5100 |

The total fair value of the RSUs vested during the years ended December 31, 2020, 2021 and 2022 was RMB178,855, RMB675,837, and RMB1,539,004 (US$223,135), respectively. The weighted average grant date fair value of the RSUs granted during the years ended December 31, 2020, 2021, and 2022 was US$16.6133, US$32.4843 and US$13.0177, respectively.

As of December 31, 2022, RMB4,459,730 (US$646,600) of unrecognized share-based compensation expenses related to RSUs is expected to be recognized over a weighted average vesting period of 2.78 years using the accelerated method. Total unrecognized share-based compensation expenses may be adjusted for future changes when actual forfeitures incurred.

*(c)* **Share-based compensation expense by function:**

The Group recognized share-based compensation expenses for the years ended December 31, 2020, 2021 and 2022 as follows:

|  | For the years ended December 31, | | | |
|---|---|---|---|---|
|  | 2020 | 2021 | 2022 | 2022 |
|  | RMB | RMB | RMB | US$ |
| Costs of revenues | 32,291 | 26,624 | 33,788 | 4,899 |
| Sales and marketing expenses | 1,093,547 | 1,612,219 | 2,158,676 | 312,979 |
| General and administrative expenses | 966,985 | 792,421 | 3,004,327 | 435,586 |
| Research and development expenses | 1,520,220 | 2,343,466 | 2,521,574 | 365,594 |
|  | 3,613,043 | 4,774,730 | 7,718,365 | 1,119,058 |

**17. Income Taxes**

*Cayman Islands*

Under the current laws of the Cayman Islands, the Company is not subject to tax on income or capital gain arising in Cayman Islands. Additionally, upon payments of dividends by the Company to its shareholders, no Cayman Islands withholding tax will be imposed.

*Hong Kong*

Walnut HK is incorporated in Hong Kong and is subject to Hong Kong profits tax at the rate of 16.5% on its activities conducted in Hong Kong and it may be exempted from income tax on its foreign-derived income and there are no withholding taxes in Hong Kong on remittance of dividends.

F-40

PDD HOLDINGS INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)
(Amounts in thousands of RMB and US$, except for number of shares and per share data)

**17. Income Taxes (Continued)**

*PRC*

The Company's subsidiaries and VIE and its subsidiaries in the PRC are subject to the statutory rate of 25%, in accordance with the Enterprise Income Tax law (the "EIT Law"), which was effective since January 1, 2008, except for certain entities eligible for preferential tax rates.

Shanghai Xunmeng, a subsidiary of VIE, was recognized as high and new technology enterprise ("HNTE") and was eligible for a preferential tax rate of 15% from 2018 to 2023. Walnut Shanghai, a subsidiary of the Company, was recognized as HNTE and was eligible for a preferential tax rate of 15% from 2021 to 2023.

Xinzhijiang, a subsidiary of the Company established in April 2018, located in Qianhai District, Shenzhen, Guangdong Province, was eligible for a preferential tax rate of 15% and started to apply this rate from then on. The preferential tax rate is awarded to companies that are located in Qianhai District which operate in certain encouraged industries, from 2014 to 2025.

Dividends, interests, rent or royalties payable by the Company's PRC subsidiaries, to non-PRC resident enterprises, and proceeds from any such non-resident enterprise investor's disposition of assets (after deducting the net value of such assets) shall be subject to 10% withholding tax, unless the respective non-PRC resident enterprise's jurisdiction of incorporation has a tax treaty or arrangements with China that provides for a reduced withholding tax rate or an exemption from withholding tax.

The Group's (loss)/profit before income taxes consisted of:

|  | For the years ended December 31, | | | |
| --- | --- | --- | --- | --- |
|  | 2020 | 2021 | 2022 | 2022 |
|  | RMB | RMB | RMB | US$ |
| Non-PRC | (3,763,962) | (5,633,012) | (7,839,712) | (1,136,651) |
| PRC | (3,415,780) | 15,335,267 | 44,103,441 | 6,394,397 |
|  | (7,179,742) | 9,702,255 | 36,263,729 | 5,257,746 |

The Group's income taxes consisted of:

|  | For the years ended December 31, | | | |
| --- | --- | --- | --- | --- |
|  | 2020 | 2021 | 2022 | 2022 |
|  | RMB | RMB | RMB | US$ |
| Current income tax | — | 1,933,798 | 5,754,253 | 834,288 |
| Deferred income tax benefit | — | (213) | (1,028,586) | (149,131) |
|  | — | 1,933,585 | 4,725,667 | 685,157 |

F-41

PDD HOLDINGS INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)
(Amounts in thousands of RMB and US$, except for number of shares and per share data)

**17. Income Taxes (Continued)**

**PRC (Continued)**

The reconciliations of the income tax expenses for the years ended December 31, 2020, 2021 and 2022 were as follows:

| | For the years ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2020 | 2021 | 2022 | 2022 |
| | RMB | RMB | RMB | US$ |
| (Loss)/profit before income tax expense | (7,179,742) | 9,702,255 | 36,263,729 | 5,257,746 |
| PRC statutory tax rate | 25 % | 25 % | 25 % | 25 % |
| Income tax (benefits)/expense at PRC statutory tax rate | (1,794,935) | 2,425,564 | 9,065,932 | 1,314,437 |
| International tax rate differential | 1,077,383 | 1,522,480 | 2,013,305 | 291,902 |
| Preferential tax rate differential | 57,483 | (1,439,100) | (4,442,822) | (644,149) |
| Non-deductible expenses | 108 | 167,098 | 361,045 | 52,346 |
| Non-taxable income | (164,120) | (139,417) | (122,067) | (17,698) |
| Deferred tax items tax rate differential | (110,821) | 51,493 | 527,035 | 76,413 |
| Additional deduction of research and development expenses | (124,858) | (223,591) | (444,071) | (64,384) |
| Change in valuation allowance | 1,059,760 | (430,942) | (2,232,690) | (323,710) |
| **Income tax expenses** | — | **1,933,585** | **4,725,667** | **685,157** |

The significant components of the Group's deferred tax balances were as follows:

| | As of December 31, | | |
| --- | --- | --- | --- |
| | 2021 | 2022 | 2022 |
| | RMB | RMB | US$ |
| **Deferred tax assets** | | | |
| Tax losses carried forward | 1,432,514 | 1,472,388 | 213,476 |
| Carryforwards of non-deductible advertising expenses and donations | 1,331,067 | 79,608 | 11,542 |
| Others | 31,926 | 58,994 | 8,553 |
| Less: valuation allowance | (2,764,003) | (531,313) | (77,033) |
| **Total deferred tax assets** | **31,504** | **1,079,677** | **156,538** |
| **Total deferred tax liabilities** | **(31,291)** | **(47,672)** | **(6,911)** |

In assessing the ability to realize the deferred tax assets, the Group has considered whether it is more likely than not that some portion or all of the deferred tax assets will not be realized. The ultimate realization of deferred tax assets is dependent upon the generation of future taxable income during the periods in which those temporary differences become deductible. The Group evaluates the potential realization of deferred tax assets on an entity-by-entity basis. As of December 31, 2021 and 2022, management recorded full valuation allowance against deferred tax assets in entities that were in a cumulative loss with no forecast profits in the foreseeable future.

As of December 31, 2021 and 2022, the Group had taxable losses of RMB5,881,960 and RMB5,744,189 (US$832,829) derived from entities in the PRC, which can be carried forward for five years to offset future taxable profit, and the period was extended to ten years for entities qualified as HNTEs in 2022 and thereafter. The PRC taxable loss will expire from December 31, 2023 to 2031 if not utilized. The tax losses in Hong Kong can be carried forward with no expiration date.

The Group plans to indefinitely reinvest the undistributed earnings of its subsidiaries, the VIE and the subsidiaries of the VIE located in the PRC. As of December 31, 2021 and 2022, all of the earnings distributable by our subsidiaries in China were reserved for permanent reinvestment in China, and no withholding tax has been accrued.

F-42

Table of Contents

PDD HOLDINGS INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)
(Amounts in thousands of RMB and US$, except for number of shares and per share data)

**17. Income Taxes (Continued)**

**PRC (Continued)**

As of December 31, 2021 and 2022, the Group did not have significant unrecognized tax benefit, all of which were presented on a net basis against the deferred tax assets related to tax loss carry forwards on the consolidated balance sheets. It is possible that the amount of unrecognized benefit will further change in the next 12 months; however, an estimate of the range of the possible change cannot be made at this moment.

For the years ended December 31, 2020, 2021 and 2022, no interest expense was accrued in relation to the unrecognized tax benefit. As of December 31, 2021 and 2022, there were no accumulated interest expenses recorded in unrecognized tax benefit.

As of December 31, 2022, the tax years ended December 31, 2017 through period ended as of the reporting dates for the WFOE, the VIE and the subsidiaries of the VIE remain open to examination by the PRC tax authorities.

**18. Related Party Transactions**

*(a)* Related parties

| Names of related parties | Relationship with the Group |
|---|---|
| Tencent and its affiliates ("Tencent Group") | A shareholder of the Company |
| Ningbo Hexin Equity Investment Partnership | Company controlled by one of the executive officers of the Company |
| Shanghai Fufeitong Information Service Co., Ltd. and its affiliates ("Fufeitong Group") | Company controlled by one of the executive officers of the Company |

*(b)* Other than disclosed elsewhere, the Group had the following significant related party transactions for the years ended December 31, 2020, 2021 and 2022, respectively:

| | For the years ended December 31, | | | |
|---|---|---|---|---|
| | 2020 | 2021 | 2022 | 2022 |
| | RMB | RMB | RMB | US$ |
| **Services provided to:** | | | | |
| Fufeitong Group | — | — | 10,765 | 1,561 |
| | | | | |
| **Services received from:** | | | | |
| Tencent Group | 10,541,479 | 8,416,635 | 7,061,132 | 1,023,769 |
| Fufeitong Group | 45,364 | 211,414 | 653,972 | 94,817 |

In 2021, the Group purchased a batch of computer equipment from Tencent Group with a total amount of RMB1,833,495.

F-43

PDD HOLDINGS INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)
(Amounts in thousands of RMB and US$, except for number of shares and per share data)

**18. Related Party Transactions(Continued)**

*(c)* The Group had the following significant related party balances as of December 31, 2021 and 2022:

| | As of December 31, | | |
| --- | --- | --- | --- |
| | 2021 | 2022 | 2022 |
| | RMB | RMB | US$ |
| Amounts due from related parties: | | | |
| Current: | | | |
| Tencent Group* | 2,803,265 | 2,763,924 | 400,731 |
| Ningbo Hexin Equity Investment Partnership ** | 697,632 | 697,632 | 101,147 |
| Fufeitong Group*** | 748,875 | 2,856,856 | 414,205 |
| Amounts due to related parties: | | | |
| Current: | | | |
| Tencent Group | 1,916,482 | 1,539,694 | 223,235 |
| Fufeitong Group | 46,525 | 136,697 | 19,819 |

\*   The balance primarily represents receivables due from the online payment platform operated by Tencent Group.

\*\*   The balance represents loans to Ningbo Hexin Equity Investment Partnership, an entity controlled by one of the executive officers of the Company.

\*\*\*   The balance primarily represents receivables due from the online payment platform operated by Fufeitong Group.

F-44

PDD HOLDINGS INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)
(Amounts in thousands of RMB and US$, except for number of shares and per share data)

**19. Earnings/(Loss) Per Share**

The following table sets forth the computation of basic and diluted net earnings/(loss) per share for the following periods:

| | For the year ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2020 RMB | 2021 RMB | 2022 RMB | 2022 US$ |
| *Numerator:* | | | | |
| Net (loss)/income | (7,179,742) | 7,768,670 | 31,538,062 | 4,572,589 |
| Net (loss)/income attributable to ordinary shareholders – basic | (7,179,742) | 7,768,670 | 31,538,062 | 4,572,589 |
| Dilution effect arising from convertible bonds | — | — | 51,655 | 7,489 |
| Net (loss)/income attributable to ordinary shareholders – diluted | (7,179,742) | 7,768,670 | 31,589,717 | 4,580,078 |
| | | | | |
| *Denominator (in thousands of shares):* | | | | |
| Weighted-average number of ordinary shares outstanding – basic | 4,768,343 | 5,012,651 | 5,057,540 | 5,057,540 |
| Adjustments for dilutive RSUs and share options | — | 701,113 | 640,545 | 640,545 |
| Conversion of convertible bonds to Class A ordinary shares | — | — | 63,206 | 63,206 |
| Weighted-average number of ordinary shares outstanding – diluted | 4,768,343 | 5,713,764 | 5,761,291 | 5,761,291 |
| | | | | |
| (Loss)/earnings per share – basic | (1.51) | 1.55 | 6.24 | 0.90 |
| (Loss)/earnings per share –diluted | (1.51) | 1.36 | 5.48 | 0.79 |

During the years ended December 31, 2020, 2021 and 2022, the Company issued 12,050,000, 40,000,000 and 220,805,720 ordinary shares to its share depositary bank, respectively. No consideration was received by the Company for the issuance. As of December 31, 2022, 271,049,824 out of the total 273,455,720 ordinary shares were used to settle share-based compensation. The remaining 2,405,896 ordinary shares are legally issued and outstanding but are treated as escrowed shares for accounting purposes and therefore, have been excluded from the computation of earnings/(loss) per share.

The Group did not include certain share options, restricted shares and the effect of convertible bonds in the computation of diluted loss per share for the year ended December 31, 2020 because those share options, restricted shares and convertible bonds were anti-dilutive. The Group did not include the effect of convertible bonds in the computation of diluted earnings per share for the year ended December 31, 2021 because those convertible bonds were anti-dilutive.

**20. Restricted Net Assets**

The Company's ability to pay dividends is primarily dependent on the Company receiving distributions of funds from its subsidiaries, the VIE and subsidiaries of the VIE. Relevant PRC statutory laws and regulations permit payments of dividends by the Company's PRC subsidiaries, the VIE and subsidiaries of the VIE only out of their retained earnings, if any, as determined in accordance with PRC accounting standards and regulations. The results of operations reflected in the consolidated financial statements prepared in accordance with U.S. GAAP differ from those reflected in the statutory financial statements of the Company's subsidiaries, the VIE and subsidiaries of the VIE.

In accordance with the PRC Regulations on Enterprises with Foreign Investment and the articles of association of the Company's PRC subsidiaries, a foreign-invested enterprise established in the PRC is required to provide certain statutory reserves, namely general reserve fund, the enterprise expansion fund and staff welfare and bonus fund which are appropriated from net profit as reported in the enterprise's PRC statutory accounts. A foreign-invested enterprise is required to allocate at least 10% of its annual after-tax profit to the general reserve fund until such reserve has reached 50% of its respective registered capital based on the enterprise's PRC statutory accounts. Appropriations to the enterprise expansion fund and staff welfare and bonus fund are at the discretion of the board of directors for all foreign-invested enterprises. The aforementioned reserves can only be used for specific purposes and are not distributable as cash dividends. The WFOE was established as a foreign-invested enterprise and, therefore, is subject to the above mandated restrictions on distributable profits. For the years ended December 31, 2020, 2021 and 2022, WFOE did not have accumulated after-tax profit and therefore no statutory reserves have been allocated.

F-45

PDD HOLDINGS INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)
(Amounts in thousands of RMB and US$, except for number of shares and per share data)

**20. Restricted Net Assets (Continued)**

Foreign exchange and other regulations in the PRC may further restrict the Company's VIE from transferring funds to the Company in the form of dividends, loans and advances. Amounts restricted include paid-in capital and statutory reserves of the Company's PRC Subsidiaries and the equity of the VIE, as determined pursuant to PRC generally accepted accounting principles. As of December 31, 2022, restricted net assets of the Company's PRC subsidiaries, the VIE and subsidiaries of the VIE were RMB57,000,116 (US$8,264,240).

**21. Mainland China Employee Contribution Plan**

As stipulated by the regulations of the PRC, full-time employees of the Group are entitled to various government statutory employee benefit plans, including medical insurance, maternity insurance, workplace injury insurance, unemployment insurance and pension benefits through a PRC government-mandated multi-employer defined contribution plan. The Group is required to make contributions to the plan based on certain percentages of employees' salaries. The total expenses the Group incurred for the plan were RMB277,429, RMB829,440 and RMB1,131,829 (US$164,100) for the years ended December 31, 2020, 2021 and 2022, respectively.

**22. Commitments and Contingencies**

***(a) Operating lease commitments***

The Company leases offices for operation under operating leases. Future minimum lease payments under non-cancellable operating leases with initial terms in excess of one year is included in Note 8.

***(b) Investment commitments***

The Group's investment commitments primarily relate to capital contributions obligation under certain arrangement which does not have contractual maturity date. As of December 31, 2022, the total investment commitments contracted but not yet reflected in the financial statements amounted to approximately RMB80,000 (US$11,599).

**23. Subsequent Events**

In March 2023, a number of media channels reported cybersecurity concerns about Pinduoduo mobile app alleged by an anonymous source. At present, the exact impact of these allegations remains uncertain and cannot be reasonably estimated.

Table of Contents

PDD HOLDINGS INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)
(Amounts in thousands of RMB and US$, except for number of shares and per share data)

**24. Condensed Financial Information of the Company**

The following is the condensed financial information of the Company on a parent company only basis.

| | As of December 31, | | |
| | 2021 | 2022 | |
| | RMB | RMB | US$ |
|---|---|---|---|
| **ASSETS** | | | |
| **Current assets** | | | |
| Cash and cash equivalents | 2,269 | 61,553 | 8,924 |
| Others | 390 | 443 | 64 |
| **Total current assets** | **2,659** | **61,996** | **8,988** |
| **Non-current assets** | | | |
| Intangible asset | 674,057 | 109,847 | 15,926 |
| Investments in subsidiaries, the VIE and subsidiaries of the VIE | 86,252,341 | 133,085,591 | 19,295,598 |
| **Total non-current assets** | **86,926,398** | **133,195,438** | **19,311,524** |
| **Total assets** | **86,929,057** | **133,257,434** | **19,320,512** |
| | | | |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | | |
| **Current liabilities** | | | |
| Accrued expenses and other liabilities | 24,607 | 25,017 | 3,627 |
| Convertible bonds, current portion | — | 13,885,751 | 2,013,245 |
| **Total current liabilities** | **24,607** | **13,910,768** | **2,016,872** |
| | | | |
| Convertible bonds | 11,788,907 | 1,575,755 | 228,463 |
| Other non-current liabilities | 996 | — | — |
| **Total non-current liabilities** | **11,789,903** | **1,575,755** | **228,463** |
| **Total liabilities** | **11,814,510** | **15,486,523** | **2,245,335** |
| | | | |
| **Shareholders' equity** | | | |
| Class A ordinary shares (US$0.000005 par value; 77,300,000,000 shares authorized; 5,057,542,676 and 5,278,348,396 shares issued and outstanding as of December 31, 2021 and 2022, respectively) | 161 | 170 | 25 |
| Additional paid-in capital | 95,340,819 | 99,250,468 | 14,389,965 |
| Statutory reserves | — | 5,000 | 725 |
| Accumulated other comprehensive (loss)/income | (2,519,900) | 3,322,238 | 481,679 |
| (Accumulated deficits)/retained earnings | (17,706,533) | 15,193,035 | 2,202,783 |
| **Total shareholders' equity** | **75,114,547** | **117,770,911** | **17,075,177** |
| **Total liabilities and shareholders' equity** | **86,929,057** | **133,257,434** | **19,320,512** |

F-47

Table of Contents

PDD HOLDINGS INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)
(Amounts in thousands of RMB and US$, except for number of shares and per share data)

**24.Condensed Financial Information of the Company (Continued)**

| | For the years ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2020 | 2021 | 2022 | |
| | RMB | RMB | RMB | US$ |
| **Costs of revenues** | **(623,524)** | **(580,506)** | **(605,611)** | **(87,805)** |
| | | | | |
| Sales and marketing expenses | (36,940) | (27,839) | — | — |
| General and administrative expenses | (6,746) | (40,826) | (54,605) | (7,917) |
| **Total operating expenses** | **(43,686)** | **(68,665)** | **(54,605)** | **(7,917)** |
| **Operating loss** | **(667,210)** | **(649,171)** | **(660,216)** | **(95,722)** |
| | | | | |
| Interest income | 126,502 | 32,452 | 11,693 | 1,695 |
| Interest expense | (695,794) | (1,221,846) | (51,655) | (7,489) |
| Other gain/(loss) | 53,244 | 27,497 | (14) | (2) |
| Share of results from subsidiaries, the VIE and subsidiaries of the VIE | (5,996,484) | 9,579,738 | 32,238,254 | 4,674,107 |
| (Loss)/profit before income tax | **(7,179,742)** | **7,768,670** | **31,538,062** | **4,572,589** |
| Income tax expenses | — | — | — | — |
| Net (loss)/income | **(7,179,742)** | **7,768,670** | **31,538,062** | **4,572,589** |
| | | | | |
| Other comprehensive (loss)/income | | | | |
| Foreign currency translation difference, net of tax of nil | (2,495,958) | (1,472,172) | 5,860,304 | 849,664 |
| Unrealized losses on available-for-sale investments, net of tax | — | — | (18,166) | (2,634) |
| Total other comprehensive (loss)/income | (2,495,958) | (1,472,172) | 5,842,138 | 847,030 |
| **Comprehensive (loss)/income** | **(9,675,700)** | **6,296,498** | **37,380,200** | **5,419,619** |

| | For the years ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2020 | 2021 | 2022 | |
| | RMB | RMB | RMB | US$ |
| **Net cash generated from/(used in) operating activities** | **735,231** | **82,074** | **(24,202)** | **(3,509)** |
| **Cash flows from investing activities:** | | | | |
| Proceeds from sales of short-term investments | 6,034,863 | 5,764,134 | — | — |
| Cash given to purchase of short-term investments | (6,250,248) | — | — | — |
| Cash received from subsidiaries, the VIE and subsidiaries of the VIE, net | — | — | 65,707 | 9,527 |
| Cash given to subsidiaries, the VIE and subsidiaries of the VIE, net | (52,051,474) | (5,855,304) | — | — |
| **Net cash (used in)/generated from investing activities** | **(52,266,859)** | **(91,170)** | **65,707** | **9,527** |
| **Cash flows from financing activities:** | | | | |
| Proceeds from the private placements | 11,063,339 | — | — | — |
| Net proceeds from the follow-on offerings | 26,805,438 | — | — | — |
| Net proceeds from the issuance of convertible bonds | 13,024,199 | — | — | — |
| Others | (6) | 318 | 10,079 | 1,461 |
| **Net cash generated from financing activities** | **50,892,970** | **318** | **10,079** | **1,461** |
| Exchange rate effect on cash, cash equivalents and restricted cash | (16,490) | 4,481 | 7,700 | 1,116 |
| Net (decrease)/increase in cash, cash equivalents and restricted cash | (655,148) | (4,297) | 59,284 | 8,595 |
| Cash, cash equivalents and restricted cash at beginning of year | 661,714 | 6,566 | 2,269 | 329 |
| **Cash, cash equivalents and restricted cash at end of year** | **6,566** | **2,269** | **61,553** | **8,924** |

Table of Contents

PDD HOLDINGS INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)
(Amounts in thousands of RMB and US$, except for number of shares and per share data)

**24. Condensed Financial Information of the Company (Continued)**

*Basis of presentation*

Condensed financial information is used for the presentation of the Company, or the parent company. The condensed financial information of the parent company has been prepared using the same accounting policies as set out in the Company's consolidated financial statements except that the parent company used the equity method to account for investment in its subsidiaries, the VIE and subsidiaries of the VIE.

