UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

BLAKE BAXTER, Individually and on behalf  :
of all others similarly situated,                           :
                                                                        :
      Plaintiff,                                             :
                                                                        :
v.                                                                    :  24-cv-5653 (PKC) (CLP)
                                                                        :
PDD HOLDINGS INC. F/K/A PINDUODUO        :
INC., LEI CHEN, JING MA, JUN LIU, and        :
JIAZHEN ZHAO,                                              :
                                                                        :
      Defendants.                                          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DEFENDANT PDD HOLDINGS INC.'S
## MEMORANDUM OF LAW IN SUPPORT OF ITS
## <u>MOTION TO DISMISS THE AMENDED COMPLAINT</u>

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP

Scott D. Musoff
Robert A. Fumerton
Michael C. Griffin
Judith A. Flumenbaum
One Manhattan West
New York, New York 10001
Phone: (212) 735-3000

*Counsel for Defendant PDD Holdings Inc.*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................................ ii

PRELIMINARY STATEMENT ......................................................................................................... 1

STATEMENT OF FACTS ................................................................................................................ 3

      A.      THE COMPANY ............................................................................................ 3

      B.      PDDH'S RISK DISCLOSURES .................................................................... 4

      C.      UFLPA COMPLIANCE ................................................................................. 6

      D.      DATA SECURITY ALLEGATIONS ............................................................ 8

      E.      MONTHS BEFORE THE END OF THE CLASS PERIOD,  PDDH DISCLOSES UPDATES ON COMPLIANCE EFFORTS ................................... 9

ARGUMENT ................................................................................................................................. 10

I. PLAINTIFF FAILS TO PLEAD ANY MISSTATEMENT OR OMISSION ........................... 10

      A.      Plaintiff Fails to Plead a Misstatement or Omission Regarding the UFLPA ........ 10

      B.      Plaintiff Fails to Plead a Misstatement or Omission Regarding Data Privacy ...... 15

      C.      Many of the Challenged Statements Are Inactionable Puffery ............................ 19

II. PLAINTIFF FAILS TO ALLEGE A STRONG INFERENCE OF SCIENTER ...................... 19

      A.      Plaintiff's Impermissible Group Pleading Warrants Dismissal ............................ 20

      B.      Plaintiff's Scienter Allegations Are Insufficient .................................................... 20

      C.      Nonculpable Inferences Are More Compelling ..................................................... 23

III. PLAINTIFF FAILS TO PLEAD LOSS CAUSATION .......................................................... 24

CONCLUSION ............................................................................................................................... 25

# TABLE OF AUTHORITIES

## CASES

*In re Aceto Corp. Securities Litigation*,
No. 2:18-cv-2425-ERK-AYS, 2019 WL 3606745 (E.D.N.Y. Aug. 6, 2019) ...................23

*Altayyar v. Etsy, Inc.*,
242 F. Supp. 3d 161 (E.D.N.Y. 2017), *aff'd*, 731 F. App'x 35 (2d Cir. 2018)..................11

*In re Arcimoto Inc. Securities Litigation*,
No. 21-CV-2143 (PKC), 2022 WL 17851834 (E.D.N.Y. Dec. 22, 2022).............22, 24, 25

*Asay v. Pinduoduo Inc.*,
No. 20-1423, 2021 WL 3871269 (2d Cir. Aug. 31, 2021) .........................................11, 12

*ATSI Communications, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007)...............................................................................3, 10, 20, 24

*Board of Trustees of Ft. Lauderdale General Employees' Retirement System v.
Mechel OAO*,
811 F. Supp. 2d 853 (S.D.N.Y. 2011), *aff'd sub nom. Frederick v.
Mechel OAO*, 475 F. App'x 353 (2d Cir. 2012) ................................................................20

*City of Monroe Employees' Retirement System v. Hartford Financial Services
Group, Inc.*,
No. 10 Civ. 2835(NRB), 2011 WL 4357368 (S.D.N.Y. Sept. 19, 2011) ....................20, 21

*City of Pontiac Policemen's & Firemen's Retirement System v. UBS AG*,
752 F.3d 173 (2d Cir. 2014)....................................................................................................13

*City of Warren Police & Fire Retirement System v. Foot Locker, Inc.*,
412 F. Supp. 3d 206 (E.D.N.Y. 2019) ...............................................................................23

*In re DraftKings Inc. Securities Litigation*,
650 F. Supp. 3d 120 (S.D.N.Y. 2023)...............................................................................18

*In re DRDGOLD Ltd. Securities Litigation*,
472 F. Supp. 2d 562 (S.D.N.Y. 2007)..........................................................................16, 22

*Dura Pharmaceuticals, Inc. v. Broudo*,
544 U.S. 336 (2005)......................................................................................................24, 25

*ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009).............................................................................................19

*Eden Alpha CI LLP v. Polished.com Inc.*,
763 F. Supp. 3d 270 (E.D.N.Y. 2025) .............................................................................19

*Francisco v. Abengoa, S.A.*,
    624 F. Supp. 3d 365 (S.D.N.Y. 2022)............................................................................20, 22

*Fries v. Northern Oil & Gas, Inc.*,
    285 F. Supp. 3d 706 (S.D.N.Y. 2018)..................................................................................21

*Garber v. Legg Mason, Inc.*,
    537 F. Supp. 2d 597 (S.D.N.Y. 2008), *aff'd*, 347 F. App'x 665 (2d Cir. 2009)................14

*Garnett v. RLX Technology Inc.*,
    632 F. Supp. 3d 574 (S.D.N.Y. 2022), *aff'd sub nom. Tseng v. De Vries*,
    No. 22-2787-cv, 2023 WL 8073087 (2d Cir. Nov. 21, 2023) ...........................................13

*In re Garrett Motion Inc. Securities Litigation*,
    No. 20 Civ. 7992 (JPC), 2022 WL 976269 (S.D.N.Y. Mar. 31, 2022) .............................24

*Gillis v. QRX Pharma Ltd.*,
    197 F. Supp. 3d 557 (S.D.N.Y. 2016)..................................................................................24

*Greco v. Qudian Inc.*,
    No. 1:20-cv-577-GHW, 2022 WL 4226022 (S.D.N.Y. Sept. 13, 2022) ...........................20

*In re iQIYI, Inc. Securities Litigation*,
    No. 20-CV-01830 (DG) (TAM), 2024 WL 4362509 (E.D.N.Y. Sept. 30, 2024) .............20

*Jiajia Luo v. Sogou, Inc.*,
    465 F. Supp. 3d 393 (S.D.N.Y. 2020)..................................................................................16

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001)..................................................................................................20

*Key v. Horizon Bancorp. Inc.*,
    No. 23-cv-2961 (BMC), 2025 WL 1017552 (E.D.N.Y. Apr. 4, 2025) ..............................14

*In re Keyspan Corp. Securities Litigation*,
    383 F. Supp. 2d 358 (E.D.N.Y. 2003) ..........................................................................10, 14

*Kusnier v. Virgin Galactic Holdings, Inc.*,
    639 F. Supp. 3d 350 (E.D.N.Y. 2022) ..................................................................................19

*In re Lehman Bros. Securities & ERISA Litigation*,
    No. 10 Civ. 6637(LAK), 2013 WL 3989066 (S.D.N.Y. July 31, 2013)............................17

*Long Miao v. Fanhua, Inc.*,
    442 F. Supp. 3d 774 (S.D.N.Y. 2020)..................................................................................17

*In re Merrill Lynch & Co. Research Reports Securities Litigation*,
    273 F. Supp. 2d 351 (S.D.N.Y. 2003), *aff'd*, 396 F.3d 161 (2d Cir. 2005)..........................3

iii

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000)....................................................................................18

*Plumber & Steamfitters Local 773 Pension Fund v. Danske Bank A/S*,
11 F.4th 90 (2d Cir. 2021) .....................................................................................19

*Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of
Commerce*,
694 F. Supp. 2d 287 (S.D.N.Y. 2010)......................................................................22

*In re Qudian Inc. Securities Litigation*,
No. 17-CV-9741 (JMF), 2019 WL 4735376 (S.D.N.Y. Sept. 27, 2019) .........................12

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004).....................................................................................20

*RSM Production Corp. v. Fridman*,
643 F. Supp. 2d 382 (S.D.N.Y. 2009), *aff'd*, 387 F. App'x 72 (2d Cir. 2010)...................17

*Schiro v. Cemex, S.A.B. de C.V.*,
396 F. Supp. 3d 283 (S.D.N.Y. 2019).......................................................................22

*In re Sibanye Gold Ltd. Securities Litigation*,
No. 18-CV-3721(KAM)(PK), 2020 WL 6582326 (E.D.N.Y. Nov. 10, 2020)...................18

*Singh v. Cigna Corp.*,
918 F.3d 57 (2d Cir. 2019).............................................................................10, 11, 12

*Smith v. PureCycle Technologies, Inc.*,
No. 23-cv-8605 (JGK), 2024 WL 5186586 (S.D.N.Y. Dec. 20, 2024) ...........................23

*In re Telefonaktiebolaget LM Ericsson Securities Litigation*,
675 F. Supp. 3d 273 (E.D.N.Y. 2023), *aff'd sub nom. Boston Retirement
System v. Telefonaktiebolaget LM Ericsson*, No. 23-940-cv, 2024 WL 4023842
(2d Cir. Sept. 3, 2024)............................................................................................22

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007).................................................................................................23

