**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ x | |
| BLAKE BAXTER, individually and on behalf of all others similarly situated, : | Case No. 24-cv-05653-PKC-CLP |
| Plaintiff, : | |
| vs. : | |
| PDD HOLDINGS INC. F/K/A PINDUODUO INC., LEI CHEN, JING MA, JUN LIU, and JIAZHEN ZHAO, : | |
| Defendants : | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ x | |

**LEAD PLAINTIFF'S MEMORANDUM OF LAW**
**IN OPPOSITION TO DEFENDANT PDD HOLDING INC.'S**
**MOTION TO DISMISS THE AMENDED COMPLAINT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

I.    PRELIMINARY STATEMENT ................................................................................... 1

II.   STATEMENT OF FACTS ........................................................................................... 3

      A.    During the Class Period, PDD Allowed Merchants To Sell Products On Its
            Platforms That Were Made Using Forced Labor in Violation of the UFLPA ........ 3

      B.    During the Class Period, PDD's Platforms Illegally Acted as Spyware When
            Installed on Customer's Devices ............................................................................ 4

      C.    Defendants' False and Misleading Statements Made During the Class Period ...... 5

      D.    Revelation of the Truth Brings Harm To Investors ................................................. 6

III.  ARGUMENT ............................................................................................................... 7

      A.    The Complaint States Actionable Misstatements or Omissions Concerning
            PDD's Compliance with the UFLPA ...................................................................... 7

      B.    The Complaint States Actionable Misstatements or Omissions Concerning
            PDD's Platforms Functioning as Spyware ........................................................... 12

      C.    The Complaint Pleads a Strong Inference of Scienter ......................................... 15

      D.    The Complaint Adequately Pleads Loss Causation .............................................. 20

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Altayyar v. Etsy, Inc.*,
242 F. Supp. 3d 161 (E.D.N.Y. 2017) ......................................................................................11

*In re Arqit Quantum Inc. Sec. Litig.*,
774 F. Supp. 3d 505 (E.D.N.Y. 2025) ...................................................................15, 17, 18, 20

*Asay v. Pinduoduo Inc.*,
2021 WL 3871269 (2d Cir. Aug. 31, 2021)..............................................................................11

*Bernacchi v. Investment Technology Group, Inc.*,
No. 15-cv-6369 (S.D.N.Y. Apr. 26, 2017) ...............................................................................11

*Christine Asia Co. v. Ma*,
718 F. App'x 20 (2d Cir. 2017) ..........................................................................................12, 14

*City of Hollywood Police Officers' Ret. Sys. v. Henry Schein, Inc.*,
552 F. Supp. 3d 406 (E.D.N.Y. 2021) ........................................................................................8

*City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp.*,
875 F. Supp. 2d 359 (S.D.N.Y. 2012).......................................................................................19

*City of Warren Police & Fire Ret. Sys. v. Foot Locker, Inc.*,
412 F. Supp. 3d 206 (E.D.N.Y. 2019) ......................................................................................20

*Constr. Laborers Pension Tr. for S. California v. CBS Corp.*,
433 F. Supp. 3d 515 (S.D.N.Y. 2020).......................................................................................22

*Crivellaro v. Singularity Future Tech. Ltd.*,
2024 WL 5146051 (E.D.N.Y. Dec. 17, 2024) ..........................................................................13

*In re Dentsply Sirona, Inc. Sec. Litig.*,
665 F. Supp. 3d 255 (E.D.N.Y. 2023) ......................................................................................20

*Eden Alpha CI LLP v. Polished.com Inc.*,
763 F. Supp. 3d 270 (E.D.N.Y. 2025) ......................................................................................14

*Handal v. Tenet Fintech Grp. Inc.*,
2023 WL 6214109 (E.D.N.Y. Sept. 25, 2023) .........................................................................16

*Hawaii Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*,
422 F. Supp. 3d 821 (S.D.N.Y. 2019).................................................................................10, 14

*IWA Forest Indus. Pension Plan v. Textron Inc.*,
    14 F.4th 141 (2d Cir. 2021) ..............................................................................8

*Jiajia Luo v. Sogou, Inc.*,
    465 F. Supp. 3d 393 (S.D.N.Y. 2020).............................................................15

*Lea v. TAL Educ. Grp.*,
    837 F. App'x 20 (2d Cir. 2020) ......................................................................22

*In re Lehman Bros. Sec. & ERISA Litig.*,
    2013 WL 3989066 (S.D.N.Y. July 31, 2013) .................................................13

*Lematta v. Casper Sleep, Inc.*,
    2022 WL 4637795 (E.D.N.Y. Sept. 30, 2022) ...............................................22

*Levy v. Maggiore*,
    48 F. Supp. 3d 428 (E.D.N.Y. 2014) ..............................................................19

*Meyer v. Jinkosolar Holdings Co.*,
    761 F.3d 245 (2d Cir. 2014)................................................................9, 10, 12, 13

*In re MF Global Holdings Ltd. Sec. Litig.*,
    982 F. Supp. 2d 277 (S.D.N.Y. 2013)........................................................11, 15

*In re Moody's Corp. Sec. Litig.*,
    599 F. Supp. 2d 493 (S.D.N.Y. 2009)..............................................................13

*In re Mylan N.V. Sec. Litig.*,
    2018 WL 1595985 (S.D.N.Y. Mar. 28, 2018) .................................................10

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)....................................................................13, 14, 16

*In re Openwave Sys. Sec. Litig.*,
    528 F. Supp. 2d 236 (S.D.N.Y. 2007)..............................................................20

*In re OSI Pharms., Inc. Sec. Litig.*,
    2007 WL 9672541 (E.D.N.Y. Mar. 31, 2007)...................................................9

*Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*,
    11 F.4th 90 (2d Cir. 2021) .............................................................................11

*RSM Prod. Corp. v. Fridman*,
    643 F. Supp. 2d 382 (S.D.N.Y. 2009)..............................................................13

*In re Salix Pharms., Ltd.*,
    2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016)..................................................16

iii

*San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*,
  2025 WL 1903959 (S.D.N.Y. July 10, 2025) ...................................................................21

*Saskatchewan Healthcare Employee's Pension Plan v. KE Holdings Inc.*,
  718 F. Supp. 3d 344 (S.D.N.Y. 2024) ..............................................................................13

*In re Scholastic Corp. Sec. Litig.*,
  252 F.3d 63 (2d Cir. 2001) ................................................................................................18

*In Re Shanda Games Ltd. Sec. Litig.*,
  128 F.4th 26 (2d Cir. 2025) ..............................................................................................16

*In re Sibanye Gold Ltd. Sec. Litig.*,
  2020 WL 6582326 (E.D.N.Y. Nov. 10, 2020) ..................................................................14

*In re Signet Jewelers Ltd. Sec. Litig.*,
  2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018) ............................................................9, 17, 19

