UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
BLAINE BAXTER, *et al.*,

Plaintiffs,

- against -

PDD HOLDINGS, INC. F/K/A PINDUODUO INC.; LEI CHEN; JING MA; JUN LIU; JIAZHEN ZHAO,

Defendants.
-------------------------------------------------------x

**MEMORANDUM & ORDER**
24-CV-5653 (PKC) (CHK)

PAMELA K. CHEN, United States District Judge:

**TABLE OF CONTENTS**


BACKGROUND ..... 4

I. Factual Background ..... 4

A. The Parties ..... 4

B. Events During the Class Period ..... 5

1. PDD and UFLPA/Forced Labor Allegations ..... 5

a. PDD's Pre-Congressional Investigation Statements Related to the UFLPA (April 2022 and April 2023 Reports) ..... 6

b. June 2023: Congressional Investigation of PDD Related to the UFLPA ..... 7

c. PDD's Post-Congressional Investigation Statements Related to the UFLPA (April 2024 Report and May 2024 Earnings Call) ..... 9

2. PDD and Cybersecurity Allegations ..... 10

a. PDD's Pre-Google Suspension Statements Related to Cybersecurity (April 2021 Report and August 2022 Earnings Call) ..... 10

b. March 2023: Google's Suspension of Pinduoduo for Cybersecurity Breaches ..... 11

c. PDD's Post-Google Suspension Statement Related to Cybersecurity (April 2023 Report) ..... 12

d. May and September 2023: Investigations of Temu Related to Cybersecurity ..... 13

e. PDD's Post-Google Suspension Statements Related to Cybersecurity (November 2023 Earnings Call, April 2024 Report, and May 2024 Earnings Call) ..... 14

f. June 2024: Arkansas Lawsuit Related to Cybersecurity ..... 15

3. PDD's Second-Quarter 2024 Results ..... 16

II. Procedural Background ..... 16

LEGAL STANDARD ..... 17

DISCUSSION ..... 18

I. Plaintiffs' Section 10(b) and Rule 10b-5 Claim ..... 18

A. Legal Standard ..... 18

B. Plaintiffs Largely Fail to Plead Material Misrepresentations and Omissions ..... 19

1. Plaintiffs Fail to Plead Materially Misleading Statements or Omissions Related to the UFLPA ..... 21

a. Pre-Congressional Investigation Statement Related to the UFLPA (April 2023 Report) ..... 21

i. The April 2023 Report Statement Was Not Material ..... 22

ii. The April 2023 Report Statement Was Not Misleading ..... 24

b. Post-House Investigation Statement: April 2024 Report ..... 26

c. Post-House Investigation Statement: May 2024 Earnings Call ..... 29

2. Plaintiffs Largely Fail to Plead Materially Misleading Statements or Omissions as to PDD's Cybersecurity Measures ..... 30

a. Pre-Google Suspension Statements (April 2021 Report and April 2022 Earnings Call) ..... 31

i. Plaintiffs Insufficiently Allege Falsity ..... 32

ii. Statements on the April 2022 Earnings Call Were Puffery ..... 36

b. Post-Google Suspension Statement: the April 2023 Report ..... 37

c. Post-Google Suspension Statement: the November 2023 Earnings Call ..... 38

d. Post-Google Suspension Statement: the April 2024 Report ..... 39

C. Plaintiffs Fail to Plead Scienter ..... 41

1. Individual Defendants' Scienter ..... 41

a. Scienter Pleading Requirement ..... 41

b. Plaintiffs Have Failed to Sufficiently Allege Circumstantial Evidence of Scienter ..... 42

2. Corporate Scienter ..... 47

II. Plaintiffs' Section 20(a) Claim ..... 48

III. Plaintiffs' Item 303 Claim ..... 48
IV. Leave to Amend ..... 49
CONCLUSION ..... 50

## BACKGROUND

Lead Plaintiff Boston Retirement Systems ("BRS") and Named Plaintiff Blaine Baxter (collectively, "Plaintiffs") bring this putative class action lawsuit against Defendant PDD Holdings, Inc. f/k/a Pinduoduo ("PDD"), as well as Defendants Lei Chen, Jing Ma, Jun Liu, and Jiazhen Zhao (collectively, the "Individual Defendants," and with PDD, "Defendants"). Plaintiffs, individual stockholders who purchased or otherwise acquired PDD's American Depository Shares between April 30, 2021 through August 23, 2024 (the "Class Period"), have filed suit under Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act"), as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. §§ 78j(b) and 78t(a); and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, as well as Item 303 of Regulation S-K, 17 C.F.R. § 229.303.

Plaintiffs seek damages for what they allege were misrepresentations and omissions made by Defendants during the Class Period regarding PDD's compliance with the Uyghur Forced Labor Prevention Act ("UFLPA"), and PDD's adoption of cybersecurity measures. Defendants now move to dismiss Plaintiffs' suit, arguing that Plaintiffs have failed to sufficiently allege (1) a material misrepresentation or omission with particularity, (2) Defendants' scienter, and (3) loss causation. For the reasons stated below, Defendants' motion to dismiss is granted in its entirety.

### I. Factual Background

#### A. The Parties

PDD is a multinational commerce group that owns and operates a portfolio of businesses, including Chinese online retailer Pinduoduo and the U.S.-based ecommerce platform Temu. (First Am. Compl. ("FAC"), Dkt. 31, ¶ 24.) Temu and Pinduoduo are online e-commerce platforms and mobile applications that "allow[] Chinese vendors to sell and ship directly to customers across the globe without having to rely on intermediate distributors in the destination country." (*Id.* ¶¶ 24,

27.) Defendant Lei Chen ("Chen") served as PDD's CEO and then co-CEO during the Class Period. (*Id.* ¶ 18.) Defendant Jing Ma ("Ma") served as PDD's Vice President of Finance from the beginning of the Class Period until January 1, 2022. (*Id.* ¶ 19.) Defendant Jun Liu ("Liu") served as PDD's Vice President of Finance after Ma for the remainder of the Class Period. (*Id.* ¶ 20.) Defendant Jiazhen Zhao ("Zhao") served as Senior Vice President and then Co-CEO during the Class Period. (*Id.* ¶ 21.)

**B. Events During the Class Period**

This action centers around PDD's disclosures and statements concerning its compliance with the UFLPA and its adoption of cybersecurity measures. As to the UFLPA, Plaintiffs focus on PDD's disclosures prior to and after Congress released initial findings as to PDD's compliance with the UFLPA. As to the adoption of cybersecurity measures, Plaintiffs focus on PDD's disclosures prior to and after Google suspended the Pinduoduo application from its application store and after news articles concerning malware in the Pinduoduo and Temu applications surfaced.

1. <u>PDD and UFLPA/Forced Labor Allegations</u>

On December 23, 2021, the UFLPA was signed into law. (*Id.* ¶ 32.) The UFLPA, enacted in response to "the Chinese government's systemic use of forced labor against Uyghurs and other ethnic minorities in the Xinjiang Uyghur Autonomous Region" of China, created a rebuttable presumption that all goods manufactured in Xinjiang and imported into the United States were made with forced labor. (*Id.* (citation omitted).) This presumption as to imported goods could only be overcome through a certification from the United States Customs and Border Protection. (*Id.*); UFLPA, Pub. L. No. 117-87, § 3, 135 Stat. 1525, 1529 (2021). The presumption took effect on June 21, 2022. (FAC, Dkt. 31, ¶ 32.)

a. PDD's Pre-Congressional Investigation Statements Related to the UFLPA (April 2022 and April 2023 Reports)

In PDD's report for fiscal year 2021, filed April 25, 2022 (the "April 2022 Report")[1], PDD stated that "[c]hanges in U.S. and international trade policies, particularly with regard to China, may adversely impact our business and operating results." (*Id.* ¶ 61 (alteration in original) (emphasis omitted).) In PDD's report for fiscal year 2022, filed April 26, 2023 (the "April 2023 Report"), PDD reiterated this statement. (April 2023 Report, Dkt. 44-2, at 8; *see also id.* at 44.[2]) The April 2023 Report was released after the UFLPA's presumption came into effect and noted that PDD was "subject to a large number of laws across many jurisdictions, many of which are evolving." (FAC, Dkt. 31, ¶ 69 (emphasis omitted).) The April 2023 Report further advised:

> We strive to comply with all applicable laws, but they may conflict with each other, and by complying with the laws or regulations of one jurisdiction, we may find that we are violating the laws or regulations of another jurisdiction. Despite our efforts, we may not have fully complied in the past and may not fully comply in the future, particularly where the applicable regulatory regimes have not been broadly interpreted. If we become liable under laws or regulations applicable to us, we could be required to pay significant fines and penalties, our reputation may be harmed, and we may be forced to change the way we operate. That could require us to incur significant expenses or to discontinue certain services, which could negatively affect our business. . . .

[1] To make the chronology of relevant events and disclosures clear, the Court refers to PDD's Reports by the date they were published, not by the fiscal year reported on.

[2] "[D]istrict courts may 'permissibly consider documents other than the complaint' for the truth of their contents if they 'are attached to the complaint or incorporated in it by reference[.]'" *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 352 n.3 (2d Cir. 2022) (second alteration in original) (quoting *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007)). Plaintiffs did not attach a full copy of the April 2023 Report to the FAC. However, the FAC references and relies on it. (*See* FAC, Dkt. 31, ¶¶ 69, 83.) The FAC's "clear, definite and substantial reference to the document[]" incorporates it by reference. *See Thomas v. Westchester Cnty. Health Care Corp.*, 232 F. Supp. 2d 273, 275 (S.D.N.Y. 2002). Moreover, given the centrality of the document to the FAC's allegations, it is "integral" to the FAC and thus properly before the Court. *See Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 156 (2d Cir. 2006).

> Additionally, if third parties with whom we work violate applicable laws or our policies, those violations could also result in liabilities for us and could harm our business. Our ability to rely on insurance, contracts, indemnification and other remedies to limit these liabilities, may be insufficient or unavailable in some cases. Furthermore, the circumstances in which we may be held liable for the acts, omissions, or responsibilities of our merchants is uncertain, complex, and evolving.

(April 2023 Report, Dkt. 44-2, at 44–45.)

b. June 2023: Congressional Investigation of PDD Related to the UFLPA

In June 2023, the United States House Select Committee on Strategic Competition between the United States and the Chinese Communist Party (the "House Committee" or "Committee") released interim findings on "Fast Fashion and the Uyghur Genocide" ("Interim Findings"). (Interim Findings, Dkt. 44-4.[3]) The Committee concluded that "Temu is responsible for millions of shipments that are sent to the United States each year through a network of tens of thousands of sellers on its online marketplace. However, Temu does not have any system to ensure compliance with the [UFLPA]." (*Id.* at 2; *see also* FAC, Dkt. 31, ¶ 35.) Specifically, the Interim Findings shared:

> Temu conducts no audits and reports no compliance system to affirmatively examine and ensure compliance with the UFLPA. The only measure Temu reported that it takes . . . was that its suppliers agree to boilerplate terms and conditions that prohibit the use of forced labor. . . . Temu admitted that it "does not expressly prohibit third-party sellers from selling products based on their origin in the Xinjiang Autonomous Region."

(Interim Findings, Dkt. 44-4, at 2; *see also* FAC, Dkt. 31, ¶¶ 35, 37.) Temu also relied on a "'reporting system' in which 'consumers, sellers, [and] regulators,' among others, c[ould] 'file complaints for violations of Temu platform rules.'" (Interim Findings, Dkt. 44-4, at 9; FAC, Dkt.

[3] This document is also incorporated by reference or integral to the FAC. *See supra* n.2; (*see, e.g.*, FAC, Dkt. 31, ¶ 34 (referencing and relying on this document)).

31, ¶ 37.) Temu denied ever receiving any complaints regarding forced labor practices and informed the Committee that "[b]ecause Temu is not the importer of record with respect to goods shipped to the United States, [the UFLPA] . . . do[es] not apply directly to Temu's activities as an online platform operator." (Interim Findings, Dkt. 44-4, at 8.)