The parent company records its investment in its subsidiaries, the VIE and its subsidiaries under the equity method of accounting as prescribed in ASC 323, *Investments-Equity Method and Joint Ventures*. Such investments are presented on the condensed balance sheets as ''Investments in subsidiaries, the VIE and subsidiaries of the VIE'' or ''Loss in excess of investments in subsidiaries, the VIE and subsidiaries of the VIE'' and their respective income/(loss) as ''Share of results in subsidiaries, the VIE and subsidiaries of the VIE'' on the condensed statements of comprehensive income/(loss). Equity method accounting ceases when the carrying amount of the investment, including any additional financial support, in subsidiaries, the VIE and subsidiaries of the VIE is reduced to zero unless the parent company has guaranteed obligations of the subsidiaries, the VIE and subsidiaries of the VIE or is otherwise committed to provide further financial support. If the subsidiaries, the VIE subsidiaries of the VIE subsequently reports net income, the parent company shall resume applying the equity method only after its share of that net income equals the share of net income/(loss) not recognized during the period the equity method was suspended.

The parent company's condensed financial statements should be read in conjunction with the Company's consolidated financial statements.

F-49

**Exhibit 2.2**

# PDD Holdings Inc.

| NAME AND ADDRESS OF SHAREHOLDER | CERTIFICATE NUMBER | DISTINCTIVE NUMBERS | | PAR VALUE PER SHARE |
|---|---|---|---|---|
| | | FROM | TO | |
| Deutsche Bank Trust Company Americas 60 Wall Street, New York, NY 10005, United States of America | | | | USD 0.000005 |
| | DATE OF ISSUE | NO. OF SHARES | | CONSIDERATION PAID |
| | | | | Fully Paid |

## SHARE CERTIFICATE OF

## PDD Holdings Inc.

### INCORPORATED IN THE CAYMAN ISLANDS

The authorised share capital of the Company is US$400,000 divided into 80,000,000,000 shares comprising of (i) 77,300,000,000 Class A Ordinary Shares of a par value of US$0.000005 each, (ii) 2,200,000,000 Class B Ordinary Shares of a par value of US$0.000005 each and (iii) 500,000,000 shares of a par value of US$0.000005 each of such class or classes (however designated) as the board of directors may determine in accordance with Article 9 of the Articles. Subject to the Companies Law and the Articles, the Company shall have power to redeem or purchase any of its Shares and to increase or reduce its authorised share capital and to sub-divide or consolidate the said Shares or any of them and to issue all or any part of its capital whether original, redeemed, increased or reduced with or without any preference, priority, special privilege or other rights or subject to any postponement of rights or to any conditions or restrictions whatsoever and so that unless the conditions of issue shall otherwise expressly provide every issue of shares whether stated to be ordinary, preference or otherwise shall be subject to the powers on the part of the Company hereinbefore provided.

THIS IS TO CERTIFY THAT THE UNDERMENTIONED PERSON IS THE REGISTERED HOLDER OF THE SHARES SPECIFIED HEREUNDER SUBJECT TO THE RULES AND LAWS GOVERNING THE ADMINISTRATION OF THE COMPANY

| SHAREHOLDER | NO. OF SHARES | DISTINCTIVE NUMBERS | | CERTIFICATE NUMBER | DATE OF ISSUE |
|---|---|---|---|---|---|
| | | FROM | TO | | |
| Deutsche Bank Trust Company Americas | | | | | |

GIVEN UNDER THE COMMON SEAL OF THE COMPANY ON THE DATE STATED ABOVE AND IN THE PRESENCE OF

_____
            *DIRECTOR*

NO TRANSFER OF ANY OF THE ABOVE SHARES CAN BE REGISTERED UNLESS ACCOMPANIED BY THIS CERTIFICATE

**Description of rights of each class of securities**
**registered under Section 12 of the Securities Exchange Act of 1934 (the "Exchange Act")**

Class A ordinary shares, par value US$0.000005 per share, of PDD Holdings Inc. ("we," "our," "our company," or "us") are registered under Section 12(b) of the Exchange Act, and our American depositary shares ("ADSs"), each representing four Class A ordinary shares, are listed and traded on the Nasdaq Global Select Market. This exhibit contains a description of the rights of (i) the holders of Class A ordinary shares and (ii) the holders of ADSs. Class A ordinary shares underlying the ADSs are held by Deutsche Bank Trust Company Americas, as depositary, and holders of ADSs will not be treated as holders of the Class A ordinary shares.

**Description of Class A Ordinary Shares**

The following is a summary of material provisions of our currently effective amended and restated memorandum and articles of association (the "Memorandum and Articles of Association"), as well as the Companies Act (as amended) of the Cayman Islands (the "Companies Act") insofar as they relate to the material terms of our ordinary shares. Notwithstanding this, because it is a summary, it may not contain all the information that you may otherwise deem important. For more complete information, you should read our Memorandum and Articles of Association, which has been furnished with the SEC as an exhibit to our current report on Form 6-K on February 9, 2023 (File No. 001-38591).

***Type and Class of Securities (Item 9.A.5 of Form 20-F)***

Each Class A ordinary share has US$0.000005 par value. The number of Class A ordinary shares that have been issued as of the last day of each financial year is provided on the cover of the annual report on Form 20-F filed for such financial year (the "Form 20-F"). Our Class A ordinary shares may be held in either certificated or uncertificated form.

***Preemptive Rights (Item 9.A.3 of Form 20-F)***

Our shareholders do not have preemptive rights.

***Limitations or Qualifications (Item 9.A.6 of Form 20-F)***

We have a dual-class voting structure such that our ordinary shares consist of Class A ordinary shares and Class B ordinary shares. Each Class A ordinary share shall entitle the holder thereof to one vote on all matters subject to the vote at general meetings of our company, and each Class B ordinary share shall entitle the holder thereof to ten (10) votes on all matters subject to the vote at general meetings of our company. Due to the super voting power of Class B ordinary share holder, the voting power of the Class A ordinary shares may be materially limited.

***Rights of Other Types of Securities (Item 9.A.7 of Form 20-F)***

Not applicable.

***Rights of Class A Ordinary Shares (Item 10.B.3 of Form 20-F)***

*Conversion*

Each Class B ordinary share is convertible into one Class A ordinary share at any time by the holder thereof. Class A ordinary shares are not convertible into Class B ordinary shares under any circumstances. Upon any sale of Class B ordinary shares by a holder thereof to any person other than Mr. Zheng Huang or any entity which is not ultimately controlled by Mr. Zheng Huang, such Class B ordinary shares shall be automatically and immediately converted into the same number of Class A ordinary shares.

*Dividends*

The holders of our ordinary shares are entitled to such dividends as may be declared by our board of directors. Under the laws of the Cayman Islands, our company may declare and pay a dividend out of either profit or share premium account, provided that in no circumstances may a dividend be paid if this would result in our company being unable to pay its debts as they fall due in the ordinary course of business.

*Voting Rights*

Our Class A ordinary shares and Class B ordinary shares vote together as a single class on all matters submitted to a vote of our shareholders, except as may otherwise be required by law or provided for in our memorandum and articles of association. In respect of matters requiring shareholders' vote, each Class A ordinary share is entitled to one vote, and each Class B ordinary share is entitled to ten votes. At any general meeting a resolution put to the vote of the meeting shall be decided on a show of hands, unless a poll is (before or on the declaration of the result of the show of hands) demanded by the chairman.

A quorum required for a meeting of shareholders consists of one or more shareholders holding not less than a majority of all votes attaching to all of our shares in issue and entitled to vote present in person or by proxy or, if a corporation or other non-natural person, by its duly authorized representative. Advance notice of at least ten calendar days is required for the convening of our annual general meeting and other shareholders meetings.

An ordinary resolution to be passed at a meeting by the shareholders requires the affirmative vote of a simple majority of the votes attaching to the ordinary shares cast at a meeting. A special resolution requires the affirmative vote of no less than two-thirds of the votes cast attaching to the outstanding shares at a meeting. Our articles of association provide that a special resolution shall be required, and that for the purposes of any such special resolution, the affirmative vote of no less than 95% of votes cast by the shareholders entitled to vote who are present in person or by proxy at a general meeting shall be required to approve any amendments to any provisions of our articles of association that relate to or have an impact upon: (i) the right of the PDD Partnership to appoint executive directors and nominate and recommend chief executive officer of our company and (ii) the procedures regarding the election, appointment and removal of directors or size of the board. Both ordinary resolutions and special resolutions may also be passed by a unanimous written resolution signed by all the shareholders of our company, as permitted by the Companies Act and our memorandum and articles of association. A special resolution will be required for important matters such as a change of name or making changes that will affect the rights, preferences, privileges or powers of the preferred shareholders.

*General Meetings of Shareholders*

As a Cayman Islands exempted company, we are not obliged by the Companies Act to call shareholders' annual general meetings. Our articles of association provide that we may (but are not obliged to) in each year hold a general meeting as our annual general meeting in which case we shall specify the meeting as such in the notices calling it, and the annual general meeting shall be held at such time and place as may be determined by our directors.

Shareholders' general meetings may be convened by the chairman or a majority of our board of directors. Advance notice of at least ten (10) calendar days is required for the convening of our annual general shareholders' meeting (if any) and any other general meeting of our shareholders. A quorum required for any general meeting of shareholders consists of one or more shareholders present or by proxy, representing not less than a majority of all votes attaching to all of our shares in issue and entitled to vote.

The Companies Act provides shareholders with only limited rights to requisition a general meeting, and does not provide shareholders with any right to put any proposal before a general meeting. However, these rights may be provided in a company's articles of association. Our memorandum and articles of association provide that upon the requisition of shareholders representing in aggregate not less than one-third of all votes attaching to all issued and outstanding shares of our company that as at the date of the deposit carry the right to vote at general meetings of our company, our board of directors will convene an extraordinary general meeting and put the resolutions so requisitioned to a vote at such meeting. However, our memorandum and articles of association do not provide our shareholders with any right to put any proposals before annual general meetings or extraordinary general meetings not called by such shareholders.

*Transfer of Ordinary Shares*

2

Subject to the restrictions set out below, any of our shareholders may transfer all or any of his or her ordinary shares by an instrument of transfer in writing, and shall be executed by or on behalf of the transferor, and if in respect of a nil or partly paid up share, or the directors so require, shall also be executed by the transferee.

Our board of directors may, in its absolute discretion, decline to register any transfer of any ordinary share which is not fully paid up or on which we have a lien. Our board of directors may also decline to register any transfer of any ordinary share unless:

·  the instrument of transfer is lodged with us, accompanied by the certificate for the ordinary shares to which it relates and such other evidence as our board of directors may reasonably require to show the right of the transferor to make the transfer;

·  the instrument of transfer is in respect of only one class of ordinary shares;

·  the instrument of transfer is properly stamped, if required;

·  in the case of a transfer to joint holders, the number of joint holders to whom the ordinary share is to be transferred does not exceed four; and

·  a fee of such maximum sum as the Nasdaq Global Select Market may determine to be payable or such lesser sum as our directors may from time to time require is paid to us in respect thereof.

If our directors refuse to register a transfer they shall, within three calendar months after the date on which the instrument of transfer was lodged, send to each of the transferor and the transferee notice of such refusal.

The registration of transfers may, after compliance with any notice required of the Nasdaq Stock Market, be suspended and the register closed at such times and for such periods as our board of directors may from time to time determine, provided, however, that the registration of transfers shall not be suspended nor the register closed for more than 30 calendar days in any calendar year as our board may determine.

*Liquidation*

On the winding up of our company, if the assets available for distribution amongst our shareholders shall be more than sufficient to repay the whole of the share capital at the commencement of the winding up, the surplus shall be distributed amongst our shareholders in proportion to the par value of the shares held by them at the commencement of the winding up, subject to a deduction from those shares in respect of which there are monies due, of all monies payable to our company for unpaid calls or otherwise. If our assets available for distribution are insufficient to repay all of the paid-up capital, the assets will be distributed so that the losses are borne by our shareholders in proportion to the par value of the shares held by them.

*Calls on Shares and Forfeiture of Shares*

Our board of directors may from time to time make calls upon shareholders for any amounts unpaid on their shares in a notice served to such shareholders at least 14 calendar days prior to the specified time of payment. The shares that have been called upon and remain unpaid are subject to forfeiture.

*Redemption, Repurchase and Surrender of Shares*

We may issue shares on terms that such shares are subject to redemption, at our option or at the option of the holders of these shares, on such terms and in such manner as may be determined by our board of directors, or by the shareholders by special resolutions. Our Company may also repurchase any of our shares on such terms and in such manner as have been approved by our board of directors or by an ordinary resolution of our shareholders. Under the Companies Act, the redemption or repurchase of any share may be paid out of our Company's profits or out of the proceeds of a new issue of shares made for the purpose of such redemption or repurchase, or out of capital (including share premium account and capital redemption reserve) if our company can, immediately following such payment, pay its debts as they fall due in the ordinary course of business. In addition, under the Companies Act no such share may be redeemed or repurchased (a) unless it is fully paid up, (b) if such redemption or repurchase would result in

3

there being no shares outstanding or (c) if the company has commenced liquidation. In addition, our company may accept the surrender of any fully paid share for no consideration.

### Requirements to Change the Rights of Holders of Class A Ordinary Shares (Item 10.B.4 of Form 20-F)

*Variations of Rights of Shares*

If at any time, our share capital is divided into different classes of shares, the rights attached to any class of shares (unless otherwise provided by the terms of issue of the shares of that class), whether or not our company is being wound-up, may be varied with the consent in writing of the holders of two-thirds of the issued shares of that class or with the sanction of a resolution passed at a separate meeting of the holders of the shares of the class by the holders of two-thirds of the issued shares of that class. The rights conferred upon the holders of the shares of any class issued shall not, unless otherwise expressly provided by the terms of issue of the shares of that class, be deemed to be varied by the creation or issue of further shares ranking pari passu with such existing class of shares.

### Limitations on the Rights to Own Class A Ordinary Shares (Item 10.B.6 of Form 20-F)

There are no limitations imposed by our memorandum and articles of association on the rights of non-resident or foreign shareholders to hold or exercise voting rights on our shares. In addition, there are no provisions in our memorandum and articles of association governing the ownership threshold above which shareholder ownership must be disclosed.

### Provisions Affecting Any Change of Control (Item 10.B.7 of Form 20-F)

*Anti-Takeover Provisions*

Some provisions of our memorandum and articles of association may discourage, delay or prevent a change of control of our company or management that shareholders may consider favorable, including provisions that:

· authorize our board of directors to issue preference shares in one or more series and to designate the price, rights, preferences, privileges and restrictions of such preference shares without any further vote or action by our shareholders; and

· limit the ability of shareholders to requisition and convene general meetings of shareholders.

However, under Cayman Islands law, our directors may only exercise the rights and powers granted to them under our memorandum and articles of association for a proper purpose and for what they believe in good faith to be in the best interests of our company.

### Ownership Threshold (Item 10.B.8 of Form 20-F)

There are no provisions in our memorandum and articles of association governing the ownership threshold above which shareholder ownership must be disclosed.

### Differences Between the Law of Different Jurisdictions (Item 10.B.9 of Form 20-F)

The Companies Act is modeled after that of England but does not follow recent English statutory enactments and differs from laws applicable to U.S. corporations and their shareholders. Set forth below is a summary of the significant differences between the provisions of the Companies Act applicable to us and the laws applicable to companies incorporated in the United States and their shareholders.

*Mergers and Similar Arrangements*

The Companies Act permits mergers and consolidations between Cayman Islands companies and between Cayman Islands companies and non-Cayman Islands companies. For these purposes, (a) "merger" means the merging of two or more constituent companies and the vesting of their undertaking, property and liabilities in one of such companies as the surviving company, and (b) a "consolidation" means the combination of two or more constituent companies into a consolidated company and the vesting of the undertaking, property and liabilities of such companies

4

to the consolidated company. In order to effect such a merger or consolidation, the directors of each constituent company must approve a written plan of merger or consolidation, which must then be authorized by (a) a special resolution of the shareholders of each constituent company, and (b) such other authorization, if any, as may be specified in such constituent company's articles of association. The plan must be filed with the Registrar of Companies of the Cayman Islands together with a declaration as to the solvency of the consolidated or surviving company, a list of the assets and liabilities of each constituent company and an undertaking that a copy of the certificate of merger or consolidation will be given to the members and creditors of each constituent company and that notification of the merger or consolidation will be published in the Cayman Islands Gazette. Court approval is not required for a merger or consolidation which is effected in compliance with these statutory procedures.

A merger between a Cayman parent company and its Cayman subsidiary or subsidiaries does not require authorization by a resolution of shareholders of that Cayman subsidiary if a copy of the plan of merger is given to every member of that Cayman subsidiary to be merged unless that member agrees otherwise. For this purpose a company is a "parent" of a subsidiary if it holds issued shares that together represent at least 90% of the votes at a general meeting of the subsidiary.

The consent of each holder of a fixed or floating security interest over a constituent company is required unless this requirement is waived by a court in the Cayman Islands.

Save in certain limited circumstances, a shareholder of a Cayman constituent company who dissents from the merger or consolidation is entitled to payment of the fair value of his shares (which, if not agreed between the parties, will be determined by the Cayman Islands court) upon dissenting to the merger or consolidation, provide the dissenting shareholder complies strictly with the procedures set out in the Companies Act. The exercise of dissenter rights will preclude the exercise by the dissenting shareholder of any other rights to which he or she might otherwise be entitled by virtue of holding shares, save for the right to seek relief on the grounds that the merger or consolidation is void or unlawful.

Separate from the statutory provisions relating to mergers and consolidations, the Companies Act also contains statutory provisions that facilitate the reconstruction and amalgamation of companies by way of schemes of arrangement, provided that the arrangement is approved by a majority in number of each class of shareholders and creditors with whom the arrangement is to be made, and who must in addition represent three-fourths in value of each such class of shareholders or creditors, as the case may be, that are present and voting either in person or by proxy at a meeting, or meetings, convened for that purpose. The convening of the meetings and subsequently the arrangement must be sanctioned by the Grand Court of the Cayman Islands. While a dissenting shareholder has the right to express to the court the view that the transaction ought not to be approved, the court can be expected to approve the arrangement if it determines that:

· the statutory provisions as to the required majority vote have been met;

· the shareholders have been fairly represented at the meeting in question and the statutory majority are acting bona fide without coercion of the minority to promote interests adverse to those of the class;

· the arrangement is such that may be reasonably approved by an intelligent and honest man of that class acting in respect of his interest; and

· the arrangement is not one that would more properly be sanctioned under some other provision of the Companies Act.

The Companies Act also contains a statutory power of compulsory acquisition which may facilitate the "squeeze out" of dissentient minority shareholder upon a tender offer. When a tender offer is made and accepted by holders of 90% of the shares affected within four months, the offeror may, within a two-month period commencing on the expiration of such four month period, require the holders of the remaining shares to transfer such shares to the offeror on the terms of the offer. An objection can be made to the Grand Court of the Cayman Islands but this is unlikely to succeed in the case of an offer which has been so approved unless there is evidence of fraud, bad faith or collusion.

5

If an arrangement and reconstruction is thus approved, or if a tender offer is made and accepted, a dissenting shareholder would have no rights comparable to appraisal rights, save that objectors to a takeover offer may apply to the Grand Court of the Cayman Islands for various orders that the Grand Court of the Cayman Islands has a broad discretion to make, which would otherwise ordinarily be available to dissenting shareholders of Delaware corporations, providing rights to receive payment in cash for the judicially determined value of the shares.

*Shareholders' Suits*

In principle, we will normally be the proper plaintiff and as a general rule a derivative action may not be brought by a minority shareholder. However, based on English authorities, which would in all likelihood be of persuasive authority in the Cayman Islands, there are exceptions to the foregoing principle, including when:

· a company acts or proposes to act illegally or ultra vires;

· the act complained of, although not ultra vires, could only be effected duly if authorized by more than a simple majority vote that has not been obtained; and

· those who control the company are perpetrating a "fraud on the minority."