*Tian v. Peloton Interactive, Inc.*,
No. 23-CV-4279 (MKB), 2025 WL 510043 (E.D.N.Y. Feb. 14, 2025)...........................21

*Ulbricht v. Ternium S.A.*,
No. 18-CV-6801 (PKC) (RLM), 2020 WL 5517313 (E.D.N.Y. Sept. 14, 2020)........13, 16

*In re Vale S.A. Securities Litigation*,
No. 19 CV 526 (RJD) (SJB), 2020 WL 2610979 (E.D.N.Y. May 20, 2020)...................19

**STATUTES**

17 C.F.R. § 229.303(b)(2)(ii) ...............................................................................................13

People's Republic of China, Pub. L. No. 117-78, 135 Stat. 1525 (2021) ....................................... 6

Defendant PDD Holdings Inc. ("PDDH" or the "Company") respectfully submits this memorandum of law in support of its motion to dismiss the Amended Complaint (the "Complaint" or "AC") (ECF No. 31).[1]

## **PRELIMINARY STATEMENT**

Plaintiff brings meritless claims for securities fraud against PDDH for allegedly failing to disclose (i) purported noncompliance with a law that does not even apply to PDDH, and (ii) vague accusations of malware issues made long before the stock price drop that caused Plaintiff's alleged losses. PDDH, a holding company, is the parent company of corporate entities that own and operate e-commerce platforms, including Pinduoduo and Temu. In August 2024, after years of explosive growth, PDDH announced that it expected revenue growth and profitability to slow due to increasing competition and other external factors. It also warned that it did not anticipate any dividends or stock buybacks for years to come. Predictably, the Company's stock price fell 29 percent. Plaintiff now seeks to use the federal securities laws to recoup its purported losses by parroting unrelated and unsubstantiated third-party allegations made more than a year earlier, and months before Plaintiff even purchased PDDH stock. In doing so, Plaintiff alleges a sprawling and unsupported theory of fraud based on statements regarding PDDH's (i) efforts to comply with the Uyghur Forced Labor Prevention Act ("UFLPA"); and (ii) commitment to data security. But Plaintiff fails to establish a single actionable false or misleading statement, raise a strong inference of scienter, or plead loss causation for any of its alleged misstatements.

First, Plaintiff fails to plead a material misrepresentation or omission. With respect to both the UFLPA and data security claims, PDDH repeatedly disclosed the precise risks Plaintiff claims

---

[1] Exhibits attached to the Declaration of Michael C. Griffin are cited herein as "Ex. __." Pincites for all exhibits reference the original pagination at the bottom of the page. All internal quotation marks and citations are omitted, and all emphases in quotations are added, unless otherwise indicated.

were omitted, and candidly warned of shortcomings in its compliance procedures and controls. Indeed, many of PDDH's disclosures are ***nearly identical*** to disclosures that the Second Circuit has held are sufficient to warn investors of the types of risks at issue here. To the extent Plaintiff argues that PDDH should have disclosed more, those claims fail for several reasons. For starters, it is black-letter law that the securities laws do not require public companies to disclose uncharged, unadjudicated wrongdoing, which is all Plaintiff has alleged here. Nor do companies have any duty to disclose information that is publicly known. Here, there is no dispute that the UFLPA allegations and speculative claims of malware on the apps were known to the public prior to the alleged "corrective" disclosures. Moreover, Plaintiff fails to plead particularized facts establishing the underlying conduct regarding its UFLPA or data privacy claims at the heart of the Complaint. Worse, its UFLPA claims are not just unparticularized, but flatly contradicted by the Complaint and the sources on which it relies. Finally, many of the challenged statements are inactionable puffery, and cannot serve as a basis for Plaintiff's claim of falsity.

Second, Plaintiff fails to plead the requisite "strong inference" of scienter. Plaintiff's impermissible reliance on group pleading alone warrants dismissal. Plaintiff also makes no attempt to plead motive, and its other allegations—based not on any confidential witness accounts or improper stock sales but solely on the Individual Defendants' positions, conclusory claims of what they "must have known," and vague speculation from anonymous, unparticularized sources—are plainly insufficient to plead recklessness. Indeed, far from presenting a "cogent" and "compelling" inference of scienter, the Complaint demonstrates that Defendants' behavior throughout the Class Period is simply inconsistent with fraud, as Defendants proactively warned investors of relevant risks and updated investors in the wake of rapidly evolving regulations.

2

Finally, Plaintiff fails to plead loss causation.  It is well-established that the securities laws protect investors only against economic losses that misrepresentations actually cause.  Not only has Plaintiff failed to plead a misrepresentation; it bases its theory of loss on alleged corrective disclosures that post-date the supposed "revelation" of the alleged conduct, or worse, do not even mention that conduct at all.  The Court should reject Plaintiff's blatant attempt to use the securities laws as insurance against losses that have nothing to do with any alleged misrepresentation.

For these reasons, the Complaint should be dismissed in its entirety with prejudice.

## STATEMENT OF FACTS[2]

### A.    THE COMPANY

PDDH is a multinational commerce group that owns a portfolio of businesses.  (Ex. A at 3.)  PDDH aims to expand the digital economy so that communities and businesses can benefit from new opportunities.  (*Id.*)  PDDH is the parent company of corporate entities that own and operate e-commerce platforms, including Pinduoduo and Temu.  (AC ¶ 24.)  The Pinduoduo platform provides buyers with a selection of value-for-money merchandise, shopping experiences, and agricultural products.  (Ex. B at 3.)  Temu was launched in 2022 and presents "a global online platform dedicated to providing quality products to consumers at attractive prices."  (*Id.*)

In 2023, there were 14.2 million active third-party merchants across both platforms.  (Ex. A at 92.)  The platforms operate under a marketplace model whereby "substantially all products offered on [the] platforms are supplied by merchants, who are separately responsible for sourcing and coordinating delivery of the products."  (Ex. B at 22; *see* AC ¶ 24.)  PDDH's American

---

[2]    The facts set forth herein are drawn from the allegations in the Complaint, documents incorporated by reference, matters of which judicial notice may be taken, and documents integral to the Complaint. *See In re Merrill Lynch & Co. Rsch. Reps. Sec. Litig.*, 273 F. Supp. 2d 351, 356-57 (S.D.N.Y. 2003), *aff'd*, 396 F.3d 161 (2d Cir. 2005). The Court may also consider "legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

Depository Shares ("ADSs") began trading on the NASDAQ via an initial public offering on July 26, 2018. (Ex. C at 52.)

## B. PDDH'S RISK DISCLOSURES

PDDH is committed to compliance with all local and foreign laws and regulations and to ensuring its users' data security and privacy. (*See* Ex. A at 23, 27-28; Ex. B at 27.) PDDH's risk disclosures reflect these commitments while also warning investors of the numerous risks relating to its business.

### 1. PDDH Disclosed the Relevant Compliance Risks

First, PDDH warned of risks relating to its third-party merchants, including that:

- *"We may incur liability for counterfeit, unauthorized, illegal, or infringing products sold . . . on our platforms"*;

- *"We have been and may continue to be subject to allegations and lawsuits claiming that products listed or sold through our platforms by us or third-party merchants are . . . unauthorized, [or] illegal"*;

- *"We have in the past received claims alleging the sales of . . . unauthorized items on our platforms"* and

- "[C]ertain merchants may post and sell on our platforms products that may not be sold via e-commerce platform under the applicable regulations. *Failure to identify and remove such products and content from our platforms may subject us to liability and administrative penalties*." (Ex. B at 22-23.)

Second, PDDH candidly warned that although it had measures to protect against third-party misuse of its platforms, such measures may not be successful. This warning was not just hypothetical. Rather, PDDH detailed instances in which it had been required to remediate its procedures to prevent the sale of improper or unauthorized products on its platform. (*See id.* at 22 (noting that "[a]lthough we have adopted strict measures to protect us against these potential liabilities, . . . *these measures may not always be successful or timely*.").) Similarly, PDDH explicitly warned that its zero-tolerance policy may not successfully prevent all illegal activities

4

by third-party merchants.  (*Id.* at 23 ("***[T]here can be no assurance that our controls and policies will prevent all fictitious, fraudulent or illegal activities by merchants***").)

Third, following the launch of the global Temu platform in 2022, the Company disclosed that it was subject to numerous evolving laws and regulations in different jurisdictions:

> ***Our business is subject to a large number of laws across many jurisdictions, many of which are evolving***. . . .  These laws and regulations are continuously evolving, and compliance is costly and can require changes to our business practices and significant management time and effort.  ***Additionally, it is not always clear how existing laws apply to online marketplaces . . .***  (*Id.* at 44-45.)