*Singh v. Cigna Corp.*,
  918 F.3d 57 (2d Cir. 2019) ................................................................................................11

*Strougo v. Barclays PLC*,
  105 F. Supp. 3d 330 (S.D.N.Y. 2015) ..............................................................................13

*In re Symbol Techs., Inc. Sec. Litig.*,
  2013 WL 6330665 (E.D.N.Y. Dec. 5, 2013) ....................................................................16

*In re Synchrony Fin. Sec. Litig.*,
  988 F.3d 157 (2d Cir. 2021) ..............................................................................................8

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007) ..........................................................................................14, 15, 16, 19

*Ulbricht v. Ternium S.A.*,
  2020 WL 5517313 (E.D.N.Y. Sept. 14, 2020) .................................................................15

*In re Vale S.A. Sec. Litig.*,
  2020 WL 2610979 (E.D.N.Y. May 20, 2020) ..............................................................11, 20

*In re Vivendi, S.A. Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016) ..............................................................................................21

*Zornberg v. NAPCO Sec. Techs., Inc.*,
  778 F. Supp. 3d 516 (E.D.N.Y. 2025) ..............................................................................21

**Statutes & Rules**

15 U.S.C. § 78u-4 ........................................................................................................8, 13, 14

iv

15 U.S.C. § 78v(b) ..............................................................................................................8

Fed. R. Civ. P. 15..............................................................................................................22

Fed. R. Civ. P.  8..............................................................................................................20

Fed. R. Civ. P.  9(b) ...........................................................................................................8

Uyghur Forced Labor Prevention Act, Pub. L. No. 117-78, 135 Stat. 1525 (2021).............. *passim*

## I.    PRELIMINARY STATEMENT[1]

This action challenges materially false and misleading statements and omissions by PDD Holdings Inc. ("PDD" or the "Company") and certain of its senior executives (the "Individual Defendants") concerning the Company's compliance with U.S. law and the safety of its platforms: Pinduoduo, a Chinese online marketplace, and Temu, a global shopping app. While touting that it had "strict policies" against forced labor and "industry-leading" data protections, PDD built its business on exactly those abuses—permitting and profiting from the sale of goods produced with forced labor and embedding spyware in its widely-downloaded apps.

Throughout the Class Period, Defendants insisted that PDD had robust safeguards against forced labor and industry-leading data protections. They told investors that PDD "require[d]" merchants not to use forced, penal, or child labor, and that it had "established policies and procedures" to ensure compliance with the Uyghur Forced Labor Prevention Act ("UFLPA"). They represented that PDD's Temu shopping app collected only "anonymized, non-sensitive" data and operated under "strict data protection" protocols and that customer trust was "essential" to PDD. These present-tense assurances conveyed to investors that PDD had invested in and implemented enforceable compliance frameworks and meaningful safeguards.

In reality, no such safeguards existed, and their eventual price tag would be devastating. In June 2023, an investigation by Congress found that Temu lacked "even the façade of a meaningful compliance program" which guaranteed that shipments containing forced-labor goods were entering the United States "on a regular basis." PDD admitted that it conducted no audits, had no compliance program, and disclaimed responsibility for the 80,000 merchants on its platform.

---

[1] Citations to "¶" or "¶¶" are to paragraphs in Lead Plaintiff's Consolidated Complaint (the "Complaint"). ECF No. 31. Citations to "Mot." are to Defendant PDD Holdings Inc.'s Motion to Dismiss. ECF No. 41. All internal quotation marks and citations are omitted, and all emphases in quotations are added, unless otherwise indicated. For ease of reference, each alleged false and misleading statement ("Misstatement #") is listed in **Appendix A**.

Instead, PDD relied on a hollow "reporting system" that predictably never generated a single forced-labor complaint, even as high-risk products were openly sold on Temu.

At the same time, investigative journalists, security researchers, and ultimately the Arkansas Attorney General uncovered that Temu was purposefully designed to operate as spyware. Technical analyses revealed that Temu was capable of bypassing phone security systems, demanding excessive permissions, and harvesting virtually all of a phone's data. That data was then sold to third parties, at the direct expense of customer privacy. Even more troubling, Temu knowingly and illegally collected personal data from minors without parental consent.

When these reports were ultimately confirmed by PDD after its prior denials and the cost of bringing the Company into compliance became known, investors paid the price. On June 27, 2024, PDD's stock fell 4.55% following the Arkansas Attorney General's public confirmation of prior speculation that Temu was designed to operate as spyware. Then, on August 26, 2024, the Company's stock collapsed nearly 30% after the Company released its financial results for second quarter 2024 ("Q2 2024 Earnings Release"), which revealed that profitability was sharply reduced and would remain under pressure for the "foreseeable years ahead." On the accompanying call, Defendant Chen explained that PDD would not issue dividends or repurchase shares and explained that margins would be depressed by reductions in transaction fees for "high-quality merchants," which he attributed to the Company taking on "greater social responsibilities." These admissions confirm that PDD relied on unsustainable business practices—forced labor and spyware—and for the first time revealed the increase costs and diminish profitability needed to remedy them.

PDD now attempts to dismiss the Complaint's well-pled allegations by mischaracterizing the facts and law. The Complaint contains allegations corroborated by multiple independent sources: a congressional investigation, detailed short-seller and forensic reports, contemporaneous

investigative journalism, and PDD's own admissions. Viewed holistically, these facts easily meet the PSLRA's heightened pleading standards. They support not only a strong inference of scienter but the most compelling inference: that PDD and its executives knew they lacked any meaningful compliance framework and deliberately misled investors as to the Company's sustainability while continuing to profit from forced labor and spyware.

Investors are entitled to rely on a company's sworn filings, not to scour foreign media reports or guess at risks and costs the company might be concealing. PDD chose to assure investors of its "strict policies" and "robust safeguards" while knowing they did not exist, thereby misleading the market. For these reasons, PDD's motion to dismiss should be denied entirely.

## II.    STATEMENT OF FACTS

### A.    During the Class Period, PDD Allowed Merchants To Sell Products On Its Platforms That Were Made Using Forced Labor in Violation of the UFLPA

Xinjiang is a major cotton-producing region in China, and forced labor there has been described as so pervasive that it forms part of the region's regular economy. ¶31. In response, on December 23, 2021, Congress enacted the UFLPA, which took effect on June 21, 2022. ¶32. The law was passed specifically to address the systemic use of forced labor against Uyghurs and other ethnic minorities in China, and it establishes a rebuttable presumption that all goods produced in Xinjiang are tainted by forced labor unless U.S. Customs and Border Protection (the "CBP") certifies otherwise. *Id.* Since then, the CBP has detained thousands of shipments worth hundreds of millions of dollars across industries, underscoring the breadth of the forced-labor problem and compelling companies to trace their supply chains for forced labor. ¶33.