The Committee's Interim Findings received news coverage. (FAC, Dkt. 31, ¶¶ 39–40.) *The New York Times* reported that "[l]awmakers are flagging what they say are likely significant violations of U.S. law by Temu, a popular Chinese shopping platform, accusing it of providing an unchecked channel that allows goods made with forced labor to flow into the United States." Ana Swanson and Claire Fu, *Congress Spotlights 'Serious' Forced Labor Concerns with Chinese Shopping Sites*, N.Y. Times (last updated Nov. 3, 2023), https://www.nytimes.com/2023/06/22/business/economy/shein-temu-forced-labor-china.html; (*see* FAC, Dkt. 31, ¶ 39 (referencing and relying on this article)). Temu, however, "argued that its use of direct shipping meant that the U.S. consumer, not Temu, would bear the ultimate responsibility for adhering to the ban on Xinjiang goods." Swanson and Fu, *supra.* Customs lawyers, the article reported, "said that it was not entirely clear which party would be liable for complying with the U.S. ban, but that any company facilitating the importation of goods from Xinjiang could face civil or criminal penalties." *Id.* *Business Insider* similarly published an article titled "Temu reportedly relies on customers and suppliers to report if goods from the site were produced by forced labor." (FAC, Dkt. 31, ¶ 40.)

Temu continued to be in the news for allegations of forced labor. In February 2024, Temu's Super Bowl ads "spark[ed] backlash" and resurfaced allegations of forced labor. (*Id.* ¶ 41.) Goldman Sachs and Morgan Stanley analyst reports, authored around the same time, noted that "US lawmakers have been asking agencies including the Department of Homeland Security (DHS)

to consider adding Temu to the UFLPA [Entity] [L]ist[4] alongside an import ban, citing the platform has not taken enough actions to prevent its suppliers from using forced labor." (*Id.* ¶¶ 42, 43 (emphasis omitted).)

c. PDD's Post-Congressional Investigation Statements Related to the UFLPA (April 2024 Report and May 2024 Earnings Call)

On April 25, 2024, PDD released its report for fiscal year 2023 (the "April 2024 Report"). (*Id.* ¶ 71.) PDD reiterated that it strove to comply with applicable laws, but that it may not have fully complied with those laws in the past and future. (*Id.* ¶ 74.) PDD shared that "if the third-party merchants that sell merchandise on [its] platforms or the third-party vendors that provide services to [PDD] violate applicable laws or regulations, those violations could also result in liabilities for [PDD] and harm its brands, reputation and business." (April 2024 Report, Dkt. 44-1, at 45; FAC, Dkt. 31, ¶ 72.) "For example," the Report noted, "in June 2022, . . . the UFLPA[] became effective in the U.S., establishing a rebuttable presumption that goods mined, produced, or manufactured in a certain region in China or by an entity on the UFLPA Entity List are prohibited from importation into the U.S." (April 2024 Report, Dkt. 44-1, at 45.)

PDD maintained:

> We require merchants on the Temu platform to comply with our third-party code of conduct, which strictly prohibits the use of forced, penal or child labor. In addition, we establish policies and procedures to ensure that no seller on the Temu platform is on the UFLPA Entity List, and use technology to identify products that are at higher risk of non-compliance. Any third-party violations of applicable laws or our policies may subject us to negative publicity, investigations, fines, fees, settlements or other costs and liabilities as a result of the enforcement of laws, regulations, sanctions, embargoes, export controls programs or other restrictions.

[4] The UFLPA Entity List is a "list of entities in Xinjiang that mine, produce, or manufacture wholly or in part any goods, wares, articles and merchandise with forced labor." *See* UFLPA Entity List, *U.S. Dep't Homeland Sec.*, https://www.dhs.gov/uflpa-entity-list [https://perma.cc/6RY4-DGTN] (last updated Jul. 31, 2026).

> Our ability to rely on insurance, contracts, indemnification and other remedies to limit these liabilities may be insufficient or unavailable in some cases.

(*Id.*; FAC, Dkt. 31, ¶ 72.) PDD shared that "the circumstances in which [it] may be held liable for the acts, omissions, or responsibilities of [its] merchants or other third parties [is] uncertain, complex, and evolving." (April 2024 Report, Dkt. 44-1, at 45.) "Upcoming and proposed regulations may require platforms like [PDD's] to comply with additional obligations, and the resulting compliance costs and potential liability risk could negatively impact [its] business." (*Id.*)

Approximately one month later, during a May 2024 Earnings Call, Defendant Chen stated that PDD had "the goal of building an industry-leading compliance program" and that "compliance is an area where [PDD has] committed to improve and where [it has] invested significant resources over the past few quarters." (FAC, Dkt. 31, ¶ 76 (emphasis omitted).) "Major regulatory frameworks around the world are evolving and new laws and regulations are being introduced. And therefore [PDD] sees compliance capability as an important aspect of [its] high-quality development strategy and also compliance capabilities as one of [its] core capabilities of [its] platform." (*Id.*)

2. <u>PDD and Cybersecurity Allegations</u>

a. <u>PDD's Pre-Google Suspension Statements Related to Cybersecurity (April 2021 Report and August 2022 Earnings Call)</u>

In its report for fiscal year 2020, issued April 30, 2021 ("April 2021 Report"), PDD stated that it had a whole team "dedicated to protecting the security of [its] data" and that it had adopted a "strict data protection policy to ensure the security of [its] proprietary data." (*Id.* ¶ 79 (emphasis omitted).) Although PDD acknowledged that it collected data from its users, it clarified that it collected "anonymized, non-confidential user behavior and pattern data based on [users'] interactions with [its] platform through [its] social network partners, which have been preprocessed to exclude user identity or other sensitive information." (*Id.* (emphasis omitted).) PDD maintained

that it "strictly control[s] and manage[s] the use of data within [its] various departments and do[es] not share data with external third parties, nor do[es it] cooperate with third-party vendors in data analytics efforts." (*Id.*)

The next year, during an April 2022 Earnings Call, Defendant Chen stated that PDD has "always been strictly compliant with China's data security standards as regulators and the industry as a whole continue to raise the bar on data security and data protection." (*Id.* ¶¶ 65, 81.)

b. March 2023: Google's Suspension of Pinduoduo for Cybersecurity Breaches

On March 21, 2023, Google suspended the Pinduoduo application from its application store, "after malware issues were found on versions of the Chinese e-commerce app." (*Id.* ¶ 48.) "[D]ays after" this suspension, Russian security researchers shared that earlier "versions of the Pinduoduo app contained malicious code, which exploited known Android vulnerabilities to escalate privileges, download and execute additional malicious modules, some of which also gained access to users' notifications and files." (Bloomberg Law Article, Dkt. 44-5, ECF[5] 2; FAC, Dkt. 31 ¶ 49 (referencing and relying on this article).) PDD "rejected claims of its app containing malicious code." (Bloomberg Law Article, Dkt. 44-5, at ECF 3.)

On April 2, 2023, CNN released its own investigation of Pinduoduo's suspension. (CNN Investigation, Dkt. 44-6; FAC, Dkt. 31, ¶ 51 (referencing this investigation).) CNN shared that suspicions of malware on Pinduoduo first arose in February 2023, through a report authored by a Chinese cybersecurity firm, although the firm did not name Pinduoduo. (CNN Investigation, Dkt. 44-6, at ECF 9.) Since the suspension, cybersecurity researchers in Israel, Delaware, and Finland determined that a February 2024 version of Pinduoduo could "bypass users' cell phone security to

[5] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

monitor activities on other apps, check notifications, read private messages and change settings." (FAC, Dkt. 31, ¶ 51; CNN Investigation, Dkt. 44-6, at ECF 2–3, 6.) PDD released a new version of the application on March 5, 2023, which "removed the exploits," although one expert stated that "the underlying code was still there and could be reactivated to carry out attacks." (CNN Investigation, Dkt. 44-6, at ECF 9–10.)

This malware, CNN reported, was not a new feature. (*See id.* at ECF 6.) "[A]ccording to a current Pinduoduo employee," in 2020, the company "set up a team of about 100 engineers and product managers to dig for vulnerabilities in Android phones, develop ways to exploit them — and turn that into profit." (*Id.*) The team was disbanded in "early March [2023]," although [a] core group of about 20 cybersecurity engineers who specialize in finding and exploring vulnerabilities remain at Pinduoduo." (*Id.* at ECF 6, 9–10.) According to the employee, most team members were moved to Temu. (*Id.* at ECF 10.)

c. PDD's Post-Google Suspension Statement Related to Cybersecurity (April 2023 Report)

In PDD's April 2023 Report, PDD shared that its "business generates and processes a large amount of data," and that it was "required to comply with applicable laws relating to privacy and cybersecurity." (April 2023 Report, Dkt. 44-2, at 27 (emphasis omitted); FAC, Dkt. 31, ¶ 83.)[6] PDD acknowledged that it faced challenges in protecting data on its systems from "fraudulent behavior or improper use by [its] employees"; "addressing concerns related to privacy, sharing, safety, security and other factors"; and "complying with applicable laws and regulations relating to the collection, use, storage, transfer, disclosure and security of personal data." (April 2023

[6] For example, PDD stated, Chinese authorities enacted the "Data Security Law" in June 2021, the "Regulations on the Protection of Critical Information" in July 2021, and "Cybersecurity Review Measures" in December 2021. (April 2023 Report, Dkt. 44-2, at 28.)

Report, Dkt. 44-2, at 27; FAC, Dkt. 31, ¶ 83.) "To address these challenges," PDD shared, it "ha[d] adopted strict security policies and measures, including encryption technology, to protect [its] proprietary data and buyer information." (April 2023 Report, Dkt. 44-2, at 27; FAC, Dkt. 31, ¶ 83.) "Any negative publicity on [its] platforms' data safety or privacy protection mechanisms and policies," as well as any "compromise of [its] information security," "could . . . materially and adversely affect" the company. (April 2023 Report, Dkt. 44-2, at 27; FAC, Dkt. 31, ¶ 83.)

Moreover, PDD stated, its business was "subject to complex and evolving laws and regulations regarding privacy and data protection in countries and regions where [it has] operations." (April 2023 Report, Dkt. 44-2, at 27 (emphasis omitted); FAC, Dkt. 31, ¶ 94.) Although it had "taken and will continue to take reasonable measures to comply with such laws and regulations," PDD stated that "there are uncertainties with respect to how such laws and regulations will be implemented and interpreted in practice" and that it may not have "have fully complied in the past, and may not be able to fully or timely comply in the future." (April 2023 Report, Dkt. 44-2, at 29, 44; FAC, Dkt. 31, ¶¶ 74, 94.) "[A]ny material failure to [comply with those laws] may subject [PDD] to negative publicity, harm [its] reputation and business operations, significantly limit or completely hinder [its] ability to continue to offer securities to investors, or cause the value of such securities to significantly decline." (April 2023 Report, Dkt. 44-2, at 29; FAC, Dkt. 31, ¶ 94.)

d. May and September 2023: Investigations of Temu Related to Cybersecurity

Public attention soon turned to malware on Temu. On May 17, 2023, the state of Montana banned the Temu application on government devices, citing fears of the application providing "personal information or data to foreign adversaries." (FAC, Dkt. 31, ¶ 53 (citation omitted).) And in September 2023, Grizzly Research released a report about malware on the Temu

application (the "Grizzly Report"). The Grizzly Report found that Temu has "hidden functions that allow for extensive data exfiltration," and that it was "evident that great efforts were taken to intentionally hide the malicious intent and intrusiveness of the software." (FAC, Dkt. 31, ¶ 54 (quoting Grizzly Report, Dkt. 44-7, at ECF 3).) For example, the Grizzly Report found that Temu could "read, process and modify all user and system data: cat logs, images, user content" and more. (Grizzly Report, Dkt. 44-7, at ECF 12.) Temu could also "remotely collect any and all files from the user's device and send them to their own servers," as well as access users' locations. (*Id.* at ECF 12, 14.)

e. <u>PDD's Post-Google Suspension Statements Related to Cybersecurity (November 2023 Earnings Call, April 2024 Report, and May 2024 Earnings Call)</u>