*Indemnification of Directors and Executive Officers and Limitation of Liability*

Cayman Islands law does not limit the extent to which a company's memorandum and articles of association may provide for indemnification of officers and directors, except to the extent any such provision may be held by the Cayman Islands courts to be contrary to public policy, such as to provide indemnification against civil fraud or the consequences of committing a crime. Our memorandum and articles of association permit indemnification of officers and directors against all actions, proceedings, costs, charges, expenses, losses, damages or liabilities incurred or sustained by such officers and directors, other than by reason of such officer's or director's own dishonesty, willful default or fraud, in or about the conduct of our business or affairs (including as a result of any mistake of judgment) or in the execution or discharge of his or her duties, powers, authorities or discretions, including without prejudice to the generality of the foregoing, any costs, expenses, losses or liabilities incurred by such officer and director in defending (whether successfully or otherwise) any civil proceedings concerning us or our affairs in any court whether in the Cayman Islands or elsewhere. This standard of conduct is generally the same as permitted under the Delaware General Corporation Law for a Delaware corporation.

In addition, we have entered into indemnification agreements with our directors and executive officers that provide such persons with additional indemnification beyond that provided in our memorandum and articles of association.

Insofar as indemnification for liabilities arising under the Securities Act may be permitted to our directors, officers or persons controlling us under the foregoing provisions, we have been informed that in the opinion of the SEC, such indemnification is against public policy as expressed in the Securities Act and is therefore unenforceable.

*Directors' Fiduciary Duties*

Under Delaware corporate law, a director of a Delaware corporation has a fiduciary duty to the corporation and its shareholders. This duty has two components: the duty of care and the duty of loyalty. The duty of care requires that a director act in good faith, with the care that an ordinarily prudent person would exercise under similar circumstances. Under this duty, a director must inform himself of, and disclose to shareholders, all material information reasonably available regarding a significant transaction. The duty of loyalty requires that a director acts in a manner he reasonably believes to be in the best interests of the corporation. He must not use his corporate position for personal gain or advantage. This duty prohibits self-dealing by a director and mandates that the best interest of the corporation and its shareholders take precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the shareholders generally. In general, actions of a director are presumed to have been made on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the corporation. However, this presumption may be rebutted by evidence of a breach of one of the fiduciary duties. Should such evidence be presented concerning a transaction by a director, the director must prove the procedural fairness of the transaction, and that the transaction was of fair value to the corporation.

6

As a matter of Cayman Islands law, a director of a Cayman Islands company is in the position of a fiduciary with respect to the company and therefore it is considered that he owes the following duties to the company a duty to act bona fide in the best interests of the company, a duty not to make a profit based on his position as director (unless the company permits him to do so) and a duty not to put himself in a position where the interests of the company conflict with his personal interest or his duty to a third party. A director of a Cayman Islands company owes to the company a duty to act with skill and care. It was previously considered that a director need not exhibit in the performance of his duties a greater degree of skill than may reasonably be expected from a person of his knowledge and experience. However, English and Commonwealth courts have moved towards an objective standard with regard to the required skill and care and these authorities are likely to be followed in the Cayman Islands.

*Shareholder Action by Written Consent*

Under the Delaware General Corporation Law, a corporation may eliminate the right of shareholders to act by written consent by amendment to its certificate of incorporation. Cayman Islands law and our articles of association provide that shareholders may approve corporate matters by way of a unanimous written resolution signed by or on behalf of each shareholder who would have been entitled to vote on such matter at a general meeting without a meeting being held.

*Shareholder Proposals*

Under the Delaware General Corporation Law, a shareholder has the right to put any proposal before the annual meeting of shareholders, provided it complies with the notice provisions in the governing documents. A special meeting may be called by the board of directors or any other person authorized to do so in the governing documents, but shareholders may be precluded from calling special meetings.

The Companies Act provide shareholders with only limited rights to requisition a general meeting, and does not provide shareholders with any right to put any proposal before a general meeting. However, these rights may be provided in a company's articles of association. Our articles of association allow our shareholders holding in aggregate not less than one-third of all votes attaching to the outstanding shares of our company entitled to vote at general meetings to requisition an extraordinary general meeting of our shareholders, in which case our board is obliged to convene an extraordinary general meeting and to put the resolutions so requisitioned to a vote at such meeting. Other than this right to requisition a shareholders' meeting, our articles of association do not provide our shareholders with any other right to put proposals before annual general meetings or extraordinary general meetings. As an exempted Cayman Islands company, we are not obliged by law to call shareholders' annual general meetings.

*Cumulative Voting*

Under the Delaware General Corporation Law, cumulative voting for elections of directors is not permitted unless the corporation's certificate of incorporation specifically provides for it. Cumulative voting potentially facilitates the representation of minority shareholders on a board of directors since it permits the minority shareholder to cast all the votes to which the shareholder is entitled on a single director, which increases the shareholder's voting power with respect to electing such director. There are no prohibitions in relation to cumulative voting under the laws of the Cayman Islands but our articles of association do not provide for cumulative voting. As a result, our shareholders are not afforded any less protections or rights on this issue than shareholders of a Delaware corporation.

*Removal of Directors*

Under the Delaware General Corporation Law, a director of a corporation with a classified board may be removed only for cause with the approval of a majority of the outstanding shares entitled to vote, unless the certificate of incorporation provides otherwise. Under our articles of association, directors may be removed with or without cause, by an ordinary resolution of our shareholders.

*Transactions with Interested Shareholders*

The Delaware General Corporation Law contains a business combination statute applicable to Delaware corporations whereby, unless the corporation has specifically elected not to be governed by such statute by amendment to its certificate of incorporation, it is prohibited from engaging in certain business combinations with an "interested

7

shareholder" for three years following the date that such person becomes an interested shareholder. An interested shareholder generally is a person or a group who or which owns or owned 15% or more of the target's outstanding voting share within the past three years. This has the effect of limiting the ability of a potential acquirer to make a two-tiered bid for the target in which all shareholders would not be treated equally. The statute does not apply if, among other things, prior to the date on which such shareholder becomes an interested shareholder, the board of directors approves either the business combination or the transaction which resulted in the person becoming an interested shareholder. This encourages any potential acquirer of a Delaware corporation to negotiate the terms of any acquisition transaction with the target's board of directors.

Cayman Islands law has no comparable statute. As a result, we cannot avail ourselves of the types of protections afforded by the Delaware business combination statute. However, although Cayman Islands law does not regulate transactions between a company and its significant shareholders, it does provide that such transactions must be entered into bona fide in the best interests of the company and not with the effect of constituting a fraud on the minority shareholders.

*Dissolution; Winding Up*

Under the Delaware General Corporation Law, unless the board of directors approves the proposal to dissolve, dissolution must be approved by shareholders holding 100% of the total voting power of the corporation. Only if the dissolution is initiated by the board of directors may it be approved by a simple majority of the corporation's outstanding shares. Delaware law allows a Delaware corporation to include in its certificate of incorporation a supermajority voting requirement in connection with dissolutions initiated by the board.

Under Cayman Islands law, a company may be wound up by either an order of the courts of the Cayman Islands or by a special resolution of its members or, if the company is unable to pay its debts as they fall due, by an ordinary resolution of its members. The court has authority to order winding up in a number of specified circumstances including where it is, in the opinion of the court, just and equitable to do so. Under the Companies Act and our articles of association, our company may be dissolved, liquidated or wound up by a special resolution of our shareholders.

*Variation of Rights of Shares*

Under the Delaware General Corporation Law, a corporation may vary the rights of a class of shares with the approval of a majority of the outstanding shares of such class, unless the certificate of incorporation provides otherwise. Under Cayman Islands law and our articles of association, if our share capital is divided into more than one class of shares, we may vary the rights attached to any class with the written consent of the holders of two-thirds of the issued shares of that class or with the sanction of a resolution passed at a general meeting of the holders of the shares of that class by holders of two-thirds of the issued shares of that class.

*Amendment of Governing Documents*

Under the Delaware General Corporation Law, a corporation's governing documents may be amended with the approval of a majority of the outstanding shares entitled to vote, unless the certificate of incorporation provides otherwise. As permitted by Cayman Islands law, our memorandum and articles of association may only be amended with a special resolution of our shareholders.

**Changes in Capital (Item 10.B.10 of Form 20-F)**

Our shareholders may from time to time by ordinary resolution:

·    increase our share capital by such sum, to be divided into shares of such classes and amount, as the resolution shall prescribe;

·    consolidate and divide all or any of our share capital into shares of a larger amount than our existing shares;

·    convert all or any of our paid up shares into stock and reconvert that stock into paid up shares of any denomination;

8

·    subdivide our existing shares, or any of them, into shares of an amount smaller than that fixed by the memorandum, provided that in the subdivision the proportion between the amount paid and the amount, if any, unpaid on each reduced share shall be the same as it was in case of the share from which the reduced share is derived; or

·    cancel any shares which, at the date of the passing of the resolution, have not been taken or agreed to be taken by any person and diminish the amount of our share capital by the amount of the shares so cancelled.

We may by special resolution, reduce our share capital and any capital redemption reserve in any manner permitted by law.

**Debt Securities (Item 12.A of Form 20-F)**

Not applicable.

**Warrants and Rights (Item 12.B of Form 20-F)**

Not applicable.

**Other Securities (Item 12.C of Form 20-F)**

Not applicable.

**Description of American Depositary Shares (Items 12.D.1 and 12.D.2 of Form 20-F)**

Deutsche Bank Trust Company Americas, as depositary, registers and delivers the ADSs. Each ADS represents ownership of four Class A ordinary shares, deposited with Deutsche Bank AG, Hong Kong Branch, as custodian for the depositary. Each ADS also represents ownership of any other securities, cash or other property which may be held by the depositary. The depositary's corporate trust office at which the ADSs will be administered is located at 60 Wall Street, New York, NY 10005, USA. The principal executive office of the depositary is located at 60 Wall Street, New York, NY 10005, USA.

The Direct Registration System, or DRS, is a system administered by The Depository Trust Company, or DTC, pursuant to which the depositary may register the ownership of uncertificated ADSs, which ownership shall be evidenced by periodic statements issued by the depositary to the ADS holders entitled thereto.

We do not treat ADS holders as our shareholders and accordingly, you, as an ADS holder, do not have shareholder rights. Cayman Islands law governs shareholder rights. The depositary is the holder of the Class A ordinary shares underlying your ADSs. As a holder of ADSs, you have ADS holder rights. A deposit agreement among us, the depositary and you, as an ADS holder, and the beneficial owners of ADSs sets out ADS holder rights as well as the rights and obligations of the depositary. The laws of the State of New York govern the deposit agreement and the ADSs.

The following is a summary of the material provisions of the deposit agreement. For more complete information, you should read the entire deposit agreement and the form of American Depositary Receipt. The deposit agreement has been filed with the SEC as an exhibit to a Registration Statement on Form F-6 (File No. 333-226185) for our company.

***Holding the ADSs***

*How will you hold your ADSs?*

You may hold ADSs either (1) directly (a) by having an American Depositary Receipt, or ADR, which is a certificate evidencing a specific number of ADSs, registered in your name, or (b) by holding ADSs in DRS, or (2) indirectly through your broker or other financial institution. If you hold ADSs directly, you are an ADS holder. This description assumes you hold your ADSs directly. ADSs will be issued through DRS, unless you specifically request certificated ADRs. If you hold the ADSs indirectly, you must rely on the procedures of your broker or other financial

9

institution to assert the rights of ADS holders described in this section. You should consult with your broker or financial institution to find out what those procedures are.

### Dividends and Other Distributions

*How will you receive dividends and other distributions on the shares?*

The depositary has agreed to pay to you the cash dividends or other distributions it or the custodian receives on Class A ordinary shares or other deposited securities, after deducting its fees and expenses. You will receive these distributions in proportion to the number of Class A ordinary shares your ADSs represent as of the record date (which will be as close as practicable to the record date for our Class A ordinary shares) set by the depositary with respect to the ADSs.

- *Cash.* The depositary will convert or cause to be converted any cash dividend or other cash distribution we pay on the Class A ordinary shares or any net proceeds from the sale of any Class A ordinary shares, rights, securities or other entitlements under the terms of the deposit agreement into U.S. dollars if it can do so on a practicable basis, and can transfer the U.S. dollars to the United States and will distribute promptly the amount thus received. If the depositary shall determine in its judgment that such conversions or transfers are not practical or lawful or if any government approval or license is needed and cannot be obtained at a reasonable cost within a reasonable period or otherwise sought, the deposit agreement allows the depositary to distribute the foreign currency only to those ADS holders to whom it is possible to do so. It will hold or cause the custodian to hold the foreign currency it cannot convert for the account of the ADS holders who have not been paid and such funds will be held for the respective accounts of the ADS holders. It will not invest the foreign currency and it will not be liable for any interest for the respective accounts of the ADS holders. Before making a distribution, any taxes or other governmental charges, together with fees and expenses of the depositary, that must be paid, will be deducted. It will distribute only whole U.S. dollars and cents and will round down fractional cents to the nearest whole cent. If the exchange rates fluctuate during a time when the depositary cannot convert the foreign currency, you may lose some or all of the value of the distribution.

- *Shares.* For any Class A ordinary shares we distribute as a dividend or free distribution, either (1) the depositary will distribute additional ADSs representing such Class A ordinary shares or (2) existing ADSs as of the applicable record date will represent rights and interests in the additional Class A ordinary shares distributed, to the extent reasonably practicable and permissible under law, in either case, net of applicable fees, charges and expenses incurred by the depositary and taxes and/or other governmental charges. The depositary will only distribute whole ADSs. It will try to sell Class A ordinary shares which would require it to deliver a fractional ADS and distribute the net proceeds in the same way as it does with cash. The depositary may sell a portion of the distributed Class A ordinary shares sufficient to pay its fees and expenses, and any taxes and governmental charges, in connection with that distribution.

- *Elective Distributions in Cash or Shares.* If we offer holders of our Class A ordinary shares the option to receive dividends in either cash or shares, the depositary, after consultation with us and having received timely notice as described in the deposit agreement of such elective distribution by us, has discretion to determine to what extent such elective distribution will be made available to you as a holder of the ADSs. We must timely first instruct the depositary to make such elective distribution available to you and furnish it with satisfactory evidence that it is legal to do so. The depositary could decide it is not legal or reasonably practicable to make such elective distribution available to you. In such case, the depositary shall, on the basis of the same determination as is made in respect of the Class A ordinary shares for which no election is made, distribute either cash in the same way as it does in a cash distribution, or additional ADSs representing Class A ordinary shares in the same way as it does in a share distribution. The depositary is not obligated to make available to you a method to receive the elective dividend in shares rather than in ADSs. There can be no assurance that you will be given the opportunity to receive elective distributions on the same terms and conditions as the holders of Class A ordinary shares.

- *Rights to Purchase Additional Shares.* If we offer holders of our Class A ordinary shares any rights to subscribe for additional shares, the depositary shall having received timely notice as described in the

10

deposit agreement of such distribution by us, consult with us, and we must determine whether it is lawful and reasonably practicable to make these rights available to you. We must first instruct the depositary to make such rights available to you and furnish the depositary with satisfactory evidence that it is legal to do so. If the depositary decides it is not legal or reasonably practicable to make the rights available but that it is lawful and reasonably practicable to sell the rights, the depositary will endeavor to sell the rights and in a riskless principal capacity or otherwise, at such place and upon such terms (including public or private sale) as it may deem proper distribute the net proceeds in the same way as it does with cash.

The depositary will allow rights that are not distributed or sold to lapse. In that case, you will receive no value for them.

If the depositary makes rights available to you, it will establish procedures to distribute such rights and enable you to exercise the rights upon your payment of applicable fees, charges and expenses incurred by the depositary and taxes and/or other governmental charges. The Depositary shall not be obliged to make available to you a method to exercise such rights to subscribe for Class A ordinary shares (rather than ADSs).

U.S. securities laws may restrict transfers and cancellation of the ADSs represented by shares purchased upon exercise of rights. For example, you may not be able to trade these ADSs freely in the United States. In this case, the depositary may deliver restricted depositary shares that have the same terms as the ADSs described in this section except for changes needed to put the necessary restrictions in place.

There can be no assurance that you will be given the opportunity to exercise rights on the same terms and conditions as the holders of Class A ordinary shares or be able to exercise such rights.

- *Other Distributions.* Subject to receipt of timely notice, as described in the deposit agreement, from us with the request to make any such distribution available to you, and provided the depositary has determined such distribution is lawful and reasonably practicable and feasible and in accordance with the terms of the deposit agreement, the depositary will distribute to you anything else we distribute on deposited securities by any means it may deem practicable, upon your payment of applicable fees, charges and expenses incurred by the depositary and taxes and/or other governmental charges. If any of the conditions above are not met, the depositary will endeavor to sell, or cause to be sold, what we distributed and distribute the net proceeds in the same way as it does with cash; or, if it is unable to sell such property, the depositary may dispose of such property in any way it deems reasonably practicable under the circumstances for nominal or no consideration, such that you may have no rights to or arising from such property.

The depositary is not responsible if it decides that it is unlawful or impractical to make a distribution available to any ADS holders. We have no obligation to register ADSs, shares, rights or other securities under the Securities Act. We also have no obligation to take any other action to permit the distribution of ADSs, shares, rights or anything else to ADS holders. This means that you may not receive the distributions we make on our shares or any value for them if we and/or the depositary determines that it is illegal or not practicable for us or the depositary to make them available to you.

### *Deposit, Withdrawal and Cancellation*

*How are ADSs issued?*

The depositary will deliver ADSs if you or your broker deposit Class A ordinary shares or evidence of rights to receive Class A ordinary shares with the custodian. Upon payment of its fees and expenses and of any taxes or charges, such as stamp taxes or stock transfer taxes or fees, the depositary will register the appropriate number of ADSs in the names you request and will deliver the ADSs to or upon the order of the person or persons entitled thereto.

*How do ADS holders cancel an American Depositary Share?*

You may turn in your ADSs at the depositary's corporate trust office or by providing appropriate instructions to your broker. Upon payment of its fees and expenses and of any taxes or charges, such as stamp taxes or stock

11

transfer taxes or fees, the depositary will deliver the Class A ordinary shares and any other deposited securities underlying the ADSs to you or a person you designate at the office of the custodian. Or, at your request, risk and expense, the depositary will deliver the deposited securities at its corporate trust office, to the extent permitted by law.

*How do ADS holders interchange between certificated ADSs and uncertificated ADSs?*

You may surrender your ADR to the depositary for the purpose of exchanging your ADR for uncertificated ADSs. The depositary will cancel that ADR and will send you a statement confirming that you are the owner of uncertificated ADSs. Alternatively, upon receipt by the depositary of a proper instruction from a holder of uncertificated ADSs requesting the exchange of uncertificated ADSs for certificated ADSs, the depositary will execute and deliver to you an ADR evidencing those ADSs.

***Voting Rights***

*How do you vote?*

You may instruct the depositary to vote the Class A ordinary shares or other deposited securities underlying your ADSs at any meeting at which you are entitled to vote pursuant to any applicable law, the provisions of our memorandum and articles of association, and the provisions of or governing the deposited securities. Otherwise, you could exercise your right to vote directly if you withdraw the Class A ordinary shares. However, you may not know about the meeting sufficiently enough in advance to withdraw the Class A ordinary shares.

If we ask for your instructions and upon timely notice from us by regular, ordinary mail delivery, or by electronic transmission, as described in the deposit agreement, the depositary will notify you of the upcoming meeting at which you are entitled to vote pursuant to any applicable law, the provisions of our memorandum and articles of association, and the provisions of or governing the deposited securities, and arrange to deliver our voting materials to you. The materials will include or reproduce (a) such notice of meeting or solicitation of consents or proxies; (b) a statement that the ADS holders at the close of business on the ADS record date will be entitled, subject to any applicable law, the provisions of our memorandum and articles of association, and the provisions of or governing the deposited securities, to instruct the depositary as to the exercise of the voting rights, if any, pertaining to the Class A ordinary shares or other deposited securities represented by such holder's ADSs; and (c) a brief statement as to the manner in which such instructions may be given or deemed given in accordance with the second to last sentence of this paragraph if no instruction is received, to the depositary to give a discretionary proxy to a person designated by us. Voting instructions may be given only in respect of a number of ADSs representing an integral number of Class A ordinary shares or other deposited securities. For instructions to be valid, the depositary must receive them in writing on or before the date specified. The depositary will try, as far as practical, subject to applicable law and the provisions of our memorandum and articles of association, to vote or to have its agents vote the Class A ordinary shares or other deposited securities (in person or by proxy) as you instruct. The depositary will only vote or attempt to vote as you instruct. If we timely requested the depositary to solicit your instructions but no instructions are received by the depositary from an owner with respect to any of the deposited securities represented by the ADSs of that owner on or before the date established by the depositary for such purpose, the depositary shall deem that owner to have instructed the depositary to give a discretionary proxy to a person designated by us with respect to such deposited securities, and the depositary shall give a discretionary proxy to a person designated by us to vote such deposited securities. However, no such instruction shall be deemed given and no such discretionary proxy shall be given with respect to any matter if we inform the depositary we do not wish such proxy given, substantial opposition exists or the matter materially and adversely affects the rights of holders of the Class A ordinary shares.

We cannot assure you that you will receive the voting materials in time to ensure that you can instruct the depositary to vote the Class A ordinary shares underlying your ADSs. In addition, there can be no assurance that ADS holders and beneficial owners generally, or any holder or beneficial owner in particular, will be given the opportunity to vote or cause the custodian to vote on the same terms and conditions as the holders of our Class A ordinary shares.

The depositary and its agents are not responsible for failing to carry out voting instructions or for the manner of carrying out voting instructions. This means that you may not be able to exercise your right to vote and you may have no recourse if the Class A ordinary shares underlying your ADSs are not voted as you requested.

12

In order to give you a reasonable opportunity to instruct the depositary as to the exercise of voting rights relating to deposited securities, if we request the depositary to act, we will give the depositary notice of any such meeting and details concerning the matters to be voted at least 30 business days in advance of the meeting date.