Finally, PDDH warned that, due to these legal ambiguities and uncertainties, it may have ***already*** failed to comply with laws or regulations, including as a result of third-party actions, and emphasized this could result in "significant fines and penalties":

> ***Despite our efforts, we may not have fully complied in the past and may not fully comply in the future***, particularly where the applicable regulatory regimes have not been broadly interpreted. . . .  Additionally, if third parties with whom we work violate applicable laws or our policies, those violations could also result in liabilities for us and could harm our business. . . .  Furthermore, the circumstances in which we may be held liable for the acts, omissions, or responsibilities of our merchants is uncertain, complex, and evolving.  (*Id.*)

### 2.      PDDH Disclosed Data Privacy and Security Risks

Throughout the Class Period, PDDH warned that "***[o]ur business generates and processes a large amount of data***." (*See, e.g.*, Ex. B at 27.)  It also disclosed that it "face[s] a number of challenges relating to data from transactions and other activities on our platforms, including:

- protecting the data in and hosted on our system, including against attacks on our system by outside parties or fraudulent behavior or improper use by our employees, and securely transmitting such data over public networks;

- ***addressing concerns related to privacy, sharing, safety, security and other factors;*** and

- ***complying with applicable laws and regulations relating to the collection, use, storage, transfer, disclosure and security of personal data,*** including any requests from regulatory and government authorities relating to these data." (*Id.*)

5

PDDH further warned that while it had adopted policies to protect user data, it may not be able to protect against illegal attempts to obtain confidential or private data:

> *We may not be able to prevent third parties, especially hackers or other individuals or entities engaging in similar activities* through viruses, Trojan horses, *malicious software*, break-ins, phishing attacks, third-party manipulation or security breaches, *from illegally obtaining the confidential or private data we hold on our platforms.* (*Id.*)

Finally, PDDH warned that "[a]ny *negative publicity on our platforms' data safety or privacy* protection mechanisms" or any "compromise of our information security" "*could have a material and adverse effect* on our public image, reputation, financial condition and results of operations," and may require "[s]ignificant capital, managerial and other resources." (*Id.*)

## C.    UFLPA COMPLIANCE

### 1.    In June 2022, the UFLPA Went Into Effect

The UFLPA was enacted on December 23, 2021, and took effect on June 21, 2022. (AC ¶ 32). It instructs an inter-agency task force to create a list of entities involved in the use of forced labor in the Xinjiang Uyghur Autonomous Region ("Xinjiang") of the People's Republic of China ("PRC") ("the UFLPA Entity List"). Pub. L. No. 117-78, § 2(d)(2)(B). It also creates a rebuttable presumption that the importation of any goods produced in Xinjiang or by an entity on the UFLPA Entity List is prohibited. Pub. L. No. 117-78, § 3(a)-(b)(1).

### 2.    Temu's Forced Labor Policies

Temu maintains policies to ensure that its third-party merchants complied with all applicable forced-labor laws and regulations. First, Temu's merchants must adhere to a "Third Party Code of Conduct" that includes "a zero-tolerance policy" for the use of forced, indentured, or penal labor. (Ex. D at 9.) Second, Temu maintains "a 'reporting system' in which 'consumers, sellers, [and] regulators,' among others, can 'file complaints for violations of Temu platform rules.'" (*Id.*) Third, under Temu's "Prohibited Products List" policy, "sellers are alerted when

6

they list a product 'prohibited by applicable laws' . . . and 'products that support illegal activities.'" (*Id.* at 10.)  PDDH specifically disclosed this policy update and updated its risk disclosures to warn that the circumstances in which PDDH could be liable for the acts of its merchants were "uncertain, complex, and evolving":

> *We require merchants on the Temu platform to comply with our third-party code of conduct, which strictly prohibits the use of forced, penal or child labor.  In addition, we establish policies and procedures to ensure that no seller on the Temu platform is on the UFLPA Entity List* . . . Upcoming and proposed regulations may require platforms like ours to comply with additional obligations, and the resulting compliance costs and potential liability risk could negatively impact our business.  (Ex. A at 45.)

### 3.    The June 22, 2023 Interim Congressional Report

On June 22, 2023, the U.S. Select Committee on the Chinese Communist Party (the "Committee") published an interim report titled "Fast Fashion and the Uyghur Genocide: Interim Findings" (the "Interim Report"), which discusses initial findings based on information voluntarily provided to the Committee by Temu, Shein, Nike, and Adidas.  (AC ¶ 34; Ex. D at 3.)  As detailed therein, Temu explained to the Committee that "[b]ecause Temu is not the importer of record with respect to goods shipped to the United States, [the UFLPA] and the prohibitions set out in [Section 307 of the Tariff Act of 1930] do not apply directly to Temu's activities as an online platform operator."  (Ex. D at 8.)  The Interim Report *does not* accuse Temu of violating the UFLPA.

The Interim Report and its allegations received wide coverage in the press, including articles in the *New York Times*, *Business Insider*, and *Fox Business*.  (AC ¶¶ 39-43.)  The findings were also discussed in analyst reports published by Goldman Sachs and Morgan Stanley.  (AC ¶¶ 42-43.)  None of these sources alleged that Temu or PDDH violated the UFLPA or appeared on the UFLPA Entity List, and Plaintiff does not allege that any entity that sells goods on Temu or PDDH's platforms is on the list.  The Committee has not released additional findings or final conclusions since its Interim Report was issued over two years ago.

7

### D.    DATA SECURITY ALLEGATIONS

#### 1.    Accusations of Malware Begin in March 2023

Beginning in March 2023, Reuters, Bloomberg, and CNN published articles concerning potential "malware" found on Pinduoduo.  (*See* AC ¶¶ 48-49, 51.)  PDDH denied the claims that its app contained malicious code.  (AC ¶ 50; Ex. E at 2.)  CNN also made clear that "Temu has not been implicated."  (Ex. F at 3.)  In addition, CNN noted that Pinduoduo did not appear on any of the PRC's Ministry of Industry and Information Technology lists that named apps "found to have undermined user privacy or other rights."  (*Id.* at 6-10.)

#### 2.    In September 2023, the Grizzly Report Is Published

On September 6, 2023, short seller Grizzly Research published a report (the "Grizzly Report") accusing the Temu app of using "spyware."  (AC ¶ 54; *see* Ex. G.)  The Grizzly Report disclaimed that "this report and all statements contained herein are the opinions of Grizzly Research LLC and *are not statements of fact*," and disclosed that Grizzly Research or its clients and investors "have a short position in the securities" of PDDH.  (Ex. H.)  The Grizzly Report recycles many of the same unparticularized allegations in the CNN article about Pinduoduo (Ex. G at 8, 20, 21), and is highly speculative (*id.* at 2 ("We strongly *suspect* that TEMU is already, or intends to, illegally sell stolen data . . .")). Despite the Grizzly Report's sensationalized speculation, PDDH's ADS price closed at $101.59, up from the prior day's closing of $101.06.  (Ex. I.)

#### 3.    Nearly a Year Later, the Arkansas Complaint Is Filed

On June 25, 2024, the Arkansas Attorney General filed a civil suit ("the Arkansas Complaint") against PDDH, alleging the Temu app collects data from users without their knowledge and sells it to third parties.  (AC ¶¶ 55-56; Ex. J ¶ 2.)  The Arkansas Complaint based its claims almost entirely on the Grizzly Report, expressly citing it more than 20 times and implicitly relying on it in dozens of other paragraphs.  (*See* Ex. J.)

8

E.      MONTHS BEFORE THE END OF THE CLASS PERIOD,
        PDDH DISCLOSES UPDATES ON COMPLIANCE EFFORTS

On May 22, 2024, PDDH released its Q1 2024 Earnings Report.  The Company discussed in the investor call, in detail, its belief in "compliant business conduct" as the "foundation to long-term growth of our platform."  (Ex. K at 5.)  Defendant Lei Chen emphasized the importance of improving compliance as "[m]ajor regulatory framework[s] around the world are evolving and new laws and regulations are being introduced," including "data-related regulations" and "those related to merchant operations."  (Ex. K at 5, 10.)  PDDH management emphasized their continued commitment to working with regulators to strengthen compliance measures, including by "*investing heavily in researching and understanding the regulations of each market.*"  (*Id.* at 9.)

PDDH disclosed that its investment in compliance would impact financials.  In the context of discussing "*investments to create a safe and trustworthy shopping environment* for our users," Defendant Lei warned that "[w]e do not expect this to be easy and *we are prepared for investments in the long run.*"  (*Id.* at 5.)  He also reiterated that "[o]ur business does not follow a linear path and our earnings will almost certainly fluctuate."  (*Id.* at 6.)  That day, PDDH's ADS price closed at $147.09, up from the prior day's closing of $145.45.  (Ex. I.)

Three months later, on August 26, 2024, PDDH released its financial results for Q2 2024.  (AC ¶ 98.)  During the earnings call, Defendants reiterated what PDDH had disclosed the prior quarter, including that "we will remain committed to high quality development and focus on creating a healthy and sustainable platform ecosystem;" "we will continue to strengthen these efforts;" and "[w]e have communicated [on] a number of occasions that profit growth in the past few quarters should not be used as long term guidance."  (Ex. L at 5.)  PDDH also announced that it would not issue dividends or repurchase shares for the foreseeable future due to intensifying

9

competition and efforts to create a safe and reliable shopping experience.  (Ex. L at 6, 9.)

Following the announcement, PDDH's stock price dropped by 29%.  (AC ¶ 102.)

**ARGUMENT**

To state a claim under Section 10(b), Plaintiff must allege, among other things: (1) a material misstatement or omission; (2) scienter; and (3) loss causation.  *See Singh v. Cigna Corp.*, 918 F.3d 57, 62 (2d Cir. 2019).  Failure to allege any one of these elements independently warrants dismissal.  Plaintiff must also satisfy the heightened pleading requirements of Rule 9(b) and the PSLRA, which require that the Complaint plead the circumstances constituting the fraud with particularity.  *See ATSI Commc'ns*, 493 F.3d at 99.

## I.    PLAINTIFF FAILS TO PLEAD ANY MISSTATEMENT OR OMISSION[3]

### A.    Plaintiff Fails to Plead a Misstatement or Omission Regarding the UFLPA

Plaintiff argues that five compliance-related statements made between April 26, 2023, and May 22, 2024, were materially false and misleading because they did not say that PDDH's compliance measures were insufficient to prevent third-party vendors on Temu from violating the UFLPA.  (AC ¶¶ 69-77.)  For several reasons, including that many of the statements are simply *true*, Plaintiff fails to state a claim.