On June 22, 2023, a Congressional Committee issued a report detailing PDD and Temu's noncompliance with the UFLPA (the "Congressional Report"). ¶34. The Congressional Report concluded that PDD had no system in place to prevent the import of goods made with forced labor,

3

thereby "guarantee[ing] that shipments from Temu containing products made with forced labor are entering the United States on a regular basis," and PDD admitted that it conducted no audits, had no compliance program to ensure adherence to U.S. law. ¶¶35–36, 114–17.

The Congressional Report further stated that PDD does not prohibit sellers from sourcing goods in Xinjiang, instead relying on a "reporting system" where consumers or regulators could file complaints—despite acknowledging that it had never received any complaints related to forced labor. ¶¶37, 114–17. The Congressional Report also identified products openly advertised on Temu's platform as made with Xinjiang cotton, underscoring the absence of any meaningful safeguards. ¶¶38, 118. Defendant PDD participated in the congressional investigation and responded to inquiries concerning the misconduct alleged herein, evidencing awareness and knowledge of the issues by the Company's senior officers and managements. ¶111. Moreover, the misconduct alleged concerned core operations of PDD's business. ¶112.

## B. During the Class Period, PDD's Platforms Illegally Acted as Spyware When Installed on Customer's Devices

During the Class Period, PDD's platform functioned as spyware capable of bypassing phone security, monitoring activity, and accessing private data. ¶46. On March 20, 2023, Jefferies highlighted growing consumer concerns over data privacy. ¶47. The next day, Reuters reported that Google suspended PDD's Pinduoduo app after finding malware in its off-store version, and Bloomberg reported Kaspersky Lab's confirmation that certain versions of the Company's platform contained malicious code exploiting Android vulnerabilities. ¶¶48–49. *Credit Suisse noted PDD's denial of these findings*. ¶50.

On April 2, 2023, CNN reported that cybersecurity researchers concluded Pinuoduo had taken privacy violations "to the next level" by spying on customers and competitors. ¶51. Citibank also flagged PDD among firms posing regulatory risks, citing Google's suspension of its app, and

Montana banned the Temu app from government devices due to data-sharing concerns. ¶¶52–53.

On September 6, 2023, Grizzly Research issued a report (the "Grizzly Report") explaining that Temu contained hidden functions enabling broad data exfiltration from users' devices, was intentionally designed to conceal its intrusiveness, and shared development ties with the Pinduoduo app previously suspended by Google. Researchers cited by Grizzly concluded Temu was "the most dangerous app in wide circulation." ¶54.

On June 25, 2024, the Arkansas Attorney General filed a complaint (the "Arkansas Complaint") claiming that Temu was designed to gain unrestricted access to sensitive phone data—i.e., camera, location, contacts, text messages, documents, and other applications—and monetized this unauthorized collection of data by selling it to third parties. ¶¶56–59, 119–23. The Arkansas Complaint further cited researchers who concluded Temu was intentionally loaded with spyware tools, capable of bypassing security systems, demanding excessive permissions, and spying on users and competitors. *Id*. The Arkansas Complaint emphasized that Defendants knowingly collected personal data from minors without parental consent. *Id.*

**C.    Defendants' False and Misleading Statements Made During the Class Period**

Throughout the Class Period, Defendants falsely assured investors that PDD: (1) had internal policies to ensure UFLPA compliance; (2) prioritized customer data protection and data security; and (3) strived to comply with all applicable laws and regulations. ¶¶60, 69–70, 74–75. In SEC filings on April 25, 2022 and April 26, 2023 (the "2022 Annual Report"), PDD acknowledged only the potential impact of changes to U.S. trade policy, while downplaying passage of the UFLPA despite knowing, or recklessly disregarding, its violations. ¶¶61, 69–70.

PDD further claimed it had procedures to ensure no Temu seller was on the UFLPA Entity List and that it used technology to identify high-risk products. ¶¶62, 71–75. In an SEC filing on April 25, 2024 (the "2023 Annual Report"), PDD told investors that it "require[d]" merchants on

5

its platform not to use "forced, penal or child labor." ¶71. On May 22, 2024, during an earnings call ("Q1 2024 Earnings Call"), Defendant Chen claimed that PDD invested significant resources into its compliance efforts. ¶¶76–77.

Defendants also concealed that the Company's platforms acted as spyware. In an SEC filing from April 30, 2021 (the "2020 Annual Report"), PDD stated that it had "strict data protection policy," a team "dedicated to protecting the security of our data," and collected only anonymized, non-sensitive information, strictly limiting internal use and never sharing data with third parties. ¶¶63, 79–80. PDD emphasized that maintaining platform security was "essential" and that it employed strict policies and encryption to safeguard user information. ¶¶64, 66, 83. Defendants reiterated these misleading claims in the 2022 Annual Report. ¶¶61, 64, 66, 83–86.

On an August 29, 2022 earnings call, Defendant Chen assured investors that PDD had "always been strictly compliant" with data security standards and would "keep holding [itself] to the higher standards" to provide a safe shopping environment. ¶¶65, 81–82. On November 28, 2023, Defendant Zhao denied all spyware allegations as "totally baseless." ¶¶67, 87–90.

Also, the 2023 Annual Report claimed that PDD had "adopted strict security policies and measures, including encryption technology, to protect our proprietary data and buyer information." ¶¶92–95. The 2023 Annual Report further acknowledged that "[m]aintaining complete security on our platforms . . . is essential to maintaining consumer confidence," hypothetically claiming that negative publicity about its privacy efforts "could" materially impact their business. *Id.*

**D.**    **Revelation of the Truth Brings Harm To Investors**

On June 27, 2024, the price of PDD ADS declined 4.55% after the filing of the Arkansas Complaint, which provided the public with new credible information regarding the Company's use of spyware and Temu's deliberate design to harvest unrestricted access to sensitive user data (including from minors and competitors) and then profited by using that date or selling it to third

6

parties. ¶¶56–59, 119–23, 136.

On August 26, 2024, PDD ADS declined 29% following Defendants' disclosure that the Company did not plan to issue dividends or repurchase shares for the "foreseeable years ahead." ¶¶98, 102, 137–38. Defendant Chen explained that future profitability would be weighed down by reductions in transaction fees for high-quality merchants intended to promote the "high-quality development" of its merchant ecosystem. ¶¶98, 138. Defendants attributed the Company's current and future poor performance to taking on greater social responsibilities in part, confirming PDD's wrongful acts relating to forced labor and spyware and revealing for the first time their ultimate price. ¶¶99–100, 138. PDD had previously suggested on its Q1 2024 Earnings Call that it needed to "improve" compliance but without disclosing the substantial costs. ¶¶99–100, 138.