On a November 2023 Earnings Call with shareholders ("the November 2023 Earnings Call"), Defendant Zhao acknowledged that "a short-tail report[7] on [PDD] was issued in early September." (FAC, Dkt. 31, ¶ 89 (emphasis omitted).)[8] Nonetheless, Defendant Zhao asserted that "[t]he allegations in the report are totally baseless and [the] short s[eller] had a spotty track record. . . . [T]he report was published with the intent to create panic and to drive down stock prices and enabling the . . . short seller to profit from [a] short position." (*Id.*) PDD continued to maintain that it "adopted strict security policies and measures" to address challenges in "protecting

[7] In the call, Defendant Zhao referred to short-tail and short-sale interchangeably. (*See* FAC, Dkt. 31, ¶ 89.) A short sale is a "sale of securities or commodities that the seller does not possess or has not contracted for at the time of the sale." *Short-sale*, Merriam Webster, https://www.merriam-webster.com/dictionary/sale [https://perma.cc/FMX8-Z7CX] (last accessed Sep. 24, 2026). The purpose of such a sale is "to profit from an anticipated drop in the price of a security or commodity." (*Id.*)

[8] The full transcript, which is incorporated by reference or integral to the FAC, *see supra* n.2, can be found at https://plus.lexis.com/api/permalink/8e95bc3a-98b9-4874-b75e-43f393b382c6/?context=1530671.

the data in and hosted on [its] system, including against attacks on [its] system by outside parties or fraudulent behavior or improper use by [its] employees." (April 2024 Report, Dkt. 44-1, at 26; FAC, Dkt. 31, ¶ 92.) And, on a May 2024 Earnings Call with shareholders, Defendant Chen emphasized that "to create a trustworthy shopping environment for our users, compliance is an area where [PDD is] committed to improve and where [it] ha[s] invested significant resources over the past few quarters." (May 2024 Earnings Call, Dkt. 44-11, at 9; FAC, Dkt. 31, ¶ 96 (referencing and relying on this call).)

f. June 2024: Arkansas Lawsuit Related to Cybersecurity

In June 2024, allegations of malware in PDD's applications received further scrutiny when the Attorney General of Arkansas sued PDD for, *inter alia*, violations of the Arkansas Deceptive Trade Practices Act. (FAC, Dkt. 31, ¶ 55); Compl. ¶¶ 161–92, *Arkansas v. PDD Holdings, Inc. F/K/A Pinduoduo Inc. and Whaleco Inc. D/B/A Temu*, No. 12-CV-24-149 (Ark. June 25, 2024), Dkt. 1.[9] The Arkansas Complaint, citing extensively to the Grizzly Report and CNN Investigation, *see, e.g.*, Ark. Compl., Dkt. 44-10, ¶¶ 10, 12–13, 45, 51, 53, 58, 85, 89–90, charged that "Temu is purposefully designed to gain unrestricted access to a user's phone operating system, including, but not limited to, a user's camera, specific location, contacts, text messages, documents, and other applications . . . Temu monetizes this unauthorized collection of data by selling it to third parties, profiting at the direct expense of Arkansans' privacy rights." (FAC, Dkt. 31, ¶ 56 (quoting Ark. Compl., Dkt. 44-10, ¶ 2).)

[9] For ease of reference, the Court cites to this filing, incorporated by reference and integral to the FAC, *see supra* n.2, as: "Ark. Compl., Dkt. 44-10."

3. PDD's Second-Quarter 2024 Results

On August 26, 2024, PDD released its Second-Quarter Earnings Results ("Q2 2024 Earnings Results"). Defendant Chen shared that PDD was "enter[ing] a new phase of high-quality development that calls for increased investments," in light of consumers' increased priority on quality goods and intensifying competition. (Aug. 2024 Earnings Call Tr., Dkt. 44-12, at 4–5; FAC, Dkt. 31, ¶ 7 (referencing this call).[10]) Accordingly, Chen warned, PDD's "profits will gradually trend down starting in Q3." (Aug. 2024 Earnings Call Tr., Dkt. 44-12, at 5.) This downward trend in profitability was also driven by "significant uncertainties from intense competition and [an] evolving external environment." (*Id.*) "As the environment evolves and [PDD] continues to grow, [the] management team . . . often discuss[es] how [PDD] can better fulfill [its] corporate social responsibilities." (*Id.*) Chen asserted that there were "still many things that can be done, for example, through enhancing [PDD's] governance structure and extracting resources to better adapt to a changing time." (*Id.*) Chen emphasized that PDD would "further enforce strong governance of [its] platform and merchants," such as by "identifying and removing unlawful merchants from [its] platforms to strengthen [its] supply chain." (*Id.* at 10.)

After PDD published its Q2 2024 Earnings Results and made its accompanying earnings call, "PDD shares plummeted by 29% from the August 23, 2024 closing price of $139.87 per share" to a closing price of "$100.00 per share" on August 26, 2024. (FAC, Dkt. 31, ¶ 102.)

## II. Procedural Background

On August 13, 2024, Named Plaintiff filed a Complaint against Defendants Chen, Liu, Ma, and PDD Holdings. (Dkt. 1.) On October 28, 2024, the Court consolidated several related cases from within the District, *Baxter v. PDD Holdings Inc. et al*, 24-CV-5653; *Macomb County Retiree*

[10] This document is incorporated by reference or integral to the FAC. *See supra* n.2.

*Health Care Fund v. PDD Holdings Inc. et al*, 24-CV-6881; and *Shaw v. PDD Holdings Inc. et al*, 24-CV-6950, into this instant action. (10/28/2024 Dkt. Order.) Plaintiffs subsequently filed an Amended Consolidated Complaint (the "FAC"). (FAC, Dkt. 31.) On September 26, 2025, Defendants moved to dismiss the FAC in its entirety. (*See* Defs.' Notice Mot. Dismiss, Dkt. 43; Defs.' Mem. Supp. Mot. to Dismiss ("MTD"), Dkt. 45.)

**LEGAL STANDARD**

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556). In addressing the sufficiency of a complaint, courts are required to accept the well-pleaded factual allegations contained within the complaint as true, *see Bldg. Indus. Elec. Contractors Ass'n v. City of New York*, 678 F.3d 184, 187 (2d Cir. 2012), but "need not credit conclusory statements unsupported by assertions of facts or legal conclusions and characterizations presented as factual allegations," *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 404 (S.D.N.Y. 2001) (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). Additionally, "a court need not feel constrained to accept as truth conflicting pleadings that make no sense, or that would render a claim incoherent, or that are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely, or by facts of which the court may take judicial notice." *Brown v. City Univ. of*

*N.Y.,* No. 21-CV-0854 (PKC) (MMH), 2022 WL 4637818, at *5 (E.D.N.Y. Sep. 30, 2022) (internal citation and quotation marks omitted).

## DISCUSSION

### I. Plaintiffs' Section 10(b) and Rule 10b-5 Claim

#### A. Legal Standard

Under Section 10(b) of the Exchange Act, it is unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of [the] rules and regulations" that the Securities and Exchange Commission ("SEC") prescribes. 15 U.S.C. § 78j(b). Rule 10b-5, which implements Section 10(b), *see Vacold LLC v. Cerami*, 545 F.3d 114, 121 (2d Cir. 2008), makes it unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading," 17 C.F.R. § 240.10b-5(b); *accord Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 212 (2d Cir. 2020). To survive a motion to dismiss under Section 10(b) and Rule 10b-5 thereunder, a plaintiff must plausibly allege: "(1) a material misrepresentation (or omission); (2) scienter, *i.e.*, a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." *Singh v. Cigna Corp.*, 918 F.3d 57, 62 (2d Cir. 2019) (alteration omitted) (citation omitted).[11] Because the instant case is a private securities class action that alleges materially false statements and omissions, the heightened pleading requirements of the PSLRA and Rule 9(b) apply. *See* 15 U.S.C. § 78u-4(b)(1); *In re Banco Bradesco S.A. Sec. Litig.*,

[11] Defendants argue only that Plaintiffs failed to plead actionable misrepresentations, scienter, and loss causation, and thus the Court does not address the remaining factors.

277 F. Supp. 3d 600, 629 (S.D.N.Y. 2017) (citing *Novak v. Kasaks*, 216 F.3d 300, 306–07 (2d Cir. 2000)).

**B. Plaintiffs Largely[12] Fail to Plead Material Misrepresentations and Omissions**

Section 10(b) and Rule 10b–5(b) prohibit making any untrue statement of a material fact, or omitting a material fact necessary to make the statements made not misleading. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37 (2011). They "do not create an affirmative duty to disclose any and all material information." *Id.* at 44; *see also Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014) (explaining that there is "no duty to disclose a fact . . . 'merely because a reasonable investor would very much like to know that fact'" (quoting *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993))). When a company does not have an obligation to speak but does so anyway, it assumes "a duty to be both accurate and complete." *Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002); *see also Setzer*, 968 F.3d at 214 n.15 ("[E]ven when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth." (quoting *Meyer*, 761 F.3d at 250)); *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 366 (2d Cir. 2010) (explaining that once a corporation makes "a disclosure about a particular topic, whether voluntary or required, the representation must be 'complete and accurate'" (quoting *Glazer v. Formica Corp.*, 964 F.2d 149, 157 (2d Cir. 1992))).

To allege a misrepresentation or omission under the PSLRA, a plaintiff must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the

[12] As noted *infra* Part I.B.2.c., the Court assumes, without deciding, that Defendant Zhao's statements during the November 2023 Earnings Call present actionable misrepresentations.

complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1)(B). Under Rule 9(b), which requires a complaint to "state with particularity the circumstances constituting fraud," Fed. R. Civ. P. 9(b), a plaintiff must similarly "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent," *Emps.' Ret. Sys. of Gov't of the Virgin Is. v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015) (quoting *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004)). To determine whether a misrepresentation or omission is actionable, the alleged representation must be viewed in its entire context, not as isolated sentences plucked from its companions. *See In re Morgan Stanley*, 592 F.3d at 366; *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 171 (2d Cir. 2021) (explaining that plaintiffs "may not cherry pick certain public statements for [their] complaint and divorce them from the universe of disclosed information to plausibly allege fraud"). After all, some statements, even though literally accurate, "can become, through their context and manner of presentation, devices which mislead investors." *McMahan & Co. v. Wherehouse Ent., Inc.*, 900 F.2d 576, 579 (2d Cir. 1990).

A statement or omission is material if "there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to [act]." *Steamfitters Loc. 449 Pension Plan v. AT&T Inc.*, No. 21-2698-CV, 2022 WL 17587853, at *2 (2d Cir. Dec. 13, 2022) (summary order) (alteration in original) (quoting *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009)); *accord Singh*, 918 F.3d at 63 ("An alleged misrepresentation is material if 'there is a substantial likelihood that a reasonable person would consider it important in deciding whether to buy or sell shares of stock.'" (quoting *Operating Loc. 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92–93 (2d Cir. 2010))); *United States v. Litvak*, 889 F.3d 56, 65 (2d Cir. 2018) (similar); *cf. Greco v. Qudian Inc.*, No.

1:20-CV-0577 (GHW), 2022 WL 4226022, at *14 (S.D.N.Y. Sep. 13, 2022) (finding aspirational statements immaterial because they were "too general to cause a reasonable investor to rely upon them"). Although materiality is traditionally a fact-specific finding, a complaint may be dismissed where the alleged statements or omissions are "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 717 (2d Cir. 2011) (quoting *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000)); *accord ECA*, 553 F.3d at 197.