### Compliance with Regulations

#### *Information Requests*

Each ADS holder and beneficial owner shall (a) provide such information as we or the depositary may request pursuant to law, including, without limitation, relevant Cayman Islands law, any applicable law of the United States of America, our memorandum and articles of association, any resolutions of our Board of Directors adopted pursuant to such memorandum and articles of association, the requirements of any markets or exchanges upon which the Class A ordinary shares, ADSs or ADRs are listed or traded, or to any requirements of any electronic book-entry system by which the ADSs or ADRs may be transferred, regarding the capacity in which they own or owned ADRs, the identity of any other persons then or previously interested in such ADRs and the nature of such interest, and any other applicable matters, and (b) be bound by and subject to applicable provisions of the laws of the Cayman Islands, our memorandum and articles of association, and the requirements of any markets or exchanges upon which the ADSs, ADRs or Class A ordinary shares are listed or traded, or pursuant to any requirements of any electronic book-entry system by which the ADSs, ADRs or Class A ordinary shares may be transferred, to the same extent as if such ADS holder or beneficial owner held Class A ordinary shares directly, in each case irrespective of whether or not they are ADS holders or beneficial owners at the time such request is made.

#### *Disclosure of Interests*

Each ADS holder and beneficial owner shall comply with our requests pursuant to Cayman Islands law, the rules and requirements of the New York Stock Exchange and any other stock exchange on which the Class A ordinary shares are, or will be, registered, traded or listed or our memorandum and articles of association, which requests are made to provide information, inter alia, as to the capacity in which such ADS holder or beneficial owner owns ADS and regarding the identity of any other person interested in such ADS and the nature of such interest and various other matters, whether or not they are ADS holders or beneficial owners at the time of such requests.

### Fees and Expenses

As an ADS holder, you will be required to pay the following service fees to the depositary bank and certain taxes and governmental charges (in addition to any applicable fees, expenses, taxes and other governmental charges payable on the deposited securities represented by any of your ADSs):

| Service | Fees |
| --- | --- |
| · To any person to which ADSs are issued or to any person to which a distribution is made in respect of ADS distributions pursuant to stock dividends or other free distributions of stock, bonus distributions, stock splits or other distributions (except where converted to cash) | Up to US$0.05 per ADS issued |
| · Cancellation of ADSs, including the case of termination of the deposit agreement | Up to US$0.05 per ADS cancelled |
| · Distribution of cash dividends | Up to US$0.05 per ADS held |
| · Distribution of cash entitlements (other than cash dividends) and/or cash proceeds from the sale of rights, securities and other entitlements | Up to US$0.05 per ADS held |
| · Distribution of ADSs pursuant to exercise of rights. | Up to US$0.05 per ADS held |
| · Distribution of securities other than ADSs or rights to purchase additional ADSs | Up to US$0.05 per ADS held |

13

| Service | Fees |
|---|---|
| · Depositary services | Up to US$0.05 per ADS held on the applicable record date(s) established by the depositary bank |

As an ADS holder, you will also be responsible to pay certain fees and expenses incurred by the depositary bank and certain taxes and governmental charges (in addition to any applicable fees, expenses, taxes and other governmental charges payable on the deposited securities represented by any of your ADSs) such as:

· Fees for the transfer and registration of Class A ordinary shares charged by the registrar and transfer agent for the Class A ordinary shares in the Cayman Islands (i.e., upon deposit and withdrawal of Class A ordinary shares).

· Expenses incurred for converting foreign currency into U.S. dollars.

· Expenses for cable, telex and fax transmissions and for delivery of securities.

· Taxes and duties upon the transfer of securities, including any applicable stamp duties, any stock transfer charges or withholding taxes (i.e., when Class A ordinary shares are deposited or withdrawn from deposit).

· Fees and expenses incurred in connection with the delivery or servicing of Class A ordinary shares on deposit.

· Fees and expenses incurred in connection with complying with exchange control regulations and other regulatory requirements applicable to Class A ordinary shares, deposited securities, ADSs and ADRs.

· Any applicable fees and penalties thereon.

The depositary fees payable upon the issuance and cancellation of ADSs are typically paid to the depositary bank by the brokers (on behalf of their clients) receiving the newly issued ADSs from the depositary bank and by the brokers (on behalf of their clients) delivering the ADSs to the depositary bank for cancellation. The brokers in turn charge these fees to their clients. Depositary fees payable in connection with distributions of cash or securities to ADS holders and the depositary services fee are charged by the depositary bank to the holders of record of ADSs as of the applicable ADS record date.

The depositary fees payable for cash distributions are generally deducted from the cash being distributed or by selling a portion of distributable property to pay the fees. In the case of distributions other than cash (i.e., share dividends, rights), the depositary bank charges the applicable fee to the ADS record date holders concurrent with the distribution. In the case of ADSs registered in the name of the investor (whether certificated or uncertificated in direct registration), the depositary bank sends invoices to the applicable record date ADS holders. In the case of ADSs held in brokerage and custodian accounts (via DTC), the depositary bank generally collects its fees through the systems provided by DTC (whose nominee is the registered holder of the ADSs held in DTC) from the brokers and custodians holding ADSs in their DTC accounts. The brokers and custodians who hold their clients' ADSs in DTC accounts in turn charge their clients' accounts the amount of the fees paid to the depositary banks.

In the event of refusal to pay the depositary fees, the depositary bank may, under the terms of the deposit agreement, refuse the requested service until payment is received or may set off the amount of the depositary fees from any distribution to be made to the ADS holder.

The depositary may make payments to us or reimburse us for certain costs and expenses, by making available a portion of the ADS fees collected in respect of the ADR program or otherwise, upon such terms and conditions as we and the depositary bank agree from time to time.

14

*Payment of Taxes*

You will be responsible for any taxes or other governmental charges payable, or which become payable, on your ADSs or on the deposited securities represented by any of your ADSs. The depositary may refuse to register or transfer your ADSs or allow you to withdraw the deposited securities represented by your ADSs until such taxes or other charges are paid. It may apply payments owed to you or sell deposited securities represented by your ADSs to pay any taxes owed and you will remain liable for any deficiency. If the depositary sells deposited securities, it will, if appropriate, reduce the number of ADSs to reflect the sale and pay to you any net proceeds, or send to you any property, remaining after it has paid the taxes. You agree to indemnify us, the depositary, the custodian and each of our and their respective agents, directors, employees and affiliates for, and hold each of them harmless from, any claims with respect to taxes (including applicable interest and penalties thereon) arising from any refund of taxes, reduced rate of withholding at source or other tax benefit obtained for you. Your obligations under this paragraph shall survive any transfer of ADRs, any surrender of ADRs and withdrawal of deposited securities or the termination of the deposit agreement.

*Reclassifications, Recapitalizations and Mergers*

| If we: | Then: |
|---|---|
| Change the nominal or par value of our Class A ordinary shares | The cash, shares or other securities received by the depositary will become deposited securities. |
| Reclassify, split up or consolidate any of the deposited securities | Each ADS will automatically represent its equal share of the new deposited securities. |
| Distribute securities on the Class A ordinary shares that are not distributed to you, or recapitalize, reorganize, merge, liquidate, sell all or substantially all of our assets, or take any similar action | The depositary may distribute some or all of the cash, shares or other securities it received. It may also deliver new ADSs or ask you to surrender your outstanding ADRs in exchange for new ADRs identifying the new deposited securities. |

*Amendment and Termination*

*How may the deposit agreement be amended?*

We may agree with the depositary to amend the deposit agreement and the form of ADR without your consent for any reason. If an amendment adds or increases fees or charges, except for taxes and other governmental charges or expenses of the depositary for registration fees, facsimile costs, delivery charges or similar items, including expenses incurred in connection with foreign exchange control regulations and other charges specifically payable by ADS holders under the deposit agreement, or materially prejudices a substantial existing right of ADS holders, it will not become effective for outstanding ADSs until 30 days after the depositary notifies ADS holders of the amendment. At the time an amendment becomes effective, you are considered, by continuing to hold your ADSs, to agree to the amendment and to be bound by the ADRs and the deposit agreement as amended . If any new laws are adopted which would require the deposit agreement to be amended in order to comply therewith, we and the depositary may amend the deposit agreement in accordance with such laws and such amendment may become effective before notice thereof is given to ADS holders.

*How may the deposit agreement be terminated?*

The depositary will terminate the deposit agreement if we ask it to do so, in which case the depositary will give notice to you at least 90 days prior to termination. The depositary may also terminate the deposit agreement if the depositary has told us that it would like to resign, or if we have removed the depositary, and in either case we have not appointed a new depositary within 90 days. In either such case, the depositary must notify you at least 30 days before termination.

After termination, the depositary and its agents will do the following under the deposit agreement but nothing else: collect distributions on the deposited securities, sell rights and other property and deliver Class A ordinary shares

15

and other deposited securities upon cancellation of ADSs after payment of any fees, charges, taxes or other governmental charges. Six months or more after the date of termination, the depositary may sell any remaining deposited securities by public or private sale. After that, the depositary will hold the money it received on the sale, as well as any other cash it is holding under the deposit agreement, for the pro rata benefit of the ADS holders that have not surrendered their ADSs. It will not invest the money and has no liability for interest. After such sale, the depositary's only obligations will be to account for the money and other cash. After termination, we shall be discharged from all obligations under the deposit agreement except for our obligations to the depositary thereunder.

### Books of Depositary

The depositary will maintain ADS holder records at its depositary office. You may inspect such records at such office during regular business hours but solely for the purpose of communicating with other holders in the interest of business matters relating to the Company, the ADRs and the deposit agreement.

The depositary will maintain facilities in the Borough of Manhattan, The City of New York to record and process the issuance, cancellation, combination, split-up and transfer of ADRs.

These facilities may be closed at any time or from time to time when such action is deemed necessary or advisable by the depositary in connection with the performance of its duties under the deposit agreement or at our reasonable written request.

### Limitations on Obligations and Liability

*Limits on our obligations and the Obligations of the Depositary and the Custodian; Limits on Liability to Holders of ADSs*

The deposit agreement expressly limits our obligations and the obligations of the depositary and the custodian. It also limits our liability and the liability of the depositary. The depositary and the custodian:

· are only obligated to take the actions specifically set forth in the deposit agreement without gross negligence or willful misconduct;

· are not liable if any of us or our respective controlling persons or agents are prevented or forbidden from, or subjected to any civil or criminal penalty or restraint on account of, or delayed in, doing or performing any act or thing required by the terms of the deposit agreement and any ADR, by reason of any provision of any present or future law or regulation of the United States or any state thereof, the Cayman Islands or any other country, or of any other governmental authority or regulatory authority or stock exchange, or on account of the possible criminal or civil penalties or restraint, or by reason of any provision, present or future, of our memorandum and articles of association or any provision of or governing any deposited securities, or by reason of any act of God or war or other circumstances beyond its control (including, without limitation, nationalization, expropriation, currency restrictions, work stoppage, strikes, civil unrest, revolutions, rebellions, explosions and computer failure);

· are not liable by reason of any exercise of, or failure to exercise, any discretion provided for in the deposit agreement or in our memorandum and articles of association or provisions of or governing deposited securities;

· are not liable for any action or inaction of the depositary, the custodian or us or their or our respective controlling persons or agents in reliance upon the advice of or information from legal counsel, any person presenting Class A ordinary shares for deposit or any other person believed by it in good faith to be competent to give such advice or information;

· are not liable for the inability of any holder of ADSs to benefit from any distribution on deposited securities that is not made available to holders of ADSs under the terms of the deposit agreement;

· are not liable for any special, consequential, indirect or punitive damages for any breach of the terms of the deposit agreement, or otherwise;

16

·    may rely upon any documents we believe in good faith to be genuine and to have been signed or presented by the proper party;

·    disclaim any liability for any action or inaction or inaction of any of us or our respective controlling persons or agents in reliance upon the advice of or information from legal counsel, accountants, any person presenting Class A ordinary shares for deposit, holders and beneficial owners (or authorized representatives) of ADSs, or any person believed in good faith to be competent to give such advice or information; and

·    disclaim any liability for inability of any holder to benefit from any distribution, offering, right or other benefit made available to holders of deposited securities but not made available to holders of ADS.

The depositary and any of its agents also disclaim any liability (i) for any failure to carry out any instructions to vote, the manner in which any vote is cast or the effect of any vote or failure to determine that any distribution or action may be lawful or reasonably practicable or for allowing any rights to lapse in accordance with the provisions of the deposit agreement, (ii) the failure or timeliness of any notice from us, the content of any information submitted to it by us for distribution to you or for any inaccuracy of any translation thereof, (iii) any investment risk associated with the acquisition of an interest in the deposited securities, the validity or worth of the deposited securities, the credit-worthiness of any third party, (iv) for any tax consequences that may result from ownership of ADSs, Class A ordinary shares or deposited securities, or (v) for any acts or omissions made by a successor depositary whether in connection with a previous act or omission of the depositary or in connection with any matter arising wholly after the removal or resignation of the depositary, provided that in connection with the issue out of which such potential liability arises the depositary performed its obligations without gross negligence or willful misconduct while it acted as depositary.

In addition, the deposit agreement provides that each party to the deposit agreement (including each holder, beneficial owner and holder of interests in the ADRs) irrevocably waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in any lawsuit or proceeding against the depositary or our company related to our shares, the ADSs or the deposit agreement. This provision does not apply to claims against us made under the federal securities laws.

In the deposit agreement, we and the depositary agree to indemnify each other under certain circumstances.

### *Requirements for Depositary Actions*

Before the depositary will issue, deliver or register a transfer of an ADS, split-up, subdivide or combine ADSs, make a distribution on an ADS, or permit withdrawal of Class A ordinary shares, the depositary may require:

·    payment of stock transfer or other taxes or other governmental charges and transfer or registration fees charged by third parties for the transfer of any Class A ordinary shares or other deposited securities and payment of the applicable fees, expenses and charges of the depositary;

·    satisfactory proof of the identity and genuineness of any signature or any other matters contemplated in the deposit agreement; and

·    compliance with (A) any laws or governmental regulations relating to the execution and delivery of ADRs or ADSs or to the withdrawal or delivery of deposited securities and (B) such reasonable regulations and procedures as the depositary may establish, from time to time, consistent with the deposit agreement and applicable laws, including presentation of transfer documents.

The depositary may refuse to issue and deliver ADSs or register transfers of ADSs generally when the register of the depositary or our transfer books are closed or at any time if the depositary or we determine that it is necessary or advisable to do so.

17

*Your Right to Receive the Shares Underlying your ADSs*

You have the right to cancel your ADSs and withdraw the underlying Class A ordinary shares at any time except:

· when temporary delays arise because: (1) the depositary has closed its transfer books or we have closed our transfer books; (2) the transfer of Class A ordinary shares is blocked to permit voting at a shareholders' meeting; or (3) we are paying a dividend on our Class A ordinary shares;

· when you owe money to pay fees, taxes and similar charges;

· when it is necessary to prohibit withdrawals in order to comply with any laws or governmental regulations that apply to ADSs or to the withdrawal of ordinary shares or other deposited securities, or

· other circumstances specifically contemplated by Section I.A.(l) of the General Instructions to Form F-6 (as such General Instructions may be amended from time to time); or

· for any other reason if the depositary or we determine, in good faith, that it is necessary or advisable to prohibit withdrawals.

The depositary shall not knowingly accept for deposit under the deposit agreement any Class A ordinary shares or other deposited securities required to be registered under the provisions of the Securities Act, unless a registration statement is in effect as to such ordinary shares.

This right of withdrawal may not be limited by any other provision of the deposit agreement.

*Direct Registration System*

In the deposit agreement, all parties to the deposit agreement acknowledge that the DRS and Profile Modification System, or Profile, will apply to uncertificated ADSs upon acceptance thereof to DRS by DTC. DRS is the system administered by DTC pursuant to which the depositary may register the ownership of uncertificated ADSs, which ownership shall be evidenced by periodic statements issued by the depositary to the ADS holders entitled thereto. Profile is a required feature of DRS which allows a DTC participant, claiming to act on behalf of an ADS holder, to direct the depositary to register a transfer of those ADSs to DTC or its nominee and to deliver those ADSs to the DTC account of that DTC participant without receipt by the depositary of prior authorization from the ADS holder to register such transfer.

18

Exhibit 4.1

**PDD Holdings Inc.**
**AMENDED AND RESTATED 2015 GLOBAL SHARE PLAN**

(amended by the Company's Board of Directors on November 28, 2022)

1.      <u>Purposes of the Plan</u>. The purposes of this Plan are to perfect the corporate governance structure and establish a mechanism to share both interest and risk among its shareholders, key employees and/or consultants; establish a long-term incentive and restraint mechanism to perfect the remuneration system of the company; attract and retain the best available personnel for positions of substantial responsibility, to provide additional incentives to selected Employees, Directors, and Consultants and to promote the success of the Company's business by offering these individuals an opportunity to acquire a proprietary interest in the success of the Company or to increase this interest, by permitting them to purchase Shares of the Company; adapt to the needs of the strategic development of the company and enhance its competitive strength to promote sustainable development. The Plan provides both for the direct award or sale of Shares and for the grant of Options to purchase Shares, as determined by the Administrator at the time of grant.

2.      <u>Definitions</u>. For the purposes of this Plan, the following terms shall have the following meanings:

(a)      "<u>Acquisition Date</u>" means, with respect to Shares, the respective dates on which the Shares are sold under the Plan or the Shares are issued upon exercise of an Option.

(b)      "<u>Administrator</u>" means the Board or any of its Committees as shall be administering the Plan in accordance with Section 4 hereof.

(c)      "<u>Applicable Law</u>" means any applicable legal requirements relating to the administration of and the issuance of securities under equity securities-based compensation plans, including, without limitation, the requirements of U.S. state corporate laws, U.S. federal and state securities laws, U.S. federal law, U.S. Internal Revenue Code of 1986, the laws of the Cayman Islands, and the requirements of any stock exchange or quotation system upon which the Shares may then be listed or quoted and the applicable laws of any other country or jurisdiction where Awards are granted under the Plan. For all purposes of this Plan, references to statutes and regulations shall be deemed to include any successor statutes or regulations, to the extent reasonably appropriate as determined by the Administrator.

(d)      "<u>Award</u>" means an Option or a Share Purchase Right.

(e)      "<u>Board</u>" means the Board of Directors of the Company.

(f)      "<u>Change in Control</u>" means the occurrence of any of the following events:

(i)        any person becomes the beneficial owner, directly or indirectly, of securities of the Company representing fifty percent (50%) or more of the total voting power represented by the Company's then outstanding voting securities; or

(ii)        the consummation of the sale, lease, or disposition by the Company of all or substantially all of the Company's assets; or

(iii)        the consummation of a merger or consolidation of the Company with any other corporation, other than a merger or consolidation that would result in the voting securities of the Company outstanding immediately prior thereto continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity or its parent) at least fifty percent (50%) of the total voting power represented by the voting securities of the Company or such surviving entity or its parent outstanding immediately after such merger or consolidation.

Anything in the foregoing to the contrary notwithstanding, a transaction shall not constitute a Change in Control if its sole purpose is to change the legal jurisdiction of the Company's incorporation or to create a holding company that will be owned in substantially the same proportions by the persons who held the Company's securities immediately before such transaction. In addition, a sale by the Company of its securities in a transaction, the primary purpose of which is to raise capital for the Company's operations and business activities including, without limitation, an initial public offering of Shares under Applicable Law, shall not constitute a Change in Control.

(g)        "Committee" means a committee of Directors appointed by the Board in accordance with Section 4 hereof.

(h)        "Company" means PDD Holdings Inc., a company organized under the laws of the Cayman Islands, or any successor corporation thereto.

(i)        "Consultant" means, any person who is engaged by the Company or any Parent or Subsidiary to render consulting or advisory services to such entity, and, any natural person, including an advisor, who is engaged by the Company, or any Parent or Subsidiary to render bona fide consulting or advisory services to such entity and who is compensated for the services; provided that the term "Consultant", does not include (i) Employees, (ii) Directors who are paid only a director's fee by the Company or who are not compensated by the Company for their services as Directors, (iii) securities promoters, (iv) independent agents, franchisees and salespersons who do not have employment relationships with the Company from which they derive at least fifty percent of their annual income, or (v) any other person who would not be "consultants" or "advisors" as defined pursuant to Applicable Laws.

(j)        "Date of Grant" means the date an Award is granted to a Participant in accordance with Section 13 hereof.

(k)        "Director" means a member of the Board.

(l)        "Disability" means total and permanent physical disability.

2

(m)    "Employee" means any person, including officers and Directors, employed by the Company or any Parent or Subsidiary. A Service Provider shall not cease to be an Employee in the case of (i) any leave of absence approved by the Company or any Parent or Subsidiary, including sick leave, military leave, or any other personal leave, or (ii) transfers between locations of the Company or between the Company or any Parent or Subsidiary, or any successor, provided that no such leave may exceed ninety (90) days, unless reemployment upon expiration of such leave is guaranteed by statute or contract. If reemployment upon expiration of a leave of absence approved by the Company is not so guaranteed, then three (3) months following the 91st day of such leave, any Option held by the Optionee shall then cease to be an Option. Neither service as a Director nor payment of a director's fee by the Company or any Parent or Subsidiary shall be sufficient to constitute "employment" by the Company or any Parent or Subsidiary.

(n)    "Exercise Price" means the amount for which one Share may be purchased upon exercise of an Option, as specified by the Administrator in the applicable Option Agreement in accordance with Section 6(c) hereof.

(o)    "Exchange Act" means the U.S. Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

(p)    "Fair Market Value" means, as of any date, the value of the Shares determined by the Administrator in good faith and with reference to the market value of such Shares in accordance with Applicable Law.

(q)    "Option" means an option to purchase Shares that is granted pursuant to the Plan in accordance with Section 6 hereof.