#### 1.    PDDH Disclosed the Relevant Risks

First, Plaintiff's claim fails because the relevant risks were disclosed, as Plaintiff ***admits***. (*See* AC ¶¶ 69, 72, 74.)  "Even at the pleading stage, dismissal is appropriate where the complaint is premised on the nondisclosure of information that was actually disclosed." *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 377 (E.D.N.Y. 2003).  As detailed above, PDDH included extensive risk disclosures warning of the limits of its compliance measures.   (*See supra* § B.1.)

---

[3]    Attached as Appendix 1 is a chart detailing each alleged misstatement and a summary of the reasons why Plaintiff has failed to state a claim pertaining to it, as detailed below.

10

For example, PDDH disclosed that "[a]lthough we have adopted strict measures to protect us against these potential liabilities, . . . *these measures may not always be successful or timely*;" "*[f]ailure to identify and remove [illegal] products and content from our platforms may subject us to liability*;" and "[a]lthough we implement a zero-tolerance policy . . . *there can be no assurance that our controls and policies will prevent all fictitious, fraudulent or illegal activities by merchants*." (Ex. B at 22-23.)

PDDH made clear these risks were not hypothetical and may be ongoing, and even gave specific examples of when it was "required by the relevant government authorities to strengthen supervision." (*See supra* § B.1; Ex. B at 22.)  The Second Circuit has consistently held that such candid and fulsome disclosures, which explicitly warn of past and ongoing risks and shortcomings in compliance measures, preclude claims based on alleged misrepresentations relating to inadequate compliance.  *See, e.g.*, *Asay v. Pinduoduo Inc.*, No. 20-1423, 2021 WL 3871269, at *2-3 (2d Cir. Aug. 31, 2021); *Singh*, 918 F.3d at 64; *Altayyar v. Etsy, Inc.*, 242 F. Supp. 3d 161, 177 (E.D.N.Y. 2017), *aff'd*, 731 F. App'x 35 (2d Cir. 2018).

This case is on all fours with *Asay*, a separate putative securities class action filed against PDDH (then known as Pinduoduo Inc.) that similarly alleged the Company's controls were so ineffective that it "became 'the counterfeiters' forum of choice'" and that PDDH punished third-party misconduct with "meaningless slaps on the wrist."  2021 WL 3871269, at *2.  There, the Second Circuit held that PDDH's disclosures—which are *nearly identical* to those at issue here—adequately warned of the compliance risks.  The court held that PDDH's disclosures—that "[a]lthough we have adopted strict measures to protect us . . . *these measures may not always be successful or timely*;" that it "*ha[s] been and may continue to be subject to* allegations and lawsuits;" and its disclosures of specific examples when it was required by government authorities

11

to "*strengthen supervision [of its merchants]*"—clearly supported dismissal, as "a reasonable investor, based on the specificity of the contemporaneous examples of anti-counterfeiting failures and risks, would have understood that Pinduoduo's anti-counterfeiting measures were not, at the time of the [statements], successfully prevent[ing] substantial violations of" law. *Id.* at *3.

The same result follows here with even more force. Despite ongoing uncertainty about whether the newly enacted UFLPA *even applied* to platforms like Temu, PDDH's disclosures were "framed by acknowledgements of the complexity" of the new regulation, "suggest[ing] caution (rather than confidence) regarding the extent of [its] compliance." *Singh*, 918 F.3d at 64. Specifically, PDDH disclosed that it "is subject to a large number of laws across many jurisdictions, *many of which are evolving*;" that "*it is not always clear how existing laws apply* to its business," and warned that even "*if third parties . . . violate applicable laws or our policies, those violations could also result in liabilities for us and could harm our business.*" (Ex. B at 44-45.) Indeed, even after the Interim Report was released—which again, did not find that PDDH had violated the UFLPA—PDDH warned that "the circumstances in which we may be held liable for the acts, omissions, or responsibilities of our merchants or other third parties are *uncertain, complex, and evolving*." (Ex. A at 45). Here, as in *Asay*, PDDH's statements "reflect the Company's 'uncertainty as to the very possibility of maintaining adequate compliance mechanism[s] in light of complex and shifting government regulations.'" 2021 WL 3871269, at *3; *see also In re Qudian Inc. Sec. Litig.*, No. 17-CV-9741 (JMF), 2019 WL 4735376, at *7-8 (S.D.N.Y. Sept. 27, 2019) (no misrepresentation where company warned regulatory framework was "evolving," "uncertain," and "still at a nascent stage and subject to further change and interpretation," and that existing compliance measures "might not comply with applicable laws").

12

Plaintiff's Item 303 claim fails for the same reasons.  Item 303 requires disclosure of "any known trends or uncertainties that have had or that are reasonably likely to have a material . . . unfavorable impact" on financials.  17 C.F.R. § 229.303.  To plead an Item 303 claim, Plaintiff must allege that the trend or uncertainty was "both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operations."  *Garnett v. RLX Tech. Inc.*, 632 F. Supp. 3d 574, 599 (S.D.N.Y. 2022), *aff'd sub nom. Tseng v. De Vries*, No. 22-2787-cv, 2023 WL 8073087 (2d Cir. Nov. 21, 2023).  As detailed above, PDDH described these risks and uncertainties in detail.  To the extent Plaintiff contends PDDH was required to disclose more, it does not explain why "disclosure [was] otherwise 'necessary' to make the [existing] statements . . . not misleading."  *Id.* at 604.

### 2.    PDDH Had No Duty to Disclose Anything Further

To the extent Plaintiff alleges PDDH failed to disclose specific non-compliance issues alleged in the Interim Report (*see* AC ¶¶ 70, 73,75, 77), PDDH had no duty to do so.  It is well-established that "[t]he securities laws . . . do not impose 'a freestanding legal duty' to disclose uncharged wrongdoing.'"  *Ulbricht v. Ternium S.A.*, No. 18-CV-6801, 2020 WL 5517313, at \*7 (E.D.N.Y. Sept. 14, 2020) (Chen, J.); *accord City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014).  Here, neither the Complaint nor any source cited therein alleges that PDDH was *ever* charged with violating the UFLPA or was added to the UFLPA Entity List.  The Interim Report was self-evidently not a final adjudication of wrongdoing.  (*See* Ex. D at 4 ("These interim findings should not be read to imply any findings as to matters not discussed in the report.").)  In fact, neither Plaintiff nor the Interim Report disagrees with Temu's statement that "*[the UFLPA] and the prohibitions set out in [Section 307 of the Tariff Act of 1930] do not apply directly to Temu's activities as an online platform operator*."  (*Id.* at 8.)

Moreover, "[w]here allegedly undisclosed material information is in fact readily accessible in the public domain, the Second Circuit has found that a defendant may not be held liable for failing to disclose this information." *Keyspan*, 383 F. Supp. 2d at 377. The Interim Report was published on June 22, 2023, and as Plaintiff admits, was followed by extensive coverage in prominent U.S. and Western media sources. (AC ¶¶ 39-45); *Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597, 612 (S.D.N.Y. 2008) (no duty to disclose what was "already publicly reported in several news articles"), *aff'd*, 347 F. App'x 665 (2d Cir. 2009). This independently bars Plaintiff's claims based on the 2023 Annual Report issued on April 25, 2024, and the Q1 2024 Earnings Call on May 22, 2024—both of which came many months after the Interim Report and related coverage.

### 3.    Plaintiff Fails to Plead the Statements Were False

Many of the challenged statements are indisputably accurate and must be dismissed. (*See, e.g.*, AC ¶ 72 ("[W]e establish policies and procedures to ensure that no seller on the Temu platform is on the UFLPA Entity List, and use technology to identify products that are at higher risk of non-compliance."); ¶ 74 ("Our business is subject to a large number of laws across many jurisdictions, many of which are evolving.").) *See Key v. Horizon Bancorp. Inc.*, No. 23-cv-2961, 2025 WL 1017552, at *4 (E.D.N.Y. Apr. 4, 2025) (dismissing where "plaintiffs cannot locate a false or misleading statement of fact"). Further, Plaintiff alleges no facts to show that PDDH's disclosures after the Interim Report were false. Prior to the release of the 2023 Annual Report and Q1 2024 Earnings, PDDH made clear that it was "proactively strengthening [its] compliance capabilities" in the face of "evolving and new laws and regulations" around the world. (Ex. K at 5, 9.) Plaintiff alleges no particularized facts showing that PDDH's descriptions of enhanced compliance measures and efforts to improve its compliance were false. (*See* AC ¶¶ 72, 74, 76.)

Plaintiff's allegations also are belied by its own sources, namely, the Interim Report. Contrary to Plaintiff's assertion that "Defendants failed to implement any internal guidelines,"

14

"review the Company's platform," or "take sufficient actions (if any) to ensure goods sold on its platform" were not produced using forced labor (*see* AC ¶¶ 70, 73,75, 77), the Interim Report confirms that Temu has a "*zero-tolerance policy for the use of forced, indentured, or penal labor*," maintains a system to report violations, and maintains a "Prohibited Product List" that alerts sellers of products that are prohibited or that support illegal activities. (Ex. D at 9-10.) Plaintiff alleges no facts contradicting these findings.