PDD blamed both "intensifying competition" and a commitment to "social responsibility" for its poor performance. ¶¶103–04. In reality, PDD was so fixated on outpacing competitors that it resorted to unsustainable and unethical business practices. ¶¶8, 103. As alleged in the Arkansas Complaint and reported by an IT security firm, insiders confirmed that PDD's platforms were designed to spy on users and competitors to boost sales. ¶103. PDD also turned a blind eye to forced labor concerns: PDD admitted it had no policy prohibiting the sale of goods from Xinjiang and further denied responsibility for ensuring that its merchants did not sell forced labor products. ¶104. These allegations underscore that PDD purposefully misled and harmed investors by prioritizing competitive advantage above user privacy and human rights.

III.    ARGUMENT

   A.    **The Complaint States Actionable Misstatements or Omissions Concerning PDD's Compliance with the UFLPA**

In considering PDD's motion to dismiss, the Court must consider "whether, assuming the allegations of the complaint to be true . . . the complaint sets forth factual material to render the

claims plausible." *City of Hollywood Police Officers' Ret. Sys. v. Henry Schein, Inc.*, 552 F. Supp. 3d 406, 414 (E.D.N.Y. 2021). In addition, a claim under Section 10(b) must meet the pleading requirements of Rule 9(b) and the PSLRA. *See IWA Forest Indus. Pension Plan v. Textron Inc.*, 14 F.4th 141, 145 (2d Cir. 2021). Section 10(b) of the Exchange Act imposes a duty to tell the full truth and makes actionable statements that are "inaccurate, incomplete, or misleading." *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 167 (2d Cir. 2021). The Complaint satisfies Rule 9(b) and the PSLRA by explaining "why and how" each statement was false, "evaluated not only by literal truth, but by context and manner of presentation." *IWA*, 14 F.4th at 145.

Section 10(b) prohibits both false statements and omissions of material fact necessary to render those statements not misleading in context. PDD told investors that it "require[s] merchants on the Temu platform to comply" with its code of conduct, "which strictly prohibits the use of forced penal, or child labor[,]" and that it had "establish[ed] policies and procedures" to ensure compliance with the UFLPA. ¶¶4, 62, 72–75; Misstatement 2–3. These statements are incomplete and materially misleading considering PDD's later admission that it lacked any internal controls to validate compliance with the UFLPA. *Id.*

PDD's representation that it "strictly prohibits the use of forced, penal or child labor" on its platform rested solely on boilerplate self-attestation by merchants. ¶¶72–75; Misstatement 2–3. A reasonable investor would interpret such statements to mean that PDD had adopted and implemented operational controls, procedures, or enforcement mechanisms to detect and prevent violations. Yet, the Complaint alleges that PDD had no system in place to independently verify compliance with the UFLPA, no company-lead screening mechanisms, and no audit and enforcement protocols. ¶¶70, 73, 75, 77. Because PDD relied entirely on merchant-self reporting, it unsurprisingly did not "receive any complaints regarding forced labor practices." ¶¶37, 117.

8

Thus, Defendants touted the existence of an enforceable compliance framework that did not exist.

PDD's claim that certain statements (Mot. 14–15; Misstatement 1–3) are "indisputably accurate" is a red herring. Even if it were literally true that PDD maintained a "zero-tolerance policy" and a "Prohibited Product List," those assurances were materially misleading because the Complaint alleges they existed only on paper—without any internal monitoring, audits, or enforcement to make them meaningful. Courts consistently hold that compliance representations are actionable where no meaningful procedures exist or where they are contradicted by contemporaneous knowledge of deficiencies. *See Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 251 (2d Cir. 2014) (statements about compliance misleading where the company omitted known deficiencies in controls); *In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *15 (S.D.N.Y. Nov. 26, 2018) (defendants owed a duty to implement touted safeguards to render earlier statements not misleading).

The fact that forced labor in Xinjiang was discussed in the Congressional Report and media coverage (Mot. 14) does not excuse PDD's duty to disclose that it lacked any meaningful UFLPA compliance framework and affirmatively permitted Xinjiang goods on its platform and the cost that compliance would ultimately have on the Company. Public reporting of general risks is not equivalent to disclosure of a company's particular deficiencies; and here, PDD's assurances of "strict measures," "zero-tolerance," and "policies and procedures" created the misleading impression of a functioning compliance regime, an impression not cured by scattered media reports, and one that concealed the ultimate financial impact. Mot. 10–11; Misstatement 1–3. Whether a reasonable investor would rely on the Company's official filings rather than public speculation is a fact question inappropriate for resolution on a motion to dismiss. *See, e.g.*, *In re OSI Pharms., Inc. Sec. Litig.*, 2007 WL 9672541, at *13–14 (E.D.N.Y. Mar. 31, 2007).

9

PDD's reliance on generic risk statements is misplaced. Mot. 10–13. The cited "warnings" were framed in conditional terms—i.e., that PDD "adopted strict measures . . . [that] may not always be successful" and that "[a]lthough we implement a zero-tolerance policy . . . there can be no assurance" it would prevent illegal activity. Mot. 10–11. Such statements described hypothetical risk, not present reality. In fact, PDD had no meaningful compliance program as its so-called "strict measures" amounted only to boilerplate self-attestation by merchants. ¶¶72–75. Nor did the "zero-tolerance policy" disclose that PDD affirmatively permitted the sale of Xinjiang-made goods, presumptively produced with forced labor under the UFLPA. ¶¶32, 74–75, 115–18.

Courts reject the notion that vague disclaimers cure omissions where the company knew its "policies" were illusory. *Meyer*, 761 F.3d at 251; *see also In re Mylan N.V. Sec. Litig.*, 2018 WL 1595985, at *10 (S.D.N.Y. Mar. 28, 2018). Once Defendants touted "strict measures" and a "zero-tolerance policy," they had a duty to disclose that they did not exist in any operational sense.

Under the UFLPA, all goods manufactured in Xinjiang are presumed made with forced labor. ¶¶32, 74–75, 115–18. Yet, PDD admitted that it did not prohibit merchants from selling Xinjiang-made products. *Id.* These facts would fundamentally alter a reasonable investor's assessment of the likelihood and prevalence of non-compliance. *See Hawaii Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*, 422 F. Supp. 3d 821, 840 (S.D.N.Y. 2019) ("[G]eneric warning of a risk will not suffice when undisclosed facts . . . would substantially affect a reasonable investor's calculations of probability."). To a reasonable investor statements such as "we establish policies and procedures" and "strictly prohibit the use of forced, penal or child labor" mean that PDD had, at a minimum, implemented some formal compliance framework—even if imperfect. ¶¶72–75; Misstatement 1–3. Yet, the Complaint alleges that no such measures existed at the time Defendants made those statements. ¶¶70–77. PDD cannot shield

10

itself with vague disclaimers that its hypothetical controls "may not always be successful" (Mot. 10–11), when the undisclosed reality was that its "policies" were illusory.[2]

Moreover, Defendants later confirmed the falsity of these representations. On August 26, 2024, PDD admitted its poor performance and suspension of dividends or buybacks was driven in part by the "greater social responsibilities" stemming from its forced labor violations. ¶¶70, 73, 75, 77. This disclosure corroborates the falsity and materiality of the earlier statements.