1. Plaintiffs Fail to Plead Materially Misleading Statements or Omissions Related to the UFLPA

Plaintiffs claim three statements made by Defendants in (1) the April 2023 Report; (2) the April 2024 Report;[13] (3) and the May 2024 Earnings Call, (FAC, Dkt. 31, ¶¶ 69, 72, 74, 76), materially misled investors as to PDD's compliance with the UFLPA. The Court finds that none of these statements are materially misleading under Section 10(b) and Rule 10b–5(b).

a. Pre-Congressional Investigation Statement Related to the UFLPA (April 2023 Report)

Plaintiffs allege that PDD's statement in its April 2023 Report—that it "strive[s] to comply with all applicable laws," but that "despite [its] efforts, [it] may not have fully complied in the past and may not fully comply in the future, particularly where the applicable regulatory regimes have not been broadly interpreted"—was materially misleading. (*Id.* ¶ 69 (emphasis omitted).)[14]

[13] Plaintiffs point to two statements within the April 2024 Report as individual misrepresentations, (FAC, Dkt. 31, ¶¶ 72, 74); however, because the Court must analyze these statements in context, the Court analyzes both purported misrepresentations together, as they appear in the same document. *See In re Synchrony Fin. Sec. Litig.*, 988 F.3d at 171.

[14] Although contained in two separate sentences in the April 2023 Report, Plaintiffs treat these phrases as a single statement or disclosure, as does the Court. (FAC, Dkt. 31, ¶ 69.) Plaintiffs also highlight another sentence in the April 2023 Report—"Our business is subject to a large number of laws across many jurisdictions, many of which are evolving"—but the Court views that

Plaintiffs assert that this risk disclosure was materially false and misleading because PDD had not and would not comply with the UFLPA, as it failed to implement internal guidelines to ensure compliance with the UFLPA, failed to identify and outright prohibit sellers from selling products from Xinjiang, and merely relied on consumers and suppliers to report goods produced by forced labor. (*Id.* ¶¶ 69–70.)

i. The April 2023 Report Statement Was Not Material

The first part of PDD's statement—that it strives to comply with all applicable laws—is a classic example of inactionable, immaterial "puffery." Puffery includes a "general statement[] about reputation, integrity, and compliance with ethical norms," *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014), or laws and regulations, *see Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 103–04 (2d Cir. 2021 (finding company's statement that it "strive[s] to conduct our business in accordance with internationally recognised principles in the area[ ] of . . . anti corruption" to be immaterial puffery (alterations in original)); *see also Greco*, 2022 WL 4226022 at *14 (finding aspirational statements "regarding [defendant's] attempts to remain compliant with regulations" inactionable because they "are too general to cause a reasonable investor to rely upon them"). "This is particularly true where . . . the statements are explicitly aspirational, with qualifiers such as 'aims to,' 'wants to,' and 'should.'" *City of Pontiac*, 752 F.3d at 183. The language PDD used here, "*striv[ing]* to comply with all applicable laws," (*Id.* ¶ 69 (emphasis added)), is plainly aspirational, *see Plumber & Steamfitters Loc.*, 11 F.4th at 103–04; *Greco*, 2022 WL 4226022, at *14 (categorizing general statements that a company would "continue to make efforts to ensure that [it is] compliant with

---

sentence as simply providing context for the Report's references to "applicable laws" and "applicable regulatory regimes" in the allegedly misleading statement. (*Id.*)

the existing laws, regulations and governmental policies relating to [its] industry and to comply with new laws and regulations" as puffery); *Leonard v. Abbott Lab'ys, Inc.*, No. 10-CV-4676 (ADS) (WDW), 2012 WL 764199, at *22 (E.D.N.Y. Mar. 5, 2012) (concluding that statement that company was "dedicated . . . to complying with all applicable laws and regulations in the countries where [it] [did] business" was puffery because it did not identify "specific requirements or standards").

Considering PDD's aspirational statement in context of the broader April 2023 Report further weakens any claim of materiality. Aspirational language, like "strives," is inherently cautionary, as it signals to investors that PDD *might not actually be* complying with regulations in the present and that it *might not have complied* with applicable regulations in the past. Indeed, in the April 2023 Report, PDD's aspirational statement is accompanied by *explicit* warnings that PDD might not have complied with regulations in the past and might not do so in the future. When a disclosure "warns of the exact risk that later materialize[s], a [securities fraud] claim will not lie as a matter of law." *See In re ProShares Trust Sec. Litig.*, 728 F.3d 96, 102 (2d Cir. 2012) (citation omitted); *accord In re Allergan PLC Sec. Litig.*, No. 18-CV-12089 (CM), 2019 WL 4686445, at *20 (S.D.N.Y. Sep. 20, 2019).[15] "[A]lleged misrepresentations . . . are immaterial" where, in light of "adequate cautionary language set out" in the same document as the misrepresentation, "it cannot be said that any reasonable investor could consider them important." *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002) (collecting cases). Thus, PDD's general hortatory

---

[15] Conversely, "risk factor disclosures *are* actionable if the disclosed risk has already come to pass." *Steamship Trade Ass'n of Balt.-Int'l Longshoreman's Ass'n Pension Fund v. Olo Inc.*, 704 F. Supp. 3d 429, 438 (S.D.N.Y. 2023) (emphasis added) (first citing *Set Cap. LLC v. Credit Suisse Grp.*, 996 F.3d 64, 85 (2d Cir. 2021); and then citing *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 400 (S.D.N.Y. 2005)); *accord TCP Diversified Tech. Fund v. Gaotu Techedu Inc.*, No. 22-CV-7966 (PKC) (CLP), 2025 WL 416872, at *8 (E.D.N.Y. Feb. 6, 2025).

statements about striving to comply with the UFLPA, "framed by acknowledgements of the complexity and numerosity of applicable regulations," *Singh*, 918 F.3d at 64, could not have *materially* misled investors as to its past and future compliance with the UFLPA, *see id.* at 60 (finding general statement that company "established policies and procedures to comply with applicable requirements," was too generic to reasonably rely on, particularly when paired with warning that company was "subject to . . . numerous and complex regulations and requirements that are frequently modified and subject to administrative discretion"); *In re Qudian Inc. Sec. Litig.*, No. 17-CV-9741 (JMF), 2019 WL 4735376, at *8 (S.D.N.Y. Sep. 27, 2019) (declining to find statement that company could not assure that "existing user information protection system and technical measures will be considered sufficient under applicable laws and regulations" materially misleading (emphasis omitted)).[16]

ii. The April 2023 Report Statement Was Not Misleading

Plaintiffs also cannot show that PDD's "public reporting of general risks" in the April 2023 Report was misleading because PDD did not disclose its "particular deficiencies." (*See* Pls.' Mem. Opp'n MTD ("Opp'n"), Dkt. 46, at 9–12; *see also id.* (arguing that "[c]ourts reject the notion that vague disclaimers cure omissions where the company knew its 'policies' were illusory").) Plaintiffs appear to be relying on the concept that "generic warning of a risk will not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability." *Meyer*, 761 F.3d at 251 (citing *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004)); *see also In re Didi Glob. Inc. Sec. Litig.*, No. 21-CV-5807 (LAK), 2024 WL 1119483, at *8 (S.D.N.Y. Mar. 14, 2024) ("[T]he amorphous discussion of a generic risk cannot insulate an issuer

[16] Furthermore, PDD's explicitly cautionary statements about non-compliance in the April 2023 Report were neither false nor misleading. Indeed, Plaintiffs themselves allege that Defendants had not and would not be complying with the UFLPA. (FAC, Dkt. 31, ¶¶ 69–70.)

from liability when it fails to disclose a *specific* known risk."). But Plaintiffs cannot point to undisclosed facts on the ground that indicate that PDD's April 2023 disclosures were misleading at the time they were issued. Here, although the UFLPA and its presumption *had* come into effect over one year prior, at the time PDD issued its April 2023 Report, it was unclear whether PDD had violated the UFLPA. Despite the fact that concerns were raised before the House Committee in March 2023 about "forced labor . . . in the retail apparel industry and with the supply chains of a number of Western and China-based companies," (Interim Findings, Dkt. 44-4, at 3), it was not until June 22, 2023 that the Committee specifically warned that "there is an extremely high risk that Temu's supply chains are contaminated with forced labor," (*id.* at 11).[17] Even then, the Committee and relevant experts did not reject PDD's argument that the UFLPA did not apply to companies that were not the importer of record. (*Id.* at 8 (documenting this argument but not addressing it)); Swanson and Fu, *supra* (reporting that attorneys were not clear whether Temu "would be liable for complying with the U.S. ban" but that "facilitating the importation of goods

[17] Indeed, the FAC does not present any facts suggesting that PDD was being investigated for violations of the UFLPA at the time it made its April 2023 Report. The Interim Findings report that on "May 2, 2023"—only after the April 2023 Report was issued—the Committee "requested information from [Temu] regarding the steps . . . taken to ensure that the products that [Temu] provides to American consumers as well as their constituent materials were not produced with forced labor." (Interim Findings, Dkt. 44-4, at 3.) The facts alleged in the FAC thus stand in contrast to those in which a company had more specific, non-public information of how it might be in violation of a law. *See, e.g.*, *In re Didi Glob. Inc. Sec. Litig.*, 2024 WL 1119483, at *8 (finding misleading a generic risk disclosure—that a company's failure to comply with applicable laws could result in investigations and other penalties—because it did not make mention of a specific risk known to the company: that it was likely not compliant with applicable privacy laws, as evidenced by the Chinese government's "suggest[ing] strongly that it did not think that [the company] was fully compliant with [data and privacy] laws" such that it should postpone its IPO); *TCP Diversified*, 2025 WL 416872, at *7–8 (finding disclosure that pending regulations would "create risks that [the company] may be found to violate the existing laws and regulations" to be misleading because the company had specific, non-public information on the contents of the regulation and its "potentially devasting impact" on business).

from Xinjiang could [result in] civil or criminal penalties"). Discussions of targeted bans on Temu surfaced later, in early 2024. (*See* FAC, Dkt. 31, ¶¶ 42–43 (citing to analyst reports discussing U.S. lawmakers "demanding a shipment ban on Temu").) Even if Plaintiffs had alleged that the House Committee began investigating PDD *before* the April 2023 Report's issuance, PDD's failure to disclose such an investigation would not have been misleading. "[A] corporation does not have a duty to disclose information simply . . . because it suggests that the corporation or its employees engaged in uncharged illegal conduct." *In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 353 (S.D.N.Y. 2008) (collecting cases); *see also In re Lions Gate Ent. Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 10–13 (S.D.N.Y. 2016) (concluding that company's statement that it did not believe outcome of pending proceedings would have an adverse effect on finances was not materially misleading for failing to disclose current SEC investigation into the company because "securities laws do not impose an obligation on a company to predict the outcome of investigations" (citations omitted)). Plaintiffs do not allege enough facts to reasonably infer that, at the time PDD released the April 2023 Report, a far more specific risk—*e.g.*, that PDD was specifically suspected of violating the UFLPA—had materialized.

b. Post-House Investigation Statement: April 2024 Report

Plaintiffs next contend that PDD's April 2024 Report was materially misleading when it stated that PDD: (1) "strives to comply with all laws and regulations that are applicable to [its] operations"; (2) "require[s] merchants on the Temu platform to comply with [its] third-party code of conduct, which strictly prohibits the use of forced, penal or child labor"; and (3) has "establish[ed] policies and procedures to ensure that no seller on the Temu platform is on the UFLPA Entity List, and use[s] technology to identify products that are at higher risk of non-compliance." (FAC, Dkt. 31, ¶¶ 74–75 (emphasis omitted).) Plaintiffs claim that these statements are materially misleading because "[a] reasonable investor would interpret such statements to

mean that PDD had adopted and implemented operational controls, procedures, or enforcement mechanisms to detect and prevent [UFLPA] violations" when, in fact, it had not. (Opp'n, Dkt. 46, at 8; *see also* FAC, Dkt. 31, ¶ 75.)