(r)    "Option Agreement" means a written or electronic agreement between the Company and an Optionee, the form(s) of which shall be approved from time to time by the Administrator, evidencing the terms and conditions of an individual Option granted under the Plan, and includes any documents attached to or incorporated into the Option Agreement, including, but not limited to, a notice of option grant and a form of exercise notice. The Option Agreement shall be subject to the terms and conditions of the Plan.

(s)    "Optioned Shares" means the Shares subject to an Option.

(t)    "Optionee" means the holder of an outstanding Option granted under the Plan.

(u)    "Parent" means a "parent corporation" with respect to the Company, whether now or hereafter existing.

(v)    "Participant" means an Optionee or Purchaser, as applicable given the context, or the holder of Shares issuable or issued pursuant to the exercise of an Option or Share Purchase Right.

(w)    "Plan" means this 2015 Global Share Plan, as amended from time to time.

3

(x)        "Purchase Price" means the amount of consideration for which one Share may be acquired pursuant to a Share Purchase Right, as specified by the Administrator in the applicable Restricted Share Purchase Agreement in accordance with Section 7(b) hereof.

(y)        "Purchaser" means the holder of Shares purchased pursuant to the exercise of a Share Purchase Right.

(z)        "Restricted Share Purchase Agreement" means a written or electronic agreement between the Company and a Purchaser, the form(s) of which shall be approved from time to time by the Administrator, evidencing the terms and conditions of an individual Share Purchase Right, and includes any documents attached to or incorporated into the Restricted Share Purchase Agreement. The Restricted Share Purchase Agreement shall be subject to the terms and conditions of the Plan.

(aa)        "Restricted Shares" means Shares acquired pursuant to a Share Purchase Right.

(bb)        "Securities Act" means the U.S. Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

(cc)        "Service Provider" means an Employee, Director, or Consultant.

(dd)        "Share" means an ordinary share of the Company, as adjusted in accordance with Section 12 hereof.

(ee)        "Shareholders Agreement" means any agreement between a Participant and the Company or members of the Company or both.

(ff)        "Share Purchase Right" means a right to purchase Restricted Shares pursuant to Section 7 hereof.

(gg)        "Subsidiary" means a "subsidiary corporation" with respect to the Company, whether now or hereafter existing.

(hh)        "United States" means the United States of America, its territories and possessions, any State of the United States, and the District of Columbia.

(ii)        "U.S. Person" has the meaning accorded to it in Rule 902(k) of the Securities Act, and currently includes:

(i)        any natural person resident in the United States;

(ii)        any partnership or corporation organized or incorporated under the laws of the United States;

(iii)        any estate of which any executor or administrator is a U.S. Person;

(iv)        any trust of which any trustee is a U.S. Person;

4

(v)  any agency or branch of a foreign entity located in the United States;

(vi)  any non-discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary for the benefit or account of a U.S. Person;

(vii)  any discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary organized, incorporated, or (if an individual) resident in the United States; and

(viii)  any partnership or corporation if:

(A)  organized or incorporated under the laws of any foreign jurisdiction; and

(B)  formed by a U.S. Person principally for the purpose of investing in securities not registered under the Securities Act, unless it is organized or incorporated, and owned, by accredited investors (as defined in Rule 501(a) promulgated under the Securities Act) who are not natural persons, estates or trusts.

3.  <u>Shares Subject to the Plan</u>.

(a)  <u>Basic Limitation</u>. Subject to the provisions of Section 12 hereof, the maximum aggregate number of Shares that may be issued under the Plan shall not exceed 945,103,260 Shares; provided, however, that, at no time while the Shares are not registered pursuant to the Securities Act or the Company is not otherwise subject to the public reporting requirements of the Exchange Act, shall the maximum aggregate number of Shares that may be issued upon the exercise of all outstanding Awards and the aggregate number of Shares provided for under any other share bonus or similar plan of the Company exceed the number of Shares that the Company is permitted to issue pursuant to the exemption from registration under the Securities Act provided by Rule 701 of the Securities Act plus the aggregate number of Shares issued pursuant to Regulation S of the Securities Act or other exemption available under the Securities Act. The Shares may be authorized but unissued Shares. The number of Shares that are subject to Awards outstanding under the Plan at any time shall not exceed the aggregate number of Shares that then remain available for issuance under the Plan. The Company, during the term of the Plan, shall at all times reserve and keep available sufficient Shares to satisfy the requirements of outstanding Awards granted under the Plan.

(b)  <u>Additional Shares</u>. If an Award expires, becomes unexercisable, or is cancelled, forfeited, or otherwise terminated without having been exercised or settled in full, as the case may be, the Shares allocable to the unexercised portion of the Award shall again become available for future grant or sale under the Plan (unless the Plan has terminated). Shares that actually have been issued under the Plan, upon exercise of an Option or delivery under a Share Purchase Right, shall not be returned to the Plan and shall not become available for future distribution under the Plan, except that in the event that Shares issued under the Plan are reacquired by the Company pursuant to any forfeiture provision, right of repurchase or redemption, or are retained by the Company upon the exercise of or purchase of Shares under an Award in order to satisfy the Exercise Price or Purchase Price for the Award or any withholding

5

taxes due with respect to the exercise or purchase, such Shares shall again become available for future grant under the Plan.

4.        Administration of the Plan.

(a)        Administrator. The Plan shall be administered by the Board or a Committee appointed by the Board, which Committee shall be constituted to comply with Applicable Law.

(b)        Powers of the Administrator. Subject to the provisions of the Plan and, in the case of a Committee, the specific duties delegated by the Board to such Committee, and subject to the approval of any relevant authorities, the Administrator shall have the authority in its discretion:

(i)        to determine the Fair Market Value, in accordance with Section 2(o) hereof;

(ii)        to select the Service Providers to whom Awards may from time to time be granted hereunder;

(iii)        to determine the number of Shares to be covered by each Award granted hereunder;

(iv)        to approve the form(s) of agreement for use under the Plan;

(v)        to determine the terms and conditions of any Award granted hereunder including, but not limited to, the Exercise Price, the Purchase Price, the time or times when Options may be exercised (which may be based on performance criteria), the time or times when repurchase or redemption rights shall lapse, any vesting acceleration or waiver of forfeiture restrictions, and any restriction or limitation regarding any Award or the Shares relating thereto, based in each case on such factors as the Administrator, in its sole discretion, shall determine;

(vi)        to implement a program where (A) outstanding Awards are surrendered or cancelled in exchange for Awards of the same type (which may have lower Exercise/Purchase Prices and different terms), Awards of a different type, or cash, or (B) the Exercise/Purchase Price of an outstanding Award is reduced, based in each case on terms and conditions determined by the Administrator in its sole discretion;

(vii)        to prescribe, amend, and rescind rules and regulations relating to the Plan, including rules and regulations relating to sub-plans established for the purpose of satisfying Applicable Laws;

(viii)        to allow Optionees to satisfy withholding tax obligations by electing to have the Company withhold from the Optioned Shares to be issued under an Option that number of Shares having a Fair Market Value equal to the minimum amount required to be withheld. The Fair Market Value of the Shares to be withheld shall be determined on the date that the amount of tax to be withheld is to be determined. All elections by Optionees to have

6

Shares withheld for this purpose shall be made in such form and under such conditions as the Administrator may deem necessary or advisable;

(ix) to modify or amend each Award (subject to Section 17 hereof and Participant consent if the modification or amendment is to the Participant's detriment), including, without limitation, the discretionary authority to extend the post-termination exercisability of an Option longer than is otherwise provided for in an Option Agreement or accelerate the vesting or exercisability of an Option or lapsing of a repurchase or redemption right to which Restricted Shares may be subject;

(x) to construe and interpret the terms of the Plan and Awards granted pursuant to the Plan; and

(xi) to make any other determination and take any other action that the Administrator deems necessary or desirable for the administration of the Plan.

(c) Delegation of Authority to Officers. Subject to Applicable Law, the Administrator may delegate limited authority to specified officers of the Company to execute on behalf of the Company any instrument required to effect an Award previously granted by the Administrator.

(d) Effect of Administrator's Decision. All decisions, determinations, and interpretations of the Administrator shall be final and binding on all Participants.

(e) Term of the Plan. The Plan shall be valid for 10 years after it enters into force. In event of Liquidation or events that have material impact on the Plan, the Board may resolve to terminate the Plan before it expires. If the Plan is terminated before expiry, the Company shall no longer award Options to Service Providers pursuant hereto.

5. Eligibility.

Only Service Providers shall be eligible for the grant of Options and Share Purchase Rights.

6. Terms and Conditions of Options.

(a) Option Agreement. Each grant of an Option under the Plan shall be evidenced by an Option Agreement between the Optionee and the Company. Each Option shall be subject to all applicable terms and conditions of the Plan and may be subject to any other terms and conditions that are not inconsistent with the Plan and that the Administrator deems appropriate for inclusion in an Option Agreement. The provisions of the various Option Agreements entered into under the Plan need not be identical.

(b) Number of Shares. Each Option Agreement shall specify the number of Shares that are subject to the Option and shall provide for the adjustment of such number in accordance with Section 12 hereof.

7

(c)      Exercise Price. Each Option Agreement shall specify the Exercise Price, which shall be determined by the Administrator in its sole discretion. The Exercise Price shall be payable in accordance with Section 9 hereof and the applicable Option Agreement. The exercise price per Share subject to an Option may be amended or adjusted in the absolute discretion of the Administrator, the determination of which shall be final, binding and conclusive.  For the avoidance of doubt, to the extent not prohibited by Applicable Laws or any exchange rule, a downward adjustment of the exercise prices of Options mentioned in the preceding sentence shall be effective without the approval of the Company's shareholders or the approval of the affected Optionees.

(d)      Term of Option. The Option Agreement shall specify the term of the Option; provided, however, that the term shall not exceed twenty (20) years from the Date of Grant. Subject to the preceding sentence, the Administrator in its sole discretion shall determine when an Option is to expire.

(e)      Exercisability. Each Option Agreement shall specify the date when all or any installment of the Option is to become exercisable. The exercisability provisions of any Option Agreement shall be determined by the Administrator in its sole discretion.

(f)      Fast-track Exercisability. Under normal circumstances, Options awarded pursuant to the Plan shall not be exercised prior to its maturity, except for circumstances otherwise determined by the Administrator, including but not limited to event of Liquidation or events where the Optionee is deemed to have made extraordinary contribution to the Company in the unanimous opinion of the Board.

(g)      Exercise Procedure. Any Option granted hereunder shall be exercisable according to the terms hereof at such times and under such conditions as may be determined by the Administrator and as set forth in the Option Agreement; provided, however, that an Option shall not be exercised for a fraction of a Share.

(i)      An Option shall be deemed exercised when the Company receives (A) written or electronic notice of exercise (in accordance with the Option Agreement) from the person entitled to exercise the Option, (B) full payment for the Shares with respect to which the Option is exercised, and (C) all representations, indemnifications, and documents reasonably requested by the Administrator including, without limitation, any Shareholders Agreement. Full payment may consist of any consideration and method of payment authorized by the Administrator in accordance with Section 9 hereof and permitted by the Option Agreement.

(ii)      Shares issued upon exercise of an Option shall be issued in the name of the Optionee or, if requested by the Optionee, in the name of the Optionee and his or her spouse. Subject to the provisions of Sections 8, 9, 14, and 15, the Company shall issue (or cause to be issued) certificates evidencing the issued Shares promptly after the Option is exercised. Notwithstanding the foregoing, the Administrator in its discretion may require the Company to retain possession of any certificate evidencing Shares acquired upon the exercise of an Option, if those Shares remain subject to repurchase or redemption under the provisions of the Option Agreement, the Shareholders Agreement, or any other agreement between the Company and the Participant, or if those Shares are collateral for a loan or obligation due to the Company.

8

(iii)    Exercise of an Option in any manner shall result in a decrease in the number of Shares thereafter available, both for purposes of the Plan and for sale under the Option, by the number of Shares as to which the Option is exercised.

(iv)    Unless the Optionee exercises the Option in accordance with the provision set forth in 6(g) above, the Optionee shall not acquire or entitled to any rights of the Restricted Shares, including not but limited to income and right to distribution of remaining assets.

(h)    <u>Acquisition of Restricted Shares</u>. Pursuant to section 6(g) above, the Restricted Share Agreement has been duly executed and enters into force, a Service Provider has the right to Restricted Shares.

(i)    Termination of Service (other than by death or Disability).

(i)    If an Optionee ceases to be a Service Provider for any reason other than because of death or Disability, then the Optionee's Options shall expire on the earliest of the following occasions:

(A)    The expiration date determined by Section 6(d) hereof;

(B)    The 7th day following the termination of the Optionee's relationship as a Service Provider for any reason other than that in Section 6(g)i)(C); and

(C)    Immediately expired upon termination or demission of such Optionee's relationship as a Service Provider due to infringement of Company's interest by such Optionee at Company's judgment.

(ii)    Under Section 6(g)i), unless the Option Agreement provides otherwise, the Company may, at its sole discretion, choose to redeem the vested Optioned Shares of such Service Provider at the Company's determined price, or allow such optionee to decide whether to exercise the vested Optioned Shares within 7 days after the termination by paying the total exercise price in one lump sum, but only to the extent that the Option was vested and exercisable as of expiration date determined by Section 6(d) hereof. The balance of the Shares subject to the Option shall be forfeited on the expiration date.

(j)    <u>Leaves of Absence</u>. Unless otherwise determined by the Administrator, for purposes of Section 6 hereof, the service of an Optionee as a Service Provider shall be deemed to continue while the Optionee is on a bona fide leave of absence, if such leave was approved by the Company in writing. Unless otherwise determined by the Administrator and subject to Applicable Law, vesting of an Option shall be suspended during any unpaid leave of absence.

(k)    <u>Death or Disability of Optionee</u>.

(i)    If an Optionee ceases to be a Service Provider as a result of the Optionee's death or Disability, then the Optionee's Option shall expire on the earlier of the following dates:

9

(A)     The expiration date determined by Section 6(d) hereof; and

(B)     The last day of the six-month period following the Optionee's death or Disability, or such later date as the Administrator may determine and specify in the Option Agreement.

(ii)     The Company or the founder of the Company may redeem/purchase all or part of the Optionee's Option at the Fair Market Value of such Option, and rest of Optionee's vested Option Shares, which are not fully redeemed or repurchased, may be exercised at any time before the expiration of the Option as set forth in Section 6(g)(i) hereof by the Optionee, executors or administrators of the Optionee's estate or by any person who has acquired the Option directly from the Optionee by beneficiary designation, bequest, or inheritance, but only to the extent that the Option was vested and exercisable as of the date of the Optionee's death or Disability, or had become vested and exercisable as a result of the death, unless the Option Agreement provides otherwise. The balance of the Shares subject to the Option shall be forfeited upon the Optionee's death or Disability. Any unvested Options or Optioned Shares subject to the portion of the Option that are vested as of the Optionee's death or Disability but that are not purchased prior to the expiration of the Option pursuant to this Section 6(k)(ii) shall be forfeited immediately following the Option's expiration.

(l)     Restrictions on Transfer of Shares. Any Shares issued upon exercise of an Option shall be subject to such special forfeiture conditions, rights of repurchase or redemption, rights of first refusal, and other transfer restrictions as the Administrator may determine, and subject to any and all transfer restrictions under the Shareholders Agreement. The restrictions described in the preceding sentence shall be set forth in the applicable Option Agreement and shall apply in addition to any restrictions that may apply to holders of Shares generally.

7.     Terms and Conditions of Share Purchase Rights.

(a)     Restricted Share Purchase Agreement. Each Share Purchase Right under the Plan shall be evidenced by a Restricted Share Purchase Agreement between the Purchaser and the Company. Each Share Purchase Right shall be subject to all applicable terms and conditions of the Plan and may be subject to any other terms and conditions that are not inconsistent with the Plan and that the Administrator deems appropriate for inclusion in a Restricted Share Purchase Agreement. The provisions of the various Restricted Share Purchase Agreements entered into under the Plan need not be identical.

(b)     Duration of Offers and Nontransferability of Share Purchase Rights. Any Share Purchase Rights granted under the Plan shall automatically expire if not exercised by the Purchaser within 30 days (or such longer time as is specified in the Restricted Share Purchase Agreement) after the Date of Grant. Unless otherwise specified in the Restricted Share Purchase Agreement, Share Purchase Rights shall not be transferable and shall be exercisable only by the Purchaser to whom the Share Purchase Right was granted.

(c)     Purchase Price. The Purchase Price shall be determined by the Administrator in its sole discretion. The Purchase Price shall be payable in a form described in Section 9 hereof.

10

(d)      Restrictions on Transfer of Shares. Any Shares awarded or sold pursuant to Share Purchase Rights shall be subject to such special forfeiture conditions, rights of repurchase or redemption, rights of first refusal, and other transfer restrictions as the Administrator may determine, and subject to any and all transfer restrictions under the Shareholders Agreement. The restrictions described in the preceding sentence shall be set forth in the applicable Restricted Share Purchase Agreement and shall apply in addition to any restrictions that may apply to holders of Shares generally. Unless otherwise determined by the Administrator and subject to Applicable Law, vesting of Shares acquired pursuant to a Restricted Share Purchase Agreement shall be suspended during any unpaid leave of absence.

(e)      Forfeiture/Repurchase. Upon termination of employment or service during the applicable restriction period, Restricted Shares that are at that time subject to restrictions shall be forfeited or repurchased in accordance with the Restricted Share Purchase Agreement; provided, however, the Administrator may (a) provide in any Restricted Share Purchase Agreement that restrictions or forfeiture and repurchase conditions relating to Restricted Shares will be waived in whole or in part in the event of of terminations resulting from specified causes, and (b) in other cases waive in whole or in part restrictions or forfeiture and repurchase conditions relating to Restricted Shares. .

8.      Withholding Taxes. As a condition to the exercise of an Option or purchase of Restricted Shares, the Participant (or in the case of the Participant's death or in the event of a permissible transfer of Awards hereunder, the person exercising the Option or purchasing Restricted Shares) shall make such arrangements as the Administrator may require for the satisfaction of any applicable withholding taxes arising in connection with the exercise of an Option or purchase of Restricted Shares under the Applicable Law. The Participant (or in the case of the Participant's death or in the event of a permissible transfer of Awards hereunder, the person exercising the Option or purchasing Restricted Shares) also shall make such arrangements as the Administrator may require for the satisfaction of withholding tax obligations under Applicable Law that may arise in connection with the disposition of Shares acquired by exercising an Option or purchasing Restricted Shares. The Company shall not be required to issue any Shares under the Plan until the foregoing obligations are satisfied. Without limiting the generality of the foregoing, upon the exercise of the Option or delivery of Restricted Shares, the Company shall have the right to withhold taxes from any compensation or other amounts that the Company may owe to the Participant, or to require the Participant to pay to the Company the amount of any taxes that the Company may be required to withhold with respect to the Shares issued to the Participant. Without limiting the generality of the foregoing, the Administrator in its discretion may authorize the Participant to satisfy all or part of any withholding tax liability by (i) having the Company withhold from the Shares that would otherwise be issued upon the exercise of an Option or purchase of Restricted Shares that number of Shares having a Fair Market Value, as of the date the withholding tax liability arises, equal to the portion of the Company's withholding tax liability to be so satisfied or (ii) by delivering to the Company previously owned and unencumbered Shares having a Fair Market Value, as of the date the withholding tax liability arises, equal to the amount of the Company's withholding tax liability to be so satisfied. Subject to the preceding sentence, the exercisability provisions of any Option Agreement and rights to acquire Restricted Shares shall be determined by the Administrator in its sole discretion.

11

9.  <u>Payment for Shares</u>. The consideration to be paid for the Shares to be issued under the Plan, including the method of payment, shall be determined by the Administrator, subject to the provisions in this Section 9.

(a)  <u>General Rule</u>. The entire Purchase Price or Exercise Price (as the case may be) for Shares issued under the Plan shall be payable in cash or cash equivalents at the time when the Shares are purchased, except as otherwise provided in this Section 9.

(b)  <u>Surrender of Shares</u>. To the extent that an Option Agreement so provides, all or any part of the Exercise Price may be paid by surrendering, or attesting to the ownership of, Shares that are already owned by the Optionee. These Shares shall be surrendered to the Company in good form for transfer and shall be valued at their Fair Market Value on the date the Option is exercised. The Optionee shall not surrender, or attest to the ownership of, Shares in payment of the Exercise Price if this action would subject the Company to adverse accounting consequences, as determined by the Administrator.

(c)  <u>Services Rendered</u>. At the discretion of the Administrator and to the extent so provided in the agreements evidencing Awards of Shares under the Plan, Shares may be awarded under the Plan in consideration of services rendered to the Company or any Parent or Subsidiary prior to the Award.

(d)  <u>Promissory Note</u>. At the discretion of the Administrator and to the extent an Option Agreement or a Restricted Share Purchase Agreement so provides, all or a portion of the Exercise Price or Purchase Price (as the case may be) may be paid with a promissory note in favor of the Company. The Shares shall be pledged as security for payment of the principal amount of the promissory note and interest thereon. The interest rate payable under the terms of the promissory note shall not be less than the minimum rate (if any) required to avoid the imputation of additional interest. Subject to the foregoing, the Administrator (at its sole discretion) shall specify the term, interest rate, amortization requirements (if any), and other provisions of the promissory note.

(e)  <u>Exercise/Sale</u>. At the discretion of the Administrator and to the extent an Option Agreement so provides, and if the Shares are publicly traded, payment may be made all or in part by the delivery (on a form prescribed by the Company) or an irrevocable direction to a securities broker approved by the Company to sell Shares and to deliver all or part of the sales proceeds to the Company in payment of all or part of the Exercise Price and any withholding taxes.

(f)  <u>Exercise/Pledge</u>. At the discretion of the Administrator and to the extent an Option Agreement so provides, and if the Shares are publicly traded, payment may be made all or in part by the delivery (on a form prescribed by the Company) or an irrevocable direction to pledge Shares to a securities broker or lender approved by the Company, as security for a loan, and to deliver all or part of the loan proceeds to the Company in payment of all or part of the Exercise Price and any withholding taxes.