> **B.     Plaintiff Fails to Plead a Misstatement or Omission Regarding Data Privacy**

Plaintiff also challenges statements regarding data privacy and security made between April 30, 2021, and May 22, 2024. (AC ¶¶ 78-97.) This claim also fails for several reasons.

> **1.     PDDH Disclosed Risks About Data Privacy**

As with the risks related to the UFLPA, PDDH repeatedly warned of risks regarding data privacy and security. Indeed, Plaintiff quotes many of these disclosures. For example, PDDH's Annual Reports warned that PDDH's "business generates and processes a large amount of data" and "[t]he improper use or disclosure of data could have a material and adverse effect on [its] business and prospects." (AC ¶¶ 83, 92.) PDDH emphasized the ***ongoing*** risk that it "faces a number of challenges," including "addressing concerns related to privacy and sharing, safety, security and other factors" and "complying with applicable laws and regulations relating to the collection, use, storage, transfer, disclosure and security of personal data." (*Id.*) The Company acknowledged that it "may not have fully complied in the past and may not fully comply in the future." (*Id.* ¶¶ 83, 85.) PDDH also specifically warned of the risk of "attacks on our system by outside parties or fraudulent behavior or improper use by our employees," (*id.* ¶¶ 83, 92), and warned that it "may not be able to prevent third parties, especially hackers or other individuals or entities . . . from illegally obtaining the confidential or private data we hold on our platforms," including through the use of "*malicious software*" (Ex. B at 27). PDDH explained that "[a]ny

15

negative publicity on our platforms' data safety or privacy protection mechanisms and policies, and any claims asserted against us or fines imposed upon us as a result of actual or perceived failures, could have a material and adverse effect[.]"  (AC ¶¶ 83, 92.)  No reasonable investor reading these warnings could have thought PDDH was immune from complaints about its data privacy and security, and PDDH had no duty to disclose any more specific "uncharged wrongdoing."  *Ulbricht*, 2020 WL 5517313, at *7; *see also Jiajia Luo v. Sogou, Inc.*, 465 F. Supp. 3d 393, 413-14 (S.D.N.Y. 2020).[4]

### 2.    Plaintiff Fails to Plead the Data Privacy Statements Were False

Plaintiff fails to allege particularized facts showing PDDH built spyware into its apps and used them to illicitly obtain data from consumers.  Plaintiff contends all the challenged statements failed to disclose the same four alleged facts:

> (a) the Company's applications were "purposefully and intentionally loaded with tools to execute virulent and dangerous malware and spyware activities on user devices that have downloaded and installed the TEMU app;"

> (b) the Company's applications could "bypass users' cell phone security to monitor activities on other apps, check notifications, read private messages and change settings;"

> (c) the Company's applications were "purposefully designed to gain unrestricted access to a user's phone operating system, including, but not limited to, a user's camera, specific location, contacts, text messages, documents, and other applications;" [and]

> (d) the Company "monetize[d the] unauthorized collection of data by selling it to third parties, profiting at the direct expense . . . [of] privacy rights[.]"

(AC ¶¶ 80, 82, 84, 86, 90, 93, 95, 97.)

These allegations are entirely conclusory, and do not come close to meeting the PSLRA's heightened pleading standards.  *See In re DRDGOLD Ltd. Sec. Litig.*, 472 F. Supp. 2d 562, 567 (S.D.N.Y. 2007) ("[P]articularity means the who, what, when, where, and how: the first paragraph

---

[4]    All of the challenged data privacy disclosures predate the Arkansas Complaint, filed on June 25, 2024, which asserts only civil claims in any event.

16

of any newspaper story.").  Plaintiff does not allege who supposedly put these "tools" in the Temu app, when or why, what the tools were, or how they work.  Plaintiff claims PDDH's apps "could" bypass users' cell phone security to conduct certain illicit activities, but does not allege they ever actually did so.  Plaintiff fails to allege who "purposefully designed [PDDH's apps] to gain unrestricted access to a user's phone operating system," when, why or how.  (*Id.*)  And Plaintiff vaguely asserts that PDDH "monetize[d the] unauthorized collection of data by selling it to third parties," (AC ¶ 56) but again alleges no specifics whatsoever, including who was involved in these supposed sales, when they occurred, what data was sold, for how much, or any other information.

The lack of specificity is unsurprising considering Plaintiff merely copied these allegations from the Arkansas Complaint.  (*See* Ex. J ¶¶ 2, 10, 46.)  Neither Plaintiff nor Lead Counsel claims to have spoken with the authors of the Arkansas Complaint or independently verified its allegations.  Nor have those allegations been adjudicated.  Plaintiff cannot blindly rely on mere allegations copied from another pleading without further investigation.  *See RSM Prod. Corp. v. Fridman*, 643 F. Supp. 2d 382, 403 (S.D.N.Y. 2009) ("Second Circuit case law is clear that paragraphs in a complaint that are either based on, or rely on, complaints in other actions that . . . [are] not resolved, are, as a matter of law, immaterial."), *aff'd* 387 F. App'x 72 (2d Cir. 2010); *In re Lehman Bros. Sec. & ERISA Litig.*, No. 10 Civ. 6637, 2013 WL 3989066, at *4 (S.D.N.Y. July 31, 2013) ("Allowing counsel to rely on [allegations] recounted in a separate complaint would provide the Court little assurance that the factual contentions have any evidentiary support.").

Moreover, the allegations Plaintiff parrots from the Arkansas Complaint were in turn copied from the Grizzly Report.  (*See, e.g.*, Ex. J ¶ 10 n.7.)  Courts caution against crediting allegations from self-interested short sellers "whose authors had 'significant motive and opportunity . . . to misuse or mischaracterize'" information.  *Long Miao v. Fanhua, Inc.*, 442 F.

Supp. 3d 774, 804 (S.D.N.Y. 2020).  Again, neither Plaintiff nor Lead Counsel claims to have

spoken with the authors of the Grizzly Report or independently verified its allegations.  Worse still,

the Grizzly Report expressly admits that it contains no facts, only opinions, and disclaims the

accuracy of those opinions:

> **THIS REPORT AND ALL STATEMENTS CONTAINED HEREIN ARE THE OPINIONS OF GRIZZLY RESEARCH LLC AND ARE NOT STATEMENTS OF FACT**. . . .  [The statements in the Report] REMAIN OUR OPINIONS AND BELIEFS ONLY. . . .  Grizzly Research LLC makes no representation, express or implied, as to the accuracy, timeliness, or completeness of any such information or with regard to the results to be obtained from its use.

(Ex. H (emphasis in original).)   Plaintiff's verbatim allegations based on these admittedly

unreliable opinions should be "discounted or put aside altogether as ill-pled."  *In re DraftKings*

*Inc. Sec. Litig.*, 650 F. Supp. 3d 120, 155 (S.D.N.Y. 2023).

Finally, both the Arkansas Complaint and the Grizzly Report rely on unparticularized

allegations from news articles, which Plaintiff again regurgitates without any independent

corroboration.  (*See* AC ¶¶ 48-53.)  "Newspaper articles should be credited only to the extent that

other factual allegations would be—if they are sufficiently particular and detailed to indicate their

reliability."  *In re Sibanye Gold Ltd. Sec. Litig.*, No. 18-CV-3721, 2020 WL 6582326, at *16

(E.D.N.Y. Nov. 10, 2020).  "Conclusory allegations of wrongdoing are no more sufficient if they

come from a newspaper article than from plaintiff's counsel."  *Id.*  Here, the articles rely on dubious

"experts" and anonymous purported "insiders," none of whom is "described . . . with sufficient

particularity to support the probability that a person in the position occupied by the source would

possess the information alleged."  *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000).  For example,

Plaintiff's citation to a Bloomberg article reporting on "*potential* malware" is speculative, and

supported by sources including researchers at a Moscow-based lab (AC ¶ 49) which the U.S. had

recently put "on a list of companies it deemed a threat to national security" (Ex. E at 4).  Another

18

article cites anonymous "company insiders" but provides no detail on who these supposed "insiders" are, their positions, whether they interacted with the Individual Defendants, or any other basis for their purported knowledge. Such scant allegations are insufficient to plead securities fraud. *See Eden Alpha CI LLP v. Polished.com Inc.*, 763 F. Supp. 3d 270, 296 (E.D.N.Y. 2025) ("[C]ourts tend not to credit uncorroborated statements of anonymous witnesses that are sourced secondhand from individuals 'with whom plaintiffs' counsel have not themselves interacted.'").[5]

### C.   Many of the Challenged Statements Are Inactionable Puffery

Many of the challenged statements are inactionable for other reasons. Disclosures that PDDH "strive[s] to comply with all applicable laws" and is "committed to improv[ing] compliance" are mere puffery and forward-looking statements. (AC ¶¶ 69, 74, 76, 85, 96). *See Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 103 (2d Cir. 2021); *In re Vale S.A. Sec. Litig.*, No. 19 CV 526, 2020 WL 2610979, at *12 (E.D.N.Y. May 20, 2020). So too are statements describing PDDH's high standards of customer safety. (AC ¶¶ 81, 83, 96.) *See Kusnier v. Virgin Galactic Holdings, Inc.*, 639 F. Supp. 3d 350, 374 (E.D.N.Y. 2022).