PDD's attempt to dismiss certain UFLPA statements (Mot. 19; Misstatement 1, 3), as puffery or forward-looking fares no better. Statements are not puffery or about the future where, as here, they convey "misrepresentations of existing facts." *See, e.g.*, *In re MF Global Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 305, 318 (S.D.N.Y. 2013). Defendants did not make vague, aspirational promises about future conduct; they gave present-tense assurances that PDD had established enforceable policies and procedures to prohibit forced labor—assurances that were untrue. ¶¶62, 71–75. Defendants did not make aspirational commitments about the future, but false assurances about the Company's present operations.[3] *See, e.g.*, *Bernacchi v. Investment Technology Group, Inc.*, No. 15-cv-6369, at *27–28 (S.D.N.Y. Apr. 26, 2017) (statements that

---

[2] PDD's reliance on *Asay v. Pinduoduo Inc.*, 2021 WL 3871269, at *2–3 (2d Cir. Aug. 31, 2021) is misplaced. In *Asay*, the Company disclosed contemporaneous compliance failures, candidly alerting investors to known weaknesses in its controls. Here, the Complaint alleges that Defendants failed to disclose that PDD had no compliance framework whatsoever, rendering its assurances misleading half-truths. ¶¶32, 74–75. Similarly, in *Singh v. Cigna Corp.*, 918 F.3d 57, 64 (2d Cir. 2019), the court found immaterial statements about a company's "integrity" and "commitment" to compliance because they were vague puffery paired with candid disclosures. By contrast, Defendants' statements were specific factual assertions about existing compliance procedures—assertions flatly contradicted by revelations that PDD lacked any effective compliance measures. Unlike in *Altayyar v. Etsy, Inc.*, 242 F. Supp. 3d 161, 177 (E.D.N.Y. 2017), where Etsy disclosed the precise limits of established procedures, PDD assured investors it had "establish[ed] policies and procedures" and "require[d] merchants" to comply with a code "strictly prohibit[ing]" forced labor—while omitting the present fact that no such compliance framework existed. ¶¶72–75.

[3] Unlike in *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 103 (2d Cir. 2021), the Complaint does not challenge generic platitudes; Defendants chose to speak about UFLPA compliance, yet omitted the material fact that the Company had no effective policies, procedures, or monitoring systems—transforming the disclosure into a misleading half-truth. And unlike the aspirational statements in *In re Vale S.A. Sec. Litig.*, 2020 WL 2610979, at *12 (E.D.N.Y. May 20, 2020), Defendants assured investors they "may not have fully complied in the past and may not fully comply in the future," which, given their knowledge that no compliance framework existed, was materially misleading. Misstatement 1, 3, 8.

11

product allowed users to "remain 'anonymous'" and provided "complete confidentiality" were actionable, not "vague or aspirational").

Because PDD failed to disclose known deficiencies in its compliance measures, its misstatements and omissions are also actionable under Item 303. *See Christine Asia Co. v. Ma*, 718 F. App'x 20, 23 (2d Cir. 2017); ¶124. PDD's argument that the risks were already disclosed (Mot. 13) ignores that Item 303 requires disclosure of presently known trends and uncertainties— not hypothetical risks. *Christine Asia*, 718 F. App'x at 23; ¶124. The Complaint alleges PDD and its management knew the Company had no meaningful UFLPA compliance framework and affirmatively allowed the sale of Xinjiang-made goods, making the risk of non-compliance not merely possible, but present and inevitable. ¶¶70–77, 115–18. That present reality would and did materially impact the Company's financials, and Item 303 required disclosure of those facts. ¶124.

### B.   The Complaint States Actionable Misstatements or Omissions Concerning PDD's Platforms Functioning as Spyware

The Complaint alleges particularized facts showing that Defendants' misrepresentations related to Temu acting as spyware were materially false or misleading. Specifically, PDD claimed it had "adopted strict data protection policy to ensure the security of our proprietary data" and only "collect[ed] anonymized, non-confidential user behavior and pattern data . . . which [had] been pre-processed to exclude user identity or other sensitive information." ¶¶78–80; Misstatement 5, 10. In reality, the Temu app was "purposefully designed to gain unrestricted access to a user's phone operating system, including, but not limited to, a user's camera, specific location, contacts, text messages, document, and other applications" and to monetize that unauthorized data by selling it to third parties. ¶¶46, 55–59, 78–105. Having chosen to speak about data protection and collection, Defendants assumed a duty disclose the full truth about Temu's spyware design and data monetization. *See Meyer*, 761 F.3d at 250–51; Misstatement 5, 10.

12

Contrary to PDD's contention (Mot. 16), the Complaint does not rest on speculation. Rather, it details specific misconduct corroborated by independent, contemporaneous evidence. ¶¶46–59, 78–97. This evidence includes investigative reporting (¶¶47–54), forensic analysis and evidence cited by the Arkansas Attorney General (¶¶46, 55–59), and PDD's own public admissions following prior denials (¶¶5, 67–68, 87, 93–105).[4] Collectively, these sources confirm that the Temu app's code was designed to operate like spyware. These particularized allegations are adequate under the PSLRA and are bolstered by independent corroboration, which courts recognize as sufficient to satisfy the heightened pleading standard.[5] *See Crivellaro v. Singularity Future Tech. Ltd.*, 2024 WL 5146051 (E.D.N.Y. Dec. 17, 2024).

PDD attacks the Grizzly Report as inherently unreliable (Mot. 17–18); but courts credit short-seller research where, as here, it is sufficiently detailed and corroborated by other sources. Notably, the Grizzly Report "explains [its] methodology," "corroborate[s] its analysis," and does not rely on confidential sources. *KE Holdings*, 718 F. Supp. 3d at 381–84 (rejecting argument that short seller reports must be independently corroborated by counsel). The Complaint does not rely on allegations from the Grizzly Report alone; rather, it expressly links the Grizzly Report's findings to investigative journalism, government inquiries, and technical analysis (¶¶48–53)— precisely the sort of corroboration that courts deem reliable.

---

[4] *Saskatchewan Healthcare Employee's Pension Plan v. KE Holdings Inc.*, 718 F. Supp. 3d 344, 381–84 (S.D.N.Y. 2024) (crediting short seller allegations towards falsity); *Strougo v. Barclays PLC*, 105 F. Supp. 3d 330, 343 (S.D.N.Y. 2015) (crediting state attorney general complaint because "[t]he facts are derived from a credible complaint based on facts obtained after an investigation"); *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 504, 508 (S.D.N.Y. 2009) (recognizing Congressional hearing transcripts supported falsity); *Novak v. Kasaks*, 216 F.3d 300, 312–13 (2d Cir. 2000) (defendants' own admissions count towards falsity); *Meyer*, 761 F.3d at 251 (finding defendants' own identification of its compliance issues to regulators could "allow a trier of fact . . . to draw an inference" that the existing problems were both present and substantial).