The Court does not find this statement material because, at the time of its issuance, PDD's lack of compliance protocols was already publicly known. "It is well-established law that the securities laws do not require disclosure of information that is publicly known." *Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597, 611 (S.D.N.Y. 2008) (quoting *In re Progress Energy, Inc.*, 371 F.Supp.2d at 552–53); *accord In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 377 (E.D.N.Y. 2003) (compiling cases finding that "[w]here allegedly undisclosed material information is in fact readily accessible in the public domain, . . . a defendant may not be held liable for failing to disclose this information"). By the time PDD released its April 2024 Report, the House Committee had shared that Temu "d[id] not have any system to ensure compliance with the [UFLPA]," and only offered a "boilerplate" "Third Party Code of Conduct," that touted "'a zero-tolerance policy' for the use of forced, indentured, or penal labor." (Interim Findings, Dkt. 44-4, at 3, 9.) And *The New York Times*, *Business Insider*, *Fox Business*, Goldman Sachs, and Morgan Stanley had all reported on the House Committee's findings that Temu had no affirmative compliance system, did not expressly prohibit third-party sellers from selling products from Xinjiang, and was not taking enough actions to prevent suppliers from using forced labor. *See supra* pp. 8–9; (FAC, Dkt. 31, ¶¶ 39–43). These articles and reports also indicated that Temu's non-compliance had not improved since the Committee released its Interim Findings. (*See* FAC, Dkt. 31, ¶¶ 42–43 (describing February and March 2024 allegations that U.S. lawmakers were pushing for a shipment ban of Temu because it had not taken enough actions to prevent suppliers from using forced labor).) Thus, even assuming that PDD's statements in the April 2024 Report amounted to misrepresentations,

facts concerning its failure to comply with the UFLPA were "readily accessible in the public domain." *See In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d at 377; *cf. Haping v. 17 Educ. & Tech. Grp. Inc.*, No. 1:22-CV-9843 (LAK) (SDA), 2023 WL 8716895, at *10 (S.D.N.Y. July 20, 2023) (reaching a similar conclusion in the context of claims under Section 11 of the Exchange Act).

The Court disagrees with Plaintiffs' argument that this readily available information was too speculative and "scattered" to vitiate a reasonable investor's reliance on PDD's statements of compliance. (*See* Opp'n, Dkt. 46, at 9.) But courts within this Circuit regularly dismiss statements as immaterial where, as here, reputable news sources with a broad reach, such as *The New York Times*, disclosed the allegedly omitted information. *See In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 576 (S.D.N.Y. 2013) (determining risk of lawsuit was readily accessible to a reasonable investor via the public domain because the information was shared in the *New York Times* and republished nationally and internationally in publications like the *Houston Chronicle*, *Wall Street Journal*, and *Dow Jones Business News*), *aff'd*, 566 F. App'x 93 (2d Cir. 2014); *see also Dagan Invs., LLC v. First High-Sch. Educ. Grp. Co.*, No. 22-CV-3831 (JGK), 2023 WL 8452223, at *5 (S.D.N.Y. Dec. 6, 2023) (finding defendants' omissions in registration statement were not material where omitted information was reported "in widely accessible publications and in English" and where "plaintiffs themselves relied on the news articles . . . to make their allegations" (citations omitted)). The FAC indicates that these news sources and reports provided enough details about Temu's noncompliance with the UFLPA—that Temu "relie[d] on customers and suppliers" to report goods produced by forced labor and was even facing a "shipment ban" at the urging of U.S. lawmakers, (FAC, Dkt. 31, ¶¶ 40–43)—such that any disclosure by PDD of its noncompliance with UFLPA would not have significantly altered the mix

of information available to a reasonable investor. *See In re UBS AG Sec. Litig.*, No. 07-CV-11225 (RJS), 2012 WL 4471265, at *32–33 (S.D.N.Y. Sep. 28, 2012) (pointing to articles in *The New York Times*, *Wall Street Journal*, and *Business Week* as revealing enough about government investigations into defendant such that there was not a "substantial likelihood that the disclosure of the omitted fact[s] would have been viewed by the reasonable investor as having *significantly* altered the 'total mix' of information made available" (alteration in original) (citation omitted)), *aff'd sub nom. City of Pontiac*, 752 F.3d 173. The Court therefore concludes that any alleged misrepresentations or omissions in the April 2024 Report would not have been material.

c. Post-House Investigation Statement: May 2024 Earnings Call

The Court finds immaterial and thus inactionable Defendant Chen's alleged misrepresentations on the May 22, 2024 Earnings Call, that PDD had the "goal of building an industry-leading compliance program," was "committed to improv[ing] [compliance]" and had "invested significant resources" in compliance "over the past few quarters." (FAC, Dkt. 31, ¶¶ 76–77 (emphasis omitted).) These aspirational statements as to PDD's goals and commitments are puffery. *See supra* pp. 22–24; *Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 297–98 (S.D.N.Y. 2019) (finding aspirational language, such as "committed to" and statements of goals, "too general to give rise to a securities-fraud violation"); *High Income Sec. Fund v. Cedar Realty Tr., Inc.*, No. 22-CV-4031 (JMA) (JMW), 2023 WL 6214237, at *6–7 (E.D.N.Y. Sep. 25, 2023) (concluding that statements of value-creation, such as what a company was "committed" to doing or what its goals were, were puffery and compiling cases finding the same). And Defendant Chen's claim that PDD had invested significant resources in compliance lacks sufficient specificity to have induced reasonable reliance by an investor. *See In re Virtu Fin., Inc. Sec. Litig.*, 770 F. Supp. 3d 482, 506 (E.D.N.Y. 2025) (collecting cases finding that "[g]eneral statements about compliance policies, procedures, and mechanisms are not actionable in securities actions" unless the

descriptions are detailed and specific); *Plumber & Steamfitters Loc.*, 11 F.4th at 103–04 (finding statement that the bank "takes the steps necessary to comply with internationally recogni[z]ed standards" too vague to be actionable because the descriptions of compliance efforts were not detailed or specific). Moreover, the widespread reporting of PDD's complete lack of material mechanisms for compliance with the UFLPA—even as recently as two months before the Earnings Call, (*see* FAC, Dkt. 31, ¶ 43 (describing February 2024 press coverage discussing lawmakers demanding a shipment ban on Temu))—would have deterred a reasonable investor from placing much credence into Defendant Chen's claims of investments in compliance.

2. Plaintiffs Largely Fail to Plead Materially Misleading Statements or Omissions as to PDD's Cybersecurity Measures

Plaintiffs also challenge six of Defendants' statements as materially misleading investors as to PDD's cybersecurity measures in (1) Defendants' April 2021 Report; (2) the April 2022 Earnings Call; (3) Defendants' April 2023 Report; (4) the November 2023 Earnings Call; (5) Defendants' April 2024 Report; and (6) the May 2024 Earnings Call. (FAC, Dkt. 31, ¶¶ 79, 81, 83, 85, 89, 92, 94, 96.)[18] The Court finds that, with the exception of the November 2023 Earnings Call—which the Court assumes *arguendo* was materially misleading—Plaintiffs have failed to allege that these statements were misleading at the time they were made or that they would be material to a reasonable investor.

[18] Plaintiffs point to two statements related to cybersecurity within the April 2023 Report and two statements related to cybersecurity in the April 2024 Report as individual actionable misrepresentations, (FAC, Dkt. 31, ¶¶ 83, 85, 92, 94), but the Court analyzes these purported misrepresentations together, as they originate from one document and must be considered in context.

a. Pre-Google Suspension Statements (April 2021 Report and April 2022 Earnings Call)

Plaintiffs contend that, in light of the malware plaguing PDD's applications, PDD's April 2021 Report, which boasted of the company's "strict data protection policy to ensure the security of [its] proprietary data," was materially misleading. (*Id.* ¶ 63.) Specifically, the April 2021 Report stated that:

> (1) PDD collected "anonymized, non-confidential user behavior and pattern data based on [users'] interactions with [its] platform";
>
> (2) PDD pre-processed this data to exclude user identity or other sensitive data;
>
> (3) PDD encrypted this confidential personal information;
>
> (4) PDD did not share this data with external third parties; and
>
> (5) PDD limited employee access to confidential personal data.

(*Id.* ¶ 79 (emphasis omitted).) On the April 2022 Earnings Call, Defendant Chen stated that PDD was always "strictly compliant with China's data security standards" and that the company would "keep holding [itself] to the higher standards" to ensure a "safe and efficient shopping environment." (*Id.* ¶ 81.)

These statements, Plaintiffs contend, were false and materially misleading because the applications were "purposefully and intentionally loaded with tools to execute virulent and dangerous malware and spyware activities on user devices that have downloaded and installed the TEMU [or Pinduoduo[19]] app," "designed to gain unrestricted access to a user's phone operating system," and sell that information to third parties. (*Id.* ¶¶ 80, 82.)

---

[19] Although Plaintiffs only mention malware in the Temu application when alleging falsity, (FAC, Dkt. 31, ¶¶ 78–97), the Court determines that Plaintiffs are also referring to malware in the Pinduoduo application, as many of the facts and allegations in the FAC refer to Pinduoduo. The Court does not determine whether this failure to specify Pinduoduo fails to plead falsity with

For the reasons explained below, the Court determines that these statements are not misleading because the FAC relies on uncorroborated allegations that must be discounted, and without these allegations, Plaintiffs cannot allege Defendants' statements were false at the time they were made. Separately, the Court finds that Defendant Chen's statements on the April 2022 Earnings Call are puffery.

i. Plaintiffs Insufficiently Allege Falsity

As a threshold matter, the Court must discount Plaintiffs' unparticularized allegations in the FAC. In explaining *how* PDD's Pre-Google Suspension statements were materially misleading, Plaintiffs rely primarily on—and quote from—the Arkansas Complaint.[20] "A fraud complaint that '*merely* recites others' allegations' is generally insufficient under Rule 9(b) where it does not [also] allege . . . non-conclusory facts to support its claim for relief." *Deluca v. GPB Auto. Portfolio, LP*, No. 19-CV-10498 (LAK), 2020 WL 7343788, at *16 (S.D.N.Y. Dec. 14, 2020) (quoting *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 180 (2d Cir. 2015)). Specifically, neither the Arkansas Complaint nor Plaintiffs provide independent facts to support the allegation that PDD was selling the data it collected to third parties. (*See* Ark. Compl., Dkt. 44-10, ¶ 2.) Accordingly, the Court must discount, and may even disregard, the

requisite particularity under the PSLRA and Rule 9(b) because it concludes that Plaintiffs' allegations are insufficient for other reasons.

[20] (*Compare* FAC., Dkt. 31, ¶ 80 (quoting, without attribution, that the applications were "purposefully and intentionally loaded with tools to execute virulent and dangerous malware and spyware activities on user devices that have downloaded and installed the TEMU app"; could "bypass users' cell phone security to monitor activities on other apps, check notifications, read private messages, and change settings"; were "purposefully designed to gain unrestricted access to a user's phone operating system, including, but not limited to, a user's camera, specific location, contacts, text messages, documents, and other applications"; and "monetize[d the] unauthorized collection of data by selling it to third parties, profiting at the direct expense . . . [of] privacy rights"), *with* Ark. Compl., Dkt. 44-10, ¶¶ 2, 10, 23 (using exact same language).)

allegations set forth in the Arkansas Complaint and repeated by Plaintiffs regarding Defendants' sales of user data. *See In re UBS AG Sec. Litig.*, 2012 WL 4471265, at *17 n.17 ("[B]ecause [certain] allegations are taken directly from uncorroborated allegations embedded in a complaint in another action, the Court will not consider them."); *Zhou v. NextCure, Inc.*, No. 20-CV-7772 (LTS) (RWL), 2023 WL 4493541, at *11 (S.D.N.Y. July 12, 2023) (finding that "allegations fail[ed] to provide sufficient support for [p]laintiff's fraud claim because recitations of unproven allegations made in other complaints do not, on their own, constitute factual allegations sufficient to survive a motion to dismiss" and collecting cases reaching the same outcome).[21]

The Court reaches a similar conclusion as to allegations that PDD's employees intentionally loaded Pinduoduo with malware in 2020. To make this assertion, the FAC relies primarily on the CNN Investigation, which in turn relies on an anonymous Pinduoduo employee. (*See* FAC, Dkt. 31, ¶ 51; *see generally* CNN Investigation, Dkt. 44-6.) "A plaintiff is permitted to rely on newspaper articles in pleading a securities fraud claim, provided that the reports themselves indicate particularized facts in order to support plaintiffs' claims." *In re Sibanye Gold Ltd. Sec. Litig.*, No. 18-CV-3721 (KAM) (PK), 2020 WL 6582326, at *16 (E.D.N.Y. Nov. 10, 2020) (quoting *Lopez v. Ctpartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 31 (S.D.N.Y. 2016)). The anonymous source quoted in the CNN Investigation is merely referred to as a "current Pinduoduo employee." (CNN Investigation, Dkt. 44-6, at ECF 6.) This description is insufficient