(g)  <u>Other Forms of Consideration</u>. At the discretion of the Administrator and to the extent an Option Agreement or a Restricted Share Purchase Agreement so provides, all or

12

a portion of the Exercise Price or Purchase Price may be paid by any other form of consideration and method of payment to the extent permitted by Applicable Law.

10.     Nontransferability of Awards. Unless otherwise determined by the Administrator and provided in the applicable Option Agreement or Restricted Share Purchase Agreement (or be amended to provide), no Award shall be sold, pledged, assigned, hypothecated, transferred, or disposed of in any manner (whether by operation of law or otherwise) other than by will or applicable laws of descent and distribution or (except in the case of an Incentive Stock Option) pursuant to a qualified domestic relations order, and shall not be subject to execution, attachment, or similar process. Upon any attempt to pledge, assign, hypothecate, transfer, or otherwise dispose of any Award or of any right or privilege conferred by this Plan contrary to the provisions hereof, or upon the sale, levy or attachment or similar process upon the rights and privileges conferred by this Plan, such Award shall thereupon terminate and become null and void. Awards may be exercised (including the purchase of Restricted Shares thereunder in the event of a Share Purchase Right) during the lifetime of the Participant only by the Participant.

11.     Rights as a Member. Until the Shares actually are issued (as evidenced by the appropriate entry on the books of the Company or of a duly authorized transfer agent of the Company), no right to vote or receive dividends or any other rights as a member shall exist with respect to the Shares, notwithstanding the exercise of the Award. No adjustment shall be made for a dividend or other right for which the record date is prior to the date the Shares are issued, except as provided in Section 12 of the Plan.

12.     Adjustment of Shares.

(a)     Changes in Capitalization. Subject to any required action by the members of the Company, the class(es) and number and type of Shares that have been authorized for issuance under the Plan but as to which no Awards have yet been granted or that have been returned to the Plan upon cancellation or expiration of an Award, and the class(es), number, and type of Shares covered by each outstanding Award, as well as the price per Share covered by each outstanding Award, shall be proportionately adjusted for any increase, decrease, or change in the number or type of outstanding Shares or other securities of the Company or exchange of outstanding Shares or other securities of the Company into or for a different number or type of shares or other securities of the Company or successor entity, or for other property (including, without limitation, cash) or other change to the Shares resulting from a share split, reverse share split, share dividend, dividend in property other than cash, combination of shares, exchange of shares, combination, consolidation, recapitalization, reincorporation, reorganization, change in corporate structure, reclassification, or other distribution of the Shares effected without receipt of consideration by the Company; provided, however, that the conversion of any convertible securities of the Company shall not be deemed to have been "effected without receipt of consideration." The adjustment contemplated in this Section 12(a) shall be made by the Board, whose determination shall be final, binding and conclusive. Except as expressly provided herein, no issuance by the Company of equity securities of the Company of any class, or securities convertible into equity securities of the Company of any class, shall affect, and no adjustment by reason thereof shall be made with respect to, the number, type, or price of Shares subject to an Award.

13

(b)    <u>Dissolution or Liquidation</u>. In the event of the proposed dissolution or liquidation of the Company, the Administrator shall notify each Participant as soon as practicable prior to the effective date of such proposed transaction. The Administrator in its discretion may provide for an Optionee to have the right to exercise his or her Option until fifteen (15) days prior to the proposed dissolution or liquidation as to all of the Optioned Shares covered thereby, including Shares as to which the Option would not otherwise be exercisable. In addition, the Administrator may provide that any Company repurchase or redemption option applicable to any Shares purchased upon exercise of an Option or Restricted Shares purchased under a Share Purchase Right shall lapse as to all such Shares, provided the proposed dissolution or liquidation takes place at the time and in the manner contemplated. To the extent it has not been previously exercised, an Award will terminate immediately prior to the consummation of such proposed action.

(c)    <u>Change in Control</u>. In the event of a Change in Control, unless the Option Agreement or Restricted Share Purchase Agreement provides otherwise, each outstanding Option shall be assumed or an equivalent option shall be substituted by, and each right of the Company to repurchase or redeem Shares upon termination of a Purchaser's relationship as a Service Provider shall be assigned to, the successor corporation or a Parent or Subsidiary of the successor corporation. If, in the event of a Change in Control, the Option is not assumed or substituted, or the repurchase or redemption right is not assigned, in the case of an outstanding Option, the Option shall fully vest immediately and the Participant shall have the right to exercise the Option as to all of the Optioned Shares, including Shares as to which it would not otherwise be vested or exercisable, and, in the case of Restricted Shares, the Company's repurchase or redemption right shall lapse immediately and all of the Restricted Shares subject to the repurchase or redemption right shall become vested. If the Option becomes fully vested and exercisable, in lieu of assumption or substitution in the event of a Change in Control, the Administrator shall notify the Optionee in writing or electronically that the Option shall be fully exercisable for a period of fifteen (15) days from the date of such notice, and the Option shall terminate upon the expiration of such period, <u>provided that</u>, in the event of the proposed merger or consolidation of the Company with any other corporation as set forth in Section 2(f)(iii) hereof, the Administrator shall notify each Optionee as soon as practicable prior to the effective date of such proposed transaction. the Company has the right to redeem/purchase all or part of the Optionee's Option at the Fair Market Value of such Option, and the Company may at its best efforts to allow such Optionee to swap the rest of the vested Optioned Shares, which are not fully redeemed or repurchased, but only to the extent that the Option was vested and exercisable as of the date fifteen (15) days prior to the proposed transaction, to the options of the successor corporation (subject to the option plan of the successor corporation and terms and conditions thereunder). The balance of the Shares subject to the Option shall be forfeited as of the date fifteen (15) days prior to the proposed transaction, unless the Option Agreement or Restricted Share Purchase Agreement provides otherwise. For purposes of this Section 12(c), an Option shall be considered assumed if, following the Change in Control, the Option confers the right to purchase or receive, for each Optioned Share immediately prior to the Change in Control, the consideration (whether shares, cash, or other securities or property) received in connection with the Change in Control by holders of Shares for each Share held on the effective date of the transaction (and if holders were offered a choice of consideration, the type of consideration chosen by the holders of a majority of the outstanding Shares); provided, however, that if the consideration received in the Change in Control is not solely common stock or

14

ordinary shares of the successor corporation or its Parent or Subsidiary, the Administrator may, with the consent of the successor corporation, provide for the consideration to be received upon the exercise of the Option, for each Optioned Share, to be solely common stock or ordinary shares of the successor corporation or its Parent or Subsidiary equal in Fair Market Value to the per Share consideration received by holders of Shares in the Change in Control.

(d)    [Reserved.]

(e)    Reservation of Rights. Except as provided in this Section 12 and in the applicable Option Agreement or Restricted Share Purchase Agreement, a Participant shall have no rights by reason of (i) any subdivision or consolidation of Shares or other securities of any class, (ii) the payment of any dividend, or (iii) any other increase or decrease in the number of Shares or other securities of any class. Any issuance by the Company of equity securities of any class, or securities convertible into equity securities of any class, shall not affect, and no adjustment by reason thereof shall be made with respect to, the number or Exercise Price of Optioned Shares. The grant of an Option or Share Purchase Right shall not affect in any way the right or power of the Company to make adjustments, reclassifications, reorganizations, or changes of its capital or business structure, to merge or consolidate or to dissolve, liquidate, sell, or transfer all or any part of its business or assets.

13.    Date of Grant. The Date of Grant of an Award shall, for all purposes, be the date on which the Administrator makes the determination to grant the Award, or such other later date as is determined by the Administrator.

14.    Securities Law Requirements.

(a)    Legal Compliance. Notwithstanding any other provision of the Plan or any agreement entered into by the Company pursuant to the Plan, the Company shall not be obligated, and shall have no liability for failure to deliver any Shares under the Plan unless the issuance and delivery of Shares comply with (or are exempt from) all Applicable Law, including, without limitation, the Securities Act, U.S. state securities laws and regulations, and the regulations of any stock exchange or other securities market on which the Company's securities may then be traded, and shall be further subject to the approval of counsel for the Company with respect to such compliance.

(b)    Investment Representations. Shares delivered under the Plan shall be subject to transfer restrictions, and the person acquiring the Shares shall, as a condition to the exercise of an Option or the purchase of Restricted Shares if requested by the Company, provide such assurances and representations to the Company as the Company may deem necessary or desirable to assure compliance with Applicable Law, including, without limitation, the representation and warranty at the time of acquisition of the Shares that the Shares are being acquired only for investment purposes and without any present intention to sell, transfer, or distribute the Shares.

15.    Inability to Obtain Authority. The inability of the Company to obtain authority from any regulatory body having jurisdiction, which authority is deemed by the Company's counsel to be necessary to the lawful issuance and sale of any Shares hereunder,

15

shall relieve the Company of any liability in respect of the failure to issue or sell such Shares as to which such requisite authority shall not have been obtained.

16.     [Reserved.]

17.     Duration and Amendment.

(a)     Term of Plan. Subject to approval by members of the Company in accordance with Section 16 hereof, the Plan shall become effective upon the earlier to occur of its adoption by the Board or its approval by the members of the Company as described in Section 16 hereof. Unless sooner terminated under Section 17(b) hereof, the Plan shall continue in effect for a term of ten (10) years from the later of (i) the effective date of the Plan, or (ii) the date of the most recent Board approval of an increase in the number of Shares reserved for issuance under the Plan.

(b)     Amendment and Termination. The Board may at any time amend, alter, suspend, or terminate the Plan.

(c)     Approval by Members. The Board shall obtain approval of the members of any Plan amendment to the extent necessary and desirable to comply with Applicable Law.

(d)     Effect of Amendment or Termination. No amendment, alteration, suspension, or termination of the Plan shall materially and adversely impair the rights of any Participant with respect to an outstanding Award, unless mutually agreed otherwise between the Participant and the Administrator, which agreement must be in writing and signed by the Participant and the Company. Termination of the Plan shall not affect the Administrator's ability to exercise the powers granted to it hereunder with respect to Awards granted under the Plan prior to the date of such termination. No Shares shall be issued or sold under the Plan after the termination thereof, except upon exercise of an Award granted prior to the termination of the Plan.

18.     Legending Share Certificates. In order to enforce any restrictions imposed upon Shares issued upon the exercise of Options or the acquisition of Restricted Shares, including, without limitations, the restrictions described in Sections 6(i) and 7(c) hereof, the Administrator may cause a legend or legends to be placed on any share certificates representing the Shares, which legend or legends shall make appropriate reference to the restrictions, including, without limitation, a restriction against sale of the Shares for any period as may be required by Applicable Law.

19.     No Retention Rights. Neither the Plan nor any Award shall confer upon any Participant any right to continue his or her relationship as a Service Provider with the Company for any period of specific duration or interfere in any way with his or her right or the right of the Company (or any Parent or Subsidiary employing or retaining the Participant), which rights are hereby expressly reserved by each, to terminate this relationship at any time, with or without cause, and with or without notice.

20.     No Trust or Fund Created. Neither the Plan nor any Award shall create or be construed to create a trust or separate fund of any kind or a fiduciary relationship between the

16

Company or any Parent or Subsidiary and a Participant or any other person. To the extent that any Participant acquires a right to receive payments from the Company or any Parent or Subsidiary pursuant to an Award, such right shall be no greater than the right of any unsecured general creditor of the Company, a Parent, or any Subsidiary.

21.    No Rights to Awards. No Participant, eligible Service Provider, or other person shall have any claim to be granted any Award under the Plan, and there is no obligation for uniformity of treatment of a Service Provider, Participant, or holders or beneficiaries of Awards under the Plan. The terms and conditions of Awards need not be the same with respect to any Participant or with respect to different Participants.

[*REMAINDER OF PAGE INTENTIONALLY LEFT BLANK*]

17

Exhibit 4.2

**PDD HOLDINGS INC.**
**AMENDED AND RESTATED 2018 SHARE INCENTIVE PLAN**

(amended by the Company's Board of Directors on November 28, 2022)

## ARTICLE 1
### PURPOSE

The purpose of this 2018 Share Incentive Plan, as amended and restated from time to time (the "Plan") is to promote the success and enhance the value of PDD Holdings Inc., an exempted company formed under the laws of the Cayman Islands (the "Company"), by linking the personal interests of the Directors, Employees, and Consultants to those of the Company's shareholders and by providing such individuals with an incentive for outstanding performance to generate superior returns to the Company's shareholders. The Plan is further intended to provide flexibility to the Company in its ability to motivate, attract, and retain the services of the Directors, Employees, and Consultants upon whose judgment, interest, and special effort the successful conduct of the Company's operation is largely dependent.

## ARTICLE 2
### DEFINITIONS AND CONSTRUCTION

Wherever the following terms are used in the Plan they shall have the meanings specified below, unless the context clearly indicates otherwise. The singular pronoun shall include the plural where the context so indicates.

2.1    "Administration Committee" means a committee consisting of the Executive Directors of the Board.

2.2    "Applicable Laws" means the legal requirements relating to the Plan and the Awards under applicable provisions of the corporate, securities, tax and other laws, rules, regulations and government orders, and the rules of any applicable stock exchange or national market system, of any jurisdiction applicable to Awards granted to residents therein.

2.3    "Award" means an Option, Restricted Share, Restricted Share Unit or other types of awards, in the form of cash or otherwise, as approved by the Administration Committee granted to a Participant pursuant to the Plan.

2.4    "Award Agreement" means any written agreement, contract, or other instrument or document evidencing an Award, including through electronic medium.

2.5    "Board" means the Board of Directors of the Company.

2.6    "Cause" with respect to a Participant means (unless otherwise expressly provided in the applicable Award Agreement, or another applicable contract with the Participant that defines such term for purposes of determining the effect that a "for cause" termination has on the

Participant's Awards) a termination of employment or service based upon a finding by the Service Recipient, acting in good faith and based on its reasonable belief at the time, that the Participant:

   (a) has been negligent in the discharge of his or her duties to the Service Recipient, has refused to perform stated or assigned duties or is incompetent in or (other than by reason of a disability or analogous condition) incapable of performing those duties;

   (b) has been dishonest or committed or engaged in an act of theft, embezzlement or fraud, a breach of confidentiality, an unauthorized disclosure or use of inside information, customer lists, trade secrets or other confidential information;

   (c) has breached a fiduciary duty, or willfully and materially violated any other duty, law, rule, regulation or policy of the Service Recipient; or has been convicted of, or plead guilty or nolo contendere to, a felony or misdemeanor (other than minor traffic violations or similar offenses);

   (d) has materially breached any of the provisions of any agreement with the Service Recipient;

   (e) has engaged in unfair competition with, or otherwise acted intentionally in a manner injurious to the reputation, business or assets of, the Service Recipient; or

   (f) has improperly induced a vendor or customer to break or terminate any contract with the Service Recipient or induced a principal for whom the Service Recipient acts as agent to terminate such agency relationship.

 A termination for Cause shall be deemed to occur (subject to reinstatement upon a contrary final determination by the Administration Committee) on the date on which the Service Recipient first delivers written notice to the Participant of a finding of termination for Cause.

 2.7 "Code" means the Internal Revenue Code of 1986 of the United States, as amended.

 2.8 "Consultant" means any consultant or adviser if: (a) the consultant or adviser renders bona fide services to a Service Recipient; (b) the services rendered by the consultant or adviser are not in connection with the offer or sale of securities in a capital-raising transaction and do not directly or indirectly promote or maintain a market for the Company's securities; and (c) the consultant or adviser is a natural person who has contracted directly with the Service Recipient to render such services.

 2.9 "Corporate Transaction", unless otherwise defined in an Award Agreement, means any of the following transactions, *provided*, *however*, that the Administration Committee shall determine under (d) and (e) whether multiple transactions are related, and its determination shall be final, binding and conclusive:

   (a) an amalgamation, arrangement or consolidation or scheme of arrangement (i) in which the Company is not the surviving entity, except for a transaction the principal

2

purpose of which is to change the jurisdiction in which the Company is incorporated or (ii) following which the holders of the voting securities of the Company do not continue to hold more than 50% of the combined voting power of the voting securities of the surviving entity;

(b)        the sale, transfer or other disposition of all or substantially all of the assets of the Company;

(c)        the complete liquidation or dissolution of the Company;

(d)        any reverse takeover or series of related transactions culminating in a reverse takeover (including, but not limited to, a tender offer followed by a reverse takeover) in which the Company is the surviving entity but (A) the Company's equity securities outstanding immediately prior to such takeover are converted or exchanged by virtue of the takeover into other property, whether in the form of securities, cash or otherwise, or (B) in which securities possessing more than fifty percent (50%) of the total combined voting power of the Company's outstanding securities are transferred to a person or persons different from those who held such securities immediately prior to such takeover or the initial transaction culminating in such takeover, but excluding any such transaction or series of related transactions that the Administration Committee determines shall not be a Corporate Transaction; or

(e)        acquisition in a single or series of related transactions by any person or related group of persons (other than the Company or by a Company-sponsored employee benefit plan) of beneficial ownership (within the meaning of Rule 13d-3 of the Exchange Act) of securities possessing more than fifty percent (50%) of the total combined voting power of the Company's outstanding securities but excluding any such transaction or series of related transactions that the Administration Committee determines shall not be a Corporate Transaction.

2.10      "Director" means a member of the Board or a member of the board of directors of any Subsidiary of the Company.

2.11      "Disability" unless otherwise defined in an Award Agreement, means that the Participant qualifies to receive long-term disability payments under the Service Recipient's long-term disability insurance program, as it may be amended from time to time, to which the Participant provides services regardless of whether the Participant is covered by such policy. If the Service Recipient to which the Participant provides service does not have a long-term disability plan in place, "Disability" means that a Participant is unable to carry out the responsibilities and functions of the position held by the Participant by reason of any medically determinable physical or mental impairment for a period of not less than ninety (90) consecutive days. A Participant will not be considered to have incurred a Disability unless he or she furnishes proof of such impairment sufficient to satisfy the Administration Committee in its discretion.

2.12      "Effective Date" shall have the meaning set forth in Section 11.1.

2.13      "Employee" means any person, including an officer or a Director, who is in the employment of a Service Recipient, subject to the control and direction of the Service Recipient as to both the work to be performed and the manner and method of performance. The payment of a director's fee by a Service Recipient shall not be sufficient to constitute "employment" by the Service Recipient.

2.14    "Exchange Act" means the Securities Exchange Act of 1934 of the United States, as amended.

2.15    "Executive Director" means an executive director nominated by Qubit Partners L.P. and appointed by the Board in accordance with the Company's Memorandum of Association and Articles of Association and the amended and restated exempted limited partnership agreement of Qubit Partners L.P., as amended from time to time.

2.16    "Fair Market Value" means, as of any date, the value of Shares determined as follows:

(a)    If the Shares are listed on one or more established stock exchanges or national market systems, including without limitation, the New York Stock Exchange or the Nasdaq Stock Market, its Fair Market Value shall be the closing sales price for such Shares (or the closing bid, if no sales were reported) as quoted on the principal exchange or system on which the Shares are listed (as determined by the Administration Committee) on the date of determination (or, if no closing sales price or closing bid was reported on that date, as applicable, on the last trading date such closing sales price or closing bid was reported), as reported on the website maintained by such exchange or market system or such other source as the Administration Committee deems reliable;

(b)    If the Shares are regularly quoted on an automated quotation system (including the OTC Bulletin Board) or by a recognized securities dealer, its Fair Market Value shall be the closing sales price for such Shares as quoted on such system or by such securities dealer on the date of determination, but if selling prices are not reported, the Fair Market Value of a Share shall be the mean between the high bid and low asked prices for the Shares on the date of determination (or, if no such prices were reported on that date, on the last date such prices were reported), as reported in The Wall Street Journal or such other source as the Administration Committee deems reliable; or

(c)    In the absence of an established market for the Shares of the type described in (a) and (b) above, the Fair Market Value thereof shall be determined by the Administration Committee in good faith and in its discretion by reference to (i) the placing price of the latest private placement of the Shares and the development of the Company's business operations and the general economic and market conditions since such latest private placement, (ii) other third party transactions involving the Shares and the development of the Company's business operation and the general economic and market conditions since such transaction, (iii) an independent valuation of the Shares, or (iv) such other methodologies or information as the Administration Committee determines to be indicative of Fair Market Value.

2.17    "Group Entity" means any of the Company and Subsidiaries of the Company.

2.18    "Incentive Share Option" means an Option that is intended to meet the requirements of Section 422 of the Code or any successor provision thereto.

2.19    "Independent Director" means (i) if the Shares or other securities representing the Shares are not listed on a stock exchange, a Director of the Company who is a Non-Employee Director; and (ii) if the Shares or other securities representing the Shares are listed on one or

4

more stock exchange, a Director of the Company who meets the independence standards under the applicable corporate governance rules of the stock exchange(s).

2.20     "Non-Employee Director" means a member of the Board who qualifies as a "Non-Employee Director" as defined in Rule 16b-3(b)(3) of the Exchange Act, or any successor definition adopted by the Board.

2.21     "Non-Qualified Share Option" means an Option that is not intended to be an Incentive Share Option.

2.22     "Option" means a right granted to a Participant pursuant to Article 5 of the Plan to purchase a specified number of Shares at a specified price during specified time periods. An Option may be either an Incentive Share Option or a Non-Qualified Share Option.

2.23     "Participant" means a person who, as a Director, Consultant or Employee, has been granted an Award pursuant to the Plan.

2.24     "Parent" means a parent corporation under Section 424(e) of the Code.

2.25     "Plan" means this 2018 Share Incentive Plan of PDD Holdings Inc., as amended and/or restated from time to time.