## II.   PLAINTIFF FAILS TO ALLEGE A STRONG INFERENCE OF SCIENTER

The Complaint should be dismissed for the independent reason that Plaintiff fails to adequately plead "with particularity facts giving rise to a strong inference" that Defendants acted with scienter, *i.e.*, "an intent 'to deceive, manipulate, or defraud.'" *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009). The inference "must be 'more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.'" *Id.* Scienter may be pled with specific facts

---

[5]   Plaintiff also cites Google's temporary suspension of the Pinduoduo app from the Google Play Store. (AC ¶ 48.) According to Google, this was based on alleged malware issues supposedly found on a different version of the app not available on Google Play to begin with. (*Id.*) Regardless, PDDH released an updated version just days later that fixed the alleged issues. (Ex. F at 8.)

showing (i) a "motive and opportunity" to commit fraud, or (ii) "strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns*, 493 F.3d at 99.  Plaintiff fails to do so.

### A.    Plaintiff's Impermissible Group Pleading Warrants Dismissal

As an initial matter, Plaintiff fails to plead scienter "with respect to each defendant." *City of Monroe Emps.' Ret. Sys. v. Hartford Fin. Servs. Grp., Inc.*, No. 10 Civ. 2835, 2011 WL 4357368, at \*13 (S.D.N.Y. Sept. 19, 2011).  Throughout the Complaint, Plaintiff vaguely refers to "Defendants" and fails to allege a *single* allegation about *any* particular Defendant's state of mind. (*See, e.g.*, AC ¶¶ 107-09, 111 ("Defendants actually participated in the investigation"), 113 ("Individual Defendants were hands-on managers").)  This alone warrants dismissal.  *See In re iQIYI, Inc. Sec. Litig.*, No. 20-CV-01830, 2024 WL 4362509, at \*15 (E.D.N.Y. Sept. 30, 2024); *see also Greco v. Qudian Inc.*, No. 1:20-cv-577, GHW, 2022 WL 4226022, at \*25 (S.D.N.Y. Sept. 13, 2022) ("plaintiffs must plead circumstances providing a factual basis for scienter for each defendant . . . .  [G]roup pleading of scienter . . . runs afoul of the PSLRA.'").

### B.    Plaintiff's Scienter Allegations Are Insufficient

Putting aside Plaintiff's improper group pleading, the Complaint is devoid of any allegation that an Individual Defendant realized a "concrete benefit" by issuing the purportedly false and misleading statements, thereby failing to plead motive.  *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001); *see also Rombach v. Chang*, 355 F.3d 164, 177 (2d Cir. 2004).  Because of this, the "strength of the circumstantial allegations [of conscious misbehavior or recklessness] must be correspondingly greater." *Francisco v. Abengoa, S.A.*, 624 F. Supp. 3d 365, 401 (S.D.N.Y. 2022).  Plaintiff must plead conduct that "at the least . . . is highly unreasonable and which represents an extreme departure from the standards of ordinary care." *Bd. of Trs. of Ft. Lauderdale Gen. Emps.' Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853, 869 (S.D.N.Y. 2011), *aff'd sub nom. Frederick v. Mechel OAO*, 475 F. App'x 353 (2d Cir. 2012).  Plaintiff's vague allegations fall short.

20

First, Plaintiff asserts that Defendants acted with scienter because they "recei[ved] information reflecting" the alleged (but unspecified) "true facts." (AC ¶¶ 107-08, 111.) But when a plaintiff contends that "defendants had access to contrary facts," the plaintiff must "specifically identify the reports or statements containing [the truthful] information." *Fries v. N. Oil & Gas, Inc.*, 285 F. Supp. 3d 706, 721 (S.D.N.Y. 2018). Plaintiff has not identified a single internal report indicating that there had been any UFLPA violation or data security breach. Notably, the Complaint does "not rely on a single confidential witness or internal document" that could shed light on Defendants' state of mind. *City of Monroe Emps.' Ret. Sys.*, 2011 WL 4357368, at *1.

Instead, the ***only*** alleged instance of purported contrary information is ***one*** example in support of Plaintiff's UFLPA claim of a keychain that purportedly included "Xinjiang Cotton" in the title. Based on that single example, Plaintiff concludes that "Defendants cannot with a straight face say that they did not know . . . that the products sold on its platforms were ***likely*** violating the UFLPA." (AC ¶¶ 38, 118.) Not only does Plaintiff not identify a specific Defendant with actual knowledge of this keychain at the time the statements were made, but as Plaintiff acknowledges, Temu "connects consumers with ***millions*** of merchandise partners," rendering it implausible that any Defendant was reckless based on this single, one-off allegation. (AC ¶ 27.) *See Tian v. Peloton Interactive, Inc.*, No. 23-CV-4279, 2025 WL 510043, at *15 (E.D.N.Y. Feb. 14, 2025) (35 customer complaints out of 2.2 million sales insufficient to allege scienter).

Second, far from supporting scienter, Plaintiff's vague allegation that Defendants "participated in the investigation in connection with" the Interim Report undermines its theory of scienter with respect to its UFLPA claim. (AC ¶¶ 107-08, 111.) Indeed, as the Interim Report noted, Temu "voluntarily cooperated with the investigation." (Ex. D at 3.) Temu's participation in this process and PDDH's proactive efforts throughout the Class Period to engage with regulators

21

about these evolving legal and regulatory rules are simply "not consistent with fraud." *Plumbers & Steamfitters Loc. 773 Pension Fund v. Canadian Imperial Bank of Com.*, 694 F. Supp. 2d 287, 302 (S.D.N.Y. 2010). Regardless, courts routinely hold that the mere existence of government investigations does not support a strong inference of scienter. *See, e.g.*, *In re Telefonaktiebolaget LM Ericsson Sec. Litig.*, 675 F. Supp. 3d 273, 298-99 (E.D.N.Y. 2023), *aff'd sub nom. Bos. Ret. Sys. v. Telefonaktiebolaget LM Ericsson*, No. 23-940-cv, 2024 WL 4023842 (2d Cir. Sept. 3, 2024).

Third, Plaintiff cannot plead scienter based on the Individual Defendants' "positions and access to material non-public information." (AC ¶ 22; *see also id.* ¶ 113 (Defendants "spoke to investors" and "were hands-on managers"); ¶ 132 ("had access to the adverse undisclosed information").) "Courts in this Circuit have long held that accusations founded on nothing more than a defendant's corporate position are entitled to no weight." *Francisco*, 624 F. Supp. 3d at 402.

Fourth, the Arkansas Complaint—the sole basis for Plaintiff's data privacy claim— likewise fails to provide insight into any Defendant's state of mind. (*See* AC ¶¶ 110, 119-23.) The Arkansas Complaint's allegations are unreliable and based on the accounts of anonymous, insufficiently pled "sources." (*See supra* § I.B.2.) Its allegation that "security researchers concluded that the Temu application was 'purposefully and intentionally loaded with tools to execute virulent and dangerous malware'" (AC ¶ 122) is "so vague as to be meaningless," *Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 305 (S.D.N.Y. 2019), and does not provide any specifics concerning "the who, what, when, where, and how" required to plead scienter with particularity. *DRDGOLD*, 472 F. Supp. 2d at 567; *see also In re Arcimoto Inc. Sec. Litig.*, No. 21-CV, 2143, 2022 WL 17851834, at *7 (E.D.N.Y. Dec. 22, 2022) (Chen, J.) ("negative innuendos" and "boilerplate" scienter pleading "falls far below what Congress had envisioned when enacting the heightened pleading standard of the [PSLRA].") Moreover, other allegations undermine any

22

inference of scienter, including that, in response to third-party reports of "*potential* malware in *versions* of PDDH's app," Pinduoduo quickly "issued a new update . . . which *removed the exploits*" and "*disbanded* the team of engineers and product managers who had developed" them.  (AC ¶¶ 50, 57.)  Although Plaintiff alleges that "most members of this team were transferred to work at Temu," they again allege no facts indicating who was involved, their roles, when it occurred, or whether any Individual Defendant knew or had reason to know that these rogue employees later moved to Temu.  (AC ¶ 57.)  Plaintiff fails to make any particularized allegation concerning what role any Individual Defendant purportedly played in investigating these purported data security exploits.

Finally, Plaintiff's attempt to fall back on the "core operations" doctrine fails.  (AC ¶ 112.) Plaintiff cannot "rely only on the 'core operations' doctrine to meet the PSLRA's demanding scienter pleading requirement."  *City of Warren Police & Fire Ret. Sys. v. Foot Locker, Inc*., 412 F. Supp. 3d 206, 228 (E.D.N.Y. 2019).  At most, the doctrine "constitutes supplemental support for alleging scienter but does not independently establish scienter."  *In re Aceto Corp. Sec. Litig.*, No. 2:18-cv-2425, 2019 WL 3606745, at \*10 (E.D.N.Y. Aug. 6, 2019).  Regardless, Plaintiff once again provides non-specific, conclusory allegations, alleging only that the "magnitude" of the "alleged fraud" "support[s] a strong inference of scienter."[6]  (AC ¶ 112.)