[5] PDD's cited authorities are inapplicable. *See* Mot. 17 (citing *RSM Prod. Corp. v. Fridman*, 643 F. Supp. 2d 382, 403 (S.D.N.Y. 2009); *In re Lehman Bros. Sec. & ERISA Litig.*, 2013 WL 3989066, at *4 (S.D.N.Y. July 31, 2013)). In *RSM* and *Lehman Bros.*, the courts rejected pleadings that relied ***exclusively*** on unresolved complaints in unrelated actions. Here, by contrast, the Complaint does not blindly or exclusively rely on third-party pleadings: it incorporates allegations that are corroborated by detailed investigative reports, media coverage, and PDD's own subsequent admissions. ¶¶34–43, 47–59, 61–77, 91–95, 114–23.

PDD also mischaracterizes the Complaint's references to media reporting as uncorroborated speculation. Mot. 18–19 (citing ¶¶48–53). The Complaint does not "regurgitate" unparticularized press clippings, but incorporates detailed, contemporaneous findings corroborated by multiple independent sources. For example, Reuters reported that Google suspended PDD's app after Google Play Protect identified malware (¶48); Bloomberg described Kaspersky Lab's technical findings that the app contained malicious code exploiting Android vulnerabilities (¶49); and CNN cited cybersecurity experts and insiders who confirmed the app could bypass security, intercept messages, and spy on competitors (¶51). Analysts at Credit Suisse and Citibank further reported on these issues, and the state of Montana banned the Temu app from government devices for security risks. ¶¶47, 50, 52–53. Courts routinely credit the corroborative effect of such detailed media coverage at the pleading stage.[6] *See Christine Asia*, 718 F. App'x at 23 (faulting the district court for discounting contemporaneous public materials and failing to draw inferences in the plaintiff's favor and reversing).

Defendants' boilerplate warnings cannot immunize them from liability. Mot. 15–16. PDD's disclosures that it "may not have fully complied [with all applicable laws and regulations] in the past and may not fully comply in the future" (¶¶83–85; Misstatement 8) were couched as hypothetical. Yet, the Complaint alleges present and ongoing misconduct: the Temu app was intentionally spying on customers and monetizing user data. Courts hold that risk disclosures framed as mere possibilities are misleading when the risk has already materialized. *See AMC*, 422 F. Supp. 3d at 840. Similarly, warnings that "actual or perceived failures" in data privacy "could

---

[6] Unlike here, *Novak*, 216 F.3d at 314 and *Eden Alpha CI LLP v. Polished.com Inc.*, 763 F. Supp. 3d 270, 296 (E.D.N.Y. 2025), involved confidential sources and the courts cautioned against crediting secondhand anonymous witnesses. Far from the conclusory or uncorroborated reporting at issue in *In re Sibanye Gold Ltd. Sec. Litig.*, 2020 WL 6582326, at *16 (E.D.N.Y. Nov. 10, 2020), these allegations are particularized, mutually reinforcing, and anchored in contemporaneous evidence. Defendants complain that the Complaint does not rely on confidential witnesses or internal documents, yet nothing in *Tellabs* or the PSLRA imposes such requirement. Mot. 21.

14

have a material and adverse effect" on the Company ring hollow when PDD's platform was intentionally designed to function as spyware. Misstatement 7, 10. Defendants cannot warn of possible data privacy failures while concealing that such failures were a present fact.[7]

For the same reasons that the UFLPA statements are not puffery or forward looking, neither are Defendants' claims concerning data privacy. Representations that PDD had adopted "strict" data protections, limited collection to anonymized data, and required compliance with privacy laws conveyed specific, verifiable assurances. ¶¶81, 83, 96; Misstatement 5, 6, 10. These were not aspirational, but concrete representations directly contradicted by contemporaneous facts showing Temu was designed to operate as spyware. Defendants' assurances misrepresented existing practices; therefore, they are actionable. *See MF Global Holdings*, 982 F. Supp. 2d at 316–18.

### C.   The Complaint Pleads a Strong Inference of Scienter

In analyzing scienter, the Court must conduct a "comparative assessment of plausible inferences" while "constantly assuming the plaintiff's allegations to be true," to determine whether "a reasonable person [would] deem the inference of scienter as least as strong as any opposing inference." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 326–27 (2007). Scienter allegations must be viewed holistically. *Id.* It is black letter law that scienter can be established by "alleg[ing] facts that constitute strong circumstantial evidence of conscious misbehavior ***or*** recklessness" which is "an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *In re Arqit Quantum Inc. Sec. Litig.*, 774 F. Supp. 3d 505, 544–45 (E.D.N.Y. 2025).

Scienter is adequately pled where a complaint alleges facts giving rise to a strong inference

---

[7] Because Defendants chose to speak in concrete terms, they had a duty to disclose the full truth, making *Ulbricht v. Ternium S.A.*, 2020 WL 5517313, at *7 (E.D.N.Y. Sept. 14, 2020) and *Jiajia Luo v. Sogou, Inc.*, 465 F. Supp. 3d 393, 413–14 (S.D.N.Y. 2020) inapposite.

of recklessness by pleading that defendants "knew facts or had access to information suggesting that their public statements were not accurate" or "failed to check information they had a duty to monitor." *Novak*, 216 F.3d at 307, 311. Such a showing supports the inference that the defendants "knew or, more importantly, should have known that they were misrepresenting material facts." *In re Symbol Techs., Inc. Sec. Litig.*, 2013 WL 6330665, at *9 (E.D.N.Y. Dec. 5, 2013). The inference "need not be irrefutable, i.e., of the 'smoking gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs*, 551 U.S. at 324. "When the competing inferences rest in equipoise, the tie . . . goes to the plaintiff." *In re Salix Pharms., Ltd.*, 2016 WL 1629341, at *13 (S.D.N.Y. Apr. 22, 2016). The Individual Defendants' and managements' scienter is imputed to the Company. *See e.g.*, *In Re Shanda Games Ltd. Sec. Litig.*, 128 F.4th 26, 53 (2d Cir. 2025) (imputing scienter of senior officers and management to the corporation).

Here, the Complaint's allegations show: "(1) specific contradictory information [that] was available to the defendants (2) at the same time they made their misleading statements." *Handal v. Tenet Fintech Grp. Inc.*, 2023 WL 6214109, at *16 (E.D.N.Y. Sept. 25, 2023); Mot. 20–23. The Complaint alleges particularized facts to show that Defendants were at least deliberately reckless in: (1) not knowing that the statements issued by PDD were materially false or misleading; (2) not knowing that such statements would be issued to the public; and (3) substantially participating or acquiescing in the issuance of such statements in violation of federal securities laws. ¶¶106–12.