---

[21] Plaintiffs cite to *Strougo v. Barclays PLC*, 105 F. Supp. 3d 330, 343 (S.D.N.Y. 2015), for the proposition that the Court may credit the Arkansas Complaint because "[t]he facts are derived from a credible complaint based on facts obtained after an investigation." (Opp'n, Dkt. 46, at 13 n.4 (quoting *Strougo*, 105 F. Supp. 3d at 343).) In that case, unlike this one, "counsel for plaintiffs . . . indicated that they ha[d] reached out to attorneys at the [New York Attorney General's Office] to verify the allegations in th[at] [c]omplaint." *Strougo*, 105 F. Supp. 3d at 343. Moreover, *Strougo* concerned whether the allegations in the complaint should be struck pursuant to Rule 11(b), for failure to conduct "inquiry reasonable under the circumstances," not whether the allegations satisfied Rule 9(b)'s demands for particularity.

to support the conclusion that the employee would possess the information alleged. Nowhere does the CNN Investigation or the FAC "describe the position held by or work assignments of the . . . source[], or any other information that would support an inference that the source[] would possess the information attributed to them." *See Feasby v. Industri-Matematik Int'l Corp.*, No. 99-CV-8761 (LTS) (JCF), 2003 WL 22976327, at *4 (S.D.N.Y. Dec. 19, 2003) (discounting allegations by "former employees" for this reason); *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 595 (S.D.N.Y. 2011) (reaching a similar conclusion as to one confidential witness because the complaint gave no "indication of what . . . [his] job duties entailed, what kind of access [he] had to [defendant], . . . or how [the witness] was privy to [the information underlying the] statement"). Although "'independent [adequately pled] factual allegations' [that] corroborate a confidential source's statements" can loosen the "requirement of a description of the source's job,"[22] Plaintiffs' only corroboration of the fact attributed to the anonymous Pinduoduo employee comes from the Arkansas Complaint and Grizzly Research—both of which cite to the CNN Investigation for this exact proposition.[23] In other words, Plaintiffs' malware allegations are based on circular references that all lead back to the same unsupported statements of the Pinduoduo employee. Accordingly, the Court must discount the allegations raised by the anonymous Pinduoduo

---

[22] *Glaser*, 772 F. Supp. 2d at 590 (first alteration in original) (quoting *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F.Supp.2d 474, 493 n. 10 (S.D.N.Y. 2004)); *see also In re Arqit Quantum Inc. Sec. Litig.*, 774 F. Supp. 3d 505, 527–28 (E.D.N.Y. 2025) (crediting *Wall Street Journal* account of "former employees" where Plaintiffs corroborated the sources' statements in interviews with confidential witnesses).

[23] (*Compare* FAC, Dkt. 31, ¶¶ 54, 57 (alleging that the Grizzly Report reported that "[t]he TEMU app development team includes 100 engineers who built the Pinduoduo app, which earned a suspension from the Google Play [application s]tore" and that "[t]he Arkansas Complaint also alleged that ' . . . [t]wo days after the update, Pinduoduo disbanded the team of engineers and product managers who had developed the exploits, . . . . [and] transferred [them] to work at Temu . . . .'"), *with* Ark. Compl., Dkt. 44-10, ¶ 54 & nn. 33–34 (citing to the CNN Investigation for this claim), *and* Grizzly Report, Dkt. 44-7, at ECF 3 (same).)

employee, namely that Pinduoduo engineers loaded malware into the application as early as 2020. *See In re E-House Sec. Litig.*, No. 20-CV-2943 (ER), 2021 WL 4461777, at *15 (S.D.N.Y. Sep. 29, 2021) (discounting for lack of particularity the allegations of "an individual close to the Company" in a news article), *aff'd sub nom. Maso Cap. Invs. Ltd. v. E-House (China) Holdings Ltd.*, No. 22-355, 2024 WL 2890968 (2d Cir. June 10, 2024).

Without these allegations, Plaintiffs' FAC fails to state, with particularity, that Defendants' statements in the April 2021 Report or on the April 2022 Earnings Call were false at the time that they were made. Plaintiffs' FAC largely amounts to allegations that, at some point prior to March 21, 2023, PDD had malware on certain versions of the Pinduoduo application, (*see* FAC, Dkt. 31, ¶ 48), and that, at some point prior to August 30, 2023, Temu's application had "hidden functions that allow[ed] for extensive data exfiltration" demonstrating that "great efforts were taken to intentionally hide the malicious intent and intrusiveness of the software," (*id.* ¶ 54; Grizzly Report,[24] Dkt. 44-7, at ECF 6 (explaining research was done "on several versions of Temu" up to August 30, 2023).) Plaintiffs lack any facts specifying, or even suggesting, precisely *when* such malware existed on PDD's applications. In other words, Plaintiffs do not allege facts to support the inference that on April 30, 2021 and April 29, 2022 (when the April 2021 Report was released and April 2022 Earnings Call occurred, respectively), there was malware on PDD's applications. This atemporality is fatal to Plaintiffs' Pre-Google Suspension allegations as the Court cannot

[24] The Court declines to consider whether Plaintiffs improperly credited the Grizzly Report, (*see* MTD, Dkt. 45, at 17–18), because it determines that Plaintiffs' allegations fail to state a claim even if the Court were to consider the Report. The Court acknowledges that in another securities fraud lawsuit, *Handal v. Tenet Fintech Group Inc.*, No. 21-CV-6461 (PKC) (RER), 2023 WL 6214109, at *12 (E.D.N.Y. Sep. 25, 2023), the Court ruled, in the context of a motion to dismiss, that it was premature to discount a similar Grizzly Report. However, in that case, unlike here, the plaintiffs had done additional research to corroborate the findings of the Grizzly Report at issue, including accessing the public records and evidence that the report had relied on. *Id.* at *2–3, *12–15.

evaluate whether Defendants' statements were materially misleading *when they were made*. *See Dresner v. Utility.com, Inc.*, 371 F. Supp. 2d 476, 498 (S.D.N.Y. 2005) (declining to find allegation that defendant "misrepresented the functionality" of a website during a merger was materially misleading because the plaintiffs did not "allege with particularity that the specific problems with [the website] were occurring *at the time of the preparation* of the Merger Documents or any point thereafter" (emphasis added)).

ii. Statements on the April 2022 Earnings Call Were Puffery

Separately, the Court finds that Defendant Chen's statements on the April 2022 Earnings Call are inactionable puffery. As noted above, commitments to "keep holding ourselves to the higher standards," (FAC, Dkt. 31, ¶ 81), are too vague to induce reasonable reliance from an investor. *See supra* pp. 22–24, 29; *In re AstraZeneca PLC Sec. Litig.*, No. 21-CV-0722 (JPO), 2022 WL 4133258, at *8 (S.D.N.Y. Sep. 12, 2022) (concluding that defendant's "commitment to the highest safety standards" was puffery), *aff'd sub nom. Nandkumar v. AstraZeneca PLC*, No. 22-2704-CV, 2023 WL 3477164 (2d Cir. May 16, 2023). Similarly, Defendant Chen's affirmations that PDD has "always been strictly compliant with China's data security standards," without any specifics as to *what* those standards are, or what PDD's strict compliance entailed, are insufficiently specific to cause a reasonable investor to rely on them. *See Asay v. Pinduoduo Inc.*, No. 20-1423, 2021 WL 3871269, at *3 (2d Cir. Aug. 31, 2021) (summary order) (finding affirmations as to Pinduoduo's "strict" anti-counterfeiting measures to be too vague and generalized to be actionable); *Sherman v. Abengoa, S.A.*, 156 F.4th 152, 164 (2d Cir. 2025) (determining that statements that defendant "enforce[d] strict financial discipline" were inactionable puffery (alteration in original)); *Diehl v. Omega Protein Corp.*, 339 F. Supp. 3d 153, 162–63 (S.D.N.Y. 2018) (collecting cases finding statements touting compliance to be too general to be actionable).

b. Post-Google Suspension Statement: the April 2023 Report

Plaintiffs next assert that several statements within PDD's April 2023 Report concerning cybersecurity were materially misleading because they were "framed as mere possibilities . . . when the risk ha[d] already materialized." (Opp'n, Dkt. 46, at 14.) In particular, Plaintiffs point to Defendant's assertions that (1) PDD "face[s] a number of challenges relating to data from transactions and other activities on our platforms," including "protecting the data in and hosted on [its] system" from, for example, "attacks on [its] system by outside parties or fraudulent behavior or improper use by [its] employees"; and (2) "significant capital, managerial and other resources . . . may be required . . . to address the issues caused by a potential security failure." (FAC, Dkt. 31, ¶ 83 (emphasis omitted).)

The Court finds that these statements are not material because by the time they were made, PDD's cybersecurity problems had already been publicized. Approximately one month prior to the Report's issuance, Google suspended Pinduoduo from its application store for malware, and several news sources, including Reuters, Bloomberg, Credit Suisse, and CNN had published detailed reports concerning malware and cybersecurity issues on Pinduoduo, as well as the risk that Temu faced the same challenges. (*Id.* ¶¶ 48–51.) To the extent these statements might be actionable for characterizing known risks as hypotheticals, these risks (which may have become reality) were already "in the mix of public information at the time of the [April 2023 Report]" and therefore would not be material to investors. *See Haping*, 2023 WL 8716895, at *10; *Dagan*, 2023 WL 8452223, at *5 (declining to find materiality where alleged omissions were reported in accessible news publications); *N.Y.C. Pub. Pension Funds v. Coupang, Inc.*, No. 22-CV-7309 (VSB), 2025 WL 2613650, at *34 (S.D.N.Y. Sep. 10, 2025) (similar).

c. Post-Google Suspension Statement: the November 2023 Earnings Call

Plaintiffs next assert that Defendant Zhao's statements on the November 2023 Earnings Call were materially misleading. In that call, Zhao was asked about how PDD was evaluating competitors who "have been putting more emphasis on value-for-money merchandise." Jiazhen Zhao, Co-Chief Exec. Officer of PDD Holdings Inc, Q3 2023 Earnings Call Transcript (Nov. 28, 2023). Defendant Zhao responded, in relevant part:

> There is both healthy and malicious competition. Sometimes competition can easily evolve into unhealthy market practices, and those who do well will always attract attacks. For example, we noted a short-tail report on our company was issued in early September. The allegations in the report are totally baseless . . . . [T]he report was published with the intent to create panic and to drive down stock prices and enabling the . . . short seller to profit from [a] short position. As we investigated further, we found out that there were actually more follow-up actions taken by the instigators behind the report. Their motives and the unusual actions are quite apparent. We are encouraged to see that most investors understood the underlying motives and saw through the groundless accusations.

*Id.*; (*see also* FAC, Dkt. 31, ¶ 89 (emphasis omitted)). Defendants concede that the Grizzly Report is a short-seller report, (MTD, Dkt. 45, at 8), and thus, the Court finds that Plaintiffs have plausibly alleged that the short-seller report to which Zhao is referring is the Grizzly Report. Although the Court notes the issues with relying heavily on short-seller reports to plead materiality, *see supra* n.24, as well as Plaintiffs' repetition of uncorroborated allegations in the CNN Investigation, *see supra* pp. 33–34, the Court assumes *arguendo* that Plaintiffs have plausibly alleged that actionable statements were made during the November 2023 Earnings Call. As explained below, the Court determines that, even if Plaintiffs had alleged materially misleading statements, the FAC must be dismissed because Plaintiffs do not allege scienter. *See infra* Part I.C.

d. <u>Post-Google Suspension Statement: the April 2024 Report</u>

For many of the same reasons explained above, the Court must dismiss Plaintiffs' allegations concerning PDD's statements regarding cybersecurity the April 2024 Report as immaterial. In the April 2024 Report, Defendants acknowledged that PDD was "subject to complex and evolving laws and regulations regarding privacy and data protection in the countries and regions where [it had] operations." (FAC, Dkt. 31, ¶ 94 (emphasis omitted).) Although the April 2024 Report stated that PDD "str[o]ve to comply with all laws and regulations," it also cautioned that there were "uncertainties with respect to how such laws or regulations will be implemented," and PDD "may not have fully complied in the past, and may not be able to fully or timely comply in the future." (April 2024 Report, Dkt. 44-1, at 29, 45.) PDD's aspirational statements about compliance, combined with "acknowledgements of the complexity and numerosity of applicable regulations," would not be material reasonable investor. *See supra* pp. 22–24 (citing *Singh*, 918 F.3d at 64; *Halperin*, 295 F.3d at 357; *In re Qudian Inc. Sec. Litig.*, 2019 WL 4735376, at *8); *Asay*, 2021 WL 3871269, at *3 (finding similar statements to not be material for the same reason).