2.26     "Related Entity" means any business, corporation, partnership, limited liability company or other entity in which the Company, a Parent or Subsidiary of the Company holds a substantial ownership interest, directly or indirectly, or controls through contractual arrangements and consolidates the financial results according to applicable accounting standards, but which is not a Subsidiary and which the Board designates as a Related Entity for purposes of the Plan.

2.27     "Restricted Share" means a Share awarded to a Participant pursuant to Article 6 that is subject to certain restrictions and may be subject to risk of forfeiture.

2.28     "Restricted Share Unit" means an Award granted pursuant to Article 7.

2.29     "Securities Act" means the Securities Act of 1933 of the United States, as amended.

2.30     "Service Recipient" means the Company or Subsidiary of the Company to which a Participant provides services as an Employee, a Consultant or a Director.

2.31     "Share" means the ordinary shares of the Company, par value US$0.000005 per share, and such other securities of the Company that may be substituted for Shares pursuant to Article 9.

2.32     "Subsidiary" means any corporation or other entity of which a majority of the outstanding voting shares or voting power is beneficially owned directly or indirectly by the Company.

5

2.33    "Trading Date" means the closing of the first sale to the general public of the Shares pursuant to a registration statement filed with and declared effective by the U.S. Securities and Exchange Commission under the Securities Act.

## ARTICLE 3
## SHARES SUBJECT TO THE PLAN

3.1    Number of Shares.

(a)    Subject to the provisions of Article 9 and Section 3.1(b), the maximum aggregate number of Shares which may be issued pursuant to all Awards (including Incentive Share Options) is 363,130,400, plus an annual increase on the first day of each fiscal year of the Company during the ten-year term of this Plan commencing with the fiscal year beginning January 1, 2019, by an amount equal to the lesser of (i) 3.0% of the total number of Shares issued and outstanding on the last day of the immediately preceding fiscal year, and (ii) such number of Shares as may be determined by the Board. For the avoidance of doubt, the annual increase shall cease to occur upon expiry of the ten-year term of the Plan.

(b)    To the extent that an Award terminates, expires, or lapses for any reason, any Shares subject to the Award shall again be available for the grant of an Award pursuant to the Plan. To the extent permitted by Applicable Laws, Shares issued in assumption of, or in substitution for, any outstanding awards of any entity acquired in any form or combination by a Group Entity shall not be counted against Shares available for grant pursuant to the Plan. Shares delivered by the Participant or withheld by the Company upon the exercise of any Award under the Plan, in payment of the exercise price thereof or tax withholding thereon, may again be optioned, granted or awarded hereunder, subject to the limitations of Section 3.1(a). If any Restricted Shares are forfeited by the Participant or repurchased by the Company, such Shares may again be optioned, granted or awarded hereunder, subject to the limitations of Section 3.1(a). Notwithstanding the provisions of this Section 3.1(b), no Shares may again be optioned, granted or awarded if such action would cause an Incentive Share Option to fail to qualify as an incentive share option under Section 422 of the Code.

3.2    Shares Distributed. Any Shares distributed pursuant to an Award may consist, in whole or in part, of authorized and unissued Shares, treasury Shares (subject to Applicable Laws) or Shares purchased on the open market. Additionally, at the discretion of the Administration Committee, any Shares distributed pursuant to an Award may be represented by American Depository Shares. If the number of Shares represented by an American Depository Share is other than on a one-to-one basis, the limitations of Section 3.1 shall be adjusted to reflect the distribution of American Depository Shares in lieu of Shares.

## ARTICLE 4
## ELIGIBILITY AND PARTICIPATION

4.1    Eligibility. Persons eligible to participate in this Plan include Employees, Consultants, and Directors, as determined by the Administration Committee.

4.2    Participation. Subject to the provisions of the Plan, the Administration Committee may, from time to time, select from among all eligible individuals, those to whom Awards shall

6

be granted and shall determine the nature and amount of each Award. No individual shall have any right to be granted an Award pursuant to this Plan.

4.3     Jurisdictions. In order to assure the viability of Awards granted to Participants employed in various jurisdictions, the Administration Committee may provide for such special terms as it may consider necessary or appropriate to accommodate differences in local law, tax policy, or custom applicable in the jurisdiction in which the Participant resides, is employed, operates or is incorporated. Moreover, the Administration Committee may approve such supplements to, or amendments, restatements, or alternative versions of, the Plan as it may consider necessary or appropriate for such purposes without thereby affecting the terms of the Plan as in effect for any other purpose; *provided, however*, that no such supplements, amendments, restatements, or alternative versions shall increase the share limitations contained in Section 3.1 of the Plan. Notwithstanding the foregoing, the Administration Committee may not take any actions hereunder, and no Awards shall be granted, that would violate any Applicable Laws.

**ARTICLE 5**
**OPTIONS**

5.1     General. The Administration Committee is authorized to grant Options to Participants on the following terms and conditions:

(a)     Exercise Price. The exercise price per Share subject to an Option shall be determined by the Administration Committee and set forth in the Award Agreement which may be a fixed price or a variable price related to the Fair Market Value of the Shares. The exercise price per Share subject to an Option may be amended or adjusted in the absolute discretion of the Administration Committee, the determination of which shall be final, binding and conclusive. For the avoidance of doubt, to the extent not prohibited by Applicable Laws or any exchange rule, a downward adjustment of the exercise prices of Options mentioned in the preceding sentence shall be effective without the approval of the Company's shareholders or the approval of the affected Participants.

(b)     Time and Conditions of Exercise. The Administration Committee shall determine the time or times at which an Option may be exercised in whole or in part, including exercise prior to vesting; *provided* that the term of any Option granted under the Plan shall not exceed twenty years, except as provided in Section 12.1. The Administration Committee shall also determine any conditions, if any, that must be satisfied before all or part of an Option may be exercised.

(c)     Payment. The Administration Committee shall determine the methods by which the exercise price of an Option may be paid, the form of payment, including, without limitation (i) cash or check denominated in U.S. Dollars, (ii) to the extent permissible under the Applicable Laws, cash or check in Chinese Renminbi, (iii) cash or check denominated in any other local currency as approved by the Administration Committee, (iv) Shares held for such period of time as may be required by the Administration Committee in order to avoid adverse financial accounting consequences and having a Fair Market Value on the date of delivery equal to the aggregate exercise price of the Option or exercised portion thereof, (v) after the Trading

7

Date the delivery of a notice that the Participant has placed a market sell order with a broker with respect to Shares then issuable upon exercise of the Option, and that the broker has been directed to pay a sufficient portion of the net proceeds of the sale to the Company in satisfaction of the Option exercise price; *provided* that payment of such proceeds is then made to the Company upon settlement of such sale, (vi) other property acceptable to the Administration Committee with a Fair Market Value equal to the exercise price, or (vii) any combination of the foregoing. Notwithstanding any other provision of the Plan to the contrary, no Participant who is a member of the Board or an   executive officer" of the Company within the meaning of Section 13(k) of the Exchange Act shall be permitted to pay the exercise price of an Option in any method which would violate Section 13(k) of the Exchange Act.

(d)        Evidence of Grant. All Options shall be evidenced by an Award Agreement between the Company and the Participant. The Award Agreement shall include such additional provisions as may be specified by the Administration Committee.

(e)        Effects of Termination of Employment or Service on Options. Termination of employment or service shall have the following effects on Options granted to the Participants:

(i)        Dismissal for Cause. Unless otherwise provided in the Award Agreement, if a Participant's employment by or service to the Service Recipient is terminated by the Service Recipient for Cause, the Participant's Options will terminate upon such termination, whether or not the Option is then vested and/or exercisable;

(ii)        Death or Disability. Unless otherwise provided in the Award Agreement, if a Participant's employment by or service to the Service Recipient terminates as a result of the Participant's death or Disability:

(a)        the Participant (or his or her legal representative or beneficiary, in the case of the Participant's Disability or death, respectively), will have until the date that is 12 months after the Participant's termination of Employment to exercise the Participant's Options (or portion thereof) to the extent that such Options were vested and exercisable on the date of the Participant's termination of Employment on account of death or Disability;

(b)        the Options, to the extent not vested and exercisable on the date of the Participant's termination of Employment or service, shall terminate upon the Participant's termination of Employment or service on account of death or Disability; and

(c)        the Options, to the extent exercisable for the 12-month period following the Participant's termination of Employment or service and not exercised during such period, shall terminate at the close of business on the last day of the 12-month period.

(iii)        Other Terminations of Employment or Service. Unless otherwise provided in the Award Agreement, if a Participant's employment by or service to the

8

Service Recipient terminates for any reason other than a termination by the Service Recipient for Cause or because of the Participant's death or Disability:

    (a)    the Participant will have until the date that is 90 days after the Participant's termination of Employment or service to exercise his or her Options (or portion thereof) to the extent that such Options were vested and exercisable on the date of the Participant's termination of Employment or service;

    (b)    the Options, to the extent not vested and exercisable on the date of the Participant's termination of Employment or service, shall terminate upon the Participant's termination of Employment or service; and

    (c)    the Options, to the extent exercisable for the 90-day period following the Participant's termination of Employment or service and not exercised during such period, shall terminate at the close of business on the last day of the 90-day period.

5.2    <u>Incentive Share Options</u>. Incentive Share Options may be granted to Employees of the Company or a Subsidiary of the Company. Incentive Share Options may not be granted to employees of a Related Entity or to Independent Directors or Consultants. The terms of any Incentive Share Options granted pursuant to the Plan, in addition to the requirements of Section 5.1, must comply with the following additional provisions of this Section 5.2:

    (a)    <u>Individual Dollar Limitation</u>. The aggregate Fair Market Value (determined as of the time the Option is granted) of all Shares with respect to which Incentive Share Options are first exercisable by a Participant in any calendar year may not exceed $100,000 or such other limitation as imposed by Section 422(d) of the Code, or any successor provision. To the extent that Incentive Share Options are first exercisable by a Participant in excess of such limitation, the excess shall be considered Non-Qualified Share Options.

    (b)    <u>Exercise Price</u>. The exercise price of an Incentive Share Option shall be equal to the Fair Market Value on the date of grant. However, the exercise price of any Incentive Share Option granted to any individual who, at the date of grant, owns Shares possessing more than ten percent of the total combined voting power of all classes of shares of the Company or any Parent or Subsidiary of the Company may not be less than 110% of Fair Market Value on the date of grant and such Option may not be exercisable for more than five years from the date of grant.

    (c)    <u>Transfer Restriction</u>. The Participant shall give the Company prompt notice of any disposition of Shares acquired by exercise of an Incentive Share Option within (i) two years from the date of grant of such Incentive Share Option or (ii) one year after the transfer of such Shares to the Participant.

    (d)    <u>Expiration of Incentive Share Options</u>. No Award of an Incentive Share Option may be made pursuant to this Plan after the tenth anniversary of the Effective Date.

9

(e)     <u>Right to Exercise</u>. During a Participant's lifetime, an Incentive Share Option may be exercised only by the Participant.

**ARTICLE 6**
**<u>RESTRICTED SHARES</u>**

6.1     <u>Grant of Restricted Shares</u>. The Administration Committee, at any time and from time to time, may grant Restricted Shares to Participants as the Administration Committee, in its sole discretion, shall determine. The Administration Committee, in its sole discretion, shall determine the number of Restricted Shares to be granted to each Participant.

6.2     <u>Restricted Shares Award Agreement</u>. Each Award of Restricted Shares shall be evidenced by an Award Agreement that shall specify the period of restriction, the number of Restricted Shares granted, and such other terms and conditions as the Administration Committee, in its sole discretion, shall determine. Unless the Administration Committee determines otherwise, Restricted Shares shall be held by the Company as escrow agent until the restrictions on such Restricted Shares have lapsed.

6.3     <u>Issuance and Restrictions</u>. Restricted Shares shall be subject to such restrictions on transferability and other restrictions as the Administration Committee may impose (including, without limitation, limitations on the right to vote Restricted Shares or the right to receive dividends on the Restricted Shares). These restrictions may lapse separately or in combination at such times, pursuant to such circumstances, in such installments, or otherwise, as the Administration Committee determines at the time of the grant of the Award or thereafter.

6.4     <u>Forfeiture/Repurchase</u>. Except as otherwise determined by the Administration Committee at the time of the grant of the Award or thereafter, upon termination of employment or service during the applicable restriction period, Restricted Shares that are at that time subject to restrictions shall be forfeited or repurchased in accordance with the Award Agreement; *provided, however*, that the Administration Committee may (a) provide in any Restricted Share Award Agreement that restrictions or forfeiture and repurchase conditions relating to Restricted Shares will be waived in whole or in part in the event of terminations resulting from specified causes, and (b) in other cases waive in whole or in part restrictions or forfeiture and repurchase conditions relating to Restricted Shares.

6.5     <u>Certificates for Restricted Shares</u>. Restricted Shares granted pursuant to the Plan may be evidenced in such manner as the Administration Committee shall determine. If certificates representing Restricted Shares are registered in the name of the Participant, certificates must bear an appropriate legend referring to the terms, conditions, and restrictions applicable to such Restricted Shares, and the Company may, at its discretion, retain physical possession of the certificate until such time as all applicable restrictions lapse.

6.6     <u>Removal of Restrictions</u>. Except as otherwise provided in this Article 6, Restricted Shares granted under the Plan shall be released from escrow as soon as practicable after the last day of the period of restriction. The Administration Committee, in its discretion, may accelerate the time at which any restrictions shall lapse or be removed. After the restrictions have lapsed, the Participant shall be entitled to have any legend or legends under Section 6.5

10

removed from his or her Share certificate, and the Shares shall be freely transferable by the Participant, subject to applicable legal restrictions. The Administration Committee (in its discretion) may establish procedures regarding the release of Shares from escrow and the removal of legends, as necessary or appropriate to minimize administrative burdens on the Company.

## ARTICLE 7
## RESTRICTED SHARE UNITS

7.1     Grant of Restricted Share Units. The Administration Committee, at any time and from time to time, may grant Restricted Share Units to Participants as the Administration Committee, in its sole discretion, shall determine. The Administration Committee, in its sole discretion, shall determine the number of Restricted Share Units to be granted to each Participant.

7.2     Restricted Share Units Award Agreement. Each Award of Restricted Share Units shall be evidenced by an Award Agreement that shall specify any vesting conditions, the number of Restricted Share Units granted, and such other terms and conditions as the Administration Committee, in its sole discretion, shall determine.

7.3     Form and Timing of Payment of Restricted Share Units. At the time of grant, the Administration Committee shall specify the date or dates on which the Restricted Share Units shall become fully vested and nonforfeitable. Upon vesting, the Administration Committee, in its sole discretion, may pay Restricted Share Units in the form of cash, Shares or a combination thereof.

7.4     Forfeiture/Repurchase. Except as otherwise determined by the Administration Committee at the time of the grant of the Award or thereafter, upon termination of employment or service during the applicable restriction period, Restricted Share Units that are at that time unvested shall be forfeited or repurchased in accordance with the Award Agreement; *provided, however*, the Administration Committee may (a) provide in any Restricted Share Unit Award Agreement that restrictions or forfeiture and repurchase conditions relating to Restricted Share Units will be waived in whole or in part in the event of terminations resulting from specified causes, and (b) in other cases waive in whole or in part restrictions or forfeiture and repurchase conditions relating to Restricted Share Units.

## ARTICLE 8
## PROVISIONS APPLICABLE TO AWARDS

8.1     Award Agreement. Awards under the Plan shall be evidenced by Award Agreements that set forth the terms, conditions and limitations for each Award which may include the term of an Award, the provisions applicable in the event the Participant's employment or service terminates, and the Company's authority to unilaterally or bilaterally amend, modify, suspend, cancel or rescind an Award.

11

8.2    No Transferability; Limited Exception to Transfer Restrictions.

8.2.1    Limits on Transfer. Unless otherwise expressly provided in (or pursuant to) this Section 8.2, by applicable law and by the Award Agreement, as the same may be amended:

(a)    all Awards are non-transferable and will not be subject in any manner to sale, transfer, anticipation, alienation, assignment, pledge, encumbrance or charge;

(b)    Awards will be exercised only by the Participant; and

(c)    amounts payable or shares issuable pursuant to an Award will be delivered only to (or for the account of), and, in the case of Shares, registered in the name of, the Participant.

In addition, the shares shall be subject to the restrictions set forth in the applicable Award Agreement.

8.2.2    Further Exceptions to Limits on Transfer. The exercise and transfer restrictions in Section 8.2.1 will not apply to:

(a)    transfers to the Company or a Subsidiary;

(b)    transfers by gift to immediate family" as that term is defined in SEC Rule 16a-1(e) promulgated under the Exchange Act;

(c)    the designation of a beneficiary to receive benefits if the Participant dies or, if the Participant has died, transfers to or exercises by the Participant's beneficiary, or, in the absence of a validly designated beneficiary, transfers by will or the laws of descent and distribution; or

(d)    if the Participant has suffered a disability, permitted transfers or exercises on behalf of the Participant by the Participant's duly authorized legal representative; or

(e)    subject to the prior approval of the Administration Committee or an executive officer or director of the Company authorized by the Administration Committee, transfer to one or more natural persons who are the Participant's family members or entities owned and controlled by the Participant and/or the Participant's family members, including but not limited to trusts or other entities whose beneficiaries or beneficial owners are the Participant and/or the Participant's family members, or to such other persons or entities as may be expressly approved by the Administration Committee, pursuant to such conditions and procedures as the Administration Committee or may establish. Any permitted transfer shall be

12

subject to the condition that the Administration Committee receives evidence satisfactory to it that the transfer is being made for estate and/or tax planning purposes and on a basis consistent with the Company's lawful issue of securities.

Notwithstanding anything else in this Section 8.2.2 to the contrary, but subject to compliance with all Applicable Laws, Incentive Share Options, Restricted Shares and Restricted Share Units will be subject to any and all transfer restrictions under the Code applicable to such Awards or necessary to maintain the intended tax consequences of such Awards. Notwithstanding clause (b) above but subject to compliance with all Applicable Laws, any contemplated transfer by gift to "immediate family" as referenced in clause (b) above is subject to the condition precedent that the transfer be approved by the Administration Committee in order for it to be effective.

8.3    Beneficiaries. Notwithstanding Section 8.2, a Participant may, in the manner determined by the Administration Committee, designate a beneficiary to exercise the rights of the Participant and to receive any distribution with respect to any Award upon the Participant's death. A beneficiary, legal guardian, legal representative, or other person claiming any rights pursuant to the Plan is subject to all terms and conditions of the Plan and any Award Agreement applicable to the Participant, except to the extent the Plan and Award Agreement otherwise provide, and to any additional restrictions deemed necessary or appropriate by the Administration Committee. If the Participant is married and resides in a community property state, a designation of a person other than the Participant's spouse as his or her beneficiary with respect to more than 50% of the Participant's interest in the Award shall not be effective without the prior written consent of the Participant's spouse. If no beneficiary has been designated or survives the Participant, payment shall be made to the person entitled thereto pursuant to the Participant's will or the laws of descent and distribution. Subject to the foregoing, a beneficiary designation may be changed or revoked by a Participant at any time provided the change or revocation is filed with the Administration Committee.

8.4    Performance Objectives and Other Terms. The Administration Committee, in its discretion, shall set performance objectives or other vesting criteria which, depending on the extent to which they are met, will determine the number or value of the Awards that will be granted or paid out to the Participants.

8.5    Share Certificates.

(a)    Notwithstanding anything herein to the contrary, the Company shall not be required to issue or deliver any certificates evidencing the Shares pursuant to the exercise of any Award, unless and until the Administration Committee has determined, with advice of counsel, that the issuance and delivery of such certificates is in compliance with all Applicable Laws, regulations of governmental authorities and, if applicable, the requirements of any exchange on which the Shares are listed or traded. All Share certificates delivered pursuant to the Plan are subject to any stop-transfer orders and other restrictions as the Administration Committee deems necessary or advisable to comply with all Applicable Laws, and the rules of any national securities exchange or automated quotation system on which the Shares are listed, quoted, or traded. The Administration Committee may place legends on any Share certificate to reference

13

restrictions applicable to the Shares. In addition to the terms and conditions provided herein, the Administration Committee may require that a Participant make such reasonable covenants, agreements, and representations as the Administration Committee, in its discretion, deems advisable in order to comply with any such laws, regulations, or requirements. The Administration Committee shall have the right to require any Participant to comply with any timing or other restrictions with respect to the settlement or exercise of any Award, including a window-period limitation, as may be imposed in the discretion of the Administration Committee.

(b)    Notwithstanding anything herein to the contrary, unless otherwise determined by the Administration Committee or required by Applicable Laws, the Company shall not deliver to any Participant certificates evidencing Shares issued in connection with any Award and instead such Shares shall be recorded on the books of the Company or, as applicable, its transfer agent or the Administration Committee.

8.6    Paperless Administration. Subject to Applicable Laws, the Administration Committee may make Awards and provide applicable disclosure and procedures for exercise of Awards by an internet website or interactive voice response system for the paperless administration of Awards.

8.7    Foreign Currency. A Participant may be required to provide evidence that any currency used to pay the exercise price of any Award was acquired and taken out of the jurisdiction in which the Participant resides in accordance with Applicable Laws, including foreign exchange control laws and regulations. In the event the exercise price for an Award is paid in Chinese Renminbi or other foreign currency, as permitted by the Administration Committee, the amount payable will be determined by conversion from U.S. dollars at the official rate promulgated by the People's Bank of China for Chinese Renminbi, or for jurisdictions other than the People's Republic of China, the exchange rate as selected by the Administration Committee on the date of exercise.

## ARTICLE 9
## CHANGES IN CAPITAL STRUCTURE

9.1    Adjustments. In the event of any dividend, share split, combination or exchange of Shares, amalgamation, arrangement or consolidation, spin-off, recapitalization or other distribution (other than normal cash dividends) of Company assets to its shareholders, or any other change affecting the shares of Shares or the share price of a Share, the Administration Committee shall make such proportionate adjustments, if any, as the Administration Committee in its discretion may deem appropriate to reflect such change with respect to (a) the aggregate number and type of shares that may be issued under the Plan (including, but not limited to, adjustments of the limitations in Section 3.1); (b) the terms and conditions of any outstanding Awards (including, without limitation, any applicable performance targets or criteria with respect thereto); and (c) the grant or exercise price per share for any outstanding Awards under the Plan.