## C.    Nonculpable Inferences Are More Compelling

Given Plaintiff's wholly conclusory assertions and utter failure to plead a single allegation specific to any Defendant, the more compelling inference is of nonfraudulent intent.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).  Here, the more compelling inference is that Defendants made a good faith effort to comply with changing regulatory regimes

---

[6]    "[B]ecause the [complaint] fails to plead scienter plausibly against any individual defendant, . . . the [complaint] also fails to plead corporate scienter."  *Smith v. PureCycle Techs., Inc.*, No. 23-cv-8605, 2024 WL 5186586, at \*15 (S.D.N.Y. Dec. 20, 2024).

and data privacy challenges, warned that such a failure to comply could have a material impact, timely updated its disclosures as new information became available, and participated in the Congressional investigation.   Contrary to Plaintiff's assertion, at no point did Defendants "confirm[] wrongful acts PDDH committed relating to forced labor and spyware." (AC ¶ 138.) Instead, the purported corrective disclosures merely reported that PDDH would not be issuing dividends or repurchasing shares for the "foreseeable years ahead," and disclosed—*as it had throughout the Class Period*—that future profitability would be impacted by intensifying competition and PDDH taking on greater social responsibility. (AC ¶ 138.) Courts do not hesitate to reject theories of fraud that, like this one, make no sense. *See In re Garrett Motion Inc. Sec. Litig.*, No. 20 Civ. 7992, 2022 WL 976269, at *13 (S.D.N.Y. Mar. 31, 2022); *Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 600 (S.D.N.Y. 2016).

## III.   PLAINTIFF FAILS TO PLEAD LOSS CAUSATION

Finally, Plaintiff's claims also fail because there is no causal link between any of the alleged misstatements and any purported loss. *See Dura Pharms.*, *Inc. v. Broudo,* 544 U.S. 336, 345-46 (2005). Plaintiff cannot simply point to a price decline following negative news; it must plead facts demonstrating that the negative news revealed "the truth" about a prior misstatement or omission. *ATSI*, 493 F.3d at 107. Critically, "publications that merely characterize information already circulating in the public sphere in a negative way cannot prove loss causation." *Arcimoto*, 2022 WL 17851834, at *6.

Plaintiff claims the alleged fraud "became apparent to the market" and caused the price of PDDH's ADS to fall on June 27, 2024, and August 26, 2024. (AC ¶¶ 136-37.) No statements on those dates revealed any purported falsity and so they cannot support loss causation. <u>First</u>, Plaintiff alleges that PDDH's share price dropped on June 27, 2024, two days after the Arkansas Complaint. (*See* AC ¶¶ 55, 136.) But as detailed *supra* § I.B.2, the Arkansas Complaint "simply parroted facts

already in the public sphere"—which defeats any basis for alleging loss causation. *Arcimoto*, 2022 WL 17851834, at *6.[7]

Second, Plaintiff alleges the Q2 2024 Earnings Call on August 26, 2024, "confirm[ed] the wrongful acts PDDH committed relating to forced labor and spyware." (AC ¶¶ 137-38.) But Defendants said no such thing during that call (or ever). There was no mention whatsoever of any alleged violation of the UFLPA or data privacy laws. (*See* Ex. L at 5, 7.) The stock price drop following that earnings announcement was caused by PDDH's disclosure that revenue growth and profitability had slowed and were expected to remain depressed, and that the Company did not anticipate any share repurchases or dividends for years to come. (*Id.* at 4, 9.) It was this negative news, not the revelation of any fraud, that caused the losses Plaintiff seeks to recover.[8]

Finally, Plaintiff notably does not allege that the Grizzly Report from September 2023 or the Interim Report from June 2023 supports loss causation. That is because the price of PDDH ADS did not drop in the second half of 2023, ***it went up***. (*See* Ex. I.) And worse, Plaintiff did not even purchase PDDH securities until April 9, 2024, (ECF No. 12-3), well after the Interim Report and the Grizzly Report were made public. Plaintiff thus cannot plead loss causation. *See Dura*, 544 U.S. at 346.

## CONCLUSION

For the foregoing separate and independent reasons, the Amended Complaint should be dismissed in its entirety with prejudice.

---

[7]   Plaintiff's pre-motion letter asserts that "the Arkansas Complaint revealed new information," but does not (and cannot) identify any such new information. (ECF No. 34 at 3.) Indeed, while Plaintiff cited ¶¶ 46-59, many of those paragraphs allege accusations from ***other*** sources ***before*** the Arkansas Complaint. (AC ¶¶ 47-54.) The five paragraphs that are actually about the Arkansas Complaint do not add anything new. (*Id.* ¶¶ 55-59.)

[8]   The two Morningstar Reports Plaintiff cites likewise do not reference the alleged misconduct. (*See* AC ¶ 142.) One simply states that "more stringent data privacy requirements could hurt PDD," (Ex. N), and the other cites "pessimistic guidance on future growth and margin" and the dividend announcement as the reasons driving the share price decline (Ex. M).

Dated: New York, New York
      July 18, 2025

Respectfully submitted,

*/s/ Michael C. Griffin*

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
Scott D. Musoff
Robert A. Fumerton
Michael C. Griffin
Judith A. Flumenbaum
One Manhattan West
New York, New York 10001
Phone: (212) 735-3000
Facsimile: (212) 735-2000
scott.musoff@skadden.com
robert.fumerton@skadden.com
michael.griffin@skadden.com
judy.flumenbaum@skadden.com

*Counsel for Defendant PDD Holdings Inc.*

## APPENDIX 1

| Alleged Misstatement[1] | Reasons Not False or Misleading |
|---|---|
| **UFLPA Statements** | |
| **2022 Annual Report**<br>*Our business is subject to a large number of laws across many jurisdictions, many of which are evolving.*<br><br>**\*\*\***<br><br>*We strive to comply with all applicable laws,* but they may conflict with each other, and by complying with the laws or regulations of one jurisdiction, we may find that we are violating the laws or regulations of another jurisdiction. *Despite our efforts, we may not have fully complied in the past and may not fully comply in the future, particularly where the applicable regulatory regimes have not been broadly interpreted . . .* (AC ¶ 69.) | Relevant Risks Disclosed<br><br>No Duty to Disclose Uncharged Wrongdoing<br><br>No Allegations Showing Statement False When Made<br><br>Puffery<br><br>Forward-Looking |
| **2023 Annual Report**<br>*Additionally, if the third-party merchants that sell merchandise on our platforms or the third-party vendors that provide services to us violate applicable laws or regulations, those violations could also result in liabilities for us and harm our brands, reputation and business. For example, in June 2022, the Uyghur Forced Labor Prevention Act, or the UFLPA, became effective in the U.S., establishing a rebuttable presumption that goods mined, produced, or manufactured in a certain region in China or by an entity on the UFLPA Entity List are prohibited from importation into the U.S. We require merchants on the Temu platform to comply with our third-party code of conduct, which strictly prohibits the use of forced, penal or child labor. In addition, we establish policies and procedures to ensure that no seller on the Temu platform is on the UFLPA Entity List, and use technology to identify products that are at higher risk of non-compliance. Any third-party violations of applicable laws or our policies may subject us to negative publicity, investigations, fines, fees, settlements or other costs and liabilities as a result of the enforcement of laws, regulations, sanctions, embargoes, export controls programs or other restrictions.* (AC ¶ 72.) | Relevant Risks Disclosed<br><br>No Duty to Disclose Uncharged Wrongdoing<br><br>No Allegations Showing Statement False When Made |

---

[1] The alleged misstatements are copied directly from the Amended Complaint. All emphasis and quotations are from the Amended Complaint, not the original disclosure.

| Alleged Misstatement[1] | Reasons Not False or Misleading |
|---|---|
| **2023 Annual Report**<br>*Our business is subject to a large number of laws across many jurisdictions, many of which are evolving.*<br><br>\*\*\*<br><br>*We strive to comply with all laws and regulations that are applicable to our operations around the world.* Despite our efforts, we may not have fully complied in the past, and may not be able to fully or timely comply in the future, with all applicable laws and regulations, particularly where the regulatory regimes have not been broadly applied to e commerce platforms<br><br>\* \* \*<br><br>*Additionally, if the third-party merchants that sell merchandise on our platforms or the third-party vendors that provide services to us violate applicable laws or regulations, those violations could also result in liabilities for us and harm our brands, reputation and business. For example, in June 2022, the Uyghur Forced Labor Prevention Act, or the UFLPA, became effective in the U.S., establishing a rebuttable presumption that goods mined, produced, or manufactured in a certain region in China or by an entity on the UFLPA Entity List are prohibited from importation into the U.S. We require merchants on the Temu platform to comply with our third-party code of conduct, which strictly prohibits the use of forced, penal or child labor. In addition, we establish policies and procedures to ensure that no seller on the Temu platform is on the UFLPA Entity List, and use technology to identify products that are at higher risk of non-compliance.* (AC ¶ 74.) | Relevant Risks Disclosed<br><br>No Duty to Disclose Uncharged Wrongdoing<br><br>No Allegations Showing Statement False When Made<br><br>Puffery<br><br>Forward-Looking |
| **Q1 2024 Earnings Call**<br>With the goal of building an *industry-leading compliance program,* we will make . . . [firm] investment to create a safe and trustworthy shopping environment for our users. To uphold our compliance [standards], we will conduct forward-looking research into laws and regulations in the market we operate and transform our know-how into tools that can be easily assessed at our merchants.<br><br>\* \* \*<br><br>And regarding your second question on compliance, [a]s our business grows, consumers and regulatory bodies are holding us accountable for ever higher compliance requirements and also on the merchants doing business with us. And in order to create a trustworthy shopping environment for our users, *compliance is an area where we're* | Relevant Risks Disclosed<br><br>No Duty to Disclose Uncharged Wrongdoing<br><br>No Allegations Showing Statement False When Made<br><br>Puffery<br><br>Forward-Looking |