Viewed holistically, investigations by Lead Plaintiff, the Arkansas Attorney General, Congress, as well as Defendants' own admissions, are sufficient to draw an inference of scienter as least as compelling as any alternative. Mot. 20–23. The Complaint pleads detailed allegations showing that Defendants were aware, or at the very least deliberately reckless, of the Company's lack of UFLPA compliance mechanisms and the spyware embedded in its platforms. *See, e.g.*,

16

*Signet Jewelers*, 2018 WL 6167889, at *15 (having assured investors of real-time monitoring, defendants' false assurances or failure to disclose known negative trends supported scienter).

Concerning UFLPA compliance, the Complaint alleges that Defendants knew PDD offered goods that violated forced labor laws. PDD failed to adopt even the most basic internal guidelines or screening protocols to prevent the importation or sale of products made with forced labor. ¶¶110, 114–18. Defendants also refused to explicitly prohibit sourcing or selling goods originating from Xinjiang, despite international and U.S. focus on that region as the epicenter of forced labor abuses. ¶¶114–15. Instead, Defendants relied on a passive, system that required merchants to self-report— an approach that predictably never identified a violation. ¶¶110, 114–18. At the Company's scale, the notion that every merchant was compliant was implausible. The deliberate design of a system guaranteed not to reveal violations, coupled with Defendants' refusal to adopt safeguards, supports a strong inference that Defendants consciously disregarded the risk of UFLPA violations because those violations fueled PDD's low-cost supply chain and rapid growth. ¶¶35–38, 114–18.

Defendants cannot credibly claim ignorance. Public reports, government scrutiny, and congressional investigations repeatedly put Defendants on notice that Chinese e-commerce companies were at risk of UFLPA violations. ¶¶34–45. Yet, while denying those reports to investors and doubling down in public filings, Defendants chose not to remediate and instead continued to profit from forced-labor goods or at least recklessly turned a blind eye in the pursuit of profits. ¶¶36–38, 114–18. This sustained course of conduct, in the face of mounting red flags, is the "extreme departure from the standards of ordinary care" that satisfies the PSLRA's standard for pleading scienter. *Arqit Quantum*, 774 F. Supp. 3d at 545.

Similarly, the Complaint alleges that Defendants knew or recklessly disregarded that the Temu app was "purposefully and intentionally loaded" with malware and spyware tools capable

17

of bypassing security systems and harvesting users' data, including from minors, without consent. ¶¶110, 119–23. After receiving public scrutiny, PDD rushed to issue an update removing exploits and reassigned the exploit development team to another entity. ¶121. Far from negating scienter, these actions indicate that Defendants knew about the misconduct.

Defendants also collected the personal information of minors and monetizing that information—knowing such practices violated U.S. and international privacy laws. ¶123. These were not negligent oversights but intentional business decisions, constituting an extreme departure from ordinary care and strongly supporting scienter. *Arqit Quantum*, 774 F. Supp. 3d at 545.

The Complaint pleads particularized allegations as to each Defendant. ¶¶106–23. Defendants Chen and Zhao are both PDD founders and served as CEO or co-CEO during the Class Period, with Defendant Chen also serving as the chairman of the Board. ¶¶18, 21. Defendants Ma and Liu each held the position of Vice President of Finance—the Company's most senior financial role. ¶¶18–19. As the Company's highest-ranking officers and directors, the Individual Defendants exercised ultimate authority over, or substantially participated in, the drafting, review, and dissemination of SEC filings, press releases, and investor communications. *See, e.g.*, *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 75–76 (2d Cir. 2001) (VP of finance was in a position to access confidential information and to control the extent to which it was released). Each was privy to proprietary, material non-public information directly contradicting the public statements they issued or approved. ¶¶22–23. As executives and members of the Board, each of the Individual Defendants signed and approved the very statements alleged to be false or misleading. ¶¶61, 69, 71, 78. Their scienter is imputed to Defendant PDD under respondeat superior and agency principles. ¶23. Accordingly, PDD's "group pleading" argument fails.[8] Mot. 20.

---

[8] Even so, group pleading is an appropriate mechanism for attributing statements in group-published documents, such as SEC filings and press releases, to corporate insiders involved in the Company's day-to-day operations. *See, e.g.*,

Defendants' own admissions further establish scienter. PDD admitted it had no audits or program to monitor compliance with the UFLPA, and it disclaimed responsibility for its 80,000 merchants—while touting a sham "reporting system." ¶¶32, 74–75, 115–18. PDD admitted that compliance was an area needing "improvement" and that profitability would decline as PDD belatedly accepted greater "social responsibilities"—effectively confessing that its past denials were false. ¶¶98–105; *Signet Jewelers*, 2018 WL 6167889, at *15 (strong inference of scienter "supported by [the defendants'] various representations").

PDD's assertion that the more compelling inference is one of good faith compliance efforts ignores the Complaint's extensive, particularized allegations of actual knowledge and deliberate recklessness. Mot. 23–24. As detailed above, the Complaint pleads specific contradictory information known to Defendants at the time they made the challenged statements. ¶¶106–23. These are not boilerplate or "wholly conclusory" assertions—they are corroborated by official government findings, credible third-party investigations, and Defendants' own conduct. Mot. 23; ¶¶34–43, 47–59, 61–77, 91–95, 114–23. Nor does Defendants participation in the congressional investigation undercut scienter—that involvement confirms Defendants' knowledge of the underlying issues. Partial cooperation with regulators does not absolve fraudulent statements that persist uncorrected. Detailed, cross-sourced allegations such as these easily satisfy *Tellabs*.[9]

PDD's good faith inference collapses under the weight of the facts. Mot. 23–24. It is implausible that high-ranking executives, who controlled SEC filings and investor communications speaking on these issues, were innocently unaware of core operational practices that violated both U.S. labor law and global data privacy protections. ¶¶18–23, 106–23. The forced

---

*City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 373–74 (S.D.N.Y. 2012); *Levy v. Maggiore*, 48 F. Supp. 3d 428, 448–49, n.16 (E.D.N.Y. 2014).
[9] *See supra* n.4.

labor and spyware practices alleged were not peripheral compliance issues; they were central to PDD's growth strategy and profitability. *See City of Warren Police & Fire Ret. Sys. v. Foot Locker, Inc.*, 412 F. Supp. 3d 206, 228 (E.D.N.Y. 2019) (core operations doctrine bolsters inference of scienter). When viewed holistically, the detailed allegations here support an inference of fraudulent intent that is far more compelling than PDD's benign narrative.[10]