More glaringly, Plaintiffs have not alleged with particularity that PDD's generic statement of risk was false or misleading. Plaintiffs do not allege *which* laws PDD's alleged malware ran afoul of, or how, thus preventing the Court from determining whether this statement was misleading in any way. *See Schiro*, 438 F. Supp. 3d at 198 (requiring allegations concerning "non-disclosure of illegal activity" to plead, with particularity, "the facts of the underlying illegal acts" that were not disclosed (citation omitted)); *see Menora Mivtachim Ins. Ltd. v. Int'l Flavors & Fragrances Inc.*, No. 19-CV-7536 (NRB), 2021 WL 1199035, at *19 (S.D.N.Y. Mar. 30, 2021) (dismissing claim based on statement that company and its subsidiaries "have been and are in compliance with [ ] all applicable Laws" where plaintiffs did not "explain[] how [defendants']

conduct violated any applicable law" (citing *Schiro*, 438 F. Supp. 3d at 198–200)), *aff'd sub nom. Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd.*, 49 F.4th 790 (2d Cir. 2022), *and aff'd sub nom. Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd.*, 54 F.4th 82 (2d Cir. 2022). Some of the documents incorporated by reference into the FAC do discuss PDD's compliance with Chinese data privacy laws or pending U.S. legislation, (*see, e.g.*, CNN Investigation, Dkt. 44-6, at ECF 10–11; Grizzly Report, Dkt. 44-7, at ECF 8); however, these documents do not obviate Plaintiffs' burden to plead falsity with specificity when it comes to their claim that Defendants failed to disclose illegal activity.[25] In any event, these documents demonstrate that, by the time Defendants issued their April 2024 Report, reports of PDD's risk of noncompliance with data privacy laws was well-publicized; thus, any alleged misrepresentations or omissions in the April 2024 Report would not have been material to a reasonable investor.[26]

* * *

In sum, the Court finds that Plaintiffs have failed to allege, with particularity, that Defendants' statements were materially misleading, except as to Defendants' November 2023 Earnings Call, which the Court assumes *arguendo* is actionable.

---

[25] Defendants also referenced various Chinese data privacy laws in its April 2024 Report, which applied to "critical information infrastructure." (April 2024 Report, Dkt. 44-1, at 27.) PDD acknowledged that *if* the company was "deemed to be a critical information infrastructure operator or a network platform operator under [Chinese] law, [it] may become subject to [China's] cybersecurity laws and regulations." (*Id.*)

[26] For these reasons, Plaintiffs' allegations concerning Defendants' statements in the April 2023 Report addressing regulatory compliance must also be dismissed. There too, PDD only stated generally that it was "subject to a large number of laws across many jurisdictions," but it "may not have fully complied in the past and may not fully comply in the future." (FAC, Dkt. 31, ¶ 85.)

**C. Plaintiffs Fail to Plead Scienter**

Even assuming Plaintiffs had pleaded actionable misrepresentations and omissions, the Court must dismiss the FAC because Plaintiffs fail to sufficiently allege Defendants' scienter. For claims under the PLSRA to survive a Rule 12(b)(6) motion, a complaint must "'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind' with respect to each alleged mis[representation] or omission." *In re Banco Bradesco*, 277 F. Supp. 3d at 629 (quoting 15 U.S.C. § 78u–4(b)(2)); *accord Emps.' Ret. Sys. of Gov't of the V.I.*, 794 F.3d at 305; *ECA*, 553 F.3d at 198. Plaintiffs must allege sufficient facts such that "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007). Here, Plaintiffs have failed to allege the Individual Defendants' scienter with particularity because Plaintiffs rely almost entirely on these Defendants' positions in the company to infer knowledge. Meanwhile, Plaintiffs' allegations as to PDD's scienter piggybacks entirely on their allegations as to the Individual Defendants, and thus necessarily fail to state a claim as well.

1. <u>Individual Defendants' Scienter</u>

a. <u>Scienter Pleading Requirement</u>

A complaint may satisfy the scienter pleading requirement by alleging facts either "(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). The first showing requires the plaintiff to allege that the defendant "benefitted in some concrete and personal way from the purported fraud." *ECA*, 553 F.3d at 198 (*quoting Novak*, 216 F.3d at 307–08). The second showing "requires allegations of either actual intent or 'conscious recklessness—*i.e.*, a state of

mind approximating actual intent, and not merely a heightened form of negligence.'" *In re Bristol-Myers Squibb Co. CVR Sec. Litig.*, 658 F. Supp. 3d 220, 230 (S.D.N.Y. 2023) (*quoting Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 106 (2d Cir. 2015)). Recklessness is "an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Novak*, 216 F.3d at 308 (citation omitted). Circumstantial evidence of conscious misbehavior or recklessness can include a defendant's (1) "knowledge of facts or access to information contradicting their public statements," or (2) "fail[ure] to review or check information that they had a duty to monitor, or ignor[ing] obvious signs of fraud." *Id.* Where a plaintiff relies on circumstantial evidence to show scienter, that showing must be stronger than when proving scienter based on evidence of motive and opportunity. *ECA*, 553 F.3d at 198–99.

b. <u>Plaintiffs Have Failed to Sufficiently Allege Circumstantial Evidence of Scienter</u>

Plaintiffs' FAC relies on circumstantial evidence to allege the Individual Defendants' scienter. (*See* FAC, Dkt. 31, ¶¶ 106–23.) Specifically, Plaintiffs' theory of scienter is based on Defendants' purported knowledge of facts or access to information contradicting their public statements. (FAC, Dkt. 31, ¶ 22.) Plaintiffs primarily rely on the Individual Defendants' positions as PDD's "highest-ranking officers and directors" to show that the Individual Defendants received "confidential proprietary information concerning" the true nature of PDD's actions and that they controlled, received, and modified the misleading statements. (*Id.* ¶¶ 107–08; Opp'n, Dkt. 46, at 18 (claiming that Defendants Chen, Zhao, Ma, and Liu "exercised ultimate authority over, or substantially participated in, the drafting, review, and dissemination of SEC filings, press releases, and investor communications" and were "privy to proprietary, material non-public information

directly contradicting the public statements they issued or approved" (citing FAC, Dkt. 31, ¶¶ 18–19, 21–23)).)

Because these allegations are insufficient to show that the Individual Defendants, in fact, received the contradictory information, Plaintiffs have not alleged scienter. Scienter "cannot be inferred solely from the fact that, due to the defendants' board membership or executive managerial position[s], they had access to the company's internal documentation as well as any adverse information." *Greco*, 2022 WL 4226022, at *26 (quoting *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 407 (S.D.N.Y. 2016)); *accord Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 37 (S.D.N.Y. 2019) (holding that "bare assertions" that defendants, due to their "high level positions" had access to adverse undisclosed information, without further allegations, did not support a strong inference of scienter (citation omitted)); *Ulbricht v. Ternium S.A.*, No. 18-CV-6801 (PKC) (RLM), 2020 WL 5517313, at *12 n.9 (E.D.N.Y. Sep. 14, 2020) ("Allegations of scienter based solely on a defendant's 'corporate position are entitled to no weight' . . . ." (quoting *City of Brockton Ret. Sys. v. Avon Prods., Inc.*, No. 11-CV-4665 (PGG), 2014 WL 4832321, at *19 (S.D.N.Y. Sep. 29, 2014))); *San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 732 F. Supp. 3d 300, 323 (S.D.N.Y. 2024) (similar).

Rather, to allege that "defendants had access to [information contrary to their statements]," Plaintiffs must "*specifically identify* the reports or statements containing this information." *Novak*, 216 F.3d at 309 (emphasis added) (citation omitted); *In re AppHarvest Sec. Litig.*, 684 F. Supp. 3d 201, 243 (S.D.N.Y. 2023) (similarly requiring plaintiff to allege the "specific contradictory information the makers of the statements had and the connection (temporal or otherwise) between that information and the statements at issue" (citation omitted)); *Ulbricht*, 2020 WL 5517313, at *12 n.9 (same); *see also In re United States Oil Fund, LP Sec. Litig.*, No. 20-CV-4740 (PGG),

2025 WL 2771445, at *43 (S.D.N.Y. Sep. 29, 2025) (requiring such a showing and rejecting allegations that merely relied upon a defendant's corporate position to allege such access); *Plumbers' Union Loc. No. 12 Pension Fund v. Swiss Reinsurance Co.*, 753 F. Supp. 2d 166, 185–86 (S.D.N.Y. 2010) (rejecting argument that "the individual defendants serv[ing] on an executive committee that monitored 'operational risks' g[a]ve rise to a strong inference of scienter," where there was no "particularized allegation of contrary information possessed by the members of the committee").

Plaintiffs have not made such a showing here, either. They have not specifically identified any adverse information the Individual Defendants had access to *at the time* they made their allegedly contradictory and misleading statements. *See In re PXRE Grp., Ltd., Sec. Litig.*, 600 F.Supp.2d 510, 536 (S.D.N.Y. 2009) (requiring allegations to specify the "*specific* contradictory information" available to defendants "*at the same time* they made misleading statements" (quoting *In re Marsh & Mclennan Cos., Inc. Sec. Litig.*, 501 F.Supp.2d 452, 484 (S.D.N.Y. 2006)); *In re Lottery.com, Inc. Sec. Litig.*, 765 F. Supp. 3d 303, 349 (S.D.N.Y. 2025). As to the statements concerning PDD's compliance with governing laws (such as the UFLPA), *see supra* Part I.B.1, Plaintiffs argue that "public reports," as well as the Interim Findings, "put [the Individual] Defendants on notice that Chinese e-commerce companies were at risk of UFLPA violations." (Opp'n, Dkt. 46, at 17.) But the Individual Defendants were on notice of this allegedly contradictory information only *after* they made the alleged misrepresentations, and thus this information cannot support an inference that Defendants knew that their statements were false when made. As to Defendants' cybersecurity-related statements, Plaintiffs have failed to show that the information in the Arkansas Complaint, CNN Investigation, or Grizzly Report was available to Defendants prior to their issuance of the allegedly misleading statements, other than

by virtue of Defendants' positions within the company. The closest Plaintiffs come to suggesting that Defendants knew about the risk of malware on their systems prior to the Google suspension are by relying on the anonymous PDD employee's statements to CNN. First, the Court cannot consider the substance of these uncorroborated allegations, *see supra* pp. 33–34, and, second, even if it did, the Court would find that these statements, in themselves, do not support a "strong inference" of scienter, *In re Banco Bradesco*, 277 F. Supp. 3d at 629, because there are no allegations from which to infer that the facts purportedly known to the anonymous employee "made their way up the entire corporate hierarchy to the Individual Defendants," *Schiro*, 396 F. Supp. 3d at 305.[27]

Nor may Plaintiffs rely on the Arkansas Complaint, CNN Investigation, Grizzly Report, or Interim Findings as the "adverse information" Defendants had access to when making their Post-Congressional Investigation and Post-Google Suspension statements. "Plaintiffs cannot rely on information generally known or available to the public to support circumstantial scienter allegations." *See Glaser*, 772 F. Supp. 2d at 588 (citing *In re Sec. Cap. Assurance, Ltd. Sec. Litig.*, 729 F.Supp.2d 569, 595–96 (S.D.N.Y. 2010)); *In re Xunlei Ltd. Sec. Litig.*, No. 18-CV-0467

[27] *See also Campo v. Sears Holdings Corp.*, 371 F. App'x 212, 217 (2d Cir. 2010) (summary order) (determining confidential witness testimony did not support inference of scienter where witnesses could only confirm that defendant executives *could* access the information, but did not have knowledge that they *did* access the information); *In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 245 (S.D.N.Y. 2010) ("Plaintiffs cannot rely on assertions that the information presented by confidential witnesses was known or common knowledge within the company; these assertions are too vague and conclusory to support a finding that defendants knew they were making false statements or made those statements with reckless disregard for their truth or falsity." (citations omitted)); *Sporn v. BrainStorm Cell Therapeutics, Inc.*, No. 23-CV-9630 (DEH), 2025 WL 26439 83, at *14 n.4 (S.D.N.Y. Sep. 15, 2025) (determining that confidential witness statements "do not appear to be a basis" to infer scienter because "[p]laintiffs do not allege that these witnesses 'were privy to the [i]ndividual [d]efendants' knowledge or [i]ndividual [d]efendants, such that the [i]ndividual [d]efendants are alleged to have knowledge of or access to contemporaneous information that would show that their representations were false'" (quoting *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 378 (E.D.N.Y. 2013))).