9.2    Corporate Transactions. Except as may otherwise be provided in any Award Agreement or any other written agreement entered into by and between the Company and a Participant, if the Administration Committee anticipates the occurrence, or upon the occurrence, of a Corporate Transaction, the Administration Committee may, in its sole discretion, provide for

14

(i) any and all Awards outstanding hereunder to terminate at a specific time in the future and shall give each Participant the right to exercise the vested portion of such Awards during a period of time as the Administration Committee shall determine, or (ii) either the purchase of any Award for an amount of cash equal to the amount that could have been attained upon the exercise of such Award or realization of the Participant's rights had such Award been currently exercisable or payable or fully vested (and, for the avoidance of doubt, if as of such date the Administration Committee determines in good faith that no amount would have been attained upon the exercise of such Award, then such Award may be terminated by the Company without payment), or (iii) the replacement of such Award with other rights or property selected by the Administration Committee in its sole discretion or the assumption of or substitution of such Award by the successor or surviving corporation, or a Parent or Subsidiary thereof, with appropriate adjustments as to the number and kind of Shares and prices, or (iv) payment of such Award in cash based on the value of Shares on the date of the Corporate Transaction plus reasonable interest on the Award through the date as determined by the Administration Committee when such Award would otherwise be vested or have been paid in accordance with its original terms, if necessary to comply with Section 409A of the Code.

9.3     Outstanding Awards — Other Changes. In the event of any other change in the capitalization of the Company or corporate change other than those specifically referred to in this Article 9, the Administration Committee may, in its absolute discretion, make such adjustments in the number and class of shares subject to Awards outstanding on the date on which such change occurs and in the per share grant or exercise price of each Award as the Administration Committee may consider appropriate to prevent dilution or enlargement of rights.

9.4     No Other Rights. Except as expressly provided in the Plan, no Participant shall have any rights by reason of any subdivision or consolidation of Shares of any class, the payment of any dividend, any increase or decrease in the number of shares of any class or any dissolution, liquidation, merger, or consolidation of the Company or any other corporation. Except as expressly provided in the Plan or pursuant to action of the Administration Committee under the Plan, and no issuance by the Company of shares of any class, or securities convertible into shares of any class, shall affect, and no adjustment by reason thereof shall be made with respect to, the number of Shares subject to an Award or the grant or exercise price of any Award.

## ARTICLE 10
## ADMINISTRATION

10.1     Administration of the Plan. The Plan shall be administered by the Administration Committee to whom the Board shall delegate the authority to grant or amend Awards to Participants other than members of the Administration Committee, Independent Directors and executive officers of the Company. Reference to the Administration Committee shall refer to the Board in absence of the Administration Committee. Notwithstanding the foregoing, the full Board, acting by majority of its members in office, shall conduct the general administration of the Plan if required by Applicable Laws, and with respect to Awards granted to members of the Administration Committee, Independent Directors and executive officers of the Company and for purposes of such Awards, the term "Administration Committee" as used in the Plan shall be deemed to refer to the Board. The Administration Committee may further delegate, to the extent permitted by applicable law, to one or more officers of the Company, its powers under this Plan

15

(a) to designate officers, employees and consultants of the Company and its Subsidiaries who will receive grants of Awards under this Plan, and (b) to determine the number of shares subject to, and the other terms and conditions of, such Awards, in each case within the limits established by the Board or the Committee.

10.2    Action by the Administration Committee. A majority of the Administration Committee shall constitute a quorum. The acts of a majority of the members present at any meeting at which a quorum is present, and acts approved unanimously in writing by all members of the Administration Committee in lieu of a meeting, shall be deemed the acts of the Administration Committee. Each member of the Administration Committee is entitled to, in good faith, rely or act upon any report or other information furnished to that member by any officer or other employee of a Group Entity, the Company's independent certified public accountants, or any executive compensation consultant or other professional retained by the Company to assist in the administration of the Plan.

10.3    Authority of the Administration Committee. Subject to any specific designation in the Plan, the Administration Committee has the exclusive power, authority and discretion to:

(a)    designate Participants to receive Awards;

(b)    determine the type or types of Awards to be granted to each Participant;

(c)    determine the number of Awards to be granted and the number of Shares to which an Award will relate;

(d)    determine the terms and conditions of any Award granted pursuant to the Plan, including, but not limited to, the exercise price, grant price, or purchase price, any restrictions or limitations on the Award, any schedule for lapse of forfeiture restrictions or restrictions on the exercisability of an Award, and accelerations or waivers thereof, and any provisions related to non-competition and recapture of gain on an Award, based in each case on such considerations as the Administration Committee in its sole discretion determines;

(e)    determine whether, to what extent, and pursuant to what circumstances an Award may be settled in, or the exercise price of an Award may be paid in, cash, Shares, other Awards, or other property, or an Award may be canceled, forfeited, or surrendered;

(f)    prescribe the form of each Award Agreement, which need not be identical for each Participant;

(g)    decide all other matters that must be determined in connection with an Award;

(h)    establish, adopt, or revise any rules and regulations as it may deem necessary or advisable to administer the Plan;

(i)    interpret the terms of, and any matter arising pursuant to, the Plan or any Award Agreement;

16

(j)        amend terms and conditions of Award Agreements; and

(k)        make all other decisions and determinations that may be required pursuant to the Plan or as the Administration Committee deems necessary or advisable to administer the Plan, including design and adopt from time to time new types of Awards that are in compliance with Applicable Laws.

10.4    Decisions Binding. The Administration Committee's interpretation of the Plan, any Awards granted pursuant to the Plan, any Award Agreement and all decisions and determinations by the Administration Committee with respect to the Plan are final, binding, and conclusive on all parties.

## ARTICLE 11
## EFFECTIVE AND EXPIRATION DATE

11.1    Effective Date. This Plan shall become effective as of the date on which the Board adopts the Plan, if the Company seeks a home country practice exemption from shareholder approval pursuant to the relevant U.S. stock exchange rules applicable to foreign private issuers (the "Effective Date"). If the Board decides to submit the Plan or any amendment to the Plan to shareholder approval, the Plan or the amendment, as applicable, shall be approved by the shareholders at a meeting duly held in accordance with the applicable provisions of the Company's Memorandum of Association and Articles of Association or unanimous written approval by all the shareholders of the Company.

11.2    Expiration Date. The Plan will expire on, and no Award may be granted pursuant to the Plan after, the tenth anniversary of the Effective Date. Any Awards that are outstanding on the tenth anniversary of the Effective Date shall remain in force according to the terms of the Plan and the applicable Award Agreement.

## ARTICLE 12
## AMENDMENT, MODIFICATION, AND TERMINATION

12.1    Amendment, Modification, and Termination. At any time and from time to time, the Board may terminate, amend or modify the Plan; *provided, however*, that (a) to the extent necessary and desirable to comply with Applicable Laws or stock exchange rules, the Company shall obtain shareholder approval of any Plan amendment in such a manner and to such a degree as required, unless the Company decides to follow home country practice, and (b) unless the Company decides to follow home country practice, shareholder approval is required for any amendment to the Plan that (i) increases the number of Shares available under the Plan (other than any adjustment as provided by Article 9), or (ii) permits the Administration Committee to extend the term of the Plan or the exercise period for an Option beyond ten years from the date of grant.

12.2    Awards Previously Granted. Except with respect to amendments made pursuant to Section 12.1, no termination, amendment, or modification of the Plan shall adversely affect in any material way any Award previously granted pursuant to the Plan without the prior written consent of the Participant.

17

**ARTICLE 13**
**GENERAL PROVISIONS**

13.1     No Rights to Awards. No Participant, employee, or other person shall have any claim to be granted any Award pursuant to the Plan, and neither the Company nor the Administration Committee is obligated to treat Participants, employees, and other persons uniformly.

13.2     No Shareholders Rights. No Award gives the Participant any of the rights of a shareholder of the Company unless and until Shares are in fact issued to such person in connection with such Award.

13.3     Taxes. No Shares shall be delivered under the Plan to any Participant until such Participant has made arrangements acceptable to the Administration Committee for the satisfaction of any income and employment tax withholding obligations under Applicable Laws. The Company or any Subsidiary shall have the authority and the right to deduct or withhold, or require a Participant to remit to the Company, an amount sufficient to satisfy all applicable taxes (including the Participant's payroll tax obligations) required or permitted by Applicable Laws to be withheld with respect to any taxable event concerning a Participant arising as a result of this Plan. The Administration Committee may in its discretion and in satisfaction of the foregoing requirement allow a Participant to elect to have the Company withhold Shares otherwise issuable under an Award (or allow the return of Shares) having a Fair Market Value equal to the sums required to be withheld. Notwithstanding any other provision of the Plan, the number of Shares which may be withheld with respect to the issuance, vesting, exercise or payment of any Award (or which may be repurchased from the Participant of such Award after such Shares were acquired by the Participant from the Company) in order to satisfy any income and payroll tax liabilities applicable to the Participant with respect to the issuance, vesting, exercise or payment of the Award shall, unless specifically approved by the Administration Committee, be limited to the number of Shares which have a Fair Market Value on the date of withholding or repurchase equal to the aggregate amount of such liabilities based on the minimum statutory withholding rates for the applicable income and payroll tax purposes that are applicable to such supplemental taxable income.

13.4     No Right to Employment or Services. Nothing in the Plan or any Award Agreement shall interfere with or limit in any way the right of the Service Recipient to terminate any Participant's employment or services at any time, nor confer upon any Participant any right to continue in the employment or services of any Service Recipient.

13.5     Unfunded Status of Awards. The Plan is intended to be an  unfunded" plan for incentive compensation. With respect to any payments not yet made to a Participant pursuant to an Award, nothing contained in the Plan or any Award Agreement shall give the Participant any rights that are greater than those of a general creditor of the relevant Group Entity.

13.6     Indemnification. To the extent allowable pursuant to Applicable Laws, each member of the Administration Committee or of the Board shall be indemnified and held harmless by the Company from any loss, cost, liability, or expense that may be imposed upon or reasonably incurred by such member in connection with or resulting from any claim, action, suit,

18

or proceeding to which he or she may be a party or in which he or she may be involved by reason of any action or failure to act pursuant to the Plan and against and from any and all amounts paid by him or her in satisfaction of judgment in such action, suit, or proceeding against him or her; *provided* he or she gives the Company an opportunity, at its own expense, to handle and defend the same before he or she undertakes to handle and defend it on his or her own behalf. The foregoing right of indemnification shall not be exclusive of any other rights of indemnification to which such persons may be entitled pursuant to the Company's Memorandum of Association and Articles of Association, as a matter of law, or otherwise, or any power that the Company may have to indemnify them or hold them harmless.

13.7    Relationship to Other Benefits. No payment pursuant to the Plan shall be taken into account in determining any benefits pursuant to any pension, retirement, savings, profit sharing, group insurance, welfare or other benefit plan of any Group Entity except to the extent otherwise expressly provided in writing in such other plan or an agreement thereunder.

13.8    Expenses. The expenses of administering the Plan shall be borne by the Group Entities.

13.9    Titles and Headings. The titles and headings of the Sections in the Plan are for convenience of reference only and, in the event of any conflict, the text of the Plan, rather than such titles or headings, shall control.

13.10    Fractional Shares. No fractional Shares shall be issued and the Administration Committee shall determine, in its discretion, whether cash shall be given in lieu of fractional Shares or whether such fractional Shares shall be eliminated by rounding up or down as appropriate.

13.11    Limitations Applicable to Section 16 Persons. Notwithstanding anything herein to the contrary, the Plan, and any Award granted or awarded to any Participant who is then subject to Section 16 of the Exchange Act, shall be subject to any additional limitations set forth in any applicable exemptive rule under Section 16 of the Exchange Act (including any amendment to Rule 16b-3 of the Exchange Act) that are requirements for the application of such exemptive rule. To the extent permitted by the Applicable Laws, the Plan and Awards granted or awarded hereunder shall be deemed amended to the extent necessary to conform to such applicable exemptive rule.

13.12    Government and Other Regulations. The obligation of the Company to make payment of awards in Shares or otherwise shall be subject to all Applicable Laws, and to such approvals by government agencies as may be required. The Company shall be under no obligation to register any of the Shares paid pursuant to the Plan under the Securities Act or any other similar law in any applicable jurisdiction. If the Shares paid pursuant to the Plan may in certain circumstances be exempt from registration pursuant to the Securities Act or other Applicable Laws, the Company may restrict the transfer of such Shares in such manner as it deems advisable to ensure the availability of any such exemption.

13.13    Governing Law. The Plan and all Award Agreements shall be construed in accordance with and governed by the laws of the Cayman Islands.

19

13.14    <u>Section 409A</u>. To the extent that the Administration Committee determines that any Award granted under the Plan is or may become subject to Section 409A of the Code, the Award Agreement evidencing such Award shall incorporate the terms and conditions required by Section 409A of the Code. To the extent applicable, the Plan and the Award Agreements shall be interpreted in accordance with Section 409A of the Code and the U.S. Department of Treasury regulations and other interpretative guidance issued thereunder, including without limitation any such regulation or other guidance that may be issued after the Effective Date. Notwithstanding any provision of the Plan to the contrary, in the event that following the Effective Date the Administration Committee determines that any Award may be subject to Section 409A of the Code and related Department of Treasury guidance (including such Department of Treasury guidance as may be issued after the Effective Date), the Administration Committee may adopt such amendments to the Plan and the applicable Award agreement or adopt other policies and procedures (including amendments, policies and procedures with retroactive effect), or take any other actions, that the Administration Committee determines are necessary or appropriate to (a) exempt the Award from Section 409A of the Code and/or preserve the intended tax treatment of the benefits provided with respect to the Award, or (b) comply with the requirements of Section 409A of the Code and related U.S. Department of Treasury guidance.

13.15    <u>Appendices</u>. Subject to Section 12.1, the Administration Committee may approve such supplements, amendments or appendices to the Plan as it may consider necessary or appropriate for purposes of compliance with Applicable Laws or otherwise and such supplements, amendments or appendices shall be considered a part of the Plan; provided, however, that no such supplements shall increase the share limitation contained in Section 3.1 of the Plan without the approval of the Board.

20

**Exhibit 8.1**

**List of Principal Subsidiaries and Consolidated Variable Interest Entity**

| Subsidiary | Place of Incorporation |
|---|---|
| HongKong Walnut Street Limited | Hong Kong |
| Shenzhen Qianhai Xinzhijiang Information Technology Co., Ltd. | PRC |
| Radiance Sea Investment Limited | British Virgin Islands |
| Radiance Sea Group Limited | Cayman Islands |
| Radiance Sea Hong Kong Limited | Hong Kong |
| Pinduoduo Investment Limited* | British Virgin Islands |
| Shanghai Yucan Information Technology Co., Ltd. | PRC |

| Consolidated Variable Interest Entity | Place of Incorporation |
|---|---|
| Hangzhou Aimi Network Technology Co., Ltd. | PRC |

| Subsidiary of Consolidated Variable Interest Entity | Place of Incorporation |
|---|---|
| Shanghai Xunmeng Information Technology Co., Ltd. | PRC |

* Pinduoduo Investment Limited is the immediate parent company of 9 wholly-owned subsidiaries, whose names have been omitted in reliance on Instruction 8 of the exhibit requirements set forth in Form 20-F. Pinduoduo Investment Limited and its subsidiaries engaged in investment activities outside the United States.

Exhibit 12.1

**Certification by the Principal Executive Officer**
**Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002**

I, Lei Chen, certify that:

1.  I have reviewed this annual report on Form 20-F of PDD Holdings Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report;

4.  The company's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the company and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  Evaluated the effectiveness of the company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting; and

5.  The company's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the company's auditors and the audit committee of the company's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting.

Date: April 26, 2023

By:     /s/ Lei Chen
Name:   Lei Chen
Title:  Chairman of the Board of Directors and Co-Chief Executive
        Officer

Exhibit 12.2

**Certification by the Principal Financial Officer**
**Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002**

I, Jun Liu, certify that:

1.   I have reviewed this annual report on Form 20-F of PDD Holdings Inc.;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report;

4.   The company's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the company and have:

(a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)   Evaluated the effectiveness of the company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)   Disclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting; and

5.   The company's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the company's auditors and the audit committee of the company's board of directors (or persons performing the equivalent functions):

(a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information; and

(b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting.

Date: April 26, 2023

By:      /s/ Jun Liu
Name:   Jun Liu
Title:    Vice President of Finance

Exhibit 13.1

**Certification by the Principal Executive Officer**
**Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002**

In connection with the Annual Report of PDD Holdings Inc. (the "Company") on Form 20-F for the fiscal year ended December 31, 2022 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Lei Chen, Co-Chief Executive Officer of the Company, hereby certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

(1)     The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)     The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: April 26, 2023

By:     /s/ Lei Chen
Name:  Lei Chen
Title:   Chairman of the Board of Directors and Co-Chief Executive
         Officer

Exhibit 13.2

**Certification by the Principal Financial Officer**
**Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002**

In connection with the Annual Report of PDD Holdings Inc. (the "Company") on Form 20-F for the fiscal year ended December 31, 2022 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Jun Liu, Vice President of Finance of the Company, hereby certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

(1)    The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)    The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: April 26, 2023

By:    /s/ Jun Liu
Name:    Jun Liu
Title:    Vice President of Finance

**Exhibit 15.1**

April 26, 2023

PDD Holdings Inc.
First Floor, 25 St Stephen's Green
Dublin 2, D02 XF99
Ireland

Dear Sirs,

Re: Consent of People's Republic of China Counsel

We consent to the reference to our firm under the headings "Item 3. KEY INFORMATION" and "Item 4. INFORMATION ON THE COMPANY" in the annual report of PDD Holdings Inc. on Form 20-F for the year ended December 31, 2022 (the "**Annual Report**"), which is filed with the U.S. Securities and Exchange Commission on the date hereof.

In giving such consent, we do not thereby admit that we come within the category of persons whose consent is required under Section 7 of the Securities Act of 1933, or under the Securities Exchange Act of 1934, in each case, as amended, or the regulations promulgated thereunder.

Very truly yours,

/s/ King & Wood Mallesons
King & Wood Mallesons

**Consent of Independent Registered Public Accounting Firm**

We consent to the incorporation by reference in the following Registration Statements:

    (1)      Registration Statement (Form S-8 No. 333-233897) pertaining to the 2015 Global Share Plan and the 2018 Share Incentive Plan; and

    (2)      Registration Statement (Form F-3 No. 333-250117) of PDD Holdings Inc.

of our reports dated April 26, 2023, with respect to the consolidated financial statements of PDD Holdings Inc. and the effectiveness of internal control over financial reporting of PDD Holdings Inc. included in this Annual Report (Form 20-F) of PDD Holdings Inc. for the year ended December 31, 2022.

/s/ Ernst & Young Hua Ming LLP

Ernst & Young Hua Ming LLP

Shanghai, The People's Republic of China
April 26, 2023

April 26, 2023

**VIA EDGAR**

Division of Corporate Finance
Office of Trade & Services
U.S. Securities & Exchange Commission
100 F Street, NE
Washington, D.C. 20549

Re:    **PDD Holdings Inc.**
       **Supplemental Submission Pursuant to Item 16I(a) of Form 20-F**

PDD Holdings Inc. (the "Company") is submitting via EDGAR the following information as required under Item 16I(a) of Form 20-F.

On May 26, 2022, the Company was conclusively identified by the U.S. Securities and Exchange Commission (the "SEC") as a Commission-Identified Issuer pursuant to the Holding Foreign Companies Accountable Act. The Company filed an annual report on Form 20-F for the year ended December 31, 2021 with the SEC on April 25, 2022, containing an audit report issued by Ernst & Young Hua Ming LLP, a registered public accounting firm retained by the Company, for the preparation of the audit report on the Company's financial statements included therein. Ernst & Young Hua Ming LLP is a registered public accounting firm headquartered in mainland China. In December 2021, the Public Company Accounting Oversight Board (the "PCAOB") determined that it was unable to inspect or investigate completely registered public accounting firms that were headquartered in mainland China. The PCAOB subsequently vacated this determination in December 2022.

In response to Item 16I(a) of Form 20-F, based on the following information, the Company believes it is not owned or controlled by a governmental entity in China.

Based on the public EDGAR filings made by the Company's shareholders and the Company's register of members, the entities affiliated with Mr. Zheng Huang, the entities affiliated with Tencent Holdings Limited, and the entities affiliated with the PDD Partnership owned 26.5%, 14.7% and 7.0% of the Company's total issued and outstanding shares as of February 28, 2023, respectively. To the Company's knowledge, based on an examination of the Company's register of members and public EDGAR filings made by its shareholders, no other shareholder owned more than 5% of the Company's outstanding shares as of February 28, 2023. Tencent Holdings Limited is a company incorporated in the Cayman Islands whose shares are listed and publicly traded on The Stock Exchange of Hong Kong Limited. Please refer to "Item 6. Directors, Senior Management and Employees—E. Share Ownership" of the Company's annual report on Form 20-F for the year ended December 31, 2022 for more details.

In addition, the Company is not aware of any governmental entity in China that is in possession of the power, direct or indirect, to direct or cause the direction of the management and policies of the Company, whether through the ownership of voting securities, by contract, or otherwise.

Very truly yours,

**PDD HOLDINGS INC.**

By:   /s/ Lei Chen

Name: Lei Chen

Title:  Chairman of the Board of Directors and Co-Chief Executive Officer

CC:     Jianchong Zhu, General Counsel, PDD Holdings Inc.

Yuting Wu, Esq., Partner, Skadden, Arps, Slate, Meagher & Flom LLP