| Alleged Misstatement[1] | Reasons Not False or Misleading |
|---|---|
| *committed to improve and where we have invested significant resources over the past few quarters.* Major regulatory frameworks around the world are evolving and new laws and regulations are being introduced. And therefore we see compliance capability as an important aspect of our high-quality development strategy and also compliance capabilities as one of our core capabilities of our platform. (AC ¶ 76.) | |
| **Data Privacy Statements** | |
| **2020 Annual Report** <br> We have a data security team of engineers and technicians dedicated to protecting the security of our data. *We have also adopted strict data protection policy to ensure the security of our proprietary data. We collect anonymized, non-confidential user behavior and pattern data based on their interactions with our platform through our social network partners, which have been pre-processed to exclude user identity or other sensitive information.* We encrypt confidential personal information we gather from our own platform. To ensure data security and avoid data leakage, we have established stringent internal protocols under which we grant classified access to confidential personal data only to limited employees with strictly defined and layered access authority. We strictly control and manage the use of data within our various departments and do not share data with external third parties, nor do we cooperate with third-party vendors in data analytics efforts.  (AC ¶ 79.) | Relevant Risks Disclosed <br><br> No Duty to Disclose Uncharged Wrongdoing <br><br> No Allegations Showing Statement False When Made |
| **Q2 2022 Earnings Call** <br> PDDH has "always been strictly compliant with China's data security standards as regulators and the industry as a whole continue to raise the bar on data security and data protection. We will also keep holding ourselves to the higher standards. This is to help provide to our users and merchants a safe and efficient shopping environment."  (AC ¶ 81.) | Relevant Risks Disclosed <br><br> No Duty to Disclose Uncharged Wrongdoing <br><br> No Allegations Showing Statement False When Made <br><br> Puffery <br><br> Forward-looking |
| **2022 Annual Report** <br> Defendants explained to investors that they "may not have fully complied . . . and may not fully comply in the future" with laws and regulations of another jurisdiction. <br><br> *** <br><br> *Our business generates and processes a large amount of data, and we are required to comply with applicable laws relating to privacy and* | Relevant Risks Disclosed <br><br> No Duty to Disclose Uncharged Wrongdoing <br><br> No Allegations Showing Statement False When Made <br><br> Puffery |

| Alleged Misstatement[1] | Reasons Not False or Misleading |
|---|---|
| *cybersecurity. The improper use or disclosure of data could have a material and adverse effect on our business and prospects.*<br><br>Our business generates and processes a large amount of data. We face risks inherent in handling and protecting them. ***In particular, we face a number of challenges relating to data from transactions and other activities on our platforms, including:***<br><br>• *protecting the data in and hosted on our system, including against attacks on our system by outside parties or fraudulent behavior or improper use by our employees, and securely transmitting such data over public networks;*<br>• *addressing concerns related to privacy and sharing, safety, security and other factors; and*<br>• *complying with applicable laws and regulations relating to the collection, use, storage, transfer, disclosure and security of personal data, including requests from regulatory and government authorities relating to these data.*<br><br>* * *<br><br>*Any negative publicity on our platforms' data safety or privacy protection mechanisms and policies, and any claims asserted against us or fines imposed upon us as a result of actual or perceived failures, could have a material and adverse effect on our public image, reputation, financial condition and results of operations.* Any compromise of our information security or the information security measures of our contracted third-party online payment service providers that results in data being improperly used or disclosed could have a material and adverse effect on our reputation, business, prospects, financial condition and results of operations. ***Significant capital, managerial and other resources, including costs incurred to deploy additional personnel and develop network protection technologies, train employees, and engage third-party experts and consultants, may be required to ensure and enhance information security or to address the issues caused by a potential security failure.*** (AC ¶ 83.) | |
| **2022 Annual Report**<br>*Our business is subject to a large number of laws across many jurisdictions, many of which are evolving.*<br><br>* * *<br><br>*We strive to comply with all applicable laws,* but they may conflict with each other, and by complying with the laws or regulations of one jurisdiction, we may find that we are violating the laws or regulations of | Relevant Risks Disclosed<br><br>No Duty to Disclose Uncharged Wrongdoing<br><br>No Allegations Showing Statement False When Made<br><br>Puffery |

| Alleged Misstatement[1] | Reasons Not False or Misleading |
|---|---|
| another jurisdiction. ***Despite our efforts, we may not have fully complied in the past and may not fully comply in the future, particularly where the applicable regulatory regimes have not been broadly interpreted . . .*** (AC ¶ 85.) | Forward-Looking |
| **Q3 2023 Earnings Call** <br> ***Our approach to competition has always been clear, which is we don't focus on what our competitors do, but what our consumers need. We have been seeing a clear trend of consumption upgrade among our users. And against this backdrop, we formulated the high-quality development strategy to better adapt to this trend. The idea is very simple, but simple does not mean easy. There is both healthy and malicious competition. Sometimes competition can easily evolve into unhealthy market practices. And those who do well will always attract attacks. And for example, we noted a short-tail report on our company was issued in early September. The allegations in the report are totally baseless and a short sale had a spotty track record. And on this page, the report was published with the intent to create panic and to drive down stock prices and enabling the firm to -- the short seller to profit from short position.*** (AC ¶ 89.) | Relevant Risks Disclosed <br><br> No Duty to Disclose Uncharged Wrongdoing <br><br> No Allegations Showing Statement False When Made |
| **2023 Annual Report** <br> ***Our business generates and processes a large amount of data, and we are required to comply with laws relating to privacy and cybersecurity. The improper use or disclosure of data could have a material and adverse effect on our business and prospects.*** <br><br> Our business generates and processes a large amount of data. We face a number of challenges relating to data from transactions and other activities on our platforms, including: <br><br> • protecting the data in and hosted on our system, including against attacks on our system ***by outside parties or fraudulent behavior or improper use by our employees,*** and securely transmitting such data over public networks; <br> • addressing concerns related to privacy, sharing, safety, security and other factors; and <br> • ***complying with applicable laws and regulations relating to the collection, use, storage, transfer, disclosure and security of personal data,*** including any requests from regulatory and government authorities relating to these data. <br><br> To address these challenges, we have adopted strict security policies and measures, including encryption technology, to protect our proprietary data and buyer information. ***Maintaining complete security on our platforms and systems for the storage and transmission of confidential or private data, such as buyers' personal information,*** | Relevant Risks Disclosed <br><br> No Duty to Disclose Uncharged Wrongdoing <br><br> No Allegations Showing Statement False When Made |

| Alleged Misstatement[1] | Reasons Not False or Misleading |
|---|---|
| *payment-related information and transaction information, is essential to maintaining consumer confidence in our platforms and systems.* <br><br> \* \* \* <br><br> *Any negative publicity on our platforms' data safety or privacy protection mechanisms and policies, and any claims asserted or investigations against us or fines imposed upon us as a result of actual or perceived failures, could have a material and adverse effect on our public image, reputation, financial condition and results of operations.* Any compromise of our information security or the information security measures of our contracted third-party payment service providers that results in data being improperly used or disclosed could also materially and adversely affect us. Significant capital, managerial and other resources, including costs incurred to deploy additional personnel, develop network protection technologies, train employees, and engage third-party experts and consultants, may be required to ensure and enhance information security or to address the issues caused by a potential security failure. (AC ¶ 92.) | |
| **2023 Annual Report** <br> *Our business is subject to complex and evolving laws and regulations regarding privacy and data protection in the countries and regions where we have operations. These laws and regulations can be complex and stringent, and many are subject to change and evolving interpretation, which may result in claims, changes to our data and other business practices, regulatory investigations, penalties, or otherwise affect our business.* <br><br> Regulatory authorities around the world have adopted laws and regulations or are considering legislative and regulatory proposals concerning privacy and data protection, including in the PRC, U.S. and the European Union. These laws and regulations regulate the way we collect, use, store, transfer, disclose and secure data and protect the privacy of our users. Global developments in these laws may also create additional compliance obligations for us in the jurisdictions in which we operate. <br><br> \* \* \* <br><br> Aspects of certain newly enacted state privacy statutes remain unclear, resulting in further legal uncertainty and potentially requiring us to modify our data practices and policies and to incur substantial additional costs and expenses to comply. *If more stringent privacy legislation arises in the United States, it could increase our potential liability and* | Relevant Risks Disclosed <br><br> No Duty to Disclose Uncharged Wrongdoing <br><br> No Allegations Showing Statement False When Made |

| Alleged Misstatement[1] | Reasons Not False or Misleading |
|---|---|
| *adversely affect our business, results of operations, and financial condition.*<br><br>* * *<br><br>*Complying with these laws and contractual or other obligations relating to privacy, data protection, data transfers, data localization, or information security may require us to incur substantial operational costs or modify our data practices and policies.* We have taken and will continue to take reasonable measures to comply with such laws and regulations, including those set forth under "Item 4. Information on the Company—B. Business Overview—Data Security and Protection" and "Item 16K. Cybersecurity." *However, there are uncertainties with respect to how such laws and regulations will be implemented and interpreted in practice. Complying with applicable laws and regulations relating to data security and personal information protection may be costly and result in additional expenses to us, and any material failure to do so may subject us to potential liability, regulatory investigations, costly litigation or negative publicity, harm our reputation and business operations, significantly limit or completely hinder our ability to continue to offer securities to investors, or cause the value of such securities to significantly decline.* (AC ¶ 94.) | |
| **Q1 2024 Earnings Call**<br>"compliance is an area where [PDDH is] committed to improve and where [PDDH has] invested significant resources over the past few quarters." (AC ¶ 96.) | Relevant Risks Disclosed<br><br>No Duty to Disclose Uncharged Wrongdoing<br><br>No Allegations Showing Statement False When Made<br><br>Puffery<br><br>Forward-Looking |