### D.       The Complaint Adequately Pleads Loss Causation

At the pleading stage, alleging loss causation "is not a heavy" burden and must merely provide "some indication of the actual loss suffered and of a plausible causal link." *In re Dentsply Sirona, Inc. Sec. Litig.*, 665 F. Supp. 3d 255, 292 (E.D.N.Y. 2023). The Complaint "need not establish . . . that no other factors caused the decline in stock price." *Vale S.A.*, 2020 WL 2610979, at *17. Moreover, loss causation allegations are subject to Rule 8 pleading requirements. *Id.*

The Arkansas Complaint revealed new information from a highly credible source about the Company's platform operating as spyware, and as a direct result, investors suffered loss. The Complaint alleges that PDD's stock price fell 4.55% on June 27, 2024, directly in response to the filing of the Arkansas Complaint. ¶136. The Complaint further explains the Arkansas Complaint revealed new information to the public regarding PDD's platform operating as spyware—facts that went beyond mere speculation and were a "subject of the fraudulent statement[s] [and] omission[s]." *In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 252–53 (S.D.N.Y. 2007).

The Arkansas Complaint consisted of new facts, clarifying information, and confirmation from a credible source—and courts hold that such confirmation can itself reveal the truth, even if

---

[10] PDD's reliance on *In re Garrett Mot. Inc. Sec. Litig.* and *Gillis v. QRX Pharma Ltd.* attacks a strawman. Mot. 24; 2022 WL 976269, at *13 (S.D.N.Y. Mar. 31, 2022); 197 F. Supp. 3d 557, 600 (S.D.N.Y. 2016). In those cases, the plaintiffs presented allegations of motive and opportunity to prove scienter, and the courts found it implausible that executives would knowingly steer a company or product toward inevitable failure. However, scienter may be shown by pleading either motive and opportunity **or**, as here, severe recklessness. *Arqit Quantum*, 774 F. Supp. 3d at 544.

parts were publicly available. Mot. 24–25; *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 260–61 (2d Cir. 2016). For example, the Arkansas Complaint revealed new information that the Company's spyware practices were particularly harmful "given that many of the users of Temu are minors, including minors under the age of 13." ¶59.

The stock price decline on June 27, 2024, reflects the market's assimilation of the Arkansas Complaint's allegations. A short delay between the filing and the drop does not undermine loss causation, it shows that the decline was tied to investor awareness of the concealed truth, not merely the act of filing. Courts have recognized that the market may take time to digest new information; an instantaneous stock drop is not required, especially given the Arkansas Complaint contained over fifty pages of detailed allegations against the Company. *San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 2025 WL 1903959, at *4 (S.D.N.Y. July 10, 2025) ("[A] disclosure's circumstances will determine how long a market takes to process information . . . there is no standard amount of time for an efficient market to reflect a disclosure.").

The Q2 2024 Earnings Release revealed for the first time the truth, gravity, and results of the Company's unsustainable business practices, and PDD's stock price plummeted 29%. ¶¶137–38. The Complaint connects that decline to the misconduct: Defendants attributed poor results to intensifying competition, taking on "greater social responsibility" in response to wrongful acts relating to forced labor and spyware, and compliance improvements.[11] ¶¶6–8, 99–100, 103, 137–41. Such disclosures "need not be a 'mirror image' tantamount to a confession of fraud" to be corrective. *Zornberg v. NAPCO Sec. Techs., Inc.*, 778 F. Supp. 3d 516, 528 (E.D.N.Y. 2025).

---

[11] These admissions confirm that PDD's business was weighed down by the very unsustainable and unethical business practices that Defendants concealed from investors—the exploitation of forced labor and spyware tactics. ¶¶6–8, 99–100, 103, 137–41. On a prior earnings call, PDD noted that compliance was an area where PDD needed to "improve" and where it had belatedly invested resources. Taken together, PDD admitted that its deteriorating financial results was linked to its lack of compliance and wrongful practices. ¶¶95, 99–100, 105, 138.

PDD's claim that the loss was caused solely by weak financial results is a factual dispute that should be rejected at this stage as premature. Mot. 25; *see, e.g.*, *Lematta v. Casper Sleep, Inc.*, 2022 WL 4637795, at *15 n.6 (E.D.N.Y. Sept. 30, 2022) (collecting cases).

Prior public information does not bar loss causation unless it was fully understood and credited by the market, especially where Defendants continued to mislead investors. *See, e.g.*, *Lea v. TAL Educ. Grp.*, 837 F. App'x 20, 28 (2d Cir. 2020) (report compiling information "not readily accessible to investors" supported loss causation). The Grizzly Report was a short-seller opinion stating it "believe[d]" PDD's shopping app "is cleverly hidden spyware." *Constr. Laborers Pension Tr. for S. California v. CBS Corp.*, 433 F. Supp. 3d 515, 550 (S.D.N.Y. 2020) ("[P]re-disclosure contemplations of a possibility, which they could have believed was remote, would have remarkably less impact on the stock price than the event actually happening."). It lacked authoritative confirmation and was expressly denied by Defendant Zhao on November 28, 2023, when he told investors the claims "[we]re totally baseless and . . . inten[ded] to create panic." ¶67. The market's reaction—moving upwards in the second half of 2023, versus a sharp decline after the filing of the Arkansas Complaint—confirms that the earlier speculation did not reveal the truth.

The Congressional Report fares no better at defeating loss causation. Even if damaging facts about the Company were available earlier, Defendants' continued misleading statements maintained artificial inflation until the Company revealed the full extent of the harm during Q2 2024 Earnings Release. Additionally, the market could not fully grasp the financial impact on PDD's business until the Company's earnings release.

**CONCLUSION**

For the foregoing reasons, the Complaint should be sustained.[12]

---

[12] If the Court dismisses any or all of the Complaint, Lead Plaintiff respectfully requests leave to amend pursuant to Rule 15 of the Federal Rules of Civil Procedure as this is the first complaint this Court has considered on this matter.

Dated: August 29, 2025

New York, New York

Respectfully submitted,

*/s/ Alfred L. Fatale III*
**LABATON KELLER SUCHAROW LLP**
Alfred L. Fatale III
Beth C. Khinchuk
Wesley A. Mann
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
afatale@labaton.com
bkhinchuk@labaton.com
wmann@labaton.com

*Counsel for Lead Plaintiff and Lead Counsel for the Proposed Class*

*/s/ Phillip Kim*

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
Jing Chen
101 Greenwood Ave., Ste. 440
Jenkintown, PA 19046
Telephone: (215) 600-2817
philkim@rosenlegal.com
jchen@rosenlegal.com

*Liaison Counsel for Lead Plaintiff and the Proposed Class*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on August 29, 2025, I caused the foregoing to be served on all counsel of record via email.

*/s/ Alfred L. Fatale III*
Alfred L. Fatale III