(PAC), 2019 WL 4276607, at *12 (S.D.N.Y. Sep. 10, 2019) (quoting *Glaser*, 722 F. Supp. 2d. at 588); *In re Sec. Cap.*, 729 F. Supp. 2d at 596 (rejecting attempt to show scienter based on defendants' awareness of the housing market crisis because "the housing crisis was popular news by the end of 2006 and early 2007," and therefore plaintiffs, who had "the same information that they allege Defendants had, . . . should have been equally able to respond to it"). Plaintiffs do not point to non-public information available to Defendants that would support a finding of scienter as to the Post-Congressional Investigation and Post-Google Suspension statements.

Finally, the statements that Plaintiffs characterize as "Defendants' own admissions," (Opp'n, Dkt. 46, at 19), do not support a finding of scienter. That "PDD admitted it had no audits or program to monitor compliance with the UFLPA," (*id.*), does not establish that PDD *knew* or recklessly disregarded information concerning the UFLPA's applicability when making its alleged misrepresentations. *Cf. In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 653 (S.D.N.Y. 2007) (distinguishing between duty to monitor regulatory compliance, which does not give rise to an inference of scienter, and identifying information concerning compliance that defendants knew or recklessly disregarded). Defendants' "rush[] to issue an update removing exploits" similarly does not support the inference that they had knowledge of these exploits when they made their Pre-Google Suspension statements, particularly where, as here, the Court cannot consider the uncorroborated allegations that PDD hired a team to find ways to exploit vulnerabilities in Android phones in 2020 and that "PDD reassigned the exploit development team to another entity" after this update. (*See* Opp'n, Dkt. 46, at 18.)[28]

[28] Although Plaintiffs do not make this point, the allegation that "the underlying code was still [on the application after it was updated] and could be reactivated to carry out attacks," (CNN Investigation, Dkt. 44-6, at ECF 9–10), somewhat supports PDD's prior knowledge of the malware. That said, this fact does not cure Plaintiffs' failure to specify *when* malware was put onto PDD's applications and, consequently, Plaintiffs' failure to plead that PDD's Pre-Google

Stripped to its essentials, all the FAC offers to support a finding of scienter is publicly available reports that discuss prior facts about PDD's cybersecurity or sale of items from China. To allege scienter, the Court would need to infer Defendants' access to the information within these reports prior to their publication due to the Individual Defendants' managerial positions within the company—which, as discussed, is exactly the kind of allegation courts have repeatedly rejected as insufficient. Plaintiffs point to nothing else that would provide strong circumstantial evidence of scienter.

2. Corporate Scienter

Plaintiffs also fail to sufficiently allege the scienter of Defendant PDD. To allege scienter of a corporate entity, "the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap., Inc.*, 531 F.3d 190, 195 (2d Cir. 2008). "Alternatively, Courts in this District will impute corporate scienter even if the corporation's agent making a misrepresentation did not individually have the requisite knowledge of the falsity of that statement if a sufficiently senior director or officer of the corporation with some oversight over the public-facing misrepresentation had such knowledge and did not intervene." *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 424–25 (S.D.N.Y. 2020) (citing *Loreley*, 797 F.3d at 177; *Rex & Roberta Ling Living Trust v. B Commc'ns, Ltd.*, 346 F. Supp. 3d 389, 409–10 (S.D.N.Y. 2018)). Plaintiffs have not presented any well-pleaded allegations of scienter of individuals whose intent can be imputed to the corporation. Nor do Plaintiffs identify any other individual with the requisite oversight and knowledge who failed to intervene.

---

Suspension statements were false when made. Nor does it indicate that the *Individual Defendants* knew or recklessly ignored this information.

## II. Plaintiffs' Section 20(a) Claim

Plaintiffs also bring claims against the Individual Defendants under Section 20(a) of the Exchange Act, which imposes liability on individuals who control any person or entity that violates Section 10(b). *See* 15 U.S.C. § 78t(a). "To assert a *prima facie* case under Section 20(a), a plaintiff 'must show a primary violation by the controlled person and control of the primary violator by the targeted defendant, and show that the controlling person was in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person.'" *In Re PetroChina Co. Ltd. Sec. Litig.*, 120 F. Supp. 3d 340, 369 (S.D.N.Y. 2015) (quoting *Bd. of Trs. of City of Ft. Lauderdale Gen. Emps.' Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853, 882 (S.D.N.Y. 2011)). Where a plaintiff has not adequately alleged a primary violation of Section 10(b) of the Exchange Act, a Section 20(a) claim must be dismissed. *In re Arcimoto Inc., Sec. Litig.*, No. 21-CV-2143 (PKC), 2022 WL 17851834, at *8 (E.D.N.Y. Dec. 22, 2022); *accord Martin v. Arbor Realty Tr., Inc.*, No. 24-CV-5347 (PKC) (LKE), 2026 WL 878343, at *14 (E.D.N.Y. Mar. 31, 2026) ("Section 20(a) claims rise and fall with Section 10(b) claims."); *Salim v. Mobile Telesystems PJSC*, No. 19-CV-1589 (AMD) (RLM), 2021 WL 796088, at *15 (E.D.N.Y. Mar. 1, 2021) (explaining that failure to allege scienter under Section 10(b) is fatal to a Section 20(a) claim), *aff'd*, No. 21-839-CV, 2022 WL 966903 (2d Cir. Mar. 31, 2022). Because the Court has dismissed all of Plaintiffs' claims under Section 10(b) and Rule 10b-5, the Court must dismiss Plaintiffs' Section 20(a) claim.

## III. Plaintiffs' Item 303 Claim

Plaintiffs also do not sufficiently allege Defendants' failure to comply with Item 303 of Regulation S-K, (FAC, Dkt. 31, ¶ 124; Opp'n, Dkt. 46, at 12). Item 303 requires certain SEC filings to describe "any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(b)(2)(ii). Plaintiffs appear to assert that an Item 303

violation is separately actionable. (FAC, Dkt 31, ¶ 24 ("Separately, Defendants were required to comply with Item 303.").) Not so. *See Pension Tr. Fund for Operating Eng'rs v. Clarivate Plc*, 826 F.Supp.3d 296, 335 (E.D.N.Y. 2026). "'[T]he failure to disclose information required by Item 303 can[not] support a private action under Rule 10b-5(b)' unless the failure renders any 'statements made' misleading." *Smith v. Gap, Inc.*, No. 25-1130, 2026 WL 1502033, at *5 (2d Cir. May 28, 2026) (summary order) (second alteration in original) (quoting *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 260 (2024)). Put otherwise, "[f]or Defendants' breach of their Item 303 duty to be actionable under Section 10(b), Plaintiffs [are] required [to] adequately . . . plead each element of a 10b–5 securities fraud claim." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 103 (2d Cir. 2015), *abrogated on other grounds by Macquarie*, 601 U.S. 257. Here, even assuming that Plaintiffs could allege materiality under Item 303, Plaintiffs' claim must be dismissed because the "[C]omplaint does not give rise to a strong inference of scienter." *Id.* at 106; *accord Amorosa v. Gen. Elec. Co.*, No. 21-CV-3137 (JMF), 2023 WL 3847161, at *3 n.2 (S.D.N.Y. June 6, 2023); *In re Gen. Elec. Sec. Litig.*, 844 F. App'x 385, 387–89 (2d Cir. 2021) (summary order).

## IV. Leave to Amend

Plaintiffs have moved for leave to amend their pleading, (*see* Opp'n, Dkt. 46, at 22 n.12), "albeit in a cursory footnote at the end of their response brief," *see Schiro*, 396 F. Supp. 3d at 308. Under Rule 15(a), a court "should freely give leave" to a party to amend its pleading "when justice so requires." Fed. R. Civ. P. 15(a)(2). This rule is a "permissive standard," *Loreley*, 797 F.3d at 190 (quoting *Williams v. Citigroup Inc.*, 659 F.3d 208, 212–13 (2d Cir. 2011)), although leave to amend may be denied "for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party," *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (citation omitted).

The Court grants Plaintiffs' request for leave to amend under Rule 15. (*See* Opp'n, Dkt. 46, at 22 n.12.) Although the Court is "skeptical that the flaws in the Amended Complaint can be remedied, the Court will allow Plaintiffs to amend their pleading." *Schiro*, 396 F. Supp. 3d at 309. Notably, even where, as here, Plaintiffs "have not specified how they would amend their pleading if granted leave to do so, the Second Circuit has admonished district courts that 'complaints dismissed under Rule 9(b) are almost always dismissed with leave to amend.'" *Id.* (quoting *Pasternack v. Shrader*, 863 F.3d 162, 175 (2d Cir. 2017)). Because Plaintiffs have not yet had an opportunity to amend their complaint in response to a court order pointing out the deficiencies in their pleading, the Court will afford them an opportunity to do so.[29]

**CONCLUSION**

For the reasons stated herein, the Court grants Defendants' Motion to Dismiss its entirety.[30] Plaintiffs have failed to state a claim for relief under Section 10(b), Rule 10-b5, or Section 20 of the Exchange Act. Plaintiffs have until October 27, 2026 to file a Second Amended Complaint, after which Defendants will have twenty-one (21) days to answer or file a pre-motion conference

---

[29] Plaintiffs are warned, however, that if the Court grants a motion to dismiss the Second Amended Complaint, the Court will not grant further leave to amend after this instance, "unless Plaintiffs provide a detailed indication of what facts they would add to cure the pleading's defects (and, ideally, a redlined proposed Third Amended Complaint) with an explanation of why the amendment would not be futile." *Schiro*, 396 F. Supp. 3d at 309. Indeed, the Court notes that Plaintiffs have already had an opportunity to amend their complaint to allege greater specificity. (*Compare* Compl., Dkt. 1 (totaling 61 pages), *with* FAC, Dkt. 31 (totaling 74 pages).)

[30] The PSLRA requires that the Court "include in the record specific findings regarding compliance by each party and each attorney representing any party with each requirement of Rule 11(b) of the Federal Rules of Civil Procedure as to any complaint, responsive pleading, or dispositive motion." 15 U.S.C. § 78u–4(c)(1). Here, neither the claims nor defenses were harassing or frivolous, and all factual contentions had evidentiary support or were reasonably based on belief or a lack of information. *See* Fed. R. Civ. P. 11(b). Furthermore, Defendants have not affirmatively alleged any improper conduct or moved for sanctions. *See id.* In accordance with the PSLRA, the Court finds that the parties and counsel in this matter have complied with Rule 11(b).

request to file a second motion to dismiss. If Plaintiffs fail to file a Second Amended Complaint by that date, this case will be dismissed with prejudice.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: September 29, 2026
Brooklyn, New York